QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
Andrew J. Bramhall (Bar No. 253115)
andrewbramhall@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:      (650) 801-5000
Facsimile:       (650) 801-5100

WINSTON & STRAWN LLP
Katherine Vidal (SBN: 194971)
KVidal@winston.com
275 Middlefield Road, Suite 205
Menlo Park, California 94025-4004
Telephone:      (650) 858-6500
Facsimile:       (650) 858-6550

Attorneys for Defendant
NATERA, INC.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Anne S. Toker (*pro hac vice*)
annetoker@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone:      (650) 801-5000
Facsimile:       (650) 801-5100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC., | CASE NO. 3:21-CV-04062-EMC |
| Plaintiff, | **NATERA, INC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT THEREOF** |
| vs. | |
| NATERA, INC., | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................3

    A.    Natera Launches The Signatera Molecular Residual Disease ctDNA Test ..............3

    B.    Guardant Releases Reveal, A Tumor-Naïve MRD Test ............................................3

    C.    Measuring Performance Of A ctDNA Test .................................................................3

    D.    The Parikh Study ........................................................................................................5

    E.    As Part Of A New "Product Launch" Sales Campaign, Guardant Falsely Advertises Reveal As Having Properties Unsupported By Data .............................7

        1.    Guardant Falsely Claims That Reveal Has Higher Specificity Than CEA In The Surveillance Setting ....................................................................9

        2.    Guardant Falsely Claims Sensitivity Of 91% In The Surveillance Setting..................................................................................................................10

        3.    Guardant Falsely Claims Its "100% PPV" Can Identify Early-Stage CRC Patients Who May Benefit From Adjuvant Therapy ........................11

        4.    Guardant Falsely Claims That Reveal Has A Greater Lead Time Than Current Methods ..............................................................................13

    F.    Guardant Deployed A Substantial New Salesforce To Spread Misinformation To Doctors ......................................................................................13

LEGAL STANDARD ..........................................................................................................13

ARGUMENT ......................................................................................................................14

I.    NATERA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS...................14

    A.    Guardant Makes Multiple Literally False And Misleading Statements ..................15

        1.    Guardant's Claimed Specificity Under The Surveillance Setting Is Not Reported In The Parikh Study Or Anywhere Else ...............................16

        2.    Guardant's Claimed 91% Sensitivity In The Surveillance Setting Is Manipulated And Unexplained ........................................................17

    B.    Guardant's Advertisements Deceive Its Customers.................................................19

    C.    Guardant's Misstatements Are Material ..................................................................19

    D.    Guardant's False Statements Entered Interstate Commerce ....................................20

    E.    Natera Has Been Harmed By Guardant's False Statements .....................................20

II.     NATERA AND THE PUBLIC HAVE BEEN AND WILL CONTINUE TO BE
        IMMINENTLY AND IRREPARABLY HARMED BY GUARDANT'S
        CONDUCT.................................................................................................................21

III.    GRANTING THE REQUESTED RELIEF FURTHERS THE PUBLIC INTEREST ........23

IV.     THE BALANCE OF EQUITIES IS IN NATERA'S FAVOR ............................................23

V.      NO BOND SHOULD BE REQUIRED ..............................................................................23

CONCLUSION ...................................................................................................................................24

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

**Cases**

*Alliance for Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011).........................................................................................14

*California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*,
766 F.2d 1319 (9th Cir. 1985).........................................................................................24

*Comet Techs. United States of Am. Inc. v. Beuerman*,
No. 18-cv-01441, 2018 WL 1990226 (N.D. Cal. Mar. 15, 2018)...........................23, 24

*Hall v. Bed Bath & Beyond, Inc.*,
705 F.3d 1357 (Fed. Cir. 2013).......................................................................................19

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989)...........................................................................................20

*Illumina, Inc. v. Qiagen, N.V.*,
207 F. Supp. 3d 1081 (N.D. Cal. 2016) ..........................................................................22

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009)...................................................................................23, 24

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
299 F.3d 1242 (11th Cir. 2002).......................................................................................19

*Jorgensen v. Cassiday*,
320 F.3d 906 (9th Cir. 2003)...........................................................................................24

*Kurin, Inc. v. Magnolia Med. Techs., Inc.*,
473 F. Supp. 3d 1117 (S.D. Cal. 2020) ...........................................................................15

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*,
887 F. Supp. 1323 (N.D. Cal. 1995) ...............................................................................14

*Miller ex rel. NLRB v. California Pac. Medical Ctr.*,
19 F.3d 449 (9th Cir. 1993).............................................................................................23

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*,
290 F.3d 578, 590 (3d Cir. 2002).....................................................................................15

*POM Wonderful LLC v. Purely Juice, Inc.*,
No. 07-cv-02633, 2008 WL 4222045 (C.D. Cal. July 17, 2008).....................................19

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991)...........................................................................................21

*Seed Servs. v. Winsor Grain, Inc.*,
868 F. Supp. 2d 998 (E.D. Cal. 2012) .............................................................................21

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134, 1139 (9th Cir. 1997) ........................................................ 14, 15, 18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ............................................................................. 21

*Suzie's Brewery Co. v. Anheuser-Busch Companies, LLC*,
   No. 3:21-CV-178-SI, 2021 WL 472915 (D. Or. Feb. 9, 2021) ......................... 21, 22

*ThermoLife Int'l, LLC v. Compound Sols., Inc.*,
   848 F. App'x 706 (9th Cir. 2021) ........................................................................ 15

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007) ........................................................................ 15, 20

*TrafficSchool.com v. Edriver, Inc.*,
   653 F.3d 820 (9th Cir. 2011) ............................................................................. 20

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
   793 F.2d 1034, 1040 (9th Cir. 1986) ................................................................... 19

*Verigy US, Inc. v. Mayder*,
   No. C07-04330RMWHRL, 2007 WL 2429652 (N.D. Cal. Aug. 24, 2007) ............. 21

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ........................................................................................... 23

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
   758 F.3d 1069 (9th Cir. 2014) *as amended* (Mar. 11, 2014) ............................... 14

*Winter v. Natural Resources Defense Council*,
   555 U.S. 7, 129 S. Ct. 365 (2008) ....................................................................... 14

## **Statutory Authorities**

15 U.S.C. § 1116 ...................................................................................................... 20

**INTRODUCTION**

Natera files this Application for a Temporary Restraining Order to stop Guardant from disseminating false and misleading statements inflating the performance of Reveal, its newly released circulating tumor DNA ("ctDNA") test.  These statements are being made as part of a sweeping new "Product Launch" sales campaign commenced on or around July 15, 2021.  To promote Reveal, Guardant is blitzing physicians with deceptive and baseless performance claims that put patient health at risk.  Natera respectfully requests that the Court evaluate and put a halt to Guardant's reckless and irresponsible distribution of misinformation.

Natera is the market leader in non-invasive genetic testing for colorectal cancer ("CRC"), having launched its "tumor-informed" minimal/molecular residual disease ("MRD") detection test called Signatera in August 2017.  In February 2021, Guardant released its first MRD test for CRC: a "tumor-naïve" test called Reveal.  Rather than create a superior product, Guardant is seeking to play catch-up by misleading physicians as to their test's true performance, a practice that can have dire consequences for cancer patients.

