**WINSTON & STRAWN LLP**
Katherine Vidal (S.B. #194971)
KVidal@winston.com
275 Middlefield Road, Suite 205
Menlo Park, CA 94025-4004
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

Thomas M. Melsheimer (admitted pro hac vice)
tmelsheimer@winston.com
John C.C. Sanders (admitted pro hac vice)
jsanders@winston.com
Chase J. Cooper (admitted pro hac vice)
ccooper@winston.com
2121 N. Pearl St., Suite 900
Dallas, TX 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

**QUINN EMANUEL URQUHART
& SULLIVAN LLP**
KEVIN P.B. JOHNSON (S.B. #177129)
kevinjohnson@quinnemanuel.com
VICTORIA F. MAROULIS (S.B. #202603)
victoriamaroulis@quinnemanuel.com
ANDREW J. BRAMHALL (S.B. #253115)
andrewbramhall@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5113
Facsimile: (650) 801-5100

ANNE S. TOKER (admitted pro hac vice)
annetoker@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

*Attorneys for Defendant and Counterclaim-Plaintiff* NATERA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC.<br><br>        Plaintiff and<br>        Counterclaim-Defendant,<br><br>    vs.<br><br>NATERA, INC.<br><br>        Defendant and<br>        Counterclaim-Plaintiff. | CASE NO. 3:21-cv-04062-EMC<br><br>**DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE FILED UNDER SEAL** |

Defendant Natera, Inc. ("Natera"), by and through its undersigned counsel, hereby files its Answer, Affirmative Defenses, and Counterclaims to Plaintiff Guardant Health, Inc.'s ("Guardant") Original Complaint ("Complaint"). Natera demands a trial by jury on all issues so triable. Natera denies any allegation in the Complaint that is not specifically admitted. Natera has re-produced the Complaint's section headings for ease of reference; to the extent any headings or subheadings in the Complaint make factual allegations that would require a response if stated in the main text, Natera denies all such allegations and claims for relief. Natera responds to each paragraph in the Complaint as follows:

## I.    INTRODUCTION

1.    This case concerns Plaintiff's Guardant Reveal™ ("Reveal") liquid biopsy cancer assay for early-stage colorectal cancer (CRC) patients, and Defendant Natera's campaign of false and misleading advertising directed at this important and innovative diagnostic product. As the world's leading provider of comprehensive circulating tumor DNA (ctDNA) assays for clinical use, Guardant's oncology platform—including its gold-standard Guardant360®, Guardant360® CDx, and GuardantOMNI® assays—have helped improve clinical outcomes, while lowering healthcare costs, for advanced stage cancer patients around the world.

**ANSWER:** Natera denies the allegations in Paragraph 1 of the Complaint.

2.    Leveraging its patented technology, vast data sets, and advanced analytics, Guardant recently launched Reveal, a plasma-only liquid biopsy test that detects residual and recurrent CRC in about 7 days from a simple blood draw. For oncologists, Reveal improves the management of early-stage CRC patients by detecting ctDNA in plasma after surgery, enabling doctors to identify patients with residual CRC who may benefit from post-surgery chemotherapy (adjuvant chemotherapy), months earlier than current standard-of-care tests permit. Reveal is the first test for minimal residual disease (MRD) detection that detects ctDNA in the plasma of CRC patients following treatment without the need for a tissue sample and sequencing to determine the particular

mutations that were present in the patient's tumor. Reveal achieves outstanding sensitivity (91%) for predicting recurrence of CRC disease.

**ANSWER:** Natera admits that Guardant launched Reveal, a plasma-only liquid (tumor-naïve) biopsy test, in or around February 2021. Except as expressly admitted, Natera denies the allegations in Paragraph 2 of the Complaint.

3.      With little or no concern for the CRC patients who could be harmed, Natera has undertaken a campaign of misinformation to convince customers and potential customers, including oncologists and other physicians, cancer researchers, health care institutions, biopharmaceutical companies, and genetic laboratories, to avoid using Reveal in favor of Natera's own Signatera™ ("Signatera"), a tumor-dependent assay. In its commercial advertising and promotion, Natera makes literally false and misleading statements that disparage Guardant's new assay, and falsely asserts that Signatera is superior to Reveal across a variety of metrics, including sensitivity,[1] failure rate,[2] negative predictive value (NPV),[3] and Hazard Ratio,[4] among other categories. These claims are false. Natera combines outright misrepresentations with scientifically unfounded comparisons based on cherry-picked metrics, data artifacts, and noncomparable clinical studies to exaggerate the purported benefits of Signatera while inaccurately denigrating Reveal. In truth, Reveal has important clinical advantages over Signatera—including its superior landmark sensitivity, its availability for patients from whom tumor samples are unavailable, and its faster initial turnaround time from sample collection to assay results—all of which Natera ignores.

---

[1]  "Sensitivity" refers to the assay's ability to identify which patients will develop recurrences based on MRD detection by ctDNA assay. A higher percentage indicates a test is more sensitive.
[2]  "Failure rate" refers to the percentage of time a ctDNA assay fails to provide a result at all, whether positive or negative. For any test, a lower failure rate is more desirable.
[3]   "NPV" refers to the assay's ability to correctly predict which patients will subsequently not develop a recurrence of CRC (i.e., a "negative" test result means CRC will not recur).
[4]  The "Hazard Ratio" refers to a comparison between the recurrence rate over time in CRC patients who tested positive for MRD by ctDNA assay, to the recurrence rate in CRC patients who tested negative for MRD by ctDNA. A larger hazard ratio suggests that the assay is potentially more useful in successfully distinguishing CRC patients whose cancers will or will not recur.

1

2      **ANSWER:** Natera denies the allegations in Paragraph 3 of the Complaint.

3

4      4.      Guardant seeks to enjoin Natera from continuing to make or disseminate false and

5   misleading statements about the performance of Reveal and Signatera; to require Natera to retract,

6   remove, and correct these false and misleading advertising claims; and to recover damages and other

7   relief for the harm that Natera has inflicted on Guardant.

8

9      **ANSWER:** Natera admits that Guardant has filed a complaint in this action purporting to

10  seek injunctive relief and damages against Natera but denies that Guardant is entitled to any relief.

11  Except as expressly admitted, Natera denies the allegations in Paragraph 4 of the Complaint.

12

13                      **II.      PARTIES**

14     5.      Plaintiff Guardant is a Delaware corporation having its principal place of business at

15  505 Penobscot Dr., Redwood City, California 94063.

16

17     **ANSWER:** Natera admits the allegations in Paragraph 5 of the Complaint.

18

19     6.      Guardant was founded in 2012 by pioneers in DNA sequencing and cancer

20  diagnostics. Since its inception, Guardant has focused its expertise on the development of liquid

21  biopsy assays for cancer. It was the first company to develop and commercialize a comprehensive

22  liquid biopsy assay to identify genomic biomarkers for advanced solid tumors using cell-free

23  ctDNA, from simple, non-invasive blood draws.

24

25     **ANSWER:** Natera admits that Guardant was founded in 2012. Except as expressly admitted,

26  Natera denies the allegations in Paragraph 6 of the Complaint.

27

28

7.      Today, Guardant is a leading precision oncology company focused on helping conquer cancer globally through the use of its proprietary blood tests, vast data sets, and advanced analytics. The Guardant oncology platform leverages its capabilities to drive commercial adoption, improve patient clinical outcomes, and lower healthcare costs across all stages of the cancer care continuum. Guardant Health has commercially launched the liquid biopsy-based Guardant360®, Guardant360® CDx, and GuardantOMNI® tests for advanced stage cancer patients, and recently launched its Reveal test for early-stage CRC patients.

**ANSWER:** Natera admits that Guardant launched the liquid biopsy-based Guardant360®, Guardant360® CDx, and GuardantOMNI® tests for advanced stage cancer patients and that it launched the Reveal test in or around February 2021. Except as expressly admitted, Natera denies the allegations in Paragraph 7 of the Complaint.

8.      Defendant Natera is a Delaware corporation having its principal place of business at 13011 McCallen Pass, Building A, Suite 100 Austin, Texas 78753, and offices at 201 Industrial Rd., San Carlos, California 94070. Natera may be served with process by serving a copy of this Complaint on its Registered Agent: National Registered Agents, Inc., 1209 Orange Street, Wilmington, Delaware 19801.

**ANSWER:** Natera admits the allegations in Paragraph 8 of the Complaint.

9.      Natera markets and sells Signatera, a product it describes as a "personalized, tumor-informed assay optimized to detect circulating tumor DNA (ctDNA) for molecular residual disease (MRD) assessment and recurrence monitoring for patients previously diagnosed with cancer." Signatera competes with Reveal in the market for ctDNA assays that can be used after surgery on CRC patients, to detect recurrences and evaluate the need for adjuvant chemotherapy.

1    **ANSWER:** Natera admits the allegations in Paragraph 9 of the Complaint.

2

3    ### III.    JURISDICTION AND VENUE

4    10.    This is an action for false advertising under Section 43(a) of the Lanham Act, 15

5    U.S.C. § 1125(a); for false advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq.; for

6    unlawful trade practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.; and for unfair

7    competition in violation of the common law of California and other states in which Defendant is

8    conducting its activities.

9

10    **ANSWER:** Natera admits that Guardant has filed a complaint purporting to assert claims

11    against Natera. Natera states that the complaint speaks for itself, and no response is required. Natera

12    denies that any of Guardant's claims against Natera are valid. To the extent an answer is required,

13    Natera denies the allegations in Paragraph 10 of the Complaint.

14

15    11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

16    §§ 1331 and 1338 and 15 U.S.C. §§ 1051, et seq.

17

18    **ANSWER:** The allegations in Paragraph 11 of the Complaint state legal conclusions that

19    Natera is neither required to admit nor deny.

20

21    12.    This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C.

22    § 1367 and the doctrine of supplemental jurisdiction.

23

24    **ANSWER:** The allegations in Paragraph 12 of the Complaint state legal conclusions that

25    Natera is neither required to admit nor deny.

26

27

28

13.    The exercise of personal jurisdiction in California is proper both because of Defendant's ongoing and systematic contact with California and the Northern District of California, including its maintenance of a regular place of business in the District, and because acts giving rise to Plaintiff's causes of action have occurred in the Northern District of California. Specifically, Natera markets, promotes, advertises, offers for sale, sells, and/or distributes Signatera to customers including oncologists and other physicians, cancer researchers, health care institutions, biopharmaceutical companies, genetic laboratories, and/or others throughout the United States, including in the Northern District of California. Defendant has purposefully and voluntarily placed Signatera into the stream of commerce with the expectation that this product will be purchased by customers in the Northern District of California. Furthermore, Natera falsely and misleadingly advertises Signatera to customers, including oncologists, pathologists, additional physicians, health care institutions, pharmaceutical companies, and/or others throughout the United States, including in the Northern District of California.

**ANSWER:** The allegations in Paragraph 13 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera admits that Natera markets, promotes, advertises, offers for sale, sells, and/or distributes Signatera to customers including oncologists and other physicians, cancer researchers, health care institutions, biopharmaceutical companies, genetic laboratories, and/or others throughout the United States, including in the Northern District of California. Except as expressly admitted, Natera denies the allegations in Paragraph 13 of the Complaint.

14.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391.

**ANSWER:** The allegations in Paragraph 14 of the Complaint state legal conclusions that Natera is neither required to admit nor deny.

1    IV.    FACTUAL BACKGROUND

2   **A.    Early Identification of At-Risk Patients is a Key to Preventing Recurrence of**

3        **Colorectal Cancer and Prolonging Survival**

4        15.    Colorectal cancer (CRC) is the third most commonly diagnosed cancer and the

5   second leading cause of cancer death in the United States in both men and women. While a majority

6   of patients are diagnosed with early-stage disease, nearly a third of patients whose CRC spreads into

7   adjacent tissues and lymph nodes will die from their disease within five years.

8

9        **ANSWER:** Natera admits the allegations in Paragraph 15 of the Complaint.

10

11       16.    Surgery alone is often curative for early-stage CRC, and in later-stage cases, adjuvant

12  chemotherapy after surgery can reduce the risk of recurrence. However, clinicians have had very

13  limited means of identifying patients that require adjuvant chemotherapy. Thus, the development of

14  effective clinical tests to identify CRC patients with MRD—i.e., a small number of CRC cells

15  remaining in the body that can later multiply and cause recurrence of the disease—after surgery has

16  long been recognized as a need, to help doctors both identify patients who may benefit from

17  additional therapy, and avoid administering unnecessary and toxic treatment to patients who will

18  not benefit from it.

19

20       **ANSWER:** Natera denies that clinicians have had very limited means of identifying patients

21  that require adjuvant chemotherapy since the clinical launch of Signatera, in 2019. Natera admits

22  the remaining allegations in Paragraph 16 of the Complaint.

23

24       17.    Because residual cancer cells that remain in the body following treatment typically

25  cause no physical signs or symptoms and are present at very low levels that are undetectable with

26  standard techniques, detecting and monitoring MRD has required development of advanced and

27

28

highly sophisticated technologies with the requisite precision and sensitivity for clinical decision-making. Reveal provides that sophisticated technology.

**ANSWER:** Natera admits the allegations in the first sentence of Paragraph 17 of the Complaint. Natera denies the remaining allegations in Paragraph 17 of the Complaint.

**B.      Liquid Biopsy Technology Allows Assessment of MRD by Detecting Circulating Tumor DNA in Blood**

18.      Human blood contains fragments of DNA that are shed into the bloodstream by dying cells in tissues—including cancers. Such fragments derived from tumor cells are known as circulating tumor DNA (ctDNA). This phenomenon led to the development of so-called "liquid biopsies" a game-changing technology capable of detecting the presence of cancer in patients by detecting ctDNA in their blood, and eventually led to liquid biopsies specifically designed to assess MRD following treatment of CRC. Liquid biopsies using simple blood draws offer major advantages for identifying MRD, because they are quick, convenient, and minimally invasive, and can be easily repeated to monitor for the presence of ctDNA over time.

**ANSWER:** Natera admits the allegations in the first two sentences of Paragraph 18 of the Complaint. Natera denies the remaining allegations in Paragraph 18 of the Complaint.

