**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen

| | |
|---|---|
| GUARDANT HEALTH, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS.  ) | **NO. 3:21-cv-4062 EMC** |
| ) | |
| NATERA, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

San Francisco, California
Thursday, January 18, 2024

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
        SHEARMAN & STERLING LLP
        300 West 6th Street, 22nd Floor
        Austin, TX 78701
  **BY:  SAUL H. PERLOFF**
       **ATTORNEY AT LAW**

        SHEARMAN & STERLING LLP
        599 Lexington Avenue
        New York, NY 10022
  **BY:  CHRISTOPHER LLOYD LaVIGNE**
       **ATTORNEY AT LAW**

For Defendant:
        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
        555 Twin Dolphin Dr. - 5th Floor
        Redwood Shores, California  94065
  **BY:  BRIAN C. CANNON**
       **ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Rhonda L. Aquilina, RMR, CRR, CRC
                     CSR No. 9956, Official U.S. Reporter

**UNITED STATES COURT REPORTERS**

|   |   |   |
|---|---|---|
| 1 | **Thursday - January 18, 2024** | **2:25 p.m.** |

**P R O C E E D I N G S**

---o0o---

**THE CLERK:** The Court will now being hearing Guardant Health, Inc. versus Natera, Inc., case number 21-4062.

Counsel, please state your appearance for the record, beginning with the plaintiff.

**MR. PERLOFF:** Good afternoon, Your Honor, and Happy New Year. Saul Perloff for the plaintiff Guardant Health, Inc.

**THE COURT:** All right. Thank you, Mr. Perloff.

**MR. LaVIGNE:** Good everyone, Your Honor. Chris LaVigne on behalf of Plaintiff Guardant Health.

**THE COURT:** All right. Good afternoon, Mr. LaVigne.

**MR. CANNON:** Good afternoon, Your Honor. Brian Cannon of Quinn, Emmanuel for Natera. And I wanted to say our lead counsel Kevin Johnson is away in Delaware today trying a case and wanted me to express to you he wished he could be at this hearing.

**THE COURT:** All right. Appreciate it. Thank you for standing in.

We have a trial date, right, March 11. As you know, every time you appear I ask you about settlement talks. I'm always interested in that. Are there any discussions ongoing? Is there anything planned prior to trial?

**MR. PERLOFF:** My understanding, Your Honor, is similar

1  to our last call.  There have been, and I think since the last
2  call, some discussions directly between the general counsels of
3  the two companies.  I don't know the substance of those, but
4  clearly we haven't gotten to a place where they've asked us to
5  come in and get anything done.  So I still think the parties
6  are pretty far apart, but the communication lines are still
7  open.
8          **MR. CANNON:**  That's my understanding as well, Your
9  Honor.  Nothing substantive to report.
10         **THE COURT:**  Okay.  Well, then we are barreling towards
11 trial, and I intend to try this case because it has been
12 pending a long time.  That does mean that we're what, 7 weeks
13 away?  I haven't done the calculation.  We're not far away.  I
14 think it's about 7 weeks or so.
15         **MR. PERLOFF:**  I believe that's right, Your Honor.
16         **MR. CANNON:**  Correct.
17         **THE COURT:**  And so let me ask the practical question.
18 I understand now a formal motion has been made with respect to
19 the joint statement and to have that either declared no longer
20 in effect or have it dissolved.
21         Is there anything that's going to happen in the next 7
22 weeks that's sort of monumental in terms of marketing events or
23 trajectory of the competing products here?
24         **MR. CANNON:**  Your Honor, Brian Cannon for Natera.
25         There's no singular event that's coming up.  We filed

