Pages 1 - 25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen

GUARDANT HEALTH, INC.,        )
                              )
            Plaintiff,        )
                              )
   VS.                        )   **NO. 3:21-cv-4062 EMC**
                              )
NATERA, INC.,                 )
                              )
            Defendant.        )
_____)

                         San Francisco, California
                         Thursday, February 15, 2024


                 <u>**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**</u>

<u>**APPEARANCES BY ZOOM WEBINAR:**</u>

For Plaintiffs:
                    SHEARMAN & STERLING LLP
                    300 West 6th Street, 22nd Floor
                    Austin, TX 78701
          BY:  **SAUL H. PERLOFF**
               **ATTORNEY AT LAW**

                    SHEARMAN & STERLING LLP
                    599 Lexington Avenue
                    New York, NY 10022
          BY:  **CHRISTOPHER LLOYD LaVIGNE**
               **ATTORNEY AT LAW**

                    KELLER/ANDERLE LLP
                    18300 Von Karman Ave., Ste. 930
                    Irvine, CA 92612
          BY:  **JENNIFER LYNN KELLER**
               **CHASE A. SCOLNICK**
               **ATTORNEYS AT LAW**

REPORTED REMOTELY BY:  Rhonda L. Aquilina, RMR, CRR, CRC
                       CSR No. 9956, Official U.S. Reporter


                  **UNITED STATES COURT REPORTERS**

<u>**APPEARANCES CONT'D.**</u>

For Defendant:

                    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                    555 Twin Dolphin Dr. - 5th Floor
                    Redwood Shores, California  94065
        **BY:  VICTORIA MAROULIS**
              **BRIAN C. CANNON**
              **MARGARET SHYR**
              **ATTORNEYS AT LAW**

                    QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                    865 S. Figueroa Street, 10th Floor
                    Los Angeles, CA 90017
        **BY:  RYAN SADLER LANDES**
              **ATTORNEY AT LAW**

**UNITED STATES COURT REPORTERS**

PROCEEDINGS

| | |
|---|---|
| 1 | **Thursday - February 15, 2024** **4:30 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:** A reminder to everyone observing: These |
| 5 | proceedings are being recorded by this court. Any other |
| 6 | recording of this proceeding, either by video, audio, including |
| 7 | screen shots, or other copying of the hearing is strictly |
| 8 | prohibited. |
| 9 | Calling civil action 21-4062, Guardant Health, Inc. versus |
| 10 | Natera, Inc. |
| 11 | Counsel, please state your appearances for the record, |
| 12 | beginning with the plaintiff. |
| 13 | **MR. PERLOFF:** Good evening or good afternoon, Your |
| 14 | Honor. Saul Perloff on behalf of the plaintiff Guardant |
| 15 | Health. With me from my firm is Chris LaVigne. And I'd like |
| 16 | to introduce you to our newest team members Jennifer Keller and |
| 17 | Chase Scolnick. |
| 18 | **MS. KELLER:** Good afternoon, Your Honor. Jennifer |
| 19 | Keller also on behalf of Guardant. |
| 20 | **THE COURT:** All right. Thank you. Good afternoon. |
| 21 | **MR. SCOLNICK:** And good afternoon, Your Honor. Chase |
| 22 | Scolnick, also on behalf of Guardant. |
| 23 | **THE COURT:** All right. Thank you. |
| 24 | **MS. MAROULIS:** Good afternoon, your Honor. Victoria |
| 25 | Maroulis with Quinn, Emanuel for Natera. And with me are my |

**UNITED STATES COURT REPORTERS**

1  partners Brian Cannon, Ryan Landes, and Margaret Shyr.

2      **THE COURT:**  All right.  Good afternoon, Ms. Maroulis,

3  and everybody else.

4      So I thought we should talk as a group here and figure out

5  what we're going to do.  It seems to me that this recently I

6  won't say published study, but this revelation of the results

7  of the COBRA trial seemed pretty relevant.  I don't know how

8  much weight to be giving it, and there's a lot to be explored,

9  it appears.

