Pages 1 - 109

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

GUARDANT HEALTH, INC.,          )
                                )
            Plaintiff,          )
                                )
   VS.                          )     **Case No. 3:21-cv-04062 EMC**
                                )
NATERA, INC.,                   )
                                )
            Defendant.          )
_____)

San Francisco, California
Monday, February 26, 2024

**TRANSCRIPT OF REMOTE ZOOM PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

              SHEARMAN & STERLING LLP
              300 West 6th Street, 22nd Floor
              Austin, TX 78701
         BY:  **SAUL H. PERLOFF, ATTORNEY AT LAW**

              SHEARMAN & STERLING LLP
              599 Lexington Avenue
              New York, NY 10022
         BY:  **CHRISTOPHER LAVIGNE, ATTORNEY AT LAW**

              KELLER/ANDERLE LLP
              18300 Von Karman Avenue, Suite 930
              Irvine, CA 92612
         BY:  **CHASE A. SCOLNICK, ATTORNEY AT LAW**
              **JENNIFER L. KELLER, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Kendra A. Steppler, RPR, CRR
              Official Reporter

**APPEARANCES:   (CONTINUED)**

For Defendant:

                              QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                              555 Twin Dolphin Drive, 5th Floor
                              Redwood Shores, CA 94065
                    BY:   **KEVIN JOHNSON, ATTORNEY AT LAW**
                          **ANDREW J. BRAMHALL, ATTORNEY AT LAW**
                          **BRIAN C. CANNON, ATTORNEY AT LAW**
                          **VICTORIA F. MAROULIS, ATTORNEY AT LAW**
                          **MARGARET H. SHYR, ATTORNEY AT LAW**
                          **VALERIE A. LOZANO, ATTORNEY AT LAW**

| | |
|---|---|
1 | <u>**Monday - February 26, 2024**</u>                                    <u>**2:32 p.m.**</u>

2                          P R O C E E D I N G S

3                             ---oOo---

4          **THE CLERK:**  This court is now in session, the

5   Honorable Edward M. Chen presiding.

6          Court is calling the case Guardant Health, Inc. v. Natera,

7   Inc., Case No. 21-4062.

8          Counsel, please state your appearance for the record,

9   beginning with the plaintiff.

10          **MR. PERLOFF:**  Good afternoon.

11          **MS. KELLER:**  Good --

12          **MR. PERLOFF:**  Saul Perloff on behalf of Guardant

13   Health.  With me from Shearman & Sterling today is Christopher

14   LaVigne.

15          **THE COURT:**  Okay.

16          **MS. KELLER:**  Good afternoon, Your Honor.

17          **THE COURT:**  All right.  Good afternoon.

18          **MS. KELLER:**  Jennifer Keller of Keller Anderle on

19   behalf of Gardant Health.

20          **THE COURT:**  All right.  Thank you, Ms. Keller.

21          **MR. SCOLNICK:**  And good afternoon, Your Honor.  Chase

22   Scolnick on behalf of Guardant Health.

23          **THE COURT:**  All right.  Thank you, Mr. Scolnick.

24          **MR. JOHNSON:**  Good afternoon, Your Honor.  Kevin

25   Johnson on behalf of Natera.  And with me -- depending upon

1    what issues you want to address -- there may be a few of us

2    speaking, Your Honor.  We have Valerie Lozano, Margaret Shyr,

3    Vickie Maroulis, Brian Cannon, and Andrew Bramhall.

4         **THE COURT:**  All right.  I don't know if everybody will

5    get a chance to speak, but we'll see.

6         **MR. JOHNSON:**  Yeah.

7         **THE COURT:**  Okay.

8         All right.  First thing we should talk about is the trial

9    date.  So I did receive the declarations.  Perhaps I can get an

10   update whether there's been any more word about the

11   presentation dates, because there was a range of dates that

12   were suggested, and I don't know whether anything is new.

13        **MR. SCOLNICK:**  Thank you, Your Honor.

14        We have no updates since Friday.  But I would like to

15   provide some additional information.  In preparing for today's

16   hearing, we were looking through some of the most recent

17   materials that Natera submitted to the Court, including their

18   latest updated trial witness list.  And we learned that from

19   that list, they intend to have Dr. Aleshin and Mr. Moshkevich

20   also testify about the COBRA Study.

21        So if -- if the Court's going to allow the COBRA Study

22   into evidence, and if the Court's going to allow them to

23   testify, then of course we would need to seek their documents

24   regarding the COBRA Study and also take their depositions about

25   that topic.  This is not something that was noticed earlier,

1  before the most recent submission.

2         **THE COURT:**  All right.

3         **MR. SCOLNICK:**  And, in addition, Your Honor, there are

4  also -- something we didn't raise -- we referenced them in

5  passing -- some of the other studies that were referenced in

6  Dr. Hochster's supplemental report.  And those would include

7  the bestoke [phonetic] -- BESPOKE -- excuse me -- and

8  CIRCULATE-Japan Study.  Those studies are not published.  They

9  are interim studies.  And Dr. Hochster seeks to opine on them.

10 So if he's going to be permitted to do so, we would seek

11 discovery on that, as well.

12        **THE COURT:**  All right.

13     Response?

14        **MR. JOHNSON:**  Well, Your Honor, this is -- we had a

15 meet and confer process where we talked about the discovery

16 that they wanted.  This is the first time we're hearing that

17 they want additional discovery, beyond all the other categories

18 that they provide in the last telephone call conference.

19     You know, I don't think there's any real surprise that

20 we're calling our -- Dr. Moshkevich and Dr. Aleshin.  And, you

21 know, the -- they're on our will-call list.  In fact, I want

22 to -- and I'm -- this is something we do want to address.  They

23 want to call each of these witnesses in their case in chief.

24 They want to take them out of order.  They don't want them to

25 testify in our case.  They want them to testify in their case.

1          So, you know, as we said in -- the last time -- we think
2     we're -- we're fine with some limited discovery.  And the --
3     you know -- and just because Your Honor raised it, you know, I
4     mean, when I read the declarations -- and I'm not going to
5     comment on them -- but this is a one-day meeting that they're
6     talking about.  And they're setting aside a full month for --
7     you know, of saying they're not available -- for a one-day
8     meeting.

9          Your Honor knows -- you know, we can -- we firmly believe
10    we can take that into consideration and -- you know, as a trial
11    date that appears in sometime in April or May -- to take into
12    account if, in fact, their schedule is set for sometime during
13    those -- during those days.

14         I will tell you, on a recent earnings call, that they --
15    that they -- that Guardant identified that the hearing they
16    thought would occur with the FDA would occur at the end of the
17    second quarter of the year, which since tells us and told the
18    public that that's closer to June.  So I'm not sure what the
19    real date is here.  And we're all sort of, you know, working
20    off of something that may get scheduled at some point or may
21    not get scheduled at some point.  But we're -- we're in the
22    time frame that we care about.

23         At the end of the day, we're willing to agree to some
24    limited discovery.  And I need to go back and check on --
25    specifically with respect to Dr. Moshkevich and Dr. Aleshin.

1          **THE COURT:**  All right.  Well, we'll talk about the

2     scope of discovery.

3          What about this indication that this meeting may not occur

4     until the second quarter?  Is there a possibility this could

5     occur in -- at a later date -- beyond the time frame that was

6     indicated?

7          **MR. SCOLNICK:**  No, Your Honor.  The latest information

8     that we have is that it is going to be between the days we set,

9     which I believe it's April 25th and the end of May.  I believe

10    that we said in the earnings call that it would happen sometime

11    in late second quarter, which is consistent with that, and also

12    taking a conservative approach.

13         So, yes, it is a one-day meeting, but we don't know when

14    that date is, which is what is providing the complication here.

15    In addition, as we note in our declarations -- the founders

16    did -- it's going to take extensive preparation.  And this is

17    probably one of the most important days in Guardant's history,

18    for the reasons we set forth.

19         And, again, if -- we were prepared to go forward with

20    trial as currently set.  And it's not our -- we're not the ones

21    causing the delay here.  It's opposing Counsel and it's Natera.

22    So if that's going to be -- if we're going to allow this

23    additional evidence in, then we need time to prepare.  And,

24    unfortunately, our founders are not -- not available during

25    this period of time.

1          **MR. JOHNSON:**  Your Honor, I just want to read from the

2    February 23rd earnings call.  And it says, quote, "In our

3    recent discussions, the FDA has informed us that the meeting

4    date will now likely take place in late Q2 as they continue to

5    work to fill the remaining vacant advisory seats on the panel."

6          So "late Q2," to us, suggests could be as late as June.

7    That's -- so, you know, I'm not -- I think everybody would

8    agree, there is no date yet.  And they've -- as recently as

9    just a few days ago, they told the public, in our earnings

10   call, it could be as late as Q2.  And I think -- I don't think

11   anybody really knows, is the point.  And so finding one day

12   that -- you know -- and I know we're trying to thread the

13   needle to find the right time for the trial schedule.  And our

14   position is the dates that you identified the last time --

15   April 29th -- you know, is the right date to start with.

16          **THE COURT:**  What -- well, let me ask, if -- is it a

17   one-day meeting?

18          **MR. SCOLNICK:**  My understanding is that it's going to

19   be a one-day meeting.  But these things have bled over into

20   two.

21          And, in addition, Your Honor -- I apologize for not

22   mentioning this earlier -- we did reach out to our expert --

23   testifying expert -- on damages -- Mr. Malackowski -- and he's

24   informed us that he also has a two-week trial between

25   April 29th and through the week of May 6th.  And he's expected

1    to attend throughout the trial in Delaware.

2        **THE COURT:**  All right.  Well, that's new.  That was

3    not brought to my attention; is that correct?

4        **MR. SCOLNICK:**  I don't recall.  I think we made

5    mention that there was an additional conflict with our damages

6    expert, but we've since been able to acquire more specific

7    information.

8        **MR. JOHNSON:**  Your Honor, that's correct.  That's the

9    first we're hearing of it, is right now.

10       **THE COURT:**  All right.  Let me -- let's put aside the

11   start of the trial for a moment, and let's talk about the scope

12   of discovery.  What have we found out about the availability of

13   the principal investigator, coauthors, et cetera, et cetera?

14       **MR. SCOLNICK:**  Yes, Your Honor.  So, as we expected,

15   there would be a process at MD Anderson in order to secure

16   his -- the principal investigator's testimony -- Dr. Morris.

17   So we reached out to them.  We've been engaging with them over

18   the last few days.  And they informed us that we need to

19   complete forms and have a more complete and formal request.

20   And we've done that.

21       We have also sent a subpoena out to Dr. Hochster.  We're

22   preparing and finalizing subpoenas to NRG.  And we continue to

23   investigate and further our efforts to secure an appropriate

24   expert to respond to Dr. Hochster's supplemental report.

25       **THE COURT:**  So subpoenas have not gone out yet to the

1    NRCG [sic]?

2            MR. SCOLNICK:  NRG?  No, Your Honor.  The only

3    subpoena that's gone out, to my knowledge, is to Dr. Hochster.

4    And, again, we've sent out the request, and we're following the

5    instructions and procedures of MD Anderson.

6            THE COURT:  All right.  And in terms of who needs to

7    be deposed and what needs to happen, what -- did you all meet

8    and confer about the scope of further discovery if I were to

9    allow the COBRA trial to come in?

10           MR. SCOLNICK:  Your Honor, yes, we met and conferred

11   before the last hearing.  And we provided our estimate of what

12   discovery we needed.  Opposing Counsel did not provide us with

13   any details, although we did learn those details -- some of

14   them -- before the last call -- before the last hearing -- and

15   then, at the hearing, they provided us some additional

16   information.  But, since then, we've not communicated.

17           THE COURT:  So you've not met and conferred to see if

18   you can narrow your differences in terms of the scope?

19           MR. SCOLNICK:  Your Honor, yes, we did that on our

20   call before the last hearing, pursuant to the Court's

21   instructions, but not since.

22           THE COURT:  All right.

23           MR. CANNON:  Your Honor, Brian Cannon from Natera.

24   I've subbed in for Kevin Johnson on this particular issue.

25       We have not met and conferred since the last hearing, Your

1    Honor.  And our position really is the same, which is what

2    Mr. Johnson stated, which is some reasonable amount of

3    discovery -- such as the deposition of Dr. Hochster -- and

4    perhaps this additional third-party discovery is appropriate.

5    But sort of the full-term scope of discovery that Guardant

6    proposed on the last call, with rounds and rounds of reports

7    and additional fact discovery, we feel is out of proportion to

8    the supplemental report and will unduly delay preparation for

9    trial.

10           **THE COURT:**  Yeah.  Well, we're sort of back where we

11   were.  I thought there was going to be an effort to meet and

12   confer, with that view in mind, to see if that fairly broad

13   scope could be narrowed to the parties' liking.  But I guess

14   that hasn't happened.

15           **MR. CANNON:**  It has not, Your Honor.  Like I said,

16   we're open to some limited scope.  But if the starting point is

17   the amount of discovery that Guardant proposed in the last

18   hearing, that is -- that is difficult.  That's just undue in

19   terms of its breadth.

20           **THE COURT:**  Okay.  Well, let me indicate a couple

21   things.  We will -- I want to go through some of these motions

22   in limine, perhaps some of the evidentiary matters, and I have

23   some comments about the jury instructions.  So these are

24   matters we're going to have to deal with, one way or the other,

25   regardless of the time.

1          But I will say, at the outset, that whenever we start this

2     trial, I have always allocated ten days to do this case.  And

3     what that means, in time, is that we'll probably have to devote

4     one day to -- or a good part of the day -- to jury selection.

5     So we essentially have, safely put, probably nine trial days.

6          And my trial hours are 8:30 to 1:30.  And though I try to

7     keep the breaks down to 15, 20 minutes, with no lunch break,

8     when you have a jury -- and these days we're using neighboring

9     courtrooms for public health reasons instead of the little

10    cramped jury room usually for the jury assembly -- it takes

11    time for them to kind of gather up and get into our courtroom.

12         So the reality, unfortunately, is we usually get about

13    four hours -- maybe a little over four hours -- of testimony a

14    day.  What that means is we have 36 hours to try this case --

15    nine days -- if you assume one day is devoted to jury

16    selection.  Maybe we'll get in a little extra.  We'll see.

17    That comes down to 18 hours apiece.  Your time estimates, I

18    think on Guardant's side, was a little -- exceeded that a

19    bit -- and it didn't include cross-examination time, nor did it

20    include time for opening statements and closing arguments.

21         So just a warning to you now, you're going to have to take

22    a look at your witness lists, especially now with the sort of

23    new issues coming to the fore.  You're going to have to be

24    selective on both sides.  And keep that 18-hour limit, which

25    covers your direct, your cross, your openings, your closings,

1    in mind.  So that's one thing I want to tell you in advance.

2        Second of all, I don't know how much public interest -- I

3    imagine there would be some in this case.  Right now, the

4    broadcast policies in our court and in the circuit are a little

5    bit in a state of flux.  Until I'm told otherwise, our current

6    local rules do allow for broadcast of civil trials.  But that

7    may change.  But I wanted to see if anybody -- if that doesn't

8    change, and the Ninth Circuit doesn't direct otherwise, I want

9    to see if there's any objection to putting this on Zoom.

10          **MR. CANNON:**  No objection from Natera, Your Honor.

11          **MR. PERLOFF:**  No objection here.  And perhaps we can

12   revisit the question of what documents are going to remain

13   under seal if not only is it going to be public, but maybe even

14   broadcast.  We can visit that, perhaps, with them, after this

15   call.  But we'd like to look at -- look into that.

16          **THE COURT:**  Yeah.  Why don't -- why don't you all --

17   I'd like you to meet and confer about that.  Because it becomes

18   an intractable problem -- although, of course, this will be a

19   public trial, so whatever you do in terms of documents that you

20   don't want to disclose publicly, that's sort of true whether

21   it's broadcast or not.  My understanding sensitivity --

22          **MR. PERLOFF:**  Yeah.

23          **THE COURT:**  -- broadcast magnifies that issue.

24       But I'd like you to meet and confer.  And if there are

25   some very substantial problems, and it's going to get in the

 1    way of this trial, then I may reconsider the broadcast.  But it

 2    seems to me in a case of public interest and transparency,

 3    Counsel is in favor of broadcast, but I will -- I'm certainly

 4    open to revisiting that.

 5            **MR. CANNON:**  Agreed.

 6            **MR. PERLOFF:**  Okay.

 7            **MR. CANNON:**  Agreed and understood, Your Honor.  Thank

 8    you.

 9            **THE COURT:**  Okay.  And in my pretrial conference

10    report, I'll also set forth some procedural rules.  Generally,

11    I require the party to give the opposing party a 48 -- 48 sort

12    of court hours' notice of witnesses it intends to call,

13    exhibits it intends to seek to admit, and any demonstratives.

14    The opposing party will have until the next day to indicate any

15    objection.  If it can't be resolved, I need to know about that

16    the day before so that we can talk about it first thing in the

17    morning the day of trial.

18            So there's kind of a two-day lead time.  So keep that in

19    mind that disclosures -- instead of one day ahead, I find that

20    two days works, because it gives time for the objection, it

21    gives time for me to look at it in advance, and my goal is to

22    not spend any of the jurors' time kind of waiting around and

23    listening to argument on admissibility.

