# Exhibit I

Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

```
GUARDANT HEALTH, INC.,        )
                              )
            Plaintiff,        )
                              )
   VS.                        )   NO. C 21-04062-EMC
                              )
NATERA, INC.,                 )
                              )
            Defendant.        )
_____)
```

San Francisco, California
Thursday, February 22, 2024

**TRANSCRIPT OF REMOTE PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom videoconference.)

For Plaintiff:

        SHEARMAN & STERLING, LLP
        300 West 6th Street - 22nd Floor
        Austin, Texas 78701
  **BY:  SAUL H. PERLOFF, ATTORNEY AT LAW**

        SHEARMAN & STERLING, LLP
        599 Lexington Avenue
        New York, New York 10022
  **BY:  CHRISTOPHER LaVIGNE, ATTORNEY AT LAW**

        KELLER/ANDERLE LLP
        18300 Von Karman Avenue - Suite 930
        Irvine, California 92612
  **BY:  CHASE A. SCOLNICK, ATTORNEY AT LAW**
        **JENNIFER L. KELLER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
           Official Reporter, CSR No. 12219

1  APPEARANCES:   (CONTINUED)

2  For Defendant:

3                          QUINN, EMANUEL, URQUHART
                              & SULLIVAN LLP

4                          555 Twin Dolphin Dr. - 5th Floor
                           Redwood Shores, California  94065

5              BY:  KEVIN JOHNSON, ATTORNEY AT LAW
                    ANDREW J. BRAMHALL, ATTORNEY AT LAW

6                   BRIAN C. CANNON, ATTORNEY AT LAW
                    VICTORIA F. MAROULIS, ATTORNEY AT LAW

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - February 22, 2024**                    **10:01 a.m.** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Court is now in session.  The Honorable |
| 5 | Edward M. Chen is presiding. |
| 6 | Calling Civil Action 21-4062, Guardant Health, Inc. vs. |
| 7 | Natera, Inc. |
| 8 | Counsel, please state your appearances for the record |
| 9 | beginning with counsel for plaintiffs. |
| 10 | **MR. PERLOFF:**  Good morning, Your Honor.  Saul Perloff |
| 11 | for the plaintiff.  And I would like for the rest of my -- the |
| 12 | rest of the trial team to introduce themselves.  They'll be |
| 13 | participating today with your permission. |
| 14 | **THE COURT:**  All right. |
| 15 | **MS. KELLER:**  Good morning, Your Honor.  Jennifer |
| 16 | Keller on behalf of Guardant. |
| 17 | **THE COURT:**  All right.  Good morning, Ms. Keller. |
| 18 | **MR. SCOLNICK:**  And good morning, Your Honor.  Chase |
| 19 | Scolnick on behalf of Guardant Health. |
| 20 | **THE COURT:**  All right.  Thank you, Mr. Scolnick. |
| 21 | **MR. LaVIGNE:**  Good morning, Your Honor.  Chris LaVigne |
| 22 | on behalf of Guardant, Shearman & Sterling. |
| 23 | **THE COURT:**  All right.  Thank you, Mr. LaVigne. |
| 24 | **MR. JOHNSON:**  And, Your Honor, good morning. |
| 25 | Kevin Johnson behalf of Natera, and with me are Vicky Maroulis, |

**PROCEEDINGS**

1    Brian Cannon, and Andrew Bramhall.

2            **THE COURT:**  All right.  Thank you, Mr. Johnson.

3        All right.  What have we learned about discovery prospects

4    here?

5            **MR. CANNON:**  Well, Your Honor, I don't know who wants

6    to go first here.

7            **MR. SCOLNICK:**  I can lead off.

8            **MR. CANNON:**  Yeah.

9            **MR. SCOLNICK:**  I'll be happy to.

10       Thank you, Your Honor.

11       We are seeking additional discovery and continuance of

12   trial that's necessary to fairly respond to the supplemental

13   report of Dr. Hochster.

14       I want to start by pointing out how significant Natera

15   claims that this information in the supplement is.  In

16   Dr. Hochster's report, he claimed that this information, the

17   COBRA data, quote, "shook the field," unquote, and it was

18   unprecedented and it will have a long-lasting impact on the

19   entire field.

20       Well, the problem, Your Honor, is that that's entirely

21   misleading and a number of claims in the report are as well.

22       The trial was stopped based more on the design of the

23   study than the performance of the tests.  Reveal is a

24   surveillance test.  It's not designed to be used during

25   chemotherapy, which is what happened during the COBRA study.

**PROCEEDINGS**

1      Now, discovery is necessary to prevent the jury from being

2   misled, to correct the record, and to allow us to respond by

3   presenting all of the evidence truthfully, accurately, and

4   completely.

5      Now I want to highlight several categories of evidence and

6   discovery that we're expecting to take.

7      The first is the heart of the matter, which would be the

8   primary investigators and the authors of the study.  What

9   Natera is seeking to do is have Dr. Hochster essentially

10  provide color commentary about what happened at the study, but

11  we want to hear from the person that actually drafted it.

