QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
Andrew J. Bramhall (Bar No. 253115)
andrewbramhall@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Valerie Lozano (Bar No. 260020)
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Anne S. Toker (*pro hac vice* pending)
annetoker@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100

Attorneys for Defendant
NATERA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC.,<br><br>                Plaintiff,<br><br>        vs.<br><br>NATERA, INC.,<br><br>                Defendant. | CASE NO. 3:21-CV-04062-EMC<br><br>**NATERA, INC'S OPPOSITION TO GUARDANT HEALTH, INC.'S MOTION TO FOR EVIDENTIARY AND MONETARY SANCTIONS**<br><br>**REDACTED FOR PUBLIC FILING**<br><br>Hearing:     July 26, 2024<br>Time:         3:00 PM<br>Place:        Courtroom 5, 17th Floor<br>Judge:        Hon. Edward M. Chen |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

I.     THE COBRA CLINICAL TRIAL, ITS EARLY TERMINATION IN AUGUST 2023, AND ITS PRESENTATION AT ASCO-GI IN JANUARY 2024 ............................ 3

II.     UNBEKNOWNST TO NATERA, GUARDANT LEARNS OF THE ENDPOINT ANALYSIS RESULTS IN AUGUST 2023, AND SCRAMBLES TO EXCUSE ITS TEST PERFORMANCE WHICH IT KNEW WAS PLAGUED BY FALSE POSITIVE RESULTS ............................................................................................... 5

III.    GUARDANT FIGHTS TO KEEP THE COBRA TRIAL OUT OF THE CASE DESPITE ITS CLEAR RELEVANCE, AND PIVOTS TO A STRATEGY OF "SHOOTING THE MESSENGER" ........................................................................ 9

    A.     Guardant Subpoenas Dr. Hochster for Documents that Have Nothing to Do with His Opinions ................................................................................. 9

    B.     Guardant Promptly Obtains All of the (Irrelevant) Documents It Sought ............... 11

        1.     Dr. Hochster's Communications with COBRA PIs ...................................... 12

        2.     The Early Draft of the COBRA Abstract ...................................................... 12

        3.     Dr. Hochster's Suggestion to Salvage COBRA Data Using Signatera ....... 13

        4.     Dr. Hochster's Email With Natera ............................................................... 14

IV.    GUARDANT LAUNCHES YET MORE ATTACKS ON DR. HOCHSTER, SUBMITTING TWO REBUTTAL EXPERT REPORTS CHALLENGING HIS OPINIONS, FILING A *DAUBERT* MOTION SEEKING TO EXCLUDE HIM, AND THEN FILING THIS MOTION FOR SANCTIONS ................................................. 15

LEGAL STANDARD ................................................................................................... 15

ARGUMENT ................................................................................................................ 16

I.     GUARDANT IS NOT ENTITLED TO SANCTIONS ........................................... 16

    A.     Guardant's Reliance on the Court's Inherent Authority Is Misplaced .................... 16

    B.     Even Under the Court's Inherent Authority, There Is No Basis for Sanctions ........ 17

        1.     Guardant Was Not Prejudiced ..................................................................... 17

        2.     There Was No Bad Faith .............................................................................. 19

II.     GUARDANT'S CITED LEGAL AUTHORITY DOES NOT SUPPORT THE EXTREME SANCTIONS IT SEEKS (OR ANY SANCTIONS) ............................... 22

CONCLUSION ................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*" Am. Unites for Kids v. Rousseau*,
    985 F.3d 1075 (9th Cir. 2021) ............................................................... 17

*Adriana Int'l Corp. v. Thoeren*,
    913 F.2d 1406 (9th Cir. 1990) ............................................................... 24

*Chambers v. NASCO, Inc.*,
    501 U.S. 32 (1991) ................................................................................ 17

*Complete Ent. Res. LLC v. Live Nation Ent., Inc.*,
    2017 WL 11631963 (C.D. Cal. Oct. 18, 2017) ...................................... 26

*Edwards v. Lattimer*,
    2020 WL 13533315 (D. Nev. Feb. 11, 2020) ........................................ 17

*Fallbrook Hosp. Corp. v. Cal. Nurses Assoc./Nat'l Nurses Org. Comm.*,
    2014 WL 4385465 (S.D. Cal. Sept. 4, 2014) ........................................ 25

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) ................................................................. 23

*Fjelstad v. Am. Honda Motor Co.*,
    762 F.2d 1334 (9th Cir. 1985) ............................................................... 23

*Galderma Lab'ys, L.P. v. Tisckos*,
    2023 WL 3402156 (C.D. Cal. Mar. 31, 2023) ...................................... 20

*Haeger v. Goodyear Tire & Rubber Co.*,
    813 F.3d 1233 (9th Cir. 2016) ............................................................... 25

*ImprimisRx, LLC v. OSRX, Inc.*,
    2023 WL 8604148 (S.D. Cal. Dec. 12, 2023) ...................................... 19

*Laub v. Horbaczewski*,
    2020 WL 7978227 (C.D. Cal. Nov. 17, 2020) ...................................... 19

*Liberty Ins. Corp. v. Sw. Traders Inc.*,
    2013 WL 12139424 (C.D. Cal. Sept. 2, 2013) ...................................... 19

*Merrick v. Paul Revere Life Ins. Co.*,
    500 F.3d 1007 (9th Cir. 2007) ............................................................... 24

*Newberry v. Cnty. of San Bernardino*,
    750 F. App'x 534 (9th Cir. 2018) .......................................................... 18

*Nguyen v. Biter*,
    2015 WL 366932 (E.D. Cal. Jan. 27, 2015) .................................................................. 20

*Samsung Elecs. Co. v. Nvidia Corp.*,
    314 F.R.D. 190 (E.D. Va. 2016) ........................................................................... 24, 25

*Swisher Hygiene Franchise Corp. v. Clawson*,
    2023 WL 2734449 (D. Ariz. Mar. 31, 2023) .............................................................. 20

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
    982 F.2d 363 (9th Cir. 1992) ..................................................................................... 24

*Update Art, Inc. v. Modiin Pub., Ltd.*,
    843 F.2d 67 (2d Cir. 1988) ......................................................................................... 17

*Winns v. DeJoy*,
    2022 WL 2674202 (N.D. Cal. June 22, 2022) ............................................................ 23

*Xped LLC v. Entities Listed on Exhibit 1*,
    690 F. Supp. 3d 831 (N.D. Ill. 2023) .......................................................................... 21

### Statutes / Rules

Fed. R. Civ. P. 37 ................................................................................................... 18, 19

Fed. R. Civ. P. 37(e) ............................................................................................... 17, 18

# INTRODUCTION

Guardant brings a serious charge of bad faith abuse of the judicial process.  But none has occurred.  Guardant seeks to leverage a dispute about document searches from third party expert and preeminent oncologist Dr. Howard Hochster into a reason to exclude some of the most relevant evidence in this case: the failure of Guardant's Reveal assay to meet expectations and the resulting excessive false positives that led to the failure of the COBRA trial.

The COBRA trial is critical.  Guardant's (newly retained) expert Dr. Aparna Parikh confirmed that COBRA—which relied on Guardant's assay—was "a high-profile national study." The study's sponsor, NRG, terminated the study in August 2023 because of an excessive false positive rate.  Guardant's other expert, biostatistician Daniel Heitjan, conceded COBRA was "███████████████" The reason the COBRA failure is so important is because Guardant claimed— to NRG and the public—that its assay had 100% specificity and positive predictive value (PPV), and thus would not give false positive results.  The COBRA results demonstrate the falsity of that claim—and show that, as Natera has alleged, the Reveal assay suffers from false positives.  Indeed, Dr. Parikh conceded in her recent deposition that Reveal does not have 100% specificity or PPV but yields 1 in 20 false positives.  This has real-world impact.

After the failure of the COBRA trial in August 2023, Dr. Hochster—who was an early proponent of the study and enrolled his own patients in it—sent emails to his colleagues to commiserate about the disappointment of the failure and to try to salvage the trial results.  These are the documents at issue.

