Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen

GUARDANT HEALTH, INC.,        )
                              )
          Plaintiff,          )
                              )
   VS.                        )   NO. 3:21-cv-4062 EMC
                              )
NATERA, INC.,                 )
                              )
          Defendant.          )
_____)

San Francisco, California
Friday, July 26, 2024


**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**


**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:
              ALLEN OVERY SHEARMAN STERLING US LLP
              300 West 6th Street, 22nd Floor
              Austin, TX 78701
         BY:  SAUL H. PERLOFF
              ATTORNEY AT LAW

              ALLEN OVERY SHEARMAN STERLING US LLP
              599 Lexington Avenue
              New York, NY 10022
         BY:  CHRISTOPHER LLOYD LaVIGNE
              ATTORNEY AT LAW

              KELLER/ANDERLE LLP
              18300 Von Karman Ave., Ste. 930
              Irvine, CA 92612
         BY:  CHASE A. SCOLNICK
              ATTORNEY AT LAW


REPORTED REMOTELY BY:  Rhonda L. Aquilina, RMR, CRR, CRC
                       CSR No. 9956, Official U.S. Reporter

**UNITED STATES COURT REPORTERS**

**APPEARANCES CONT'D.**

For Defendant:

                QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                555 Twin Dolphin Dr. - 5th Floor
                Redwood Shores, California  94065
      BY:  **VICTORIA MAROULIS**
           **BRIAN C. CANNON**
           **ANDREW BRAMHALL**
           **KEVIN JOHNSON**
           **ATTORNEYS AT LAW**

                QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
                865 S. Figueroa Street, 10th Floor
                Los Angeles, CA 90017
      BY:  **RYAN SADLER LANDES**
           **ATTORNEY AT LAW**

                QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                50 California Street - 22nd Floor
                San Francisco, California  94111
      BY:  **ELLE WANG**
           **ATTORNEY AT LAW**

PROCEEDINGS

1    <u>Friday - July 26, 2024</u>                          <u>3:04 p.m.</u>

2                      P R O C E E D I N G S

3                          ---o0o---

4        **THE CLERK:**  These proceedings are being recorded by

5    this Court.  Any other recording of this proceeding either by

6    audio, video, including screen shots or any other copying of

7    the hearing is strictly prohibited.

8        This Court is now in session.  The Honorable Edward M.

9    Chen presiding.

10       The Court is calling the case Guardant Health, Inc. versus

11   Natera, Inc., case number 21-4062.

12       Counsel, please state your appearance for the record

13   beginning with the plaintiff.

14       **MR. PERLOFF:**  Good afternoon -- go ahead, Chase.

15       **MR. SCOLNICK:**  Good afternoon, Your Honor.  Chase

16   Scolnick of Keller/Anderle on behalf of Guardant Health.

17       **THE COURT:**  All right.  Good afternoon.

18       **MR. PERLOFF:**  Good afternoon.  Saul Perloff with A & O

19   Shearman on behalf of Guardant Health.  And with me today is

20   Chris LaVigne.

21       **THE COURT:**  All right.  Thank you, Mr. Perloff.

22       I can't hear you, Mr. Johnson, for some reason.

23       **MS. MAROULIS:**  Good afternoon, Your Honor.  Looks like

24   Mr. Johnson is having some mic troubles.

25       I'm Victoria Maroulis, counsel for Natera.  I'm here with

PROCEEDINGS

```
 1   Kevin Johnson, Andrew Bramhall, Brian Cannon, Ryan Landes, and
 2   Elle Wang.
 3              THE COURT:  All right.  Good afternoon, everyone.
 4        All right.  So I guess I'd like, after all the briefing
 5   and everything else, I'd like a simple explanation from
 6   Natera's counsel as to how is it that in response to document
 7   requests we get -- and I believe it's dozens, I think it's
 8   represented to be like 70-something documents evidencing
 9   correspondence between Doc Hochster and people at, I'll just
10   say COBRA, and when that same document request was propounded
11   upon Natera, they came up with nothing.  How could that be?
12   What's the simple explanation?
13              MR. LANDES:  Your Honor, this is Ryan Landes on behalf
14   of Natera.
15        So the simple explanation, Your Honor, Dr. Hochster
16   testified to this in his deposition, is that he did not
17   remember having these emails.
18              THE COURT:  Okay.  Let's stop right there.
19              MR. LANDES:  Sure.
20              THE COURT:  Honestly, you think that's credible?
21   After all this exchange, something of this import, his depth of
22   involvement, including suggesting a substitution of his
23   company's product in the study, and his critique and his
24   questions and his closeness, his colleagues running that, that
25   he had no memory, and he's a retained expert in this case; you
```

1  honestly believe that?

2          **MR. LANDES:**  I do, Your Honor.

3          **THE COURT:**  Well, you're a fool.

4      Okay.  What's your other explanation that he didn't

5  remember?

6      So even if he didn't remember, you have a duty to search,

7  and you as counsel have a duty to instruct your client to do a

8  search and not rely on memory.  What happened?

9          **MR. LANDES:**  He did a search, Your Honor.  And,

10  again --

11          **THE COURT:**  How many times?

12          **MR. LANDES:**  He did an ESI search on his computer

13  once.

14          **THE COURT:**  A singular search, correct?

15          **MR. LANDES:**  Yes, Your Honor.

16          **THE COURT:**  Not again, not multiple, a singular

17  search.

18          **MR. LANDES:**  So, Your Honor, what he did when he

19  received the subpoena, we spoke with him numerous times to ask

20  whether he remembered having communications with NRG, with the

21  principal investigators or with Natera.  He said he did not

22  recall any such communications.  We answered that in a

23  subpoena.

24      Following meet and confer, Guardant's counsel asked us to

25  run a search on his email docs with particular search terms.

PROCEEDINGS

1    We went back and we did that.  He searched his computer for

2    those emails.  They did not come up.

3        As he explained in his deposition, he deletes his emails

4    on an ongoing basis.  As Magistrate Judge Kim recognized at the

5    hearing, this is not someone who is a -- someone who preserves

6    all of his documents for eternity.  He did not have them.

7            THE COURT:  So you believe that he ran the search but

8    all responsive documents had been deleted?

9            MR. LANDES:  Yes, Your Honor.

10            THE COURT:  And have you asked him to run or have you

11    sent a forensic expert to go back and look to see whether in

12    fact that is the case?

13            MR. LANDES:  We have not sent a forensic expert to see

14    whether the emails were deleted, because they were retrieved

15    from Rutgers.  The emails are available.

16            THE COURT:  Well, that's not the question.  You don't

17    get out of discovery just because the propounding party also

18    happened to get some documents from a third party.  It may be

19    relevant to state of mind and other reasons.  It doesn't

20    absolve the responder, especially when they're a party in the

21    case, to say:  Oh, you already got the documents.

22        In fact, you have to respond even if you know that the

23    propounding party has the documents.  Because the fact that you

24    may have certain documents, even though the other side has it,

25    the fact is that possession may be relevant in some cases.

PROCEEDINGS

1    So why hasn't there been -- is that the only reason why

2    there has not been a followup, is because, well, Rutgers

3    already produced a bunch of documents?

4        **MR. LANDES:**  I think that that's the primary reason,

5    Your Honor.  And if, you know, if there's any need to go back

6    and search his personal computer more extensively, that's

7    something that we could do.

8        **THE COURT:**  What do you know about the deletion

9    policy?  Is there an automatic process that these are on -- are

10   they on a server, are they on a company server or some company

11   server, or is it all on his personal computer?  Does he have a

12   purging -- a periodic purging or something or does he just ad

13   hoc delete things as his computer gets filled?

14       **MR. LANDES:**  It's the latter, Your Honor.  That's what

15   he testified at his deposition, is that his email box has

16   limited space in it, and so he reviews his emails in the

17   morning and typically deletes them as he goes.

18       **THE COURT:**  So --

19       **MR. LANDES:**  And Rutgers -- sorry.  I didn't mean to

20   interrupt, Your Honor.

21       **THE COURT:**  No.  And he intends to delete as he goes,

22   so there's -- if there's -- there's no older emails in his

23   computer that are, say, six months or more or older?

24       **MR. LANDES:**  There may be some, but at least as to

25   these they did not come up when he searched, was his testimony.

PROCEEDINGS

1      **THE COURT:** Well, I find that a little odd, because

2  these are -- if it was one or two emails, but given the number

3  of emails, they appear to be at least in the dozens, it's hard

4  to believe that none of them, each and every one of them would

5  have been -- would have been erased or deleted.

6      **MR. LANDES:** I -- that was his testimony, Your Honor.

7  I understand that you may not find it credible.  I, again, I

8  spoke with him numerous times.  I've seen his deposition

9  testimony, and I believe it to be the case.

