| | |
|---|---|
| QUINN EMANUEL URQUHART & SULLIVAN, LLP | QUINN EMANUEL URQUHART & SULLIVAN, LLP |
| Kevin P.B. Johnson (Bar No. 177129) | Anne S. Toker (*pro hac vice*) |
| kevinjohnson@quinnemanuel.com | annetoker@quinnemanuel.com |
| Victoria F. Maroulis (Bar No. 202603) | 51 Madison Avenue, 22nd Floor |
| victoriamaroulis@quinnemanuel.com | New York, New York 10010-1601 |
| Andrew J. Bramhall (Bar No. 253115) | Telephone: (650) 801-5000 |
| andrewbramhall@quinnemanuel.com | Facsimile: (650) 801-5100 |
| Margaret H.S. Shyr (Bar No. 300253) | |
| margaretshyr@quinnemanuel.com | |
| 555 Twin Dolphin Drive, 5th Floor | |
| Redwood Shores, California 94065-2139 | |
| Telephone: (650) 801-5000 | |
| Facsimile: (650) 801-5100 | |

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Valerie Lozano (Bar No. 260020)
valerielozano@quinnemanuel.com
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Defendant and Counterclaim-Plaintiff NATERA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> vs. <br><br> NATERA, INC, <br><br> Defendant and Counterclaim-Plaintiff. | Case No. 21-cv-04062-EMC <br><br> **NATERA'S TRIAL BRIEF** <br><br> **Pretrial Conference:** <br> Date: October 15, 2024 <br> Time: 9:00 am <br> Ctrm: 5 – 17th Floor <br> Judge: Hon. Edward M. Chen <br><br> **Trial:** <br> Date: November 12, 2024 <br><br> **REDACTED FOR PUBLIC FILING** |

**TABLE OF CONTENTS**

**Page**

I. BACKGROUND ........................................................................................................... 1

II. NATERA'S THEORY OF THE CASE & KEY EVIDENCE ...................................... 3

    A. Guardant Engaged In False And Misleading Advertisements Of Reveal. ................. 3

        1. Guardant Falsely Claimed Perfect Performance. ............................................ 3

        2. Guardant Falsely Claimed Support For Surveillance Testing. ....................... 4

        3. Guardant's Reliance On The Fraudulently Procured Parikh Study Is False Advertising ................................................................................................ 5

            (a) The Parikh Study Is Unreliable. ............................................................ 6

                (i) The Parikh Study Falsely And Fraudulently Describes Itself As A "Prospective" Study. ............................................. 6

                (ii) The Parikh Study Falsely And Fraudulently Describes Itself As "Performed Blinded To The Clinical Data." ........... 7

            (b) Guardant's Claims For Reveal Are Not Established. ......................... 8

            (c) Guardant's Advertising That Reveal Has Superior Performance Relative To CEA Is Not Supported By The Parikh Study. ....................................................................................... 9

            (d) Guardant's Advertising That Reveal Has "Industry-Leading Sensitivity" Is Not Supported By The Parikh Study. ........................ 9

            (e) Guardant's Performance Claims Regarding Reveal In "Early Stage" CRC Patients Are Not Supported By The Parikh Study. ................................................................................................... 9

        4. All The Other Elements Of Natera's Claims Against Guardant Are Met. ................................................................................................................ 10

    B. Natera's Advertising Statements Accurately Reported Data From The Cited Studies And Are Not False Or Misleading. ............................................................. 10

        1. Natera's Advertising Statements Are Literally True. .................................. 11

        2. Guardant Cannot Show Actual Deception From Natera's Advertising. ............................................................................................................... 12

        3. Guardant Cannot Show Natera's Advertising Was Likely To Influence Any Physician Decisions. ............................................................ 12

        4. Guardant's Litigation Survey Is Flawed. ..................................................... 13

        5. Guardant Cannot Show Actual Injury From Natera's Advertising ............. 13

C. Guardant's Damages Seek A Legally Impermissible Windfall, Whereas Natera's Damages Are Reasonable And Fully Supported By Law. .......................... 13

**Cases**

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
　2023 WL 2652855 (C.D. Cal. Mar. 13, 2023) ........................................................................... 15

*Hickson Corp. v. N. Crossarm Co.*,
　357 F.3d 1256 (11th Cir. 2004) ................................................................................................ 5

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
　316 U.S. 203 (1942) ............................................................................................................... 15