Specifically, Guardant has recently launched a new aggressive, nationwide "Product Launch" campaign for Reveal.  On July 15, 2021, its sales team sent out an email blast disseminating numerous false and misleading performance claims for Reveal, including its ability to predict cancer recurrence. This new email is just the tip of the spear of Guardant's new sales push, which also involved hiring, training, and deploying a substantial national sales team to bombard physicians with false claims to persuade them to ditch Signatera and order Reveal.

Guardant's July 15, 2021 email to a Signatera customer makes a series of false claims that will mislead healthcare providers into believing Reveal is a more effective MRD test than it really is, to patients' detriment.  The email claims that, in the critical surveillance setting, Reveal has higher "specificity" (the ability to accurately detect true negative results) than the non-ctDNA standard of care, Carcinoembryonic Antigen ("CEA") testing.  Specificity is a key metric in MRD testing because it tells doctors how likely a positive result is false.  False positives can lead to unnecessary medical treatment, including chemotherapy, which can involve substantial side effects, even death.  There is no peer-reviewed published data on Reveal's specificity in this setting and the only study to test

Reveal's performance in the relevant context defined "surveillance" in a way that **makes it impossible to determine specificity**:  the study cohort was designed such that there were no negative patients in the surveillance setting.  Without negative patients, there can be no data to show that Reveal correctly identified a negative patient or falsely identified them as positive.[1]  Guardant nevertheless is making claims to physicians about specificity that could cause cancer physicians to forego CEA testing in favor of Reveal.

What is more, Guardant's sales personnel are also claiming a 91% sensitivity for Reveal in the surveillance setting without informing doctors that Guardant concocted this number by ignoring seven patients (out of 29) who received false negative results.  Sensitivity is a crucial metric for patients, as it refers to the ability of the test to reliably detect true positive results—i.e., that there is actually ctDNA in the patient's blood.  When the seven excluded patients are included as they must be, Reveal's sensitivity is 69%, meaning that more than 30% of positive results are wrong.[2]  Guardant misleadingly omits any mention of the actual sensitivity number and thus fails to provide critical data to physicians who are considering Reveal.  A patient who receives a false negative result may miss a cancer recurrence, and miss the chance for a life-saving surgery before the cancer spreads.

To make the best decisions for their patients, physicians must be able to understand the true performance of the tests on which they rely.  Guardant's recklessly false and misleading advertising of inflated metrics for Reveal will induce physicians to choose Reveal over other tests and result in negative outcomes for cancer patients, including unnecessary and potentially harmful post-surgical treatments.  Each of Guardant's claims is thus putting patient's physical, economic, and emotional well-being at risk.  Guardant's statements are likely to cause irreparable harm to Natera in the form of lost sales of Signatera, lost opportunity costs, and impaired goodwill and reputation.

While Natera welcomes and indeed encourages vigorous scientific debate, it cannot allow healthcare providers and their patients to be deceived by gross misrepresentations.  A temporary restraining order is necessary until the Court has an opportunity to rule on Natera's forthcoming

---

[1]   Under these circumstances, Reveal's specificity could have been 0%, 100%, or literally anywhere in between.

[2]   When the study data was presented pre-publication, the authors appropriately included the seven false-negative patients, and accordingly nowhere reported a sensitivity of 91%.

1  motion for a preliminary injunction to prevent Guardant's further dissemination of false and

2  misleading claims, protect informed physician decision-making, and protect patient health.

3  **FACTUAL BACKGROUND**

4  **A.    Natera Launches The Signatera Molecular Residual Disease ctDNA Test**[3]

5  In August 2017, Natera launched Signatera, a bespoke ctDNA test designed to detect and

6  measure MRD in patients previously diagnosed with cancer, to aid detection of cancer recurrence.

7  Aleshin Decl. ¶ 3.  By detecting the presence of MRD—which is a small number of cancer cells that

8  remain in a patient's body after treatment such as surgery and/or chemotherapy—MRD tests have

9  proven to be important for treatment of cancer patients, as they can inform whether a patient's cancer

10 is likely to recur.  *Id.* ¶ 4.  Such tests guide physicians, and patients, in determining whether or not

11 additional therapies are needed to prevent recurrence.  Signatera's performance has been clinically

12 validated in multiple cancer types including CRC, non-small cell lung, breast, and bladder cancers.

13 *Id.* ¶ 5.

14 **B.    Guardant Releases Reveal, A Tumor-Naïve MRD Test**

15 In February 2021, Guardant released "Reveal," a "tumor-naïve" MRD test for detecting

16 ctDNA.  *Id.* ¶ 6.  Reveal has been validated in CRC but, unlike Signatera, no other cancers.  *Id.*  To

17 date, there is a single peer-reviewed publication that describes and analyzes aspects of Reveal's

18 performance in the intended use population under certain narrow circumstances[4]—a study that was

19 supported and co-authored by Guardant.  *Id.* ¶ 13.

20 **C.    Measuring Performance Of A ctDNA Test**

21 Researchers rely on widely accepted key metrics to evaluate the performance of a ctDNA test

22 like Signatera or Reveal, in particular sensitivity and specificity.  *Id.* ¶ 7.  These refer to an assay's

23 ability to detect true positives and true negatives, respectively.  *Id.* ¶¶ 9-10.  Tests may also be

24

25    [3]  Natera is providing information about Signatera only for context.  The claims addressed in this TRO pertain solely to Guardant's claims about its own test's performance.

26    [4]   There is one other published study of Reveal's performance, but it is in the context of

27 neoadjuvant therapies—that is, therapies delivered ***before*** the main cancer treatment (e.g., surgery)— rather than the adjuvant therapies that are the focus of Guardant's marketing and this TRO—therapies

28 that are delivered ***after*** the main cancer treatment.  Aleshin Decl. ¶ 13.

evaluated using additional metrics, such as positive predictive value ("PPV"), negative predictive value ("NPV"), and diagnostic lead time (the time between first MRD detection and confirmed radiographic recurrence).  *Id.* ¶ 7.