19.      However, detecting and characterizing the very low concentrations of ctDNA present in the blood of patients with MRD, and using that information to stratify CRC patients as high- or low-risk for recurrence, requires an assay that is both highly sensitive and specific. Recognizing this need, Guardant expended substantial resources and time to develop Reveal, a clinical blood-based assay to evaluate ctDNA in blood using advanced DNA sequencing methods. Launched in February 2021, Reveal is the first commercially available plasma-only ctDNA assay, capable of detecting

MRD in post-operative CRC patients without the need for prior sampling and sequencing of tumor tissue or the time needed to create a new, customized test for each new patient.

**ANSWER:** Natera admits the allegations in the first sentence of Paragraph 19 of the Complaint. Natera also admits that Reveal was launched in or around February 2021. Except as expressly admitted, Natera denies the remaining allegations in Paragraph 19 of the Complaint.

20.     Most important, Reveal works. Peer-reviewed data published by Parikh et al. in the journal Clinical Cancer Research shows that Reveal offers 91% recurrence sensitivity (i.e., ability to identify which patients will recur based on ctDNA detection) and 100% positive predictive value[5] for recurrence (i.e., all patients Reveal identified as having a "positive" ctDNA test result later recurred).

**ANSWER:** Natera denies the allegations in Paragraph 20 of the Complaint.

21.     Natera offers a liquid biopsy MRD assay it calls Signatera, which it launched commercially in 2019. Natera advertises, promotes, markets, and sells Signatera to oncologists and other physicians, cancer researchers, health care institutions, biopharmaceutical companies, genetic laboratories, and others nationwide, including in California. Unlike Reveal, Signatera is a "tumor-informed" (tumor-dependent) assay. It requires initial genomic profiling of tumor tissue taken from the individual patient. Information from the tumor tissue is then used to identify a panel of tumor-derived mutations specific to that patient, which then can be monitored through testing of blood samples collected throughout the patient's disease course.

---

[5]  Positive predictive value (PPV) refers to the assay's ability to correctly predict which patients will subsequently develop a recurrence of CRC (i.e., "positive" test result means CRC will recur).

1       **ANSWER:** Natera admits that Natera launched Signatera clinically in 2019. Except as

2  expressly admitted, Natera denies the remaining allegations in the first sentence of Paragraph 21.

3  Natera admits the allegations in second-through-fifth sentences of Paragraph 21 of the Complaint.

4

5       22.     Tumor-dependent assays like Signatera have meaningful drawbacks. Specifically, a

6  significant number of CRC patients—particularly those treated with chemotherapy prior to

7  surgery—may not have sufficient samples of tumor tissue to allow initial genomic profiling of the

8  tumor. For these patients, a plasma-only ctDNA assay like Reveal provides the only option for MRD

9  detection using ctDNA. Furthermore, acquiring sufficient tissue specimens can be painful,

10 dangerous, time consuming and create significant delays in MRD testing turnaround time. Reveal

11 reduces the time spent waiting for results needed to decide whether high-risk patients require

12 adjuvant chemotherapy from approximately three weeks to 7 days. For patients with a potentially

13 lethal disease, this reduction in wait time is critical for both outcomes (earlier initiation of

14 chemotherapy has been associated with improved outcomes) and for peace of mind.

15

16      **ANSWER:** Natera denies the allegations in Paragraph 22 of the Complaint.

17

18 **C.     Natera's Advertising Falsely Claims that Signatera is Superior to Reveal, and that**

19      **Reveal is Unproven and Insensitive**

20      23.     Fearful that Signatera cannot compete with Reveal and Guardant on the merits,

21 Natera falsely and misleadingly advertises and promotes Signatera in comparison to Reveal. In its

22 advertising, Natera deceptively characterizes Reveal as unproven, insensitive, and consequently and

23 unfoundedly "detrimental to patients," while touting Signatera's supposed superiority.

24

25      **ANSWER:** Natera denies the allegations in Paragraph 23 of the Complaint.

26

27

28

24.     Natera's advertising is based on irrelevant metrics, misrepresented data artifacts, and misleading and inapt comparisons, presented in disregard of the actual scientific evidence supporting Reveal's substantial benefits for oncologists and their patients. Carefully timed to coincide with the very launch of Reveal, Natera's false and misleading comparisons of Reveal and Signatera have harmed Guardant, and will continue to cause Guardant irreparable harm if not stopped.

**ANSWER:** Natera denies the allegations in Paragraph 24 of the Complaint.

### 1.     Natera's Advertising Falsely Claims Signatera Is Superior to Reveal

25.     Shortly after Reveal's commercial launch in February 2021, Natera began contacting both its and Guardant's current and potential customers, including leading cancer centers like the Mayo Clinic, expressing supposed "concern" about "other laboratories rushing into the clinical MRD market and making potentially misleading claims" that Natera asserted "may be detrimental to patients." In a "Dear Colleague" advertisement dated March 2, 2021, which, on information and belief, Natera widely emailed to both its and Guardant's customers and potential customers, Natera stated:

> Natera is committed to the science and precision of molecular residual disease (MRD) testing for improving patient care. We are proud that Signatera data has been published or presented from over 2,000 patients across 30+ tumor histologies. As this exciting field gains momentum, especially in early-stage CRC, there is concern about other laboratories rushing into the clinical MRD market and making potentially misleading claims with no peer-reviewed evidence, which may be detrimental to patients. As you review the evidence for any new MRD test, please keep in mind several minimum requirements for MRD product performance and clinical validation (emphasis in original).

1    **ANSWER:** Natera admits that the block quote in Paragraph 25 is an accurate quotation from

2    an email sent by Natera on or around March 2, 2021. Natera asserts that the excerpt is only a select

3    portion of the referenced document, and that the document speaks for itself and is the best source of

4    its full content and context. Natera denies the allegations in Paragraph 25 of the Complaint to the

5    extent they do not accurately represent the document's full content and context. Except as expressly

6    admitted, Natera denies the allegations in Paragraph 25 of the Complaint.

7

8    26.    In the same promotional email, Natera sent these customers and potential customers

9    a slide presentation entitled "Evidence Review: Tumor-informed vs. tumor-naive MRD." Though

10   not identifying Reveal by name, Natera's presentation expressly references data presented by

11   "Parikh, A. et al." at the 2020 European Society for Medical Oncology (ESMO) conference—a

12   study specifically concerning Reveal. Moreover, Reveal is the only "tumor-naive" (that is, plasma-

13   only) ctDNA assay for detecting MRD in CRC patients available on the market, and is also the only

14   ctDNA assay for MRD introduced at or around the time Natera sent this presentation.

15

16   **ANSWER:** Natera denies that Reveal is the only tumor-naïve ctDNA assay for detecting

17   MRD in CRC patients. Natera admits the remaining allegations in Paragraph 26 of the Complaint.

18

19   27.    Natera's "Evidence Review" falsely criticizes "tumor-naive methods," that is,

20   Reveal, as unsupported by "peer-reviewed evidence." In fact, interim data from the very study cited

21   by Natera—Parikh et al.—was peer-reviewed before being published, first as abstract-presentations

22   at three separate prestigious scientific meetings (ASCO 2019, ESMO 2019, and ESMO 2020), and

23   later as an article in the April 29, 2021 issue of the journal Clinical Cancer Research.

24

25   **ANSWER:** Natera denies the allegations in Paragraph 27 of the Complaint.

26

27

28

28.     Natera further erroneously claims that, while Signatera's "test performance" is "unsurpassed," Reveal is not only inferior to Signatera, but has "unknown" performance with respect to sensitivity and hazard ratios for two of three "time points" that "matter":



**ANSWER:** Natera admits that its March 2021 document entitled "Evidence Review: Tumor-informed vs. tumor-naive MRD" states on the second page: "Test performance with tumor-informed method is unsurpassed." Natera further admits that the image contained in Paragraph 28 is an excerpt from the sixth page of the same March 2021 document. Natera asserts that these excerpts are only select portions the referenced document, and that the document speaks for itself and is the best source of its full content and context. Natera denies the allegations in Paragraph 28 of the Complaint to the extent they do not accurately represent the document's full content and context. Natera states that the document referenced in Paragraph 28 of the Complaint speaks for itself. To the extent Paragraph 28 contains factual allegations requiring a response, Natera denies the allegations in Paragraph 28 of the Complaint.

29.     These statements too are false, as explained below. But rather than correcting its falsehoods, Natera repeated and amplified them—repeatedly.

**ANSWER:** Natera denies the allegations in Paragraph 29 of the Complaint.

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

1

2        30.    Shortly after Natera distributed its "Evidence Review," Parikh et al.'s previously

3    presented data supporting the clinical performance of Reveal, derived from plasma specimens from

4    84 CRC patients undergoing curative intent surgery, was published in the peer-reviewed journal

5    Clinical Cancer Research. Nonetheless, Natera renewed and repeated its previous criticisms of

6    Reveal on its website, including in a broadly misleading "white paper to learn how our tumor-

7    informed    approach    stacks    up    against    a    tumor    naive    assay"    found    at

8    https://www.natera.com/wpcontent/uploads/2021/05/SGN_WP_Solar_20210503_NAT-

9    9000052_FINAL_DWNLD.pdf.

10

11        **ANSWER:** Natera admits that the Parikh study was first published in the journal *Clinical*

12    *Cancer Research* on or around April 29, 2021. Natera also admits that it published a document

13    entitled "A comparison of tumor-informed and tumor-naive approaches for early-stage molecular

14    residual disease (MRD) detection" at the hyperlink contained in Paragraph 30 of the Complaint.

15    Except as expressly admitted, Natera denies the allegations in Paragraph 30 of the Complaint.

16

17        31.    In its white paper, which Natera publishes on its website to influence customers and

18    potential customers to purchase Signatera rather than Reveal, Natera purports to compare "Signatera

19    (tumor informed assay)" to a "Tumor-naive assay," that is, plasma-only Reveal, citing data that

20    appear to show—again, falsely—that Reveal is "not validated," or that Signatera significantly

21    outperforms Reveal on every referenced metric, including "Hazard ratios" and "Negative predictive

22    value (NPV)":

23

24

25

26

27

28

Table 3. Comparison of hazard ratios and negative predictive values of tumor-informed and tumor-naive assays in early-stage CRC

| | Signatera (tumor-informed assay)[4,7,8] | Tumor-naive assay[19] |
|---|---|---|
| **Hazard ratios of ctDNA (positive vs negative)** | | |
| Post-surgery (30 day single test) | 7.2-14.0* | Not Validated |
| Post-ACT (single test) | 17.5 | 9.8-11.2** |
| Serial testing | 43.5-47.5 | 11.4 |
| **Negative predictive value (NPV)** | | |
| Post-surgery (30 day single test) | 88% (74/84) | Not Validated |
| Post-ACT (single test) | 86% (44/51) | 78% (37/49)** |
| Serial testing | 97% (58/60) | 82% (41/50) |

**ANSWER:** Natera admits that the image in Paragraph 31 is an excerpt from the document published on Natera's website, at https://www.natera.com/wp-content/uploads/2021/05/SGN_WP_Solar_20210503_NAT-9000052_FINAL_DWNLD.pdf and that the excerpted image reflects information about hazard ratios and NPVs for Signatera and tumor-naïve assays. Natera asserts that the excerpt is only a select portion of the referenced document, and that the document speaks for itself and is the best source of its full content and context. Natera denies the allegations in Paragraph 31 of the Complaint to the extent they do not accurately represent the document's full content and context. Except as expressly admitted, Natera denies the allegations in Paragraph 31 of the Complaint.

32.    Natera's white paper further asserts that: "Without the genomic information for each primary tumor, tumor naive assays are unable to filter out background biological noise from CHIP or to avoid tracking driver mutations that may be subjected to selection pressure from

treatment . . . ,"[6] But this is false; Reveal can and does filter out CHIP background noise bioinformatically. In fact, data publicly presented in 2018 on a prototype of the Reveal assay showed 100% specificity with incorporation of the CHIP filter.



### Signatera vs. Reveal performance comparison

| | Signatera | Reveal |
|---|---|---|
| Validation data published or presented (# patients analyzed) | > 2,000[1,2] | < 150[4,5] |
| Pre-surgical sensitivity in CRC | 89-94%[1,3] | 47%[*4] |
| Failure rate in CRC – tissue and plasma combined | < 3%[3] | 12-14%[4] |
| Number of blood tubes required | 2 | 4 |
| Diagnostic lead time vs. radiographic recurrence in CRC (avg) | 8.7 months[1] | ~4 months[*4] |
| Post-surgical NPV/PPV in CRC (30 days post-surgery) | 88% / 100%[*1] | not reported[4] |
| Serial longitudinal NPV in CRC | 97%[1] | 82%[4] |
| Serial longitudinal Hazard Ratio in CRC | 43.5[1] | 11.4[4] |
| Serial longitudinal sensitivity in CRC | 88-94%[1,2] | 69%[4] |
| Quantitation of ctDNA burden for monitoring purposes | Tumor copies per mL | none |

**ANSWER:** Natera states that the document referenced in Paragraph 32 speaks for itself. To the extent Paragraph 32 contains factual allegations requiring a response, Natera denies the allegations in Paragraph 32 of the Complaint.

33.     In May 2021, Natera also published on its public-facing website advertising entitled "Investor presentation," which purports to compare "Signatera vs. Reveal performance":

**ANSWER:** Natera admits that it posted an investor presentation on its website in May 2021 and that the heading of Slide No. 12 of such presentation is entitled "Signatera vs. Reveal performance comparison." Except as expressly admitted, Natera denies the allegations in Paragraph 33 of the Complaint.

---

[6]  "CHIP" refers to clonal hematopoiesis of indeterminate potential—mutations from blood cells that can lead to false positive results when testing for MRD.

34.     Shortly after posting the May 2021 performance comparison on its website, Natera began disseminating it—repeatedly—to the same customers and potential customers in order to tout Signatera's supposed superiority over Reveal.

**ANSWER:** Natera denies the allegations in Paragraph 34 of the Complaint.

35.     Similar to its "Evidence Review" and white paper advertising, Natera's May 2021 performance comparison claims to demonstrate quantitatively that Signatera is superior to Reveal across a wide-ranging set of metrics. Here, these metrics purportedly include "pre-surgical sensitivity," "failure rate," "diagnostic lead time,"[7] "post-surgical" and "serial longitudinal" negative predictive value (NPV), and "Hazard Ratio," among other categories. All of this is false and misleading.

**ANSWER:** Natera admits that Slide 12 of an investor presentation Natera published in May 2021 references data regarding pre-surgical sensitivity, failure rate, diagnostic lead time, post-surgical negative predictive value, hazard ratio, and other categories, for both Signatera and Reveal. Except as expressly admitted, Natera denies the allegations in Paragraph 35 of the Complaint.