1  this motion in November.  Shortly after, Your Honor, back in
2  October, we set the trial for March.  There's no sort of major
3  marketing campaign or major conference or anything like that
4  that we're aware of.  It's just our client Natera is being
5  restrained in a manner that we feel is inappropriate.
6        You know, I know there's been discussion throughout
7  the course of the case, and I wasn't -- you know, I'm
8  relatively new to the case, but I've reviewed the history, and
9  we just felt, given the fact that trial has been moved several
10 times, it was time to bring the motion just to resolve this
11 once and for all.
12        And, obviously, we hope to go to trial in March.
13 We're planning on going to trial in March, but at this point we
14 felt we needed to bring this up to Your Honor for resolution.
15        **THE COURT:**  All right.  Is there any particular -- I
16 know, you know, any time you have somebody that's restrained,
17 whether it's by way of consensual agreement or through a court
18 order, is there anything that you could point to in particular
19 that's sort of pressing in terms of some speech that Natera
20 would like to engage in or something specific that it is --
21 because this is -- the joint statement is limited to the direct
22 comparison.  I mean, you can talk all you -- you each can
23 trumpet your product and you can disparage the studies of the
24 other products and all that, but it's the head-to-head thing.
25 Is there something that you can point to that Natera wants to

1 | do in the next 7 weeks that's --
2 |     **MR. CANNON:** Well, Your Honor, that's a great
3 | question, and I guess the answer to that is this is a
4 | significant restraint on Natera's ability to do marketing, and
5 | it's not just a restraint on what Natera can do, but there's
6 | obligations with respect to educating the sales staff, and
7 | there's specific instructions in the joint agreement about what
8 | to do if a customer asks Natera, hey, are there head-to-head
9 | comparisons.  You know, there's instructions about what to say.
10 |     So Natera feels this is a significant, you know, set
11 | of obligations and does tie Natera's hands in a way that is,
12 | you know, that it never agreed to when it first, you know,
13 | tried to reach agreement on this.
14 |     **THE COURT:** Right.  Right.  Do you know if there have
15 | been of recent sort of customer questions about head-to-head
16 | studies or not?  Has that been an occurrence of recent?
17 |     **MR. CANNON:** I don't have a specific example to share
18 | with you, but I know that Natera took this obligation seriously
19 | and educated its sales force, and those questions have come up
20 | throughout the course of the case, but I don't have any
21 | information on any sort of recent example.
22 |     **THE COURT:** Okay.  Mr. Perloff or Mr. LaVigne, any
23 | response?
24 |     **MR. PERLOFF:** If there had been substantial inquiries,
25 | I would have certainly hoped to have received them in the

1  course of discovery in this case.  I did not see that.  So I --
2  certainly, while discovery was open, that did not appear to be
3  some type of dramatic issue.
4        And I think that the Court has sort of hit upon the
5  fundamental question.  Even assuming that their logic is
6  correct that they didn't know what they were getting into when
7  they signed it -- and I would note that this was negotiated by
8  the inestimable, you know, Tom Melsheimer of Winston & Strawn,
9  and was deliberate and thought through very carefully.  But
10 even if they had some other idea, we're now 7 weeks away.
11       And, you know, I could say, well, Your Honor, I'd like
12 to have a hearing on a motion for preliminary injunction, and
13 perhaps we can set it the same day as we start trial and they
14 can all go together.  Because as a practical matter, the Judge,
15 the Court is going to rule on, effectively, one way or the
16 other, the permanent injunction in this case.
17       So that 7 weeks, I'm not aware, certainly, of anything
18 that's happening in the marketplace, anything relating to data
19 that's been -- both companies continue to develop and publish
20 data on their products.  That's still happening.  I cannot
21 think of any reason why now, especially given the disruption,
22 it would bring 7 weeks from trial, why after waiting 19 months,
23 we should revisit it now.
24       **THE COURT:**  All right.  Well, here's what we're going
25 to do.  I find, number one, that the law that applies in