10     But it seems to me that given the nature of this case, I

11 have a hard time seeing how we could just ignore this thing and

12 pretend it didn't happen.  And if that's the case, is there a

13 way -- there's obviously some discovery that would need to be

14 done.  There's several expert reports.  Is it reasonable to

15 expect that all to happen in light of the February 26th

16 pretrial conference and the March 11th start date in this case.

17     So I want to hear I think first from Guardant.  I see what

18 Natera wants to do, and they've got an expert now opining on

19 this.  But Guardant's response is that, well, we've got an

20 interview -- or I don't know if you want to depose the authors

21 of the study, file a counter expert report or what.

22     Maybe I can hear from Guardant what they feel they need to

23 do in order to respond and prepare, assuming this study is

24 going to be admitted or at least discussed at trial.

25     **MR. PERLOFF:**  Yes, Your Honor.  Look, let's take stock

1    where we are.  We are less than four weeks from trial, and

2    having this door open would require us to take significant

3    discovery from, as you suggested, the study sponsor from the

4    principal investigators who did not want the study closed -

5    perhaps from Dr. Parikh whose opinion he -- Dr. Hochster

6    purports.  Plus, if you look in his report, he's making

7    comparisons to other data that we would need to take discovery

8    on.

9         After all of that discovery were taken, we would need to

10   prepare our own rebuttal expert report, do a *Daubert* motion

11   probably almost certainly, and we just wouldn't have time to do

12   it.  If the Court knows how long it took just to discover the

13   one, you know, Harvard Parikh study that's at issue in this

14   lawsuit.

15        But I really do want to, if I may, push back on the idea

16   that it's relevant, because certainly the tone and tenor of

17   their argument that this is the most significant thing that has

18   happened might lead one to believe that.  But let me attempt to

19   correct the record if I can.

20        The COBRA study had to do with clearance rates, so in --

21   specifically you had patients with very low risk of recurrence

22   who -- some of whom were put on chemotherapy and some of who

23   weren't.  The Reveal test was used to determine whether or not

24   they had ctDNA.  The reason for the closure was because the 16

25   patients they looked at, they didn't see the clearance rates

PROCEEDINGS

1   that they thought they would on the two arms:  The people who

2   got chemo and those that didn't.

3        If you look at his report, and actually at the data that

4   he shows, it does not have anything to do with sensitivity,

5   specificity, PPV, NPV, pre-surgical sensitivity, lead time,

6   failure rates, turnaround time - none of those things are

7   addressed at all, because that's not what the study was

8   designed to do, and, more importantly, they didn't collect any

9   of the recurrence data.

10        So to the extent they're trying to make this fit into one

11   of their arguments in the case, for example, that specificity

12   is exaggerated, it can't tell you anything about specificity

13   because nobody knows what happened to these patients.

14        There are certainly some very interesting questions raised

15   by the study about why, for example, did -- you know, were the

16   blood samples drawn during chemo instead of after; why were the

17   principal investigators ignored, things like that.  But those

18   don't have anything to do with the remaining issues in this

19   case.

20        So especially given where we are, it doesn't seem fair to

21   put Guardant to this Hobson's choice of either getting to

22   finally have its day in court or to properly and fully address

23   this ambush, quite frankly.

24        And just to put it in context, COBRA is not the only study

25   that has reported data since the close of discovery in this

1    case 18 months ago.  There are other studies that he doesn't

2    address.  And of course the whole point of discovery cutoffs is

3    at some point in time you've got to say when.  And this Court

4    and the parties said *when* 18 months ago.

5        And, you know, to constantly refresh or bring up new

6    studies, because there are favorable studies, things that were

7    in his original report that he doesn't address due to new data,

8    we would be -- it would be a never-ending process.

9        So with due respect, the sound bites from his report and

10   from their papers might lead you to think it has something to

11   do with sensitivity, specificity or the issues that are in this

12   suit, but it doesn't, and that's why the data they actually

13   show you don't say those words, ever.