24            And that would also apply to demonstratives for

25    openings -- I want those disclosed in advance -- as well as

1    closings.  I don't want to have objections to have to be ruled

2    on in the middle of somebody's opening statement or closing

3    argument.  So I'd like that process to work, as well.

4        What I want to do is -- since we have a number of in

5    limine motions -- I think something like 13 or 12 -- I want to

6    go through some of those.  Because some of those will also shed

7    light on the evidentiary objections, as well.  So why I don't I

8    just start and talk about -- we'll start with Guardant's

9    motions.

10        Motion Number 1 is to exclude attacks and criticisms of

11    the Parikh Study.  And I think part of what is sought to be

12    excluded are some internal documents discussing this study;

13    some evidence regarding the consequences -- alleged

14    consequences -- of the study not being blind, which, as I

15    understand it, it arguably informs the one-year cutoff date;

16    and then some additional mischaracterizations about the

17    landmark time of the draw and some other matters.

18        So to take their first issue of sort of these internal

19    documents that -- as I understand, these are Guardant documents

20    discussing the Parikh Study and whether there may be some

21    issues there.  It seems to me that Guardant's state of mind may

22    be relevant, and, therefore, it seems like these documents

23    would be admissible.  But I'll hear argument on that.

24        MR. PERLOFF:  Well, I think that our motion was

25    focused as much on Natera's apparent intention to have their

1    expert witnesses testify on matters that you had actually

2    excluded them on already.

3         So, you know, certainly if a document is discussing one of

4    the areas that you've left in the case with respect to their

5    counterclaim -- for example, the subject matter of blinding --

6    when, you know, their clinical data was submitted, when it was

7    sent, as well as whether or not the design was prospective or

8    not -- then certainly that -- that would be relevant -- and

9    relevant to state of mind, even if it was an internal document.

10        But, for example, I'm -- and I'm not sure that I have a

11   particular document in mind that might be focused on one of the

12   areas, for example, the cutoff time -- right? -- which -- the

13   one-year cutoff time.  That -- I'm not sure how that would be

14   relevant to anything that was left in, insofar as the Court has

15   already thrown out that issue.

16        **THE COURT:**  Okay.  Let's -- yeah.  Let's talk about

17   that one, because that's an interesting one.

18        **MR. PERLOFF:**  Yeah.

19        **THE COURT:**  Yes.  I've not allowed that as -- if

20   there's a critique about the methodology, using that cutoff,

21   et cetera, et cetera, that is a -- I'll call it an ONY problem.

22   And I will reiterate -- I know that Natera essentially wants to

23   sort of reopen that discussion.  And the jury instructions also

24   talk about, you know, you can attack the reliability to the

25   study and all that.  But I'm not revisiting that.  My views are

1    as I've stated.

2        But the one-year cutoff -- I understand there's an

3    argument there that that is one of the consequences, or at

4    least alleged consequences, of the non-blinding or unblinding

5    of the study.  I think, as I understand Natera's argument, that

6    there was some retrospective quarterbacking here in choosing

7    that date, or choosing that date post-unblinding, in order to

8    achieve a certain result.

9        If that's the allegation, then it's not so much critiquing

10   the scientific methodology of it, but it goes to the question

11   of, you know, was there blindness or not, because there's a

12   dispute as to what that really means.  But if it meant one

13   definition is -- once -- something of consequence occurred

14   after unblinding, and, therefore, that's what blinding is

15   about, then it does seem to me that there is an argument that

16   it becomes relevant in that regard.

17       So maybe, Mr. Perloff, you can respond to that argument.

18       **MR. PERLOFF:**  Well, I think part of this also is --

19   you know -- so the question of blinding presumably has to be

20   related to some of the advertising.  And this has actually been

21   an issue that we haven't quite been able to figure out from the

22   rulings yet, which, you know, none of Guardant's advertising

23   that they attack uses the term "blinded."

24       The description of the ctDNA analysis was conducted

25   blinded.  That's the statement.  It was in the Parikh Study

 1  itself, not in --

 2       **THE COURT:**  And I thought that was the -- that was the

 3  challenge.  That was the ONY exception.  That is, if the Parikh

 4  Study representative was blinded, and, in fact, it wasn't, that

 5  was the one door I left open under that narrow ONY exception;

 6  that, and the prospective debate about whether the study's

 7  characterization itself was misleading or false.

 8       **MR. PERLOFF:**  Right.  And I guess what I'm saying is

 9  presumably you would still need to have some use of that

10  statement unblinded as part of your -- as part of your

11  advertising.  And that -- that didn't occur.  In other words,

12  the ads that are at issue -- the Guardant ads -- don't say "in

13  this blinded study" or "Parikh was blinded."  The Parikh Study

14  definitely does, but the advertising statements that they've

15  attacked -- 91 percent surveillance sensitivity and 100 percent

16  specificity -- those -- those don't say anything about

17  blinding.

18       **THE COURT:**  Well, that's not my understanding of the

19  theory -- the limited theory -- that the ad has then referenced

20  what the falsity -- alleged falsity -- in the study was.  If

21  the study itself is unreliable because of some false

22  representation or misleading representation about what -- how

23  it was conducted -- then, you know, it kind of taints

24  everything about the study and the reliance.

25       And I think there's a theory that if you can attack the

study under the narrow exception -- not just generally, but
under the narrow exception allowed by ONY -- that's fair game,
even if it wasn't -- regardless of whether it was in an ad or
not, since the study was relied upon for -- a lot.

MR. PERLOFF:  Okay.  So I guess if what you're saying
is -- and this -- perhaps this -- if the issue of blinding --
if they're able to tie it to -- and I think you even used this
term -- a consequence -- right? -- that it informed the
results -- so if they have a document -- if we're talking about
a document -- that ties the issue of being unblinded to, for
example, a specific statement like "100 percent specificity,"
then I guess that it could be relevant and admissible.

But I guess part of my -- again, I'm not sure that I know
which document they're focused on.  And the reason -- because,
for example, the Parikh Study reported both the results of
specificity with and without the cutoff.  You know, they showed
all of the data and calculated it both ways.

So I'm having some trouble, I guess, seeing how they could
do the connection.  And I'm concerned that without having a
bridge in advance -- if they're just going to be essentially
rearguing the same point -- that that one-year cutoff was
arbitrary -- because that was their argument -- that it was an
arbitrary cutoff.  They weren't attempting to tie it to
blindness or prospectiveness.

THE COURT:  Okay.  Well --

1          **MR. PERLOFF:**  And then -- so that's -- do you see --

2          **THE COURT:**  Yeah.

3          **MR. PERLOFF:**  I'm concerned if we're going to use any

4     sort of narrow opening to drive a great wedge and just simply

5     reargue all of their criticisms of Parikh.

6          **THE COURT:**  In other words, there needs to be some

7     foundation that ties the blindness discussion -- or --

8     discussion with this particular decision about the one-year

9     cutoff.

10          **MR. PERLOFF:**  I would think so.  Because, again,

11     otherwise you end up exactly back where we were before the

12     summary judgment with them making attacks on the underlying

13     methodology.  Because, fundamentally, that decision, like the

14     decision in how to conduct the surveillance analysis, was a

15     methodological one that you correctly pointed out was

16     accurately described in the study.  So, yes, I --

17          **THE COURT:**  All right.

18          **MR. PERLOFF:**  -- would think that there has to be some

19     tie.

20          **THE COURT:**  Okay.  Let me hear from Natera.

21       First of all, do I have your argument correct?  And, if

22     so, what is the foundational evidence that suggests the

23     blindness question had anything to do with the choice of the

24     one-year cutoff?

25          **MR. BRAMHALL:**  Sure.  Sure, Your Honor.  Andrew

1   Bramhall for Natera.

2       So let me just step back for a moment, Your Honor.  We

3   have two theories of establishment.  And we discussed this in

4   our brief.  We have a theory about lack of support, whereby

5   there are claims made by Guardant, in its advertising, that

6   have no support in any study; reliable, fraudulent, fabricated,

7   or otherwise.  That is not what we're talking about here.

8       We're talking about the lack of reliability side of the

9   coin, where Your Honor rightly pointed out -- Your Honor is

10  applying ONY.  We see it differently, but we understand that

11  that's what Your Honor is doing.  And there's an exception

12  where, if the data is fraudulent or fabricated, then it can be

13  the basis for a lack of reliability claim under Southland Sod.

14  That's as we understand it.

15          **THE COURT:**  Right.

16          **MR. BRAMHALL:**  So we're talking about the second

17  bucket here.

18          **THE COURT:**  Yep.

19          **MR. BRAMHALL:**  Under the second bucket, the blinding

20  and prospective issues that Your Honor permitted to go

21  forward -- those are, at their heart, methodological issues.

22  So we don't agree with Counsel on the other side that

23  methodological challenges to the study are off the table.

24      At the very heart of the study are the claims that it was

25  blinded to ctDNA analysis and also it was performed as a

prospective study.  The word "retrospective" never appears.

Now, we can talk about an example here with the one-year cutoff that was applied.  The one-year cutoff that was applied -- we're not, Your Honor, going to violate your Daubert or summary judgment order.  We are not going to argue how the study could be improved, optimized, or clarified.  We're not doing that.  We're not arguing that it's arbitrary.

What we're saying, Your Honor, for example, with the one-year cutoff, is that that decision was made unblinded and retrospectively, which are -- neither -- neither of those things are disclosed in the study.  And, in fact, the study suggests the exact opposite was done.  And this affects how the scientific community would evaluate the Parikh Study.

And what Mr. Perloff is right about is their -- their advertisement does not say the Parikh Study was a blinded and prospective study.  But it does, Your Honor, rely on the Parikh Study for every one of its claims.  And inherent to those arguments -- excuse me -- those marketing claims -- are the statements in the Parikh Study that it was both blinded and prospective, which we know are false based on the --

**THE COURT:**  Well, that's -- that's my question.  Now, I understand the argument that I thought I had --

**MR. BRAMHALL:**  Sorry.

**THE COURT:**  -- accurately summarized.  My question is -- and what I think Mr. Perloff is saying -- is there some

1  foundational evidence that this is true?  That this was a

2  retrospective rigging of the -- you know -- choosing the

3  one-year cutoff in order to get better results after it was

4  unblinded?

5          **MR. BRAMHALL:**  So, Your Honor, from a better results

6  side of things, we understand.  That's not what we're saying.

7  But what we are saying is it was -- those decisions were

8  prospectively -- excuse me -- retrospectively made unblinded.

9  And there's ample evidence of that.  It's in the summary

10  judgment motion.  We cited more of that, Your Honor, in our MIL

11  opposition.  There is ample evidence that these decisions were

12  being made, including about the surveillance analysis, the

13  one-year cutoff.  They were all made after the fact.  Putting

14  aside the motivation -- sorry -- and it's not just documents,

15  to be clear.  There's deposition testimony.

16          **THE COURT:**  But -- but was there any evidence -- yes,

17  it was made timing-wise -- these decisions made after the fact.

18  But the question was did the unblinding then inform the

19  decision to go one way or the other to --

20          **MR. BRAMHALL:**  100 percent, Your Honor.  Because they

21  had, for example, 69 percent sensitivity right up until the

22  point where they were about to submit the paper to the journal.

23  And then Guardant came up with, retrospectively, a new

24  definition to create a new analysis to change the results.  And

25  that's one of numerous decisions that were made after the fact.

1          And, frankly, Your Honor, the evidence does show those

2     decisions were made to change the results so different results

3     could be reported and then ultimately relied upon by Guardant

4     in its advertising.  We have ample documentation of that.

5     There's no question.

6          **THE COURT:**  All right.

7          **MR. BRAMHALL:**  And it will come out at trial, Your

8     Honor.

9          **THE COURT:**  So, essentially, that -- I hate to use a

10    derogatory word -- but manipulation or choice of criteria, for

11    instance, to enhance the numbers, or make it look better, was

12    made after unblinding and with full knowledge, retrospectively,

13    how you could improve at least the appearance of results.

14         **MR. BRAMHALL:**  For example, Your Honor, the

15    surveillance analysis was only patients who recurred.  You can

16    only pick patients who recurred if you know the outcomes, if

17    you're making retrospective decisions.  So, again, that's just

18    one example, Your Honor.  And, again, there are many more.  I'm

19    not -- I know we have limited time and a lot of issues to

20    discuss.  But, absolutely, those decisions were made to

21    influence the outcome.

22         And the problem is, Your Honor, had that all been

23    disclosed in a very clear way, and the study said we did this

24    unblinded, and we did this in a retrospective fashion, that

25    might be a different story.  But what we have is the study

1  tells the world it was both prospective and blinded when it

2  wasn't.  That's fraudulent.  And Guardant knew and, frankly,

3  the Parikh Study authors knew that these decisions were being

4  made, to a large extent.

5          **MR. PERLOFF:**  If I can respond?

6          **THE COURT:**  Yeah, briefly.  Then I need to move on.

7          **MR. PERLOFF:**  Yeah.  A couple of -- you notice that he

8  completely sidestepped the question, utterly, of the one-year

9  cutoff.  And that's because they -- the testimony they took,

10 the documents they have, clearly showed that the one-year

11 cutoff was selected by the study authors -- not MGH --

12 Harvard -- and not by us.  And both sets of data --

13         **MR. BRAMHALL:**  I --

14         **MR. PERLOFF:**  Both sets of data had been reported to

15 the public.  So this idea that it could have been

16 manipulated -- it wasn't.  And there is no connection.  On the

17 surveillance analysis, again, the only thing they're saying is

18 that temporarily -- temporarily -- that Guardant had the

19 clinical data before that analysis was done.  But they still

20 have to connect it to the decision.  And they haven't been able

21 to do that.

22        And there is no evidence of that, because it's not true.

23 And the reason why -- and this is the fundamental flaw in their

24 analysis to begin with -- what this Parikh Study actually says

25 is that the ctDNA analysis was performed blinded to the

clinical data.  And that's because nobody would say the entire

study was blinded when the study authors, by definition, had to

know the data.

It was a very specific thing that was said.  And this was

where we got, Your Honor, in the summary judgment, to your

conclusion and correct observation that the only evidence at

all that they ended up putting forth, that showed -- that they

tried to put forward -- showing a connection between unblinding

and a change in the ctDNA analysis was that -- the QC caller --

the Methyl95.  And, at the end of the day, they had no evidence

that the Parikh samples were used to create or inform the

Methyl95.

And so, again, what I'm concerned about is them using just

the temporal timing to, you know, create this very broad

opening to do a side attack -- a blindside attack -- on Parikh.

I don't think that --

**THE COURT:**  Well -- okay.  So this discussion

demonstrates, I think, the very simple point that whatever you

call it -- whether you call it blinding, unblinding, et cetera,

et cetera -- what's key is whether it was consequential.

**MR. PERLOFF:**  Correct.

**THE COURT:**  Whether that unblinding was used in a way

to manipulate, to put in crude terms, the results -- enhanced

results -- et cetera, et cetera.  And I guess it will boil down

to, you know, whether there is evidence of that.  Because if

1  there's no evidence of that nexus, then the choice of one year

2  versus something else -- then that's just a straight-up

3  arbitrary methodological attack, not a fraud attack.

4       So I don't know until I guess --

5            MR. PERLOFF:  Right.

6            THE COURT:  I mean, so far, you know, the evidence

7  seems a little thin.  But I will say that sort of the

8  consequences -- the choices that were made that still have to

9  be attacked now by Natera -- you know, there's an ONY line that

10  I intend to adhere to.  And if there's going to be a sort of

11  fraud exception, there has to be a nexus.  And whether I get a

12  proffer of evidence at some point at a hearing with a jury, or

13  something, but that -- I think that's going to be the approach

14  that I will take.

15            MR. PERLOFF:  And I think that's fair.  If I might

16  say, you know, there was an opportunity for them to proffer

17  that evidence, because we attacked this directly in summary

18  judgment.  And that's why I referred to your observation that,

19  after all of the statements that they made in Court about what

20  the evidence showed, when it came time to put that evidence on

21  the record, it boiled down to that one Methyl95 caller.  And

22  even you, you know, observed that it wasn't even clear for

23  that -- you know -- you left open the door that they might be

24  able to prove that.

25            THE COURT:  Right.

1        **MR. PERLOFF:**  So -- and I guess what I'm concerned

2    about is sort of the timing.  But if there's a proffer and

3    their claim that they'll be able to, outside of the jury, put

4    on evidence, for example, from Parikh or Corcoran -- and they

5    had their opportunity do to that -- but I didn't see it in the

6    transcript -- and I was there -- that they were influenced or

7    made those decisions.  That would be one thing.  I don't think

8    they'll have it.  But I do think the approach of making them

9    show that the connection is vital.

10        **MR. BRAMHALL:**  Your Honor, we fully intend to show the

11    nexus at trial.  Obviously, we can't put all our evidence in

12    the motions that we've filed so far.  There is ample evidence.

13    And I'll say, I completely disagree with Mr. Perloff about

14    where the cutoff came from.  We have documents talking about

15    publication strategies to exclude false positives.  That's

16    somebody caught red-handed, Your Honor.  So I won't go into

17    this more.  I think this debate shows --

18        **THE COURT:**  Okay.