12     And that's important here, Your Honor, because this is not

13  a published study, and the data that's typically available that

14  would allow us to respond, allow us to analyze the underlying

15  data, is not currently available to Guardant.  So we need to,

16  A, seek documents from the investigators, including the

17  clinical data, whatever's available, and analytical data and

18  also to take depositions.

19     Now, another important thing to know here is that there

20  apparently was some disagreement, including with the PI in this

21  case, about stopping the study and there was some opposition to

22  doing so; and there is also an issue about whether and which

23  version of Guardant's Reveal would be used in the study.  And

24  that's all relevant information how that decision was made and

25  that's necessary to respond, again, to Dr. Hochster's

1  characterizations about what happened.

2       In addition to the underlying clinical data, we're also

3  seeking information from NRG, who is the sponsor of the study.

4  We're seeking documents that we'll request by subpoena, and

5  also we're going to depose a number of people or seek to depose

6  a number of people at NRG.  First, the documents will inform us

7  what evidence exists and which would be the most relevant

8  witnesses.

9       We're also seeking potentially to depose key opinion

10  leaders in the field.  And, Your Honor, this would be made

11  necessary by Dr. Hochster's report.  In it he relays and

12  repeats what purport to be tweets by various doctors around the

13  country.

14       Now, if this type of evidence is admissible -- and I

15  suggest that it's not given the Court's prior in limine rulings

16  and the text of 703, but if the Court is going to allow this

17  type of testimony, then we would need to call by deposition all

18  of these doctors and be able do depose them and get their

19  accurate statements.

20       Further, we would request a document production of

21  Dr. Hochster prior to his deposition, and we would then depose

22  him.  But, importantly, the deposition could not take place

23  until after fact discovery.  That's typically the course with,

24  as the Court's well aware, with expert depositions.  They

25  should not go before, precede fact discovery on the topic, and

1    that's what we're seeking to do here.  We first want to develop

2    the record, including the documents and the testimony of the

3    relevant witnesses, and then question Dr. Hochster more

4    completely.

5        Then we would seek to provide a rebuttal expert, and this

6    is going to be someone who is knowledgeable in the field of

7    oncology and in clinical studies.  We're currently speaking to

8    some experts and trying to narrow that down.  We have not

9    secured an expert yet.

10       Then --

11           THE COURT:  None of your current experts will do?

12           MR. SCOLNICK:  No, Your Honor.  This is going to

13    require a clinical expert, someone who is an expert in -- not

14    only in trials but medical trials and is familiar with some of

15    the claims being made by Dr. Hochster, including the impact of

16    chemotherapy on people who are -- the impact on -- how do I say

17    it? -- let's see, chemotherapy's impact on ctDNA assays; and

18    that's an important issue here, and I think that's something

19    that Dr. Hochster is missing entirely in his report, so our

20    expert would need to address that.

21           MR. CANNON:  Your Honor, may I jump in for a moment?

22           THE COURT:  Let me just -- finish -- please finish

23    your categories here.  I'm not saying by my silence I'm

24    accepting all this, but I want you to articulate that.  Then

25    I'll hear from the response.

1    Is there anything else?

2        MR. SCOLNICK:  With respect to the expert, no,

3    Your Honor.  But we are working diligently to find the

4    appropriate expert and will continue to do.

5        And then at that point we would seek to exclude, based on

6    the evidence that we elicit in discovery, Dr. Hochster's

7    supplemental report.

8        And in addition, finally, I'll just say this Your Honor:

9    That if we're going to open the door to this -- to this new

10    study, then it's -- there's another bucket of studies that are

11    also out there that we believe would be made relevant by the

12    supplemental evidence, and we would -- we would like to pursue

13    that as well.

14        THE COURT:  All right.  Mr. Cannon.

15        MR. CANNON:  Thank you, Your Honor.  Brian Cannon for

16    Natera.

17        As Your Honor instructed, we did meet and confer with the

18    other side -- and that was, I believe, on Tuesday -- about

19    these issues.

20        And as you can -- as you can imagine, there was a

21    disagreement about the scope of discovery, and I guess I would

22    start by saying that the discovery that Guardant seeks is

23    really way out of proportion to the scope of Dr. Hochster's

24    supplemental report.

25        And, you know, based on the discussion with Your Honor

1    last week, we understand Your Honor is inclined to allow some

2    discovery, and we agree with that, and then a short continuance

3    of the trial.  And we understand that makes sense from

4    Your Honor's perspective, and we're happy to go along with

5    that; but that the actual scope of discovery that Guardant is

6    discussing is really quite -- quite dramatic and, as I said,

7    really out of proportion to what Dr. Hochster did.

8         Dr. Hochster made a single supplemental opinion basically

9    about the termination of the COBRA study, which was a large

10   clinical study.  And as Your Honor noted, I believe in the last

11   hearing, this opinion that Guardant's test design leads to more

12   false positives has been in the case from the very beginning.

13   It was in Dr. Hochster's original report and, in fact, his

14   report noted that the COBRA trial was ongoing.