Some six months later, after Dr. Hochster submitted a supplemental expert report on COBRA, Guardant sent third-party subpoenas to him and subsequently to his employer, Rutgers University.  In responding to his personal subpoena, Dr. Hochster did not remember his communications from 2023 that were made in the wake of the news that COBRA had failed, and then did not find them when he did a key-word search on his emails.  However, Guardant obtained them from Rutgers.  In one, Dr. Hochster refers to the failure as a "clusterf@@@."  In another, he emailed a Natera medical officer to see if Natera could run the COBRA samples using its bespoke assay to enable the study to go to completion.  None of these communications about Dr. Hochster's

immediate reactions to the news bear on the issues in the case, *i.e.*, the truthfulness of the parties' advertising and the performance of their respective products.  And none of it is substantively different from what others reacting to COBRA's failure—including NRG oncologists and Guardant's own expert—believed and were saying.  Everyone involved would have preferred if Dr. Hochster had remembered his communications.  But he did not.  And there is no prejudice to Guardant because it promptly got the documents from Rutgers.

With respect to the timing of COBRA knowledge, there was no misrepresentation.  As Dr. Hochster set forth in his supplemental report, he learned of the failure and received the NRG letter in August 2023.  Natera told this Court that the data was publicly disclosed at ASCO-GI in January 2024.  That was and remains true.  Natera and Dr. Hochster could not have prepared and submitted a supplemental report any earlier than January 2024 even if they wanted to.  In fact, ***Guardant*** knew the underlying data before the public because it was the diagnostic partner conducting the assays— and, as discovery has since confirmed, Guardant was intimately involved behind-the-scenes with the study.  Guardant refused to produce any of this material until Natera moved to compel.

The motivations behind this motion—as well as the pending Hochster *Daubert* motion—are clear: suppress the COBRA trial at all costs.  Guardant partnered with NRG, and the study failed because of the performance of Guardant's assay.  Guardant told NRG its assay had perfect or near perfect specificity, and NRG even repeated the claim in a press release.  That would have meant no or few false positives.  That was false.  Indeed, in 2023, NRG oncologists wrote to each other that ██████████████████████████████████████████████████████" and that ███████████████████████████."  The failure of COBRA goes to the heart of this false advertising case:  Guardant's misrepresentation about the performance of its assays.

Furthermore, Guardant is not acting in good faith in bringing this motion.  Its counsel told this Court in February 2024 that information and data about COBRA "is not currently available to Guardant."  That was not true.  Guardant closely partnered with NRG as recent document productions demonstrate.  What Guardant did not tell Natera or the Court was that Guardant had the data, knew the problem, and knew NRG felt misled.

Guardant's efforts to keep this critical issue out of the case should be rejected.

# BACKGROUND

**I.      The COBRA Clinical Trial, Its Early Termination in August 2023, and Its Presentation at ASCO-GI in January 2024**

The COBRA trial was a national phase II/III clinical trial sponsored by the NRG Oncology branch ("NRG") of the National Cancer Institute ("NCI") (part of the National Institutes of Health) with over 400 participating hospitals nationwide.   COBRA used the commercial version of Guardant's Reveal test (Lunar 1.2 or Reveal 1.2), the same version tested in the 2021 Parikh Study and at issue in this case, to detect the presence or absence of circulating tumor DNA ("ctDNA") in patients' blood plasma.

The COBRA trial's overarching goal was to help oncologists understand whether ctDNA is a reliable biomarker to help guide patient-treatment, *i.e.*, whether patients who tested positive for ctDNA can benefit from receiving chemotherapy.  *See* Dkt. 447-2 (Hochster Supp.) ¶¶ 14-15.  To reach that goal, the COBRA clinical trial protocol, which was preplanned and developed by NRG, provided that all enrolled patients were to receive a baseline ctDNA test at the beginning of the trial and, depending on the initial ctDNA result, certain patients would then be assigned to receive chemotherapy, and others were put on observation.  All patients were to receive another ctDNA test six months into the trial.  *Id.* ¶¶ 18-19.  All ctDNA tests involved patient samples being run on Guardant's Reveal assay.

The NRG team designing the COBRA trial planned for an interim "endpoint analysis" after phase II as a checkpoint of the trial.  *Id.*, ¶ 20.  Depending on the results of that analysis, the NRG team would decide whether to continue the trial and move on to phase III.  Per the clinical protocol, the endpoint analysis focused on 16 patients who tested positive for ctDNA at baseline.  *Id.*, ¶ 27.  Seven of the 16 patients were assigned to the observation arm, while nine patients were assigned to the treatment arm and received six months of chemotherapy.  *Id.*  If, after six months of treatment, a pre-determined number of patients receiving chemotherapy achieved ctDNA clearance—*i.e.*, converting their ctDNA testing result from positive to negative, indicating their residual disease had

1  been eradicated—the trial would move forward.  Ex. 1 at GHI00063449-50.[1]  Otherwise, the trial

2  would be declared futile per the pre-planned "decision rule" and closed.  *Id.*

3      As this Court knows, the COBRA trial did not pass the endpoint analysis and was declared

4  futile per the clinical trial protocol.  Ex. 2 ; Dkt. 493 at 3-4.  On August 30, 2023, NRG, including

5  Dr. Van Morris (Principle Investigator of COBRA), Dr. Thomas George (Colorectal Chair of NRG's

6  GI Cancer Committee), and Dr. Greg Yothers (Senior Deputy Director & Deputy Group Statistician,

7  also the COBRA statistician), sent a letter to all participating oncologists (including Dr. Hochster),

8  stating that there was "a greater than anticipated number of participants [whose results] may have

9  been 'false positives,' *i.e.*, designated ctDNA+ incorrectly," and that as a result of the "higher-than-

10  expected 'false positive' rate," the trial was declared futile and closed to future accrual.  Dkt. 447-2

11  at 74 (NRG letter).  NRG determined that the continuation of the study constituted a "safety issue"

12  because patients with potential false positives results were receiving unnecessary chemotherapy.

13  Ex. 3.  By the time it was closed, the COBRA trial had enrolled 635 patients (out of a planned

14  1400+), including Dr. Hochster's own patients.  Ex. 25 (Hochster Tr.) at 36:20-21.

15      Natera learned about the closure of the COBRA trial through NRG's public announcement,

16  as did Dr. Hochster and other oncologists.  The COBRA closure generated intense social medial

17  interest (Ex. 4), and a press release from Guardant (Ex. 5).  The data underlying COBRA's interim

18  analysis did not become public until January 2024, at the annual ASCO GI Conference.  Dkt. 447-

19  2 (Hochster Supp.) ¶ 2.

20      Discovery has shown that, since the closure of the COBRA trial in August 2023, early drafts

21  of the abstract that was later presented at ASCO GI circulated among NRG oncologists (who are

22  also COBRA PIs) and **Guardant**, but the final data was strictly embargoed and did not become

23  public until it was presented at ASCO GI in January 2024.  Ex. 6 (NRG-N-000553); Ex. 7

24  (GHI00063468).  Natera's expert, Dr. Hochster, submitted a supplemental report on the data

25  presented at ASCO GI two weeks after it was presented.  Dkt. 447-2 (Hochster Supp.).

26

27      [1]  Numbered exhibits refer to the exhibits attached to the concurrently filed Declaration of Elle

28  X. Wang in Support of Natera's Opposition to Guardant's Motion for Sanctions.

**II.  Unbeknownst to Natera, Guardant Learns of the Endpoint Analysis Results in August 2023, and Scrambles to Excuse its Test Performance Which It Knew Was Plagued by False Positive Results**

In February 2024, after the Court found the COBRA trial relevant to this case, Guardant (successfully) feigned ignorance as to the details of the COBRA trial and asked the Court to delay trial for four months to conduct extensive discovery related to COBRA.  To justify its request, Guardant told the Court that, "[COBRA] is not a published study, and the data that's typically available that would allow [Guardant] to respond, allow [Guardant] to analyze the underlying data, *is not currently available to Guardant*." Ex. 8 (Feb. 22, 2024 Hr'g Tr.) at 5:7-11 (emphasis added).  Guardant's professed ignorance, disagreement, and need for discovery about other aspects of the COBRA trial were not true.  Discovery from Guardant—which Natera needed *three* Court orders to obtain—has shown that not only was Guardant in possession of *all* the underlying data from COBRA all along, Guardant was the source of it.  Discovery also made it clear why Guardant resisted so mightily—Guardant's and NRG's documents confirm that Natera's claims and Dr. Hochster's opinions regarding Reveal's poor performance are true.