10     He is -- he is a practicing oncologist.  He is not a party

11  in this case, and he was going about his practice.

12     And just to be clear, Your Honor, the number of emails

13  were the total number of emails that he had that mentioned

14  COBRA in any way, so it included general distributions or

15  circulars or things like that.  The number of actual emails

16  with, to use your summary word, the COBRA people, I think was

17  on the order of 10 to 15.

18     **THE COURT:** Well, let me ask you, there seems to be

19  some dispute about that.

20     Is that accurate, Mr. Perloff, or whoever on your side is

21  going to respond?

22     **MR. SCOLNICK:** No, Your Honor.  This explanation is at

23  odds with -- in addition to being at odds with common sense, it

24  also contradicts Dr. Hochster's earlier testimony in his first

25  deposition.

PROCEEDINGS

1    In that deposition he seemed to acknowledge that he did

2  preserve the emails, and that the emails outdate his memory,

3  and that he would have to go back in time in his email inbox to

4  see with whom at Guardant and with whom at Natera he

5  communicated with.

6    So this is a new explanation or a new policy somehow that

7  just came up when we requested documents for COBRA.

8    THE COURT:  But what about the representation about

9  the number of documents that would be responsive with the COBRA

10 search?

11   MR. SCOLNICK:  My last count was about 70 documents,

12 Your Honor.  There are a number of emails in there.

13   But, again, I want to reiterate --

14   THE COURT:  Why am I hearing this disparity for

15 something that should not be hard to figure out?  Is it 10 or

16 is it 70?

17   MR. LANDES:  Your Honor, if I could clarify.  There

18 were 70 emails that were produced from Rutgers that hit on

19 search terms.  Not all of them were communications with

20 COBRA -- with NRG or with COBRA PIs.  That was the smaller

21 number that I was referencing.

22   THE COURT:  Okay.

23   MR. SCOLNICK:  Your Honor, I think there was about two

24 dozen emails with Natera, NRG, Dr. Morris and Dr. Boland, who

25 were all involved in the COBRA study.

PROCEEDINGS

1          **MR. PERLOFF:**  That seems about right.

2      And just to clarify, remember what we received from

3   Rutgers were only those emails during a specific time period,

4   and only if they were sent from or received or sent to a

5   specific email address.  So that's all that Rutgers produced to

6   us.

7          **THE COURT:**  And that specific email address is

8   Dr. Hochster's email address?

9          **MR. PERLOFF:**  Yes.  And then we specified recipients

10  and senders also by specific email addresses.

11         **THE COURT:**  And that period of time was limited to

12  some point in 2023?

13         **MR. PERLOFF:**  I believe it would have been either June

14  the 1st or the middle of June of 2023, I believe, through March

15  of 2024.  And that was kind of the problem because, Your Honor,

16  Dr. Hochster stated at his deposition that when he ran that

17  search, he did find COBRA-related documents, and he said they

18  referenced the fact that COBRA was open and running at Rutgers,

19  which by definition would have been earlier, before.  So he

20  somehow had earlier COBRA documents but not COBRA documents

21  during this crucial time period.

22      I apologize, Chase.

23         **THE COURT:**  So there -- so what's missing at this

24  point, from your perspective?

25         **MR. SCOLNICK:**  Well, Your Honor, a number of things

**UNITED STATES COURT REPORTERS**

PROCEEDINGS

 1   are missing.  We only have limited emails between Dr. Hochster

 2   and a small subset of people.  More recipients would be

 3   relevant and necessary, also a greater timeline, a timeline

 4   going back probably beginning of COBRA.

 5        And in addition --

 6        **THE COURT:**  Well, when is that, when you say the

 7   beginning of COBRA?

 8        **MR. SCOLNICK:**  I would say 2017.  We have January 1st,

 9   2017.

10        **THE COURT:**  Well, why -- but when the data started

11   coming in, when was it that the actual data started being

12   accumulated?

13        **MR. SCOLNICK:**  It was -- my understanding is 2023,

14   Your Honor.

15        Is that right, Saul?

16        **MR. PERLOFF:**  It would have been May or June of 2023

17   when they began to do the -- collect the data and run the tests

18   for the interim analysis.

19        **THE COURT:**  Well, why would stuff back from 2017 have

20   any -- why is that likely to bare some information that would

21   be relevant to this case?

22        **MR. SCOLNICK:**  Well, Your Honor, you now see

23   Dr. Hochster's involvement on behalf of Natera working as an

24   agent to manipulate and to influence COBRA, and there's no

25   telling how far back that goes.  But it would certainly be

**PROCEEDINGS**

1   relevant to the trajectory of COBRA, what happened in COBRA,

2   his bias, his honesty or dishonesty, and his interest in the

3   case.

4        **THE COURT:**  Well, let's take the first one, trajectory

5   of COBRA.  What information do you have that, notwithstanding

6   his efforts, that he actually had some influence on the study

7   of the design or the trajectory or the analysis of the

8   information?

9        **MR. SCOLNICK:**  Well, Your Honor, the problem is we

10  don't know what we don't know.

11       **THE COURT:**  Well, what do you have so far?

12       **MR. SCOLNICK:**  What we have so far is Dr. Hochster, at

13  Natera's request, going out and communicating with the primary

14  investigators for COBRA, trying to denigrate Guardant, and

15  trying to influence the trajectory of COBRA, and trying to move

16  the samples over to Signatera for Natera's benefit - all the

17  while not disclosing to anybody at NRG, not disclosing to his

18  colleagues that he was allied with and on the payroll of Natera

19  and working as their --

20       **THE COURT:**  Is there any evidence that the COBRA

21  authors and those that are involved in the study acceded to his

22  requests, recommendations?

23       **MR. SCOLNICK:**  Well, Your Honor, it's circumstantial,

24  but, yes, I think that there is an evidentiary record that we

25  can draw conclusions from, that they were engaging with him,

PROCEEDINGS

1    and they --

2        THE COURT:  What's an example of something where the

3    trajectory was altered?

4        MR. SCOLNICK:  Well, you have them -- you have them

5    responding to Dr. Hochster, saying yes, we're interested in

6    having further conversations, right?  And that's in response to

7    Dr. Hochster reaching out and encouraging them to do a

8    mulligan, and to move the samples back over to Natera and --

9        THE COURT:  That never happened, did it?

10        MR. SCOLNICK:  No.  No.

11        MR. PERLOFF:  Your Honor --I'm sorry.

12        MR. SCOLNICK:  Your Honor, it's possible that without

13    Dr. Hochster's influence, interference, that COBRA would have

14    gone a different way.

15        THE COURT:  What makes you say that?

16        MR. SCOLNICK:  At this point, Your Honor, it's -- we

17    don't have all the information.  Had we had this information

18    early enough in discovery when the Court required it to be

19    turned over, perhaps we could have explored it, perhaps we

20    could have taken additional depositions of people to figure

21    out, to get to the bottom of it.  But this was all information

22    that was turned over to us after the close of discovery, and

23    that's the problem we're in.  We're left speculating here.

24        THE COURT:  Well, what discovery did you have with

25    respect to the COBRA authors?

PROCEEDINGS

1          **MR. SCOLNICK:**  I'm sorry, Your Honor?

2          **THE COURT:**  When we -- when this thing first arose and

3     we debated whether I would continue the trial, give you more

4     time, extend the discovery deadline, Mr. Perloff said, well,

5     we're going to need to contact the COBRA authors and designers

6     and talk with them and get to the bottom, you know, how hard

7     it's going -- we have to go through a couple different

8     channels, blah, blah, blah.  I mean, isn't that the direct way

9     to find out what happened with respect to the trajectory?  I

10    mean, you were given time to do that.

11         **MR. PERLOFF:**  Yes, Your Honor.

12    If I might, Chase, if you don't mind.

13         We reached out to NRG and sent them a subpoena about the

14    same time that we sent the subpoena to Rutgers.  We received

15    the documents just recently, I think perhaps two weeks ago.

16    It's not complete.  What's notably missing from the NRG

17    documents are their communications with Dr. Hochster.  They

18    sent one and only one, even though we know there are multiples.

19    I've written back to them and asked them to go back and to

20    update their production.  We're still waiting on that.

21         I just wanted to mention one thing.  We do know, Your

22    Honor, a couple of things that suggest Dr. Hochster's

23    influence.  If you -- you've seen the emails he sent.  This was

24    not emails from a stranger to a stranger.  He's referring to

25    these people by first name.  He had a relationship because he

1   is a prominent oncologist.

2       The recipients, the people at NRG, don't know he's working

3   for Natera.  But we know, for example, that NRG, the study

4   investigators in Guardant were talking about a path forward

5   even after August when they announced that it was closed.