*Nat'l Prod., Inc. v. Gamber-Johnson LLC*,
　699 F. Supp. 2d 1232 (W.D. Wash. 2010) .............................................................................. 10

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
　720 F.3d 490 (2d Cir. 2013) ................................................................................................. 5, 6

*Pfizer, Inc. v. Miles, Inc.*,
　868 F. Supp. 437 (D. Conn. 1994) .......................................................................................... 12

*Southland Sod Farms v. Stover Seed Co.*,
　108 F.3d 1134 (9th Cir. 1997) .............................................................................................. 5, 8

*U-Haul Int'l Inc. v. Jartran, Inc.*,
　793 F.2d 1034 (9th Cir. 1986) ............................................................................................ 5, 15

*Youngevity Int'l v. Smith*,
　2019 WL 2918161 (S.D. Cal. July 5, 2019) ........................................................................... 13

## I. BACKGROUND

This false advertising case involves the relatively new technology of testing a patient's blood for the presence of tumor DNA to detect for the recurrence of colorectal cancer after surgery. It is critical to detect cancer recurrence as early as possible. The ability to test blood samples for trace amounts of DNA offers a breakthrough for the treatment of patients. And Natera is the pioneer in this field.

Natera was the first to market. It developed what is called a "bespoke" or "tumor informed" assay called Signatera. This is the gold standard. The technology involves taking samples from the patient's tumor (excised during surgery) and screening for the exact genetic mutations present in the tumor. In this way, Signatera maximizes test accuracy and avoids the issue of false positives. Since its launch in 2021, doctors have used Signatera to test thousands of patients, multiple clinical trials, and over 85 publications have validated Natera's careful approach to the technology.

Guardant was the second to market and took a 'quick and dirty' approach. Guardant's Reveal assay tests blood for the presence of what it predicts to be tumor DNA but does *not* include actual mutations from a tumor sample. It is referred to as "tumor naive." Guardant's advertising claims its tumor naive approach is even more accurate—100% specificity and "industry leading sensitivity"—but that has been exposed as false and is a central issue for trial.

Guardant's product has changed significantly. The original version of Reveal tested two sources of DNA—genomic DNA and epigenomic (methylated) DNA. Guardant claimed it had a software program that would filter out biological noise such as genomic mutations in blood cells, so-called CHIP mutations. But the product did not work. It never had the 100% specificity Guardant claimed. As the late-produced COBRA documents demonstrated, Reveal was prone to false positives. As a result, Guardant fundamentally changed its assay to a new format called "Infinity." This new 2023 assay dropped any testing of genomic DNA and lacks any CHIP filter.

New to the market in 2021, Guardant engaged in false advertising. First, Guardant claimed perfect performance metrics—"100%" specificity and PPV. Guardant knew its product did not have perfect performance and would have false positives. Second, Guardant claimed that its product was supported for "surveillance" purposes, which is ongoing testing of a patient over many years.

Guardant knew it did not have such data and made the false claims anyway. Third, Guardant cannot point to the Parikh Study—co-authored by Guardant—to support any of its false claims. Discovery has revealed that the Parikh Study was unblinded and based on fraudulent data, and that Guardant misrepresented the methodology of the study.

The COBRA trial, initiated in late 2019 and closed in September 2023, demonstrated that Guardant's Reveal yields false positives at a high rate. In fact, Guardant's sub-standard performance led to the collapse of the COBRA trial—the underlying facts of which Guardant sought to hide from physicians, patients, Natera, and this Court. The COBRA discovery underscored that Natera's concerns about tumor naive approaches were entirely justified.

Guardant's claims against Natera are unfounded. When Guardant released its first advertisements claiming its tumor naive approach had perfect performance, Natera was skeptical. It published a technical paper (the "White Paper") explaining the difference between tumor informed and tumor naive approaches, and pointed out that biological noise can lead to false positives. TX-120. Guardant accused one paragraph in the White Paper of being false (Complaint ¶ 32)—but Natera's technical statements have been validated. Indeed, Guardant has changed its test exactly because of false positives and dropped any testing of genomic DNA. Natera also released advertisements comparing the results of the Parikh and Reinert studies. This cannot be false advertising because Parikh is Guardant's own study and by its own terms invites comparison with Reinert and tumor informed approaches. Nevertheless, Guardant seeks hundreds of millions of dollars in damages, including all of Natera's profits for old advertisements that were true: Guardant's original technology is not as good as Natera's and was subject to excessive false positives.