Physicians are particularly interested in how tests perform on these metrics longitudinally.  *Id.* ¶ 8.  Longitudinal analysis determines how well test performance holds up over time, and most closely approximates the situations encountered by physicians in real-world clinical contexts.  *Id.*  In the MRD context, "longitudinal" is understood to mean analysis of patients with any subsequent blood draw after the initial timepoint—e.g., the completion of surgery—no matter how much time has passed following the initial blood draw.  *Id.*

Sensitivity measures the percentage of true ***positive*** patients that are correctly identified.  *Id.* ¶ 9.  A test with high sensitivity is more likely to correctly identify the presence of cancer in a blood sample in which MRD is in fact present, as verified by a clinical "gold standard," such as clinical or radiographic recurrence—i.e., observing a tumor.  *Id.*  However, sensitivity does not indicate the number of false positives for an assay.  *Id.*  A test could achieve a 100% sensitivity score by simply issuing a positive test report for every patient—but every true negative, cancer-free patient would be a false positive.  *Id.*  Because a test with a high sensitivity metric could have a low specificity rate, a standalone measure of sensitivity is meaningless to a physician in assessing the performance of a ctDNA test.  *Id.*  For that, an additional metric—specificity—is also required.  *Id.*

Specificity measures the percentage of ***negative*** results that are correctly identified.  *Id.* ¶ 10.  In the 100% sensitivity test example above, the specificity would be a very low score because the test would miss every true negative patient.  *Id.*  A test with high specificity is more likely to correctly identify the ***absence*** of cancer in a blood sample when no MRD is in fact present, as verified by a clinical "gold standard," including that the patient remains relapse-free or progression-free.  *Id.*

Because sensitivity and specificity are related in this way, it is imperative that sensitivity and specificity be reported together, and from the same patient cohort.  *Id.* ¶ 12.  If a laboratory paired results from a study with high sensitivity (but low specificity) with results from a study with high specificity (but low sensitivity), it could claim "high sensitivity ***and*** high specificity," completely masking its low sensitivity and low specificity results.  *Id.*  Accordingly, established scientific practice

as well as guidance from regulatory authorities and professional organizations, such as the U.S. Food and Drug Administration ("FDA") and other federal agencies responsible for administering the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), the New York State Department of Health, and the College of American Pathologists ("CAP") require or recommend that labs demonstrate satisfactory sensitivity **and** specificity measures in order to be accredited.  *See, e.g.*, Ex. P at 21; Ex. Q at 69; Ex. R at 5, 42; *see also* Aleshin Decl. ¶ 11.  For this reason, a study that measures **only** sensitivity or **only** specificity is not clinically relevant and should not be used to form the basis of performance-based marketing claims.  *Id.*

PPV is related to specificity, and NPV is related to sensitivity.  PPV is defined as the probability that patients with a positive test result truly have MRD, while NPV is defined as the probability that subjects with a negative test result truly don't have MRD.  *Id.* ¶ 7.

**D.     The Parikh Study**

Guardant's claims regarding the performance of Reveal are generally based on a single peer-reviewed scientific paper, Aparna R. Parikh et al., *Minimal Residual Disease Detection using a Plasma-Only Circulating Tumor DNA Assay in Colorectal Cancer Patients*, 021 Clinical Cancer Res. OF1, *available at* https://clincancerres.aacrjournals.org/content/early/2021/06/22/1078-0432.CCR-21-0410.full-text.pdf ("Parikh") (Ex. A).  Guardant has not identified any other research or data, whether internal or external, peer-reviewed or unpublished, that could support its latest performance claims. Aleshin Decl. ¶ 13.

Parikh analyzed three sets of data, with each set excluding patients from, or adding patients to, the previous set.  *Id.* ¶ 14.  The analysis of the first data set was referred to as the "landmark" analysis.  *See* Parikh at OF4.  In this "landmark" analysis, Parikh reported sensitivity of 55.6% and specificity of 100%.[5]  Notably, the 100% specificity was only achieved by **excluding two patients** who had clinical follow-up of less than one year—a non-standard and unexplained way to measure specificity. *Id.* ¶ 15. Further, despite first having reported this data in a poster presented at the 2019 ASCO Conference

---

[5]   This is the specificity at one moment in time.  Specificity over a period of time (surveillance) is the clinically relevant specificity, and cannot be calculated from the Parikh patient cohort.

(Ex. B),[6] the Parikh authors never went back to follow up on those two patients despite nearly 2 years elapsing between ASCO 2019 and the publication of Parikh.  Aleshin Decl. ¶ 16.  Specificity *without* excluding those patients—whose results were false positives—was only 95.4%, as also reported in Parikh.  Parikh at OF4.  And, in that same analysis, Parikh reported a PPV of 100% only after excluding those two patients, thereby increasing the PPV from 15 of 17 (or 88%) to 15 of 15 (the indicated 100%).  Aleshin Decl. ¶ 15.  If patients are deemed positive by Reveal, despite being clinically negative, and physicians believe the false 100% PPV claim, those patients are likely to be subjected to potentially dangerous and unnecessary chemotherapy.  *Id.*

Parikh's analysis of the second set of data was referred to as the "longitudinal" analysis.  Parikh defined the "[l]ongitudinal timepoints" to include in this analysis as "patients who had subsequent draws after their 'landmark' timepoint."  Parikh at OF2.  In this analysis, Parikh reported a 69% sensitivity based on positive results in 20 of 29 patients.  *Id.* at OF4.

Parikh's analysis of the third set of data was referred to as the "surveillance" analysis.  To perform this "surveillance" analysis, Parikh departed from medical convention by inexplicably defining the "surveillance" data set to include only "patients with evaluable 'surveillance' draws," in turn defined by Parikh as "draw[s] obtained within 4 months of clinical recurrence."  Parikh at OF4; *see* Aleshin Decl. ¶ 19.[7]  The consequence of this esoteric definition was that 7 patients out of 29 were excluded from the "surveillance analysis."  *Id.* ¶¶ 19, 22.  Importantly, the 7 patients that were excluded all constituted false negative results—that is, negative Reveal test results despite their cancer eventually recurring—in the "longitudinal" analysis.  *Id.* ¶ 19.  Instead of conducting surveillance blood draws to determine whether these patients' test results continued to be false negatives (and thereby would have reduced the sensitivity %), Parikh simply defined "surveillance" after the fact so as to exclude those patients.  *Id.*

Further, in its "surveillance" analysis, Parikh reported sensitivity without any corresponding specificity number.  *Id.* ¶ 20.  Sensitivity without the corresponding specificity is, at best, clinically

---

[6]  The Parikh authors presented posters at two other conferences: ESMO 2019 and ESMO 2020. *See* Exs. C-D.

[7]  This definition was also an unexplained deviation from Parikh's IRB-approved statistical analysis plan.  *See* Parikh OF3; Aleshin Decl. ¶ 22.

irrelevant, and at worst, false and misleading.  Why did Parikh omit this critical metric?  The cohort observed by Parikh in the "surveillance" analysis had 100% recurrence within 4 months of the "surveillance" draw.  Since specificity measures the percentage of negative results that are correctly identified, and the cohort was defined to have no negative results, it was impossible for Parikh to determine specificity corresponding to the reported 91% sensitivity in Parikh's "surveillance" analysis.  *Id.*  Parikh did not report specificity because it could not.[8]

The progression of which patients were added or excluded from each of the three data sets ("landmark," "longitudinal," and "surveillance") in Parikh in relation to the prior data set is depicted in Figure 3B, which is reproduced below:



Parikh at OF6.