### 2.     Natera's Advertising is False and Misleading

36.     In reality, each of Natera's promotional claims of superiority, including the express and implied claims contained in its "Evidence Review," white paper, and the "Signatera vs. Reveal performance comparison" are false and misleading. They also either deceived or are likely to deceive oncologists and other physicians, cancer researchers, health care institutions, biopharmaceutical companies, and genetic laboratories, and other customers and potential customers into believing that Reveal is untested, inaccurate, insensitive, and inferior to Signatera.

---

[7] "Diagnostic lead time" refers to the time between the first MRD detection by ctDNA assay and the first confirmation of CRC recurrence by standard radiographic imaging methods. A longer diagnostic lead time is generally observed with higher sensitivity tests.

1

2          **ANSWER:** Natera denies the allegations in Paragraph 36 of the Complaint.

3

4          37.    Any valid comparison between diagnostic tests, including ctDNA assays for

5    detecting MRD in CRC patients—and specifically including Signatera and Reveal—must be

6    supported by properly designed, head-to-head studies that directly compare the two assays using the

7    same test procedures and protocols in the same patient population. Cross-test comparisons,

8    especially where the purpose and methodology of the underlying studies differ significantly, and/or

9    where the studies are conducted in different patient populations, necessarily lead to a misleading

10   apples-to-oranges result that cannot legitimately be used to claim that one test is superior to the

11   other.

12

13         **ANSWER:** Natera denies the allegations in Paragraph 37 of the Complaint.

14

15         38.    To date, no such head-to-head studies involving Signatera and Reveal and using the

16   same test protocol and study population are available. Instead, Natera's purported comparisons of

17   the "performance" of Signatera vs. Reveal largely rely on data published by Parikh et al. concerning

18   Reveal, and data published by Reinert et al. for Signatera. These different studies used very different

19   test protocols and analysis methods, and examined very different patient populations. Consequently,

20   Natera's claims of superiority based on these improper comparisons are false, misleading, and

21   deceptive.

22

23         **ANSWER:** Natera admits that it is not aware of any direct head-to-head studies involving

24   Signatera and Reveal as described in Paragraph 38. Except as expressly admitted, Natera denies the

25   allegations in Paragraph 38 of the Complaint.

26

27

28

39.     In fact, many of Natera's cherry-picked comparison metrics are unrelated to assay "performance" at all. While Natera touts the number of "patients analyzed" in "published or presented studies," which Natera claims is more than two thousand for Signatera, those numbers do not prove the superiority of the clinical performance of one ctDNA assay over another. Moreover, the ">2,000" number reported for Signatera is inflated. It double-counts some patients whose data were used in more than one published study, and it includes patient populations presenting with cancers other than CRC for which Reveal is neither validated nor intended to be used.

**ANSWER:** Natera denies the allegations in Paragraph 39 of the Complaint.

40.     Likewise, Natera claims that Signatera requires only two "blood tubes," while Reveal requires four. But again, this is not a "performance" metric at all. But even there, Natera's representation that Reveal "requires" 4 tubes is false. Reveal, like Signatera, only requires 2 tubes of blood. Unlike Natera, Guardant's Reveal kit collects 2 additional tubes of blood to provide redundancy in the rare event of an assay failure on the first 2 blood tubes; thereby protecting patients from having to provide another blood sample and saving valuable time.

**ANSWER:** Natera admits that Signatera only requires two tubes of blood. Except as expressly admitted, Natera denies the allegations in Paragraph 40 of the Complaint.

41.     Finally, "quantitation of ctDNA for monitoring purposes" is an assay feature, not an appropriate measure of assay *performance*. Natera's assertions that quantitation, i.e., "quantitative results," is necessary to achieve good assay performance, or is an "MRD assay requirement," are misleading. This is particularly so in light of the intended use of both the Signatera and Reveal assays: to identify CRC patients at increased risk for recurrence of the disease. All available evidence shows that the presence of ctDNA—regardless of the quantity— indicates a high likelihood of recurrence. As such, the clinical utility of ctDNA quantitation in the context of the

intended use of the assay is unclear, at best. Natera's assertion that "quantitation is essential for monitoring tumor response during the patient's treatment," is unsupported by any studies showing that an improvement in patient outcome is achieved by knowing or acting on changes in ctDNA quantity during treatment. Because it is wholly unsupported, Natera's claim is false. Signatera's practice of reporting a "mean tumor molecules per mL" value, and Reveal's choice not to do so, does not represent a performance advantage for one over the other.

**ANSWER:** Natera denies the allegations in Paragraph 41 of the Complaint.

42.     While these false and misleading claims are harmful, it is Natera's misrepresentations concerning Reveal's actual performance metrics that are the most damaging to Guardant and its new assay.

**ANSWER:** Natera denies the allegations in Paragraph 42 of the Complaint.

43.     **Failure rate**: Natera's comparison of "failure rate in CRC," and its claim of Signatera's superiority over Reveal, are false. As the article published by Parikh et al. in the April 29, 2021 issue of Clinical Cancer Research states, this study—which Natera cites as proof that Reveal has a "12-14%" failure rate (vs. a "< 3%" rate for Signatera)—relied on banked plasma or cell free DNA samples that had input amounts substantially less than recommended. Indeed, as Parikh et al. stated explicitly in the cited publication, "the extracted ctDNA quantity or quality was below the recommended and optimal input levels for the assay" and "may have affected overall performance characteristics." In point of fact, the actual failure rate of Reveal in patient care testing is less than 1%, better than Signatera's claimed failure rate of less than 3%.

**ANSWER:** Natera admits that the third sentence contains two accurate quotations from the Parikh et al. study. Natera asserts that the quotations are only isolated excerpts of the referenced

1    document, and that the document speaks for itself and is the best source of its full content and

2    context. Natera further states that the failure rate of Signatera in a study by Reinert et al., which

3    included banked samples, was less than 1%. Natera denies the allegations in Paragraph 43 of the

4    Complaint to the extent they do not accurately represent the document's full content and context.

5    Except as expressly admitted, Natera denies the allegations in Paragraph 43 of the Complaint.

6

7        44.    **Pre-surgical sensitivity**: Natera's claims of Signatera's superior "pre-surgical

8    sensitivity" ("89-94%" vs. "47%") is functionally meaningless and highly misleading. Reveal is not

9    intended or indicated to be used as a diagnostic tool pre-surgery. And, as an assay that relies on the

10   existence of surgically-excised tumor tissue, Signatera cannot be used as a pre-surgical diagnostic

11   tool (meaning it has a real-world pre-surgical clinical sensitivity of 0%). Moreover, the study Natera

12   cites as the source of this statistic—Parikh et al.—contains a population where nearly half (45%) of

13   the study cohort had received chemotherapy prior to surgery and in which the pre-surgical sample

14   volumes were far lower than recommended. Such pre-surgical treatment suppresses ctDNA, and

15   thus necessarily lowers the ctDNA detection rate and low sample volume also can affect assay

16   sensitivity.

17

18       **ANSWER:** Natera admits that the Parikh et al. study reported that 45% of patients received

19   neoadjuvant therapy. Natera further states that Parikh et al. nevertheless reported a pre-surgical

20   sensitivity of 47% even excluding patients who received neoadjuvant therapy. Except as expressly

21   admitted, Natera denies the allegations in Paragraph 44 of the Complaint.

22

23       45.    **Post-surgical NPV/PPV**: Natera's further comparison of the 30-day post-surgical

24   negative and positive predictive value (NPV/PPV) for Signatera vs. Reveal, (i.e., 88%/100% vs.

25   "not reported" or "not validated"), is similarly misleading. For many CRC patients, surgery to

26   remove the tumor does not represent the end of the patient's initial treatment regimen; many patients

27   receive adjuvant chemotherapy. While—contrary to Natera's claim— Parikh et al. did report data

28

that could be used to calculate a 30-day post-surgical NPV and PPV for Reveal, they did not focus on—nor did they draw conclusions from—data from this timepoint. The 30-day post-surgical MRD timepoint is relevant for clinical MRD testing to assist with adjuvant therapy decisions during patient care. It is not the appropriate timepoint in an observational/retrospective research study to validate certain performance metrics, like PPV or NPV, of assays like Signatera or Reveal that are intended to predict disease recurrence.

**ANSWER:** Natera denies the allegations in Paragraph 45 of the Complaint.

46.     Simply put, adjuvant therapy works, and can cure MRD-positive patients that otherwise would have recurred. As such, estimates of an assay's NPV and PPV, when sourced from samples collected after surgery but before adjuvant chemotherapy, are confounded by the effect of chemotherapy and are uninterpretable—one cannot sort out the merits of the assay from the effects of the chemotherapy. Parikh et al. purposely chose to report data from samples collected after all definitive treatment to avoid this confounding factor precisely because nearly 55% of the study participants received additional treatment post-surgery.

**ANSWER:** Natera admits that adjuvant therapy is sometimes effective to cure MRD-positive patients that otherwise would have recurred. Except as expressly admitted, Natera denies the allegations in Paragraph 46 of the Complaint.

47.     Meanwhile, other assay performance metrics, such as sensitivity to detect recurrence are not subject to the confounding effect of post-operative chemotherapy. Nor is sensitivity to detect recurrence subject to the confounding effects of the baseline population risk, as described below. Thus sensitivity would be a more appropriate metric to compare assay performance at the 30-day post-surgery timepoint than NPV. However, Natera chose not to report this metric in its marketing materials, presumably because it shows Signatera's performance is less favorable compared to

Reveal. As reported by Reinert et al., the sensitivity of Signatera to detect recurrence using the 30-day post-surgical timepoint is 7/17 patients (41%). This metric as reported by Parikh et al. in the supplemental data shows 14/26 patients (54%). Among the subset of patients with stage I-III disease (excluding stage IV patients, a more similar stage representation to the Reinert et al. data), the Reveal data still show an even higher sensitivity for recurrence of 9/16 (56%).

**ANSWER:** Natera denies the allegations in Paragraph 47 of the Complaint.

48.     In short, PPV as a metric of assay validity must be taken from samples collected after all therapy is complete and where sufficient follow-up is available. Underscoring the importance of this—and the misleading nature of the values presented by Natera's advertising— the PPV for both assays is 100% when these conditions are met.

**ANSWER:** Natera denies the allegations in Paragraph 48 of the Complaint.

49.     **Diagnostic lead time**: Natera's unfavorable comparison of Reveal's "diagnostic lead time vs. radiographic recurrence," to that of Signatera, is also false and misleading. The calculation of a "diagnostic lead time estimate" is affected as much by the frequency of the tests that are used to derive the estimate as it is by the assay's sensitivity. As the following graphic shows, the diagnostic lead time estimate for the same assay and the same patient with same test results can vary significantly, depending on how often follow-up testing is conducted.



Case No. 3:21-cv-04062-EMC
DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

1

2          **ANSWER:** Natera denies the allegations in Paragraph 49 of the Complaint.

3

4          50.     Because Natera's diagnostic lead time estimates are derived from studies having

5   different protocols and testing regimens, its comparison is fundamentally flawed and unreliable. The

6   "diagnostic lead time estimate" for Signatera was developed from data reported by Reinert et al.

7   Reinert's study protocol called for CRC patients to undergo ctDNA testing 30 days after surgery,

8   and every three months afterwards, for three years or until the patient's death or withdrawal from

9   the study. In contrast, the study by Parikh et al. did not involve patient testing at regular intervals

10  over a specified period of time and was not designed to estimate "diagnostic lead time."

11  Consequently, Parikh et al. did not report an estimated diagnostic lead time for Reveal, and the "~4

12  months" value Natera fabricated for Reveal has no reliable basis in fact.

13

14         **ANSWER:** Natera admits the allegations in the second and third sentences of Paragraph 50.

15  Except as expressly admitted, Natera denies the allegations in Paragraph 50 of the Complaint.

16

17         51.     **"Serial longitudinal" NPV, hazard ratio, and sensitivity**: Likewise, Natera's

18  comparisons of the "serial longitudinal" NPV, hazard ratio, and sensitivity of Signatera and Reveal

19  are fundamentally misleading. Parikh et al.'s study of Reveal was not designed to provide "serial"

20  test data (i.e. testing at regular time intervals after the initial test), and consequently did not report

21  these statistics. Natera nevertheless biased its comparison with Reveal in Signatera's favor by

22  reporting Parikh et al.'s "longitudinal" sensitivity of 69%, which is calculated in patients who had

23  at least one surveillance draw, the timing of which was highly variable relative to the time of

24  recurrence, and is in no way similar to the timing of sample collection employed by Reinert et al.

25  This is fundamentally a misleading apples-to-oranges comparison. However, the Parikh et al. study

26  includes a subset of recurrence positive patients who had a Reveal sample available within 4 months

27  of recurrence. Using these data to estimate the "serial longitudinal" sensitivity parameter, Reveal

28

has an estimated sensitivity of 91%-comparable (or superior) to Signatera. Despite the valid estimate of 91% being clearly outlined in the Parikh et al. paper, Natera chose to use a fabricated and invalid "longitudinal" sensitivity estimate, again presumably because it cast Reveal in a less favorable light.

**ANSWER:** Natera admits that the Parikh et al. study reported a "longitudinal sensitivity" of 69% for Reveal. Except as expressly admitted, Natera denies the allegations in Paragraph 51 of the Complaint.

52.     Beyond its choice to disregard differences in testing frequency, Natera further biased its serial longitudinal NPV and hazard ratio comparisons by ignoring the significant differences in the patient populations from which the data were drawn. The Reinert et al. study using Signatera examined patients with stages I to III CRC, where the CRC recurrence rate was 19% (24/125 evaluable patients). In contrast, the patients included in the Parikh et al. study were more than twice as likely to recur (39%, 27/70 evaluable patients) demonstrating that the patients in this study had a much higher risk of disease recurrence than those studied by Reinert et al. Assays of equal sensitivity and specificity yield dramatically different NPVs and hazard ratios when applied to patient populations with different risk profiles. Natera's deliberate failure to account for this difference results in false and highly deceptive comparisons.

**ANSWER:** Natera admits the allegations in the second sentence of Paragraph 52. Natera denies the remaining allegations in Paragraph 52 of the Complaint.

**D.     Natera's False and Misleading Advertising Has Caused or Will Likely Cause Harm to Patients and to Guardant**

53.     Natera's commercial advertising and promotions have had their intended effect. Natera's efforts to disparage the performance of Reveal while falsely touting Signatera has misled

or is likely to mislead oncologists, healthcare institutions, and other potential customers, and caused these customers to order Signatera rather than Reveal for their CRC patients.