1  interpreting the joint terms is basic contract law, because
2  this was a consensual agreement.  It wasn't imposed over the
3  parties' will by the Court, so it's not really -- it's really
4  in the way of a stipulated -- you could call it a stipulated
5  injunction, but like any consent decree or anything else, it is
6  governed in the final analysis I think largely by contract law.
7  And applying contract law, I'm looking to the letter of the
8  agreement, and it is express.  It could have been framed
9  differently; it could have had an actual sunset date; it could
10 have had, you know, other things that made it clear, but it
11 does say that the end date is triggered by, you know, a ruling
12 on the preliminary injunction or a motion -- the motion is
13 withdrawn or dismissed, and none of those have happened, at
14 least in a literal sense.  I understand there's an argument
15 that, well, at some point it could be deemed withdrawn, because
16 they never brought the motion.  But that, you know, that takes
17 some inference, and that's not how this thing was drafted.
18 And, like I said, it could have been drafted in another way,
19 but it wasn't, and it was drafted by counsel after I think some
20 careful negotiations.
21         So I'm going to leave that in place.  To the extent
22 that there is a request now to dissolve the joint statement
23 because of significant changes in the facts, I find that that
24 would -- it's not really warranted, in view of the fact that
25 trial is now 7 weeks away.  If we're talking about 7 months

1   away, I think that would be -- you know, I'd want to hear more
2   about what it is that the parties want to do, exactly what the
3   constraints are, what the hardships are.
4           But since there's nothing sort of earthshaking on the
5   horizon in the next 7 weeks, and as far as I'm concerned we
6   have a clear path to trial.  I have no criminal case that I'm
7   aware of that's going to intervene.  So I promised you a trial
8   date, and I know I changed it the last couple times because we
9   did have intervening criminal stuff, but we've got a clear
10  path, and so I think that's the way to go.
11          I think we need to get this thing resolved.  I was
12  hoping you'd all -- your principals could get it resolved, but
13  if they can't, that's why we're here, and we'll just get to the
14  merits and figure out where we go from here.
15          I think the money is going to be with the permanent --
16  with the ruling on any permanent relief that is either granted
17  or denied.  And so, respectfully, I'm going to deny the motion
18  on that grounds, obviously without prejudice to the final
19  ruling.  We'll see how that goes.
20          I will say I think the reason why I encouraged the
21  parties to enter into this kind of agreement is because I
22  wanted to minimize the number of problems and tit for tats, not
23  only just in terms of disruption to each of your businesses,
24  but in order to keep this trial fairly straight forward and not
25  end up having to try 40 different statements and from each side

1  and, you know, 50 or 60 statements and have to kind of resolve
2  all that.  So I think we've been able to do that thanks to your
3  cooperation and efforts.
4          As you may recall, at one point I was about ready to
5  bring in a special master.  I thought we were going to be
6  seeing you every week, which, as much as I enjoy your company,
7  I didn't enjoy that much.  But luckily we didn't have to bring
8  him in and saved you all quite a bit of money, I think.
9          So let's get ready for trial.  Meanwhile, I encourage
10 the principals to keep talking, but, if not, we'll see you in
11 court.
12         **MR. CANNON:**  We look forward to trying the case, Your
13 Honor.
14         **MR. PERLOFF:**  Yes, we do.
15         Your Honor, with your indulgence, I had a few trial
16 logistical questions that may hopefully help both sides prepare
17 more efficiently.
18         **THE COURT:**  Okay.
19         **MR. PERLOFF:**  And you may be able to answer them off
20 the top of your head.
21         **THE COURT:**  Okay.
22         **MR. PERLOFF:**  The first, and this is the one that's
23 most delicate, and so I ask as delicately as I can.  Do you
24 have a sense of when you may be ruling on the motions *in*
25 *limine*, because that may help the parties.  Particularly what

1  I'm worried about is narrowing the scope of the exhibits so
2  that we bring you only hopefully a handful of disputed ones.
3           **THE COURT:** Yeah, I generally resolve the motions *in*
4  *limine* at the pretrial conference.  Sometimes if it's
5  particularly complicated I may take it under submission for a
6  day or two.
7           The reason why I try to do the pretrial conference
8  well in advance is precisely so that I can rule on some of
9  these pretrial matters to make it clear what's on the table and
10 what's not on the table and give you a chance --
11          In this case when is our -- what day is our pretrial?
12          **MR. CANNON:** February 26th, Your Honor.
13          **THE COURT:** 26th.  So, now, if there's some things
14 that you think might be really critical and helpful, let's say
15 for settlement discussions in advance, if there was a couple
16 key issues on an *in limine*, you know, I would consider
17 advancing that, you know if it's really special.  I've done
18 that a couple times, you know, when there's a critical or
19 there's a private cause of action, you know, that half the case
20 depends on something.  So I would do it probably at the
21 pretrial conference.
22          **MR. PERLOFF:** Yeah, I thought perhaps we had both
23 submitted maybe our top two or three issues.  It was sort of --
24 it was either joint submission or each side did one.
25          **MR. CANNON:** Yes.