14       **MR. CANNON:**  Your Honor, may I respond to that -- or,

15   sorry.  Go ahead.

16       **THE COURT:**  You will, but I'm asking, it may not

17   answer everything, and there may be shortcomings, and there may

18   be some limited, limitations to its relevance.  On the other

19   hand, if you're suggesting it's not relevant and not

20   significant, I guess I'm going to hear the other side.  But

21   that seems to me a hard position to take here.

22       **MR. PERLOFF:**  There's no doubt, Your Honor, the

23   decision to close the trial was surprising, especially because

24   the principal investigators argued against it.  But, again, it

25   does not -- it is not a reflection on the performance of the

**PROCEEDINGS**

1   assay.  It's not a testament to the performance of the assay.

2   And therein lies the problem, right?  Because, again, if the --

3   this was a determination of whether or not the ctDNA could be

4   used to direct accelerated treatment for patients who

5   ordinarily wouldn't get it.  And this analysis that they're

6   focused on was this very limited set of 16 patients, and they

7   received the results and made the decision not to move forward,

8   notwithstanding the recommendation of the principal

9   investigators.

10          **THE COURT:**  Well, to say it had nothing to do with the

11  performance of the assay, I'm not sure I understand that.  I

12  mean, isn't there -- doesn't that suggest the possibility of

13  false positives and false negatives here?

14          **MR. PERLOFF:**  No.  And I want to be clear, it

15  definitely shows that if you draw blood during chemotherapy --

16  as opposed to the time points that the test is designed for,

17  validated for, and advertised for, which would be after

18  surgery, after chemotherapy -- you're going to get aberrant

19  results, that version of the test.

20          Because during chemotherapy you have essentially an

21  explosion of dead cells in the bloodstream, right?  Because, as

22  I'm sure everybody on this call knows, chemotherapy doesn't

23  just target the cancer cells; it targets all fast-growing

24  cells.  And so you have just a ton of circulating DNA, both

25  from cancer and non-cancer.

**PROCEEDINGS**

1    And without a doubt it showed that if you draw blood

2  during that time period, as opposed to what the study was

3  designed, which was after chemo, you're not going to get the

4  results you think you should get.

5    But, again, to say that that has anything to do with the

6  advertising that the parties have focused on in this suit,

7  which had to do -- and you know these time points because

8  they've been discussed *ad nauseam*:  Post-surgery, landmark,

9  surveillance.  This wasn't testing that, and therein lies the

10  problem, and that's why it's brand new.

11    **THE COURT:**  All right.  Mr. Cannon.

12    **MR. CANNON:**  Thank you, Your Honor.

13    So there's quite a bit to unpack there, but I want to

14  address the timing of this first, and that is that the clinical

15  trial was shut down last August, and Guardant has known this.

16  So there's no actual ambush going on here.  The clinical trial

17  was shut down and the letters went out to the doctors in

18  August, and Dr. Hochster included that in paragraph 37 of his

19  supplemental report.

20    And Your Honor is absolutely correct about the relevance.

21  Shutting down a trial like this is a big deal.  And the issue

22  is what Your Honor identified, which is the excessive rate of

23  false positives, and that is an issue, as Your Honor knows,

24  that's in the case.  It was in Dr. Hochster's original report,

25  and it was the subject of a *Daubert* motion.  And Your Honor in

**PROCEEDINGS**

1   the *Daubert*, the *Daubert* order, you know, identified that,

2   look, the rate of false positives is an issue in this case, and

3   Dr. Hochster is allowed to testify about it.

4        So there's no surprise in terms of the subject matter.

5   And, in fact, the letter that was sent to the doctors in August

6   of 2023, it reads:  Quote, the higher-than-expected false

7   positive rate resulted in the trial not passing the interim

8   analysis and, as such, the trial will be closed to accrual.