19        **MR. BRAMHALL:**  -- that, at trial, there's going to be

20    a disputed issue about this.  And we'll put our evidence

21    forward, and they'll put their evidence forward, and they can

22    move for Rule 50 if they think it's appropriate.

23        **THE COURT:**  All right.  Let me ask --

24        **MR. PERLOFF:**  That's what summary judgment was for.

25        **THE COURT:**  Well, let me ask about -- is there an

1    argument that there was a mischaracterization within the Parikh

2    Study not only about prospectiveness and blindness, but about

3    the landmark point of the draws of one month versus six months

4    or something?

5             **MR. BRAMHALL:**  Absolutely, Your Honor.

6        So there are three categories.  I was going to get into

7    this.  There's the category of the claim -- the false claim --

8    that the study is blinded when it was unblinded to ctDNA

9    analysis.  There's the false claim of it being prospective when

10    it was retrospective.  Then there's a third category under the

11    ONY exception that Your Honor is applying that says where

12    there's inaccurate descriptions of the methodology, that's an

13    issue for ONY.

14        And, in fact, Your Honor said, whether the Parikh Study

15    reported, quote, "artificially inflated clinical performance

16    metrics is outside the purview of this Court so long as the

17    methodology was accurately disclosed."  And there are

18    absolutely issues.  So on the landmark, Your Honor, the study

19    says it was approximately four weeks or approximately one

20    month.  But, in fact, what we discovered, through discovery,

21    through deposing the witnesses, through the documents, is that

22    it was not only four weeks, but it went all the way up to six

23    months.

24        It was -- there were 78-day, 80-day, 90-day, 100-day,

25    almost 200-day draws that were included in that landmark

```
 1    definition.  And that's a scenario where Guardant is not
 2    applying the definition that it actually put forth in the
 3    study.  That's a classic inaccurate description, Your Honor.
 4    And there's more, but that is one that we talked about in our
 5    briefing.
 6              THE COURT:  All right.
 7              MR. PERLOFF:  Right.
 8              THE COURT:  Any response?
 9              MR. PERLOFF:  And was rejected.
10        I mean, I just want to point out that -- that was one of
11    the ones that the Court specifically rejected, because, as the
12    Court correctly pointed out, all of those data were there.
13              MR. BRAMHALL:  But, Your Honor, that doesn't make the
14    definition accurate.  The definition -- so you got a lie on the
15    one hand, and you got some truth on the other, but you still
16    have the lie, Your Honor.
17              MR. PERLOFF:  That's very trite.  But the point was
18    the Court specifically addressed this very question about
19    whether the descriptions of the methodology were accurately
20    described by Parikh at all.  The Court concluded they were,
21    and, for that reason --
22              THE COURT:  So remind me --
23              MR. PERLOFF:  -- dismissed.
24              THE COURT:  -- did I expressly address the landmark
25    representation?  I can't remember now.  I'd have to look back.
```

1  I'm not sure we -- I know I had focused in on prospective and

2  the blindness.  I don't remember there being much discussion

3  about this particular blindness.  If I already ruled on this

4  expressly, then --

5          **MR. BRAMHALL:**  Your Honor --

6          **THE COURT:**  -- somebody's going to have to convince me

7  that I was wrong.  But if I didn't then --

8          **MR. BRAMHALL:**  Sure.  Your Honor --

9          **MR. PERLOFF:**  I know that it was -- I know that it was

10 explicitly briefed, as Mr. Bramhall correctly notes.  And,

11 again, the point that we made is for the very same reasons

12 that -- the data were all there for the readers to be able to

13 understand every single patient that was used in the study

14 exactly when their time points were done.

15         **MR. BRAMHALL:**  And, Your Honor, we asked the --

16 Dr. Parikh about this.  And she said it would take her hours to

17 figure out which patients are on which analysis.  So the fact

18 that the data is buried somewhere in the study, but then the

19 definition -- where the reader is going to review the text and

20 try to figure out what's being done here -- that is absolutely

21 incorrect.

22      And there's no denying that a six-month draw is not

23 approximately four weeks or approximately one month from

24 therapy.  I just -- I don't see where we can get to a point

25 where that's an accurate description that survives -- that

 1   doesn't fall within that --

 2         **THE COURT:**  I will have to review my order again.  I

 3   don't -- it doesn't ring a bell, to tell you the truth.  I read

 4   it, but I have to go back.  If I've ruled on this, and the

 5   parties had their chance to put up their evidence, and I've

 6   ruled and -- I've ruled.  On the other hand, if this was one

 7   that was left untouched, I'd have to look at it and see.

 8         All right.  Let's go to the second -- the second --

 9         **MR. PERLOFF:**  Yeah, hang on.

10   Okay.

11         **THE COURT:**  Okay.  So the peer review comments --

12   again, generally, if there's peer review comments that they

13   tried to use to detract from the Parikh Study or its general

14   methodology, that falls within the ONY situation; however, if

15   there's something -- some comments -- about the doors are left

16   open -- this, you know, critique about blindness when it really

17   wasn't blind or prospectiveness may be the issue of -- with

18   respect to the landmark time.  But to an extent there's

19   something there -- I'm not sure there is -- that peer review

20   commented on the very issues that I found may fall under the

21   ONY exception -- those would seem to be relevant.

22         So first question is, is there such evidence or are these

23   general critiques -- I haven't read through all of the --

24   there's a lot of pages there -- but you can tell me, is

25   there -- are there things that are specific to the ONY

1    exceptions?

2         **MR. PERLOFF:**  No.  The -- so there's two buckets.

3    There are the letters from the journals that it not publish.

4    And those, you know, are generally talking about the size of

5    the study and the fact that it isn't as novel anymore, because

6    there had been other things published.

7         The internal critiques by the peer reviewers -- by

8    definition, those were done before publication and were

9    addressed by the publication to the satisfaction of those peer

10   reviewers and the journal.

11        So -- and if you look, actually, at the documents, they're

12   not talking about this question of -- they're definitely not

13   talking about blinded.  I don't think they're talking about

14   prospective collection, which is what the actual terminology

15   is, or the landmark draw.  They're talking about other things

16   that were then addressed by Drs. Parikh and Corcoran, to the

17   satisfaction of everybody involved.

18        So it's -- is just an attempt to make it look like it was

19   a shoddy study.

20        **MR. BRAMHALL:**  Your Honor --

21        **THE COURT:**  And is this what's embodied in TX-755, or

22   are there other documents?

23        That's one of the bellwethers.

24        **MR. PERLOFF:**  Yeah.  I can -- and this was on -- I can

25   put it up on the screen if it helps everybody.

1          **THE COURT:**  Sure.  Yeah.

2      It looks like either reviewer comments -- Reviewer

3   Number 1, Arvind Dasari, for instance.

4          **MR. PERLOFF:**  This is 7 --

5          **THE COURT:**  55.

6          **MR. PERLOFF:**  Yes.

7          **THE COURT:**  Yeah.  Is that what you're referring to as

8   the "reviewer comments"?

9          **MR. PERLOFF:**  Yes.  And there are a few that look like

10  this.

11         **THE COURT:**  There are others?

12         **MR. PERLOFF:**  There were three peer reviewers.  And I

13  think each of them said at least something.  Some said more

14  than others.  And I want to just make sure that I'm reading

15  this correctly.

16      Is -- oh, help me here, guys.  Is this one of the peer

17  reviews?

18         **MR. BRAMHALL:**  So, if I may, I think it is.  I think

19  this is from the CCR publication.  If you look at the top left,

20  it says CCR-21.

21         **THE COURT:**  Yes.

22         **MR. BRAMHALL:**  So, Your Honor, this is peer review

23  comments from the paper that ultimately published the study.

24         **THE COURT:**  Yeah.

25         **MR. BRAMHALL:**  But, importantly, there were multiple

```
 1   journals that rejected the study before it was submitted to CCR
 2   where one of the authors is a senior editor.  Those prior
 3   comments -- and maybe Mr. Perloff is not speaking about
 4   those -- those absolutely address the prospective,
 5   retrospective element.
 6        I would encourage Your Honor to look at Exhibit KK, which
 7   is GHI00007967 to dash 70.  That is one of the exhibits that we
 8   submitted.  It is Journal of Clinical Oncology comments that
 9   were shared with one of the Parikh Study coauthors at Guardant.
10   It absolutely raises -- in fact, I believe it has major
11   comments from a peer reviewer -- this same issue that we've
12   been talking about.
13             THE COURT:  All right.  So assuming there are --
14             MR. PERLOFF:  I don't have --
15             THE COURT:  -- comments from -- in the context of
16   other potential journals that did pinpoint maybe the issue of
17   prospectiveness, why isn't that relevant?
18             MR. BRAMHALL:  I'm assuming you're not asking me --
19             THE COURT:  I'm asking Mr. Perloff.
20             MR. BRAMHALL:  -- because I think it is relevant.
21             THE COURT:  I know you think it's relevant.  I'm
22   asking Mr. Perloff.
23             MR. PERLOFF:  Oh, I thought you -- I apologize.  I
24   thought that you were asking --
25             THE COURT:  No, no.  I know -- I know your opponent's
```

 1   position.  I want yours.

 2       **MR. PERLOFF:**  Well, you know, I think that we run into

 3   the problem -- so, if you remember, they had an expert witness

 4   who purports to testify about what the meaning is.  We were

 5   able to take that witness' deposition and learn that her

 6   definition of "prospective" and "retrospective" is maybe more

 7   fluid -- and that's a generous way to put it -- than they would

 8   have us believe.  Because, again, the actual statement in the

 9   study is not "the entire study is prospective."  It's, you

10   know, "the samples were collected prospectively."

11       And so what we would lack, then, is the ability to go to

12   this third party, A, to prove it up that that's what they meant

13   and, B, to cross-examine them on it.

14       **THE COURT:**  All right.  Well, then you're bringing up

15   really a hearsay problem.  Because that's the issue here, is

16   this is essentially a hearsay from -- statement -- from a third

17   party to another journal that allegedly is critical, but you

18   have no opportunity to cross-examine hearsay.

19       **MR. PERLOFF:**  Right.  And it's not clear to me, also,

20   whether, for example, the criticism that he's referring to --

21   because I don't have the document in front of me -- is making

22   the connection that they would need to make here, which is that

23   they're criticizing the description of a prospectively

24   collected cohort -- you know -- that somehow being inaccurate.

25       **MR. BRAMHALL:**  Your Honor --

1          **MR. PERLOFF:**  So, again, just the general subject

2     matter of -- because that may have been exactly the reason why,

3     in the study, it says what it says and doesn't say, "This is a

4     prospective study."  It says --

5          **THE COURT:**  Well --

6          **MR. PERLOFF:**  -- "The samples were collected

7     prospectively."

8          **THE COURT:**  That's right.  So the issue is not whether

9     the methodology is good or bad or correct in the way that it

10    was -- blindness or prospectiveness -- was handled.  It's

11    really whether or not the study inaccurately characterized

12    itself.  So I would have to look at that -- whatever those

13    critiques are.  That wouldn't submit as a bellwether, I see, I

14    don't think.  I don't see it in 17 bellwether.  But, in any

15    event -- so one question is, you know, is it on point?  But the

16    other question is hearsay; what about the hearsay problem?

17         **MR. BRAMHALL:**  So, Your Honor, it is absolutely on

18    point.  For example, when Your Honor takes a look at it, there

19    are statements about excluding patients a priori.  That's a

20    reference to the cutoff we were talking about earlier and the

21    decision to exclude just the two patients who could be false

22    positives.  So that document I cited earlier refers to that --

23         **THE COURT:**  Okay.

24         **MR. BRAMHALL:**  -- as well as the overall retrospective

25    nature of the study.

1      From a hearsay perspective, Your Honor, there's, one,

2   this -- is -- goes to an issue Your Honor raised earlier, which

3   is state of mind.  This shows Guardant was aware of these

4   comments in the process of drafting and editing the paper and

5   chose to make no changes.  So it goes to the fraud and the

6   fabrication element of the study.  It also goes to the state of

7   mind of those in the field in terms of it wasn't just Natera

8   that had these concerns about the study and the way it was run.

9      As Your Honor may recall, there's an argument by Guardant

10  that Natera's actions were somehow improper in raising its

11  concerns about the Parikh Study with third parties.  This --

12  these peer review comments by experts in the field go to show

13  that that -- those actions were entirely legitimate.  They were

14  motivated by concerns that were shared by others.  So there's a

15  state of mind issue from that perspective, as well.

16      And then I'd say, in general, Your Honor, hearsay is about

17  trustworthiness.  There's no reason to believe these

18  documents -- these peer review comments by luminaries in the

19  field -- are anything but the most trustworthy documents.  And

20  they should at least come in, Your Honor, either as records of

21  regularly conducted activity in the scientific publication

22  context or under the residual exception of 807.

23          **MR. PERLOFF:**  I'm fairly certain that there's actually

24  case law that says that interim analyses like these wouldn't --

25  do not meet the normal exception.  But I also want to clarify

 1  one major point.  Unless somebody tells me I'm wrong, Guardant

 2  never got these.  Guardant was not privy to the -- these were

 3  directed to Dr. Corcoran and Dr. Parikh, who had to answer

 4  them.

 5      And if -- somebody on my team, if I'm wrong about this,

 6  let me know.  Because I'm 100 percent certain -- and you can

 7  tell by the Bates number -- these came from the journal.  And,

 8  for the record, they had an opportunity to take the deposition

 9  of the CCR Journal.  They subpoenaed them, but they elected not

10  to in order to prove them up.  But Guardant -- and Dr. Grant is

11  confirming I'm correct -- we never had these.

12          **MR. BRAMHALL:**  Well --

13          **MR. PERLOFF:**  Nor would we.  This -- the study was

14  conducted by -- written by -- Dr. Corcoran, Dr. Parikh.  And I

15  know they're trying to make our influence seem important.  And

16  we did have some editing.  But not at this stage.

17          **THE COURT:**  Well, okay.  So that -- that creates a

18  state of mind --

19          **MR. BRAMHALL:**  But, Your Honor -- Your Honor, Victoria

20  Raymond, a coauthor on the study, a Guardant employee, had

21  these comments.  If you look at the document I'm talking about,

22  the very top email is an email from Dr. Corcoran to Dr. Parikh

23  and Victoria Raymond of Guardant Health.  This is the document

24  I referred to earlier.  These were absolutely shared with

25  Guardant.  It's Exhibit -- I believe -- is 46 the trial --

1          **MR. PERLOFF:**  Yeah, let me -- yeah -- if you give me

2    that, I can see it.

3          **MR. BRAMHALL:**  I think -- and so I think it's -- is it

4    TX-46 or something else?

5       It's GHI00007967.  But I'm confirming the exhibit number.

6          **MR. PERLOFF:**  Yeah.  If you give me the exhibit

7    number, I can look and see what we're talking about.

8          **MR. BRAMHALL:**  Absolutely.  So it's on the docket, as

9    well, if you want to look at our Exhibit KK, but I'm working on

10   this right now.  It is TX-515.

11         **MR. PERLOFF:**  TX-515 -- if you give me a second...

12         **MR. BRAMHALL:**  And if you take a look at the -- and

13   maybe Mr. Perloff was not aware of this -- but if you look at

14   the "to" line of this email, at the top, it's to people from

15   MGH.  And it's Victoria Raymond at Guardant.  And if you go

16   down this email to the bottom, you'll see it's the Journal of

17   Clinical Oncology comments.  Now, they're a little funky

18   because --

19         **MR. PERLOFF:**  Yeah.  I -- I'm not seeing -- can you

20   put it up on the screen?

21         **MR. BRAMHALL:**  I cannot at the moment.

22         **THE COURT:**  So what's the number?  515?

23         **MR. PERLOFF:**  I've got it.

24         **MR. BRAMHALL:**  Yeah.  So assuming we're all looking at

25   the same thing, which hopefully we are --

1          **MS. SHYR:**  Andrew, I'm able to share it if you'd like

2     me to.

3          **THE COURT:**  Why don't you share it.

4          **MR. BRAMHALL:**  Yeah, if you could, that would be

5     great.  Just the top, since it's a confidential document.  But

6     you can show the top here -- well, you might have to scroll

7     through to show the rest.

8          But, yeah, this is -- this is -- if you look here, Your

9     Honor, there's -- Dr. Parikh is the first.  Victoria Raymond --

10    and you see she has a GuardantHealth.com email address -- is

11    second.  And you see the subject is "JCO Final Decision."

12    That's the rejection by the Journal of Clinical Oncology.  And

13    if you scroll down, it has commentary from the peer reviewers.

14    There's a Reviewer 1 and a Reviewer 2.  And Reviewer 1 is the

15    reviewer who raised the comments I mentioned previously.

16         So you look at point 2, "Was this decision to exclude them

17    made a priori?  This is a major decision to exclude those two

18    patients as they would have been the only negative cases."

19         If you go, Dr. Shyr, down to the minor comments, you see

20    there's a comment about retrospective versus prospective.

21          **MR. PERLOFF:**  Hang on.  Which number?