15        And, in fact, in Your Honor's *Daubert* ruling, Your Honor

16   recognized that the issue of false positives from Guardant's

17   Reveal product was going to be an issue for trial.  And the

18   COBRA result is significant, but it is significant in the sense

19   that it confirms Dr. Hochster's original opinion over which he

20   was deposed, over which there was a *Daubert* motion, and over

21   which Your Honor ruled.

22        Now, we understand some discovery is appropriate here and

23   we've offered Dr. Hochster for deposition, but the idea that we

24   open this up to the extent that Guardant suggests I think

25   really undermines getting to trial in a reasonable time this

1    year.

2        And I really do want to address the idea that Guardant is

3    suggesting it needs a brand new expert.  This is not a new

4    opinion from Dr. Hochster.  It's really not.  And, Your Honor,

5    Guardant has a qualified clinical trials expert.  His name is

6    Dr. Heitjan.  They have a physician on their witness list, a

7    Dr. Odegaard, who I believe is a pathologist or oncologist.

8    And between those two Guardant witnesses, they are well able to

9    provide a supplemental report, and we won't object to them

10   doing supplemental reports.  Each side will take depositions

11   and maybe there will a short *Daubert* motion that each side will

12   file.

13       But we think we can do this in a reasonable amount of

14   time, Your Honor, and I think -- I think we can do this within,

15   you know, two months, easily, and get to a short trial date

16   shortly after what we've got.  So that's our position.

17       **THE COURT:**  What's your response specifically to, for

18   instance, taking discovery with respect to the primary

19   investigators and authors of the study and the NRG?

20       **MR. CANNON:**  Well, in the first instance, we don't

21   think it's necessary, but we understand if that discovery takes

22   place, we would want to participate.  I think taking

23   depositions of every person that's involved in the study is

24   maybe a little bit overdone; but if Your Honor says, okay, some

25   limited discovery is appropriate, if they take the deposition

1   of a PI, then perhaps we can take the deposition of a PI.

2          But I would like to note there's a little bit of

3   information asymmetry here, Your Honor, in that Guardant was

4   actually involved in this study and Mr. Scolnick today and

5   Mr. Perloff last week indicated there was disagreement amongst

6   the PIs.

7          That's inside info.  We don't have that information.

8   Natera is working off the public information that was made

9   available to the public about the COBRA trial.  So we're not,

10  in principle, opposed to third-party discovery; it's just the

11  scope of what's being proposed we think is excessive given the

12  supplementation that was provided.

13         **THE COURT:**  What about with respect to the NRG?

14         **MR. CANNON:**  Once again, that falls into the same

15  bucket.  If some limited discovery is appropriate from NRG, we

16  don't oppose it.  We don't think it's necessary in the first

17  instance, but I understand if -- you know, if the trial is

18  being continued for a month or two, then there would be time to

19  get that done if Your Honor feels that's appropriate.

20         **THE COURT:**  All right.  Let me go back to

21  Mr. Scolnick.

22         With respect to has there been any effort to determine the

23  availability of the principal investigator, or what's the

24  information on that front?

25         **MR. PERLOFF:**  Yeah, Your Honor, we've reached out to

**PROCEEDINGS**

1    him by e-mail to have him call to find out his availability.   I

2    have a concern that it may have been routed to legal, which, of

3    course, may be entirely appropriate.   The lead investigators at

4    MD Anderson Cancer Center we've -- I've not yet heard back, but

5    hopefully we'll get that.

6         Can I just make one quick point?   Because I do think this

7    is a really critical issue.

8         Mr. Cannon, again, said that Natera is working from the

9    publicly available information, which the Court pointed out was

10   disclosed in mid-January.   We understand that's not true.   We

11   understand that actually Dr. Hochster, for some reason,

12   actually had the abstract and the data at least a month and a

13   half before, and possibly as early as November.

14        We're going to figure all that out; but just to the extent

15   that they're trying to say, "Oh, they were able to pull

16   something together in two weeks," that's just not the case.

17        Certainly they would be able to tell the Court exactly

18   when Mr. Hochster got the data, how he got it, but I do think

19   that's an important point to clarify.

20        **THE COURT:**   So you've reached out.   And I think your

21   audio cut out there.   I didn't hear who you reached out to.   Is

22   it MD Anderson?

23        **MR. PERLOFF:**   Yes.   It's Van Morris.   His first name

24   is Van.   It's not like Van Morrison.

25        **THE COURT:**   He's the PI in this case?

1          **MR. PERLOFF:**  Yeah.  And we reached out to him.

2  Hopefully he'll reply back and we'll find a mechanism.

3          You know, my idea would be to send the subpoena informally

4  as opposed to serve it so that they could hopefully agree to

5  it, but that may be wishful thinking.  But that's the kind of

6  approach we would hope to take to try to streamline it as much

7  as possible, but it's going to take a lot of time.

8          And I apologize, Chase, please.

9          **THE COURT:**  What about the NRG?  What outreach, if

10 any, have you done?

11         **MR. PERLOFF:**  So we're trying to figure out who to

12 reach out at NRG.  There were five names that we know of, and

13 we're trying to figure out who the best person -- the -- as I

14 understand it -- and perhaps somebody can correct me if I'm

15 wrong -- NRG is a nonprofit and so the people who were working

16 on it, they don't work there full-time.  They're like

17 professors at University of Florida and Pitt.