As Guardant's corporate representative and Chief Medical Officer, Craig Eagle, admitted, Guardant was NRG's "diagnostic partner" for COBRA.  Ex. 9 (July 11, 2024 Eagle Tr.) at 63:12-19.  This was not Guardant's only involvement.  Guardant was intimately involved in the COBRA trial and had inside information not available to the public.  Guardant had biweekly meetings with NRG during the COBRA trial. Ex. 10 (NRG-N-001369) at 1370.  Documents produced by Guardant in response to Natera's RFPs (only after Judge Kim granted Natera's motion to compel, Dkts. 527, 537) show Guardant was made aware of the endpoint analysis results well before they became public.  Ex. 11 (GHI00063336).  After seeing the results, Guardant pointed fingers and rushed to blame the COBRA study design, while admitting, confidentially to NRG, ███████████████ ████████████████████████████████████████████████████).[2]  *Id.*

───────────────

[2] This admission, which Natera learned about only because the Court ordered Guardant to produce COBRA documents, Dkts. 527, 537, confirms what Natera has always claimed—████████ ██████████████████████████  Guardant alleges that Natera's White Paper is "literally false" for stating "Signatera significantly reduces the false-positive rates by filtering out

Relatedly, documents produced by NRG show that its investigators felt misled by Guardant about the performance of its test, and that they suggested switching COBRA to Natera's Signatera test.[3]

Guardant's documents further show that *Guardant*, not COBRA PIs or NRG, generated and provided data to the COBRA PIs for the endpoint analysis. Ex. 11 (GHI00063336). On November 2, 2022, Dr. Greg Yothers, the statistician at NRG for the COBRA trial, asked Guardant employees to send him "████████████████" to ████████████████████████████████████ ████████████████." *Id.* at 63348-49. Dr. Thomas George, another COBRA PI and a member of NRG leadership, followed up on January 5, 2023, and again asked Guardant to transfer "██████ ████████████████████████████████████████████████████" *Id.* at 63348. A Guardant employee responded and confirmed that Guardant had "████████████████████████ ████████" *Id.* On February 3, 2023, Guardant updated NRG and informed them that ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████." *Id.* at 63343. On June 21, 2023, Guardant's employee informed NRG leadership that "████████████████████████████████████████ ████████████████████████." *Id.* at 63337.

Dr. Yothers conducted the statistical analysis the next day based Guardant's data. He analyzed the data in several different ways, but no matter how he analyzed the data, the result looked ████████ and ████████████████████" Ex. 12 (NRG-N-000046). In a letter to NCI, Dr. Yothers laid out his analysis and concluded that the result "call[s] for early stopping due to futility." Ex. 2 (GHI00063386).

NRG's disappointment was palpable. In NRG's words, Guardant's test "████████████ ████████████████████████████" Ex. 14 (NRG-N-000091). ████████████████████████ ████████████████████████████████████████████████████████████████████ *Id.*

---

clonal hematopoiesis of indeterminate potential (CHIP)" while "tumor-naïve assays are unable to filter out background biological noise from CHIP." Dkt. 250 (GHs Opp to MSJ) at 18-19 (quoting NATERA_350767). Behind closed doors, however, ████████████████████████████████████████.

[3] NRG's response to Natera's subpoena included numerous communications with Guardant about the COBRA trial that Guardant had withheld when responding to Natera's RFPs.

NRG leadership had the "███████████████████████████████████████"
Ex. 13 (NRG-N-000162).  Feeling misled by Guardant regarding the performance of Reveal, Dr.
Thomas George said in an internal email, ██████████ ████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
██████████████████████████ *Id.* (emphasis added).  Another echoed, ████████████████████
█████████████████████████ *Id.*  NRG leadership had the same concerns Dr. Hochster explained in his
initial expert report (Dkt. 224-8 (Hochster Op.), ¶¶ 24, 40-41): that a false call by Reveal may result
in unwanted health consequences for the patient.  After learning about the false positives in the
interim analysis, one of the COBRA PIs said, ██████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████ Ex. 13 (NRG-N-00162) (emphasis
added).  Others at NRG discussed the possibility of using a different test on existing samples, asking
whether they "███████████████████████████████████████████████████████████████████████
████████ Ex. 14 (NRG-N-000091).  It was clear, though, that COBRA could not continue with
Guardant or Reveal.  Ex. 13 (NRG-N-000162) ████████████████████████████████████████
█████████████████████████████) (emphasis added).

Knowing the interim analysis results were plagued by false positives, Guardant scrambled
to find post hoc excuses, blaming everyone else—from the patient cohort to NRG—for the COBRA
trial's failure. First, Guardant claimed ██████████████████████████████████████████████
████████████████████████. *See* Ex. 16 (NRG-N-001386).  Guardant omits that it knew about
the low prevalence characteristics of this cohort when it bid for COBRA.  Next, Guardant blames
the design of the COBRA trial protocol.  In a letter to NRG, Guardant claims that its "███████
███████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████," and that measuring ctDNA prior



---

[4]  "CTEP" refers to the Cancer Therapy Evaluation Program, part of the National Cancer
Institute.  *See* Ex. 15 (NRG-000069).

1    to the completion of chemotherapy somehow negatively affected Reveal's performance.  Ex. 17

2    (GHI00063358).  Guardant omits that the blood drawing schedule was stated clearly in the COBRA

3    trial protocol, which Guardant had all along but only objected to after Reveal's shortcomings caused

4    the COBRA trial's failure.  Ex. 1 (GHI00063400) at 63415.  Upon reading Guardant's complaints,

5    Dr. Yothers expressed confusion, stating that ███████████████████████████

6    ████████████████████████████████████████████████

7    ███████████████████████████" Ex. 19 (NRG-000939).

8         In an attempt to stay on the trial, Guardant introduced ████████████████

9    ████████████████████████████████████ (i.e.,

10   fewer false positives).  Ex. 11 (GHI00063336).  Using this ████████████████

11   ████████████████████████████████████████████.

12   After investigating, NRG confirmed that ████████████ were ██████████ Ex. 33 (NRG-

13   000087).

14   ███████████████████████████████████████

15   ████████████████████████████████████████

16   ███████████████████████████ Ex. 20 (NRG-N-001299),

17   Ex. 21 (NRG-N-001304), Ex. 22 (GHI00063354).  After a comprehensive review of Guardant's

18   submissions, NCI decided to close COBRA permanently.  Ex. 23 (GHI00063380) █████████

19   ████████████████████████████████████████

20   ████████████████.  Guardant was promptly notified.  *See id.* (NRG providing Guardant a

21   copy of the interim analysis results, updating Guardant of NCI's decision to permanently close the

22   trial for accrual, and offering to have a call with Guardant to discuss).  Even after NCI decided to

23   close the COBRA trial, Guardant provided input on NRG's "Dear Colleague" and "Dear Patient"

24   letters that were sent out on August 30, 2023, and advocated for NRG to adopt Guardant's preferred

25   language.  *See* Ex. 24 (GHI00063364).  Guardant then worked closely with Dr. Van Morris and

26   other COBRA PIs to direct the COBRA abstract and the slide deck presented at ASCO GI in January

27   2024.  *See* Ex. 7 (GHI00063468).

28         Guardant knew all of this in real time, months before Dr. Hochster (and Natera and the rest

of the public) first learned of the COBRA trial's closure in August 2023, or submitted his supplemental report in January 2024. Natera, on the other hand, knew none of this—not the information about the inner workings of the COBRA trial, let alone about Guardant's intimate involvement—until Natera finally obtained discovery over Guardant's constant objections.