6       But what we now -- but today, as of today that path

7   forward has not happened, and we're still trying to get to the

8   bottom of it.  We've never been able to -- if we had known his

9   involvement, we could have targeted our searches, including on

10  Natera, to find out more about who was doing what and how it

11  was being influenced.  But as Mr. Scolnick says, we don't know

12  what we don't know, but it wasn't for lack of trying.

13      **THE COURT:**  Well, I'm not saying it was lack of

14  trying.  I'm saying it was lack of evidence.  It seems to be

15  speculative when you say the trajectory of the study.

16      I know you want to -- you'd like to exclude this study,

17  you'd like to undermine this study, it's not a great study for

18  you, but I'm not seeing -- this go to the question of prejudice

19  and what kind of sanctions should be involved, if any.

20      And if -- unless the study itself and the results that

21  were obtained were somehow tainted as a result, and the

22  evidence that you were seeking to get and has not been given to

23  you would demonstrate that taint, then I don't, frankly, see a

24  remedy that leads to the total exclusion of the COBRA study.

25      **MR. PERLOFF:**  Well, we would want and need all of the

**PROCEEDINGS**

 1   documents that we do not have.  And I'll let Chase go into that

 2   more.

 3               **MR. SCOLNICK:**  Your Honor --

 4               **MR. CANNON:**  May I jump in for a moment?

 5               **THE COURT:**  All right.

 6               **MR. CANNON:**  Thanks, Your Honor.

 7        I was part of those discussions with Your Honor and

 8   Mr. Perloff back in February about the scope of discovery and

 9   opening up a little bit more discovery into COBRA.  And I think

10   it's true, Your Honor pointed this out, there have been no

11   subpoenas sent for depositions from investigators like

12   Dr. Morris or Dr. Boland from the Guardant side.  So, you know,

13   that was a little bit on them to substantiate that, I'll just

14   call it speculation, about any influence that Dr. Hochster had.

15        And I have to say, it's not like there was any influence

16   beforehand.  The communications at issue were after the

17   closure.  It was the summer of 2023.  So, I mean, there's

18   speculation on the Guardant side about, hey, there was some

19   influence on the study design.  I believe that's absolutely not

20   true.  I'm not aware of any evidence that Dr. Hochster was

21   involved in study design.  He enrolled patients, his own

22   patients in the study.  But to say he was somehow nefariously

23   twisting the study to favor Natera over Guardant, I think

24   that's pure speculation.

25               **THE COURT:**  So why not produce his whole file?  Why

**PROCEEDINGS**

1   not go through a thorough search of his files so we know one

2   way or the other?  What does it look like in 2018, '19, '20,

3   '21, '22?  Maybe there was no involvement, that it all

4   happened, as you say, once the study was closed and the stuff

5   started, you know, hitting the fan.  I mean, I don't know that.

6       But the problem is now, you know, there's a lack of

7   confidence, an understandable lack of confidence when you

8   respond "Well, there's just no documents."

9           **MR. CANNON:**  I get it, Your Honor.  I understand the

10  concern, and we, you know, we should look at that.

11      Although the other side of the coin is Guardant was very

12  involved in the study.  Guardant was in, you know, pretty

13  regular constant communication with the oncologist at NRG, and

14  we've gotten those documents now from NRG just this past month,

15  as Mr. Perloff said.

16      But I get Your Honor's concern.  That is correct.

17          **THE COURT:**  Go ahead.

18          **MR. BRAMHALL:**  Your Honor, if I may.  This is Andrew

19  Bramhall for Natera.  Just a couple things.

20      I mean, I don't think we're opposed to this additional

21  discovery from the NRG or from Rutgers.  Those subpoenas were

22  drafted and negotiated between Guardant and those third

23  parties.  We weren't involved in that.

24      So we're not -- we didn't set the parameters for those.

25  That's up to them, and we're not opposed to having more

**PROCEEDINGS**

1    information here, because we don't have any reason to believe

2    that Dr. Hochster was anything but a concerned doctor reacting

3    to the news of the closure, and the fact that the study had

4    higher than expected false positives, excuse me, the assay.

5         And, Your Honor, in addition to that, there is evidence in

6    the record that's been produced from Dr. Morris.  This is the

7    lead principal investigator from the NRG on COBRA, where he

8    says to Dr. Hochster he's been one of the best advocates for

9    the study.

10         Dr. Hochster is not biased.  He wants the best for his

11    patients.  He wants this field to move forward.  He is integral

12    in this field.  He is a preeminent oncologist in the GI space.

13    He's involved in this study.  He enrolled his own patients, so

14    he clearly had, you know, stakes in this study.  And he

15    reacted, it's true, very strongly to the closure and the news,

16    but the reality was he was reacting like everybody else, and he

17    was trying to salvage the study, Your Honor.  And the idea that

18    it was his idea first to have these samples run on the Natera

19    assay, Signatera, is wrong.

20         In June of 2023, well before Hochster -- Dr. Hochster made

21    the same recommendation, the NRG PIs, this is Dr. Wolmark and

22    Dr. George -- and this is, Your Honor, 5 -- Exhibit or DI

23    582-15, which is Exhibit 14 to our opposition -- they made the

24    suggestion themselves.  Those two scientists involved in COBRA

25    at the NRG said do we have tumor tissue to do a bespoke assay,

**PROCEEDINGS**

1  either Signatera or another assay by another company?  That's

2  what they were suggesting.  That's the logical idea and a

3  logical extension of, hey, this failed using the Guardant assay

4  because it has too many false positives.  Where can we go?  We

5  can go to an assay that didn't -- shouldn't have and doesn't

6  have the same false positive specificity issues.

7      So that was their idea, and he was having the same idea,

8  because it's the logical one.

9          **MR. PERLOFF:**  Just a small point.

10     This, again, idea that he was merely a concerned doctor,

11 from the NRG production we don't have anybody else, anyone

12 immediately contacting, after the announcement, using foul

13 language, using scatological, you know, poo-poo language like

14 Dr. Hochster was.  He was more than merely a concerned citizen,

15 more than just a concerned doctor.  And the fact of that is

16 clear, because he concealed from everybody that he was talking

17 to, hey, by the way, I'm doing some work for Natera.

18     But, you know, again, we do not know what we do not know,

19 and it was because of it all starts with the very first thing

20 we did was to try to get the documents from Dr. Hochster

21 because they would have guided our subsequent discovery.  And

22 what we got instead of documents was misrepresentation.

23         **THE COURT:**  So if we were looking forward for a

24 moment, and knowing that we still have some time, what do you

25 propose to do - short of a blanket order excluding the COBRA

1    study or excluding Dr. Hochster's testimony about the COBRA

2    study - to get the information you need to, you know, to either

3    prove or not prove your suspicions?  What do you need at this

4    point?

5              MR. SCOLNICK:  Your Honor, I think we'd start with a

6    complete download by a third party of Dr. Hochster's emails,

7    incoming and outgoing, which is what we requested in the first

8    place and we should be entitled to.

9         But I don't think that addresses the problem.  The problem

10   is that Natera and Dr. Hochster have made repeated false

11   statements to the Court, and this isn't a remedy for that.  It

12   can't be that a party gets to make repeated misrepresentations,

13   claim that documents don't exist when they do, claim that

14   documents don't exist when both parties that are represented by

15   the same attorney know those documents exist because they

16   exchanged them.

17        So simply going back and reopening discovery and getting

18   us some limited remedy is not an appropriate sanction.

19   Something far more meaningful is appropriate here, and that's

20   why we're requesting for Dr. Hochster to be excluded and the

21   study itself to be excluded, Your Honor, and I think we're on

22   solid footing here.

23             THE COURT:  Well, that may be.  But if you could show

24   that there was some prejudice along with the misconduct that

25   resulted in that sanction -- and I do have to take into account

**PROCEEDINGS**

1  both the egregiousness of the conduct as well as what it is

2  that can be -- what's curable at this point.

3        **MR. PERLOFF:**  I think Mr. Scolnick is --

4      There, you're back, Chase.

5        **MR. SCOLNICK:**  I apologize for my connection, Your

6  Honor.  I didn't catch that, the last exchange.  I apologize.

7        **THE COURT:**  I said that what I've got to take into

8  account is not only the egregiousness of the noncompliance and

9  one could argue of the less than forthrightness, to put it

10  charitably, with the Court and the counsel, and to everybody

11  else, but also what is the irreparable harm and what's the

12  prejudice here, before you invoke the ultimate sanction or the

13  sanction of exclusion.