This litigation represents an effort to silence legitimate commercial speech and to use the courts to catch up in the marketplace. Guardant brought this case despite knowing its product was prone to false positives and had low specificity. The jury will learn that the tumor informed approach is far superior. And the jury will learn that Guardant knowingly deceived customers and the market and NRG Oncology about the performance of its assay, and then tried to hide the bad COBRA results.

## II. NATERA'S THEORY OF THE CASE & KEY EVIDENCE

The central disputes here are whether Guardant's and Natera's statements regarding the products are false, and whether the intended audience (oncologists) were deceived.

Guardant claimed its product has perfect 100% performance. This was false—and Guardant knew it. Guardant claimed performance in the surveillance setting under which patients are monitored over time by repeat testing; this too was false—and Guardant knew it. And Guardant cannot point to published, peer-reviewed data to support its advertising claims. This is because Guardant manipulated the methodology and data of its cited study (the Parikh Study) behind the scenes, and then hid those actions, rendering the study fraudulent. In contrast, Natera's advertisements report data that are literally true (as this Court has ruled on summary judgment), and there is no evidence any physician was misled by them. Dkt. 326 at 22.

### A. Guardant Engaged In False And Misleading Advertisements Of Reveal.

Guardant has falsely and misleadingly mispresented critical clinical performance metrics of Reveal, such as sensitivity (an assay's ability to detect true positives and avoid false negatives), specificity (an assay's ability to detect true negatives and avoid false positives), and positive predictive value ("PPV") (the proportion of patients who test positive and actually have the disease).

#### 1. Guardant Falsely Claimed Perfect Performance.

When Guardant released Reveal, it claimed the assay had 100% specificity and 100% PPV. TX-1356.0018 (JPM Deck); TX-0576.0001-0002 (Clinical Update Flyer); TX-0552.0015, .0018, .0026, .0027 (Core Sales Aid); TX-1104.0001-2 (Press Release); TX-0554.0001 (Sales Email); and TX-1493.0002 (Sales Email). Guardant, however, knew Reveal did not have perfect performance. COBRA discovery showed that Guardant ████████████████████—a material difference. TX-1667.0007 (7/26/23 letter). And when Guardant tried to convince NRG Oncology not to terminate the COBRA study after poor results, Guardant told NRG ███████████ ████████████ TX-1636.0001 (6/22/23 email). Not only did Guardant know its assay was not perfect, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████ TX-1663.0021 (5/30/23 FDA submission). Indeed, Guardant conceded to NRG Oncology

1  that ████████████████████████████████████████. TX-1667.0007
2  (7/26/23 letter). Every percentage point below 100 represents a significant number of false
3  positives—*i.e.*, patients told that their cancer has returned when it has not, exposing patients to
4  unnecessary medical treatment.

5  　　It was literally false for Guardant to claim that its assay had 100% specificity and PPV when
6  it did not. There are real world negative consequences for patients to be told their cancer has
7  returned. In the COBRA trial this meant patients getting unnecessary chemotherapy. Guardant
8  should not have advertised its product as having perfect performance when it knew it did not and
9  knew it would never have such performance in actual patients.

10  　　2.　　**Guardant Falsely Claimed Support For Surveillance Testing.**

11  　　There are two forms of testing in this field. The first is "landmark" testing which is a test
12  conducted at a particular point in time. The second is "surveillance" testing, which is repeated testing
13  of a patient over time according to a set schedule, possibly for many years. The surveillance context
14  is important for patients and also as a commercial source of ongoing revenue.

15  　　In its ads, Guardant repeatedly and falsely claimed it had proven data for performance
16  metrics in the surveillance setting—including 91% sensitivity in that setting. *E.g.*, TX-546.0006,
17  .0008; TX-549.0001; TX-576.0002; TX-912.0006; TX-573.0017; TX-542.0003; TX-541.0008.

18  　　Guardant's internal documents, however, show it knew that it had no data for surveillance
19  testing: ████████████████████████████████████████████████████████████
20  ████████████████████████████ TX-559.0001; TX-1185.0002 ("████████
21  ████████████████████████████"); TX-637.0002 ("████████████████
22  ████████████████████████"); TX-555.5 ████████████████████████
23  ████████████); TX-559.0001 ("████████████████████████████████
24  ████████████████████████████████████████████████████████████
25  ████████████████████████████████").[1] In other words, Guardant knew internally it
26  did not have surveillance data, but published advertisements to the contrary anyway.