### E.    As Part Of A New "Product Launch" Sales Campaign, Guardant Falsely Advertises Reveal As Having Properties Unsupported By Data

On July 15, 2021, Guardant sent a "Product Launch" email blast to customers and potential customers, introducing Reveal and stating that:

> The Guardant Reveal test is a blood-only liquid biopsy test that detects residual and recurrent disease in 7 days from a simple blood draw.  The test improves the management of early-stage CRC patients by detecting circulating tumor DNA (CtDNA) in blood after surgery to identify patients with residual disease who may benefit most from adjuvant therapy, and by detecting recurrence months earlier than current standard-of-care methods like carcinoembryonic antigen (CEA) tests or imaging.  The first indication of the test is early-stage CRC, where the unmet medical

---

[8]    As explained, specificity measures how well a test detects "true negatives."  In the Parikh patient cohort, there were no "true negatives" to be found.

need exists given current tools, with additional cancer types to follow.

Guardant Reveal has two main applications for your early stage (II and III) colorectal cancer patients:

- After surgical resection to help with post-surgical chemotherapy decisions in stage II low-risk patients
  - If ctDNA is positive in the post-surgical setting for a stage 2 CRC patient, our studies have shown that Guardant Reveal has a 100% PPV, meaning the cancer recurred in 100% of those patients.  This is another tool to help you make your post-surgical therapy decisions.  Guardant Reveal has a TAT of 7 days, helping to start adjuvant therapy in the optimal timeframe.
  - *If you knew post-surgery that cancer DNA was still present and that the patient has a high risk of recurrence, would that help make adjuvant therapy decisions for your stage 2 CRC patients?*
- In the surveillance setting to reliably identify the recurrence of active disease in CRC patients
  - With a higher sensitivity and specificity than CEA, Guardant Reveal performs much better than other tools in the surveillance setting and is an actual measure of the cancer in the blood, not a surrogate.  Guardant Reveal has a 91% sensitivity in the surveillance setting.
  - *Would you consider adding Reveal alongside CEA testing to get more accurate information from a simple blood draw?*

Ex. E.

This short email, which is the tip of the spear of the sweeping new sales campaign by Guardant and was likely sent to dozens if not hundreds of physicians around the country, is rife with false and misleading statements, including that Reveal has the following performance:

- Reveal has higher specificity than CEA in the surveillance setting;
- Reveal has a 91% sensitivity in the surveillance setting;
- Reveal's PPV is 100% and can have benefits in patients with stage 2 colorectal cancer, including identifying patients who may benefit most from adjuvant therapy; and
- Reveal has a greater lead time for detecting MRD than current methods.

These claimed performance metrics either lack any support in the Parikh study—the only published study that has ever reported the performance of Reveal in anything approximating a "surveillance" setting—or severely distort what Parikh actually reported about Reveal.  The false and misleading statements that Guardant is now making to promote and drive sales of Reveal are not only irresponsible but also dangerous.  As explained in more detail below, physicians and patients alike will suffer from Guardant's misinformation.

1.   <u>Guardant Falsely Claims That Reveal Has Higher Specificity Than CEA In The Surveillance Setting</u>

Despite there being absolutely no evidence of Reveal's specificity—how good the test is at accurately detecting the absence of MRD—in the surveillance context, Guardant has begun falsely claiming that Reveal has higher specificity than CEA in that context.[9]  Ex. E at 2 ("***With a higher sensitivity and specificity than CEA***, Guardant Reveal performs much better than other tools ***in the surveillance setting*** and is an actual measure of the cancer in the blood, not a surrogate.") (emphases added).  This claim is false and misleading.

The only published study of Reveal's performance in the "surveillance" context is Parikh—a publication that says nothing about specificity.  Aleshin Decl. ¶ 24.  In fact, because Parikh's "surveillance" analysis was defined to exclude any data from which a specificity measure can be calculated, there were no true negatives to find or miss.  *See id.*  Since all patients recurred, they all necessarily developed MRD at some point before recurring; it is thus impossible, in the patient population defined for the "surveillance" analysis of Parikh, to determine how accurate Reveal was at detecting the absence of MRD.  *Id.*  In other words, in that patient population, it is impossible for any patient to have a false positive test result.  *Id.*

Claims by Guardant about Reveal's specificity mislead healthcare professionals into believing that they can rely upon Reveal in clinical surveillance contexts.  *Id.* ¶ 25.  Physicians will be misled into believing that, in a surveillance context, negative Reveal test results correctly identify no MRD being present in the patient more accurately than CEA does—despite the fact that there is no evidence whatsoever regarding what percentage of negative Reveal test results accurately identify the absence of MRD—much less that this percentage (specificity) is higher than CEA's.  *Id.*

The real-world consequences of Guardant's misinformation regarding the effectiveness of Reveal puts patients at unnecessary risk and creates waste and inefficiency in healthcare.  *Id.* ¶ 26.  For example, should physicians rely on Reveal in ways that are medically and scientifically unsupported but are nevertheless promoted by Guardant, they will be led to believe that Reveal can

---

[9]   CEA refers to a carcinoembryonic antigen, which is a protein that may be present at elevated levels in patients with certain cancers, including CRC.  A CEA test determines the presence of this tumor marker.

accurately identify the absence of MRD more often than CEA can, with absolutely no supporting evidence. *Id.* When physicians are misled into choosing Reveal over CEA, patients will be misinformed that they have tested positive for MRD, potentially causing patients to undergo unnecessary biopsies, surgeries, chemotherapy, radiation treatment, or other invasive and damaging procedures; cause emotional trauma to the patient and her loved ones; and needlessly waste time and other resources on expensive medical care. *Id.*

2. <u>Guardant Falsely Claims Sensitivity Of 91% In The Surveillance Setting</u>

In its July 15, 2021 "Product Launch" email, Guardant further claims that Reveal's sensitivity in the surveillance setting is 91%. Ex. E at 2 ("Guardant Reveal has a 91% sensitivity in the surveillance setting."). This claim is also false and misleading.

To physicians and researchers in this field, the term "surveillance" has an accepted meaning: time points or periods after the completion of definitive treatments, such as follow-up testing when there are no signs of cancer after treatment. Aleshin Decl. ¶ 27. Guardant's own clinical surveillance program based on Reveal includes a schedule of surveillance draws that extends ***five years*** after surgery and contemplates blood draws once ***every 6 months in years 2-5***. Ex. F. Yet, Guardant's claim of 91% sensitivity is not supported by the relevant analysis in Parikh. *See* Aleshin Decl. ¶¶ 27-28. The only sensitivity measure relevant to clinical surveillance settings reported in Parikh is the measure calculated from its "longitudinal" analysis, as that is the only analysis that looks at patients' recurrence any time after initial cancer treatment. *Id.* ¶ 27. In that analysis, however, Parikh reported a sensitivity measure of only 69%—not 91%. *Id.*

Instead of reporting the 69% sensitivity that is actually relevant to clinical surveillance, Guardant conflates the esoteric "surveillance" analysis as defined in Parikh with the clinically relevant surveillance context to mislead physicians.[10] To arrive at 91%, Guardant cherry-picks the sensitivity measure that Parikh reported for Reveal in its peculiar "surveillance" analysis that ***excluded*** patients from the analysis if they had not recurred within 4 months of their surveillance blood draw—in

---

[10] Highlighting the meaninglessness of Guardant's 91% sensitivity metric, none of the three posters the Parikh authors presented before publishing the Parikh paper reported a sensitivity of 91%. Exs. B-D.