**ANSWER:** Natera denies the allegations in Paragraph 53 of the Complaint.

54.     In addition, Natera's false statements regarding Reveal have injured, or are likely to injure, the reputation of this product and the reputation of Guardant itself, costing Guardant customer good will and causing the loss of future sales. Natera's express and necessarily implied assertions that Reveal has "significant gaps in study design and performance," and is less sensitive and predictive than Signatera, sow doubt among oncologists and others about the utility and performance of Reveal. Natera explicitly reinforces this doubt by warning doctors that using Reveal may "be detrimental to patients." Natera's assertions will cause, and on information and belief may have already caused, some CRC patients to lose opportunities for rapid MRD detection and the attendant benefits of timely guided treatment decisions. They are also likely to cause irreparable harm to Guardant's business and reputation.

**ANSWER:** Natera denies the allegations in Paragraph 54 of the Complaint.

55.     By misleading oncologists and other medical professionals into believing that Reveal is unsupported, insensitive and inferior to Signatera, Natera has caused patients to miss the benefits of Guardant's validated and effective plasma only liquid biopsy assay.

**ANSWER:** Natera denies the allegations in Paragraph 55 of the Complaint.

**COUNT I:**

**FALSE ADVERTISING IN VIOLATION OF**

**SECTION 43(a)(1)(B) OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(B)**

56.     Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

**ANSWER:** Natera repeats its answers to the allegations above as if fully set forth herein.

57.     In its commercial advertising and promotion to potential customers, Defendant markets Signatera by stating and implying that Reveal suffers from significant gaps in study design and performance, and that Signatera's performance is superior to Reveal.

**ANSWER:** Natera denies the allegations in Paragraph 57 of the Complaint.

58.     Defendant's promotional claims about the relative clinical support and performance of Reveal and Signatera are false and/or misleading. The data Defendant relies upon to draw its comparisons in favor of Signatera are derived from studies conducted by different researchers, employing different methodologies and procedures, using different patient populations, and having different qualities and characteristics that do not permit a fair or valid comparison. Defendant disregards data that show Reveal has excellent clinical performance.

**ANSWER:** Natera denies the allegations in Paragraph 58 of the Complaint.

59.     These claims violate Section 43(a) of the Lanham Act, which provides in relevant part that a "person who, or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin

of his or her or another person's goods, services, or commercial activities, shall be liable to a civil action by any person who believes that he or she is likely to be damaged by such act."

**ANSWER:** The allegations in Paragraph 59 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 59 of the Complaint. Natera specifically denies that it has violated the Lanham Act or any other federal or state law.

60.    Defendant's promotional claims about the performance of Reveal, alone and in comparison to Signatera, are material. The clinical characteristics and performance of cancer diagnostic procedures are of paramount importance to doctors responsible for treating patients with life-threatening illnesses like CRC.

**ANSWER:** The allegations in Paragraph 60 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 60 of the Complaint.

61.    Pursuant to 15 U.S.C. § 1117, Plaintiff is entitled to damages for Defendant's Lanham Act violations, an accounting of profits made by Defendant on sales of its product, as well as recovery of the costs of this action.

**ANSWER:** The allegations in Paragraph 61 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 61 of the Complaint. Natera specifically denies that Guardant is entitled to damages, an accounting of profits allegedly made by Natera on sales of its product, recovery of the costs of this action, or any other relief.

62.     Defendant's acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiff to recover reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**ANSWER:** The allegations in Paragraph 62 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 62 of the Complaint. Natera specifically denies that Guardant is entitled to attorneys' fees or any other relief.

63.     Unless enjoined by this Court, Defendant's acts will irreparably injure Plaintiff's goodwill and erode its market share. Pursuant to 15 U.S.C. § 1116, Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendant's continuing acts.

**ANSWER:** The allegations in Paragraph 63 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 63 of the Complaint. Natera specifically denies that Guardant is entitled to any form of injunctive relief or other relief.

## **COUNT II:**

### **FALSE ADVERTISING IN VIOLATION OF**

### **CAL. BUS. & PROF. CODE § 17500 ET SEQ.**

64.     Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

**ANSWER:** Natera repeats its answers to the allegations above as if fully set forth herein.

65.     Plaintiff brings this cause of action pursuant to CAL BUS. & PROF. CODE § 17535 in an individual capacity and not on behalf of the general public.

1

2      **ANSWER:** Natera states that the Complaint speaks for itself, and no response is required to

3   the allegations in Paragraph 65. Natera specifically denies all liability under the California Business

4   and Professions Code, or any other state or federal law.

5

6      66.      CAL. BUS. & PROF. CODE § 17500 provides that it is unlawful for any person,

7   firm, corporation, or association to dispose of property or perform services, or to induce the public

8   to enter into any obligation relating thereto, through the use of untrue or misleading statements.

9

10     **ANSWER:** The allegations in Paragraph 66 of the Complaint state legal conclusions that

11  Natera is neither required to admit nor deny. Natera further states that Guardant purports to describe

12  a statute that speaks for itself. To the extent an answer is required, Natera denies the allegations in

13  Paragraph 66 of the Complaint.

14

15     67.      CAL. BUS. & PROF. CODE § 17508 provides:

16

17     It shall be unlawful for any person doing business in California and advertising to
       consumers in California to make any false or misleading advertising claim, including
18     claims that (1) purport to be based on factual, objective, or clinical evidence, that (2)
       compare the product's effectiveness or safety to that of other brands or products, or
19     that (3) purport to be based on any fact.

20     **ANSWER:** To the extent any response is required, Natera admits that Guardant purports to

21  quote from Cal. Bus. & Prof. Code § 17508, a statute which speaks for itself. Natera denies that it

22  has violated any provision of the California Business & Professions Code or any other state or

23  federal statute.

24

25     68.      Defendant's misleading statements violate CAL. BUS. & PROF. CODE §§ 17500

26  and 17508, and Plaintiff has acted in response to and reliance on the misleading statements made by

27

28

Defendant regarding the performance of Signatera and Reveal, including by expending time, money, and other resources on preparing its sales force to respond to these misleading statements.

**ANSWER:** The allegations in Paragraph 68 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 68 of the Complaint. Natera specifically denies that it has violated Cal. Bus. & Prof. Code §§ 17500 or 17508, or any other state or federal law.

69.    Defendant's conduct has caused Plaintiff damage in an amount to be determined at the trial herein but not less than $75,000 and, unless enjoined by this Court, Defendant's conduct will continue to cause Plaintiff irreparable damage for which Plaintiff has no adequate remedy at law.

**ANSWER:** The allegations in Paragraph 69 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 69 of the Complaint. Natera specifically denies that it has caused Guardant any damage.

70.    Pursuant to CAL. BUS. & PROF. CODE § 17535, Plaintiff seeks an order of this Court compelling the Defendant to provide restitution, and to disgorge the monies to which Plaintiff is entitled but were instead collected and realized by Defendant as a result of its false and misleading statements and injunctive relief enjoining Defendant from making such false and misleading statements.

**ANSWER:** Natera states that the Complaint speaks for itself. To the extent an answer is required, Natera denies the allegations in Paragraph 70 of the Complaint. Natera specifically denies any liability to Guardant, whether in law or equity.

1

2

**COUNT III:**

3

**UNLAWFUL TRADE PRACTICE IN**

4

**VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ET SEQ.**

5

71.     Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

6

7

**ANSWER:** Natera repeats its answers to the allegations above as if fully set forth herein.

8

9

72.     Pursuant to CAL. BUS. & PROF. CODE § 17200, unfair competition is "any

10

unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

11

advertising . . . ." The misleading statements made by Defendant regarding the performance of

12

Signatera in comparison to Plaintiff's Reveal violate CAL. BUS. & PROF. CODE § 17200 et. seq.

13

Moreover, Defendant's conduct constitutes a violation of the Lanham Act, and thus as unlawful

14

business conduct is separately actionable as a violation of CAL. BUS. & PROF. CODE § 17200 et.

15

seq. Defendant's conduct is also otherwise unfair and therefore a violation of these provisions.

16

17

**ANSWER:** The allegations in Paragraph 72 of the Complaint state legal conclusions that

18

Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the

19

allegations in Paragraph 72 of the Complaint. Natera specifically denies that Natera has violated any

20

provision of the California Business & Professions Code, the Lanham Act, or any other state or

21

federal law.

22

23

73.     Defendant's conduct has caused Plaintiff damage in an amount to be determined at

24

the trial herein, and, unless enjoined by this Court, Defendant's conduct will continue to cause

25

Plaintiff irreparable damage for which Plaintiff has no adequate remedy at law.

26

27

28

**ANSWER:** The allegations in Paragraph 73 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 73 of the Complaint. Natera specifically denies that it has caused damage to Guardant.

74.     Pursuant to CAL. BUS. & PROF. CODE § 17203, Plaintiff seeks an order of this Court compelling the Defendant to provide restitution, and to disgorge the monies to which Plaintiff is entitled but were instead collected and realized by Defendant as a result of its false and misleading statements and injunctive relief enjoining Defendant from making such false and misleading statements.

**ANSWER:** The allegations in Paragraph 74 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 74 of the Complaint. Natera specifically denies any liability to Guardant, whether in law or equity.

## **COUNT IV:**

### **COMMON LAW UNFAIR COMPETITION**

75.     Plaintiff repeats and hereby realleges the allegations above as if fully set forth herein.

**ANSWER:** Natera repeats its answers to the allegations above as if fully set forth herein.

76.     With full knowledge of Plaintiff's Reveal, Defendant has made false and misleading explicit and implicit representations to potential customers, and others that Defendant's Signatera offers superior performance compared to Reveal.

**ANSWER:** Natera denies the allegations in Paragraph 76 of the Complaint.

1

2      77.     Defendant's false and misleading statements and omission of relevant facts are likely

3   to cause and have caused confusion, mistake, or deception about the nature, characteristics and

4   qualities of Defendant's Signatera in comparison, connection, or association with Plaintiff's Reveal.

5

6      **ANSWER:** Natera denies the allegations in Paragraph 77 of the Complaint.

7

8      78.     Defendant knows, or in the exercise of reasonable discretion should know, that its

9   marketing program deceives potential customers about the nature, characteristics, and qualities of

10  Signatera in comparison, connection, or association with Plaintiff's Reveal.

11

12     **ANSWER:** Natera denies the allegations in Paragraph 78 of the Complaint.

13

14     79.     Defendant's conduct amounts to deception, trickery, and/or unfair methods and has

15  damaged and jeopardized Plaintiff's business. As a result of such malicious, wanton, and/or

16  fraudulent conduct, Defendant has caused, and unless enjoined by the Court, will continue to cause

17  confusion as to the performance of Signatera in comparison to Plaintiff's Reveal.

18

19     **ANSWER:** Natera denies the allegations in Paragraph 79 of the Complaint.

20

21     80.     Plaintiff is entitled to damages for Defendant's unfair competition, an accounting of

22  profits made on sales of Defendant's product, and recovery of Plaintiff s costs of this action.

23  Defendant's actions have been willful and have been undertaken with the purpose of deceiving

24  consumers. Thus, Plaintiff is entitled to an award of punitive damages.

25

26     **ANSWER:** The allegations in Paragraph 80 of the Complaint state legal conclusions that

27  Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the

28

allegations in Paragraph 80 of the Complaint. Natera specifically denies that Guardant is entitled to damages, an accounting of profits allegedly made on sales of Natera's product, recovery of costs of this action, punitive damages, or any other relief.

81.    As a result of Defendant's conduct, Plaintiff has suffered, and unless such acts and practices are enjoined by this Court, will continue to suffer, damage to its business, reputation, and goodwill for which it is entitled to relief.

**ANSWER:** The allegations in Paragraph 81 of the Complaint state legal conclusions that Natera is neither required to admit nor deny. To the extent an answer is required, Natera denies the allegations in Paragraph 81 of the Complaint. Natera specifically denies that Guardant is entitled to any relief.

## PRAYER FOR RELIEF

Natera denies that Guardant has any valid claim and denies that Guardant is entitled to any of the relief requested in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Without conceding that it bears the burden of proof or persuasion as to any of the issues raised in these defenses (whether denominated as affirmative defenses or otherwise), as separate and distinct affirmative defenses to Guardant's Complaint, Natera alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

The Complaint, in whole or in part, fails to state a claim against Natera upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because Guardant lacks standing to sue.

### THIRD AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because the statements alleged therein concern matters of which there is legitimate ongoing scientific disagreement and are therefore not actionable.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, by the doctrine of unclean hands.

### FIFTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, by the doctrine of estoppel.

### SIXTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because Guardant cannot show that it will suffer irreparable harm.

### SEVENTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because Guardant has suffered no injury or damages.

### EIGHTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because to the extent Guardant suffered any damages, which Natera denies, Guardant failed to mitigate its damages.

### NINTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because to the extent Guardant suffered any injury or damages, which Natera denies, such injury or damages were not caused, proximately or otherwise, by any action of Natera.

### TENTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because Guardant's alleged injuries and damages, if any, were proximately caused by the actions, inactions, and/or omissions of Guardant.

### ELEVENTH AFFIRMATIVE DEFENSE

The Complaint may be barred, in whole or in part, because any acts, conduct, and/or omissions alleged arise from a reasonable exercise of business judgment.

1

**TWELFTH AFFIRMATIVE DEFENSE**

2      The Complaint may be barred, in whole or in part, because Guardant has an adequate remedy

3   at law for any claims to equitable or injunctive relief.

4

**THIRTEENTH AFFIRMATIVE DEFENSE**

5      The Complaint may be barred, in whole or in part, because the alleged speech complained

6   of by Guardant is protected under the First Amendment.

7

**FOURTEENTH AFFIRMATIVE DEFENSE**

8      The Complaint may be barred, in whole or in part, because Guardant has waived whatever

9   rights it may otherwise have had to bring its causes of action.

10

**FIFTEENTH AFFIRMATIVE DEFENSE**

11      The Complaint may be barred, in whole or in part, because Guardant would be unjustly

12   enriched if allowed to recover any portion of the damages alleged in the Complaint.

13

**SIXTEENTH AFFIRMATIVE DEFENSE**

14      The Complaint contains insufficient information to permit Natera to raise all appropriate

15   defenses, and therefore, Natera reserves the right to amend and/or supplement these defenses and to

16   assert additional defenses.