1    **MR. PERLOFF:**  Thanks, Brian.  I thought we --

2    **MR. CANNON:**  Yeah, that's correct, we did that, Your
3 Honor, on I believe July 24th of last year.  That's ECF 408.

4    But I think we're pretty close to a pretrial
5 conference date now, so I might suggest we take that up at the
6 pretrial conference date.

7    **THE COURT:**  Well, that's what I was going to do.  But
8 like I said, if you think, let's say it's worth taking one or
9 two of those issues in advance a couple weeks before because it
10 may affect -- I'm most interested in the trajectory of the
11 settlement talks, if that's something that would be helpful, I
12 would consider advancing that.  But otherwise I do take it all
13 and I try and prepare for the pretrial conference so you come
14 out of that pretrial conference with a pretty clear idea of
15 what's on the table and what's not, or at least what the
16 criteria is going to be.

17    **MR. PERLOFF:**  Okay.  We'll take a look, and if we feel
18 there's something extra, extra special, we will let you know in
19 some sort of submission.  We'll confer with Mr. Cannon.

20    **THE COURT:**  All right.  Good.

21    **MR. PERLOFF:**  My second question, so my understanding
22 is that your calendar appears open from the 11th, I guess,
23 through the 27th.  The 28th I think is Good Friday.  And so we
24 were trying, based on your general rules of your trial date and
25 the dark Thursday, to figure out how much time we're going to

have so that we can prepare our outlines, et cetera.

So I guess my first question is, is that in fact open, those -- the 11th and then the week of the 18th, and then a couple of days in that final week?

**THE COURT:** In other words, has something intervened to take out some of those days?

**MR. PERLOFF:** Yes.

**THE COURT:** Which does happen on occasion. Let me just look at my -- and, Vicki, you can look too. Right now I'm seeing a pretty clear path.

**THE CLERK:** Your Honor, we have a trial beginning on March 26th, the one you just set on Tuesday. *Navigators*.

**THE COURT:** Yeah, and that was contingent on -- this is going to take priority.

**THE CLERK:** Okay.

**THE COURT:** I think we originally said that this would run to the 26th, is what I have.

**THE CLERK:** Correct.

**THE COURT:** Including the 26th. And I was trying to be optimistic that if you all are really efficient, I could start this other trial.

But I'm not going to cut this trial short. I can delay the other trial if I have to. This case takes priority because there is injunctive relief. So right now I've got you to the 26th. I don't think I promised the 27th, but we'll work

1  out -- I mean, I'll tell you how many hours you have, but as a
2  rough guess you can assume about 4, 4.25 hours a day since we
3  run 8:30 to 1:30, sometimes it's more like closer to 4 hours,
4  and I think there's, what, about 9 or 10 days that we've
5  scheduled in there?
6      **THE CLERK:** 10.
7      **THE COURT:** 10. Now, that's what I have so far. When
8  I see your list, it would not be uncommon for me to look at it
9  and say, you know, I think you can get it done in 13 hours
10 apiece instead of 20 hours, or whatever it is. But that's why
11 it's useful, when you do your submissions, to give me witness
12 lists, the time estimates, general subject. But a lot of times
13 from that we can sort of spot duplication, and that kind of
14 thing.
15     But that's the general time frame. I mean, if we do 9
16 days or 10 days, that's about 36, 40 hours.
17     Is this scheduled as a jury trial?
18     **MR. PERLOFF:** Yes, Your Honor.
19     **MR. CANNON:** It is.
20     **THE COURT:** So we've got to allocate, you know, half a
21 day to select the jury.
22     But, you know, that gives you some ballpark, subject
23 to my looking at it and say -- taking out my scissors and
24 cutting a little bit here and there.
25     **MR. PERLOFF:** And I assume that you'll follow some