9        So, you know, this issue has been known to Guardant.  It's

10  not an ambush.  And as soon as the data was publicly

11  disseminated at the conference in January, Dr. Hochster

12  prepared a supplemental report.  He attended the conference,

13  and his patients were participants.  He encouraged his patients

14  to participate in the study.  And we provided the supplemental

15  report to Guardant just as quickly as we could.

16       Your Honor had a good question at the beginning, which is

17  what's the prejudice, you know, how can -- what kind of

18  discovery needs to happen?  And, you know, Mr. Perloff, it

19  sounds like his cross-examination is pretty much ready to go in

20  terms of the detailed technical questions that he had.  We have

21  offered Dr. Hochster for a deposition, and, you know, to date

22  Guardant has not followed up, but I think all of these

23  questions have been addressed to Dr. Hochster at his deposition

24  and subsequently at cross-examination trial.

25            **THE COURT:**  What about, though, examining Dr. Hochster

PROCEEDINGS

1  is one thing.  Talking to the principal investigators and the

2  authors of the study to find out more, it seems to me that's,

3  you know, that's something that would be fair game, but that's

4  a third party.  I don't know how hard it is, where these folks

5  are, how available they are, how cooperative they are, et

6  cetera, et cetera.

7          **MR. CANNON:**  I understand that, Your Honor.  I mean, I

8  do feel that sort of a desire to open up extraneous third-party

9  discovery is a little overstated.  The data is the data.  It

10  was shut down.  We've got the letters from NRG Oncology, which

11  was supervising the clinical trial.  That letter is in

12  Dr. Hochster's supplemental report.

13      So to the extent that this additional discovery is needed,

14  I'll say Guardant has known about this for quite some time, and

15  it's a little bit of a sort of an, oh, we've been surprised by

16  this when the final data came out in January, since it was the

17  Reveal product that was used in the trial for the last few

18  years.  Guardant knew that, and Guardant knew that the trial

19  was shut down August of last year.  So to say now, oh, now we

20  need to do all this discovery on this trial all of a sudden,

21  this clinical trial, I think that is an issue of somewhat of

22  Guardant's own making.

23      And we can provide Dr. Hochster, obviously.  And Guardant

24  obviously has a lot of resources to investigate the technical

25  issues on its own, which it sounds like it already has done.

1          **THE COURT:**  All right.  Mr. Perloff.

2          **MR. PERLOFF:**  Yeah, if I may.  This idea that we're

3    not prejudiced because Guardant knew when the trial was closed,

4    we did know when the trial was closed.  But because the trial

5    was not closed due to a reason that was in this lawsuit, we

6    certainly didn't expect that five months later or three,

7    whatever, how many months afterward, we'd get a supplemental

8    report.

9          The prejudice comes in part from Dr. Hochster waiting to

10   file the supplemental report.

11         And I want to just mention something --

12         **THE COURT:**  Well, this is all triggered by the release

13   of the abstract which triggered the report.  So I agree with

14   you, it's not necessarily fair to do, you know, to do an

15   investigation when you don't have the abstract.  I don't want

16   to pin it on whether they delayed with Dr. Hochster.  I don't

17   think that's a fruitful area.

18         I think the question, the practical question is, all

19   right, maybe you have a right or an interest in talking to the

20   investigators, the authors of this report.  I don't know about

21   the sponsors, but, I mean, you know, you don't have a right to

22   cross-examine ever person who participated, but at least the

23   principal people to get to the bottom of what about, what the

24   explanation is, et cetera, et cetera.

25         How difficult would it be, did you make an effort to try

PROCEEDINGS

1   to contact any of the investigators in this report?

2          **MR. PERLOFF:**  No, not since we've received their

3   report, no.  But I do want to be clear, the reason we would

4   need to take the deposition -- you know, the deposition and

5   discovery of the sponsor NRG is -- and Mr. Cannon alluded to it

6   but cut off the beginning of the sentence -- the only thing

7   that came from the study that mentioned false positives, i.e.