22          **MR. BRAMHALL:**  Point 2 in each, I think.

23          **THE COURT:**  Okay.  Well, your main thinking is that

24    this document, for hearsay purposes, went to Guardant via

25    Victoria Raymond.  And so, if nothing else, this informs state

```
 1   of mind.
 2         MR. BRAMHALL:  Oh, yeah, and this one -- by the way, I
 3   should say, this is the version that was actually from
 4   Guardant's files.  If you look at the bottom, it says "GHI" --
 5   there you go -- that's from Guardant's files.
 6         MR. PERLOFF:  Okay.
 7         MR. BRAMHALL:  Sorry.
 8         THE COURT:  All right.  Well, in sum, the -- any peer
 9   review sort of comments, number one, for relevance, would have
10   to connect with the ONY exception and not just general
11   critiques about sample size and this sort of thing.  So that
12   gets you into the relevance door.  And then there's the hearsay
13   door that's got to be passed.
14         And I think the strongest argument I've heard so far is,
15   to the extent that whatever documents you want to introduce
16   went into the possession of somebody responsible at Guardant,
17   it could be admissible as to Guardant's state of mind.  The
18   idea about state of mind in the field and Natera was --
19   therefore their concerns were legitimate -- that -- that --
20   that assumes the truth of the matter asserted.  That's classic
21   hearsay at that point.
22         And I'm not so confident about residual hearsay.  I'd have
23   to think about that.  But, right now, my take is that they may
24   be relevant to state of mind.  But if it's used to prove the
25   truth of the matter asserted therein, i.e., there are problems,
```

```
1   et cetera, et cetera -- now, if it went to Natera, and Natera

2   had possession of these before they decided to issue their

3   campaign, et cetera, et cetera, you know, maybe I could see

4   that.  But I don't think that's the case here.

5              MR. BRAMHALL:  Yeah.  I'm not aware of that, to be

6   clear, Your Honor.

7              THE COURT:  Yeah.  So I think if it's just generally

8   here's the state of the field, I think there are -- you know --

9   we don't know if it's -- how representative it is.  There may

10  be questions about what was meant by this, and what would cure

11  this, and how consequential it is.  That's what the value of

12  cross-examination rights are and the problem with hearsay.

13       So I'll just say that there could be a serious hearsay

14  problem there, but, again, this particular document does seem

15  to be admissible, at least on the question of state of mind.

16             MR. BRAMHALL:  And, Your Honor, we can understand your

17  views on this, and we can take this up as we go at trial, and

18  we will absolutely consider our evidence in light of your

19  comments.

20             THE COURT:  All right.  What about the other

21  studies -- this Motion Number 3 -- COSMOS, KASI, ECLIPSE?

22             MR. PERLOFF:  Right.  Yes.  So --

23             THE COURT:  So -- yeah.  Go ahead.

24             MR. PERLOFF:  Right.  And, naturally, I actually think

25  that COBRA would now fall into this category.  Because it --
```

1    the description is the same.  These are -- well, let me set

2    aside ECLIPSE just for a second.  ECLIPSE was about Guardant

3    SHIELD --

4           **THE COURT:**  Yeah.

5           **MR. PERLOFF:**  -- which is the test that they're going

6    to the FDA on.

7           **THE COURT:**  Right.

8           **MR. PERLOFF:**  It wasn't called SHIELD at the time, but

9    that's what that was about.  So difficult to understand the

10   relevance of that to anything here.  And I'm going to guess

11   that they're not going to want to talk about ECLIPSE either

12   because they're just about to go to final publication and the

13   results were very favorable.  So I'm guessing they may not want

14   to bring ECLIPSE in, because the FDA is about to prove it based

15   on ECLIPSE.  But set that aside.

16        The COSMOS and COBRA -- both are interim analyses.  Both

17   are not peer-reviewed, published articles.  And the same

18   problems that we have for COBRA are the problems we have for

19   COSMOS.  For example, not necessarily all of the data has been

20   reported out.  Certainly, in COBRA, we don't have that.

21        And I think that -- our point is that -- and to echo,

22   honestly, what Natera wrote in their matching motion to exclude

23   other studies -- if you recall, they wrote it cannot be

24   relevant to what Guardant advertised in 2021 what the results

25   of an interim analysis were in 2022 or, in the case of COBRA,

late 2023.

And I believe that that's right.  That the key issue that we're talking about here are specific claims -- you know -- so sensitivity, specificity, lead time -- that are in the advertising that they are attacking.  And if those studies are interim, and we don't have clinical data to know what the sensitivity is or specificity is, because there's no, for example, reporting of the clinical outcomes, it can't be relevant.

And what we end up -- where we end up is going down these different little rabbit holes on these -- each of the individual studies.  And there's, you know, an additional problem that presumably the studies are not going to have been as well-documented in terms of discovery; right?  We're already talking about limiting the scope of our discovery on just one of the ones they want to bring in.

And it's especially true, given that the parties, in their discovery production to each other, made agreements about excluding documents that were only about these studies.  And so I think that that's really the main point.  The parties didn't seem, during discovery, to believe that they were relevant. And now they're trying to bring in, again, this interim data that was generated after the statements that -- advertising statements -- were made, and couldn't retrospectively have anything to do with the truth or falsity.

1    **THE COURT:**  Well, I'll hear the response, but, I

2    guess, is that true?  It has nothing to do with truth or

3    falsity?  I mean...

4    **MR. PERLOFF:**  Well, I guess that that -- I'm just

5    borrowing their argument, that if it was good in --

6    **THE COURT:**  Yeah.  Well, I know -- if it's good for

7    the goose, it's good for the gander.

8    **MR. PERLOFF:**  Right.

9    **THE COURT:**  I saw that several times -- people talking

10   about, oh, they deceive people.  Oh, no, they weren't deceived

11   by our advertising, because these were sophisticated doctors.

12   I thought, oh, wait a minute, who's arguing what?

13       But, in any event, what about -- what about -- I guess --

14   this is the question -- this is something after the fact, after

15   the ad.  The attack is on the truthfulness of the ad -- the

16   accuracy of the ad -- or the advertisement.  Is it probative?

17   Is the interim -- putting aside it's not final, there are

18   issues about, you know, how reliable it is, et cetera,

19   et cetera, how much weight you should give to it -- but

20   assuming there's some evidence here that would tend to

21   contradict the statements in the ad one or two years prior, is

22   it relevant?

23   **MR. PERLOFF:**  Well --

24   **MS. SHYR:**  Your Honor, may I respond to that?

25   **THE COURT:**  Yeah.

1           **MR. PERLOFF:**  Do you want me to go first or --

2           **MS. SHYR:**  Thank you, Your Honor.  So --

3           **THE COURT:**  No.  I was going to ask Ms. Shyr to

4    respond and then you can.

5           **MS. SHYR:**  Thank you, Your Honor.

6       So regarding the COSMOS Study that was in Guardant's MIL

7    Number 3, that one has already been discussed in the Hochster

8    Daubert motion.  And, in that, it was found that COSMOS is

9    relevant to whether Guardant's ads are false and -- because

10   they have claimed that Reveal has 100 percent specificity.

11      Now, the data from COSMOS has shown that there's a high

12   number of false positives, which relates to a corresponding low

13   specificity for Reveal.  So it's directly relevant to the

14   falsity of Guardant's claims.  Similarly, COBRA is relevant for

15   that purpose.  And, actually, I came into this hoping that the

16   dispute about whether COSMOS came in had been mooted, because,

17   on the February 15th hearing, Mr. Perloff referred to

18   additional data from COSMOS that he was suggesting might be

19   relevant to further discovery.

20          **THE COURT:**  So, remind me, why is it -- if you could

21   just say, in as few words as possible, why is it that something

22   after the fact -- let's say a year or two later, a study

23   reveals that the statement in an earlier ad does not appear to

24   prove out correct.  That -- that's relevant because it just

25   tends to show the absolute truth, even if it's a year older, or

 1    a year beyond, and therefore what was -- whether that statement

 2    a year earlier was inaccurate?

 3         MS. SHYR:  That's right, Your Honor.  That Reveal does

 4    not have 100 percent specificity, because a public study showed

 5    that there was incidents of high -- of false positives -- which

 6    corresponds to low specificity.

 7         THE COURT:  Does it go to state of mind?  If these

 8    studies weren't known, is there an argument for or against

 9    that -- whether it goes to the actual absolute truth or not, it

10    does not inform state of mind, culpability, scienter?

11         MS. SHYR:  With respect to COSMOS, Your Honor, yes, it

12    does.  Because there are internal Guardant documents showing

13    that Guardant was aware of these false positives and encouraged

14    the investigators to leave those out of the public reports.

15         THE COURT:  Well, what about COBRA, now that we're on

16    that subject?  This is now two years later -- three years

17    later.  Are you arguing that COBRA also informs a question of

18    Guardant's scienter?

19         MS. SHYR:  Your Honor, we -- we don't have discovery

20    about Guardant's -- what Guardant knew about COBRA.  But I

21    think COBRA, based on the incidents of false positives, further

22    supports that Reveal does not, in fact, have 100 percent

23    specificity --

24         THE COURT:  All right.

25         MS. SHYR:  -- to the absolute truth.

1        **THE COURT:**  So it goes to what's the absolute truth

2 and whether what was stated back in whatever -- 2021 -- was, in

3 fact, inaccurate.

4        **MS. SHYR:**  Yes, Your Honor.

5        **THE COURT:**  Okay.

6     What's wrong with that, Mr. Perloff?

7        **MR. PERLOFF:**  Well, the statements that were made in

8 2021 were based on the clinical validation study in 2021.  And

9 you correctly noted these data were not available in 2021 when

10 Guardant made the statements that they're alleging are false.

11     So if you think about a false advertising case, how could

12 it be that -- when it was -- unless we do some type of time

13 manipulation -- right?  The -- there could always be data that

14 comes along later that undermines data that occurred earlier.

15 But it doesn't make the statement -- you know, when Guardant

16 says 91 percent sensitivity in the surveillance setting and

17 cites Parikh -- it doesn't make it false.  Because it was.

18 That's the data that they're reporting on in the advertisement.

19        **THE COURT:**  So, in other words, if the statement under

20 what some of you call the establishment claim -- I'm not sure

21 where that nomenclature came from -- but if you use that --

22 that prong -- that is there was -- your argument is that the

23 statement was not untruthful back in 2021, because it was

24 supported by the Parikh Study.  Not criticizing the study, but

25 if found it supported the study back then, then it's not false.

1   The fact that there's later studies that then tends to show

2   that, no, actually it wasn't an accurate statement, that

3   doesn't make the then-statement based on -- supported by data

4   then -- unsupported.

5           **MR. PERLOFF:**  Yes.  That -- I think that's right.  And

6   it's particularly, I think, true when you are dealing with the

7   ONY situation with peer-reviewed, published studies.

8       And, again, just also, for the record, in neither case --

9   neither COSMOS nor COBRA -- I -- for 100 percent certain, there

10  are no clinical outcomes reported in COBRA.  We do not know

11  whether any of the calls were true positives, false positives,

12  true negatives, false negatives, precisely because the clinical

13  recurrence was never reported, at least to us and not to the

14  study authors, as far as we know.

15      Same thing with COSMOS.  The issue back in 2021 was they

16  were still within a year of blood.  And, you know, again, the

17  idea is recurrence comes later.

18      And that's sort of the problem -- right? -- Your Honor.

19  What they're trying to do is make something false.  The Parikh

20  Study was finished.  They had the clinical data that they

21  reported.  In COSMOS, they're ongoing.  So what they're saying

22  today is a false positive could become a true positive

23  tomorrow, because the patient recurs.  That's the problem on

24  top of what they're doing.

25      I still think the fundamental issue is you couldn't go

1  back in time and render it false by something that happens in

2  the future.  But for sure you can't do it when the future isn't

3  set.  When those have not been reported out so we know what the

4  actual outcomes of those patients were.  And we end up going

5  down these rabbit holes to go through each one of these points

6  for each one of these studies.

7         THE COURT:  All right.  Let me ask -- go back to

8  Ms. Shyr.  If the question is, at the time a statement is made,

9  whether it was, in fact, established -- i.e., supported by the

10 study or did the statements go beyond and say something that

11 the study didn't support -- that's the issue under the

12 so-called establishment claim -- why does it make any

13 difference what happened two years later?  It either was

14 supported back in 2021 -- or whenever the statements were

15 made -- or it wasn't supported.

16        MS. SHYR:  Well, Your Honor, regarding the COSMOS

17 Study, at least, one of the exhibits that Guardant attached to

18 its motion in limine -- it's labeled Exhibit 87 in my printout.

19 But this is an email that was sent to -- CCing someone at

20 Guardant in September of 2021.  That's before the Parikh Study

21 was published.

22        MR. PERLOFF:  Your Honor, Parikh was published in

23 March or April of 2021; right?  The launch of Reveal was

24 announced at JP Morgan in January.  The actual launch -- soft

25 launch -- occurred in February.  The Parikh Study was

1    published, I believe, in April.  And that's, of course, when

2    this lawsuit began in May.

3           **MS. SHYR:**  Well, the preprint was published in

4    April --

5           **THE COURT:**  So, anyway, what was --

6           **MS. SHYR:**  -- and the article was published -- the

7    preprint was published in April.  The published version

8    appeared in October of 2021.

9           **MR. PERLOFF:**  Oh, the online -- it was published

10   online.  It just didn't make it into print until the September

11   print version of the journal.  But it was the final study.

12          **THE COURT:**  Well, anyway, what's the relevance of this

13   email?

14          **MS. SHYR:**  Well, what I'm saying is at the time that

15   Guardant was relying on these statements of 100 percent

16   specificity, it was aware of these issues with false positives

17   in COSMOS.

18          **THE COURT:**  All right.  So this is relevant because it

19   was within the awareness of COSMOS at the time the advertising

20   statements were made for COSMOS?

21          **MS. SHYR:**  That is -- that's correct.  Yes, Your

22   Honor.

23          **THE COURT:**  Okay.  I think I understand that point.

24   But now that we're on the subject of COBRA, what about that?

25   That did not exist.  So, I guess, it begs the question, what is

the relevance of something that's totally post hoc and not within the mindset or knowledge of Guardant?  How is that relevant if the question under the establishment claim is whether or not the advertising statements by Guardant was, in fact, supported by the Parikh Study at the time?

            **MS. SHYR:**  I think that -- thank you, Your Honor.

        So the point is that they weren't established by Parikh at the time.  And Parikh, in its falsely reported methodology -- for lack of a better term -- it did not allow physicians to understand that there were these false positives.  So this was an issue, at the time, that was concealed by the conduct of the study by Guardant.

            **THE COURT:**  Well -- all right.  I don't know if we're now talking about the study, and we're in the ONY land and the falseness of the study, or the falseness of the ads, which misrepresented the study, in a sense.  But that still doesn't answer my question.

        Yes, they -- you have an argument that it did misrepresent.  They went further -- or they said something that wasn't supported by the study.  That argument exists, they got a counterargument, et cetera, et cetera.  My only question is why should we admit evidence of a three-year or two-year post hoc event that neither side was aware of at the time?  How does that establish whether there was an accurate summation of the study back at the time in 2021?

1          **MS. SHYR:**  And, Your Honor, I see that Mr. Cannon is

2    at the podium.  He addressed the COBRA Study.  So if I could

3    pass this over to him.

4          **THE COURT:**  Okay.  All right.  All right.  But it does

5    seem like this Motion Number 3 kind of folds into COBRA a bit.

6          You're muted, Mr. Cannon.

7          **MR. CANNON:**  There we go.  Thanks.  Sorry.  I just

8    wanted to jump in since I addressed the COBRA and Dr. Hochster

9    issue earlier.

10         And one of the issues is -- and you raised a good point --

11   is why is this -- why is it that the COBRA's termination --

12   termination of the COBRA Study based on excessive false

13   positives?  How does that relate to advertisements that came

14   before?

15         And the reason is, Your Honor, Guardant is accusing

16   Natera -- the accusations against us is, hey, Natera, how can

17   you question our ads?  In fact, Guardant sued us for doing

18   comparative advertising and questioning the ads, because,

19   immediately, when Parikh was published, when the advertisements

20   that Guardant put out there showed the sky-high specificity and

21   very low false positives, Natera knew, based on the technical

22   design of that product -- on Guardant's Reveal product -- there

23   would be false positives.  Natera suspected that.

24         Dr. Hochster, our expert, who was revealed and was

25   disclosed to Guardant earlier on in his case, said that in his

first report, Your Honor.  He said, hey, there's a much higher

chance of false calls -- false positives -- based on the design

of Reveal.  And the COBRA Study is ongoing.

And, in fact, in Your Honor's Daubert decision -- that was

from March 23rd, 2023 -- ECF Number 328 on page 11, Your

Honor -- you actually ruled that Dr. Hochster could discuss

this issue.  And the opinion that Dr. Hochster said, which

survived Daubert -- in your Daubert order -- you say, "Second,

he opines that Reveal is more prone to false calls and can lead

to negative, undesirable health consequences for patients."