18         And so we're hoping that if we send -- if we contact NRG

19 centrally, they'll still be able to get the information from

20 those people, even though their day job -- right? -- is at

21 another place.  Because we really don't want to have to go to

22 these different universities separately, but we haven't pinned

23 that down yet.  We're trying to figure that out right now

24 today.

25         **THE COURT:**  And explain to me.  I understand perhaps

**PROCEEDINGS**

1  since it's not a published paper you want to get some

2  information perhaps from the principal investigator.  It's less

3  clear to me why the sponsor discovery is needed.

4      **MR. PERLOFF:**  Your Honor, the sponsor is the one that

5  actually did the analysis -- did the statistical analysis and

6  applied the rule.  The principal investigator was, as the name

7  suggests, the main investigator.  There were dozens of other

8  non-principal investigators generating data.

9      But -- so he does not have, for example, any clinical

10  information that came from the other facilities, or at least we

11  don't understand that he does; that would be at NRG.  And,

12  again, the statistical analysis that they used to terminate was

13  made at NRG, and that's what we're trying to figure out:  Who

14  made that decision, what information they were -- were they

15  relying on, and get that information.

16      **MR. CANNON:**  Your Honor, may I offer a comment in

17  response to a couple of those?

18      **THE COURT:**  Yeah.

19      **MR. CANNON:**  Mr. Perloff mentioned statistics.  They

20  actually have -- Guardant has a statistics expert, a

21  biostatistics expert, who reviews clinical trials.  That's

22  Dr. Heitjan.

23      I also would like to note that there was an accusation

24  that Dr. Hochster somehow had inside information.  The abstract

25  was available before the conference.  The conference was in

1   January, January 16th I believe.  But there was an abstract

2   available before the conference.  So I'm certainly not aware of

3   any sort of early access that Dr. Hochster may have had.

4       But I just want to make clear that this was a -- Guardant

5   was involved in this study.  You know, the Guardant Reveal test

6   was the test used in this study and the issue of false

7   positives, that was the issue that led to the termination of

8   this large-scale clinical study.

9       And I know we don't want to get into the weeds of the

10  technical issues here, but it really is as simple as that.

11  Dr. Hochster said the test design leads to more false

12  positives.  There was a large clinical study, and it was

13  stopped because of excessive false positives.

14      And we already have experts in the case on statistics and

15  clinical trials, and with some limited third-party discovery,

16  some limited expert discovery from experts we have, I think we

17  can get this done in a very reasonable amount of time.

18      **THE COURT:**  And what's your view about the comments

19  about doctors in the field and whether that opens the door to

20  discovery of those who were quoted, and this sort of thing?

21      **MR. CANNON:**  That's a separate issue I think.  That's

22  the sort of evidentiary issue that we could take up at perhaps

23  a pretrial conference or before testimony because we have the

24  opinions of Dr. Hochster about significance of the trial and

25  then we have some of the reactions in the field, and I feel

1  like we don't need discovery on reactions on thought leaders or

2  whatever it was that Guardant proposes.  But the issue of

3  specific paragraphs and Tweets in a report, I think that's an

4  evidentiary issue that sort of is not a gating item for what

5  we're discussing today.

6      THE COURT:  Well, I think Mr. Scolnick is suggesting

7  that unless that -- that class of materials is excluded,

8  whether under 703 or under relevance, they would have an

9  interest in deposing those leaders in the field whose views

10  have been -- are contained in the report, supplemental report.

11      MR. CANNON:  What I might suggest, Your Honor, is that

12  if Guardant presents a rebuttal report from one of its, you

13  know, experts or Dr. Odegaard as a witness for Guardant, they

14  can address that issue in their report and then we can -- we

15  can -- each side can depose the experts who include those

16  opinions.

17      MR. SCOLNICK:  Your Honor, if I can --

18      THE COURT:  Well --

19      MR. SCOLNICK:  I'm sorry.

20      THE COURT:  Frankly, I have my serious questions about

21  whether any of this stuff is going to come in.  Why do we care

22  about that?

23      Let's talk about the study and the merits of the study.

24  Why do we care what other people say?  I mean, that's -- that

25  seems to me we're -- on both sides we're in 703 territory.  So

1  I think I could cut that off pretty easily and say it's not

2  going to come in, and you're not going to do any discovery on

3  that.  So that's one category gone.

4        MR. SCOLNICK:  I agree, Your Honor.  We don't think

5  that evidence has any place at trial; and certainly if it did,

6  we would need to run that down and depose a number of

7  witnesses, but we're --

8        THE COURT:  All right.  Let me get to something

9  specific here.  I'm just -- there's a calendar issue.  There's

10  a -- and then I'm also looking at -- I can make room -- I can

11  continue this trial a bit and have it start April 29.  I have

12  an opening, a case that has now been shifted to another judge,

13  and I have two weeks.  A couple of those days will be

14  disrupted, so if it goes beyond two weeks, I've got the third

15  week of May -- second week of May that I can get in those 9 or

16  10 days.