### III.   Guardant Fights to Keep the Cobra Trial out of the Case Despite Its Clear Relevance, and Pivots to a Strategy of "Shooting the Messenger"

Aware that the results of the COBRA trial are devastating for both this case and Reveal generally, Guardant continues to try to bury this information. After the Court denied Guardant's motion to exclude Dr. Hochster's supplemental report and allowed discovery about COBRA, Guardant still took the position that Natera was not permitted to take *any* discovery from Guardant, and it took three motions to compel and two hearings before Natera finally received a small number of cherry-picked documents and a 30(b)(6) witness from Guardant. Dkts. 523, 532, 535, 546, 554.

Having failed to exclude the COBRA trial or prevent discovery about it, Guardant has now shifted to attacking Dr. Hochster, and his reputation, on tangential "gotcha" issues. Dr. Hochster has devoted his life to treating cancer patients and advancing the field; he is not a career litigation expert. He is a practicing CRC oncologist with 30 years of experience and is Director of the RWJBarnabas Cancer Center. Dkt. 328 at 7. Dr. Hochster is also a Distinguished Professor of Medicine, the Associate Cancer Center Director for Clinical Research of Rutgers Cancer Institute, and the Director of GI Oncology at Rutgers Cancer Institute. Dkt. 447-2 ¶¶ 10-11; *see also* Ex. 25 (Hochster Tr.) at 32:11-20, 44:8-14, 76:5-14, 79:8-80:13. In connection with his roles at Rutgers, Dr. Hochster has participated in or led many clinical trials, including ones sponsored by the NCI. Dkt. 224-8 (Hochster Op.) ¶¶ 6-9; *see also* Ex. 25 (Hochster Tr.) at 32:11-20. Consistent with his commitment to support NCI-sponsored clinical trials, Dr. Hochster enrolled two of his own patients in the COBRA trial. Dkt. 447-2 (Hochster Supp.) ¶¶ 11-12. Following the first public presentation of the COBRA data in January 2024, Dr. Hochster promptly supplemented his expert report.

### A.   Guardant Subpoenas Dr. Hochster for Documents that Have Nothing to Do with His Opinions

Despite receiving all the documents Dr. Hochster considered for his supplemental report, Guardant subpoenaed him personally, seeking documents unrelated to his opinions. Dkt. 510-1.

1   One of the document requests sought Dr. Hochster's communications with NRG and COBRA PIs.[5]

2          As Dr. Hochster testified in his deposition, when he received the subpoena he did not recall

3   having communications with COBRA PIs or NRG regarding the COBRA trial.   Ex. 25 (Hochster

4   Tr.) at 145:17-22 ("Q. But you knew, for sure, that you had e-mails communications with NRG,

5   with Natera, with some of the principal investigators about COBRA, is that correct? A. **Honestly, I**

6   **did not recall that at the time**."); *id.* at 177:11-23 (Q.  You didn't remember any of these emails?

7   A. Actually, I didn't.  It does seem kind of unbelievable, now that you put it in this context.  But,

8   you know, I think this, at the time, we were all just reacting to the kind of news of the study being

9   closed and . . . just being collegial.").   Accordingly, Dr. Hochster responded to the subpoena by

10  stating, in good faith, that he did not have communications with COBRA Investigators, NRG,

11  Guardant, or Natera concerning COBRA.   Dkt. 510-1 at 12-13.   Guardant memorialized in a

12  subsequent email that "Counsel represented that Dr. Hochster does not recall having any email

13  communications about COBRA or any other topic that is the subject of Guardant's RFPs."  Ex. 26

14  (April 2024 Meet and Confer Emails) at 7.

15          In the same email, Guardant requested that Dr. Hochster conduct an electronic search of his

16  emails using specific search terms such as "NRG" and "COBRA."   *Id.*   Dr. Hochster obliged,

17  revisiting his prior response by searching on his desktop computer, using the search terms Guardant

18  requested, but he did not find any responsive emails.   Ex. 25 (Hochster Tr.) at 140:9-24 ("Q: [Y]ou

19  searched for [communications concerning COBRA with Investigators, the NRG, Natera, Guardant,

20  and other oncologists]? A. Yes.");  *id.* at 144:17-145:10 ("Q: Why don't you tell us the search that

21  you did? A. I used my Outlook, which is our University Outlook, I typed in 'NRG,' 'COBRA' in

22

23          [5] Guardant clearly had very specific documents in mind, perhaps having been informed of or
24  shown them by its contacts among the COBRA PIs.   During the February 21, 2024 hearing,
    Guardant's counsel stated that "[w]e understand that actually Dr. Hochster, for some reason, actually
25  had the abstract and the data at least a month and a half before [ASCO GI], and possibly as early as
    November."  Feb. 21, 2024 Hr'g Tr. at 12:8-13.  Similarly, Guardant also stated elsewhere during
26  meet and confers that it "had reasons to believe" that Dr. Hochster had communications with
    COBRA PIs and NRG.   Ex. 26.  And as soon as Dr. Hochster responded that his search did not
27  return any documents, Guardant knew to go directly to his employer, Rutgers (which had access to
    email at the server level), to ask for the same documents.   At all times, Guardant has known more
28  about COBRA than Dr. Hochster or Natera, and still does.

1   the search boxes and I really did not find those emails that were subsequently produced by Rutgers.

2   Q: You didn't 'really' you said.  You didn't really find them, did you sort of find them? . . . . A. I

3   did not find them, when doing the search . . . . I'm sorry for my less-than-definitive statement.  I did

4   not find them when I searched.").

5          There was nothing suspicious or malicious about the fact that Dr. Hochster did not remember

6   and did not find copies of emails he had sent months earlier.  As Dr. Hochster explained in his

7   deposition, he has limited space in his email cache, and so he deletes emails as a matter of course.

8   Ex. 25 (Hochster Tr.) at 151:2-11 ("Q. Do you remember at any point in time deleting your

9   communications with NRG, Guardant, Natera, or the study investigators, concerning COBRA?  A.

10  I did not specifically delete any communications such that you've enumerated.  But, you know, I

11  have limited memory in our cache.  So, I'm constantly getting messages about how full my memory

12  is getting, so I try to delete things, as I go along.").  Indeed, as Magistrate Judge Kim recognized,

13  Dr. Hochster is "just a practicing doctor.  He doesn't preserve all of his documents for all eternity."

14  Ex. 27 (4/22/2024 Hr'g. Tr.) 11:6-7.[6]

15      **B.      Guardant Promptly Obtains All of the (Irrelevant) Documents It Sought**

16          Following its subpoena to Dr. Hochster, Guardant served a subpoena on Dr. Hochster's

17  employer, Rutgers University, seeking essentially the same documents.  Having access to emails at

18  the server level, Rutgers was able to locate emails that Dr. Hochster did not find when he searched

19  his computer.  Rutgers produced a number of Dr. Hochster's communications with NRG, COBRA

20  PIs, Guardant, and Natera.[7]  Rutgers made its production before Dr. Hochster's deposition.  Ex. 28

---

[6]  Contrary to Magistrate Judge Kim's recognition that Dr. Hochster had no obligation to be subject to a litigation hold, Guardant suggests that Natera is in the wrong for not conducting a "lock down" of his email account for forensic imaging.  Mot. at 12-13.  Guardant made that request for the first time during a deposition, and Natera's counsel told Guardant that the parties "can take that up" after the deposition.  Ex. 25 (Hochster Tr.) at 153:8-11.  Guardant never followed up.

[7]  Guardant implies in a footnote that Natera's counsel was somehow trying to interfere with Rutgers' production.  Mot. at 4, n.4.  Not so.  Rutgers' counsel alerted Natera's counsel that its production contained non-discoverable, work product communications between Natera's counsel and Dr. Hochster regarding his expert work in this case, and so Natera's counsel asked to review

(Rutgers Production Letter).   Guardant used these documents extensively at Dr. Hochster's deposition, and now they form the basis of this motion.  Tellingly, however, *none* of these materials are cited anywhere in Guardant's two rebuttal expert reports (plus one supplemental rebuttal report)—because they are irrelevant to Dr. Hochster's opinions and the issues in this case.