14      And that's why I asked for -- one part of the question is

15  in terms of the make wholeness, what do you need?  And

16  basically you need the complete set of documents.  I don't know

17  how complete.  You know, going back to 2017, that doesn't

18  sound, unless there's a basis for going back that far,

19  suggesting that you have some basis to believe that

20  Dr. Hochster was an influencer, and the whole way the study was

21  designed, this was designed in a way to just sort of get the

22  negative results, the unfavorable results, as opposed to sort

23  of reacting as the data came in.  You know, I have a hard time

24  seeing that without some indication that that was in fact the

25  case.

PROCEEDINGS

 1          **MR. PERLOFF:**  Just along those lines, Your Honor --

 2     Just, if I may, Chase.

 3          Dr. Hochster, in his role, remember, is he would have been

 4     reviewing the protocol before Rutgers participated in the

 5     study.  There's every reason to believe -- and, again,

 6     especially given his relationship with these people, that he

 7     may have taken a more active role, shall we say, in reviewing

 8     and commenting on the protocol.  We certainly would want to

 9     find out about that, and it should be relatively simple.

10          **THE COURT:**  By the way, did you depose the PIs of the

11     study?

12          **MR. PERLOFF:**  No.

13          **THE COURT:**  I mean, wouldn't that be a way to -- you'd

14     think -- I mean, yeah, I know you like to have documents in

15     advance, but, I mean, wouldn't that be an initiating question?

16          **MR. PERLOFF:**  Yeah, it may be worthwhile, especially

17     once we get all of the documents from NRG.  Again, I'm a

18     little -- a little concerned that we didn't get some of the

19     documents from NRG.  And they, as the study designer, would

20     probably be in the best position to comment on it, because

21     there are some serious unanswered questions that the

22     Dr. Hochster production has left open for us.

23          **THE COURT:**  And what's the scope of documents now that

24     you've asked and are awaiting from NRG?

25          **MR. PERLOFF:**  We asked for, you know, their

1  communications with various people, including Dr. Hochster and

2  Natera.

3          THE COURT:  Time limit or no time limit?

4          MR. PERLOFF:  Yes, there was a time limit.

5      Again, they were very much playing on the:  We're a public

6  nonprofit entity, so please have mercy on us, and we did.  We

7  worked with them, and I believe it has that same basic time

8  frame of June of 2023 to March of 2024.

9          Their production did include a couple of earlier

10 documents, but I think that was because they were forwarded

11 during the right time period.  So we might want to, on a

12 limited basis, expand that.  But, again, the fact that we're

13 even having to do it I think is itself a large part of the

14 prejudice that Mr. Scolnick is correct to identify.

15         THE COURT:  Well, and that prejudice, there's also the

16 monetary sanctions part, which is no small deal here, because

17 you've been now having to go through work that you may not have

18 had to have undergone had there been a forthright production in

19 the first place, and disclosure.

20         So I'm not saying there's no sanctions, and I'm not saying

21 there could be no other sanctions, but before we get to that I

22 want to know what else, in terms of further deposition work or

23 what else would you want to do.

24         MR. SCOLNICK:  Well, Your Honor, let me express my

25 concern here, that just another production is not going to be

1  sufficient from Dr. Hochster.  Because if he's going to be

2  believed, and there's little reason to believe him at this

3  point, but if he is to be believed, he said that he regularly

4  destroys emails.  Now, we requested during the deposition that

5  Natera ask him to preserve his emails.  They objected to that.

6  So those emails, if he did destroy them, if he was telling the

7  truth, then they're gone.  We can't get those back, and that's

8  irreparable prejudice.

9      But in addition to that --

10     **THE COURT:**  We don't know that.  So one of the things

11 I would order is a full and complete search with forensic help

12 to go through.  Because when he deletes, he's probably not that

13 sophisticated.  His delete may be not be a true delete.  I

14 don't know if there's a write-over or what.

15     **MR. SCOLNICK:**  That's not what he testified to, Your

16 Honor.  He said he double deletes.  My recollection of his

17 testimony is that he double deletes all of his emails.

18     **THE COURT:**  And if he deleted after his deposition,

19 for instance, and this all came to light, then that would raise

20 potential deliberate spoliation claims.

21     So I would like to know what the status of his computer

22 is.  I want a full forensic search:  What was his practice,

23 what's still there, what's not there, when was it deleted, what

24 was deleted.  So you're going to get that, and you're going to

25 get the complete NRG production.

1     What else?

2         **MR. SCOLNICK:**  Well, an additional concern I have,

3     Your Honor, with respect to prejudice is that we didn't have

4     this information when Natera argued this was relevant, when the

5     court agreed with our arguments that this was relevant, the

6     COBRA study inadmissible.

7         For example, we didn't know that when Natera characterized

8     him as a neutral and detached and honest expert, we didn't know

9     that he was secretly and surreptitiously going out and trying

10    to influence the same study that he was relying on, and then

11    lying to the investigators and not disclosing his true

12    financial relationship.  That would be a relevant fact that we

13    would have brought before the Court.  We can't do that now.  We

14    can't undo the last three, four months that have happened.

15        We can't -- we also can't point the Court to

16    Dr. Hochster's emails that have now been produced not by him

17    but by other people, by Rutgers, that show that he had serious

18    concerns with some of Natera's arguments; for example, that

19    there is no clinical data.  And without clinical data you can't

20    determine Reveal's performance.  Without clinical data, you're

21    not able to tell how many false positives or whether there are

22    any false positives.  That would have been a very important

23    fact.  That's at odds with the same arguments that Natera made

24    to introduce this evidence.  That's the same arguments this

25    court found persuasive several months ago.

PROCEEDINGS

1    So this is additional prejudice that's very difficult to

2    undo at this point, Your Honor.

3        In addition, it's not just -- it's not just the production

4    of information that's been delayed.  We based our entire

5    discovery plan on the assumption that Natera and Dr. Hochster

6    were behaving honestly.  It now turns out that's not true.  And

7    we got these documents, as Mr. Perloff said, after the close of

8    discovery.

9        So the ship has sailed with many of these witnesses,

10   especially third parties who we're negotiating more limited

11   sets of discovery with.  It's going to be very difficult to go

12   back to those people now and ask for additional discovery, when

13   our understanding is that that would be far more limited.

14       So at this point we shouldn't be prejudiced.  We shouldn't

15   have less time to prepare for trial.  We shouldn't have any

16   less evidence than we otherwise would because of Natera's

17   dishonesty and Dr. Hochster's dishonest.

18       There should be little doubt that everyone on board knew

19   that those statements were false when Natera represented and

20   Dr. Hochster represented that they had no communications about

21   COBRA.  Natera necessarily knew that that was false, because

22   they were parties to those communications, and they directed

23   Dr. Hochster to go out with the third parties, NRG, and have

24   further communications.

25       So those false statements are material.  They are material

**PROCEEDINGS**

1    to the Court, the Court's decision to admit the evidence.  They

2    are material to Judge Kim's decision to deny our motion to

3    compel discovery.

4        So at this point I think, again, some more meaningful

5    sanction is appropriate.

6            **MR. BRAMHALL:**  Your Honor, if I may.

7            **THE COURT:**  Can you think of thinking between the

8    extremes of no non-monetary sanction, as you would put it as

9    extreme, and on the other hand complete exclusion?

10           **MR. SCOLNICK:**  Well, there's complete exclusion of

11   Hochster on the one hand, and there's complete exclusion of

12   COBRA on the other.

13       A more intermediate sanction, that I don't think would be

14   sufficient, would be I suppose a cautionary instruction,

15   instructing the jury that he provided mis -- false information

16   in his discovery responses, and that they are to consider his

17   testimony with great caution.  That's typical for witnesses

18   that do far less.  But anything less would be to deprive the

19   jury of necessary information to consider his credibility.

20   But, again, I don't think that's sufficient at this point.  You

21   can't unring that bell.

22           **MR. BRAMHALL:**  And, Your Honor, if I may --

23           **THE COURT:**  And if Dr. Hochster's testimony were

24   excluded, that would -- would that essentially mean the

25   exclusion of the report?

**UNITED STATES COURT REPORTERS**

PROCEEDINGS

1          **MR. SCOLNICK:**  Of course it would, Your Honor, it

2     would.

3          And, again, I don't know -- I've never -- I assume I don't

4     have the experience of Your Honor, but I've never heard of a

5     case where a paid expert witness who has already been disclosed

6     and deposed goes out on one party's behalf and tries to

7     interfere with and manipulate and influence a study and is not

8     honest with the people who are running the study, and then that

9     party tries to introduce that study for their own benefit.

10    That's just fundamentally unfair.  That can't be --

11         **THE COURT:**  Well, it would have been fair if it was

12    demonstrated he had an influence on the study.  Then that's

13    creating evidence from manipulating evidence that is then used

14    at trial.