27

28  ─────────────
    [1]  Emphases added herein unless otherwise noted.

### 3. Guardant's Reliance On The Fraudulently Procured Parikh Study Is False Advertising.

Many of Guardant's clinical performance advertising claims for Reveal are purportedly based on a single published study—the Parikh Study, led by Drs. Aparna Parikh (now Guardant's expert) and Ryan Corcoran of Massachusetts General Hospital ("MGH") and published in *Clinical Cancer Research* in 2021. That the Parikh Study was peer-reviewed and published does not absolve Guardant—a co-author of the study and independently responsible for running all of the tests on patient samples[2]—of liability for its false and misleading commercial statements regarding Reveal.

Guardant's reliance on the flawed Parikh Study is false advertising based on two distinct theories of literal falsity under *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Under the first theory ("**unreliability theory**"), literal falsity of advertising claims based on a study can be proven by showing the study is "not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim[s] made." *Id.* (internal quotations and citation omitted). This showing can be made by "attacking the validity of the defendant's tests directly[.]" *Id.* Under the second theory ("**lack-of-support theory**"), literal falsity can be proven by showing the study, "even if reliable, do[es] not establish the proposition asserted by the defendant[.]" *Id.* (internal quotations and citations omitted). Either theory of literal falsity is sufficient to impose liability on Guardant.[3]

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013), which the Court has found applies in this case,[4] does not foreclose Natera's claims. In *ONY*, the Second Circuit held that where "a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions," their statements are "not grounds for a claim of false advertising." *Id.* at 498. Here, Natera contends that the Parikh Study

---

[2] The Parikh Study names five Guardant employees including its co-founder, Dr. Talasaz.
[3] Natera also asserts that Guardant's advertising regarding Reveal, even if "not literally false," is misleading, which imposes liability on Guardant, and Natera will show that "the advertisement has misled, confused, or deceived the consuming public." *Southland*, 108 F.3d at 1140. Evidence that advertising deceived or had a tendency to deceive consumers can be established by "direct evidence," *U-Haul Int'l Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986), or via expert testimony, *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004).
[4] Natera does not concede that *ONY* was correctly applied or is the law in this circuit.

and Guardant's advertisements are based on fraudulent data and inaccurate description of the data and methodology of the Parikh Study. Moreover, *ONY* expressly acknowledged that it does not address a scenario involving a party—like Guardant here—distorting a study's findings in its advertising. 720 F.3d at 499 ("We are therefore presented with a much easier case than we would be if a plaintiff alleged that a defendant distorted an article's findings in its promotional materials.").

Indeed, in denying Guardant's motion to dismiss Natera's counterclaims, this Court held that "*ONY* excepted from this general rule of deference disputes about statements made in a peer-reviewed, published study that are 'literally false,' *i.e.*, where the study at issue was 'fabricated' or 'fraudulently created.' Courts can resolve these kinds of disputes because if 'the data were falsified, the fraud would not be easily detectable by even the most informed members of the relevant scientific community.'" Dkt. 120 at 10 (quoting *ONY*, 720 F.3d at 497). Where "false advertising claims allege that the study's conclusions are based on inaccurate descriptions of the data and methodology, the claims are actionable under the Lanham Act[,]" thus, "*ONY* is inapplicable to Natera's counterclaims[.]" *Id.* at 12, 20.

### (a) The Parikh Study Is Unreliable.

Guardant manipulated the methodology and data reported by the Parikh Study and then concealed its actions, rendering the Parikh Study unreliable and fraudulent and Guardant's reliance on it literally false. For example, the Parikh Study fraudulently claims: (1) to have been a fully "prospective study" when its analyses were retrospective; and (2) that its analysis was performed "blinded" to clinical data when Guardant used unblinded data for the analyses.

#### (i) The Parikh Study Falsely And Fraudulently Describes Itself As A "Prospective" Study.

The Parikh Study purports to be a "prospective" study. TX-1.0002. Conducting a "prospective" study according to a pre-established protocol provides a significant indicium of reliability as compared to a retrospective study without a pre-established protocol where decisions are made *after* the outcome of interest (here, recurrence) is known. However, the Parikh Study failed to follow *any* pre-established protocol for ctDNA analysis, instead *retrospectively* analyzing samples to evaluate performance metrics for Reveal. Guardant's documents establish that the Parikh

Study authors, including Guardant, eschewed any pre-established protocol in favor of *post hoc* methods and analyses that ▇▇▇▇▇ TX-856.0002. Guardant's witnesses confirmed at deposition that the Parikh Study's analyses were retrospective.