marked contrast to Guardant's advertised "surveillance program," which recommends blood draws every 6 months. *Id.* ¶ 28; *see* Ex. F. But, in the real world, patients can recur many months—even years—after such surveillance. Aleshin Decl. ¶ 28. By focusing only on Parikh's arbitrary "surveillance" analysis, Guardant was conveniently able to—inconsistent with its own clinical recommendations for Reveal—cherry-pick an analysis that excluded 7 patients whose test results had been false negative (i.e., Reveal tested negative for MRD despite those patients' eventual recurrence). *Id.*

In clinical surveillance settings, if physicians rely on Reveal as promoted by Guardant, they will be led to believe that Reveal can accurately identify the presence of MRD in 91% of patients, whereas the evidence only supports an accuracy of 69%—far lower than Guardant falsely and misleadingly advertises. *Id.* ¶ 30. 69% sensitivity means 31%, or nearly a third, of results are false negatives. False negative test results may cause a patient to forego biopsies, surgeries, chemotherapy, radiation treatment, or other procedures necessary to prevent recurrence. *Id.* These false claims by Guardant may put patients' lives at risk.

Independently, Guardant's focus on a sensitivity of 91% in the surveillance context is false and misleading because in Parikh's "surveillance" analysis, there is no corresponding specificity reported. *Id.* ¶ 29. As discussed, sensitivity must be reported together with specificity from the same cohort to be clinically relevant. Contrary to Guardant's claims, it is impossible for physicians to evaluate the effectiveness of Reveal given the complete absence of data validating Reveal's specificity in that context. *Id.* Without any supporting data, Guardant cannot make any claims about sensitivity in the surveillance context without being inherently misleading about the overall performance of Reveal. *Id.*

       3.    <u>Guardant Falsely Claims Its "100% PPV" Can Identify Early-Stage CRC Patients Who May Benefit From Adjuvant Therapy</u>

Guardant's false and misleading advertising of cherry-picked data from Parikh does not end with the 91% sensitivity. It also falsely and misleadingly claims that Reveal helps physicians make adjuvant-therapy decisions for early-stage CRC patients based on its false and misleading claim that its "studies have shown that Guardant Reveal has a 100% PPV." Ex. E at 2.

First, not only is there a ***single*** study (Parikh)—not multiple stud*ies*—on Reveal's performance

in the relevant context, that single study determined that only 15/17 patients (or 88%) who tested positive experienced a recurrence—i.e., a PPV of 88%. Aleshin Decl. ¶ 31. Cherry-picking Parikh's reported 100% figure could be done only by selectively—and arbitrarily—excluding 2 false positive patients who did not have a clinical follow-up within 1 year. *Id.* When those patients are properly included, Reveal's PPV is 88%, meaning 12% of patients who would receive adjuvant therapy from being called positive will actually not need that potentially harmful therapy. *See id.*

Second, Guardant's use of this 100% PPV figure to support claims about Reveal's use to inform post-surgical adjuvant-therapy decisions for early-stage CRC patients is entirely without basis in Parikh. *Id.* ¶ 32. To start, the "landmark" timepoint that forms the basis for the 100% PPV figure in Parikh includes patients post-definitive therapy, which is to say both post-surgical and post-adjuvant patients, such that claims about Reveal's benefits at the "post-surgical" timepoint is entirely misleading. *Id.* Even more egregiously, the "landmark" analysis in Parikh included ***zero*** samples prior to initiation of adjuvant chemotherapy, beginning its entire analysis at a "landmark" timepoint *after* completion of definitive therapy. *Id.*; *see* Parikh at OF4 ("For the primary analysis, a single 'landmark' plasma specimen drawn approximately 1 month *after* completion of definitive therapy.") (emphasis added). In other words, the "100% PPV" claim was made based entirely on patients who had completed their entire course of cancer treatment. Therefore, the "100% PPV" claim has no relevance whatsoever to Reveal's ability to identify who may or may not benefit from treatment *before* adjuvant therapy. Guardant therefore has absolutely no published data regarding Reveal's performance in informing treatment decisions for patients who have had surgery and may benefit from adjuvant chemotherapy. Aleshin Decl. ¶ 32. And there is therefore no evidence to establish Guardant's claims regarding Reveal having benefits for patients "who may benefit most from adjuvant therapy." Ex. E at 2.

Finally, Guardant's claims about Reveal's benefits to early-stage CRC patients further mislead physicians given that Parikh's patient cohort included a significant percentage of late-stage (stage 4) patients. *Id.* ¶ 33; *see* Parikh at OF1.

The consequences of these misstatements are similar to those of its misstatements regarding specificity—physical, emotional, and economic harm to patients, and economic and reputational harm

to Natera.  Aleshin Decl. ¶ 34.

4. <u>Guardant Falsely Claims That Reveal Has A Greater Lead Time Than Current Methods</u>

Last, Guardant falsely claims that Reveal has a greater lead time than current methods.  *See* Ex. E at 2 (claiming that Reveal "detect[s] recurrence months earlier than current standard-of-care methods like carcinoembryonic antigen (CEA) tests or imaging").  But the only study to measure the performance of Reveal in the relevant context (Parikh) did not report lead time.  *Id.* ¶ 35.  Indeed, Guardant's witness Thereasa Rich submitted a declaration stating that Parikh was not designed to measure lead time because it did not conduct testing at regular intervals.  Dkt. 12-3 ¶ 35.  Guardant's executive team has represented to investors on earnings calls that its lead time was at least 4 months.  Ex. G at 13.  But reported studies of CEA's lead time range as high as 8 months.  Ex. S; *see* Aleshin Decl. ¶ 35.  Guardant's statements, lacking support in evidence as they do, are false and misleading.

**F.     Guardant Deployed A Substantial New Salesforce To Spread Misinformation To Doctors**

The July 15 email was not an isolated incident.  It was part of a new, massive "Product Launch" and sales effort by Guardant.  Guardant is arming a large number of newly trained sales representatives with misinformation to increase the sales of Reveal to unsuspecting physicians.  Guardant has dramatically increased the headcount of its sales team (*see* Exs. I-O), culminating in its salesforce's misleading, nationwide email blast.  *See* Ex. E.  These new hires include the author of the false and misleading July 15 email.  Ex. I.

Given these recent efforts to hire, train, and send out a new sales and leadership team (*see* Exs. V, W), additional false and misleading claims are to be expected.  Indeed, if the author of the July 15 email relied on his training in making false and unsupported statements regarding the performance of Reveal in an email blast, Natera can expect the rest of the salesforce to do so as well.  Each day that goes by in which similarly trained personnel are permitted to pursue such reckless marketing strategies will cause further injury to Natera, healthcare providers, and their patients.  A temporary restraining order is thus necessary to prevent Guardant from marketing and selling Reveal using false and misleading information until Natera's preliminary injunction motion can be heard and resolved.