17

**RESERVATION OF DEFENSES**

18      Additional defenses may be disclosed by discovery or additional factual allegations made

19   by Guardant. Accordingly, Natera reserves the right to amend, modify, revise, or supplement its

20   Answer, or to plead such further defense and/or take such further actions that may be necessary and

21   proper to preserve such additional defenses.

22

23

24

25

26

27

28

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

## COUNTERCLAIMS

In accordance with Rules 13 and 15(a) of the Federal Rules of Civil Procedure, Counterclaim-Plaintiff Natera, Inc. ("Natera") hereby alleges and asserts the following counterclaims against Counterclaim-Defendant Guardant Health, Inc. ("Guardant").

## SUMMARY OF THE ACTION

**A.**    ***Background***

1.    Natera is a recognized leader in non-invasive genetic testing. In August of 2017, Natera launched Signatera(TM), a novel personalized approach to cancer detection in plasma. The technology analyzes whole-exome sequencing data from a patient's tumor sample to custom design bespoke, individual-specific assays, targeting mutations known to be present in that patient's tumor tissue ("tumor signatures"). This uniquely personalized "tumor informed" approach enables physicians to accurately detect and monitor cell-free tumor DNA ("ctDNA"). The Signatera test has been shown to detect the presence of ctDNA earlier than traditional tools, and with fewer false positives, providing cancer patients with critical information that can save lives.

2.    Detecting and monitoring ctDNA in the blood of a cancer patient allows physicians to detect minimal/molecular residual disease ("MRD") and recurrence of a patient's cancer. Detection of residual disease can lead to better patient outcomes by informing important clinical decisions, including whether to treat with chemotherapy after surgery, whether to biopsy a suspicious lesion, or whether to continue or discontinue a particular treatment strategy.

3.    Natera's claims arise from Guardant's campaign of false and misleading commercial statements regarding the performance of its purportedly competitive MRD product, "Reveal."[8] Guardant's false and misleading statements, especially regarding crucial performance metrics such as sensitivity and specificity, can cause substantial harm to patients.

4.    For example, to the extent that doctors rely on Guardant's false and misleading claims about Reveal's specificity, doctors may make treatment decisions based on false positive results suggesting the presence of MRD when there is none. Such false positive results can lead to

---

[8]  Guardant has previously referred to Reveal as its "Lunar-1" test.

1 unnecessary biopsies, surgeries, chemotherapy, radiation treatment, or other invasive and damaging

2 procedures, cause emotional trauma to patients and loved ones, and needlessly waste resources on

3 expensive medical care. Unnecessary and damaging treatments such as radiation and chemotherapy

4 can put a patient's life at risk.

5      5.     To the extent that doctors rely on Guardant's false and misleading claims about

6 Reveal's sensitivity, doctors may make treatment decisions based on false negative results

7 suggesting the absence of MRD when MRD is present. Such false negative results can result in

8 doctors' failure to have patients undergo life-saving diagnostic tests and treatments such as biopsies,

9 surgeries, chemotherapy, and radiation, or other procedures necessary to prevent or treat recurrence.

10      6.     Reveal is a "tumor-naive test," which means that it looks for evidence of alterations

11 in the same genomic regions for every patient without accounting for tumor signatures.

12      7.     Rather than develop a superior product, Guardant has sought to cheat its way to

13 market share by misleading physicians and patients as to Reveal's clinical performance. In

14 particular, Guardant relies on a single published study on the performance of Reveal in colorectal

15 cancer ("CRC"), funded by Guardant and co-authored by Guardant executives and equity holders

16 ("the Study")[9] to support its claims about Reveal's clinical performance.

17 **B.**     *Guardant's Manipulation and Misrepresentation of the Study*

18      8.     The Study, however, does not support Guardant's marketing claims in multiple

19 respects: (1) Guardant makes clinical performance claims that have no basis in the Study; (2)

20 Guardant manipulated the methods used in and data reported by the Study; and (3) Guardant

21 misrepresents results from the Study.

22      **1.**     <u>**Guardant Makes Clinical Performance Claims for Reveal That Have No Basis**</u>

23          <u>**in the Study**</u>

24      9.     Guardant's marketing material intentionally misrepresents the performance metrics

25 reported in the Study. For example, the Study reports a contrived "surveillance" analysis to inflate

26 Reveal's sensitivity and does not report ***any*** specificity for the "surveillance" analysis. Nonetheless,

27 
_____

28 [9] Ex. A.

1  Guardant's marketing misleadingly and improperly claims a specificity for the surveillance analysis
2  even though no such metric is reported in the Study. Guardant's marketing also misleadingly pairs
3  the reported specificity from other, different analyses in the Study, the "landmark" and
4  "longitudinal" analyses, with the inflated sensitivity metric from the "surveillance" analysis,
5  suggesting a corresponding specificity when there is none.

6        10.     In addition, Guardant's false and misleading claims include reliance on the Study to
7  compare aspects of Reveal's clinical performance to the standard-of-care carcinoembryonic antigen
8  ("CEA") test. However, the Study reports no statistically significant data that would permit a
9  determination of the lead time of CEA in the Study's patient cohort. The Study therefore cannot be
10  relied on for a comparison of any lead time for CEA to a lead time for Reveal.

11      **2.**    **<u>Guardant's Manipulation of the Methods Used in and Data Reported by the</u>**
12          **<u>Study</u>**

13        11.     Guardant manipulated the methodology used in and data reported by the Study in
14  multiple respects, rendering the Study itself and Guardant's reliance on the Study to support its
15  broad clinical performance claims for Reveal false and misleading: (1) the Study falsely claims to
16  have been ███████████████████████████████████
17  █████████; (2) the Study reports artificially inflated clinical performance metrics, in
18  particular, sensitivity and specificity, based on improper cut-offs applied *post hoc* to exclude
19  unfavorable false negative and false positive results; and (3) the Study falsely claims that the
20  ██████████████████████████████████.

21       12.  ███████████████████████████████
22  ████████████████████████████████████████
23  ████████████████████████████████████████
24  ████████████████████████████████████████
25  ████████████████████████████████████████
26  ████████████████████████

27
28

13.    <u>Artificially inflated clinical performance metrics</u>. After the preliminary results of the Study, as reported in posters presented at scientific meetings, demonstrated Reveal's disappointing performance, Guardant contrived artificial cut-offs lacking any clinical relevance and without support in the scientific literature. In particular, in *post hoc* revisions of the Study's methodology, Guardant applied the "surveillance" analysis to exclude false negative results and a one-year clinical follow-up cut-off to exclude false positive results. Guardant also falsely attributed the "surveillance" analysis to a paper by Reinert et al., which applied no such cut-off. Indeed, tweaking cut-offs after the fact demonstrates the gross unreliability of the Study.

14.    Guardant used these unreliable, cherry-picked data to inflate key performance metrics such as sensitivity and specificity, which Guardant has since broadcast in its marketing for Reveal. For example, Guardant's manipulation of the Study's methodology artificially inflated Reveal's apparent sensitivity from 69% to 91%, an increase of 32% (22/69). Even according to Guardant's description of the surveillance methodology in the Study, the 91% sensitivity performance metric for Reveal is incorrect and should instead be a non-market leading 87.5%. This false 91% sensitivity performance metric then formed the basis of Guardant's false and misleading claims of "industry leading" performance for Reveal.

15.    

16.    Similarly, . Guardant has made dozens

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

1  of marketing claims touting the superior performance of a tumor-naïve approach despite █████

2  ████████████████████████.

### 3. Guardant's Claims Regarding Reveal's Clinical Performance Based on the Study Are False and Misleading

17.     By manipulating the Study's methodology and data to improve the apparent performance of Reveal, Guardant rendered the Study entirely unreliable, if not fraudulent. Guardant's marketing claims that rely on the Study, such as its claims of "industry leading sensitivity," are therefore also false and misleading. Guardant artificially inflated Reveal's apparent performance in a manner unrelated to the performance of Reveal in the intended clinical context. Guardant intended to, and did, mislead patients and physicians into believing that Reveal's performance was better than it actually is—a crucial consideration in deciding whether to prescribe, use, or otherwise choose Reveal over Signatera.

18.     Guardant has disseminated these false and misleading claims to influence healthcare professionals and patients to choose Reveal over Signatera and other MRD tests. Dissemination of these false and misleading statements regarding Reveal's clinical performance—including Reveal's artificially inflated sensitivity and specificity—puts Natera at a competitive disadvantage and endangers patients whose physicians rely on MRD testing to guide cancer treatment.

19.     Guardant made false and misleading claims about the Study and the performance of its product even before the Study was published—as early as January 2021. *See* Ex. B.

20.     These claims have caused and—unless enjoined—will continue to cause significant injury to Natera and put the health of cancer patients at risk across the country.

21.     Guardant's actions violate Section 43(a) of the Lanham Act and amount to unfair competition, false advertising, and unfair business practices. Natera seeks monetary and injunctive relief based on Guardant's unlawful conduct.

### THE COUNTERCLAIM PARTIES

22.     Natera is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 13011 McCallen Pass, Building A, Suite 100,

Austin, Texas 78753. Natera is a global leader in cell-free DNA testing. Natera's mission is to improve disease management around the globe, with a focus on women's health, oncology, and organ health.

23.     Guardant is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 505 Penobscot Dr., Redwood City, California 94063. Guardant may be served with process via its registered agent, CT Corporation System, 818 West Seventh Street, Suite 930, Los Angeles, California 90017.

## JURISDICTION AND VENUE

24.     Natera's counterclaims arise under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 et seq., Cal. Civ. Proc. Code § 1060 et seq., Cal. Bus. & Prof. Code § 17500 et seq., Cal. Bus. & Prof. Code § 17200 et seq., and the common law of California and other states in which Guardant is conducting its activities. An actual controversy exists under the Declaratory Judgment Act because Guardant has asserted and is asserting violations of Section 43(a) of the Lanham Act by Natera, and Natera denies those allegations.

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202. This Court has supplemental jurisdiction over Natera's state law claims pursuant to 28 U.S.C. § 1367.

26.     This Court has personal jurisdiction over Guardant because Guardant has purposefully availed itself of the rights and privileges of this forum by virtue of the filing of its Complaint in this Court in Case No. 3:21-cv-04062-EMC on May 27, 2021. Guardant is also subject to specific personal jurisdiction in this District because it maintains a regular place of business in the District, and because, as set forth in detail below, acts giving rise to Natera's counterclaims have occurred in the Northern District of California, including disseminating false and misleading advertisements to physicians, patients, healthcare professionals, and others residing in California.

27.     Venue is proper in this District as to these counterclaims pursuant to 28 U.S.C. § 1391 because, *inter alia*, Guardant has submitted to the venue of this Court by filing its complaint

1  here. Venue is also proper because a substantial part of the events giving rise to Natera's

2  counterclaims occurred and are continuing to occur in this District.

3  <u>**FACTUAL ALLEGATIONS**</u>

4  **A.    *Natera Launches Signatera.***

5      28.    On August 21, 2017, Natera launched Signatera, a bespoke ctDNA test designed to

6  detect and measure MRD in patients previously diagnosed with cancer, to aid detection of cancer

7  recurrence. Signatera is able to detect MRD earlier than traditional methods, and thereby helps

8  optimize cancer treatment decisions. The test is available for both clinical and research use and has

9  been granted three Breakthrough Device Designations by the Food and Drug Administration

10  ("FDA") for multiple cancer types and indications. Signatera's performance has been clinically

11  validated in multiple cancer types including colorectal, non-small cell lung, breast, and bladder

12  cancers.

13      29.    At least sixteen studies, publications and presentations support the efficacy of

14  Signatera.[10]

15  **B.    *Guardant Launches Reveal, a Tumor-Naïve MRD Test.***

16      30.    On or around February 16, 2021, more than three years after the release of Signatera,

17  Guardant released a "tumor-naïve" MRD test, called Reveal. Like Signatera, Reveal is a ctDNA

18  test, designed to detect the presence of MRD in patients who have been previously diagnosed with

19  cancer. Reveal is validated for use only in colorectal cancer. Reveal has not been granted FDA

20  Breakthrough Device Designation or any other FDA clearance or approval.

21      31.    Guardant supported and co-authored the Study, which is the single published study

22  on the performance characteristics of Reveal in CRC. Guardant not only manipulated the Study's

23  methods and results to improve the apparent performance of Reveal, but also, in its marketing, has

24  falsely attributed favorable performance metrics to the Study that the Study does not evaluate or

25  _____

26  [10]  Including the Reinert T., Henricksen TV, Christensen E. et al. study entitled "Analysis of Plasma
  Cell-Free DNA by Ultradeep Sequencing in Patients with Stages I to III Colorectal Cancer," published

27  in JAMA Oncology in 2019 ("Reinert et al."), and the Shirasu et al. study entitled "Prospective
  Observational Study Monitoring Circulating Tumor DNA in Resectable Colorectal Cancer Patients

28  Undergoing Radical Surgery: GALAXY Study in CIRCULATE – Japan" in 2021.

report, such as surveillance specificity and a comparison of diagnostic lead time of Reveal to the lead time for the standard-of-care CEA test. Although Guardant's marketing purports to rely on the Study, the Study's design and limited results render Guardant's performance claims unsupported, unreliable, literally false, and misleading.

**C.    *Measuring Performance of a ctDNA Test.***

32.    Researchers generally evaluate the performance of a ctDNA test such as Signatera or Reveal using two key metrics: sensitivity and specificity. Additional relevant metrics include positive predictive value ("PPV"), negative predictive value ("NPV"), diagnostic lead time (the time between first MRD detection and confirmed radiographic recurrence), outcomes analysis, and hazard ratio ("HR").

33.    Sensitivity measures the percentage of positive results that are correctly identified among recurring patients, as verified by a clinical "gold standard" (*e.g.*, subsequent clinical or radiographic recurrence). A test with high sensitivity is more likely to detect the presence of ctDNA in a blood sample in which MRD is actually present.

34.    Specificity measures the percentage of negative results that are correctly identified among non-recurring patients. A test with high specificity is more likely to identify the absence of cancer in a blood sample when no MRD is in fact present, as verified by a clinical "gold standard" (*e.g.*, the patient remains recurrence-free or progression-free).

35.    To be accurate and meaningful, sensitivity and specificity should be calculated and reported together in the same analysis of the same set of samples. *See* Ex. C at 21. Sensitivity and specificity cannot be interpreted and provide no meaningful information when presented individually, because those values can differ from analysis to analysis, based on several factors, including differences in patient cohort.