1  sort of time clock where we keep track of each --
2          **THE COURT:**  Yes, by the minute.
3          **MR. PERLOFF:**  Excellent.  This is just a very basic
4  question.  It was one that came up, and there's no real
5  dispute.  The two sides approach exhibit numbering differently.
6  We had, through the course of discovery, had done a pretty good
7  job of keeping exhibits sequential.  There's some gaps.  But
8  when we -- my assistant visited with your courtroom deputy, she
9  wanted us to renumber from 1 onward with the sticker, and so we
10 numbered them, you know, tried to keep the numbers the same
11 when they could, but basically used new numbers.
12         Natera stuck with the existing numbers.  And we can do
13 it either way, whatever the Court thinks would be best and most
14 helpful.  I'm neutral on it.  We just were hoping for some
15 guidance.  One or the other side is going to have to redo the
16 numbering.
17         **THE COURT:**  And when you say the existing numbers,
18 what are they?  What's the system there?
19         **MR. PERLOFF:**  Well, they went forward and they were
20 not -- you know, it wasn't Defendant's or Plaintiff's, it was
21 just 1, and we did like a very, very good job up through maybe
22 200, of numbering them.  Then, because there were some days
23 where there was more than one witness, there were some gaps
24 where you jumped forward to 300, and I think we ended up maybe
25 with about in the 1100s.  There aren't 1,100 exhibits, but

1  there were just some big gaps.
2          **THE COURT:** And they're not numbered according to the
3  1 through 400 as Plaintiff and 500 through -- they're just sort
4  of inter spliced as you go along?
5          **MR. PERLOFF:** Yeah, we just did them, you know,
6  whoever was being deposed, just used the next number, and
7  that's how we did it.
8          **THE COURT:** Okay.  Well, I mean, generally in our most
9  current trial we've sort of -- it used to be defense exhibits
10 were numbers and the other side were letters, and that sort of
11 thing, and it got to too many quadruples and it got too
12 confusing.  So then we went to a system where, you know,
13 100 through 400, so we could differentiate between plaintiff
14 exhibits and defense exhibits.  Now, you're asking is that
15 really necessary.  Can we just keep it all in the order that
16 you use, and I'm seeing a head shaking here by Vicki.
17         So, Vicki, tell me, what do you -- you're the one
18 keeping track of the exhibits; is that too confusing?
19         **THE CLERK:** You know what, according to your standing
20 order, like we've always done, plaintiff begins with 1, goes
21 through how many exhibits they have, then there's like about a
22 hundred number block to add in extra exhibits, and defendants
23 start with that.
24         So say, for instance, plaintiffs will go from 1 to
25 500, and defendants will start from 600 and move forward.  It's

1   the easiest way to keep track of the exhibits.
2           **THE COURT:** Yeah, and I think it makes it easier for
3   the courtroom deputy to figure out who is who.  I understand
4   that's confusing, because a lot of times you'll have a document
5   that has the deposition exhibit number at the bottom and then
6   you've got a sticker over that.  So I understand the downside
7   of that, and I understand it's a little bit of a hassle to
8   renumber them, but it does, in the end, I think minimize
9   confusion from our administration.
10          **MR. CANNON:** And for Natera, we'll do whatever the
11  Court wants, whatever the courtroom deputy instructs us to do,
12  obviously.
13          **THE CLERK:** Excuse me, Your Honor.  I'll usually send
14  out an email to the parties telling you exactly how to number
15  the exhibits, what's expected and what's required, so I'll send
16  that out next week.
17          **MR. PERLOFF:** That would be great.
18          **MR. CANNON:** Thank you.
19          **THE CLERK:** You're welcome.
20          **MR. PERLOFF:** And then the last question, the jury
21  questionnaire that I understand the Court intends to send out,
22  what is the Court's practice in terms of when does it send it
23  out and when we might expect to get it in advance of the voir
24  dire?
25          **THE COURT:** We generally send it out so that we get a