8   specificity, came from that letter.  And what it said, and he

9   cut off the beginning part, was we learned from the -- from

10  Guardant that it had excessive false positives.  So Guardant

11  knows that it did not provide that information or say that.

12      So we need to know from NRG -- which apparently

13  Dr. Hochster has been in contact with during this case, we know

14  that from his deposition, he acknowledged that he was in

15  contact with them -- what communications went on, why did they

16  make this decision.  Why did they put that language in there

17  when the principal investigator said that's not right?  And so

18  at a bear minimum we would need to do that.

19      And then to the extent that he's drawing comparisons, do

20  other studies with different patient populations that we're

21  looking at things differently, different draws, if he's really

22  going to do that we would need to look at those as well.

23      In other words, we would need to have a completely full

24  and fair opportunity to defend ourselves.  Because this really

25  is the way that they're reporting it, they want to make it the

**PROCEEDINGS**

1    new centerpiece of their case.

2    **THE COURT:**  Right.  And you will have a -- they're

3    saying that they're making Dr. Hochster available, and he

4    should be subject to further examination.  He's filed a

5    supplemental report, and you can respond to that.  You can

6    respond with your rebuttal report.  I mean, all that seems

7    doable.

8    The only thing that's not directly within your control is

9    access necessarily to the authors, the investigators, perhaps

10   the sponsor of the COBRA study.

11   **MR. PERLOFF:**  Right.  I mean, I think that's right.  I

12   mean, if the Court considers how long the parties spent looking

13   at just, for example, the Parikh study, which is at issue in

14   this lawsuit, it took almost a year if not a year to conduct

15   discovery to get the investigators, to get the authors.  And

16   here, you know, we'd be starting from scratch with a little

17   more than three and a half weeks until trial.  It could not be

18   done.

19   Even, honestly, it would be -- we would want, and I think

20   deserve to have, the written discovery from these different

21   people before we cross-examine him at his deposition.  And then

22   presumably they would want to take the deposition of our

23   counter expert, and based on whatever rebuttal report they

24   prepare.

25   And, again, I just -- the choice of having to either

**PROCEEDINGS**

1    forego a complete rebuttal of what we think is a hit job, and I

2    know they think it isn't, but in order for us to be able to

3    prove to you, for example, and the jury, Your Honor, that it

4    isn't what they say it is, we need substantial discovery.  And

5    trying to get that all done while we're simultaneously

6    preparing for trial with the final pretrial conference, as you

7    correctly note, you know, 9 -- no, 11 days away, it's not

8    feasible.

9         THE COURT:  Well, in your view, what is feasible?  If

10   this is going to come in, what are you telling me how much time

11   you need?

12        MR. PERLOFF:  I would love to be able to confer with

13   my team, but I would think it would take us three or four

14   months just to -- because of the third parties.

15        MR. CANNON:  Your Honor, may I respond to that,

16   please?

17        THE COURT:  Yeah.

18        MR. CANNON:  The COBRA trial has already been subject

19   to discovery.  Dr. Hochster was examined at his deposition

20   about the COBRA trial.  It was mentioned in his original report

21   as an ongoing clinical trial, and he was examined in his

22   deposition about it.  These letters went out from NRG Oncology

23   in August of last year.

24        So sort of the, I don't want to call it the complaint, but

25   sort of the request that, oh, we need this massive, massive

 1   amount of discovery in a very short amount of time, I think

 2   that rings hollow a little bit in terms of what discovery has

 3   been done to date and Guardant's preexisting knowledge.

 4       It actually sounds to me like Guardant knows more about

 5   what the principal investigators have been doing than we

 6   actually know, based on Mr. Perloff's statements.  So there

 7   probably has been communications there.

 8       And I do feel, look, you could never have the perfect

 9   amount of discovery leading up to trial.  It's never going to

10   happen.  But this was a big result that was disclosed in

11   January at the Health Conference, and it's a very, very

12   important part of sort of the world of facts the jury needs to

13   know about in order to evaluate the claims here.