So what that shows is Dr. Hochster, an oncologist,

suspected, hey, the design of the Reveal test shows a lot of --

you know -- potentially a lot of false positives -- way more

than the Parikh Study and the Guardant advertisements are

telling the field.  And, lo and behold, the COBRA Study

vindicated his opinion that was set forth in his opening

report.  So that is how --

**THE COURT:**  So that's your key.  The "lo and behold"

nexus.  Even though he opined at the time that the -- that

what -- I mean, justifying Natera's critiques --

**MR. CANNON:**  Right.  So Natera critiqued the Guardant

ads.  Guardant sued Natera based on those critiques.  And

Dr. Hochster had an opinion that the technical design of the

Reveal test could lead to more false positives.  That was an

opinion he put into the case.

1          There was Daubert motions about it.  Your Honor issued an

2     order.  And the COBRA test, which was identified in his

3     original report -- and it was a Guardant Reveal test used in

4     the COBRA test -- turned out to have excessive false positives,

5     exactly as Dr. Hochster said would happen.  And so that is the

6     relevance of that.  Natera is defending itself against

7     Guardant's accusations, and that's the relevance there.

8          **THE COURT:**  Well, so what you're essentially arguing

9     is that Dr. Hochster's prognostications or concerns have now

10    proven correct and therefore -- is that the idea? -- and

11    therefore Natera's express concerns and attempt to bring those

12    concerns to light to the public back in 2021 were justified?

13         **MR. CANNON:**  That's a big part of it, Your Honor.

14    Guardant is suing Natera for critiquing Guardant's product and

15    for critiquing the very high performance metrics that Guardant

16    advertised that Reveal had.  And so the COBRA test and the very

17    dramatic termination of the COBRA test is an important -- very

18    important relevant piece of evidence -- a relevant piece of

19    evidence that confirms an already existing opinion in the case.

20    And the already existing opinion is Dr. Hochster's opinion that

21    Reveal is more prone to false calls; in other words, false

22    positives.

23         **THE COURT:**  All right.

24         Mr. Perloff?

25         **MR. PERLOFF:**  There's a huge problem in Mr. Cannon's

1   analysis.  And that's simply that none of the criticisms that

2   are the subject of our false advertising claims against them

3   say the word "specificity" at all.  They know that.

4        This is -- this is -- they're trying to do a sideline

5   around here.  If you remember the comparison, none of the

6   comparisons said anything about specificity.  So they're just

7   trying to juke and jive here.

8        The Hochster issue -- so -- and you raise it -- it's the

9   lo and behold problem.  So Hochster, relying on COSMOS in 2022,

10  said that he believes that the statement made in 2021 about

11  specificity was false.  It doesn't say anything about COBRA.

12  But perhaps equally important, you'll notice that Dr. Hochster

13  didn't supplement with the most recent COSMOS data.  Because,

14  again, part of our argument is, when it's not a closed trial,

15  and the studies are ongoing, you don't really know what the

16  clinical truth is, whether true positive or false positive.

17       And, certainly, again, in the case of COBRA, nearly three

18  years later, wasn't known, couldn't have been known, and

19  doesn't render what was said in 2021, true or false, doesn't

20  render citing from Parikh, true or false.  It can't.

21            MR. CANNON:  Your Honor, if I may respond, briefly?

22            THE COURT:  Yeah.

23            MR. CANNON:  The opinion -- Dr. Hochster's original

24  opinion -- is relevant, and it is in the case, per your Daubert

25  order, on page 11.  The fact that Dr. Hochster had the opinion

 1    that Reveal -- the Reveal technical design -- leads to more

 2    false positives, that is an opinion that's in the case.

 3         And with respect to the accusations that Guardant has

 4    against Natera, I very much believe that the accusation is in

 5    the case.  Because Natera did critique the specificity, you

 6    know, of the Reveal -- the Reveal product.

 7         I'm looking at Exhibit 68, which has been put in front of

 8    me.  And it was certainly my understanding, before looking at

 9    this exhibit, that Guardant's -- that Natera's -- critique of

10    the Guardant product, in particular with respect to false

11    positives and specificity, was part of the advertisements and

12    the marketing that Guardant claims is false.

13         So if Guardant gets to accuse Natera of false advertising

14    with respect to Natera's critiques of Guardant's products,

15    Natera is entitled to defend itself by saying, hey, our

16    critiques were on point.

17              MR. PERLOFF:  But only if those critiques relate to

18    this -- this is assuming that it's even true that -- your

19    argument.  But the statements -- the comparisons -- that we're

20    talking about -- that began after the Parikh Study, after the

21    launch of Reveal -- they do not talk about specificity.  The

22    Court will remember going through, in the summary judgment,

23    each of the comparisons that we alleged were false.  None of

24    them have to deal with specificity.  It's because Natera did

25    not discuss specificity in its advertising after Parikh was

 1  published, at all.

 2      **MR. CANNON:**  Well, I'm looking at Exhibit 68, which is

 3  a Natera marketing piece.

 4      **THE COURT:**  Why don't you -- why don't you put that on

 5  the screen.

 6      **MR. CANNON:**  Yeah.  I don't have the ability,

 7  unfortunately, to do that.  If there's someone on the team that

 8  would do that, that would be great.

 9      **MR. PERLOFF:**  It is, Mr. Cannon, the one from 2019 or

10  2020?

11      **MR. CANNON:**  Well, it's Exhibit 68.  And, you know, we

12  can bring up -- we can bring up documents on the fly with the

13  Court, obviously, and discuss them.  But, to me, I go back to

14  the Daubert order where this opinion about Reveal's -- that

15  Reveal is prone to false positives -- Dr. Hochster's opinion --

16  that, to me, shows this opinion or this issue is very much in

17  the case in terms of Natera defending itself.

18      **MR. PERLOFF:**  Right.

19      **THE COURT:**  Well, it may be, if that's what was part

20  of the advertising here.

21      **MR. CANNON:**  So if we can scroll to the second -- top

22  of the second page -- top right corner -- "Specificity is

23  impacted" -- so the issue here is, Your Honor -- as you may

24  recall the technical nature of this --

25      **MR. PERLOFF:**  Right.

1          **MR. CANNON:**  -- Natera's test is what's called

2    tumor-informed, which means you take a little piece of the

3    tumor and actually get a genetic fingerprint for each

4    individual patient, which makes it, you know, very, very

5    accurate, whereas the Reveal -- Guardant's Reveal test -- is

6    what's called tumor-naive, where you don't actually take tumor

7    tissue to make kind of a BESPOKE test.  You just test the DNA

8    in the blood draw.  So -- so that's -- you know -- this is one

9    of the ads, I believe, that's been accused of -- subject to --

10   subject to --

11         **MR. PERLOFF:**  Right.

12         **MR. CANNON:**  -- subject to accusation.  And there's a

13   critique of the specificity based upon noise from germline and

14   CHIP mutations.  And, in fact, Your Honor, in your -- in the

15   summary judgment ruling -- which is ECF 326, on page 26 --

16   there is a discussion of the CHIP filter.  CHIP has to do with

17   mutations in the blood that may get picked up by some of these

18   tests because --

19         **THE COURT:**  I understand that's an issue.

20         **MR. CANNON:**  -- we filter that out.  Yeah.

21     So -- so our white paper claims that our device -- that

22   Signatera device -- I'm reading from the -- I'm reading from

23   the MSJ ruling -- you know -- it's our position -- it's

24   Natera's position -- that the Signatera design significantly

25   reduces false positive rates by filtering out some of these

1  artifacts -- these sort of noncancerous DNAs.

2       And so it's the -- this is a very important part of

3  Natera's product and Natera's advertising claims.  And the fact

4  that Natera promotes its specificity and critiques Guardant's

5  specificity -- that's an important part of the case.  That's in

6  the case from the summary judgment motion, from the Daubert

7  ruling, and Natera should be able to defend its advertising.

8       You know, it's -- our advertising is being accused of

9  being false -- falsely misleading -- and we ought to be able to

10  defend it.  And this evidence goes right to the heart of that,

11  Your Honor.

12       MR. PERLOFF:  Well, if I may, very quickly.

13       THE COURT:  Briefly, and then I've got another

14  question.

15       MR. PERLOFF:  Yeah.  It's the -- the actual

16  statement -- and I know they're pulling it down, because maybe

17  they're hoping you didn't see it.  But the whole point is that

18  statement was the very specific statement that we did attack,

19  that specificity is allegedly impacted by the lack of a CHIP

20  filter, which we established we do have a CHIP filter.  They

21  knew we had a CHIP filter.  It's not a generalized statement

22  about we have better specificity or Guardant Reveal has poor.

23       And just the last point, the fact that you allowed

24  Dr. Hochster's opinion about COSMOS --

25       Thank you for putting that up.  I appreciate it.

 1          It's impacted by biological noise from germline and CHIP

 2     mutations.  And without being able to suss that out, you would

 3     have the problem.  That's -- that is a specific attack.  We

 4     have criticized that.  But that's because it wasn't true.  We

 5     do have a chip filter.

 6          But the other point about Dr. Hochster -- the fact that

 7     you allowed him to testify about COSMOS is not letting him

 8     necessarily talk about COBRA.  They are two different things,

 9     both in timing and, again, also even whether or not there are

10     any clinical data reported.  So I don't think they've ever

11     answered your question.

12          **THE COURT:**  All right.  Let me ask you one last

13     question in that regard.  Is -- is something like COBRA not

14     relevant to damages?  To the extent that you're going to have

15     to demonstrate -- if you prove liability, prove loss of

16     income -- what's going to be required to correctively, you

17     know, fix the problem, et cetera, et cetera, if, in fact,

18     that -- it's proven as a matter of fact, even after the fact --

19     that there are problems with -- with the assay?  Why wouldn't

20     that inform damages?

21          **MR. PERLOFF:**  Well, our damages for lost sales only go

22     through May of 2022.  So something reported in November of

23     2023, or at ASCO in January of 2024, couldn't.  We -- both

24     parties have not exchanged damages information.  And our

25     damages number comes from what happened in -- only through --

1    launch through May of 2022.  So that's --

2            **THE COURT:**  You're not seeking prospective loss sales?

3            **MR. PERLOFF:**  It's not even just prospective.  We

4    haven't sought damages after -- lost sales damages -- after May

5    of 2022, at all.

6        Now, that may be a subject, but we haven't -- they haven't

7    offered to update their sales figures.  And so I'm not exactly

8    sure how it could possibly inform that.  It couldn't.  It's

9    closed; right?  That same universe of time is closed.

10   Something that happens in 2023 couldn't impact what happened in

11   2022.

12       And as far as something like corrective advertising, the

13   corrective advertising we're going to seek to do has to do with

14   the claims that they made, again, which were not about

15   specificity.  In other words, the fact that they may -- that

16   doctors may or may not have an issue because of COBRA doesn't

17   change the market that they created when they badmouthed us

18   about everything but specificity in 2021.  In other words, we

19   would still have to go and correct those false ads.

20       It may very well be that separate from that, we may have

21   to go to the world and explain to them that, no, there were not

22   false positives in this case.  They drew the blood during

23   chemo, or whatever, and then, you know, muzzled the primary

24   investigator from talking about it.  But that's a separate

25   issue from the amount of money that we would need to correct

1    what they did say, which, again, wasn't anything about a lack

2    of specificity.

3           **THE COURT:**  All right.  Comment -- response -- to the

4    damages -- why damages are not -- any claim for damages for

5    prospective relief is not --

6           **MR. CANNON:**  Well, yes, Your Honor.  I mean, the

7    specific damages theories are a little bit outside of my

8    agreement on this -- on this call today.  But I will say that

9    the consumers who are actually looking at these tests are

10   oncologists who are very sophisticated consumers.  And a lot of

11   this technical information is -- I don't want to say "baked

12   into decision-making" -- but the -- sort of the risk or the

13   thought or the concern of false positives is based on this

14   technical design you would think would be a causal factor in

15   terms of some of the sales.

16          So to have a lost sales -- a lost sales claim -- in this

17   case, and completely say, well, the false positives issues

18   can't be a causal factor, when, certainly, false positives was

19   on the radar of a lot of technical folks in this field, I think

20   is unfair.  I think COBRA does bear upon damages in that

21   regard, only to the -- at least to the extent it undermines a

22   lost sales theory.  Because a lost sales theory posits that

23   Guardant's allegedly false advertising somehow took sales away

24   from Guardant.  And we know, from the COBRA results, that may

25   not be the case.  There may be other factors at play that these

 1    physicians were considering.

 2         **THE COURT:**  Well, that would be obvious if they're

 3    seeking prospective loss sales.  But I'm being told that

 4    they're cutting off their claim for lost profits, lost sales,

 5    as of May 2022, before COBRA.  So you've got to look at the

 6    state of the world and the what-if world, you know, back then,

 7    before COBRA.  So I'm not sure how, after the fact, it sort of

 8    changed the understanding of the public, et cetera, et cetera,

 9    back in 2022.

10         **MR. CANNON:**  Well, I hear you, Your Honor.  I don't

11    have -- I don't have the facts in front -- at my fingertips --

12    to know the exact date of that damages cutoff.  But the idea

13    that a tumor -- a tumor-naive test -- would have the chance for

14    higher false positives than a tumor-informed test -- that would

15    have been in people's buying decisions from the very beginning;

16    right?  That's --

17         **THE COURT:**  And you can certainly argue that, and I'm

18    sure you will.

19         **MR. CANNON:**  And that will be in argument, you know,

20    so -- and then COBRA would sort of vindicate that concern for

21    at least come cohort of the potential consumers of these tests.

22    But I don't -- I don't have the numbers in front of me to know

23    exactly when the damages cut off to confirm or deny that

24    statement.

25         **THE COURT:**  All right.  Well, that's something I need

1    to think about, because now these motions in limine have sort

2    of raised to the forefront this whole question about sort of

3    after-the-fact studies.  I think those that were within the

4    mindset of Guardant and within the knowledge, there's a fairly

5    good argument -- or at least a stronger hook -- that they would

6    be in play.  Those which were not, and sort of longer after the

7    fact -- upon reflection, I need to think about that a little

8    bit here.

9            MR. PERLOFF:  Your Honor --

10           MR. CANNON:  I will say, Your Honor, that Guardant was

11   involved in the COBRA Study.  So it was the Guardant Reveal

12   test that was used.  And, you know, we don't have discovery

13   from the sponsor of the study, but we do know that Guardant was

14   involved.

15       In fact, Mr. Perloff seems to have indicated some inside

16   information about alleged pressure on principal investigators

17   and their reasons for the termination.  That's information I

18   don't have and Natera doesn't have, but apparently Mr. Perloff

19   and Guardant do.  So Guardant was involved in the COBRA test.

20           MR. SCOLNICK:  Your Honor, can I make one quick point?

21   It's 30 seconds.  I think it's very important to this -- to

22   this issue.

23       And, one, with respect to the allegations of false

24   positives, there's no evidence that any of these tests are

25   false positives, because there's no clinical data.

1      Second -- and this undercuts, apparently, Natera's entire

2  theory of admissibility -- is that there's nothing

3  inconsistent.  Assuming they were false positives, if you have

4  six or seven false positives out of a set of 600 people, that's

5  99 percent specificity.

6      In fact, we put this in front of the Court.  In our

7  motion, there is a slide from our presentation -- that Parikh

8  Study -- the Parikh ASCO presentation -- that shows, with 1,000

9  people, and a test that has 50 percent sensitivity at landmark,

10  which is what we're dealing at -- and with these tests

11  generally -- both of them -- if you have a test with 98 percent

12  specificity, you would expect 18 false positives.  That's with

13  98 percent specificity.

14      Here, we have 600 people, not 1,000.  So doing the math,

15  we'd expect, with 98 percent specificity, to have 11 false

16  positives.  Now, again, we're -- our contention is that no

17  false positives occurred here.  But even giving them the

18  benefit of the doubt, if we have six, that's about 99 percent

19  specificity.  There was --

20          **THE COURT:**  Well, there's a lot of assumptions --

21          **MR. CANNON:**  Well, Your Honor --

22          **THE COURT:**  There's a lot of assumptions there about

23  what the base was and how many people were tested and all that.

24  We don't have enough -- I don't have enough yet to know --

25          **MR. CANNON:**  Your Honor, can I please -- I know that

1    it was a quick 30-second or a one-minute -- I would love to be

2    able to just quickly respond to that, because there was a lot

3    of numbers and assumptions baked into that math.

4         **THE COURT:**  Well, and I understand.  I just said --

5         **MR. CANNON:**  Yeah.

6         **THE COURT:**  -- I understood that's based on a lot of

7    assumptions --

8         **MR. CANNON:**  Yeah.  And I would say that -- I mean,

9    you know, all due respect to Mr. Scolnick -- but the NRG

10   Oncology sent a letter -- and I don't have it electronically --

11   but it was in Dr. Hochster's supplemental report.  And NRG

12   Oncology certainly said, quote, "The higher than expected false

13   positive rate resulted in the trial not passing the interim

14   analysis."

15        **THE COURT:**  Yeah.  Well, I think --

16        **MR. CANNON:**  So the experts in the field pointed to

17   that as the reason for COBRA ending.

18        **THE COURT:**  Well, I think there's a bigger threshold

19   question, and that is relevance here, which I need to think

20   about.