17        MR. SCOLNICK:  And --

18        THE COURT:  That would give -- that would give the

19  parties over two months from now.

20        Now, obviously we'd like to see -- if there's going to be

21  further in limine motions and *Daubert* motions, I'd like to see

22  that before, so maybe you don't get the full two months; but it

23  seems to me that, in order to get the discovery from the

24  principal investigator -- and I don't know why you would have

25  to interview multiple people from the studies.  I would think

**PROCEEDINGS**

1   the principal investigator or somebody close to it would have

2   enough information, particularly if you can get some of the

3   underlying data as well as getting somebody at the NRG who is

4   involved.  I don't see why it would take months and months and

5   months to do this.

6           **MR. SCOLNICK:**  Your Honor, I --

7           **THE COURT:**  I'd like you to react to my proposal.

8           **MR. CANNON:**  Your Honor, I'd like to --

9           **THE COURT:**  Let Mr. Scolnick go first since he's the

10  one --

11          **MR. CANNON:**  Sorry.  I apologize.

12          **MR. SCOLNICK:**  Thank you.

13      We don't believe that two months is anywhere near

14  sufficient, Your Honor.  That would essentially give us one

15  month, given motion deadlines, to do third-party document

16  discovery, then digest those documents, then prepare for

17  depositions of third parties, at least the PI and someone at

18  NRG, maybe multiple witnesses.

19      Then we would need to prepare with that document

20  production for the deposition of Dr. Hochster after doing a

21  document request with him, finding our own expert and preparing

22  for his deposition; and then after that, doing motions.  That

23  just is not sufficient time.

24      If we're going to do this right and if we're going to give

25  Guardant --

1    **THE COURT:**  Well, I would think you would be in the

2  process now of recruiting the experts you have now.  Why wait?

3  It's not sequential.

4    I mean, with all your resources, I'm not convinced that

5  your expert is a problem and time is needed.  Your expert will

6  guide you in the process of trying to figure out what to get,

7  what to ask.  I assume your expert will be right there in the

8  deposition of the PI.  So that's -- I'm not convinced.

9    **MR. SCOLNICK:**  Okay.  Well --

10    **THE COURT:**  And taking Dr. Hochster's deposition, you

11  already have his extensive report.  And maybe you want to

12  cross-examine him with the stuff you learned, so I understand

13  why you don't want to do it now, but what are you suggesting --

14  five months?  Six months?  A year -- to do this one piece?

15    **MR. SCOLNICK:**  I don't think a year is necessary.

16    **THE COURT:**  I don't think so.

17    **MR. SCOLNICK:**  I'm not asking for a year, Your Honor.

18    **THE COURT:**  Well, you're not going to get a year.

19    **MR. SCOLNICK:**  Well --

20    **THE COURT:**  I don't think you're going to get more

21  than two months.  So far you haven't convinced me.  Keep going.

22    **MR. SCOLNICK:**  Your Honor, we think that probably

23  around six months is necessary here, and we think that because

24  that's what's going to be necessary to develop the record.  And

25  when the shoe is on the other foot --

1              THE COURT:  On one study?

2          MR. SCOLNICK:  It's not just a study.  According to

3    Natera, this is a game-changing study and one of the most --

4          THE COURT:  It may be a game-changing study.  When you

5    do your discovery, you may find out it's not game-changing at

6    all.  The sample size is so small.  There's no statistical

7    significance to it.  There are other problems with it,

8    et cetera, et cetera.  I'm sure we're going a going to hear

9    that.  I don't know why it would take so long to take discovery

10   on one study basically.

11         MR. SCOLNICK:  I'm convinced that it's not a

12   game-changing study, Your Honor, and that the information is

13   misleading, but it's going to take some time to develop the

14   record.

15      Again, there are a number of third parties that we need to

16   contact.  We need to elicit that information, consult with an

17   expert.  Even if we find an expert next week, it's going to

18   take some time to work up the record, make him familiar with

19   all the documents, and then that's just a starting point, and

20   we're not necessarily sure where this is going to lead.

21      And I remind the Court, when the shoe was on the other

22   foot, and when it was Natera who was attacking the Harvard

23   study, they had about a year to do so.  They hired three

24   experts who prepared reports that total well over 250 pages.

25   They took fact witness depositions, and there was no limit to

1    them.

2        So when this is dropped on our door on the eve of trial,

3    we should be entitled, in fairness, to the same opportunity to

4    access the same evidence to prevent the jury, again, from being

5    misled, to provide this in the proper context, and also to

6    present complete, accurate, and honest information.

7        And I think that that motion -- that much time is

8    necessary, Your Honor, otherwise we're going to be rushed.

9    And, again, this is not a problem of our making.  We were

10   prepared to go to trial at the current date, and this was

11   dropped on our doorstep just a matter of weeks before trial.

12       So we're responding to this and we, again, are asking for

13   an opportunity to do so.

14           **THE COURT:**  So you're saying what?  Five months?

15           **MR. SCOLNICK:**  Yes, Your Honor.  I think sometime late

16   summer or early fall.