### 1.   Dr. Hochster's Communications with COBRA PIs

Contrary to Guardant's mischaracterization, Dr. Hochster did not have "extensive" email communications about COBRA with the COBRA PIs (Mot. at 4)—he had about ten, all in reaction to COBRA's closure.  Guardant questioned Dr. Hochster about those emails one by one during his deposition.  These emails were sent in August 2023, right after Dr. Hochster received the news that COBRA was permanently closed.  As Dr. Hochster explained, the COBRA PIs and the NRG leadership he emailed were his close friends and colleagues, and the emails he sent were meant to be collegial and to commiserate with them over the COBRA failure.  Dkt. 578-13 (Ex. L) (Dr. Hochster referring to the COBRA failure as a "clusterf@@@");  Ex. 25 (Hochster Tr. 85:2-14) (describing email with Dr. Norman Wolmark);  *id.* at 94:10-96:9 (describing email with Dr. Thomas George);  *id.* at 163:16-165:5 (describing email with COBRA PIs Dr. Patrick Boland and Dr. Van Morris, in which Dr. Hochster told Dr. Morris that he was "sorry to hear about the outcome").  It is true that Dr. Hochster criticized the Reveal assay in his emails in light of the failed COBRA trial, but his comments were consistent with his opinions that Reveal's methylation panel is unreliable and prone to false positives.  Dkt. 224-8 (Hochster Op.) ¶¶ 93-96; Dkt. 447-2 (Hochster Supp.) ¶ 46.

### 2.   The Early Draft of the COBRA Abstract

About two weeks after the closure of the COBRA trial in August 2023, Dr. Boland, who is Dr. Hochster's colleague at Rutgers and one of the principal investigators of the COBRA trial, forwarded Dr. Hochster an early draft of the COBRA abstract.  The abstract was strictly embargoed until its publication at the January 2024 ASCO GI conference, meaning people receiving the abstract

---

the production to screen out such documents.  Dkt. 578-8 (Ex. G).  Natera's counsel did not seek to prevent or otherwise obstruct the production of the remaining material in any way.

1    could not disseminate it.  Dkt. 578-21 (Ex. T); *see also* Ex. 29 (Heitjan Tr.) at 290:15-292:16 ("the

2    investigators are not permitted to disseminate that information at any other medium until . . . the

3    moment when it's released . . . at the meeting").  Accordingly, Dr. Hochster did not, and could not,

4    disclose the abstract to anyone, let alone put it in a supplemental expert report.

5         Aside from the embargo, Dr. Hochster had no way to know or reason to believe the draft

6    abstract contained the final data.  As he explained, the data in an abstract is "frequently subject to

7    revision prior to being submitted in the final form" and "a lot of times data are updated" before the

8    abstract is presented.  Ex. 25 (Hochster Tr.) at 46:9-25.  It was not until ASCO GI in January 2024

9    that Dr. Hochster knew for certain that the data in the abstract matched the final data.  Ex. 25

10   (Hochster Tr.) at 51:9-18 ("Q. Do you know, sitting here today, whether the data that you received,

11   on September 13th, 2023, from Dr Boland, in the draft abstract, are the same as the data in the final

12   abstract that was actually presented in January of 2024?  A. I know because when they presented it,

13   those were the numbers that were presented, and I only knew at that time, when it was presented

14   publicly.").  Without this confirmation, Dr. Hochster could not have prepared a supplemental report

15   based on reliable data.  Had Dr. Hochster prepared a report based on the draft data, Guardant would

16   have undoubtedly filed a *Daubert* challenge on the basis that the data was not final.

17        Of course, Guardant had this same draft abstract, and far more data too, long before Dr.

18   Hochster did.  *See supra* Section II.  Certainly, that abstract was never shared with Natera.

19   Guardant's implication to the contrary is grossly misleading.  Mot. at 7 (first discussing Dr. Hochster

20   receiving the COBRA abstract draft, then quoting Dr. Hochster's unrelated testimony that he "let

21   [Natera] know of this information").[8]

22              3.    Dr. Hochster's Suggestion to Salvage COBRA Data Using Signatera

23        Like many oncologists, including those at NRG, Dr. Hochster was disappointed by Reveal's

24   failure in the COBRA trial.  Not wanting all the effort and resources from COBRA to go to waste,

25   _____

26   [8]  "[T]his information" was merely the public fact that the COBRA trial was closed, not the
     early COBRA abstract or any data therein.  Ex. 25 (Hochster Tr.) 240:11-17 ("Q.  So, you recall
27   that you might have had communications with Quinn Emanuel concerning COBRA at or around
     August 30th, *when the study was closed*?  A I would say it was sometime within the next month.  I'm
28   sure I let them know of this information.").

1  Dr. Hochster suggested to the COBRA PIs and NRG leadership that they should consider running

2  banked specimen on another test. Ex. 25 (Hochster Tr.) at 172:14-20 ("So, I think a reasonable

3  question, in that context, was: Is there any other way to analyze the specimens, if there are additional

4  specimens, because people had put in many hundreds of hours and a lot of resources into opening

5  this study, at 400 hospitals, and accruing a lot of patients, 600 patients."); *id* at 52:21-53:10.  In

6  particular, Dr. Hochster suggested using Signatera to re-run the banked specimens.  This was a

7  logical choice, not the result of any bias. *Id.* at 173:10-15 ("The Natera test was the test, and still is

8  the test, that NRG is using for the CIRCULATE trial.  So, that seemed like a pretty natural next step

9  if they had samples[.]"); *see also id* at 163:6-10, 192:15-193:23.  Dr. Hochster was not alone in this

10  recommendation or goal.  NRG had the same idea.  Two months ***before*** Dr. Hochster learned about

11  the COBRA trial's closure, Dr. Thom George at NRG suggested a ████████████████████

12  ████████████████████████  Ex. 13 (NRG-N-000162).  Similarly, Dr. Wolmark, the

13  Chairman of NSABP (a branch of NRG) ████████████████████████████████

14  ████████████████████████  Ex. 14 (NRG-N-000091) (emphasis added).

15  Dr. Hochster's proposal was not unusual; it was consensus among concerned oncologists facing the

16  fallout from Reveal's failure and looking for a way to continue to help their enrolled patients.

17                    4.    Dr. Hochster's Email With Natera

18        There was also nothing nefarious with Dr. Hochster's email with Dr. Minetta Liu and Lisa

19  Martin-Roman at Natera.

20        After the closure of the COBRA trial, in an effort to clear the confusions between COBRA

21  (trial number NRG-GI005) and CIRCULATE (trial number NRG-GI008, an ongoing trial using

22  Signatera), Dr. Liu sent a "Dear Colleague" email to many oncologists, including Dr. Hochster, to

23  explain the difference between the two NRG trials.[9]  Eager to salvage COBRA data, Dr. Hochster

24  responded to Dr. Liu's email to suggest the idea of potentially re-running COBRA samples.  Dr.

25  Hochster offered to connect Dr. Liu with NRG leadership, but no meeting was scheduled.  Ex. 32

26  _____

27        [9]  An email from a provider at Kaiser Permanente to NRG shows that there was indeed confusion
      between the two trials.  *See* Ex. 31 (NRG-N-001213) (responding to an email about the COBRA
28  trial but referring to it as "GI008"—the trial number for CIRCULATE).

1   (Hochster email to Dr. Liu).  The email from Lisa Martin-Roman is even less noteworthy.  Ms.

2   Martin-Roman emailed Dr. Hochster regarding patient enrollment for a ***different*** clinical trial.  At

3   the end of the email, Ms. Roman-Martin passingly referenced COBRA's closure and asked for Dr.

4   Hochster's insight.  Dr. Hochster never responded.  Dkt. 578-18 (Ex. Q).

5        Guardant suggests foul play from Natera by supposedly withholding these innocuous emails,

6   but Guardant omits that these emails are only responsive to its subpoena to Dr. Hochster, not to any

7   of the document requests Guardant propounded on Natera.  Dr. Hochster did not find these

8   documents when he did his email search, and Natera did not undertake to search its own files for

9   materials that would not be responsive to Guardant's RFPs—nor were Ms. Liu or Ms. Martin-

10  Roman ESI custodians during discovery anyway.  Nonetheless, Natera collected and produced these

11  documents after it saw them in the Rutgers production.