15         If he made an effort and it went nowhere -- and let's say

16    the study was otherwise proved to be well designed.  Are you

17    saying that should be excluded because a representative of one

18    party tried, but unsuccessfully, to influence the study?

19         **MR. SCOLNICK:**  I think it puts us in an impossible

20    position, Your Honor, to try to disprove what kind of -- or to

21    prove what kind of influence that he had, when we weren't

22    involved in those conversations.  We don't know what --

23         **THE COURT:**  You have access to the study.  That's why

24    I gave you that time.  That's why we extended this.

25         I mean, the whole thing, I remember having this

1  discussion, like how long would it take, and you told me you

2  had to get through several layers, and it built in additional

3  time so that you could do that.

4      So to say, well, we had no way of doing it, I mean, the

5  only thing to do is get it from the mouth of Dr. Hochster.  I

6  don't find that particularly persuasive.

7          **MR. PERLOFF:**  Your Honor, we -- without a doubt we at

8  the same time that -- you know, the very, very first thing we

9  did with respect to discovery was send the subpoena, even

10  before the court officially opened discovery to Natera's

11  counsel.  And then we followed that up by negotiating

12  subpoenas, which took far longer than we wanted, with NRG.  We

13  began with NRG.

14      The Hochster -- I mean Rutgers subpoena we only decided

15  when they told this story about how he didn't have any

16  documents, and it just didn't seem plausible to us.  And so

17  then we did that and that took some time.

18      You know, they both say -- both Rutgers and NRG were third

19  parties, were public institutions or non-profits, and it took a

20  long time.  And it wasn't -- we were having regular

21  conversations and making concessions in order to get the

22  documents sooner rather than later, and we still got the

23  documents after the close of discovery, even though, you know,

24  we gave them more than 30 days time to respond.

25      So it hasn't -- and I don't think there's any terrible

1    surprise that the best laid plans, especially with third-party

2    discovery, are difficult.

3         And, again, all of this new need to try to now figure out

4    what we still do not know has been necessitated by the

5    fundamental misrepresentations that they made to this court and

6    to us.

7         **MR. SCOLNICK:**  Sorry to jump in, but I neglected to

8    mention in addition, Your Honor, an intermediate sanction would

9    be an adverse inference instruction as well, but, again, it is

10   our position that that would be still inadequate.

11        **THE COURT:**  What would that adverse inference be in

12   this situation?

13        **MR. SCOLNICK:**  Well, I'd have to think about that.  I

14   think it would be a fair inference that he may have been --

15   that he influenced the scope or trajectory of the COBRA study

16   or the authors' decisions when he reached out on behalf of

17   Natera, lied to them by omission, failed to disclose his

18   relationship with Natera, and the payments he was receiving

19   when he denigrated Guardant and promoted Signatera and tried to

20   persuade them to move the samples over to Natera.  This is just

21   unseemly.

22        **MR. BRAMHALL:**  Your Honor, if I may.  I mean, the

23   allegations are fast and furious here, and it's honestly hard

24   to cover all of them.  But if I could just say a couple things.

25        I mean, Dr. Hochster, as we pointed out, is a preeminent

1    oncologist.  He is a director of GI oncology at Rutgers.  He is

2    a well-respected physician in this space.  He's not -- he

3    doesn't need to stop being a doctor because he's also working

4    as an expert witness on this case.

5              **THE COURT:**  So why didn't he disclose -- I mean, isn't

6    that obvious?  If you're talking to the authors of the study,

7    that you're working for a company that's got a competing

8    product at issue, there's a lawsuit pending, why not disclose?

9              **MR. BRAMHALL:**  It's a good question, Your Honor.  I

10   mean, I think from his perspective the litigation is totally

11   separate.  He's not a consultant or a work -- employee for

12   Natera.  He's a doctor who advocates for patients.

13         In his view, and his opinion has always been that the

14   tumor-naive tests like Reveal have problems with false

15   positives, that was his opinion before we retained him in this

16   case, and he's continued to have it, and the COBRA trial has

17   borne that out.  It's proof positive that he was right --

18             **THE COURT:**  He's talking, and at some point

19   suggesting, you know, substitutions to save the study.

20   Wouldn't you think the ethical thing to do, without having to

21   consult on a whole lot of dictionaries or anything, is to say,

22   by the way, you know, you should know I am being paid by Natera

23   as an expert in their case.

24             **MR. BRAMHALL:**  Your Honor, I think from his

25   perspective he was doing what was right for science, and I

**PROCEEDINGS**

1   don't think it was motivated, his suggestion at all, by the

2   work he's doing.  He's a user of Signatera for his patients.

3   He's also a user of a Guardant test called Guardant 360, that

4   he testified about.  He's not a partisan.  He is a person

5   who -- a physician who picks the best tests for his patients,

6   and he was advocating to move this study to salvage it after it

7   failed, and, Your Honor, exposed patients, who did not

8   necessarily have CRC, to chemotherapy.  Like this was a safety

9   issue as deemed by the NRG and the NCI, and that's why it was

10  shut down.  That had nothing to do with Dr. Hochster.

11      The results that led to the failure and the termination

12  had nothing to do with Dr. Hochster.  He reacted after the fact

13  to try to salvage the study that he had been involved with,

14  totally separate and independent from working on this case as a

15  physician enrolling patients.

16      **THE COURT:**  Was he involved in the early process in

17  the design of the study or do you not know?

18      **MR. BRAMHALL:**  I honestly, Your Honor, I do not know.

19  His institution is involved in the study, and his colleague --

20  he's the boss of Dr. Patrick Boland, as I understand it, the

21  superior, and Dr. Boland is one of the authors on the paper.

22      I've neglected to mention this before.  The email where

23  there's discussion about Dr. Hochster being the best advocate

24  for the study, and this is before the termination, Your Honor,

25  just so you have it, is Exhibit N, docket than entry 578-15,

1   and this is the email where Dr. Morris is responding to

2   Dr. Hochster who is saying, you know, I'm so sorry about what's

3   happened.  Is there anything we can do, and what can we learn

4   from this?

5       He actually -- Dr. Morris actually said:  I would highly

6   value your wisdom and experience once the data are all out

7   there.  He's -- he wants Dr. Hochster's involvement and his

8   wisdom because he's a preeminent person in this field, and he

9   shouldn't --

10      THE COURT:  Shouldn't Dr. Morris know that, by the

11  way, he's on retainer with Natera?

12      MR. BRAMHALL:  Honestly, he might have known, and I

13  don't know if he did, Your Honor, and I'm not going to

14  represent that he did.  I think, sure, in an ideal world should

15  he, every time he interacts with somebody about these two

16  tests, say that he's working for Natera on litigation on issues

17  from 2021?  Perhaps.  But I think his focus is always on the

18  medicine, the science, and the patients, and maybe, you know,

19  not ideally -- not on this litigation and the work that --

20      THE COURT:  Well, it still raises the question how

21  could he say that there are absolutely no documents

22  responsive -- that he forgot that he had communications.  I

23  mean, all the things you're just telling me about the depth of

24  his relationship with Dr. Morris, and everything else, the boss

25  of the PI, and everything else, and his involvement of his

PROCEEDINGS

 1   people, his closeness to the study, how could he say that he

 2   forgot that he had any correspondence with them?

 3         **MR. BRAMHALL:**  And, Your Honor, I don't have a great

 4   explanation for that.

 5         I also believe his testimony.  He's an older gentleman who

 6   is doing a lot of things, seeing a lot of patients, very

 7   involved.  He oversees 15 or so hospitals in New Jersey.  He's

 8   a very busy man.  Litigation consulting and expert witness work

 9   and intersection with the legal world is not something that's

10   foremost in his mind, I think.

11         And I also wanted to address one other point, Your Honor.

12   What discovery has shown from COBRA is that far beyond what

13   Natera ever thought, Guardant was heavily, heavily involved at

14   every stage of the COBRA study.  They had the data early.  They

15   had the abstract early.  They had the presentation early.  They

16   were in constant contact with the PIs.

17         Now, it's very curious why they don't want to depose the

18   PIs now after, in February, telling Your Honor over and over

19   again they need the depositions of the PIs, they need documents

20   from them.  For whatever reason they haven't actually sought

21   that discovery, and they don't seem to be really keen on it

22   today.

23         And we don't know what behind-the-scenes communications

24   have occurred since the time frame that we've gotten discovery

25   into.

PROCEEDINGS

1        And I'd just add -- could I add one other thing, Your

2    Honor just really quick?

3        **THE COURT:**  One other thing, and then I have to ask

4    you a question.