### (ii) The Parikh Study Falsely And Fraudulently Describes Itself As "Performed Blinded To The Clinical Data."

The Parikh Study reported that "ctDNA analysis was performed blinded to the clinical data." TX-1.0003. Conducting a study according to a "blinded" protocol is another significant indicator of reliability. However, Guardant had access to the patients' recurrence status for the samples it was analyzing, rendering it unblinded. Guardant has now admitted, only after this litigation commenced, that the Parikh Study was unblinded. Dkt. 94-4 at 19 (conceding "[t]he [Parikh Study] data were partially unblinded before final analysis").

As a result, at the time Guardant was analyzing (and then reanalyzing) samples to generate results for inclusion in the study, it already had the answer key as to which patients had experienced recurrence. Guardant witnesses confirmed that it performed its ctDNA analysis *unblinded* to clinical data. Guardant therefore knew, for example, whether running additional samples would help or hurt performance. The evidence shows it took full advantage of this knowledge, for example, by ▇▇▇▇▇ (TX-690.0001); by ▇▇▇▇▇, (TX-0525.0003) in order to ▇▇▇▇▇ (TX-568.0006); and by ▇▇▇▇▇—with full knowledge of recurrence status.

Using unblinded data and passing off the study as blinded is fraud. Nitin Sood, former Reveal product lead, admitted that "▇▇▇▇▇" Dkt. 553-4 (Sood Tr.) at 307:8-16. Guardant's own expert Dr. Heitjan went further, stating that those who falsely claim a study was blinded when it is not should be put in "▇▇▇▇▇" Dkt. 368-27 (Heitjan Tr.) at 302:12-22. These falsehoods demonstrate that the Parikh Study is unreliable, rendering all of Guardant's claims based on the

Parikh Study literally false.

Guardant's position that peer review of the Parikh Study immunizes the study from criticism and its advertising statements from liability is at odds with the case law (Dkt. 120 at 10, 12, 20), and would only reward its deceptions. That the peer reviewers were unable to observe or detect Guardant's machinations makes them *more* egregious not less. Evidence also shows that the Parikh Study was repeatedly rejected by other journals; that it ignored "Major Comments" from reviewers, TX-515.0003, simply moving on from one journal to the next; and that its limited review prior to publication did not address the issues raised by Natera in this case, including because the reviewers lacked access to this key information. That the Parikh study was peer reviewed provides no safe harbor for Guardant.

### (b) Guardant's Claims For Reveal Are Not Established.

Even taking the Parikh Study at face value, Guardant's advertising is false and misleading for the additional, independent reason that it includes claims that cannot be established by the Parikh Study. Under *Southland*, the second way to show literal falsity is not to attack the study itself, but show that there is no support in the study (or any other) for the claims made in the advertisements. *See Southland*, 108 F.3d at 1139.

As described above, Guardant made a number of claims about the performance of its assay, including when used for surveillance. It cannot point to the Parikh Study for these claims, because there is no support in the Parikh Study for them—even if one considered the study reliable. There is simply no support for sensitivity or specificity metrics in Parikh for the surveillance context. This is because Parikh is a landmark study—one point in time—not a surveillance study. The so-called "surveillance analysis" in the Parikh Study (conducted fully retrospectively and unblinded) involved mostly patients tested just once.

Furthermore, Guardant reported performance metrics from different Parikh Study analyses as if they were from the same analysis in its advertising. *E.g.*, TX-573.0017; TX-541.0008. In other words, Guardant took sensitivity data from one part of the Parikh study and paired it with specificity from another. This presents a false view of test performance. Nothing in the Parikh Study supports this conflation of disparate analyses. Sensitivity and specificity must be reported from the same

cohort and analysis to be meaningful; mixing and matching them as Guardant has done here will not reflect the test's actual performance *in any context*.