**<u>LEGAL STANDARD</u>**

A plaintiff seeking a temporary restraining order must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008)) (setting forth the standard for preliminary injunction); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.,* 887 F. Supp. 1323, 1323 (N.D. Cal. 1995) ("The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction."). While a movant must "make a showing on all four prongs," a stronger showing on one of these four elements may offset a weaker showing on another. *Cottrell*, 622 F.3d at 1131, 1134-35. "[S]erious questions going to the merits and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135 (internal quotation omitted).

As set forth below, Natera meets all four elements. Therefore, the Court should enjoin Guardant from disseminating false and misleading information regarding Reveal until hearing and resolution of a preliminary injunction.

## **ARGUMENT**

## I.    **NATERA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

To succeed on a false advertisement claim under Lanham Act § 43(a), Natera must prove: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014), *as amended* (Mar. 11, 2014) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement

was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139. Natera satisfies these requirements.[11]

### A.    Guardant Makes Multiple Literally False And Misleading Statements

"When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." *Southland Sod Farms*, 108 F.3d at 1139 (9th Cir. 1997); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("[A] district court evaluating whether an advertisement is literally false must analyze the message conveyed in full context[.]") (internal quotations omitted); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586-87, 590 (3d Cir. 2002) ("A 'literally false' message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated. … [A] completely unsubstantiated advertising claim by the defendant is per se false without additional evidence from the plaintiff to that effect … .") (internal quotations omitted).

Guardant's advertising statements are literally false and are entirely unsupported, if not contradicted, by their own study. In order to gain an unfair commercial advantage, Guardant falsely claimed that its specificity under the surveillance setting is higher than that of CEA. Ex. E at 2. It further falsely claimed that its sensitivity under the same surveillance setting is 91%. *Id.* But neither of these claims are supported by Parikh or any other study, making them literally false and misleading. *See Southland Sod Farms*, 108 F.3d at 1139 ("[I]f the plaintiff can show that the tests, even if reliable, do not establish the proposition asserted by the defendant, the plaintiff has obviously met its burden of demonstrating literal falsity.") (internal quotations omitted).

---

[11]   A California false advertising claim is "substantially congruent" to a false advertising claim made under the Lanham Act. *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1128 (S.D. Cal. 2020). As a result, showing a likelihood of success on Natera's Lanham Act false advertising claims also establishes a likelihood of success on Natera's state law false advertising claims. *See ThermoLife Int'l, LLC v. Compound Sols., Inc.*, 848 F. App'x 706, 709 (9th Cir. 2021) ("[S]tate common law claims of unfair competition are 'substantially congruent' to claims made under the Lanham Act, and thus share the same analysis.").

1           1.   <u>Guardant's Claimed Specificity Under The Surveillance Setting Is Not Reported In The Parikh Study Or Anywhere Else</u>

Guardant touts numbers it does not have.  In the July 15 "Product Launch" email, Guardant claims that Reveal has "a higher … specificity than CEA … ***in the surveillance setting***" but does not point to a single number, figure, or data point in support thereof.  Ex. E at 2 (emphasis added).  It cannot, because there is none.  The only published Reveal performance study that even discusses a "surveillance setting" is the Parikh study, and yet, Parikh is completely silent on the measurement of "specificity."   Indeed, as discussed above in Section I.E.1, it would be nonsensical to mention specificity in the surveillance setting given how the Parikh study defined "surveillance" to exclude only patients whose cancer did not recur.  *See* Parikh at OF4.  If the test is able to accurately detect the absence of MRD in patients without MRD, then the test is said to have a high specificity.  However, when the presence or absence of MRD in a patient cohort is already known to the researcher prior to the study, then measuring specificity loses its significance in clinical contexts or, in Parikh's case (where all patients recurred), makes it impossible to measure specificity.

Parikh's "surveillance" analysis falls into the latter category.  Under Parikh's definition for "surveillance," Parikh only included data from patients whose cancer was known to have in fact recurred within four months after the blood draw.  Because all of these patients recurred, the researcher knew that all of them necessarily had MRD present prior to the recurrence.  In that patient cohort, there could thus be no instances of false positive Reveal test results and no meaningful specificity measurement given how the patients were selected.

In short, given Parikh's patient selection and study design, there is no evidence, no discussion, and no mention whatsoever of the false positive rate or the process for measuring specificity.  Simply put, Guardant has ***not a single shred of evidence*** regarding specificity of any kind as it relates to Reveal's performance in the surveillance context, let alone one that outperforms traditional CEA methods.  Guardant's statement in its July 15 "Product Launch" email regarding Reveal's superior specificity in the surveillance setting is literally false.  Such an egregious sales tactic brings a host of harm to competitors such as Natera.  *See infra*, Section II.

Even setting aside the negative impact to Natera, Guardant's false statements should not be

MEMORANDUM OF POINTS AND AUTHORITIES ISO APPLICATION FOR TRO

tolerated, given their high likelihood of causing significantly adverse real-world consequences.  For example, a healthcare provider misled into believing Reveal's self-claimed superior specificity may decide to rely solely on Reveal in determining that the patient has MRD and therefore at high risk of cancer recurrence when the result is in fact a false positive.  The doctor then may, again, be misled by Reveal's claimed superior specificity into thinking the patient requires further treatments, thereby subjecting the patient to unnecessary invasive and damaging procedures such as chemotherapy.  A physician who counsels a patient to undergo such therapies based on a positive Reveal test result under the false belief that that patient does have MRD (and whose cancer is therefore likely to recur) may well be making a mistake based on unwarranted trust in Reveal's results.  A physician who informs treatment decisions based on Reveal test results may be unwittingly violating her oath to "do no harm."

        2.    <u>Guardant's Claimed 91% Sensitivity In The Surveillance Setting Is Manipulated And Unexplained</u>

Guardant's email further claims to its customers that Reveal "has a 91% sensitivity in the surveillance setting."  Ex. E at 2.  This statement is false and misleading on many levels.  This 91% sensitivity data appears to come from Parikh, the only peer-reviewed study that reported sensitivity measurement in the surveillance setting.  However, how Parikh arrived at this 91% number is problematic and demonstrably false in light of Guardant's own marketing regarding the use of Reveal for surveillance.

In Parikh, the only clinically relevant performance data is from the study's "longitudinal" analysis, and that analysis reported a sensitivity score of 69%—far from the manufactured 91% that Guardant now touts.  Parikh at OF6; *see* Aleshin Decl. ¶ 27.  Perhaps knowing that a sensitivity of 69% is unimpressive, Guardant cherry-picked data from Parikh's non-clinically relevant "surveillance" analysis to boost Reveal's performance.  As discussed in Section I.E.2, in order to arrive at 91% sensitivity, the data Guardant cherry-picked intentionally ***excluded*** patients from the surveillance analysis if they had not recurred within four months of their surveillance blood draw.  This means that all patients that recurred more than four months after the surveillance blood draw, even if they had MRD present in their blood ***that Reveal failed to detect***, are not part of the statistics.