36.    Mixing and matching sensitivity and specificity metrics from different studies invites abuse and permits an unscrupulous laboratory to deceive patients and physicians. Such mixing and matching is also inconsistent with guidance from the FDA and other regulatory authorities.

37.    For example, if a laboratory knew that all the samples in its study were from patients who had recurred, the laboratory could tweak its algorithm to call every result positive. In that instance, the laboratory could claim 100% sensitivity. This would be misleading, because a test designed to call every result positive would have exceedingly low specificity, and such a test would have almost no clinical utility in the real world.

38.    Conversely, a laboratory could conduct a separate study on a cohort of patients, none of whom recurred, and tweak its algorithm to call every result negative. In that instance, the test would have 100% specificity, but exceedingly low sensitivity. Such a test would have almost no clinical utility.

39.    An unscrupulous laboratory could combine the sensitivity from the first study and the specificity from the second to claim that "studies have shown that the test has 100% sensitivity and 100% specificity." Such a statement may accurately report the results of the studies, but by mixing and matching metrics, the performance claims are wildly misleading.

40.    Established scientific practice as well as guidance from regulatory authorities and professional organizations, such as the U.S. Food and Drug Administration ("FDA") and other federal agencies responsible for administering the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), the New York State Department of Health, and the College of American Pathologists ("CAP"), require or recommend that labs demonstrate satisfactory sensitivity *and* specificity measures in order to be accredited. For example, the FDA's Statistical Guidance on Reporting Results from Studies Evaluating Diagnostic Tests states: "Sensitivity and specificity are basic measures of performance for a diagnostic test. *Together*, they describe how well a test can determine whether a specific condition is present or absent. They each provide distinct and equally important information, and FDA recommends they be presented together . . . ." Ex. C at 21.[11]

41.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[11] All emphases are added unless otherwise noted.

1

2

3    42.    As described above and discussed below, Guardant's practice of reporting sensitivity

4  or specificity in isolation, mixing and matching metrics, and using non-representative study cohorts

5  permits it to make false and misleading marketing claims while nonetheless citing peer-reviewed

6  publications.

7    43.    Guardant's marketing claims fundamentally misrepresent the data and conclusions

8  of the Study to either obfuscate or artificially inflate the performance of the Reveal test.

9  **D.    *Guardant's Manipulation and Misrepresentation of the Study.***

10    **1.    <u>Guardant Makes Clinical Performance Claims for Reveal That Have No Basis</u>**

11    **<u>in the Study</u>**

12    i.    <u>Guardant's Specificity Claims Are False and Misleading Because Guardant</u>

13    <u>Has No Specificity Data in the Relevant Context</u>

14    44.    Guardant's claims regarding the specificity of Reveal are false and misleading.

15  Guardant's marketing falsely and misleadingly pairs the artificially inflated 91% sensitivity from

16  the "surveillance" analysis with the artificially inflated specificity from the "landmark" and

17  "longitudinal" analyses. Ex. B at 17. In this manner, Guardant improperly mixes and matches

18  sensitivity and specificity metrics from different analyses.

19    45.    Guardant's marketing materials and other public statements also falsely claim that

20  Reveal has 100% specificity in the surveillance context. Ex. D at 8. In its marketing materials,

21  Guardant was forced to combine specificity data from the longitudinal analysis with sensitivity data

22  from the surveillance analysis from the Study because the Study did not report specificity in

23  connection with the surveillance analysis. Presenting sensitivity and specificity scores from different

24  analyses together is extremely misleading, given the relationship between sensitivity and specificity.

25    46.    Guardant's claims of 100% specificity in the surveillance context are literally false

26  because Reveal's specificity in the surveillance context cannot be determined from the Study, and

27

28

the Study accordingly did not report such a metric. Guardant's marketing claims about 100% specificity paired with 91% sensitivity have no basis in the Study—or in reality.

47. A specificity score could not be determined utilizing the Study's peculiar "surveillance" method because, by definition, all patients in the sample group had experienced a recurrence of cancer, and it would be impossible to obtain a false positive within such a group.

48. The Study did not determine or report the specificity measure for the surveillance analysis. Guardant presents this contrived 100% surveillance specificity figure as a measure of test performance as if the Study had actually measured surveillance specificity.

49. The Study has limited clinical value given the critical need for physicians and patients to know accurately if cancer is present. The Study admits that "the lack of systematic longitudinal and surveillance draws across all patients precluded a comprehensive assessment." Ex. A at OF7.

50. Guardant also admits, through employee Thereasa Rich, that its claim of 100% surveillance specificity is no more than an estimate. Dkt. 66-3 at 11; Dkt. 68 ¶ 29.

51. Guardant's marketing materials exploit and abuse the Study's limited scope in the surveillance analysis (i.e., all patients experienced recurrence) by misleadingly pairing the Study's reported 100% specificity (from the "landmark" and "longitudinal" analyses) with its unsupported 91% sensitivity score from a different analysis (the "surveillance" analysis), including during a presentation at the January 11, 2021 JPMorgan Health Conference, which was disseminated to healthcare professionals, investors, potential patients, and others throughout the United States. *See, e.g.*, Ex. B at 17.

52. Guardant's presentation of these two metrics gives the false impression that they were reported in the same analysis, when in fact they were not.

53. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ███████████████████████████████████

4　　　54.　Guardant's marketing claims related to Reveal's specificity are also false and

5 misleading because they omit contradictory results from the Study. The Study reported a specificity

6 score of 100% in patients in the context of an arbitrary requirement of at least one-year minimum

7 clinical follow-up. This requirement allowed the Study to exclude two patients whose positive test

8 results without recurrence would have negatively affected specificity. The Study was initiated more

9 than a year prior to publication, and Guardant (as both a co-author of the Study and provider of

10 testing) has had ample opportunity to follow up with the two patients well in advance of the Study's

11 publication, issue supplemental findings, and update their marketing materials accordingly. █

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████ But Guardant evidently chose not to collect any additional data on

16 the two excluded apparently false positive patients, rendering Guardant's marketing claims

17 regarding 100% specificity false and misleading.

18　　　　　　　ii.　Guardant's Comparisons of Reveal's Lead Time and Specificity with CEA

19　　　　　　　　Are False and Misleading

20　　　55.　Guardant's comparisons of the performance of Reveal to CEA are demonstrably

21 false and misleading. For example, Guardant has claimed that Reveal has "a higher . . . specificity

22 than CEA . . . in the surveillance setting." Ex. F at 2. Given that the Study did not report *any*

23 specificity for Reveal in the "surveillance" analysis, the Study cannot support comparisons of any

24 such specificity for Reveal with the specificity of CEA.

25　　　56.　In addition, Guardant claims in its marketing materials—supported only by the

26 Study—that Reveal detects "recurrence months earlier than current standard-of-care methods like

27 carcinoembryonic antigen (CEA)" (Ex. E at 1-2 & n.7; Ex. D at 6 & n.2; *see also* Ex. F at 2).

28

1  However, the Study presents no statistically significant data from which a lead time for CEA could

2  be evaluated in the Study's patient cohort. Therefore, the Study cannot be relied on to support

3  Guardant's comparisons of a lead time for Reveal with that of CEA. Guardant's claims regarding

4  Reveal's lead time relative to that of CEA are thus false and misleading.

5       57.    Furthermore, the Study's definition of "abnormal CEA" used a non-standard cut-off

6  of 3.4 ng/mL. Ex. A at OF2. The references provided in the Study do not support using this cut-off,

7  which has, to Natera's knowledge, not been utilized in this setting. The clinical cut-off in most

8  widespread use is 5 ng/mL (used in prior ctDNA studies in the intended use population). Some

9  studies have examined other cut-offs, but not 3.4 ng/mL. The Study's unconventional cut-off falsely

10  and misleadingly inflated Reveal's performance characteristics as compared to CEA.

11       58.    Because Guardant's claims comparing Reveal's performance to CEA purport to be

12  based on the Study but are not, they are literally false and misleading.

13       59.



20   2.   **Guardant's Manipulation of the Methods Used in and Data Reported by the**

21        **Study**

22       60.    Guardant designed and manipulated the methodology of the Study, resulting in

23  artificially favorable results that have no relevance to the clinical setting and Reveal's intended use.

24  Guardant also engaged in a scheme ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to achieve more

25  favorable results in multiple ways: (1) the Study falsely claims to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

26  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; (2) the Study reports

27  artificially inflated clinical performance metrics, in particular, sensitivity and specificity, based on

28

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

improper cut-offs applied *post hoc* to exclude unfavorable false negative and false positive results; and (3) the Study falsely claims that ███████████████████████████████████████████████████████████████████████████████████

i. ████████████████████████████████

61. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ to exclude unfavorable data and yield the most favorable results. This approach renders the Study entirely unreliable, especially for use in clinical decision making.

62.     On information and belief, the manipulation of the Study's methodology and data was intended to enable Guardant to gain an improper advantage in the MRD test market.

ii.     The Study Reports Artificially Inflated Clinical Performance Metrics

63.     Guardant manipulated the Study's methodology in several ways: (1) Guardant engineered an artificial "surveillance" analysis to inflate the unimpressive 69% sensitivity demonstrated by Reveal in the Study; (2) Guardant falsely represented in the Study that the 4-month surveillance cut-off had been applied both to true positive and false negative samples, when, in fact, the 4-month cut-off was applied only to exclude false negative samples and not to exclude true positive samples, further inflating the apparent sensitivity of Reveal; (3) Guardant falsely attributed this "surveillance" method to Reinert et al. to lend the method an appearance of reliability; (4) Guardant imposed another arbitrary cut-off to exclude two false positive samples from the landmark and longitudinal analyses, resulting in an inflated specificity metric of 100% for those analyses; and (5) Guardant used ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

64.     The "surveillance" analysis is unsupported by medical or academic literature and not previously validated by the biomedical research community. Moreover, the Study fraudulently

attributes the "surveillance" method to Reinert et al., in an apparent effort to lend an imprimatur of reliability to this unscientific and unvalidated approach. Guardant's touted "91% sensitivity" for Reveal depends entirely on this illegitimate and inconsistently applied "surveillance" analysis.

65.    ███████████████████████████████████ the Study rely on it to improve the apparent sensitivity of the method. Ex. A at OF4. Specifically, the Study stated, "Based on the methods employed by Reinert and colleagues (6), we assessed performance in patients with evaluable 'surveillance' draws, defined as a draw obtained within 4 months of clinical recurrence, and observed that sensitivity improved to 91%." *Id.* This statement is false and misleading in several different respects.

66.    First, the contrived 4-month "surveillance" cut-off allowed Guardant to exclude 7 of 9 false negative results, on the improper basis that these 7 patients lacked a "surveillance draw," defined as a draw obtained within 4 months of recurrence. Ex. A at OF4. The exclusion of these 7 false negative patients resulted in a substantial increase in the apparent sensitivity of the analysis, from an unimpressive 69% (20/29) in the "longitudinal" analysis to a much higher 91% (20/22) in the "surveillance" analysis. By using the artificial 4-month cut-off to create the so-called "surveillance" analysis, Guardant could claim to have attained 91% sensitivity on the same data. Ex. A at OF6 (Fig. 3B). Guardant has repeatedly touted this artificially inflated 91% sensitivity number in its marketing materials, as discussed below in Section D.3.i. The Study offered no scientific justification for eliminating these false negative results. ██████████████ ███████, the Study therefore falsely and misleadingly boosted the sensitivity of the assay from 69.0% to 90.9%.

67.    In this fashion, the "surveillance" analysis actually excluded patients, reducing the total number of patients evaluated from 29 in the "longitudinal" analysis to 22 in the "surveillance" analysis. Notably, however, Guardant falsely concealed the elimination of patient samples from the "longitudinal" analysis to arrive at the "surveillance" analysis with its inflated 91% sensitivity, stating: "By *incorporating* longitudinal surveillance samples, sensitivity improved to 91%." Ex. G. This statement stands in stark contrast to what the Study actually reported in Figure 3B, which shows

that the "surveillance" analysis *excluded* 7 patients. Ex. A at Fig. 3B; *see also id.* at OF4 ("[W]e assessed performance in patients *with evaluable 'surveillance' draws*, defined as a draw obtained within 4 months of clinical recurrence, and observed that sensitivity improved to 91%.").

68.     Second, the 4-month "surveillance" cut-off was applied *only* to false negative results, where ctDNA was not detected in recurring patients, and not to positive results, where ctDNA was detected in recurring patients. Specifically, the "longitudinal" analysis detected ctDNA in 20/29 recurring patients, and correspondingly failed to detect ctDNA in 9 recurring patients (false negatives). Of the 9 false negatives, 7 were excluded from the "surveillance" analysis on the grounds that they did not have "surveillance draws" within 4 months of recurrence. However, all 20 positive results from the longitudinal analysis, where ctDNA had been detected in recurring patients, were included as positive results in the "surveillance" analysis, *whether or not they had "surveillance" draws* within four months of clinical recurrence. In other words, the four-month cut-off was applied *only to exclude false negative results*, *i.e.*, failures to detect ctDNA in recurring patients, from the surveillance analysis. Had the Study applied the contrived 4-month "surveillance" cut-off both to false negative results and to apparent "true positive" results, the sensitivity would have been about 14/16 or 87.5%, not 91%. Moreover, the number of patients included in the "surveillance" analysis would have dropped from 22 to about 16, *only 8* of whom were Stage I-III patients, the clinically relevant population for Reveal.

69.     Third, the Study's attribution of this biased, unscientific, and inconsistently applied "surveillance" method to Reinert et al. was fraudulent because Reinert et al. contains no such analysis. Indeed, the lead author of the Study, ███████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████



70.    The lead Study author initially

On information and belief,

, the Study's authors

Notably, Guardant appears not to reference the unfavorable 69% sensitivity performance metric in its marketing.

71.    The purported 91% sensitivity of the assay, derived from the biased, illegitimate, and inconsistently applied "surveillance" analysis, has little to no relevance in the clinical setting. Specifically, Guardant recommends that clinicians conduct blood draws only once every 6 months in years 2-5 following definitive treatment, rendering analyses within four months of recurrence, as required by the Study's "surveillance" analysis, unlikely and subject to chance. Ex. H. Although Guardant uses the term "surveillance" in its clinical recommendations and in the Study, the term has different meanings in each of these contexts. There is no evidence that the "surveillance" performance in the Study is in any way indicative of the performance of the "surveillance program" recommended by Guardant in its marketing of Reveal. Guardant's use of the same term to mean two things is a deliberate attempt to confuse patients and physicians into thinking that the Study's results are in any way relevant to clinical performance.