1  monkey survey back a couple days in advance of voir dire or
2  *voir dire*, depending what country you're from.
3           **MR. PERLOFF:**  Texas.
4           **MR. CANNON:**  That's a Texas thing.
5           **THE COURT:**  It is a Texas thing.  But what I typically
6  do is schedule a day before the actual trial starts, like maybe
7  the Friday or Thursday or something before, where we can either
8  live or on Zoom go over the questionnaires and say we can weed
9  out, you know, and often you can weed out about 10 percent of
10 people who clearly have a hardship, they can't make it, they're
11 not in the county, or they have an attitude that it's so
12 unrestorable that we can all agree, and that makes the actual
13 inquiry of voir dire a little more efficient.  We don't have to
14 spend time on people that, you know, clearly are not going to
15 qualify.
16          So in order to do that, I need to get -- I tell our
17 jury department we'd like to get it back, you know, maybe five
18 days in advance, four days in advance, so we could have at
19 least a day or two before we do the Zoom or the pre-voir dire
20 thing, and then so you'll get them a few days in advance.
21          **MR. PERLOFF:**  Very good.  Thank you.  That's all I
22 have.  Thank you for your indulgence.
23          **MR. LaVIGNE:**  Your Honor, just one question.  We had
24 talked about possibly doing jury selection the Friday before
25 trial; is that still on the table?

| | |
|---|---|
| 1 | **THE COURT:** Well, let's see.  Let me look at my |
| 2 | calendar here.  The Friday before is the 23rd; is that right? |
| 3 | **MR. LaVIGNE:** I think it's March 8th. |
| 4 | **THE COURT:** Oh, March.  I'm sorry.  I've got the wrong |
| 5 | one.  March 8th.  Wrong month. |
| 6 | Oh, I will be out of town, so we can't start the trial |
| 7 | then, but -- and I've got to figure out a time when we can do |
| 8 | our preselection discussion, which is productive.  It also |
| 9 | gives us a chance to kind of last-minute pretrial conference in |
| 10 | case there are last-minute issues, but I now realize I'm going |
| 11 | to be out.  We may have to schedule that -- well, let me look. |
| 12 | I'll let you know. |
| 13 | So, yeah, I think I'm not going to be able to do the |
| 14 | jury selection on the 8th.  Sometimes I do that to get kind of |
| 15 | a running start, but unfortunately I've got a meeting outside |
| 16 | the district that I've got to attend.  But I will have to look |
| 17 | at this calendar and figure out and work with our jury |
| 18 | department when we can have our pre-voir dire *voir dire*. |
| 19 | **MR. LaVIGNE:** Right. |
| 20 | **THE COURT:** But I think we can assume that the actual |
| 21 | voir dire will start on the 8th, and hopefully we can get |
| 22 | through by mid-morning or by early afternoon, and we can start |
| 23 | in at least with opening statements and get going. |
| 24 | **THE CLERK:** The 11th? |
| 25 | **THE COURT:** On the 11th.  But I've got to figure out a |

1  day before then when we can do our jury questionnaire review.
2          So keep the tail end of that week before brief for now
3  if you could, and we'll probably have to do it by Zoom, I
4  guess, since I can't be here in person on Friday, and you
5  probably don't want to come out here too many days in advance,
6  but we can do it by Zoom.
7          **MR. LaVIGNE:**  Okay.
8          **THE COURT:**  All right.
9          **MR. PERLOFF:**  Well, thank you very much.
10         **THE COURT:**  Any questions on your part?
11         **MR. CANNON:**  Nothing from me, Your Honor.  Thank you
12 for the time today.
13         **THE COURT:**  All right.  Thanks, everyone.
14         **MR. PERLOFF:**  Thank you.
15         **THE COURT:**  Tell your principals to keep talking,
16 otherwise we'll see you on the 11th.
17         **MR. PERLOFF:**  All right.  Thank you.
18         **MR. CANNON:**  Thank you.
19         (Proceedings adjourned at 2:51 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  January 19, 2024

_____

Rhonda L. Aquilina, CSR #9956, RMR, CRR, CRC
U.S. Court Reporter