14       **MR. PERLOFF:**  If I may, there was no extensive

15   discovery taken on COBRA.  What Dr. Hochster said about COBRA

16   in his original report is I'm not relying on COBRA, and what he

17   said at his deposition was I've enrolled some patients in

18   COBRA, and I'm in contact with NRG or the parent, the National

19   Cancer Institute, about COBRA.  That's what he said.  Nothing

20   about -- because the whole point was none of these facts were

21   at issue.

22       In the same way, when we cut off discovery, all of the

23   additional facts from other trials that have been positive that

24   actually, you know, report, for example, on sensitivity and

25   specificity in a positive way for us or in a negative way for

**PROCEEDINGS**

1    them, have not been the subject of supplements, and that's, I

2    think, what I'm fundamentally getting at.

3        I understand, you can't decide today, based on what you

4    have, whether who is telling you the truth about whether this

5    really is relevant to the issues or to the performance of the

6    test even writ large, or not.  But if they're reopening

7    discovery on new data that has been generated since the close

8    of discovery, how could it be fair for us not to be able to,

9    for example, go into the other data from other studies

10   favorable to us, negative for them.  And that's, I think, where

11   our biggest concern lies with trying to do it in a short period

12   of time, because there has been new data.

13       **THE COURT:**  Well, let's say that we open the door.

14   You're suggesting opening the door to introduction, perhaps

15   reliance by your expert on other positive studies.  How many

16   such studies have there been since the close?

17       **MR. PERLOFF:**  Well, there's been additional data that

18   was generated, I know, on COSMOS and, hang on a second.

19       **MR. CANNON:**  Only the COSMOS study is the one that

20   there has been some additional data, but that has also been

21   addressed in your dagwood order and in the earlier reports.

22       **MR. PERLOFF:**  But by definition the new data hasn't,

23   because it wasn't in any reports, with all due respect.

24       There were additional data I think also on their trials in

25   GALAXY and BESPOKE.  I'm not sure if PEGASUS has reported out

1  or Track B has reported out, but there are these other ones.

2  There was like a 2000 -- a study of the first 2000 commercial

3  samples, a Reveal that was reported out since the close of

4  discovery.

5      And all of these, if you're really trying to just instead

6  of focusing on the actual advertising statements but more

7  generally on the performance of these two tests, there's been a

8  lot because it's a research field, and it's a growing area.

9  But it's not just this one.  And some of those were even

10  reported at the very same conference that Dr. Hochster was at

11  but, again, he doesn't talk about.

12      **THE COURT:**  So if the door were opened to allow

13  supplemental expert reports, let's say on your side, to bring

14  in these other studies, I mean, through additional depositions

15  and additional reports why can't that be done in a fairly quick

16  period?

17      **MR. PERLOFF:**  Well, I think just on that, just where

18  if we were just to do a new supplemental report, not a rebuttal

19  to theirs but just our own supplemental report, I'm sure we

20  could find and retain an expert maybe in the next, you know,

21  two or three weeks and put them under the gun to like write a

22  quick update report from our perspective of the latest data.

23  But, again, that still wouldn't give them a chance to take

24  discovery of that, and it doesn't really address our need to

25  rebut.

PROCEEDINGS

1          We need the discovery especially if he's relying on, for

2    example, the statement by the NRG, where did they get that

3    information when they don't report any specificity data, when

4    they don't report any false positive data.

5          So we would need to get to that bottom of that to fairly

6    address just the one study.

7              **MR. CANNON:**  Your Honor --

8              **THE COURT:**  Go ahead.

9              **MR. CANNON:**  I was just going to say, you know,

10   there's a lot of lawyers involved in this case and a lot of

11   lawyers on the Guardant side, and a lot of this work could have

12   been done, you know, earlier on.  So my point that, you know, I

13   feel like it's a problem of their own doing to squish it all

14   into the end here.  And I really don't see this as being a big

15   open discovery.