21        **MR. PERLOFF:**  Your Honor --

22        **THE COURT:**  Let's go to Number 4.

23        **MR. PERLOFF:**  Oh.

24        **THE COURT:**  We're going to move on to Number 4.

25        **MR. PERLOFF:**  All right.  Thanks, Your Honor.

1    **THE COURT:**  The motion to exclude lay witness

2    opinions -- I'm not sure what it is that's being sought to be

3    introduced here.  I mean, to the extent that Mr. Chapman and

4    Dr. Aleshin -- is it the idea that they would speak about their

5    understanding of the terms used in Guardant's advertisement,

6    and that, therefore, informs the state of mind of Natera?  Is

7    that the basic argument here, or what is it?

8    **MS. LOZANO:**  Your Honor, this is Valerie Lozano for

9    Natera.  This is Guardant's motion, and I'm a little bit with

10   you that I don't know exactly what the scope is of what's

11   trying to be excluded.  It's quite broad in a way --

12   **THE COURT:**  Well, maybe you can start by telling me

13   what's trying to be included on your part.  Something like

14   that.

15   **MS. LOZANO:**  I mean, you know, we don't intend to have

16   our witnesses speculate about other people's thought processes

17   or motivations.  But, for example, I do think it's potentially

18   very relevant that they testify about their understanding of

19   what's important to the customers of their products, which goes

20   to their state of mind about why they put what they did in

21   their responsive ads to correct the misimpression in the

22   marketplace.  So I think that's absolutely an example of

23   something that's relevant.

24   **THE COURT:**  So it's relevant to Natera's state of

25   mind --

```
 1              MS. LOZANO:  Right.

 2              THE COURT:  -- to show that they had a genuine

 3    concern --

 4              MS. LOZANO:  Right.

 5              MS. KELLER:  Your Honor, if I could be heard.

 6         We did lay out, in our motion, exactly what we wanted to

 7    exclude.  We wanted to exclude their testimony of these lay

 8    witnesses; of how oncologists and other physicians understand

 9    and interpret Guardant and Natera's advertising; what other

10    physicians believe about tumor-informed and plasma-only ctDNA

11    tests; the factors that are most important to physicians in

12    choosing MRD assay for their patients; the beliefs,

13    understandings, motivations, and intentions of Guardant and

14    other third parties; whether Guardant Reveal met the criteria

15    for Medicare coverage; how Guardant has achieved Reveal's test

16    performance.  Okay?  We were very specific.

17         So I was quite pleased to see, in Natera's response, that

18    they said, hey, we're not going to get into any of that.  None

19    of those categories are on our witness list.  And we're not

20    going to ask anybody to opine about those.

21         Then they turned right around and said but, you know, they

22    can opine about those, and we can simply object at trial.

23    They -- they appear to be saying you can preface any improper

24    lay opinion by saying that you either believe or don't believe

25    something, or it's your understanding, and that somehow
```

immunizes the statements from admissibility, because they're,

quote, "personal opinions."  That was what they said.

That's pretty tautological.  And it would really

obliterate the distinction between 701 and 702.  And if you

look at the cases that they cited to support their position,

they cited two Northern District cases -- unpublished decisions

of district courts ruling on motions in limine.  They were both

criminal cases.

One was a criminal case involving a computer intrusion.

And Judge Orrick ruled that employees who discovered the

intrusion -- that assessed it and repaired it -- could testify

to what they did without running afoul of 701, because they're

fact witnesses, even if this involved some technical issues,

because they dealt with them every day.  So they weren't giving

opinion testimony.

And U.S. v. Chen was also a criminal case.  It involved

trade secrets.  Judge Freeman ruled that she was not going to

exclude testimony of applied materials employees as experts,

because they were just going to testify that certain technical

information was treated as confidential; how they stored CAD

drawings or bills and material in a secure, confidential

database; and how --

**THE COURT:**  Okay.  No, I -- Ms. Keller, I understand

the distinction between 701 and 702.  My question is -- that's

why I'm trying to get at exactly what is the testimony that is

1    sought.  If it's sought to elicit why -- if they had a role --

2    a percipient role -- in saying here's how we formulated the

3    ad -- the letters to, you know, various oncologists -- because

4    we were concerned with blah, blah, blah -- X -- and this was,

5    you know, a term that -- you know -- that we thought was

6    confusing, that's one thing.

7        To opine about how oncologists in the field -- when

8    interpreted -- what -- the reaction of doctors, generally --

9    that does, to me, sound like 702 territory.  So --

10        **MS. KELLER:**  Exactly.

11        **THE COURT:**  -- it's unclear to me.  But if -- if they

12    say I was involved in designing the letter that went out -- the

13    ad -- et cetera -- part of the campaign -- part of our concerns

14    were based on X, Y, and Z -- that -- although that would

15    involve some opinion, because it involves some degree of

16    explaining how they interpreted the ads and the statements made

17    by Guardant -- that would be more of a 701 type.

18        **MS. KELLER:**  It really sounds, though, like they're

19    getting into 702 territory on page 3, where they say, "Given

20    their tenure positions at Natera, they both have interactions

21    with oncologists and physicians regularly and, thus, have

22    personal knowledge about the performance metrics of MRD assay,

23    such as the meaning of specificity and sensitivity and what

24    oncologists believe is important to an MRD test."  And it goes

25    on from there.  And it --

1        **THE COURT:**  Right.  So let me hear --

2        **MS. KELLER:**  I understand --

3        **THE COURT:**  Let me hear from the proponents of this

4    testimony.  That's why I asked, what is it that's being sought

5    to be introduced here?

6        **MS. LOZANO:**  So, again, Your Honor, you know, I think

7    this goes back to where I started, which is our witnesses --

8    and I -- you know -- I think they're, you know, attempting to

9    call them all adversely.  So I don't quite know what questions

10   they're going to ask and what [sic] they're going to open the

11   door.  There is proper lay opinion testimony.  And, certainly,

12   these witnesses can testify about their understanding of what

13   is important to these products and how that impacted their --

14       **THE COURT:**  What is important to whom?

15       **MS. LOZANO:**  Important to the people purchasing it.

16   And so how that impacted their concerns when they saw

17   Guardant's ads, and whether they thought they were material and

18   problematic and needing of correcting or not, and why they put

19   out the ads that they did.  And I don't see how we can agree

20   to -- their brief asks the evidence to be excluded -- you

21   know -- unreliable, irrelevant, speculative, inflammatory

22   opinion testimony, including Natera's beliefs, understandings,

23   actions.

24       Like, this should be dealt with at trial on a

25   question-to-question basis.  And if it becomes clear that

 1    there's some pattern of improper testimony, you know, maybe

 2    there is -- there is a time --

 3            THE COURT:  So what will be the foundational evidence

 4    about Mr. Chapman and Dr. Aleshin's role in the -- I'll call it

 5    the campaign -- the anti-Guardant campaign?

 6            MS. LOZANO:  They were all intimately involved in it.

 7    There's ample evidence about that, I think.  I forget the name

 8    of the -- the name that they used to describe their meetings

 9    that they had and how they decided what ads to put out to

10    direct the misimpressions.  But Mr. Chapman was intimately

11    involved with that.

12            THE COURT:  So, Ms. Keller, why -- if they were

13    involved -- and they certainly could testify as a percipient

14    witness what they did, what they saw, how the ad came to be,

15    since that's a central part of the case.  Why can't they

16    explain why they did, since their state of mind, their

17    culpability, their scienter -- and that of Natera -- is at

18    stake, why can't they explain what went through their mind, and

19    why they thought this information was going to be absorbed by

20    the market, and was going to have consequence, et cetera,

21    et cetera?

22            MS. KELLER:  They can testify to that, Your Honor.

23    We're not saying they can't.  What they can't do is go way far

24    afield from that and start to give general testimony.  From my

25    understanding -- you know -- you have somebody like Chapman

1    who's not a scientist.  He's not a doctor.  He's a business

2    guy.  He's got a bachelor's in -- you know -- in a science

3    degree.  But, you know, he starts to go into sensitivity for

4    longitudinal tracking and surveillance and all sorts of other

5    categories; whether he thinks something is confusing; whether

6    he thinks that, you know, it's misleading for us to portray

7    91 percent sensitivity, and as longitudinal sensitivity, and

8    juxtapose that.  He starts to go into areas -- deep -- into

9    areas of expert testimony.

10        I can see if he wants to get up and say, look, I was told

11    by the experts that they were presenting misleading

12    information, and that it was misleading in a number of ways,

13    and it was going to harm our product by comparison.  And so we

14    decided to launch this ad campaign.  But when he starts to

15    spout -- because it's not enough to just say "it was my

16    understanding," and then spout a huge amount of what would

17    otherwise be expert testimony.  I think that's going too far.

18            **THE COURT:**  Well --

19            **MS. KELLER:**  But I understand -- I understand exactly

20    what the Court's saying, and I agree with you.

21            **THE COURT:**  The question of degree and the final

22    analysis -- this always happens in a 701 situation -- at what

23    point are you sort of going beyond immediate experience and

24    giving testimony that is of the type that an expert would have

25    to decide, based on their expertise, because 701 does contain a

1    limit.  It does require that the opinion, quote, "not be based

2    on scientific, technical, or other specialized knowledge within

3    the scope of 702."  So --

4            MS. KELLER:  That's right.  That's exactly right.

5            THE COURT:  You know, it always involves something,

6    whether it's the owner of the business talking about lost

7    profits.  There's going to be some expertise in there.

8        On the other hand -- so it is a question degree, and I'll

9    be alerted to that.  I think if it's tethered closely to what

10   happened, and explaining the whys as it gets further out, and

11   begins to look like relying on sort of expertise that's of a

12   702 nature, somewhere there's a line out there.  Whether we

13   approach that, I don't know.  But I'll just say that for now.

14           MS. KELLER:  Okay.  Thank you, Your Honor.

15           THE COURT:  What about -- and the Medicare coverage

16   question -- there's not a claim here that the information

17   provided by Natera resulting in the delay of the Medicare

18   coverage -- that's not an element of damages here; right?

19           MR. SCOLNICK:  Your Honor --

20           MS. KELLER:  Nor is it in within the expertise of

21   either one of these witnesses.

22           THE COURT:  Yeah.  Well, so the stuff about criteria

23   for Medicare -- it seems to me that's not relevant --

24           MS. LOZANO:  Well, Your Honor --

25           THE COURT:  -- since that whole Medicare approval

```
 1    question is not an element of damages.
 2              MS. LOZANO:  Well, I --
 3              MS. KELLER:  And -- and I must -- and, Your Honor,
 4    Natera said, in their reply brief, they weren't going to ask
 5    about that category.  That was one of the categories they said
 6    we're not going to even ask about it.
 7              MS. LOZANO:  Well, I think we're maybe speaking past
 8    each other.  We actually have motions in limine about, you
 9    know, their attempts to say that the time it took for
10    Medicare -- for Mo1DX to give them Medicare coverage -- was
11    somehow Natera's fault.  So we certainly think that should be
12    out.  If they're going to get to speculate about our
13    conversations with Mo1DX being the reason that they were unable
14    to get approval, I think our people need to be able to talk
15    about the conversations they had --
16              THE COURT:  Yeah.  Well, I'll forecast this now.  The
17    stuff about the Medicare -- I don't see that as part of this
18    case.  That's not part of the damages theory.
19              MR. LAVIGNE:  Your Honor --
20              THE COURT:  If we got into that, that raises all sorts
21    of difficult questions.  We'll talk about that more when I
22    get to --
23              MR. LAVIGNE:  Your Honor --
24              MS. KELLER:  Your Honor, before we -- before we --
25              MR. LAVIGNE:  Your Honor, may I just jump in for a
```

second?

In terms of damages, Mr. Malackowski -- our damages expert -- he did not quantify, in real dollars and cents, what the loss was from the delay in Medicare reimbursement.  But he essentially opines that this is unquantifiable.

And if Your Honor recalled, part of his report was he outlined what the degree for lost profits was, what the degree for disgorgement was, what the degree for corrective advertising was, and then said those numbers are conservative, given the fact that there's harm to Guardant's reputation and also harm to its goodwill.

And he specifically mentioned the delay in Medicare -- in Mo1DX approval -- as one of the factors.  One of the reasons, based on the testimony in the case, is the industry perceives Mo1DX approval as basically an imprimatur for the product.  And when that gets delayed, it can have very significant consequences.

So it's accurate to say it's not a specific dollar component of damages, but it is a component and a key theory of our case.  I understand we can table this discussion until we argue on the Mo1DX motion in limine, but I do just want to flag that so the Court's aware of it.

THE COURT:  All right.

MS. KELLER:  Your Honor, there's a -- there's a big difference between our showing that they deliberately

```
 1   interfered behind the scenes with us getting Medicare approval
 2   to try to salt our launch versus them being experts in what's
 3   required for Medicare approval; especially lay witnesses.  So I
 4   don't think those two issues are identical.  And we do intend
 5   to show that they deliberately tried to keep us from getting
 6   Medicare approval, behind the scenes, without any transparency.
 7             THE COURT:  Well --
 8             MS. LOZANO:  Your Honor, I think if they're going to
 9   argue that and be allowed to, then we should not be putting a
10   gag order about what our witnesses can say in response and
11   should deal with that at trial.
12             THE COURT:  Well, I think the issue -- well, we should
13   probably address the question of how much of this is coming in.
14   But if it does, I think the argument is their expertise -- if
15   they have an opinion -- you know -- it doesn't seem to me a
16   701-type opinion to say whether the denial and delay of
17   Medicare coverage was justified, et cetera, et cetera, in
18   getting into what constitutes a permissible -- or what are the
19   criteria for coverage.
20             MS. KELLER:  Right.
21             MS. LOZANO:  They're not going to speak to Mo1DX's
22   ultimate conclusions or thought processes or why that criteria
23   exists.  But there is a basic background.  They had Medicare
24   approval through Mo1DX long before.  They understood the
25   criteria.  And so that informed why they talked to Mo1DX, which
```

1    Guardant intends to paint them as, you know, bad actors for

2    speaking to Mo1DX.

3        So I think -- again, we're probably putting the cart

4    before the horse here since we haven't argued our MIL -- but,

5    if that's coming in, I do think that they need to have leeway

6    to explain what motivated them to reach out to Mo1DX.  Because

7    Guardant is going to paint that as a bad action.

8            **THE COURT:**  All right.  Let me -- let me skip through

9    a couple of things.  Let me just ask one on Number 6.  And

10   that's the deletion of emails in another case and then the

11   allegations in the Illumina case.

12       With respect to the latter, theft -- alleged theft -- in

13   and of itself was not necessarily reflective of dishonesty.

14   But I take it here it's because the nature that this was --

15   there was deceitful conduct in conjunction with the trade

16   secrets appropriation.  Is that the idea?  That's why it goes

17   to question of honesty under 608.

18           **MR. JOHNSON:**  That's correct, Your Honor.

19           **THE COURT:**  I'm not sure I understand the argument.

20           **MR. JOHNSON:**  Yes.  Kevin Johnson.

21       And, yes, Your Honor, that is correct.  You know, we

22   believe, again, this -- to the extent that the two founders are

23   going to talk about -- and, you know, talk about truthfulness,

24   and talk about reputation, and talk about -- and truthfulness

25   obviously is a big part of this false advertisements case.  And

they are going to be witnesses that are going to be front and center on the Guardant side.

And I'm not sure what the inventors are actually going to say on direct. You know? But the fact that they were found to have -- you know -- one of the founders was found to have destroyed documents after a deposition that occurred by a federal magistrate judge. And the fact that they were -- you know -- started a company and -- while they were still working for another company -- those are issues -- those are issues that are potentially fair game, for the reason Your Honor articulated.

**THE COURT:** All right. So it seems to me that the governing structure here is 608 of the Federal Rules of Evidence, which allows, if there's a good-faith basis to believe, questions on cross-examination. You don't have to -- unlike 609 -- you don't have to have proof of a conviction or you don't have to have a judgment. A lot of times you -- none of this stuff even goes to court that you can ask about under 608.

However, you cannot use extrinsic evidence to bolster that. So you have to ask. And as the commentators say, you have to accept the witness' response. If the witness, you know, denies, or whatever, that's it. But I see this as a 608 --

**MR. JOHNSON:** Understood.

1    **THE COURT:**  I see this is a 608 question.

2    **MR. LAVIGNE:**  Your Honor, can I just respond to that,

3 briefly?

4    **THE COURT:**  Yep.

5    **MR. LAVIGNE:**  It is a 608 question.  They can

6 introduce extrinsic evidence.  They put a number of exhibits on

7 their list that relate to this.  But I want to provide the

8 Court with some additional data.  Because it's just false to

9 state that Dr. Eltoukhy was found to have spoliated evidence.

10   Ultimately, what happened -- and I can give the Court as

11 much context as it wants -- Dr. Eltoukhy was in a situation

12 where he was in a dispute with Foundation Medicine, FMI.  In

13 the context of that dispute, all of his documents were

14 collected, including documents from his personal email and his

15 personal computer.

16   He was then shown those documents, some of which went back

17 to 2014, at a deposition.  The documents he was shown related

18 to his prior employer, Illumina.  After that, he realized he

19 still had access to them.  With the full understanding that

20 everything had been backed up and saved by his employer --

21 Guardant Health -- he deleted them.  That then became an issue

22 in the litigation.