17           **THE COURT:**  All right.  Response, Mr. Cannon?

18           **MR. CANNON:**  Yeah.  Thank you, Your Honor.

19       As Your Honor said, I agree with Your Honor.  I think two

20   months is plenty.  It's a single study, it's a conclusion of a

21   single study, and I think we're well able, with reasonable

22   discovery, within a month or two to do this on the schedule

23   that Your Honor as proposed.

24       And Guardant has experts.  They have experts in the stable

25   that they can use that have already provided reports.  They've

1   already provided a rebuttal to Dr. Hochster, and they have a

2   physician on -- in their witness list.

3        In terms of actual trial schedules -- so I agree with

4   Your Honor completely.  I would -- in terms of trial schedule,

5   I'd like to turn that over to Mr. Johnson if that's okay with

6   Your Honor.

7            **THE COURT:**  Okay.

8            **MR. JOHNSON:**  Your Honor, we generally agree with

9   Your Honor's view of how long this should really take to be

10  done.  And, you know, they've got the experts.  It's limited

11  discovery.  We think -- you know, and with a couple of, maybe,

12  tweaks to what you proposed, Your Honor.  I have a trial that

13  ends on April 26th and another one that starts on May 2nd

14  actually; but, you know, we could slide it in right at -- I'm

15  willing to have somebody else do the ITC trial, and if we

16  needed to go at the beginning of May or the middle of May, we

17  can find the two weeks to go during that time frame.

18       I prefer not -- if we could not start exactly on the

19  29th since I'll be finishing up in East Texas on the 26th, but

20  we can find the timing.

21       What I would say is, you know, just to put it all back in

22  place, Your Honor, the five or six months, I mean, they -- not

23  to go back and revisit things but, you know, we filed a motion

24  to lift this -- to lift the stipulation; right?  And Your Honor

25  denied that, and we understood that.

1          But, you know, the situation is such that, I mean, they --

2    another thing that's gone on here is, you know, extended -- an

3    extended period with the stipulation still in place for

4    six months is just something that neither party ever really

5    contemplated; and so we agree some discovery is, you know,

6    limited, should be had, and we can get this done in some time,

7    within a month or two months, and -- you know, and come back to

8    Your Honor in short order.

9          THE COURT:  Well --

10         MR. JOHNSON:  But what I'm saying is we can be ready

11   to go at the end of -- in May with Your Honor.

12         THE COURT:  Well, I don't have any flexibility, to

13   tell you the truth.  If we're going to have a 10-day trial,

14   it's going to start, if it's going to start that period,

15   April 29 because I've got other things happening.

16         MR. JOHNSON:  Okay.

17         THE COURT:  So I -- you know, if you're telling me

18   that's not going to work for you, that may make this exercise

19   academic.

20         MR. JOHNSON:  It will work.  It will work.  We'll make

21   it work.

22         THE COURT:  Okay.

23         MR. SCOLNICK:  Your Honor, with respect to that date,

24   we do, I'm told, have some witness availability issues.

25         THE COURT:  Well, tell me more.

1         **MR. SCOLNICK:**  My understanding is that the founders

2    are not available due to some conflicts in their schedule.

3         **MS. KELLER:**  Right.

4         **THE COURT:**  Well --

5         **MS. KELLER:**  Your Honor, if I may, they have a complex

6    FDA review that is coming up of one of their other products,

7    and they have a number of other commitments as well, but that

8    one is -- that one is critical to the company's success.  And

9    we need both founders for the trial for sure.

10         **THE COURT:**  Well, I need to hear more about why they

11    can't be available at the trial.

12         **MS. KELLER:**  They can be after June, Your Honor.  I

13    mean, from June on.

14         **THE COURT:**  I mean, what is happening in late April,

15    early May that prevents them from attending trial?

16         **MS. KELLER:**  There's an intense review and

17    presentation that has to occur with the FDA about a product

18    called Shield that they have.  It's also the closing of the

19    quarter.  There are investor calls.  There are a whole bunch of

20    reasons why they're not available until June.

21         **MR. PERLOFF:**  Your Honor, it's --

22         **MS. KELLER:**  I could get more detail and perhaps

23    Mr. Perloff has more.

24         **MR. PERLOFF:**  Yeah, I have a bit more.

25        It's a good thing.  They're going to FDA to present Shield

1   as the first blood-based diagnostic for colon cancer ever to be

2   approved.  And so because it's the first of its type, FDA looks

3   at it more carefully and there is -- as they describe, they

4   practice and practice the presentations because it's so

5   important, and they are very much engaged in that during that

6   time period.  That's my understanding.

7          THE COURT:  When is the presentation?

8          MR. PERLOFF:  Apparently, FDA doesn't give you the

9   exact date, but -- and somebody should Tweet me if we had

10  more -- if we've gotten more details in the past few days, but

11  my understanding it was -- they had like a window that it was

12  supposed to be from late March to late April or May.  I don't

13  know.  But I do know that that April time frame is kind of

14  smack dab in the middle of when they may be there.