12  **IV.   Guardant Launches Yet More Attacks on Dr. Hochster, Submitting Two Rebuttal Expert Reports Challenging His Opinions, Filing a *Daubert* Motion Seeking to Exclude Him, and Then Filing This Motion for Sanctions**

13

14       Just as it concealed its knowledge about the COBRA trial from the Court, Guardant tried to

15  conceal its two rebuttal experts, Dr. Heitjan and Dr. Parikh, from Natera.  Guardant did not disclose

16  Dr. Heitjan as a rebuttal expert until June 28, when it served his rebuttal report—*which had been*

17  *completed and signed more than two weeks earlier*.  Dkt. 568-7 (Heitjan Reb.) at 27 (signature

18  page).  As for Dr. Parikh. Guardant engaged her as an expert in ***May***, but did not disclose her to

19  Natera until July.  Ex. 30 (July 9, 2024 Parikh Tr.) at 104:2-6.  In the interim, Guardant exchanged

20  deposition designations misrepresenting that she was merely ***a third-party fact witness***.  Dkt. 563

21  (designating Dr. Parikh's prior deposition testimony).  After belatedly disclosing its experts,

22  Guardant tried to prevent Natera from timely deposing them, requiring yet another Court order to

23  make them available.  Dkt. 573 at 2-3.

24       Tellingly, ***none*** of Dr. Hochster's documents (or deposition testimony about those

25  documents) that Guardant cites in its Motion were cited or even considered by Guardant's rebuttal

26  experts.

27                              **LEGAL STANDARD**

28       Guardant moves for sanctions under the Court's inherent authority to order sanctions.

-15-                                          Case No. 3:21-cv-04062

NATERA'S OPPOSITION TO MOTION TO FOR EVIDENTIARY AND MONETARY SANCTIONS

"[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44. "When acting under its inherent authority to impose a sanction, as opposed to applying a rule or statute, a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1090 (9th Cir. 2021). "[E]xclusion sanctions are harsh remedies that 'should be imposed only in rare situations.'" *Edwards v. Lattimer*, 2020 WL 13533315, at *4 (D. Nev. Feb. 11, 2020) (citing *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)).

## ARGUMENT

### I.   GUARDANT IS NOT ENTITLED TO SANCTIONS

#### A.   Guardant's Reliance on the Court's Inherent Authority Is Misplaced

Guardant's motion is based on the fact that Dr. Hochster did not produce the documents Guardant expected him to have. Guardant's motion about "missing" or "deleted" emails falls within the ambit of Rule 37(e) of the Federal Rules of Civil Procedure. The reason Guardant seeks to rely on "inherent authority," rather than Rule 37(e), is that Guardant knows it cannot meet *any* of the requirements for *any* sanction under Rule 37(e). But Guardant's end-around Rule 37(e) is not permitted. As amended in 2015, FRCP 37(e) exclusively governs the remedies available for spoliation of electronically stored information and "forecloses reliance on inherent authority." *Newberry v. Cnty. of San Bernardino*, 750 F. App'x 534, 537 (9th Cir. 2018) (quoting Fed. R. Civ. P. 37 Advisory Committee Notes to the 2015 Amendment).

Under Rule 37(e), the Court may impose sanctions only if: (1) ESI "should have been preserved in the anticipation or conduct of litigation," (2) ESI "is lost because a party failed to take reasonable steps to preserve it," and (3) the information "cannot be restored or replaced through additional discovery." *Id.* Guardant cannot establish any of these factors; it does not even try. First, Dr. Hochster was not under any obligation to preserve documents back in August 2023 when these

1    exchanges occurred, as Magistrate Judge Kim recognized.  Ex. 27 (4/22/2024 Hrg. Tr.) at 11:5-7

2    ("THE COURT: Well, to talk to other people, he could have had emails that -- he's just a practicing

3    doctor. He doesn't preserve all of his documents for all eternity.").  Second, no material was "lost"

4    and Dr. Hochster did not fail to take reasonable steps to preserve his emails.  Instead, and to the

5    third element, Guardant was easily able to get these emails from Dr. Hochster's employer at Rutgers.

6    It received them before it deposed Dr. Hochster, and was able to use them freely.  There is no basis

7    for any sanctions under the applicable Rule.

8              **B.       Even Under the Court's Inherent Authority, There Is No Basis for Sanctions**

9              Unable to establish any of the elements for sanctions pursuant to Rule 37(e), Guardant

10   invokes the Court's inherent authority.  But it cannot establish either element of that test either—

11   Natera never violated a Court order, and did not act in bad faith.  Indeed, Guardant does not even

12   argue that Natera violated a Court order, nor does Guardant establish any prejudice.

13                        1.       Guardant Was Not Prejudiced

14             Guardant was not prejudiced by any of the recently-uncovered evidence regarding the

15   COBRA trial, or by Dr. Hochster's inability to remember or find his prior emails.  Having been

16   intimately involved with the COBRA trial—from testing samples and generating data, to providing

17   input to the abstract, presentation, and outbound messages—nothing here surprised Guardant.

18             *First*, Guardant received the communications that it complains Dr. Hochster failed to

19   produce well in advance of his deposition and in advance of any other relevant deadlines.  "Because

20   [ESI] often exists in multiple locations, loss from one source may often be harmless when substitute

21   information can be found elsewhere." Fed. R. Civ. P. 37 advisory comm. Notes; *see generally Laub*

22   *v. Horbaczewski*, 2020 WL 7978227, at *17 (C.D. Cal. Nov. 17, 2020) (where deleted information

23   constitutes ESI, "the Court's *initial focus* is on whether [employee's deleted] text messages were

24   lost and cannot be restored or replaced through, *inter alia*, additional discovery").  That is exactly

25   the case here.  Despite Guardant's complaints, it was able to promptly obtain Dr. Hochster's emails

26   regarding COBRA through its subpoena to Rutgers.  Having to serve a single additional subpoena

27   is not the sort of prejudice that warrants exclusionary sanctions.

28             *Second*, Guardant faced no difficulty using the documents.  It marked virtually every single

one of Dr. Hochster's communications that it now complains about as exhibits at his deposition. *See* Ex. 25 (Hochster Tr.) at 314-15 (exhibits).[10]  Guardant also had those documents in advance of serving its rebuttal expert reports, though declined to use the documents at all in those reports. Where, as here, any prejudice can be (and, in fact, has been) cured, a motion to preclude expert testimony (let alone the entire subject matter of the COBRA trial) must be denied.  *Liberty Ins. Corp. v. Sw. Traders Inc.*, 2013 WL 12139424 (C.D. Cal. Sept. 2, 2013) (denying motion to preclude expert testimony where prejudice can be cured and there was not bad faith or willfulness); *ImprimisRx, LLC v. OSRX, Inc.*, 2023 WL 8604148 (S.D. Cal. Dec. 12, 2023) (denying motion to exclude witnesses where plaintiff did not act in bad faith in disclosing them).

*Third*, nothing about these documents impacted Guardant's ability to respond substantively to Dr. Hochster's opinions.  Guardant repeatedly asserted to the Court and Natera that the information it sought from Dr. Hochster was necessary to respond to his opinions. Ex. 8 (2/22/2024 Hr'g Tr.) at 6:20-7:9; Ex. 34 (April 30, 2024 A. Hanson Email).  But even after receiving the documents, Guardant's rebuttal experts did not cite (or even consider) a single one of those documents in their reports.  Dkt. 568-7 (Heitjan Rebuttal Report); Dkt. 576-2 (Parikh Report).

*Finally*, as discussed above, Guardant was clearly aware of the documents it was seeking from Dr. Hochster.  But rather than asking for the specific documents it knew existed, it played games that were clearly orchestrated to set up the "gotcha" that animates this motion.  During multiple meet and confers and hearings, Guardant represented that it "had reason to believe" that Dr. Hochster had communications with certain COBRA PIs and NRG leadership, and Guardant even described the contents of those communications. Ex. 26 (April 2024 meet and confer emails) at 2.  Guardant clearly had no trouble planning its strategy around these communications.