5        **MR. BRAMHALL:**  Okay.  So on the study being relevant

6    to the performance of the test, the other thing that discovery

7    has shown is that the COBRA failure was a direct result, Your

8    Honor, of the performance of the test.  And Guardant itself did

9    its own testing where it compared the test that was used in

10   COBRA and an updated test with better specificity - Your Honor

11   may recall that means less false positives - and it changed

12   multiple results.  In fact, 4 out of the 16 patients in the

13   interim analysis were flipped from positive to negative.

14        The NRG, Dr. Hochster, all sorts of individuals involved

15   in this all concluded those are false positives.  So it's a

16   direct bearing, Your Honor, more than we ever knew when we were

17   seeking the discovery, as to the issues with the test, and the

18   fact that Guardant recognized those issues and in 2023 rolled

19   out a whole new test that they told the NRG about in 2023:  Oh,

20   hey, we fixed the problems with the false positives.  Yeah, we

21   had these problems.  There were these chip mutations.  We were

22   getting false positives, but we fixed it so we should keep the

23   study going.  But they didn't tell the NRG that until they had

24   these poor results, and the NRG had to shut the study down.

25        **MR. PERLOFF:**  That's just a misrepresentation.  I've

 1  got to correct it.  They've been saying that.  It's beyond what

 2  we're talking about here, but they keep -- they keep doing

 3  things like this, Your Honor.

 4          **THE COURT:**  Frankly, it's neither here nor there.

 5          **MR. PERLOFF:**  Okay.

 6          **THE COURT:**  My question is, clearly, there was a duty

 7  to produce documents.  There's also less than complete, I won't

 8  say it was false, but it was certainly -- risk being misleading

 9  to say that this was brand new information, that Dr. Hochster

10  didn't have access, and this is, you know, the extraordinary

11  move to reopen discovery to put this in when in fact he had

12  access to this.

13      Now, I understand the data wasn't final, I understand all

14  that stuff, but that wasn't disclosed to me.  Nobody told me,

15  well, he did have access, but because of the embargo, we can't

16  tell you, but we know he did have early access.  Nor was there

17  any warning early on that, Judge, there's a study coming down

18  the line.  We think it's significant.  And if this study gets

19  released at some point within the next couple months, we may

20  move to reopen.  None of that was disclosed to me.  None of

21  that was disclosed to Judge Kim.

22      And so I'm not going -- I don't have to get into whether

23  that was a falsehood or not, but that was less than forthright

24  and below the standard that I would expect from counsel,

25  because then it caused everybody to scramble.  Certainly I knew

**PROCEEDINGS**

1    nothing, and I know that you will say, well, Guardant knew this

2    was coming down the line, they were involved.  But all this was

3    breached at the 11th hour causing me to disrupt my schedule, my

4    calendar schedule, and having to rule on things on a moment's

5    notice.  And as you can tell, I'm not pleased with that.  You

6    know, that's pretty low-grade lawyering, in my view.

7            In any event, I'm looking forward, and what I want to hear

8    from you, Mr. Bramhall, or one of your team, is a response to

9    the intermediate sanction of something like a cautionary

10   instructions, adverse inference instruction, something short of

11   complete exclusion.  What's your response to that?

12           **MR. BRAMHALL:**  Your Honor, what I would suggest is

13   that, you know, they want the full story, so do we.  I would

14   suggest that we do whatever discovery Your Honor has in mind

15   that they're asking for:  NRG deposition, maybe deposition of

16   the PIs, whatever else they're looking for in terms of filling

17   in the gaps in the production, and then we readdress this.

18   Because I think a lot of this speculative accusations they're

19   making about Dr. Hochster are just going to fall flat once we

20   have the full story.

21           **MR. PERLOFF:**  Your Honor, apropos of that, let's be

22   sure, if you think this is appropriate, because I sure do, that

23   in addition to getting Dr. Hochster's actual production, that

24   as part of that they include Dr. Hochster's communications with

25   counsel during that critical time period when they said they

**PROCEEDINGS**

 1  had no information.

 2      We would also, I think, at a minimum need Natera's -- we

 3  only, I think, received four or five documents from Natera as

 4  part of their COBRA production.  I'd like -- and when we made

 5  those requests we didn't know that they were asking

 6  Dr. Hochster to connect the dots for them.  We'd like that as

 7  well.

 8      **THE COURT:**  What are you asking for, their direction

 9  to Dr. Hochster regarding the COBRA involvement or supervision?

10      **MR. PERLOFF:**  It looks as though there were a few

11  people at Natera that Dr. Hochster was communicating with in

12  respect of COBRA, and we would like their -- I think it's fair

13  to get the production of documents from those people.

14      **THE COURT:**  The requests that have previously been

15  propounded to Natera?

16      **MR. PERLOFF:**  Yes but no.  We agreed, based on Judge

17  Kim's order on our production, to produce documents sufficient

18  to show, and I'm not sure that this would have -- that what

19  we're asking for now would have fallen within that category.

20  In other words, I don't think we would have had reason to say

21  your direction to Dr. Hochster to interfere with this study,

22  right?  That was kind of outside the realm of what we thought

23  was possible.  So we'd like that.  I think that's necessary.

24      And I would suggest, Your Honor -- again, I agree with

25  Mr. Scolnick, naturally, that all of this is putting extra

1  burden on us so close to trial to try to scramble to get the

2  things we should have gotten.  But I would suggest you leave

3  open the final question of whether the terminating sanction is

4  appropriate until we see what more.  At a bear minimum there

5  needs to be a meaningful sanction based on what we already

6  know, and I think it's more than enough to terminate his study

7  and his ability to testify.

8      Go ahead.

9          **MR. SCOLNICK:**  Your Honor, if I could make one more

10  point, too.  If the Court is inclined to reopen discovery in

11  some capacity, I would ask that the court limit that to

12  Guardant being able to take further discovery.  Any depositions

13  will be Guardant's further depositions.  Any further document

14  requests will be our further document requests.  Anything

15  otherwise, allowing Natera at this point to take additional

16  depositions or additional discovery from a party, from an

17  nonparty would be to reward them for their misconduct.

18          **THE COURT:**  I didn't perceive there was a request to

19  open discovery by Natera.  I thought what we were talking about

20  is as a result of this non-disclosure and non-production, that

21  discovery would be extended in order to fix that problem.

22          **MR. SCOLNICK:**  Right.  Okay.

23          **THE COURT:**  That's a one-way problem.

24          **MR. SCOLNICK:**  Understood.

25      Just one more point, Your Honor.  I agree with

1   Mr. Perloff.  And as I said earlier, we think the record is

2   sufficient now for exclusion, for a more elevated sanction, but

3   at this point, at the very least we think that the record is

4   sufficient for a cautionary instruction, an adverse inference

5   instruction.

6       I understand the court's tentative position, if I

7   understood it correctly, that if there is evidence that they

8   actually influenced and changed the trajectory of the COBRA

9   study, then something more elevated would be appropriate.  But

10  just from what we know now, just with the repeated

11  misstatements to the court, to Your Honor, to Judge Kim, to

12  Guardant, and knowing the misrepresentations, not just once or

13  twice, not just a slip of the tongue, but in writing and at

14  argument, that we think that these sanctions are appropriate.

15      And in addition to not disclosing the information to NRG's

16  co-authors, I just wanted to point out, of course we all know

17  and understand and appreciate that integrity of clinical

18  studies depend on the full and transparent disclosure of

19  information, including conflict-of-interest information.  But

20  Dr. Hochster, who apparently is an investigator at some level

21  with the COBRA study, also failed to disclose.

22          **THE COURT:**  Well, wait a minute.  I didn't hear that.

23  Are you saying he was one of the investigators?  I mean, he was

24  close to them, and some of them, you know, he had a

25  relationship.  I didn't hear he was an investigator.

1    **MR. SCOLNICK:**  So, Your Honor, he -- my recollection

2    of his testimony is he does consider himself -- he believes

3    he's an investigator, because he enrolled patients as part of

4    one of the enlisted universities, which is Rutgers.  That's my

5    recollection of his testimony, so he is an author.

6    And we're talking about improper influence on the study.

7    He's not an author.  I'm sorry, I misspoke.  He did enroll

8    patients.  So my understanding is that makes him an

9    investigator, certainly not at the level of Morris, but an

10    investigator.

11    So if we're talking about inappropriate influence, this is

12    someone who failed to disclose, while communicating with

13    Rutgers, his financial relationship, his paid expert work with

14    Natera while he was -- while he was enlisting patients, while

15    he was interacting with all of these people.  He failed to

16    disclose to anyone at Rutgers his involvement, and that is not

17    only a violation of Rutgers' policy, but it's arguably a

18    violation of --

19    **THE COURT:**  I'm going to defer -- and I think you all

20    are right, until I see what the field looks like and what the

21    impact really is -- the question of sanctions, because I've got

22    to calibrate sanctions to the facts of the case.  And if

23    there's something irreparable or not, I can't make that

24    judgment at this point because we don't know exactly what the

25    field is.  So I'm going to agree with both of you and you can

PROCEEDINGS

 1   save your arguments at that juncture.