   (c) **Guardant's Advertising That Reveal Has Superior Performance Relative To CEA Is Not Supported By The Parikh Study.**

  Guardant relied on the Parikh Study to compare aspects of Reveal's performance to the standard-of-care carcinoembryonic antigen ("CEA") test. *See, e.g.*, TX-546.0006; TX-552.0012. Guardant falsely claims Reveal detects recurrence "months earlier" than standard-of-care methods like CEA tests. TX-542.0003; TX-546.0006; TX-552.0012. But the Parikh Study reported *no data* that would permit a determination of the lead time of CEA in the Parikh Study patients. Guardant also falsely claims Reveal has "a higher . . . specificity than CEA . . . in the surveillance setting." TX-542.0003.

   (d) **Guardant's Advertising That Reveal Has "Industry-Leading Sensitivity" Is Not Supported By The Parikh Study.**

  The unsupported 91% sensitivity claim, discussed above, formed the basis of Guardant's comparative false advertising of "industry-leading *sensitivity*" for Reveal. TX-573.0019; TX-650.0001. When asked whether Reveal has superior clinical sensitivity to Signatera, Dr. Parikh testified that the Parikh Study does not establish that. Other Guardant witnesses agreed.

   (e) **Guardant's Performance Claims Regarding Reveal In "Early Stage" CRC Patients Are Not Supported By The Parikh Study.**

  Although Reveal is intended for *early stage* (Stage II-III) patients, Guardant's advertising of Reveal reports data from the Parikh Study that are from all CRC patients, including late stage. *See, e.g.*, TX-542.0002; TX-546.0001-0002, .0006; TX-650.0001. In fact, 19% of the patients studied in the Parikh Study were *late stage* (Stage IV) patients. TX-1.0004. Dr. Parikh confirmed the Study did not achieve validation of Reveal in early-stage cancers, a limitation of the study that Guardant recognized. TX-501.0002; TX-969.0001; TX-90.0002. Yet Guardant still falsely claimed in its marketing that the Parikh Study represents Reveal's performance in the intended-use population. TX-541.0006.

  Guardant has therefore made numerous false statements about Reveal's performance in its

advertising, each of which represents a separate establishment claim Natera can prevail on at trial. Dissemination of these statements regarding Reveal's performance based on the Parikh Study—including the baseless claims about its performance in the surveillance setting—misleads patients and physicians into believing Reveal's performance is better than it actually is, a crucial consideration for physicians when deciding whether to choose Reveal for patients. This puts Natera at a competitive disadvantage and endangers patients whose physicians rely on MRD testing to guide cancer treatment.

### 4.  All The Other Elements Of Natera's Claims Against Guardant Are Met.

Evidence establishes all the other elements of Natera's Lanham Act false advertising claims against Guardant—deception, materiality, and injury. As discussed above, Guardant's advertising regarding Reveal is literally false because the Parikh Study does not establish or support any of Guardant's at-issue advertising statements regarding Reveal. Guardant's literally false advertising of Reveal creates "a presumption of deception and reliance." *Nat'l Prod., Inc. v. Gamber-Johnson LLC*, 699 F. Supp. 2d 1232, 1237 (W.D. Wash. 2010). Moreover, as discussed below with respect to damages, evidence of Natera's injury is strong and credible, based on actual spending by Natera on corrective advertising.

### B.  Natera's Advertising Statements Accurately Reported Data From The Cited Studies And Are Not False Or Misleading.

Unlike Guardant's advertisements, this Court has already found that Natera's advertisements accurately cited data from published studies and thus are literally true. As this Court recognized in its summary judgment order: "Here, all Natera's advertising statements at issue are directly derived from the Reinert study and the Parikh study. The numbers are not literally false on their face." Dkt. 326 at 13. The crux of Guardant's false advertising claim is in essence that, while it is *true* the study data showed higher performance for Signatera versus Reveal in certain metrics, it is nevertheless misleading to compare the results of the two studies. Guardant's theory is internally inconsistent. The Parikh Study was a Guardant study that invited comparison with Reinert. The purpose of the Parikh Study was to determine whether the performance of a tumor naive product (Guardant's) could be comparable with a tumor informed product. Guardant itself made frequent comparisons

between Parikh data and Reinert data.

### 1. Natera's Advertising Statements Are Literally True.

Guardant's expert Dr. Heitjan testified that Natera's advertising accurately reports the cited study data. Numerous other Guardant witnesses likewise admitted Natera's advertising accurately reported various performance metrics from the cited studies:

- **Pre-surgical detection:** Guardant admits Natera's advertisements accurately reported pre-surgical sensitivity of 88.5% (Signatera) and 47% (Reveal).