This approach is fundamentally flawed and makes any claims based on it inherently misleading, as it relies on defining "surveillance" in a clinically irrelevant manner.  Recurrence comes in all shapes and sizes and varies by individual.  Not everyone will experience recurrence in the same window.[12]  Because of this, Guardant's own surveillance program for Reveal contemplates ongoing surveillance blood draws every 3 months from 0-2 years after surgery and *every 6 months in the next three years*.  Ex. F at 2.  Thus, the narrow four-month window that Parikh arbitrarily set excluded patients who might have MRD present at the time of blood draw but developed recurrence outside of that window.  These patients would be critical in calculating sensitivity data but were excluded for no sound reason, which wasn't contemplated in Parikh's statistical analysis plan.  Parikh OF3.  Parikh does not provide any justification for selecting four months as a limit; nor had its authors ever bothered to report the artificial 91% sensitivity measure in three posters presented prior to publication of Parikh.  *See* Exs. B-D.

By cherry-picking the analysis in Parikh setting the "surveillance" window in a clinically-irrelevant manner, Guardant excluded a total of seven patients (nearly a third of the total patient population) whose test results had been false negative.  Had Guardant truthfully reported those seven patients as false negative, the sensitivity in the surveillance setting would have remained the unimpressive 69% from Parikh's "longitudinal analysis."  The Parikh study on which Guardant relies for the sensitivity claim in its "Product Launch" email does not support its claims.  *See Southland Sod Farms*, 108 F.3d at 1139 ("To prove that an advertisement claim based on product testing is literally false … the plaintiff must demonstrate that such tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made.") (internal quotations omitted).  Its claim of 91% sensitivity in the surveillance setting—a setting that Guardant's own program for Reveal contemplates including blood draws at least every 6 months through 5 years after surgery—is thus literally false.

Guardant's statements touting a 91% sensitivity could easily mislead a physician into thinking

---

[12]  For example, some patients develop recurrence within weeks of first having MRD present in the blood stream, while some patients do not develop recurrence until months or even years after first having MRD present in the blood stream.

that, as they monitor patients who have undergone cancer treatment for possible recurrence of their disease, Reveal will accurately detect the presence of MRD in those patients 91% of the time.  A physician who counsels a patient against treatment based on a negative Reveal test result under the false belief that that patient does not have MRD (and whose cancer is therefore unlikely to recur) may well be making a mistake ***almost a third of the time***—potentially causing a patient to miss out on life-saving therapies based on unwarranted trust in Reveal's results.  Misled physicians are potentially leading patients astray, causing them to miss the optimal treatment window and subsequently progress into more severe stages of recurrence.  When the doctor and the patient finally finds out, cancer might have metastasized to nearby tissues, lymph nodes, and spread across the entire body, forcing the patient to undergo rounds of chemotherapy, or worse, lose the battle to cancer.  These types of dire, read-world consequences could easily result from Guardant's misinformation regarding Reveal's performance.

**B.**     **Guardant's Advertisements Deceive Its Customers**

The law presumes that a literally false advertisement deceives the intended audience.  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1040 (9th Cir. 1986) ("[P]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance."); *see also Hall v. Bed Bath & Beyond, Inc.,* 705 F.3d 1357, 1367 (Fed. Cir. 2013) ("[I]f [an] advertising statement is literally false, it may be actionable without reference to the advertisement's impact on the buying public.") (internal quotations omitted).  Here, as discussed above, Guardant has made literally false statements in an effort to deceive customers into believing the Reveal test performs better than the data has shown.  Thus, deception may be presumed.  *See U-Haul*, 793 F.2d at 1041 ("The expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived.").

**C.**     **Guardant's Misstatements Are Material**

Where a statement goes to the very quality or characteristics of a product, it may be presumed to be material.  *See POM Wonderful LLC v. Purely Juice, Inc.*, No. 07-cv-02633, 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008) ("The fact that Purely Juice's false advertising pertained to the very nature of its juice product establishes its materiality.") (citing *Johnson & Johnson Vision Care, Inc. v.*

*1-800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002)).  Here, Guardant's false advertising statements regarding the performance of Reveal go to the very nature of the test and its quality.  Especially given that specificity and sensitivity are two of the most crucial metrics for an MRD test, the gravity of Guardant's deceptive practice is immeasurable.  These false statements may therefore be presumed to be material.

### D.     Guardant's False Statements Entered Interstate Commerce

Guardant's statements are in interstate commerce and have already reached numerous customers through emails, such as the July 15 email, sent by its large and growing sales team.  Thus Guardant has "caused its false or misleading statement to enter interstate commerce." *TrafficSchool.com v. Edriver, Inc.*, 653 F.3d 820, 829 n.3 (9th Cir. 2011).  If not immediately enjoined, Guardant's recently expanded sales team will continue to disseminate these false and misleading claims to customers around the country.

### E.     Natera Has Been Harmed By Guardant's False Statements

The Ninth Circuit "generally presume[s] commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *TrafficSchool.com*, 653 F.3d at 826.  This is because competitors "vie for the same dollars from the same consumer group, and a misleading ad can upset their relative competitive positions."  *Id.* at 827 (internal quotations omitted).

Given the recency in which Guardant has initiated its latest round of false advertising, it is impossible to project the extent of harm to Natera to date.  However, given the likelihood of imminent harm if no injunction issues (*see infra*, Section II), and the presumption of injury to Natera, no past injury need be proven.  *See Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) ("Of course, because of the possibility that a competitor may suffer future injury ... a competitor need not prove [past] injury when suing to enjoin conduct that violates section 43(a).");  *Time Warner*, 497 F.3d at 161 ("Because it is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement, we have resolved that a plaintiff need not ... point to an actual loss or diversion of sales" to satisfy this requirement.") (internal quotations omitted).  Nevertheless, Guardant's false and misleading

statements undoubtedly immediately cause harm to Natera's reputation and goodwill, which cannot later be redressed.

## II.   NATERA AND THE PUBLIC HAVE BEEN AND WILL CONTINUE TO BE IMMINENTLY AND IRREPARABLY HARMED BY GUARDANT'S CONDUCT

Congress has created a rebuttable presumption of irreparable harm where, as here, a likelihood of success on the merits has been demonstrated.  *See* 15 U.S.C. § 1116 ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm … upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."); *Suzie's Brewery Co. v. Anheuser-Busch Companies, LLC*, No. 3:21-CV-178-SI, 2021 WL 472915, at *12 (D. Or. Feb. 9, 2021) (applying the rebuttable presumption where plaintiff showed a likelihood of success on the merits).   As demonstrated *supra*, Natera is likely to prevail on its claims of false advertising, and thus irreparable injury may be presumed.

Even without the application of a presumption, however, Natera can demonstrate that it has suffered, and will continue to suffer, irreparable harm if immediate injunctive relief is not granted. This is all the more true given that Guardant has recently trained and deployed a large sales team that will likely repeat the false and misleading statements made in the July 15 email.  Specifically, Natera will likely lose sales as a result of Guardant's false statements, thereby harming its competitive position in the marketplace, and its goodwill and reputation amongst customers will be damaged. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("[T]hreatened loss of … goodwill certainly supports a finding of the possibility of irreparable harm."); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *Verigy US, Inc. v. Mayder*, No. C07-04330RMWHRL, 2007 WL 2429652, at *3 (N.D. Cal. Aug. 24, 2007) (temporary restraining order issued where plaintiff was likely to suffer irreparable harm "including harm to its competitive position, loss of future sales … and loss of goodwill in the marketplace").  Because money damages cannot compensate for harms to reputation, the harm to Natera's reputation based on this conduct is irreparable.  *See Seed Servs. v. Winsor Grain,*

*Inc.*, 868 F. Supp. 2d 998, 1005 (E.D. Cal. 2012) ("If … Seed Services [loses] control of its business reputation[,] [t]he likelihood of irreparable harm is established.").