72.    In light of Guardant's manipulation of the Study, the Study cannot be used to establish any performance claims about Reveal in the *clinical* context, and any such claims are therefore literally false. *See infra* Section D.3.

73.    Guardant's manipulation of the Study's methodology went beyond the "surveillance" analysis. On information and belief, Guardant also manipulated the Study's methodology pertaining to the "landmark" and "longitudinal" analyses to boost the results for marketing purposes.

74.    Just as the Study, ▮▮▮▮▮▮▮▮, excluded false negative results to inflate the apparent sensitivity of the method in the illegitimate "surveillance" analysis, the Study also falsely inflated the apparent specificity of the method by excluding false positive results based on unreliable and unscientific criteria. Specifically, on information and belief, ▮▮▮▮▮▮▮▮, the Study imposed an arbitrary and unexplained requirement that, to be included in the landmark analysis, patients must have had at least a one-year minimum clinical follow-up after the end of definitive therapy. Ex. A at Fig. 2 (TPS1363 and TPS1473 excluded). This arbitrary one-year cut-off allowed Guardant to exclude results from two patients who had ctDNA detected in their samples but did not recur during the time period during which they were monitored. Inclusion of these samples (false positives) would have reduced the apparent specificity of the assay. Their exclusion led to an artificially inflated 100% specificity. As discussed above in Section D.1.i, Guardant touts this arbitrarily obtained "perfect" specificity score in its marketing of Reveal.

75.    The Study provides no justification for the one-year cut-off. Furthermore, given that the Study was initiated two years ago in or around early 2019, Guardant (as both a co-author of the Study and provider of testing) has had ample opportunity to try to determine the recurrence status of these two patients. Had Guardant or the Study's authors done so, they could have issued supplemental findings and updated their marketing materials accordingly.

76.    Guardant, however, has apparently chosen not to follow up with these two patients, given the risk that the 100% specificity achieved would have to be downgraded. It would appear that Guardant has manipulated the Study's methodology to exclude unfavorable results and enable it to falsely and misleadingly claim specificity of 100% in its marketing.

77.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1

2

3

4

5

6

7

8

9                                              This misrepresentation is

10 significant and materially undermines the Study's reliability. It further calls into question whether

11 Guardant's marketing claims relying on the Study are established.

12         78.    In view of these methodological issues, it is unsurprising that the Study was

13

14

15

16

17                                                                              , it was

18 inappropriate for Guardant to use an arbitrary *post hoc* analysis to manipulate the Study's results in

19 support of its marketing claims.

20        iii.

21        79.    Guardant manipulated the data reported in the Study by

22

23

24

25        80.    Interpreting genetic data to call a patient positive or negative for ctDNA accurately

26 is a challenging bioinformatics problem. These "calls" are made by a "calling algorithm."

27

28



81.

82.

83.

84.

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS



85.

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS



86.

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS



DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS



87.

DEFENDANT NATERA'S FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS



88.

### 3.   Guardant's Claims Regarding Reveal's Clinical Performance Based on the Study Are False and Misleading

89.    By manipulating the Study's methodology and data to improve the apparent performance of Reveal, as outlined above, Guardant rendered the Study entirely unreliable, if not fraudulent. Guardant's marketing claims that rely on the Study are therefore also false and misleading. Guardant artificially inflated Reveal's apparent performance in a manner unrelated to the performance of Reveal in the intended clinical context. Guardant intended to, and did, mislead patients and physicians into believing that Reveal's performance was better than it actually is—a crucial consideration in deciding whether to prescribe, use, or otherwise choose Reveal over Signatera.

i.    The Study Does Not Support Guardant's Claims of "Industry-Leading" Performance

90.    On or around February 16, 2021, Guardant issued a press release making numerous false and misleading statements regarding the performance of its test, relying exclusively on the Study. *See* Ex. E. In the press release, Guardant claimed that its test had achieved an "industry-leading" sensitivity measure of 91%. *Id.* This is demonstrably false for two reasons: first, its test has

not achieved a reliable sensitivity score of 91%, given its arbitrary exclusion of cases in its surveillance analysis and the manner in which it was inconsistently applied only where it led to exclusion of false negatives but not where it led to exclusion of true positives; and second, its actual sensitivity score, as reported for the "longitudinal" analysis in the Study, lags behind its competitors in the market, including Natera's Signatera test.

91.    Among other things, the Study reported two different analyses for determining sensitivity: "longitudinal" and "surveillance" analyses. The longitudinal analysis included patient samples after definitive treatment, either surgery or surgery plus adjuvant therapy. Researchers frequently use longitudinal analysis because they offer significant real-world clinical value. Under this longitudinal analysis, the Study reported a sensitivity score of 69%. The sensitivity score of 69% was the *only* sensitivity score reported for serial test performance in three posters by the authors of the Study prior to publication of the Study in the journal. Exs. I-K.

92.    Guardant's marketing claims of 91% sensitivity in the "surveillance" context are instead derived from the peculiar definition of "surveillance" contrived by Guardant for the Study. Guardant's redefinition of the commonly used term "surveillance" demonstrates Guardant's intent to confuse physicians and patients about the surveillance analysis in the Study. As described above, Guardant was able to achieve a figure of 91% only by contriving to exclude 7 false negative results that were included in the longitudinal analysis while simultaneously (and inconsistently) declining to exclude about 6 true positive results that were included in that analysis but should have been excluded under the Study's definition of "surveillance."

93.    The only clinically relevant performance data comes from the Study's "longitudinal" analysis, which reported a sensitivity measure of 69%. Reveal's sensitivity score of 69% is far from "industry leading"; Natera's Signatera test, among others, has significantly higher sensitivity.

94.    Given both the specious definition of "surveillance" and the unreliability of the Study described above, Guardant could not have concluded with any reasonable degree of certainty that it had established either a sensitivity rate of 91% for the test or "industry leading" performance. This is especially so given that the sensitivity measure obtained through consistent application of the

Study's arbitrary 4-month cut-off results in a sensitivity of only 87.5%—not 91%, and certainly not industry leading.

95.     Since first advertising them in connection with Reveal, Guardant continues to tout these misleading results. For example, in connection with the 2021 Annual Meeting of the American Society of Clinical Oncology ("ASCO") (June 4 to June 8, 2021), Guardant again presented the unfounded results of the Study to physicians and patients and misleadingly compared the sensitivity of Signatera and Reveal to Natera's detriment. Ex. L.

96.     During Guardant's formal presentation at ASCO, Jessica Kurata, Ph.D., a Guardant Senior Bioinformatics Scientist, stated that "plasma-only MRD detection [i.e., Reveal] demonstrates favorable sensitivity and specificity for recurrence comparable to tissue dependent approaches [i.e., Signatera]." Ex. M. Reveal's 69% sensitivity does not compare favorably to Signatera.

97.     The ASCO presentation was made after Natera filed its complaint against Guardant in the Western District of Texas, which described in detail why the 91% sensitivity figure is false and misleading. Guardant's false claims were made knowingly.

98.     In addition to Guardant's false and misleading claim that its 91% sensitivity is "industry leading," Guardant's more general claims of "industry-leading performance" are similarly false and misleading. Guardant alleges that comparing results from separate studies inherently "creat[es] the false impression that [separate] studies provide an appropriate basis for comparison" because such separate studies do not "reflect a head-to-head comparative analysis." Dkt. 12-1 at 1. Guardant's marketing of Reveal as having "industry leading performance" is, by its own assertions, based only on what it claims to be misleading apples-and-oranges comparisons of separate studies.

99.     Guardant's claims of "industry leading performance" are also false on their merits. For example, while Natera's Signatera test has a diagnostic lead time of 8.7 months (*see* Ex. N), the Study does not contain sufficient data to make any claims about comparisons of Reveal's lead time to CEA, and does not support an "industry leading" diagnostic lead time of any kind. In addition, Guardant's Reveal test has a pre-surgical detection rate of only 47% (*see* Ex. A), compared to a pre-surgical detection rate of 89-94% for Natera's Signatera test. *See* Ex. N. ▮▮▮▮▮▮

1  ████████████████████████████████████████████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████ Guardant's claims that Reveal is "industry leading" are therefore false in

4  multiple respects.

        ii.    <u>The Study Does Not Support Guardant's Claims of Clinical Performance</u>

            <u>for Reveal in the Relevant Patient Cohort</u>

7        100.    In a press release posted to its website, Guardant claimed: "For oncologists, the test

8  improves the management of early-stage CRC [colorectal cancer] patients by detecting circulating

9  tumor DNA (ctDNA) in blood after surgery to identify patients with residual disease who may

10  benefit most from adjuvant therapy." Ex. O; *see also* Ex. F at 2 (advertising Reveal's "two main

11  applications for your early stage (II and III) colorectal cancer patients").

12        101.    However, the Study, which Guardant relies on for this claim, contained at least 19%

13  Stage-IV CRC patients who do not qualify as "early-stage" CRC patients.

14        102.    Moreover, if the surveillance analysis that is the basis for the 91% sensitivity metric

15  had properly applied the 4-month cut-off, as discussed above, only about 8 Stage II-III patients

16  would have been evaluated in this analysis.

17        103.    Guardant fails to account for the impact the significant percentage of Stage-IV

18  patients would have on the results of the Study. Moreover, Guardant failed to identify the number

19  of recurrences that were driven by the Stage IV group. Accordingly, Guardant's claim that the test

20  improves the management of early-stage CRC patients is highly misleading.

21        104.   ████████████████████████████████████ Guardant

22  nonetheless continues making claims about early-stage patients based on the Study that had a small

23  patient population, with only a subset of patients being early-stage patients. ████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ████████████████████████████████

105.    Similarly, one of the Study's authors expressly acknowledged this limitation in an interview with *Precision Oncology News*, stating: "I think one of the limitations that we discussed in our paper was this is not a pure population of only stage II or III. It is a mix of all four stages." Molika Ashford, *Guardant MRD Test Performs Well in Small Study as Tissue-Informed Debate Takes Shape*, PRECISION    ONCOLOGY    NEWS    (May    7,    2021), https://www.precisiononcologynews.com/liquid-biopsy/guardant-mrd-test-performs-well-small-study-tissue-informed-debate-takes-shape#.YLE36ahKj-g.

106. ███████████████████████████████

███████████████████████████████

███████████████████

107.    In short, the Study is missing the necessary indicia of a reliable validation in the relevant patient population to which Guardant markets Reveal, and it is false and deeply misleading for Guardant to use it as the basis for its false and sweeping marketing claims.

**E.    *Guardant Disseminated Its False Claims Through Interstate Commerce.***

108.    Guardant disseminated false and misleading statements regarding the effectiveness of Reveal in interstate commerce. For example, the February 16, 2021 press release (Ex. E), the June 18, 2021 press release (Ex. G), and the undated publication discussed in Paragraph 100 above (Ex. O) were all posted on Guardant's website and transmitted throughout the world. Additionally, the false statements Guardant made during the JPMorgan Healthcare Conference (*see* Ex. B) were made via video- and telephone conference to healthcare professionals, investors, potential patients, and other participants throughout the United States, and the presentation deck containing the misrepresentation has since been circulated to persons throughout the United States. Other false statements were disseminated to customers and potential customers throughout the United States (*see, e.g.*, Exs. D, F, M).

**F.    *Guardant's False and Misleading Statements Were Made in the Context of Commercial Marketing, Advertising and/or Promotion.***

109.    Guardant made the false and misleading statements detailed above in the context of commercial marketing, advertising, and/or promotion. For example, Guardant's February 16, 2021 press release publicly announced the commercial release and availability of Reveal. Ex. E ("Guardant Health Launches Guardant Reveal™ Liquid Biopsy Test for Residual Disease and Recurrence Monitoring in Patients with Early-Stage Colorectal Cancer"). A month earlier, Guardant's January 11, 2021 presentation at the JPMorgan Healthcare Conference showed the Reveal packaging and previewed the commercial launch of Reveal. Ex. B at 19 ("Launching in Q1 2021"), 33 ("Launching Guardant Reveal for use in early-stage colorectal cancer"). And the email disseminated to customers was part of a product marketing campaign. Ex. F at 1-3.

110.    Each of the false and misleading statements recounted above were widely circulated to decision makers, including healthcare professionals, investors, and others to influence those decision makers to recommend, use, purchase, or otherwise choose the Reveal test over competing—and even superior—products. Guardant intended its statements about alleged performance benefits to be heard loud and clear by potential customers and for them to choose Reveal over other competing products, including Signatera.

**G.    *Guardant's False and Misleading Statements Were Material.***

111.    As outlined in more detail above in Section D, Guardant's false and misleading statements were material. These statements misrepresented the overall effectiveness of Reveal—an inherent characteristic of Reveal and a critical consideration for any decision maker in deciding whether to prescribe, use, or otherwise choose Reveal over a different diagnostic product, such as Signatera.

112.    For example, Guardant's false and misleading statements about sensitivity and specificity are material because they understate the rates of false-negative and false-positive results, inducing physicians and patients to select the inferior Reveal test over superior alternatives such as Signatera.

113.    Each of Guardant's false and misleading statements was intended to, and likely did influence decision makers, including healthcare professionals, investors, and others, to choose Reveal over other products, such as Signatera, that have been thoroughly validated, with evidence of effectiveness and performance superior to Reveal's.

114.    Guardant knowingly and willfully communicated these statements to the public, including the potential customers of both Signatera and Reveal.

**H.      *Guardant's False and Misleading Statements Have Caused and Will Continue to Cause Natera to Suffer Significant Harm.***

115.    As outlined in more detail above in Section D, Guardant continuously and knowingly provided false and misleading information to healthcare professionals and the public to drive them away from Guardant's competitors, such as Natera, and to induce them instead to purchase Guardant's Reveal test.

116.    For example, Natera's customers and potential customers have been and continue to be approached by Guardant salespeople who repeat Guardant's false and misleading claims. Natera has lost sales of Signatera as a result of Guardant's false and misleading statements driving sales of Reveal. As another example, Natera has lost future business opportunities as the result of physicians who might otherwise have considered Signatera holding back from ordering Signatera tests for their patients in light of Guardant's false and misleading claims. Similarly, Natera has suffered lost opportunity costs resulting from the time spent correcting Guardant's false and misleading statements.