16         As you pointed out at the beginning, Your Honor, what

17   happened in the COBRA trial is a big deal in this field.  It

18   was terminated early.  And the sponsor said it was because of

19   an excessive rate of false positives, which is an issue in this

20   case, and that is what Dr. Hochster, an oncologist who has

21   already passed *Daubert*, he testified in his deposition about

22   that.  It's in his report.  It passed *Daubert*.  It's an issue

23   for trial.  And I don't see -- and I know that Guardant wants

24   to keep that out of this trial, but I don't think by saying we

25   need all of this discovery is a valid reason to keep it out.

PROCEEDINGS

1      All the lawyers are working hard.  We can keep working

2  hard.  And we will put Dr. Hochster up for deposition.  They

3  can seek the discovery that they want.

4      Natera does not feel like it needs really much extra

5  discovery, so we are prepared to go to trial as scheduled.

6      But this is a significant development in the field and

7  should be an issue for trial.  And Your Honor is going to put

8  us on a clock for trial, so we have a limited number of minutes

9  to cover a lot of issues, and this is an important issue for

10  Dr. Hochster.

11          MR. PERLOFF:  We're already --

12          THE COURT:  What information do you have about the

13  whereabouts and availability of the principal investigators,

14  authors of the COBRA trial?  Do you have any information,

15  Mr. Cannon?

16          MR. CANNON:  No, I have no information other than

17  what's in Dr. Hochster's report.  He received the letter from

18  NRG Oncology because he's a doctor and he has patients involved

19  in it.  That's in his report.  I believe Guardant has that

20  information as well.  But I have no insight into the

21  investigators beyond what's in Dr. Hochster's report.

22          THE COURT:  Well, it does seem to me that if this --

23  and I'm still of the view that this is relevant evidence that I

24  think should not be excluded at trial.  I think the question is

25  what -- what needs to be done in order to get -- to give

UNITED STATES COURT REPORTERS

1    Guardant a fair chance to cross-examine or deal with this

2    evidence.

3        And I do think, in addition to the deposition of your

4    expert, filing a counter expert or a rebuttal report, maybe

5    with or without some of the new studies, is a matter of sort of

6    equity here.

7        I think the big issue is what the availability is to the

8    extent of some limited discovery that might be sought,

9    especially since there's not a published paper.  We have an

10   abstract and a presentation.  We don't have a peer-reviewed

11   published journal that has all the data with tables and

12   everything else.  So it seems to me that's required.

13       But I'm working a little bit in the dark here, because I

14   don't know where these folks are, who might be done and how

15   quickly they can be made available.  And so I'm inclined to

16   have the parties do some very quick investigation to find out

17   where these folks are, what the availability is.

18       Is there a way that they can be made available, one or

19   more of whatever, you know, may be needed.  At least enough so

20   that there's a fair amount of investigation, cross-examination

21   that can be done, whether that can be accomplished in a very

22   short period of time or what.

23       And so I'm inclined to direct the parties, and I think

24   both can make that inquiry about, you know, where folks are,

25   whether they are amenable to cooperation and would be subject

**PROCEEDINGS**

1    to some discovery, deposition, and report back so I have a

2    better sense as to what the situation is.

3         **MR. CANNON:** That makes sense to us, Your Honor.

4         **MR. PERLOFF:** And I agree that we should do that.  I

5    do think, though, that the goal here would be to be a, you

6    know, full and fair amount of discovery, not, you know, the

7    bear minimum that Natera would want us to have, but enough that

8    it's fair for us to be able to rebut this new issue that is

9    being introduced in the case.

10        And I'm not suggesting that that necessarily means it has

11   to be forever, but I don't think the goal should be just the

12   bear minimum.  It needs to be what we need to defend ourselves.

13   We're not going to embellish it for that, but I do think it

14   needs to be full and fair.

15        **THE COURT:** Well, what I would want is for you, both

16   sides report back to me in terms of who is available, what you

17   think is needed, what each of you think is needed to be fair

18   about it.  And I suspect there may be a difference here in

19   terms of scope, but I'd like to find out that information.