23   Guardant's Counsel confirmed and got his prior laptop, got

24 his backup, and was able to produce all the materials.  There

25 was no spoliation, is the bottom line.  Nothing was lost.  Any

1   spoliation motions were withdrawn.

2        There was recently a trial that Guardant had -- the

3   TwinStrand case -- in November 2023.  This is one of the

4   reasons why this trial got adjourned.  And the judge in the

5   District of Delaware was faced with this same issue.  He did

6   not allow introduction of this issue or any cross-examination

7   on it.

8        After hearing from the parties, including Counsel from

9   Guardant who represented Guardant in the Foundation Medicine

10  case, that's because there was no spoliation.  Dr. Eltoukhy was

11  asked about this, extensively, at his deposition, for the

12  better part of an hour.  He testified consistently with what I

13  just said.

14       He did not deny deleting those emails.  He said he did so

15  because he thought it was confidential information of Illumina.

16  He realized he still had them, and he wanted, you know, it to

17  be gone from his personal computer.  And he understood that the

18  company still had access to everything.  So it doesn't bear on

19  truthfulness, because there was no spoliation.

20       My concern, Your Honor, is when they start even asking a

21  question about spoliation and destruction of evidence, even if

22  my client gives a denial, we're going to have to rebut it.  And

23  we cited a couple of cases in our brief that outline this.

24  When a witness, for example, has been acquitted of conduct, he

25  should not then be permitted to ask and answer questions about

it on cross-examination, because it can leave the impression

with the jury that he did something wrong.  So that's why, on

that, I don't think this should even be permitted on 608.

On this alleged trade secret misappropriation, that also

is a complete red herring.  There was a lawsuit filed.  That

case was ultimately settled.  And if you actually read Natera's

brief, they basically have issues with conduct that occurred 13

years ago.  That Dr. Eltoukhy and Dr. Talasaz started Guardant

when they were still working at Illumina.  Well, Dr. Eltoukhy

was a paid consultant.  Illumina was aware of Guardant.  There

have never been any adverse findings of trade secret

misappropriations.  So, for the same reasons, I don't believe

this is appropriate under 608.

**THE COURT:**  All right.

Brief response, Mr. Johnson?

**MR. JOHNSON:**  Briefly, Your Honor.

This case, in large part, is about, you know,

truthfulness.  And their personal credibility will be front and

center.  The judge in the District of Delaware made a

determination, you know, quote, "It is clear that

Dr. Eltoukhy's deletion of these emails came after Dr. Eltoukhy

was asked about the emails at a deposition."

You know, it goes to, ultimately -- you know -- again,

it's going to be fodder, you know, potentially for

cross-examination.  And to the extent that the question is

1  asked, you know, he'll have an opportunity to explain what

2  happened, and certainly on redirect.

3      And, frankly, you know, it all depends upon what they

4  testify on direct as to what they're going to be crossed on.

5  And -- but -- but, at least, at this point, you know, issuing a

6  motion -- an order on a motion in limine -- when we don't even

7  know what they going to say, I think, is putting the cart

8  before the horse in large measure.  And, you know, I think we

9  understand what the issues are.  And it depends on what they

10  say.  And we can take it up depending upon what their

11  testimony --

12      **THE COURT:**  Well, but what about -- what about

13  Mr. LaVigne's argument that the doctor was essentially

14  "acquitted," quote/unquote?

15      **MR. JOHNSON:**  He was not acquitted, at all.  He has

16  not been acquitted.  There is no -- there is nothing anywhere

17  that acquitted him of any wrongdoing anywhere.

18      **THE COURT:**  What about the judge's decision -- what

19  I'm told -- in Delaware to exclude this evidence because there

20  was no -- it wasn't sufficient evidence of spoliation?

21      **MR. JOHNSON:**  Yeah.  I mean, that -- Your Honor, that

22  wasn't in their brief, as far as I'm aware.  And I'm not sure

23  what -- whether that -- what that case is, or what the facts

24  are around that, and whether it's a false ads case or not.

25      This is a false ads case.  Truthfulness is front and

1    center.  And notwithstanding what a particular judge did in

2    that case, we did cite what Judge Burke found with respect to

3    the deletion of emails.  That is part of this motion.  I'm not

4    sure what Mr. LaVigne is referring to right now.

5            **THE COURT:**  All right.

6        Mr. LaVigne, is there some papers that haven't been filed

7    with this Court that I should know about?

8            **MR. LAVIGNE:**  Your Honor, this decision came out

9    November 7th, 2023.  It was after we filed our brief.  It came

10   to my attention, frankly, over the weekend, when I was

11   preparing.  It's an oral decision from the bench.  District of

12   Delaware Case Number 21-1126.  And it's from Judge Gregory

13   Williams.  And he denied the application to explore this issue

14   at the trial.

15           **THE COURT:**  So what do I do about the magistrate judge

16   finding?

17           **MR. LAVIGNE:**  The magistrate judge finding -- what

18   happened was the judge made that finding -- the judge had

19   ordered discovery.  During the course of that discovery, it was

20   clear that Guardant had all of Dr. Eltoukhy's emails.  And the

21   spoliation motion was withdrawn, and the case ultimately

22   settled.  So there was no --

23           **THE COURT:**  So the magistrate judge's ruling was not

24   the last word, is what you're saying.

25           **MR. LAVIGNE:**  Absolutely.  There was going to be a

 1  full-blown hearing on spoliation.  Ultimately, that motion was

 2  withdrawn, and the case then settled.

 3      But, you know, this bears on character for truthfulness.

 4  And what Dr. Eltoukhy testified at his deposition under oath,

 5  what he'll testify to on the stand, and what is true, is there

 6  was no subterfuge here.  There was no attempt to do anything

 7  wrong.  He deleted them because he didn't want to still have,

 8  in his possession, confidential --

 9      **THE COURT:**  All right.  Do you have a transcript from

10  the district judge's -- or the judge's -- vindication,

11  quote/unquote, of Dr. Eltoukhy?

12      **MR. LAVIGNE:**  I do.

13      **MR. JOHNSON:**  I --

14      **THE COURT:**  Well, I think you ought to share that with

15  Counsel and the Court, because you're just citing something now

16  that I haven't seen, that Counsel hasn't seen.

17      **MR. JOHNSON:**  And, Your Honor, I will say, in this --

18  in this case, we asked him about these emails in his

19  deposition.  And he -- he basically said he couldn't remember

20  what happened, you know, when he was confronted with the

21  Court's order during his deposition.

22      And so, again, this goes right to his credibility of

23  whether he's to be believed or not, whether he's stating the

24  truth.  And that's the purpose behind this.  And, again, it all

25  depends upon what they have him say on direct as to whether

1    this will be used on cross-examination.  But at least at this

2    state of the game, we think it's fair -- it's fair game and

3    fair use.

4         And to hear about -- I mean, you know, hear about

5    something that occurred in November -- or, I guess, July of

6    2023 -- now, you know, in the actual argument -- I mean, I just

7    don't know what to say about that.

8         **MR. LAVIGNE:**  Okay.  Well, what you can say about it

9    is the decision came down November 7th, 2023.  This was after

10   the brief was filed.

11        **THE COURT:**  Well --

12        **MR. JOHNSON:**  And, again --

13        **THE COURT:**  I'll let you -- okay.  That's enough.  You

14   submit whatever the transcript is.  Give it to Counsel.  Give

15   it to the Court.  Submit it in the next day.  I'll look at it.

16        But I will state, my view is that Rule 608, unlike 609,

17   has a pretty low basis.  I understand there's a risk of

18   prejudice.  But it doesn't take proof to be able to ask

19   somebody on cross.

20        Now, if somebody's actually been acquitted in a formal

21   sense, you know, I can see an argument that then you no longer

22   have a good-faith basis.  But I'll have to look at what the

23   judge said exactly and what I can glean from that.

24        So let's -- I want to move on to Natera's MILs.  But we

25   need to take a break.  The court reporter's been going at it

1    for two hours now.  But I do have a time limit.  I have a hard

2    stop at 5:15.  So we may have to continue this to another date.

3    I have time on Friday to continue this hearing, because I still

4    want to get through these MIL's and a few other matters.

5              MR. JOHNSON:  We're available on Friday, Your Honor.

6              THE COURT:  All right.  All right.  So let's -- let's

7    go ahead and take a ten-minute break and we'll resume.

8              THE CLERK:  Court is in recess.

9                   (Recess taken at 4:36 p.m.)

10             THE CLERK:  Court is reconvened.

11             THE COURT:  Okay.  Let's address Natera's motions.

12       Number 1, essentially I read as seeking to reconsider the

13   question about whether or not the ads could be false by

14   necessary implication on the apples to oranges comparison.  And

15   I understand that many of the cases talk about different

16   products, and these are similar products, et cetera, et cetera.

17       But I think that the general gist is if you -- whatever it

18   is you're comparing -- tests, products, studies, stats -- I

19   think the general principle, as I have stated, is if you're

20   comparing things that truly aren't comparable, or you're

21   leaving out the basis of a real difference that shows they're

22   not really comparable, and leading the public to think they are

23   comparable, that's -- that can be actionable.  So my ruling

24   stands.  I'm not going to reconsider it.  So any motion to

25   reconsider that is denied.

1            Let's talk about the MolDX stuff now.  This comes from --

2            **MR. CANNON:**  Your Honor -- Your Honor, my -- Your

3       Honor, I -- with all due respect, may I -- may I address that

4       issue?  And I'm very sensitive to revisiting a decision that

5       Your Honor has made.  I do think, with a full trial coming up

6       on false advertising, this issue was not -- there's nuances to

7       this issue and the false advertising rule, Your Honor.  And I'd

8       appreciate the chance to at least give you a very short pitch

9       about why maybe we can --

10           **THE COURT:**  I'll give you a one-minute pitch.

11           **MR. CANNON:**  Okay.  Thank you, Your Honor.

12           Your Honor, if we allow the doctrine of false by necessary

13      implication to apply in all comparative cases, what we are

14      doing is destroying the delineation between cases of falsity --

15      literal falsity -- and misleading.  Because there really is a

16      significant difference in the case law.  Because if something

17      is literally false, then a lot of presumptions flow from that.

18      There is no need to prove actual deception.  Misleading -- if

19      something is misleading -- right? -- it's not literally false,

20      but it's misleading -- then, there, you have to prove

21      deception.  And, here, what we have is an accusation of

22      misleading; right?  That the data from the study was --

23           **THE COURT:**  Why the difference between products and

24      tests?

25           **MR. CANNON:**  Well, the case law --

1          THE COURT:  Your argument is that, oh, these cases are

2    different because they involve products involving one --

3          MR. CANNON:  Yes.  That is part of the argument.  Yes.

4          THE COURT:  Why draw the line there?  What's the

5    logic?

6          MR. CANNON:  Well, the logic, Your Honor, is, if you

7    have to put something in context, if you have to add color

8    about what is being displayed here, then you're in the world of

9    misleading, and you have to prove actual deception.

10        The category of falsity -- of actual real false data --

11   that is -- like where the ad has something false in it -- that

12   is a very specific category.  And this doctrine of false by

13   necessary implication draws into it cases -- cases that would

14   otherwise be in the misleading category.

15        And I think if you go back to the original case -- Third

16   Circuit case -- which was Castrol v. Pennzoil or Pennzoil v.

17   Castrol -- the necessary implication there was that the

18   competitor was unnamed.  And the apples to oranges cases that

19   Your Honor is talking about -- that is a different set of

20   cases.

21        And the fear, as articulated in the treatise that we

22   submitted, is when you start to blur the lines between falsity

23   and misleading, you end up swallowing misleading into false by

24   necessary implication.  And there has to be a line there,

25   otherwise the presumptions make no sense, and every case would

1  be false by necessary implication.  And we know that can't be

2  the law.

3  **THE COURT:**  All right.

4  Brief response, why doesn't the exception swallow the rule

5  here?  Why didn't this conflate the difference between

6  misleading as opposed to literally false but by implication?

7  **MR. PERLOFF:**  Well, Your Honor, in this case, we had

8  summary judgment, and you considered the facts of this case.

9  There would have to be some feature of the comparison that

10  would lead a judge, like yourself, to conclude it's false by

11  necessary implication.  And you even mentioned it here.  For

12  example, the undisputed failure to, you know, mention a key

13  difference between, in this case, the studies or the tests.

14  And so it wouldn't swallow -- the exception wouldn't swallow

15  the rule.

16  And with all due respect to Professor McCarthy, every

17  circuit, that I'm aware of, that has considered this, has

18  followed the Castrol case, including the Ninth Circuit, as you

19  well know, because you've relied on it in Southland Sod.

20  There's no reason to revisit your ruling, Your Honor.  Nothing

21  new has happened, no difference, and your analysis was correct

22  to begin with.

23  **MR. CANNON:**  Your Honor, there is no case from any

24  circuit or any district court, that I'm aware of, where two

25  directly comparable products have been led to the false by

1   necessary implication issue here.

2       The apples to oranges cases is always when you have

3   products that are wildly different.  And that is a particular

4   subset of cases.  And I believe the exception would swallow the

5   rule here if we proceed under the doctrine that any comparison

6   can be false by necessary implication.  It's another way of

7   saying "misleading."

8           **MR. PERLOFF:**  I think that Southland Sod both involved

9   seeds for grass -- sod.

10          **MR. CANNON:**  Southland Sod was not a false by

11  necessary implication case whatsoever.

12          **MR. PERLOFF:**  Well, it actually said a plaintiff may

13  demonstrate a challenged statement was literally false or false

14  on its face by necessary implication.

15      But the key, again, is not the nature of the products at

16  issue or the things at issue.  It is the context of the

17  comparison that's being made.  You've considered it here, Your

18  Honor.  Your analysis was correct.

19          **MR. CANNON:**  Your Honor --

20          **MR. PERLOFF:**  There's no reason to revisit.

21          **THE COURT:**  I'm going to end it.  I'm going to end it.

22  You said -- I said one minute.  You've gone way over.  And

23  we're running out of time.

24          **MR. CANNON:**  I appreciate it, Your Honor.  Thank you.

25          **THE COURT:**  So let's go to the MolDX questions.

1    It seems to me -- and this is my understanding -- well,

2    maybe it's not my full understanding -- that there's not a

3    claim for damages based on these letters -- these

4    communications -- provided to MolDX, even if they resulted --

5    contributed -- to the delay in Medicare approval.  That's -- I

6    didn't think that that was within the purview of what was being

7    sought in this case.  This case is about the advertising.

8        **MR. BRAMHALL:**  Your Honor, I think you're exactly

9    right, although Mr. Malackowski, who is Guardant's damages

10   expert, does purport to opine on the delay as what he calls

11   "uncalculable [sic] damages."  But as Ms. Keller acknowledged

12   earlier today, neither damages expert -- neither our damages

13   expert nor Mr. Malackowski -- has any expertise in this issue.

14       This issue should not be part of the case, Your Honor.  It

15   threatens a massive mini trial.  The only, quote, "expert" in

16   the case was a percipient witness offered by Guardant --

17   Mr. McCoy -- who is their Senior VP of Reimbursement and Client

18   Services, and he couldn't identify a single shred of evidence,

19   Your Honor, that Natera did anything that delayed

20   reimbursement.

21       In fact, MolDX communicated to him, in no uncertain terms,

22   as confirmed by him and other witnesses at Guardant -- their

23   executives -- that Natera's comments to MolDX would not be

24   taken into account in the consideration of Reveal.  And we

25   cited this evidence, Your Honor, in our MIL.  This is pages 5

1    to 6.  This evidence was -- fully refutes the claim that

2    Guardant is making.  And this is evidence that is testimony

3    from their 30(b)(6) on this issue.  They can't contradict that

4    evidence, Your Honor.

5        So this issue, as far as we're concerned, is dead.  It's

6    prejudicial.  It's made just to inflame the jury.  And it's

7    being offered by experts who they acknowledged today have no

8    expertise in this field.

9            **THE COURT:**  Okay.

10   Response?  What's the relevance to this?

11          **MR. SCOLNICK:**  Your Honor, the relevance -- we have

12   numerous points of relevance.

13       But, first, I'd like to put this in the bucket of issues

14   that's already been decided by the Court.  Because, at

15   Docket 326, page 30, the Court ruled that, quote, "There is

16   evidence that Natera delayed Medicare coverage for Reveal

17   through extensive lobbying to MolDX," unquote.

18       As far as relevance, there are additional reasons, as

19   well.  First, this is inextricably intertwined with the rest of

20   Natera's solar false advertising campaign.  And let me tell you

21   why.  The strategy to pressure MolDX was planned, plotted, and

22   schemed in the same solar meetings, during the same time frame,

23   with the same Natera employees.  In fact, we had -- Ms. Lozano

24   told us today that Mr. Chapman is intimately involved in

25   this -- in the communications with MolDX.