15         THE COURT:  You mean, even if it's April 29, the very

16  end of April?

17         MR. PERLOFF:  Yeah.  That's my understanding.

18         THE COURT:  Well, I'm going to need to see a

19  declaration with some details before I decide not to schedule

20  the trial for that date because I think Natera has a fair

21  point; that we've got this stay in place, and one of the

22  reasons why I let it stay in place is because trial was

23  imminent, right around the corner, et cetera, et cetera.  And I

24  figured part of it is, you know, there's not much prejudice by

25  waiting an extra, I think it was, six weeks or two months or

1  something.  If we're now talking about several months,

2  you know, that -- I may have to revisit that question.

3      Plus, you know, this case seeks prospective relief, and

4  that's why I put this on a priority calendar above other

5  matters because it's been pending for a while and it has a

6  prospective impact.  It's not just retrospective.  And so --

7  and I continue to feel the urgency to get this case done.

8      And so far, I'm not particularly convinced about the

9  extent of discovery warranting many, many, many months.  But if

10  the principals, if I'm convinced that they are truly not

11  available and for good reason, that might be something I'd have

12  to look at.

13      So if that's the case, let me ask you -- I mean, the

14  problem is I really don't have a 10-day trial opening.  If it

15  were just a one-week trial, I could squeeze you into a couple

16  different places, but a 10-day trial, which is two and a half

17  weeks, my next opening would be end of July into the first

18  couple of weeks of August.

19      So let me just check.  I'm not saying I would do that, but

20  let me make sure there's no availability problems there if we

21  were to start July 29th, for instance.

22          MS. KELLER:  Your Honor, I'm scheduled to be out of

23  the country July 29th and for the first two weeks of August.

24  I'll be back after that.

25          THE COURT:  Well, I've got a feeling any date I pick

1  somebody is not going to be available and we have multi- --

2  multi-attorney teams here, so I don't know if I can move this

3  trial back even further because then we're talking about

4  September.

5      Let me see what else.  Anybody else have a problem?

6          **MS. KELLER:**  Your Honor --

7          **MR. JOHNSON:**  Your Honor --

8          **MS. KELLER:**  -- our associate or assistant general

9  counsel, who has been shepherding this case and superintending

10  it and intends to attend the trial, he's also unavailable in

11  August.  His name is Kim Moore, and he's listening to this

12  call.

13          **THE COURT:**  Mr. Johnson, you were going to --

14          **MR. JOHNSON:**  I was -- well, I was just going to say,

15  I mean, you know, I -- I hesitate at all, but I'm supposed to

16  be out of the country with my family going to the Olympics.

17  But, you know, frankly, if that's the only time you can do it,

18  Your Honor -- and we missed the Olympics in Tokyo, so -- but

19  I'm not going to let that get in the way of scheduling this

20  trial.  So, you know, I'm -- it is what it is; but if we have

21  to go at the end of July and beginning of August, so be it.

22          **THE COURT:**  How about you get tickets for everybody

23  and we'll be --

24          **MR. JOHNSON:**  At this rate, I probably should.  At

25  this rate -- we can probably do it in Paris.

1        In all seriousness, I mean, we think we can slide it in in

2    May; and if we have to go at the end of July, Your Honor,

3    beginning August, then so be it.  I mean, this is a case that's

4    obviously really important to Natera, and we want to push on.

5        And, I think, the end of July and beginning of August,

6    frankly, is too much time given everything else that's going

7    on, and this discovery really shouldn't be that complicated.  I

8    know Mr. Scolnick had a long list of things that he'd like to,

9    you know, go do and that all plays into trying to delay this.

10       It's kind of interesting to me, for a lot of reasons, what

11   I think is really going on, but I think doing it at the end of

12   April, beginning of May is the right time.

13            MR. SCOLNICK:  If I could, just briefly.

14            MS. KELLER:  I'm curious as to whether the Court has

15   availability in September.

16            THE COURT:  Well, I have some availability in

17   September.  My problem is now we're talking additional

18   six months delay, and I'm -- I'm very concerned about that.

19            MS. KELLER:  Well, Your Honor, we have some other

20   studies we have to look into.  I mean, this study -- close of

21   discovery, this is -- after the close of discovery this was

22   dumped on us.  And, you know, there was a hard stop date here

23   after which we weren't looking at other studies, but there are

24   some studies that are good for us, some studies that are bad

25   for Natera that are floating around out there.

1    And if they're allowed to present this late-breaking

2    study, we should be allowed to present studies that undermine

3    COBRA, and that's going to take some time too.  And I just

4    think that allowing the Defense to pick and choose essentially

5    what comes in and depriving the jury of hearing about the other

6    studies that undermine it, is not fair.

7         THE COURT:  Well, you can present those studies via an

8    expert.

9         MS. KELLER:  Well, not necessarily.  We have to first

10   find out the underlying data from the proponents of the -- the

11   persons who designed and ran the studies.

12   But perhaps Mr. Scolnick can speak a little more to that.

13        THE COURT:  Are you talking about published studies

14   that had been published after the close of discovery?