---

[10]   Guardant also alleges that Dr. Aleshin's testimony was inconsistent with documents.  Mot. at 15.  That is inaccurate.  Dr. Aleshin accurately testified that Natera never "asked somebody who is not affiliated with NRG to communicate with NRG about the COBRA study."  Dkt. 578-11 (Ex. J Aleshin Tr.) at 61:14-62:10.  The documents show that Dr. Hochster referenced Natera to the COBRA PI, but not at Natera's request.  It was a suggestion purely by Dr. Hochster in an attempt to salvage specimens from the COBRA trial. Ex. 25 (Hochster Tr.) at 52:15-53:10.  And in any event, Dr. Aleshin was a 30(b)(1) witness, not a 30(b)(6), and he was not involved in or aware of any of Dr. Hochster's communications about COBRA.

1

2.      There Was No Bad Faith

2          For sanctions under the Court's inherent authority, there must be "a specific finding of bad

3 faith, or conduct tantamount to bad faith." *Nguyen v. Biter*, 2015 WL 366932, at *6 (E.D. Cal. Jan.

4 27, 2015).  Guardant bears the burden of establishing that sanctions are warranted, and needs "clear

5 and convincing evidence" to do so.  *See Galderma Lab'ys, L.P. v. Tisckos*, 2023 WL 3402156, at

6 *2 (C.D. Cal. Mar. 31, 2023) (stating that "[i]t is the moving party's burden to demonstrate that the

7 party against whom it seeks sanctions acted with the requisite bad faith or improper purpose" and

8 finding that plaintiff failed to carry its burden to show that defendant's conduct reached "the 'high

9 threshold' justifying a bad faith finding"); *Swisher Hygiene Franchise Corp. v. Clawson*, 2023 WL

10 2734449, at *8 (D. Ariz. Mar. 31, 2023) ("Although the Ninth Circuit has not addressed the burden

11 of proof required for a sanctions award under the court's inherent authority, it has affirmed a district

12 court's bad faith finding supported by clear and convincing evidence.").  Guardant cannot meet this

13 high bar, for several reasons.

14         *First*, Guardant is not correct (Mot. at 12) that Natera misrepresented when and how Dr.

15 Hochster first learned of COBRA 's results.  As Dr. Hochster testified during his deposition, he only

16 received an early draft abstract that was under strict embargo and could not (and did not) disclose it

17 to anyone, including anyone at Natera. Ex. 25 (Hochster Tr.) at 21:13-24:4; Ex. 6 (NRG-N-000553).

18 Further, the data in the draft was not final and could have changed before the final presentation at

19 the ASCO GI.  Dr. Hochster explained that he "[does not] usually pay much attention to the actual

20 data" in the draft abstracts "because they're frequently subject to revision prior to being submitted

21 in the final form."  Ex. 25 (Hochster Dep. Tr. at 46:9-25; *see also* Ex. 35 (Aug. 2023 email form

22 Morris to Hochster) (lead author of the COBRA abstract confirming that "ASCO GI" in January

23 2024 "will be the formal data sharing" for the COBRA trial).  Dr. Hochster only confirmed that the

24 data contained in the draft was final at the ASCO GI in January 2024, when the data was publicly

25 presented, at which point he used it to prepare his supplemental report. *See supra*.  Certainly, Natera

26 and its counsel did not know Dr. Hochster received a draft, until receiving Rutgers' document

27 production in response to Guardant's subpoena.

28

The statements by Natera's counsel at the relevant hearings—which Guardant mischaracterizes with limited quotes out of context—are perfectly consistent with that, and absolutely were not made in bad faith. *See, e.g.*, Ex. 8 (2/22/2024 Hr'g Tr.) at 14:23-15:3 ("I also would like to note that there was an accusation that Dr. Hochster somehow had inside information. The abstract was available before the conference.  The conference was in January, January 16[th] I believe.  But there was an abstract available before the conference.  So I'm certainly not aware of any sort of early access that Dr. Hochster may have had."); Ex. 36 (2/26/2024 Hr'g Tr.) at 66:15-19 ("In fact, Mr. Perloff seems to have indicated some inside information about alleged pressure on principal investigators and their reasons for the termination.  That's information I don't have and Natera doesn't have, but apparently Mr. Perloff and Guardant do.").[11]   Indeed, Guardant's statements at these hearings reflect that, unlike Natera, it had extensive information about COBRA and associated communications, even without any discovery.

*Second*, Natera never represented to the Court that Dr. Hochster did not know about COBRA results until January 2024.  Instead, Natera simply stated, accurately, that he prepared, and Natera submitted, his supplemental report as soon as the data was publicly available in January 2024.  Dkt. 452 at 8, 11..  Here too, it is absurd for Guardant to claim it was somehow blindsided by this report or this data.  While Natera did not know about the final COBRA data until January 2024, Guardant knew about it since at least August 2023, if not earlier.  Ex. 11 (GHI00063336).  Guardant not only received a copy of the COBRA abstract as soon as it was created by Dr. Morris (Ex. 23 (GHI00063380)), Guardant also provided input and made edits to it (Ex. 7 (GHI00063468)).  Yet Guardant definitively represented to the Court without any reservation that COBRA "is not a published study, and the data that's typically available that would allow [Guardant] to respond,

---

[11]  Guardant's reliance on the out-of-circuit authority in *Xped LLC v. Entities Listed on Exhibit 1*, 690 F. Supp. 3d 831 (N.D. Ill. 2023) to argue that the statements of counsel may be imputed to Natera is misplaced.  In that case, a district court in Illinois found the attorney made intentional and material misstatements where he represented that his client's headquarters were located at his own law firm, and did so in order to influence the Court's issuance of a temporary restraining order.  *Id.* at 853.  That case has no connection to this case, where counsel made truthful representations based on the information known to them at the time.

1   allow [Guardant] to analyze the underlying data, *is not currently available to Guardant*."   Ex. 8

2   (2/22/2024 Hr'g Tr.) at 5:7-11.

3       *Third*, Guardant's argument (Mot. at 14) that Dr. Hochster's report is based on "hearsay"

4   and reflects only "personal opinions" is false, and irrelevant to any analysis of exclusionary

5   sanctions.  Guardant already made that argument when it previously moved to strike Dr. Hochster's

6   supplemental report, and the Court rightly rejected it.  Dkt. 328 at 17-21.  Guardant has nonetheless

7   reasserted this argument in a newly-filed *Daubert* motion to exclude Dr. Hochster's report, to which

8   Natera has not yet responded.  Dkt. 568 at 9-17.  That attack fails again for the same reason it failed

9   before, but in any event, it is irrelevant to Guardant's request for sanctions.

10      *Fourth*, Guardant complains (Mot. at 15) that Rutgers' production was insufficient, but

11  Guardant is the one that prepared the requests in the subpoena and thus identified the proper scope

12  of discovery.[12]  Guardant did so while already knowing what documents related to Dr. Hochster

13  existed and that it wanted.  Ex. 26 (April 2024 meet and confer emails) at 2.  That Guardant has now

14  apparently decided it should have asked for a broader timeframe for responsive documents is not a

15  problem of Natera's making, and not one that Natera (or Dr. Hochster) could ever cure.  Moreover,

16  Guardant's conduct on this issue shows that any additional documents from Rutgers are irrelevant,

17  and serve no purpose except to create fodder for this sanctions motion.  Guardant raised this point

18  at Dr. Hochster's deposition four weeks ago, and said it would follow up.  Ex. 25 (Hochster Tr.) at

19  152:16-153:11.  It never did.