 2        I do want to get Natera's response to Mr. Perloff's

 3   suggestion that Dr. Hochster's communication with counsel be

 4   part of the disclosure.

 5        Response?

 6        **MR. BRAMHALL:**  Your Honor, I'm happy to address this.

 7   Andrew Bramhall again for Natera.

 8        I think, Your Honor, so to start with as an initial

 9   matter, so we're in the very rarefied area here when it comes

10   to the experts.  Prior to this, in terms of expert

11   communications, the agreement had been between the parties:  No

12   communications with counsel were discoverable.  So that's been

13   the operating assumption.

14        I understand, you know, if Your Honor is interested in

15   seeing those communications, we would submit that, one, it's

16   not necessary, and we should do the rest of the discovery to

17   show you there's no there there.  But if that were to happen,

18   it would be an under -- an in-camera type of review, as opposed

19   to disclosing that to the other side.

20        I mean, I think this is all -- you know, the goal here is

21   clearly to exclude COBRA at all costs, and to exclude the fact

22   that their test failed.  But we're happy to do whatever Your

23   Honor wants us to do to show that, you know, what we're doing

24   is aboveboard and that it should be legitimately included in

25   the case because it is highly relevant.

**PROCEEDINGS**

1          And, Your Honor, just quickly, in terms of the surprise.

2     We were surprised as anyone, and so was Dr. Hochster, that the

3     test failed.  That's the issue.  It's such a spectacular

4     failure and it was so unexpected, I don't think anyone saw it

5     coming.

6          So we apologize for the timing, Your Honor, but we

7     couldn't control that, and it was all -- it was dictated by the

8     NRG clinical protocol, and it was really a shock to everybody,

9     that a test could fail this spectacularly.

10         **THE COURT:**  Well, I'm not talking about the surprise

11    of the test.  I'm talking about the surprise of the timing of

12    wanting to introduce this into the case when apparently maybe

13    on all sides there was some, you know, advance knowledge that

14    this was coming down the line, that there was a problem that

15    was obviously known by August, and so it was sort of bringing

16    this up after deadlines had been set, trial had been set, and

17    on the assertion, on the representation that, well, this was

18    substantially justified; it was late because the thing just got

19    published and just came out, you know, two weeks ago, et

20    cetera, et cetera, late-breaking news.  And now I find out it

21    wasn't quite as late-breaking.  Yes, the actual publication and

22    maybe the finalization was late-breaking, but, you know, this

23    was the kind of thing that could have been anticipated and

24    talked about in advance saying, well, Judge, I know you've set

25    this discovery deadline, but we think there's an important

**PROCEEDINGS**

1  study coming on.  We may want to introduce it.  We may not want

2  to, I don't know.  At least we could have dealt with it in

3  advance.

4     But in any event, what I'd like to do, I do want a full

5  download of Dr. Hochster's, as requested -- I'm assuming you

6  don't have to re propound something, right, Mr. Perloff?  I

7  mean, you've asked for what you're going to request or do you

8  need to refine that some way?

9     **MR. PERLOFF:**  I would like to just quickly review our

10 subpoena to Dr. Hochster.  I believe it is sufficient.  And if

11 they fully, you know, get a true image of his files and produce

12 all the responsive documents, I believe that will be correct.

13    If we could have just a few days to review what the

14 subpoena said, just to make sure there isn't anything that's

15 been raised by this that we would need to cover.

16    **THE COURT:**  All right.  Well, I'd like you to meet and

17 confer in light of my comments and see if you can fine tune

18 that.

19    Number 1, I'm going to defer and not approve at this point

20 production of Dr. Hochster's communications with counsel.  I do

21 think that that, you know, if there's enough there, I think

22 that that's worth an in-camera review.  I can always ask for

23 that.  I don't see a need yet.  I'd rather have you focus on

24 his file on the relative communications.

25    And I think that there ought to be some kind of

1    description of a process by somebody with knowledge, a forensic

2    person to say here's what was searched, sort of a procedural

3    thing to make sure that the search has been thorough, that any

4    deleted matters, you know, if they have been deleted, that

5    there's been an examination on whether those are recoverable or

6    not.  So I want to see a robust production on his part and some

7    explanation by somebody with knowledge about the forensics, if

8    in fact we find that there's large swaths missing, and I want

9    some assurance that those are in fact unrecoverable at this

10   point.

11           **MR. PERLOFF:**  Your Honor, could we -- what I would

12   propose is that within a couple of days the parties agree upon

13   a forensic examiner to conduct this, independent and at

14   Natera's cost and that we both agree upon, that can do exactly

15   what you just said.

16           **THE COURT:**  Yes.  Submit it within -- by Tuesday.

17   That's two days.

18       And you also wanted to -- well, you need to complete your

19   discovery still with respect to the NRG.  You're awaiting that.

20           **MR. PERLOFF:**  I'm going certainly do my best.

21           **THE COURT:**  And there's something else besides --

22           **MR. PERLOFF:**  Discovery on Natera.

23           **THE COURT:**  So you're going to have -- I'd like you to

24   meet and confer and make a narrowly tailored --

25           **MR. PERLOFF:**  Yes.

1          **THE COURT:**  It sounds like it's really about any

2    communications with Dr. Hochster relative to the COBRA

3    intervention or involvement or something like that.

4          **MR. PERLOFF:**  Yes.

5          **THE COURT:**  That's two things.  And then you have the

6    NRG, that's a third.

7        What else?  Anything else?

8          **MR. PERLOFF:**  It would be with respect to even if

9    there's not an in-camera review, we would request, and I don't

10   think it's unreasonable, for them to produce a log, privilege

11   log.  That way we can better know whether, you know, that's the

12   easiest way to know if there's any there there of their

13   communications just during the, you know, time period of June

14   through, you know, January or whenever.

15       And there's one final thing, Your Honor, we would like in

16   order to be able to circle back with Rutgers to see if we've

17   missed anything.  We've asked counsel whether they would allow

18   us to send Dr. Hochster's transcript to the general counsel of

19   Rutgers, and we would like their agreement.  Certainly it's

20   hard to imagine how anything that he said would be confidential

21   from his own employer in terms of his involvement and his lack

22   of disclosure.

23          **THE COURT:**  So what -- I'm not sure I understand.  You

24   would send -- you would propose to send a transcript of his

25   deposition to Rutgers?

1        **MR. PERLOFF:**  Yes.

2        **THE COURT:**  And ask them to do what?

3        **MR. PERLOFF:**  When we visited with the general counsel

4    of Rutgers after the deposition we asked if it were made

5    available would you be interested in seeing it?  And he said he

6    would.  He didn't ask for it, but he said if we were able to

7    send it to him, he would read it.

8        And we asked counsel, because you've marked it outside

9    attorneys' eyes only and confidential, can we make an exception

10   for the general counsel of Rutgers?  So far they have said no.

11       We'd like to be able to do that.

12       **THE COURT:**  And what would be the purpose of sharing

13   that with the general counsel?

14       **MR. PERLOFF:**  Both so that we can fine tune any

15   further Rutgers to make sure we have everything that we want

16   and better understand, quite frankly, his disclosures

17   obligations to the university.

18       I don't know that now is the time to go into it, but

19   Dr. Hochster plays an important role in deciding what research

20   is done by Rutgers, and we already know that he has -- I think

21   the verb they used is "tabled" a study with Guardant, a new

22   one, and still has not disclosed his involvement.

23       **THE COURT:**  But what does that have to do with this

24   case and the COBRA study?

25       **MR. PERLOFF:**  He was basing it on COBRA.  That's in --

**PROCEEDINGS**

1  that's one of the things we learned, and he wasn't telling --

2  he wasn't telling his colleagues, oh, the reason -- you know,

3  by the way, even though I really believe this, I should let you

4  know I'm being paid.

5      And that just gives us some pause.  We'd like to be able

6  to follow up with Rutgers on that.

7          **THE COURT:**  All right.  Response?

8          **MR. BRAMHALL:**  So, Your Honor, I mean, I think just at

9  one level this is getting deeper and deeper.  And going to

10  Rutgers, I'll say, at least in my mind, raises concerns about

11  the purpose of all this.

12      But we don't have any objections necessarily to them

13  talking to Rutgers.  It's not really our role to say anything

14  about it, other than at some point it starts to feel like a

15  smear campaign against a doctor who is trying to do the right

16  thing.  But hopefully through all this discovery that you're

17  ordering, Your Honor, we'll show that there's no improper

18  influence.  It's just a physician who is trying to do the right

19  thing.