- **Lead time:** Guardant admits Natera's advertisements accurately reported lead time of 8.7 months for Signatera (based on the Reinert Study) and ~4 months for Reveal (based on the Parikh Study), the latter of which Guardant agrees is "the best source for determining a lead time for Reveal."

- **Failure rate:** Guardant admits Natera's advertisements accurately reported the failure rate from the study data at 3% combined tissue and plasma for Signatera (based on the CIRCULATE study) and 12-14% for Reveal (based on the Parikh Study).

- **NPV/PPV/HR:** Guardant admits Natera's advertisements accurately reported the NPV, PPV, and hazard ratios of Signatera and Reveal based on the cited studies.

- **Longitudinal sensitivity:** Guardant admits Natera's advertisements accurately reported the serial longitudinal sensitivities of Signatera (88%) and Reveal (69%).

In addition to advertisements comparing study results, Guardant alleges that one paragraph in a multi-page technical White Paper is false advertising. The White Paper describes that tumor naive tests may not be able to screen out biological noise and this impacts specificity. Natera's technical observation was confirmed. Despite Guardant's claim that it had a CHIP filter that would lead to 100% specificity, the CHIP filter did not work and Guardant quietly dropped it from its product. COBRA-related documents confirmed that Natera's statements that "[s]pecificity is impacted by biological noise from germline and CHIP mutations" and "tumor-naïve assays are unable to filter out background biological noise from CHIP," are literally true. Guardant's own documents show that Guardant sought FDA approval for a new version of Reveal to "█████████████████████████████████████████████████" TX-1663.0021.

Without evidence of facial literal falsity, Guardant argues the comparisons between two different studies are false by implication (*i.e.*, misleading). But Guardant witnesses confirmed there

is nothing wrong with making performance comparisons between the Parikh and Reinert Studies, and Guardant has done so itself—including in the same side-by-side fashion. TX-570.0002-0006; TX-585.0007; TX-668.0006; TX-705.0001; TX-.0029-0031, TX-770.0015; TX-771.0001. Indeed, the Parikh Study was designed to be directly comparable to the Reinert Study. TX-1309.0020; TX-772.0001.

### 2. Guardant Cannot Show Actual Deception From Natera's Advertising.

Since Natera accurately reported the study data in its advertising, and thus its advertising is not literally false, there is no presumption of deception available to Guardant. And Guardant cannot prove actual deception resulting from Natera's ads. It has no evidence any physician ordering the parties' assays was misled. Its witnesses have testified that physicians are "highly knowledgeable" and sophisticated people, driven to adopt new assays by "evidence" such as published studies. And, as discussed below, Guardant's litigation survey is unreliable and, in any event, does not show any deception. Guardant's other expert Dr. Heitjan cannot fill in this evidence gap, as he admitted he is "not expressing opinions about the opinions of medical oncologists."

### 3. Guardant Cannot Show Natera's Advertising Was Likely To Influence Any Physician Decisions.

Guardant's witnesses admitted that, for products like Reveal, physicians "change or adopt new products slowly and carefully" because of the potential for "serious consequences," and that physicians are "highly knowledgeable" people, driven to adopt new assays by "evidence" such as published studies. The evidence thus shows physicians are *unlikely* to make ordering decisions based on Natera's advertisements, as opposed to the underlying data. And Guardant cannot show materiality, as its survey expert did not test the impact of any marketing claims on physician decisions. *Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 455 (D. Conn. 1994) ("Miles has failed to establish that Pfizer's use of a cross study comparison of [two studies] is actionable as either a literal falsity or misleading representation," as "**physicians are presumably aware of the inherent limitations in cross study comparisons**"). Indeed, Guardant's own expert, Dr. Parikh testified that, "I think I have, kind of, leaned more towards Signatera," because "the robustness and, kind of, volume of data that we have for Signatera." Dkt. 615-6 (Parikh July 9, 2024 Dep. Tr.) at 91:5-24.

### 4. Guardant's Litigation Survey Is Flawed.

Guardant's survey is highly flawed and its survey expert's opinions are not credible. The survey tested the wrong questions and failed to account for pre-existing beliefs about the parties' respective tests. To the extent the survey has any bearing on the issues at all, it shows that physicians view Signatera as superior to Reveal based on their own experience, not Natera's advertising. This is precisely how survey respondents—practicing physicians—answered the survey.