Natera is also likely to lose business opportunities and opportunity costs as a result of Guardant's campaign of false and misleading statements.  These lost business opportunities and lost opportunity costs constitute irreparable harm, particularly in light of the nascent, developing nature of the industry.  *See Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1093-94 (N.D. Cal. 2016) (finding irreparable harm where competitor could "capture and redefine the market" at a "crucial inflection point" in its development).

Additionally, and more importantly, physicians and cancer patients are likely to be irreparably harmed if Guardant's false advertising efforts are not enjoined.  For example, in its marketing email currently being sent to customers and potential customers, Guardant falsely states that it has achieved specificity measures that the data does not support.  Having a test with lower than expected specificity means that many more patients will receive false negative test results.  The impact cannot be overstated.  If patients and physicians inappropriately rely on Reveal's inflated specificity claims, patients may be misinformed that they have tested positive for MRD, potentially causing patients to undergo unnecessary biopsies, surgeries, chemotherapy, radiation treatment, or other invasive and damaging procedures; cause emotional trauma to the patient and her loved ones; and needlessly waste time and other resources on expensive medical care.  The harm to healthcare providers, patients, and their families cannot be quantified, and is certainly irreparable. Worse yet, false negative test results trusted by physicians relying on Guardant's inflated sensitivity claims may cause a patient to forego biopsies, surgeries, chemotherapy, radiation treatment, or other procedures necessary to prevent recurrence.  Guardant's false and misleading claims may well kill patients.

Thus, while irreparable harm may be presumed, Natera has demonstrated irreparable harm. All of this harm is imminent.  Guardant's new false and misleading statements regarding, for example, specificity of Reveal being better than CEA in the surveillance setting, accelerated by the newly deployed "Product Launch" salesforce that will imminently cause Natera to lose market share.  It will also potentially impact patients' physical and emotional health and well-being.  Only a TRO can provide the immediate relief required to prevent this imminent harm.

**III.   GRANTING THE REQUESTED RELIEF FURTHERS THE PUBLIC INTEREST**

The public interest weighs in favor of granting a TRO.  Indeed, "the public has an interest in receiving accurate information and avoiding confusion in the marketplace."  *Suzie's Brewery*, 2021 WL 472915, at *13.  Guardant is engaged in conduct that not only deceives its customers (i.e. hospitals and physicians), but puts patient lives at risk as a result.

As discussed above, Guardant's advertising statements are likely to mislead healthcare professionals into believing that Guardant's Reveal test is more effective and reliable than it actually is.  The real-world consequences of Guardant's misinformation puts patients at unnecessary risk. These risks include receiving false positive or false negative test results that lead to poorly informed treatment decisions by doctors and their patients.

The public has a clear, indisputable interest in receiving reliable, accurate information regarding their medical treatment options.  The requested injunction will help ensure the public is not mislead as to the expected performance of Reveal.  No countervailing public interest countenances Guardant's brazenly misleading conduct.

**IV.   THE BALANCE OF EQUITIES IS IN NATERA'S FAVOR**

Balancing the equities requires the Court to consider the "competing claims of injury and the effect on each party of granting and withholding injunctive relief."  *Miller ex rel. NLRB v. California Pac. Medical Ctr.*, 19 F.3d 449, 456 (9th Cir. 1993) (citing *Weinberger v. Romero-Barcelo,* 456 U.S. 305 (1982)).  Here, the balance of equities favors issuing an injunction, as there is no legitimate hardship Guardant would suffer by being ordered to do what it should have already done: avoid false and misleading statements regarding its products in the marketplace.  Any other outcome would only imperil the effective treatment of cancer patients, hinder physicians, and competitively harm Natera.

**V.   NO BOND SHOULD BE REQUIRED**

Although Rule 65 permits the Court to set a bond when issuing an injunction, a bond would not be appropriate in this case.  Both this District and the Ninth Circuit have recognized that no bond is necessary to "simply enjoin [a party] from doing something [it] never had a right to do in the first place."  *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-cv-01441, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018); *see also Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.") (internal quotations omitted). Here, Guardant never had any right to make false and misleading statements to the public regarding its products, but it has done so in order to benefit itself.  Moreover, Natera has made a strong showing of likelihood of success on the merits, which favors a "minimal bond or no bond at all." *California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985); *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.").

Natera should not be required to pay a fee to stop Guardant from continuing its wrongdoing; no bond is required here.  *Comet Techs.*, 2018 WL 1990226, at *6; *Johnson*, 572 F.3d at 1086.[13]

## CONCLUSION

Guardant has indicated its intention to mislead consumers by disseminating false and misleading statements regarding the performance of Reveal.  This reckless false advertising is designed to irreparably harm Natera and will harm patients.  For these and all of the foregoing reasons, Natera respectfully requests that this Court grant its motion for a TRO and order to show cause re: preliminary injunction.

---

[13]   If, however, the Court is inclined to require a bond, it need only cover costs and damages, if any, likely to be sustained prior to the hearing on a preliminary injunction.

1    DATED:  July 20, 2021            QUINN EMANUEL URQUHART &
2                                        SULLIVAN, LLP

3

4                                By  */s/ Kevin P.B. Johnson*

5                                  QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP

6                                  Kevin P.B. Johnson
                                        kevinjohnson@quinnemanuel.com

7                                  Victoria F. Maroulis
                                        victoriamaroulis@quinnemanuel.com

8                                  Andrew J. Bramhall
                                        andrewbramhall@quinnemanuel.com

9                                  555 Twin Dolphin Drive, 5th Floor
                                        Redwood Shores, California 94065-2139

10                                 Telephone:    (650) 801-5000
                                        Facsimile:    (650) 801-5100

11                                 QUINN EMANUEL URQUHART &
12                                 SULLIVAN, LLP
                                        Anne S. Toker (*pro hac vice*)

13                                 annetoker@quinnemanuel.com
                                        51 Madison Avenue, 22nd Floor

14                                 New York, New York 10010-1601
                                        Telephone:    (650) 801-5000

15                                 Facsimile:    (650) 801-5100

16                                 WINSTON & STRAWN LLP
                                        Katherine Vidal

17                                 KVidal@winston.com
                                        275 Middlefield Road, Suite 205

18                                 Menlo Park, California 94025-4004
                                        Telephone:    (650) 858-6500

19                                 Facsimile:    (650) 858-6550

20                                 Attorneys for Defendant
                                        NATERA, INC.

21

22

23

24

25

26

27

28

                                                               Case No. 3:21-cv-04062