117.    As a result of Guardant's false and misleading statements, Natera has suffered—and, absent relief from this Court, will likely continue to suffer—significant harm, including lost revenue, loss of goodwill, and diminished reputation.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) by Guardant

118.   Natera incorporates by reference all allegations set forth above as if fully set forth herein.

119.   Guardant made false and misleading statements, including but not limited to press releases, at least one public presentation, and written promotional materials to healthcare professionals, insurance providers, patients, members of the public, and others, about the performance and quality of its Reveal tests. Guardant's false and misleading statements are designed to—and likely will continue to—mislead healthcare professionals, patients, and others into believing that the Reveal test performs better than it actually does, and that it is superior to Natera's Signatera. Given Guardant's reliance on the Study, Guardant's false and misleading statements are further designed to mislead customers and potential customers into believing that there is evidence supporting its claims when in fact there is no such evidence. Guardant's statements are literally false and/or are misleading commercial speech in violation of the Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

120.   Guardant made these false and misleading statements in interstate commerce, and in the context of commercial advertising or promotion as they were made for the purpose of influencing healthcare providers, patients, and others to recommend, use, purchase, and otherwise prefer the Reveal test over competing and even superior products, such as Natera's Signatera.

121.   Guardant intended for these false and misleading statements to deceive healthcare providers, patients, and others about the quality and performance of its test.

122.   Guardant's false and misleading statements are material and likely will influence the decisions of healthcare providers, patients, and others.

123.   Guardant's false and misleading statements are material and likely will influence healthcare providers, patients, and the general public to choose its test over Signatera.

124.   Guardant made these false and misleading statements knowingly and willfully.

125.    Natera has suffered—and will likely continue to suffer—significant harm as a result of Guardant's false and misleading statements, including lost revenue and loss of goodwill and diminished reputation.

126.    Guardant's conduct constitutes false and misleading statements about its own goods and services and a competitor's goods and services in violation of Section 43(a) of the Lanham Act. Natera is therefore entitled to all relief available under Section 1117(a) of the Lanham Act, including but not limited to disgorgement of Guardant's profits, actual damages, and attorneys' fees and costs.

127.    Further, and unless enjoined by this Court, Guardant's acts will irreparably injure Natera's goodwill and erode its market share, for which Natera has no adequate remedy at law. Pursuant to 15 U.S.C. § 1116, Natera is entitled to preliminary and permanent injunctive relief to prevent Guardant's continuing acts.

## COUNT II

**False Advertising in Violation of Cal. Bus. & Prof. Code § 17500 et seq. by Guardant**

128.    Natera incorporates by reference all allegations set forth above as if fully set forth herein.

129.    Natera brings this counterclaim pursuant to Cal. Bus. & Pro. Code § 17535 in an individual capacity and not on behalf of the general public.

130.    Cal. Bus. & Prof. Code § 17500 provides that it is unlawful for any person, firm, corporation or association to dispose of property or to perform services, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate before the public, through the use of untrue and misleading statements that were known, or should have been known with the exercise of reasonable care, to be untrue and misleading.

131.    Cal. Bus. & Prof. Code § 17508 provides, in pertaining part, "(a) it shall be unlawful for any person doing business in California and advertising to consumers in California to make any false or misleading advertising claim, including claims that (1) purport to be based on factual, objective, or clinical evidence, (2) compare the product's effectiveness or safety to that of other brands or products, or (3) purport to be based on any fact."

132.    Guardant has violated Cal. Bus. & Prof. Code §§ 17500 and 17508 by making untrue and misleading statements, including but not limited to press releases, at least one public presentation, and written promotional materials to healthcare professionals, insurance providers, patients, and others, about the performance and quality of its Reveal test. Guardant's untrue and misleading statements are designed to—and likely will continue to—mislead healthcare professionals, patients, and others into believing that the Reveal test performs better than it actually does, and that it is superior to Natera's Signatera.

133.    Guardant's false and misleading statements purport (but fail) to be based on factual, objective, or clinical evidence. The false and misleading statements improperly compare Guardant's Reveal test to Natera's Signatera where (to date) no appropriate head-to-head study has been performed, and those comparative statements likely will influence healthcare providers, patients, and the general public to choose Guardant's Reveal test over Signatera. Guardant's false and misleading statements further purport (but fail) to be based on facts; in truth they are distortions of fact and context-bereft statements that are false or wholly misleading.

134.    Guardant made these false and misleading statements knowingly and willfully.

135.    As a result of Guardant's violations, Natera has suffered—and, unless Guardant's conduct is enjoined by this Court, will likely continue to suffer—irreparable injury, including, but not limited to, the loss of revenue, goodwill, and diminished reputation.

136.    Guardant's conduct has caused Natera damage in an amount to be determined at trial. Natera is entitled to damages to compensate for all actual harm caused by Guardant's conduct.

137.    Pursuant to Cal. Bus. & Prof. Code § 17535, Natera seeks an order of this Court (1) compelling Guardant to provide restitution, and to disgorge monies to which Natera is entitled but were instead collected and realized by Guardant as a result of its false and misleading statements, and (2) providing injunctive relief enjoining Guardant from making such false and misleading statements.

**COUNT III**

**Unlawful Trade Practice in Violation of Cal. Bus. & Prof. Code § 17200 et seq. by Guardant**

138.     Natera incorporates by reference all allegations set forth above as if fully set forth herein.

139.     Under Cal. Bus. & Prof. Code § 17200, unfair competition is defined as and includes any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. This includes, but is not limited to, any conduct or statement related to the operation of a business that is deceptive, untrue, misleading, and/or fraudulent.

140.     Guardant has violated Cal. Bus. & Prof. Code § 17200 by making untrue and misleading statements, including but not limited to press releases, at least one public presentation, and written promotional materials to healthcare professionals, insurance providers, patients, and others, about the performance and quality of its Reveal test. Further, Guardant's conduct constitutes a violation of the Lanham Act, and thus its unlawful business conduct is separately actionable as a violation of Cal. Bus. & Prof. Code § 17200 et seq. Guardant's conduct is also independently unlawful and unfair, in violation of these provisions. Guardant has also violated Cal. Bus. & Prof. Code § 17200 by engaging in fraudulent business acts or practices that defraud consumers and potential consumers of MRD tests into believing that Reveal is more effective than it actually is based on manipulated methodology and data that Guardant relies on to market Reveal.

141.     As a result of Guardant's violation, Natera has suffered—and, unless Guardant's conducts are enjoined by this Court, will likely continue to suffer—irreparable injury, including, but not limited to, goodwill and diminished reputation for which Natera has no adequate remedy at law.

142.     Guardant's conduct has caused Natera damage in an amount to be determined at trial. Natera is entitled to damages to compensate for all actual harm caused by Guardant's conduct.

143.     Guardant has been unjustly enriched from its conduct. Pursuant to Cal. Bus. & Prof. Code § 17203, Natera seeks an order of this Court compelling Guardant to provide restitution, and to disgorge monies to which Natera is entitled but were instead collected and realized by Guardant

as a result of its false and misleading statements and injunctive relief enjoining Guardant from making such false and misleading statements.

144.    Natera is further entitled to recover costs and attorneys' fees pursuant to California Unfair Competition Law.

## COUNT IV

### Common Law Unfair Competition by Guardant

145.    Natera incorporates by reference all allegations set forth above as if fully set forth herein.

146.    Guardant made false and misleading statements, including but not limited to press releases, at least one public presentation, and written promotional materials to healthcare professionals, insurance providers, patients, and others, about the performance and quality of its Reveal test compared to Natera's Signatera. Guardant's false and misleading statements are likely to cause and have caused confusion, mistake, or deception about the nature, characteristics and qualities of Guardant's Reveal in comparison, connection, or association with Natera's Signatera.

147.    Guardant knows, or in the exercise of reasonable discretion should know, that its marketing program deceives healthcare providers, patients, and the general public about the nature, characteristics, and qualities of Reveal in comparison, connection, or association with Natera's Signatera.

148.    Guardant's conduct amounts to deception, trickery, and/or unfair methods and has damaged and jeopardized—and will likely continue to damage and jeopardize—Natera's business, including lost revenue and loss of goodwill and diminished reputation.

149.    As a result of Guardant's malicious, wanton, and/or fraudulent conduct, Guardant has caused and will continue to cause confusion as to the performance of Reveal in comparison to Natera's Signatera. Guardant's conduct has caused Natera to suffer and, unless enjoined by the Court, will cause Natera to continue to suffer, irreparable harm to its business, reputation, and goodwill that cannot be adequately remedied at law and for which it is entitled to relief.

150.    Natera is entitled to damages for Guardant's unfair competition, an accounting of profits made on sales of Guardant's product, and recovery of Natera's costs of this action.

151.    Guardant's actions have been willful and have been undertaken with the purpose of deceiving consumers. Thus, Natera is entitled to an award of punitive damages.

**COUNT V**

**Declaratory Judgment of No Lanham Act Violation by Natera**

152.    Natera incorporates by reference all allegations set forth above as if fully set forth herein.

153.    Guardant's allegations that acts by Natera have violated Section 43(a) of the Lanham Act (as asserted in Guardant's complaint) have no basis in law or fact, and fail to state a claim for relief.

154.    To resolve the legal and factual questions raised by Guardant and to afford relief from the uncertainty and controversy from which Guardant's accusations have precipitated, Natera is entitled to declaratory judgment that it does not violate Section 43(a) of the Lanham Act.

155.    A judicial declaration pursuant to the Federal Declaratory Judgment Act (28 U.S.C. §§ 2201-2202 et seq.) concerning this matter is necessary and appropriate so that Natera can ascertain its belief that it can make commercial statements free from challenge that its actions violate the law.

**COUNT VI**

**Declaratory Judgment of No False Advertising**

**Under Cal. Bus. & Prof. Code § 17500 et seq. by Natera**

156.    Natera incorporates by reference all allegations set forth above as if fully set forth herein.

157.    Guardant's allegations that acts by Natera have violated Cal. Bus. & Prof. Code § 17500 et seq. (as asserted in Guardant's complaint) have no basis in law or fact, and fail to state a claim for relief.

158.    To resolve the legal and factual questions raised by Guardant and to afford relief from the uncertainty and controversy from which Guardant's accusations have precipitated, Natera is entitled to declaratory judgment that it does not violate Cal. Bus. & Prof. Code § 17500 et seq.

159.    A judicial declaration pursuant to Cal. Civ. Proc. Code § 1060 et seq. concerning this matter is necessary and appropriate so that Natera can ascertain its belief that it can make commercial statements free from challenge that its actions violate the law.

## COUNT VII

### Declaratory Judgment of No Unlawful Trade Practice
### Under Cal. Bus. & Prof. Code § 17200 et seq. by Natera

160.    Natera incorporates by reference all allegations set forth above as if fully set forth herein.

161.    Guardant's allegations that acts by Natera have violated Cal. Bus. & Prof. Code § 17200 et seq. (as asserted in Guardant's complaint) have no basis in law or fact, and fail to state a claim for relief.

162.    To resolve the legal and factual questions raised by Guardant and to afford relief from the uncertainty and controversy from which Guardant's accusations have precipitated, Natera is entitled to declaratory judgment that it does not violate Cal. Bus. & Prof. Code § 17200 et seq.

163.    A judicial declaration pursuant to Cal. Civ. Proc. Code § 1060 et seq. concerning this matter is necessary and appropriate so that Natera can ascertain its belief that it can make commercial statements free from challenge that its actions violate the law.

## COUNT VIII

### Declaratory Judgment of No Common Law Unfair Competition by Natera

164.    Natera incorporates by reference all allegations set forth above as if fully set forth herein.

165.    Guardant's allegations that acts by Natera give rise to common law unfair competition claims (as asserted in Guardant's complaint) have no basis in law or fact, and fail to state a claim for relief.

166.     To resolve the legal and factual questions raised by Guardant and to afford relief from the uncertainty and controversy from which Guardant's accusations have precipitated, Natera is entitled to declaratory judgment that Guardant has no claim for common law unfair competition.

167.     A judicial declaration pursuant to Cal. Civ. Proc. Code § 1060 et seq. concerning this matter is necessary and appropriate so that Natera can ascertain its belief that it can make commercial statements free from challenge that its actions violate the law.

**PRAYER FOR RELIEF**

WHEREFORE, Natera respectfully asks this Court to award the following relief:

1.     Judgment in favor of Natera and against Guardant;

2.     An Order that Natera has not violated Section 43(a) of the Lanham act, Cal. Bus. & Prof. Code § 17500 et seq., Cal. Bus. & Prof. Code § 17200 et seq.;

3.     An Order that Guardant is not entitled to any relief for its allegations of common law unfair competition;

4.     An Order preliminarily and permanently enjoining Guardant from disseminating or causing the dissemination of false and misleading statements regarding its products or Natera's products;

5.     An Order requiring Guardant to take all necessary corrective measures to correct the false and misleading impressions created among customers and potential customers by Guardant's false and misleading statements.

6.     An Order declaring no Lanham Act violation by Natera;

7.     An Order declaring no false advertising under Cal. Bus. & Prof. Code § 17500 et seq. by Natera;

8.     An Order declaring no unlawful trade practices under Cal. Bus. & Prof. Code § 17200 et seq. by Natera;

9.     An Order declaring no common law unfair competition by Natera;

10.     An Order requiring Guardant to publish corrective statements;

11.     Natera's actual monetary damages, including but not limited to Natera's lost business and profits, harm to Natera's goodwill and reputation, as well as Guardant's ill-gotten and unjustly derived gains pursuant to 15 U.S.C. § 1117(a), Cal. Bus. & Prof. Code §§ 17200 et. seq. and 17500 et. seq., and the common law of the State of California;

12.     Punitive and exemplary damages;

13.     Pre- and post-judgment interest on all damages awarded, as permitted by law;

14.     Costs associated with litigation, including expert witness fees, as permitted by law;

15.     Attorneys' fees to the extent permitted by law;

16.     Statutory damages as permitted by law;

17.     Such other relief at law or in equity to which Natera is entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Natera demands a trial by jury on all issues so triable.

DATED: September 7, 2021

By     */s/ Kevin P.B. Johnson*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kevin P.B. Johnson
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

WINSTON & STRAWN LLP
Katherine Vidal
Thomas M. Melsheimer *(pro hac vice)*
John C.C. Sanders *(pro hac vice)*
Chase J. Cooper *(pro hac vice)*

*Attorneys for Defendant and Counterclaim-Plaintiff NATERA, INC.*