20        It seems to me that the other, even though it's a rush

21   matter, but now that you've got something in a report and to

22   prepare a counter, you know, if you want to bring a quick

23   *Daubert* motion, I mean, that probably can be done in fairly

24   short order.  It's not ideal, but I think the unknown is the

25   third-party stuff, which I think, given the nature of this

**PROCEEDINGS**

1    abstract and the limited information that we have, I think --

2    and given potential importance of this information, I think it

3    is something that should be reasonably explored in discovery.

4        So what I'd like to do is set a time when we can get back

5    together in short order and you can report back to me what you

6    have found.  I'm going to suggest sometime next week, perhaps

7    by Wednesday.  We can do a quick conference call or another

8    status here perhaps in the morning.

9        **MR. CANNON:**  Works for me, Your Honor.

10        **MR. PERLOFF:**  That will work for us.  We'll make it

11    work for us.

12        **THE COURT:**  All right.  Why don't we say 10:00 o'clock

13    on the 21st.  And at that point I will obviously have to decide

14    what we're going to do schedule-wise.

15        Let me ask, in terms of if -- and it's a big "if" -- I do

16    decide that some postponement is warranted, are there -- you

17    may not look at your calendars, but mine is fairly impacted,

18    whether there are dates that you know that conflict with other

19    trial obligations for lead counsel.

20        **MS. MAROULIS:**  Your Honor, I may need to consult with

21    Mr. Johnson, my co-lead counsel.  If we may report that back to

22    you on the same Wednesday hearing, that would be great, or

23    earlier, but I don't have access to his calendar right at this

24    moment.

25        **THE COURT:**  All right.  Well, we can discuss that,

**PROCEEDINGS**

1    too.  Because if I do decide to continue this for a bit, I

2    still consider this our priority case, because there's

3    injunctive relief, it's ongoing competition here.  I will

4    want -- I would want to set a date certain.  So make sure you

5    have your trial calendars ready.

6              **MR. CANNON:**  Understood.

7              **MS. MAROULIS:**  Will do, Your Honor.  Thank you.

8              **THE COURT:**  All right.  And finally, of course, I have

9    to ask the question:  Are there any ongoing discussions between

10   the principals, any glimmer there?

11             **MS. MAROULIS:**  Your Honor, there are some

12   business-to-business discussions.  There was a call last week,

13   and Natera is always negotiating in good faith and is willing

14   to entertain any reasonable proposals.

15             **MR. PERLOFF:**  Yeah, my understanding was they flamed

16   out, but that, of course, never precludes additional

17   conversations.  But there wasn't the kind of progress that you

18   would want to hear about, let's put it that way, Your Honor.

19             **THE COURT:**  All right.  And there is no thought about

20   bringing in a third-party neutral to facilitate things that

21   would be helpful?

22             **MR. PERLOFF:**  I don't think so, Your Honor.  We, you

23   know, we had Judge Lang Phillips, and then we had somebody from

24   the courts that system, you know, and both tried, and, you

25   know, did a wonderful attempt, but that didn't work.

**UNITED STATES COURT REPORTERS**

**PROCEEDINGS**

1          **THE COURT:**  Okay.  Well, all right.  If your

2    principals change their mind and they're interested, for

3    instance, in an emergency settlement conference, for instance,

4    with a magistrate judge, I can try to pull a couple strings in

5    that direction.  So I leave that with you.

6          **MS. MAROULIS:**  Thank you, Your Honor.  Understood.

7          **MR. PERLOFF:**  Good to know.

8          **THE COURT:**  All right.  Talk to you on Wednesday.

9          **MR. PERLOFF:**  Thank you, Your Honor.

10          **THE COURT:**  Thank you.

11          (Proceedings adjourned at 5:07 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF REPORTER

2         I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4

5    Dated:  February 16, 2024

6

7

8

9

10

11    _____

12         Rhonda L. Aquilina, CSR #9956, RMR, CRR, CRC
              U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25