 1          The communications to MolDX parroted the very same

 2    misleading statements that were sent to oncologists, which this

 3    Court has already ruled a jury could find to be actually false.

 4    MolDX pressure campaign was initiated -- this is important now.

 5    This wasn't by the arm of -- Natera's arm -- of Medicare.  This

 6    was a plan that was initiated and plotted by Natera's VP of

 7    Marketing.  That's who started this and had the same overall

 8    goal as the rest of Natera's solar campaign, which is to

 9    prevent oncologists and patients from having access to Reveal.

10          So we've got numerous documents involving the same people,

11    discussing the same campaign, that are some of the core

12    documents of the case.  And it's not fair or practical to

13    exclude or redact MolDX references in the most central

14    documents.  So that's the first issue, because it's

15    inextricably intertwined -- first basis of relevance.

16          Second, it goes directly to the credibility of Natera's

17    witnesses.  Now, their witnesses have testified and tried to

18    justify their false advertisements as a correction of the

19    record or to protect patients.  But these emails and

20    correspondence about MolDX belie those claims and show that

21    their attacks and pressure campaign with MolDX was a campaign

22    in search of justification.

23          And what I mean is this campaign and discussions about

24    MolDX started months before the Parikh paper came out.  And you

25    can see, they're not even certain what the standards are for

 1   MolDX, or why they're attacking it, but they just knew that

 2   they wanted to shut Guardant down.  They wanted to prevent us

 3   from having access.  They wanted to prevent Medicare patients

 4   from having another opportunity or another option.

 5        And it was along the way, weeks and months after that,

 6   that they started coming up with alleged bases to attack

 7   Guardant with MolDX.  But this is directly relevant to their

 8   claims that they're going to be putting forward in this case,

 9   and it's directly relevant to the credibility.  Guardant --

10             **MR. BRAMHALL:**  Your Honor --

11             **MR. SCOLNICK:**  -- should not be precluded -- Guardant

12   should -- excuse me --

13             **THE COURT:**  Well, so is the relevance of this to show

14   state of mind and scienter and culpability and not the actual

15   effect?  In other words, what you're talking about is to show

16   what their campaign was, what their intent was.  Whether that

17   was successful with MolDX or not, it seems to me that's a

18   different question.

19             **MR. SCOLNICK:**  That was just on point two, Your Honor.

20   I'm moving on.  But the next point is that this is directly

21   relevant to damages, Your Honor.  And contrary to my friend on

22   the other side -- his assertion -- I don't believe Ms. Keller

23   stated today that our damages expert has no expertise or

24   familiarity with MolDX or with the process.

25        On the contrary, he testified, extensively, about the

1   importance of MolDX, about the importance of Medicare approval.

2   And so have a number of other witnesses in our case.  Both of

3   the founders testified about this --

4        **THE COURT:**  So why wouldn't that get into a "trial

5   within a trial" 403 problem?  That is, now we have to figure

6   out exactly what happened, why MolDX did what it did, what was

7   the influential factors looking at all -- suddenly, we're going

8   to look at why that happened, even though there's no dollar

9   amount.

10       I understand the argument that, well, maybe this is

11  relevant to state of mind.  They're on a campaign to shut down

12  Guardant, and that informs why they were fast and loose with

13  their -- with the solar campaign and the ads and blah, blah,

14  blah.  It goes to culpability, I suppose.

15       But to get into did it really have the effect, and can we

16  attribute the ultimate outcome of those proceedings to Natera,

17  as opposed to anybody else who may have commented why MolDX did

18  what it did, et cetera, et cetera, that seems to me to raise a

19  trial within a trial, with very limited probative value.

20       **MR. SCOLNICK:**  Your Honor, Natera should not be able

21  to escape responsibility because this is a slight challenge to

22  prove this.  And I think that --

23       **THE COURT:**  Slight challenge?

24       **MR. SCOLNICK:**  I think it -- I think it's only a

25  slight challenge.  Your Honor has allotted time for both sides.

1    You've given us the total clock.  And I'm telling the Court

2    that I can represent to you we will be able to introduce this

3    evidence quickly and efficiently within our allotted time.  And

4    this is not so cumbersome or confusing, particularly in light

5    of the other issues in this case.  This is one of the easier

6    ones.

7        And, Your Honor, I -- forgive -- forgive us, because our

8    papers don't really lay out the bread crumbs as clearly as we

9    could have.  But there is admissible evidence that doesn't

10   involve speculation, circumstantial evidence that would

11   establish that it is more likely than not that Natera's

12   campaign -- which they admitted was designed to delay and to --

13   not to delay -- but to sow seeds of doubt and to prevent

14   Medicare from approving our product -- that it worked.

15       And I can tell you, just very briefly, what those -- what

16   those dates and important facts are.  That in December -- on

17   December 3rd, 2020, we applied for Medicare coverage.  Now,

18   this was under an expedited TA.  Because we were following the

19   TA that had already been established by -- by Natera.  So this

20   was supposed to be a two-month process.  That's what the

21   testimony in the record is.  That's not contradicted.

22       So in February of 2020, MolDX reached out to us and said

23   that they're waiting for some additional information, but they

24   want to get things moving as quickly as possible.  We still had

25   the idea this would be done by mid-2020.  We submitted our --

1    the final paper -- Harvard paper -- on April 6th.  But two days

2    later, Natera reached out to MolDX and began its campaign of

3    sowing seeds of doubt.

4         Now, importantly, Your Honor, between December 2020 and

5    April of 2021, those four or five months, MolDX did not raise

6    any concerns, objections, or issues with the draft Parikh

7    paper, which had already been -- which had been submitted for

8    their review.

9         Now, suddenly, after Natera started making these attacks

10   on the Parikh Study -- our application -- MolDX began to raise

11   concerns.  And those concerns were the exact same concerns that

12   Natera -- exact same attacks -- that Natera made on our asset.

13        So you went from a trajectory of green light, everything

14   looked like it was going to be approved, to all of a sudden

15   we've got Natera who begins to interfere, and then it's a

16   yellow light or a red light.  And they're raising and parroting

17   the same exact concerns -- and not concerns -- but attacks that

18   Natera made and relayed to MolDX.

19        So, ultimately, it was -- Mo1DX initially denied our

20   product's approval, and we went back for six or eight months,

21   and we had to peel back the curtain and look at every single

22   patient, patient by patient data.  And we were eventually able

23   to substantiate the data in our initial application.

24        And, at that point, in April 2022, which was over a year

25   after Natera began its campaign to pressure MolDX, at that

1  point, MolDX told us, you know what, we received information

2  from Natera, but we're not going to allow it to influence our

3  decision at this point.

4      So that was a year after the -- Natera submitted the --

5  the initial complaints.  So shortly after Natera -- I'm

6  sorry -- shortly after Mo1DX told Guardant that they would not

7  consider that information, we were approved -- in April -- I'm

8  sorry -- in July of 2022.

9      So there is data.  There is admissible evidence --

10  documentary evidence -- including Natera's own emails,

11  including internal emails, their communications raising the

12  same exact attacks that ultimately influenced MolDX.  That's in

13  the record.  And it doesn't require any speculation or

14  conjecture to lay a circumstantial case as to why this

15  influenced MolDX.

16      **THE COURT:**  All right.

17      Let me hear the response.

18      **MR. BRAMHALL:**  Sure, Your Honor.  So a couple of

19  things.  One, there was an approval in July of 2022.  But, to

20  be clear, it was partial.  It wasn't full.  There's still no

21  surveillance approval for Reveal at this point.

22      But, putting that aside, there's nothing simple about

23  this, Your Honor.  As you can see from the description that we

24  just heard, this is going to involve going down -- to use Your

25  Honor's phrase -- numerous -- or actually maybe this was

1   Mr. Perloff's phrase -- rabbit holes going forward.

2        This is really, Your Honor, a classic MIL issue.  This is

3   classic 403.  It's pure speculation.  We have 30(b)(6)

4   testimony that actually refutes this argument that they're now

5   trying to contradict.  It's highly prejudicial to Natera,

6   particularly in light of the speculative nature of it.  It will

7   inflame the jury against us and create a massive mini trial if

8   they're permitted to argue that there was an effect -- a

9   delay -- we effected Medicare reimbursement to delay.  That's

10  what we're trying to keep out, Your Honor.  That's what we

11  think should stay out.

12       And I would encourage Your Honor to look at the testimony

13  of Mr. McCoy.  This is Exhibit 5 to our MIL.  It's transcript

14  page 190, line 20, to 191, line 10, and page 193, line 10 to

15  line 22.  This is where we directly ask Mr. McCoy whether there

16  was any evidence of a delay.  He wouldn't even use the term

17  "delay," Your Honor.  He just said it took longer than they

18  expected.  And then he said -- and I think this is fatal to the

19  argument on the other side -- that MolDX said we don't take

20  into account comments by third parties.  We only look at

21  peer-reviewed evidence.  That's the end of this, Your Honor.

22  There's nothing more.

23       They can speculate, create innuendo and insinuations, but

24  the reality is, the 30(b)(6) witness on their side has

25  foreclosed this argument.  And to allow the damages expert,

1  who's an accountant, who admitted during his depo he only

2  learned about MolDX from depositions, to opine on this, is

3  incredibly prejudicial to Natera.  And --

4      **THE COURT:**  All right.  What about the

5  admissibility -- what about the admissibility of the

6  statements -- the letters that were sent -- as part of a -- at

7  least as portrayed by the plaintiffs -- as a campaign,

8  consistent with the solar campaign?  At least it goes to the

9  state of mind and the potential motives of Natera.

10     **MR. BRAMHALL:**  I think this leads us to the exact same

11 place, Your Honor.  It leads us to the same arguments that are

12 prejudicial, speculative, and will inflame the jury.  And

13 Mr. McCoy, again, said that MolDX assured them that none of

14 this would be taken into account.

15     And, Your Honor, if you actually dig into the documents,

16 the back and forth that went on for years, you can see MolDX

17 had its own concerns about the Parikh Study.  Yes, they matched

18 up in some places with Natera.  But, again, that's proof that

19 Natera was right and had legitimate concerns about the Parikh

20 Study.  That's not proof that Natera had any comments.

21     There's not a single shred of evidence in the record, Your

22 Honor, where MolDX says, you know what, Natera really convinced

23 us of this, or Natera's the reason why we're doing this.  That

24 does not exist.  So this should not be presented at trial.

25     **THE COURT:**  But the evidence that I'm asking about is

1    the statements made, not the effect.  You focused on going --

2            **MR. BRAMHALL:**  Sure.

3            **THE COURT:**  -- down rabbit holes, the effects of what

4    did MolDX really consider, was it a causative factor or not,

5    et cetera, et cetera.  And I -- I tend to agree with that, for

6    the reasons I stated at the outset.

7            On the other hand, I think it's a pretty good argument

8    that at least any statements made, to whomever, often is used

9    to show state of mind of the speaker.  And the speaker here

10   happens to be the defendant.

11           So I'm having a harder time -- even if we were to say

12   we're not going to go into effects and what MolDX was thinking,

13   et cetera, et cetera, but just that the statements were made.

14   At least the other side was going to try to portray it as part

15   of a campaign mindset.

16           **MR. BRAMHALL:**  Your Honor, I'd suggest that it's not

17   probative of anything.  And it's highly prejudicial, even to

18   allow for that purpose.  Because what Guardant's going to do --

19   and they said this in their briefing -- is to point out the

20   timing of our comments and then the timing of reimbursement.

21   And then they'll make the same argument about how they thought

22   it should be two months to suggest to the jury -- to get the

23   jury in their minds to say, wow, Natera really messed up this

24   reimbursement.  Natera is the cause.  We're going to end up in

25   the same prejudicial place, Your Honor.

1    They don't -- they don't need this evidence -- and let me

2    back up.  This is about whether their test met the criteria

3    under a statutory -- the statutory framework -- of Medicare

4    reimbursement.  That has nothing to do with false advertising,

5    commercial promotion, or anything else.  That is a completely

6    separate issue that Natera was frankly justified in raising

7    concerns about.  Because, as you heard, Natera was the one who

8    went through a year's-long process to get their test approved

9    first, and then Guardant followed suit afterwards.

10          **THE COURT:**  So if the --

11          **MR. BRAMHALL:**  Natera -- sorry.

12          **THE COURT:**  If what MolDX did, and why they did it, is

13    off the table, and that evidence is barred, I'm not sure I see

14    that -- that same 403 problem.  Yeah, it's prejudicial.

15    Anything somebody says could be prejudicial if cast in a

16    certain light.  But this has got to be unduly prejudicial, and

17    I'm not sure that it is.

18          **MR. BRAMHALL:**  I'm just worried, Your Honor, we're

19    going to end up in the exact same place with the undue

20    prejudice.  Because the suggestion is going to be -- and,

21    again, they said it in their brief -- that they're going to let

22    the jury come to their own conclusions that Natera was the

23    cause of the delay.

24          And, again, Your Honor, if we -- perhaps if the expert is

25    not allowed to opine on this at all, maybe then it's less of an

1    issue with just there's some discussion of the fact that Natera

2    reached out to MolDX and raised these legitimate concerns.

3    Sure, we can explain that.  But then the expert should not be

4    able to talk about this in the context of damages.

5            **THE COURT:**  Well, I agree.  I -- that's what I'm

6    saying.  I would exclude any reference to what MolDX did.  And

7    the expert can't say, well, there was a delay, and that makes

8    it conservative.  As far as I'm concerned, the jury doesn't

9    have to know that there was any delay.  All they need to know

10   is that there was at least an effort on Natera's part to weigh

11   in on this process, which the other side will portray is

12   consistent with their motive of trying to squelch this product.

13           **MR. BRAMHALL:**  Yeah.  And, Your Honor, I think I've

14   raised my concerns with this if that's where Your Honor is

15   leaning.  But we're keeping the effect out.  I think that would

16   address a lot of the prejudice, frankly.  I'm still concerned.

17   And maybe we'd have to watch very carefully as this develops at

18   trial.  But I understand where Your Honor is coming from on

19   that.

20           **MR. SCOLNICK:**  And if I could just briefly respond,

21   Your Honor.  I agree that it's admissible for all the reasons I

22   stated.  And of course it's prejudicial.  But it's prejudicial

23   because this -- it's nefarious -- what they tried to do.  It

24   was inappropriate.  It was improper.  So the issue --

25           **THE COURT:**  Well, I mean, I understand -- I'm not the

1    jury.  So you can make that argument to the jury.  But --

2          MR. SCOLNICK:  Okay.

3          THE COURT:  I understand your position.

4    Okay.

5          MR. SCOLNICK:  So the issue with -- I'm sorry.

6          THE COURT:  Well, go ahead.

7          MR. SCOLNICK:  With respect to causation, Your Honor,

8    Mr. McCoy testified the way he did because he wasn't -- he

9    wasn't privy to all the documents that were sent to MolDX by

10    Natera.  That is attorneys' eyes only.  So had he seen that --

11    had he been able to opine the similarities of the same exact

12    issues and attacks that Natera was making were reiterated by

13    MolDX, then it would make sense.

14          And I think that there's certainly enough here for the

15    jury to -- to get the jury -- so the jury can make their own

16    conclusions.  And certainly the attacks and criticisms that my

17    friend is making on the other side can be levied to the jury.

18    But let them have -- let the jury come to the decision.  That's

19    my argument, Your Honor.

20          And I think that -- out of fairness and transparency --

21    that we should be able to present our entire case and --

22    including the multiple witnesses who already testified that

23    there has been a delay -- and this is not typical -- and for

24    all the reasons and circumstances that have been cited, that is

25    more likely than not that that delay was caused or influenced

1  by Natera.  And that's what we're seeking to admit.

2          **THE COURT:**  All right.  I kind of want to get to

3  Number 3, but I'm afraid, once we start, it's going to take

4  more than the three minutes I have left.

5      So what I want to do is continue this.  We've got to talk

6  about this, the jury instructions, some of the bellwethers, and

7  of course when our start date is going to be.  Still on the

8  table, I think, is April 29 and July 29.  I know there's some

9  conflicts there, and I know this interferes with various plans,

10  but at least those were the two that I had mentioned last time.

11  So I'm just reminding you of that.

12      So let's reconvene on -- I think I have time on Friday.

13  Let me make sure that's true.  Because I want to get through as

14  much of this as I can so you have -- you know exactly what's

15  coming down the pike here.  So why don't we say 10:00 on

16  Friday.

17          **MR. JOHNSON:**  That's fine with us.

18          **THE COURT:**  Pacific Time.  And hopefully this won't

19  take more than a couple hours.  We should be done by noon, is

20  my open hope.  Okay?

21          **MR. JOHNSON:**  Sounds good from the Natera side.

22          **THE COURT:**  All right.  Okay.  So we'll see you then.

23  I appreciate your cooperation in scheduling this.

24      All right.  Thanks, everyone.  See you on Friday.

25          **MR. JOHNSON:**  Thank you, Your Honor.

1          **MR. PERLOFF:**  Thanks for your time.

2          **THE CLERK:**  Court is adjourned.

3              (The proceedings adjourned 6:12 p.m.)

4                      ---oOo---

5

6              <u>**CERTIFICATE OF REPORTER**</u>

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:    Thursday, February 29, 2024

11

12

13   _____

14          Kendra A. Steppler, RPR, CRR

15       Official Reporter, U.S. District Court

16

17

18

19

20

21

22

23

24

25