15        MS. KELLER:  Yes.

16        THE COURT:  And these are peer-reviewed published

17   studies?

18        MS. KELLER:  Yes, unlike COBRA, which was not

19   published and was not --

20        THE COURT:  I understand that.  And the usual way that

21   is presented is through expert testimony, is to talk about

22   these recent studies and why they're significant, why they were

23   high quality, the fact that they were peer-reviewed, et cetera,

24   et cetera, et cetera.

25   It's not common, in my experience, to have principal

**PROCEEDINGS**

1    investigators of the studies that are -- you know, I'm in the

2    middle of a case now with 72 studies and, you know, yeah,

3    they've called the principal experts on a -- the principal

4    investigators on a couple of them, but there are many studies

5    that are talked about, you know, that are testified to through

6    an expert.  I don't think you get to call the authors of every

7    study that's ever cited.  I don't know about that.

8         MS. KELLER:  Well, that's all the more reason that we

9    need time to prepare an expert, though, because we're talking

10   about somebody having to absorb a tremendous amount of

11   information as --

12        THE COURT:  Well -- and, by the way, what's the

13   problem with the two experts, Dr. Heitjan and Odegaard?

14        MR. PERLOFF:  Yeah, Dr. Heitjan is a biostatistician,

15   but he's not an oncologist, and so for sure he can address some

16   statistical issues but not the clinical point that Dr. Hochster

17   is making.

18        Justin Odegaard is our internal.  You know, he's one of

19   our employees and he is -- he's an oncologist.  So is our

20   CMO -- is an oncologist.  But as tempting as it might be to

21   have an in-house person be an expert, typically the jury wants

22   to see somebody who at least is nominally independent.

23        And I would -- you know, in the same way that they have,

24   you know, Dr. Hochster, whether or not he's independent is the

25   question, but he's a third party, and so that's what --

1    you know, I just want to be clear about that.

2           **THE COURT:**  Okay.  All right.  I understand.

3           **MR. CANNON:**  Your Honor, may I respond to a couple of

4    points?

5           **THE COURT:**  Briefly.

6           **MR. CANNON:**  Briefly, yeah.

7           This is a supplement related to the COBRA study.  It

8    doesn't bring in all of these other studies that are ongoing.

9    So if -- if other studies are relevant to COBRA and are in the

10   rebuttal report of the other side, so be it, but to expand out

11   to go beyond COBRA is really not what we're talking about here

12   in order to get this trial done in a reasonable amount of time.

13          And Dr. Hochster has been in this case from the beginning.

14   His report on false calls and false positives, that was in his

15   original report.  And Guardant chose the experts that they

16   chose, and Dr. Heitjan is well able to rebut Dr. Hochster just

17   like he put in a rebuttal during the normal course.  And so we

18   don't think we need to open up to new studies and brand-new

19   experts and play it out for a long period of time.

20          So getting back to the --

21          **THE COURT:**  The argument is that if we're going to

22   sort of open discovery, it should not be done selectively

23   because this study -- I mean, if you're going to open it up,

24   extend the timeline because we had a timeline, a cut-off date,

25   you know, and if there are relevant studies that perhaps shed a

**PROCEEDINGS**

1    different light, that there's kind of a basic equity argument

2    there that it should go -- work both ways.

3        I'm still not convinced that that requires more than

4    two months, but let's do this.  We're going to see you on

5    Monday for the pretrial conference, which I'm going to go

6    forward with in any event because I think we should start the

7    pretrial process, at least accomplish what we can, but I want

8    to get as much out of the way as possible.

9        I'd like you to submit the declaration about the

10   availability and the timing for the two principals and why they

11   would not be able to attend if I were to set the trial for

12   April 29.

13       And then I will make a decision at the pretrial conference

14   what we're going to do in terms of -- so I think you can assume

15   at this point that I'm going to give some leeway for discovery.

16   The question is how much, whether it's April 29, July 29 --

17   September, I guess is the only other option.  But like I said,

18   the further out we get, the more concerned I am about the

19   delay.

20       I take it that there's not a scheduling problem for anyone

21   in September.  There's no Olympics.  There's no -- don't tell

22   me.  You're going somewhere.

23       **MR. PERLOFF:**  I have booked passage on a river cruise

24   that was paid for last year.  You know, that's one of these

25   barges that six of our closest friends that my wife put

1  together.  That begins late September.  September 16th I think

2  is when we're flying into it.  I just need to point it out.

3       **THE COURT:**  Okay.  Well, I -- we'll talk about that, I

4  suppose, on Monday.

5     So those are the sort of three options:  Two months out;

6  five months out; I think, four months -- or four and a half

7  months, whatever it is; and nearly six months out.

8     All right.  So if you could submit the declaration by --

9  let's say by Friday noon from the founders about why they

10  absolutely cannot attend, I will consider that and we'll talk

11  about it on Monday.

12    Okay?

13       **MS. KELLER:**  Okay.

14       **THE COURT:**  Thank you.

15       **THE CLERK:**  Court is adjourned.

16          (Proceedings adjourned at 10:43 a.m.)

17                    ---o0o---

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, February 23, 2024

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court