20      *Finally*, counsel's statements regarding Dr. Hochster's searches were consistent with what

21  occurred and not made in bad faith.  Guardant places undue emphasis  (Mot. at 10-11) on a single

22  turn of phrase from Dr. Hochster's portion of a letter brief on Guardant's motion to compel, which

23  states that Dr. Hochster searched "again" after Guardant provided search terms.  Guardant is

24  confusing that passing phrase, which in any case is of no moment.  Dr. Hochster did not state that

25  he performed two separate electronic email searches.  In the first instance, upon receiving the

---

[12]  If Guardant believes Rutgers' discovery responses are incomplete, it should move to compel Rutgers, not move to sanction Natera.

subpoena, Dr. Hochster reviewed the requests to consider whether he could remember having any communications with COBRA PIs or NRG; he did not remember any such communications.  Based on Dr. Hochster's recollection at that time, he responded to the subpoena stating he did not have responsive communications with COBRA Investigators, NRG, Guardant, or Natera concerning COBRA.  Ex. 26 (meet and confer emails).  Next, upon Guardant's request during meet and confer, Dr. Hochster went back again, this time to search his email account on his computer using the specific search terms Guardant asked for, and still found nothing.  Ex. 25 (Hochster Tr.) at 140:9-24 ("Q: [Y]ou searched for [communications concerning COBRA with Investigators, the NRG, Natera, Guardant, and other oncologists]? A. Yes."); *id.* at 144:17-145:10 ("Q: Why don't you tell us the search that you did? A. I used my Outlook, which is our University Outlook, I typed in 'NRG,' 'COBRA' in the search boxes and I really did not find those emails that were subsequently produced by Rutgers. Q: You didn't 'really' you said.  You didn't really find them, did you sort of find them? . . . . A. I did not find them, when doing the search . . . . I'm sorry for my less-than-definitive statement.  I did not find them when I searched.").  Counsel apologizes if its choice of words was unclear, but imprecision is not bad faith.  *See Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001) (a "district court may not sanction mere 'inadvertent' conduct," "oversight or ordinary negligence"); *see also Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1342 (9th Cir. 1985); *Winns v. DeJoy*, 2022 WL 2674202, at *1 (N.D. Cal. June 22, 2022).  Regardless, it does not matter: when Dr. Hochster used the electronic search function with Guardant's requested keywords, it did not return any emails.  Instead, Guardant got them from Rutgers, which was able to search Dr. Hochster's emails at the server level.

None of Guardant's various attacks constitutes clear and convincing evidence of bad faith.

## II.    GUARDANT'S CITED LEGAL AUTHORITY DOES NOT SUPPORT THE EXTREME SANCTIONS IT SEEKS (OR ANY SANCTIONS)

Guardant's reliance on cases providing for the exclusion of evidence does not support Guardant's request to exclude Dr. Hochster, his expert reports, and any other evidence regarding the COBRA trial (which would include evidence from Guardant's own experts, its own 30(b)(6) witness, and third parties).  In *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d

363, 369 (9th Cir. 1992), cited by Guardant (Mot. at 14), the court upheld the exclusion of evidence where "the destruction of evidence was not in dispute" and that destruction "rendered unreliable virtually all of the evidence that a finder of fact could potentially consider." *Id.* at 369.  Here, there was no destruction of evidence.  Indeed, the documents that Guardant complains Dr. Hochster did not produce were promptly produced by his employer, and may have already been in Guardant's possession.  *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406 (9th Cir. 1990), cited by Guardant (Mot. at 14), confirms that the slight delay in Guardant obtaining documents from Rutgers, rather than Dr. Hochster, does not amount to prejudice.  There, the court found that "[d]elay alone has been held to be insufficient prejudice." *Id.* at 1412.  Instead, prejudice in *Adriana* was the result of a failure to appear for scheduled depositions and continued refusal to comply with court-ordered production of documents.  *Id.*  Nothing of the sort happened here.  And in *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1014 (9th Cir. 2007), cited Mot. at 14, the court excluded documentary evidence that had been knowingly withheld.  Here, Guardant admits it has now obtained the evidence it sought, and it obtained it before Dr. Hochster's deposition, enabling Guardant to fully explore it with Dr. Hochster at his deposition.  And nobody "withheld" anything.  Dr. Hochster did not remember and did not find the documents in a search, because he deleted them in the normal course when he was under no duty to preserve.  That is not sanctionable.

Guardant's reliance on *Samsung Elecs. Co. v. Nvidia Corp.*, 314 F.R.D. 190 (E.D. Va. 2016), only highlights the inappropriateness of the sanctions it requests here.  In that case, an expert did not disclose material he relied on as part of his expert report, a fact that did not become known until his cross-examination *at trial*.  *Id.* at 196.  The court emphasized, however, that even at that late date, the nondisclosure alone did not warrant corrective action.  Instead, a court only acts "if the failure to disclose was not (1) substantially justified and (2) harmless." *Id.* at 197.  For the reasons discussed above, Guardant has not, and cannot, make that showing.  Even if it could, however, the *Nvidia* court explained the appropriate "cure" was to declare a mistrial and allow the parties to "return to the courtroom in a few weeks, when NVIDIA has been afforded sufficient time to analyze, depose, and supplement." *Id.* at 202-03.  The court explicitly rejected the request that the expert be excluded from testifying, as too severe a sanction under the circumstances. *Id.* at 203.  Here,

1    Guardant proposes an even more severe sanction—the exclusion of an entire subject matter,

2    determined to be relevant by this Court after full briefing and oral argument.  This is particularly

3    outrageous given that Guardant had the opportunity to analyze Dr. Hochster's documents before it

4    even deposed him.

5            The conduct in *Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233 (9th Cir. 2016), was

6    also far more egregious than any alleged conduct here.  In *Haeger*, over the course of *years* and

7    "throughout numerous discovery dispute filings and hearings, [the defendants] convinced the district

8    court that Goodyear had produced all test data relevant to the Haegers' claims."  *Id.* at 1245.  Unlike

9    here, defendants' attorneys were aware of relevant evidence for months and knowingly chose not to

10   supplement their responses or produce the relevant information.  *Id.* at 1239-40.  Instead, it was only

11   revealed in a public article, years after discovery had ended and after the case had settled, that certain

12   testing information was available during the time of the case but never produced in discovery.  *Id.*

13   at 1240.  It was only then that plaintiffs sought sanctions and the court found that defendants acted

14   in bad faith because they continuously refused to produce clearly relevant information and made

15   knowingly false representations to the court that all information was produced.  *Id.* at 1244-46.

16   Again, this bears no relationship to the circumstances here.

17           Nor are monetary sanctions appropriate here.  Guardant has made no showing that Natera

18   was acting in bad faith, as is required to support an award of monetary fees.  *See Fallbrook Hosp.*

19   *Corp. v. Cal. Nurses Assoc./Nat'l Nurses Org. Comm.*, 2014 WL 4385465, *4-5 (S.D. Cal. Sept. 4,

20   2014) (relied on by Guardant at 9) (***denying*** defendant's motion for attorney's fees brought pursuant

21   to the court's inherent sanctioning authority because defendant has not made a showing of "bad

22   faith" on the part of the Plaintiff); *Complete Ent. Res. LLC v. Live Nation Ent., Inc.*, 2017 WL

23   11631963, *6-7 (C.D. Cal. Oct. 18, 2017) (***declining*** to impose monetary sanctions under inherent

24   power because Plaintiffs failed to show conduct tantamount to bad faith).  Nor are the events for

25   which Guardant requests fees "but for" the purported misconduct.  For example, Guardant would

26   have prepared for and taken Dr. Hochster's deposition regardless and, in fact, did so with the benefit

27   of the discovery for which it now claims entitlement to fees.  Nor can Guardant seek fees incurred

28   in connection with the present motion, which it filed in a blatant attempt to exclude highly relevant

evidence because it is not favorable to Guardant, not because of any actual prejudice suffered by Guardant, as there was none.

Guardant has tried to bury the significance of the COBRA trial for months.  This motion is the latest effort in that string of attempts to hide the truth.  But as the Court has found, COBRA is relevant.  Discovery obtained over Guardant's fervent objections further confirms its relevance. Guardant's repeated attempts to exclude this highly relevant evidence have been rejected each time before and must be rejected now.

## CONCLUSION

For the foregoing reasons, Natera respectfully asks the Court to deny Guardant's Motion for Evidentiary and Monetary Sanctions.


DATED:  July 19, 2024                          QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                               By /s/ Andrew J. Bramhall
                                                 Andrew J. Bramhall
                                                 Attorneys for NATERA, INC., a Delaware
                                                 corporation, Defendant and Counterclaim Plaintiff