20      On the forensic evidence, I mean, one thing we would ask,

21  and we can talk to them through a meet and confer, is that we

22  get some opportunity to review the image before it goes to

23  them.  Because there is going to be a lot of patient private

24  information in his computer.  I mean, it's going to be more,

25  I'm sure, than just that.  It's probably going to be personal

1    information as well.  So we can work this out for them.  But I

2    think the notion of us just handing over a forensic image to

3    Guardant is very concerning, and so we'll have to talk about

4    that and see if we can figure out something reasonably --

5            THE COURT:  Yeah, I'd like you to work that out,

6    because obviously I don't think Mr. Perloff is suggesting you

7    just hand it over without any review.

8        My main thing is we want to get -- we want to make sure we

9    understand what's available, what's not, what's been deleted

10   and what's not.  So once I have that understanding, at least I

11   know where that's at.

12       So I'd like you to meet and confer on that, and the

13   forensic, and how you would handle procedurally maybe any

14   screening or vetting for privileged material, if there are any

15   such things.

16       I think the privileged log is a fair compromise at this

17   point.  That will help me determine whether I need to look at

18   something if it comes -- you know, and which ones I would need

19   to look at, so I think that's a fair request.  The time limit

20   would be communications between, what, June of '23 and you said

21   January of '24?

22           MR. PERLOFF:  Yeah.  I'd like to revisit that.  It may

23   be appropriate to extend that a little bit, at least until the

24   time frame of the communications that they had about his

25   emails, so --

PROCEEDINGS

1        **THE COURT:**  All right.  Well, again, I'd like you to

2    meet and confer.  But the idea of a privileged log I think is a

3    fair approach at this point.

4        And with respect to Rutgers, I'm not hearing an objection

5    in principle to sharing for eyes only, for general counsel's

6    eyes only.  But I will warn that your description to me,

7    Mr. Perloff, begins to sound like something extremely

8    collateral, and this case is already, you know, sort of spread

9    in ways that I think are beyond the necessary.

10       And so I'm going to be very skeptical about bringing in

11   stuff about, you know, that's not directly relevant to the

12   COBRA study, trying to use, you know, 404-type behavior or

13   something, saying, well, look what he's done in these other

14   studies; he's out to shaft Guardant, and he's doing this and

15   this and this and it's just part of a pattern.  I'm telling you

16   will right now I'm not going there.

17       **MR. PERLOFF:**  I understand.  To be frank, I don't want

18   to characterize Dr. Hochster's -- what Dr. Hochster said.

19   There were some questions that we had with the general counsel.

20   I wasn't comfortable characterizing his deposition.  I just

21   wanted to send the transcript so he could look at it himself,

22   and whatever we bring in in this case will be tied to these

23   issues.

24       **MR. SCOLNICK:**  And, Your Honor, one of the issues, of

25   course, is his bias and his motive, bias against Guardant, bias

PROCEEDINGS

1    in favor of Natera, and pursuant to *Davis -v- Alaska*, those are

2    never collateral issues.

3        So even if it's not directly tied to COBRA, if it's tied

4    to either party here, and we have good reason to believe that

5    it will be, we think that that's relevant, proper discovery and

6    admissible.

7        **MR. BRAMHALL:**  Your Honor, there is such thing as

8    legitimate bias when you prefer a better performing test to an

9    interior test, but...

10        **THE COURT:**  Well, we'll cross that bridge.

11        My only point is, yeah, there's bias and there's bias.  I

12    mean, that's why we have 403, that's why we have 404(b), that's

13    why we have limits.  And I'm just telling you right now that

14    you can demonstrate bias much more directly.

15        But what I'm hearing from Mr. Perloff, if I understand it

16    right, we're getting into collateral areas that are almost

17    tertiary, it seems to me.  But I don't know that.  Maybe you've

18    got something more direct in mind, so I'm not going to opine on

19    that.  I'm just warning you that the tree only goes so far.

20        **MR. PERLOFF:**  Understood.

21        **THE COURT:**  All right.  So I would like for you all to

22    report back to court and make sure we have a plan to go

23    forward, an agreed-upon plan.  If there's not, then I can

24    resolve whatever disputes or maybe with Judge Kim's help

25    resolve any fine tuning if there is some dispute.  I hope not.

1    I hope you can agree on this.

2         In terms of timing, we need to put a timeline on this.  So

3    what are you suggesting?

4         **MR. PERLOFF:**  Well, we're going to identify the

5    independent forensic examiner by Tuesday.

6         Chris, anybody who is familiar.

7         That process can take a week or two, maybe -- I don't want

8    to like say right now how long it will take them to gather that

9    snapshot.

10        And then if, in fact, Natera -- Natera's counsel are going

11   to do the review --

12        **MR. SCOLNICK:**  I could jump in there.

13        I'd suggest that a third-party discovery referee should

14   conduct a review.  And at this point, in light of all that's

15   happened, I think that would be appropriate.

16        **MR. BRAMHALL:**  Your Honor, I think the concern would

17   be that third-party referee, whoever this is, is not going to

18   have the knowledge to review for relevance, not going to have

19   the knowledge to review for patient-specific private

20   information.  I think there's a knowledge gap there that could

21   be problematic.

22        **THE COURT:**  Well, the other thing we could do is also

23   either a privilege or some other kind of log to show what's

24   been excluded, and we can decide at that point whether there's

25   so much there that we need a third-party reviewer to look at

1   that, to examine that.

2        So it probably would make sense for you to at least also

3   meet and confer.  If we do have to invoke a mechanism of a

4   discovery referee to look at that level of documentation, that

5   there's somebody that is there.  I'm not going to invoke that

6   yet because I don't think we need to go there, given the

7   processes I'm talking about.  But I think it's important that

8   you meet and confer now and see if you can agree upon a

9   theoretical person if we need to go to that resort.  I hope we

10  don't.

11       But I do want to get this done.  So why don't you see --

12  also agree on a timeline when this is done in advance,

13  sufficiently in advance of all the work we have to do in order

14  to prepare for trial.

15       Because I don't want to run into a situation where, you

16  know, we're a month away and then I hear back: oh, you know,

17  we're still not getting these documents, so now we've got to do

18  this and this and this, and we've got to subpoena X, Y and Z,

19  and now we're going to have to continue the trial date again.

20       **MR. PERLOFF:**  And we have a *Daubert* hearing.  That is

21  on him.

22       And when is it, in a month?  I think --

23       **MR. LaVIGNE:**  We have one *Daubert* hearing on

24  August 29th, yeah.

25       **MR. SCOLNICK:**  How about let's see if we can resolve

PROCEEDINGS

```
 1  all of those problems then.
 2          THE COURT:  Good.
 3          MR. PERLOFF:  Yeah.
 4          THE COURT:  I hope so.
 5      So let's -- if you could insert that, include that in
 6  your, I'll call it discovery plan, I'd appreciate it, so we all
 7  know exactly what we're doing and when we're doing it.  All
 8  right?
 9          MR. PERLOFF:  Thank you, Your Honor.
10          THE COURT:  All right.
11          MR. LaVIGNE:  Just one --
12          THE COURT:  Yes.  Go ahead, Mr. LaVigne.
13          MR. LaVIGNE:  I apologize, Your Honor.  Just one
14  question.  If we don't agree on the protocol, we'll inform the
15  court by the time you set.  But how do you want us to proceed
16  in that scenario?
17          THE COURT:  What I'd like you to do is send me a joint
18  letter saying, you know, you agreed on this, this and this, and
19  here are the three outstanding issues or one outstanding issue
20  that needs a resolution, and either I or Judge Kim will resolve
21  it for you.
22          MR. LaVIGNE:  Thank you, Your Honor.
23          THE COURT:  Okay.  So I guess is the next time I'm
24  going to see you at the *Daubert* hearing.  Is that our next
25  hearing in this matter or do we have something else scheduled?
```

PROCEEDINGS

1          **MR. PERLOFF:**  I think that's the next one.

2          **MR. LaVIGNE:**  Yeah, I believe August 29th.

3          **THE COURT:**  Yeah, that's what I have, August 29 at

4   1:30.

5      All right.  We'll see you then.

6          **ALL COUNSEL:**  Thank you, Your Honor.

7          (Proceedings adjourned at 4:18 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2            I certify that the foregoing is a correct transcript

 3    from the record of proceedings in the above-entitled matter.

 4

 5    Dated:  July 27, 2024

 6

 7

 8

 9

10

11    _____

12            Rhonda L. Aquilina, CSR #9956, RMR, CRR, CRC
                      U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**UNITED STATES COURT REPORTERS**