Guardant will claim some evidentiary void because Natera did not conduct its own survey, but literally false claims like the establishment claims Natera asserts are presumed deceptive. Moreover, "nothing in the Lanham Act, nor under [Ninth Circuit] precedents, requires a plaintiff to use such surveys.'" *Youngevity Int'l v. Smith*, 2019 WL 2918161, at *3 (S.D. Cal. July 5, 2019) (internal citations omitted). Natera did not need a litigation survey because market research *performed by Guardant* in the normal course of business demonstrates that consumers were actually deceived by Guardant's false and misleading statements, which it characterized as the "key selling messages" for Reveal. Guardant's *own* evidence thus shows it knowingly spread false and misleading claims.

### 5. Guardant Cannot Show Actual Injury From Natera's Advertising.

The record is replete with evidence showing a *lack of harm* to Guardant, as opposed to its presence. For instance, Guardant's executives have stated publicly in earnings calls about how "very pleased" they have been with Reveal sales and that it has exceeded their expectations. Guardant will be unable to show any actual injury of likelihood thereof at trial.

### C. Guardant's Damages Seek A Legally Impermissible Windfall, Whereas Natera's Damages Are Reasonable And Fully Supported By Law.

Natera incurred substantial corrective advertising expenditures related to Guardant's false statements—conservatively, ███████. Natera's damages expert, Dr. Stec conducted an analysis and vetted Natera's calculations to adjust that amount downward to ███████.

On the contrary, Guardant claims ███████ in prospective corrective advertising costs; ███████ in lost profits; and ███████ in disgorgement—each of these is speculative, unreliable, and unduly prejudicial.

[REDACTED] *in future corrective advertising*. Assuming that Guardant has neglected to take any mitigation efforts whatsoever—failing to undertake *any* corrective advertising efforts to date—Guardant's expert Malackowski opines it will need to spend [REDACTED] at some point in the future. He gets to this number by [REDACTED] No authority supports this "methodology." Unlike Dr. Stec, Malackowski also fails to do any expert analysis and simply performs basic arithmetic.

[REDACTED] *as the "potential value" of Reveal.* Malackowski purports to calculate the "value" of Reveal as a check that his future corrective advertising figure is reasonable and conservative. Not only is this an irrelevant and inappropriate metric given that future corrective advertising is a form of *actual* damages, but all of his calculation methods are also deeply flawed:

- EV-to-Revenue Multiple: [REDACTED]

- Signatera Performance: [REDACTED]

- NPV of Gross Profit: [REDACTED]

- R&D Expenditures: [REDACTED]

Additionally, one major flaw pervades all these calculations—to the extent that they measure "potential value" of Reveal at all, they do so for version that Guardant admits is "2-3 generations" beyond the version at issue in this case (TX-1762.0001), based on entirely different technology, and *not* clinically validated by the study cited in Natera's ads—the Parikh Study.

[REDACTED] *in lost profits*. Guardant [REDACTED]. Nonetheless, Malackowski opines that Guardant [REDACTED]. He did not undertake *any* analysis to vet the reliability or reasonableness of this

rosy projection before blindly relying on it. This projection is based on unreasonable assumptions and deviates materially from others Guardant produced but he never considered.

**Disgorgement**. Malackowski attributes ███████████████████████████████████████████████████████████████ in disgorgement. This directly violates the well-established principle that only a defendant's profits *attributable to*— *i.e.*, gained as a result of—the allegedly false advertising may be awarded. *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942) ("The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark."); *U-Haul Int'l*, 793 F.2d at 1042 ("The amount to be awarded is the financial benefit [the defendant] received because of the advertising."); *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2023 WL 2652855, at *3 (C.D. Cal. Mar. 13, 2023) ("'[A] court may deny recovery of a defendant's profits if,' for example 'they are only remotely or speculatively attributable to the infringement.' . . . This principle—that misconduct must have 'had an effect on profits' to justify disgorgement—is just plain 'common sense.'"). Also, other than Natera's cost of goods sold, he does not deduct any incremental costs that Natera undisputedly incurred—despite the fact that deduction of other quintessential variable costs, such as commissions, is required. ███████████████████████████████████████
███████████████████████████████████████████████████████████
███████.

DATED: September 24, 2024           Respectfully submitted,

                                               QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                               By  /s/ Kevin P.B. Johnson
                                                  Kevin P.B. Johnson
                                                  Attorneys for Defendant and Counterclaim-Plaintiff NATERA, INC.