UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUARDANT HEALTH, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>NATERA, INC.,<br><br>    Defendant. | Case No. 21-cv-04062-EMC<br><br>**FILED UNDER SEAL**<br><br>**ORDER GRANTING IN PART AND DEFERRING IN PART GUARDANT'S MOTION FOR SANCTIONS**<br><br>Docket Nos. 578, 692 |

## I.    OVERVIEW

Before the Court is Guardant's Motion for Evidentiary and Monetary Sanctions against Natera for Material Misrepresentations Regarding Natera's Expert Witness Dr. Hochster. Dkt. No. 578. Guardant moved the Court to exclude the supplemental report and testimony of Natera's expert witness, Dr. Hochster regarding the COBRA study, a study involving Guardant's colorectal cancer ("CRC") screening product. Guardant also asked for monetary sanctions in the form of payment of its attorneys' fees flowing from the behavior at issue. After reviewing the initial filings, the Court ordered that the parties conduct additional discovery to inform the sanctions motion, and to ensure that Guardant received a complete response to its discovery requests, to which it is entitled. *See* Dkt. No. 597 (Minute Entry for July 26, 2024, Motion Hearing). Following Guardant's motion to compel production of email communications between Dr. Hochster and Natera's counsel at Quinn Emanuel, Dkt. No. 630, Judge Kim ordered the documents produced to the Court for in-camera review, Dkt. No. 660. Judge Kim then ordered the documents be produced to Guardant's counsel after finding that "it appears from the two documents that Natera's counsel misled the undersigned and the District Court about the timing of

Hochster's knowledge of the COBRA study's results in order both to defeat Guardant's motion to compel and to obtain the Order allowing the late submission of Hochster's supplemental report." Dkt. No. 675.  Guardant then filed a Supplemental Memorandum is support of its Motion for Sanctions.  Dkt. No. 692.

For the following reasons, and as explained at the hearing on the motion for sanctions, the Court **GRANTS IN PART AND DEFERS IN PART** Guardant's motion and finds sanctions are warranted due to both Natera's (through its counsel at **Quinn Emanuel**) and Dr. Hochster's own deliberate misrepresentations to Judge Kim and the undersigned of this Court.  The sanctions include evidentiary sanctions in the form of: (1) excluding COBRA in its entirety, Dr. Hochster's supplemental report on COBRA, and other discovery flowing from COBRA; and (2) an adverse instruction to be given by the Court regarding Dr. Hochster's credibility.  Further, the Court finds monetary sanctions are likely appropriate due to Natera's counsel's, Quinn Emanuel, deliberate misrepresentations to this Court and to Judge Kim.  Quinn Emanuel's conduct, simply put, was unjustified, unacceptable and sanctionable.

Further, the Court also excludes the COBRA study (and evidence thereof) under Fed. R. Evid. 403, as the risk of prejudice, confusion, misleading the jury, and wasted time, now substantially outweighs the limited probative value of the COBRA.  Dkt. No. 493, Page 12-13.  The Court will essentially turn back the clock on this issue, and conduct the trial in large part as that which would have proceeded in March 2024 but for its misplaced reliance upon Dr. Hochster's supplemental testimony on COBRA.

## II. RELEVANT BACKGROUND

Guardant and Natera have competing CRC detection products.  Dkt. No. 493 at 3.  Even after treatment, some CRC patients still have a small number of CRC cells remaining in their bodies that can later multiply and cause recurrence of the disease; the small number of remaining CRC cells is termed molecular/minimum residual disease ("MRD").  Natera's product, Signatera uses tumor tissue to detect MRD or "tumor-informed" assays.  *Id.*  Guardant's product, Reveal, uses blood samples to detect "circulating tumor DNA" ("ctDNA") in the bloodstream or "tumor-naïve" assays.  *See id.*  The parties accuse one another of making false or misleading statements in

their advertisements regarding their competing products.

A.  The COBRA Trial

The COBRA trial was a national Phase II/III clinical trial sponsored by the NRG Oncology branch ("NRG") of the National Cancer Institute ("NCI") and conducted in partnership with the Rutgers Cancer Institute of New Jersey ("CINJ"). *See* Dkt. No. 447-2 (Hochster Suppl. Report) ¶¶ 14-15, Ex. 1 (ASCO presentation describing study). The study used a version of Guardant's Reveal[1] (titled Guardant "Lunar") and aimed to assess the impact of the Reveal blood test on enhancing clinical outcomes for patients diagnosed with stage II colon cancer. *See id.* According to Natera's expert witness, Dr. Hochster,[2] the COBRA study assessed whether ctDNA is a reliable marker for cancer prognosis and whether ctDNA testing offers a more reliable method for early detection of cancer recurrence as opposed to the current method of active surveillance *i.e.*, observation. *Id.* ¶ 14. The goal of the COBRA study was to use an MRD test (specifically, one of Guardant's ctDNA assay tests) to identify which patients among a particular cohort of early-stage CRC patients would benefit from chemotherapy. *Id.* ¶ 15. The COBRA study was randomized into two arms of subjects: (1) standard of care treatment (*i.e.*, observation/surveillance) and (2) prospective ctDNA-assigned treatment. For the first arm, the participants' ctDNA status was analyzed and they were observed per the standard of care, without receiving chemotherapy treatment. *Id.* ¶ 19. For the second arm, postoperative blood samples from each participant were analyzed for the presence or absence of ctDNA using Reveal. Participants who tested positive for ctDNA in the initial test were then treated with six months of adjuvant chemotherapy. All patients were to be followed with Reveal tests and CT scans every 6 months for recurrence. *Id.* On July 5, 2023, the COBRA trial was suspended in order to perform a preplanned "Phase II" endpoint analysis "as an early check for the fidelity of the ctDNA test."

---

[1] It is disputed precisely which version was used and if it corresponds to the version discussed in the ads at issue in this suit.

[2] Dr. Hochster is a colleague of investigators of the COBRA trial from Rutgers CINJ, as Dr. Hochster is the Associate Cancer Center Director for Clinical Research of Rutgers Cancer Institute, and the Director of GI Oncology at Rutgers Cancer Institute. Dkt. 447-2 ¶¶ 10-11; *see also* Opp., Ex. 25 (Hochster Tr.) at 32:11-20, 44:8-14, 76:5-14, 79:8-80:13. He is also the Director of the Robert Wood Johnson Barnabas Cancer Center. Dkt. 328 at 7.

*Id*. ¶ 22. However, within two months of the intermediate endpoint analysis, the study's conductors terminated the study due to futility, and informed the public that a greater than anticipated number of participants may have been "false positives" for CRC who received chemotherapy as a result. *Id*. ¶¶ 24, 37. Though the study did not include actual clinical outcome data, Dr. Hochster stated the results reported in the COBRA study Phase II endpoint analysis did not meet established expectations regarding clearance of ctDNA—out of the 7 patients that started with a positive ctDNA, 3 out of the 7 (43%) converted to negative without treatment. *Id*. at ¶ 32. Dr. Hochster suggested this meant that Reveal labeled those three patients as false positives because it was unlikely for a patient to spontaneously clear ctDNA without treatment. *Id*. Conversely, in the 9-patient group that did receive chemotherapy, 1 out of the 9 patients (11%) achieved clearance at the six-month mark. *Id*. at ¶ 33. This did not align with the expectation of a 40-60% clearance range based on the results from another large patient population in the GALAXY and BESPOKE trials. Dr. Hochster's supplement report suggested that COBRA showed that Reveal was prone to "false positives." *Id*.

The decision to discontinue the study was memorialized in a private letter on August 30, 2023, in a letter by NRG to participating oncologists. Dkt. 447-2 at 74 (NRG letter). The closure of the COBRA study was then made public at least as of September 4, 2023. *See Guardant Health Close enrolment in COBRA Study Following Interim Analysis*, NS MEDICAL DEVICES (September 4, 2023) https://www.nsmedicaldevices.com/news/guardanthealth-closes-enrolment-in-cobra-study-following-interim-analysis/). The data from the study was not published publicly until January 16, 2024, in materials given out prior to the 2024 American Society of Clinical Oncology Gastrointestinal Cancers Symposium (ASCO-GC). At the symposium, on January 20, 2024, COBRA was presented in an abstract and a slide deck.[3] *See* Opp. Ex. 2; Dkt. 493 at 3-4; Hochster Supp. Rpt., Ex. 1 (2024 COBRA Presentation), Ex. 4 (ASCO materials), Ex. 5 (ASCO materials).

---

[3] COBRA has not, however, been peer-reviewed or formally published in a journal.

B.  Motion to Strike

On January 31, 2024, Dr. Hochster submitted a supplemental expert report explaining the findings of the COBRA trial. *See* Hochster Supp. Rpt. ¶¶ 32-33. In that report, Dr. Hochster reported on the results and explained that "Reveal was not performing as reported by Guardant and Parikh" and that "the failure of this magnitude is unheard of and will have tremendous and long-lasting impacts on the field." *Id*. ¶ 35. Dr. Hochster reported that this study further proved his reluctance to using "tumor-naïve" diagnostics in his practice. *Id*. at ¶ 46. Guardant moved to strike the supplemental report from Dr. Hochster as untimely without excuse, irrelevant, and unduly prejudicial. *See* Dkt. No. 447. The Court denied the motion, deemed the supplemental report and the underlying COBRA trial admissible and relevant for a limited purpose, and continued the trial by four months so Guardant could conduct additional discovery and respond to the report. *See* Dkt. No. 493. The Court found that the COBRA report may be relevant to Guardant's claim for damages as a "cap" on the prospective corrective damages under *Adray v. Adry-Mart*, Inc., 76 F.3d 984 (9th Cir. 1995) because corrective damages should not exceed the "value of the mark." Dkt. No 493, 12-13. The Court also held Dr. Hochster's supplement report conditionally relevant if:

> (1) Guardant contends liability under the Lanham Act for its alleged misrepresentation of the Parikh study turns on the absolute truth of its claim of 100% specificity, or (2) if Natera presents specific evidence that the unblindness and non-prospectiveness were used to manipulate the Parikh study to report false data on specificity and sensitivity, and Guardant challenges the materiality of those falsely reported statistics. Because the COBRA trial is admissible for at least a limited purpose, the parties may conduct focused discovery as previously discussed. The parties are directed to meet and confer on the scope of that discovery.

Dkt. No. 493, 12-13.

In addressing whether the untimeliness of the report and notice about the report could be excused, the Court considered statements Natera made in its brief and orally. Specifically:

- During oral argument on February 22, 2024, counsel for Natera stated: "**I also would like to note that there was an accusation that Dr. Hochster somehow had inside information**. The abstract was available before the conference. The conference was in January, January 16th I believe. But there was an abstract available before the conference. **So I'm certainly not aware of any sort of early access that Dr. Hochster may have had**." Mot., Ex. I, Feb. 22, 2024, Tr. at 14:19-15:3.

5

- In Natera's opposition brief it stated: "At the time that Dr. Hochster submitted his Opening Report [i.e., October 2022 *see* Dkt. 224-8, Ex. 1305] the COBRA clinical trial was underway, but was 'at an early stage and no measurable clinical data [had] been generated.' *Id.* ¶ 120. **Because there was no measurable clinical data at that time, Dr. Hochster could not include a detailed analysis of the COBRA trial in his Opening Report**. Nor could he opine on the COBRA trial's impact on his analysis of Reveal's performance metrics and how those metrics compare to those marketed by Reveal." Dkt. No. 452 at 2-3 (emphasis added).

- Natera also explained that Dr. Hochster submitted his supplemental report "just days after" the ASCO-GI Conference on January 16, 2024, and explained further: "**[a]lthough the COBRA clinical trial was terminated due to the unexpectedly poor performance of Reveal in August 2023, it was not until the ASCO-GI Conference in January 2024 that the underlying clinical data supporting the NCI's decision to terminate the study was made available to the public.** Specifically, an abstract describing the underlying data was first published in an abstract on the ASCO-GI website on January 16, 2024, and the results were presented orally during the ASCO-GI Conference on January 20, 2024. **As a practicing physician, Dr. Hochster attended the ASCO-GI Conference and listened to the presentation on the COBRA clinical trial**." *Id.* at 3 n.1 (emphasis added).

The Court was left with the impression that the COBRA information was late breaking and seemingly new to Dr. Hochster and Natera, and that was the reason why no mention of the study and its potential significance to the trial in this case was made to the Court until long after discovery closed and trial was imminent. The Court thus permitted the filing of the supplemental report and reopened discovery related thereto, and importantly, continued the trial because of the putatively late-breaking development.

C.  Discovery Disputes

Disputes ensued over discovery related to the COBRA study. Guardant sent Natera's counsel a document subpoena for Dr. Hochster on February 25, 2024, and formally served that subpoena through counsel on March 8, 2024. Mot., Ex. A (subpoena and notice). Among other requests, Guardant sought any email communications between Dr. Hochster, COBRA investigators, NRG or Natera regarding the COBRA study. *See id.* at 6, 4. Natera/Dr. Hochster responded:

- **"Dr. Hochster responds that following a reasonably diligent search, Dr. Hochster is not aware of any non-privileged communications he has had with the COBRA investigators, NRG, NCI, Natera, or Guardant regarding COBRA."** Mot. Ex. C, (Natera R&O's) at 10-11. The discovery responses were signed by Natera's counsel as

6

"Attorneys for Defendant and Counterclaim-Plaintiff Natera, Inc." *Id.* at 24.

Guardant sought Judge Kim's intervention regarding the failure to produce any emails about COBRA, finding the response inconsistent with statements Dr. Hochster made in his supplemental report about his familiarity with the study from its outset. Dkt. No. 510 (Joint Discovery Letter). In response Natera/Dr. Hochster made the following statements through the representations of the Quinn Emanuel firm in its brief to the Court:

- In the discovery letter brief, Natera stated that "Guardant is wrong that Dr. Hochster 'had not conducted a reasonable search.' Given his limited role in the COBRA study, **he did not need to do a comprehensive search to know he never emailed about COBRA** . . . ." Dkt. No. 510 at 7 (emphasis added). This letter was signed by Natera's counsel as "Attorneys for Defendant/Counter- Plaintiff Natera, Inc." *Id.* at 1.

- Natera stated in this letter that: "Dr. Hochster already responded, repeatedly, that he has no responsive documents. **Though it was duplicative, Dr. Hochster has searched his email (again), using Guardant's requested search terms, 'COBRA' and 'NRG-05,' and now confirms (again) that he has no responsive documents**." *Id.* (emphasis added)

- At the hearing before Judge Kim, Natera (through its counsel) stated that "And so, he just — he doesn't have email communications. He just is a practicing oncologist. He doesn't — he doesn't email as much as us lawyers do, and you know, he did a search. In fact, he did a — **he did an exact search that Guardant asked him to do**. He searched his inbox, he searched his emails for the search terms that Guardant asked in this letter brief, and the result is there's just — there's just nothing responsive there. . . . But at this point, there's — **he's not withholding anything, there's just certainly nothing to compel**." Mot., Ex. E, April 22, 2024, Proceeding Transcript at 6-7 (emphasis added).

Judge Kim relied upon those representations and explained at the hearing: "I agree that if the other side says they've looked and they can't find anything, I can't order them to produce something that doesn't exist. . . . **[I]f he searched and there's nothing, that's it. I'm sort of stuck.**" *Id.* at 7 (emphasis added). And, moreover, that "[t]hey said they searched. They've searched. They made representation in open court and you can ask him at deposition." *Id.* at 11. Judge Kim, in a written decision, **denied** Guardant's request to compel production of the emails, stating: "**Natera represented at the hearing on this matter that Hochster had searched his electronic files using the search terms recommended by Guardant and that Hochster found no responsive documents. Thus, the Court cannot compel production of documents that do not exist**." Dkt.

7

No. 515, Order re Joint Discovery Letter at 1 (emphasis added).

D.      Present Motion for Sanctions

After the above rulings were rendered, additional information came to light prompting the present motion for sanctions by Guardant.

1.      Rutgers Production

Shortly after Judge Kim denied compulsion of Dr. Hochster's emails, Guardant served a third-party subpoena on Rutgers University, Dr. Hochster's employer and home to investigators of the COBRA study, on May 8, 2024. Mot., Ex. F (Rutgers subpoena) at 4. Given time constraints and the impending deadline for close of supplemental discovery, the request was narrow. *See id.* at 4. Rutgers produced documents on June 13, 2024, after the formal discovery deadline passed.

The production revealed *dozens* of emails between Dr. Hochster, and individuals identified as "Cobra Investigators" in its discovery requests including Dr. Morris and Drs. Boland, Wolmark, and George, discussing the COBRA study between August and October 2023. Mot., Ex. A (subpoena) at 1-2; Mot., Exh's L (email with Hochster and George), M (email with Hochster and Morris), R (email with Hochster and Wolmark), S (email with Hochster and Boland). Drs. Wolmark and George are also part of NRG, another category covered by the request. *See* Mot., Ex. A (subpoena) at 4-5. The emails, in conjunction with Dr. Hochster's deposition testimony, reveal the following:

- **Dr. Hochster learned that the COBRA study would be discontinued on August 30, 2023.** On that date, Dr. Hochster received a "Dear Colleague" letter from NRG announcing the closure to involved oncologists. Mot., Ex. K, RUTGERS_000310, at -311.

- **Dr. Hochster received a non-public (embargoed) version of the COBRA study Preliminary Abstract, summarizing the study's results and data on September 13, 2023, after Dr. Hochster asked specifically for his colleague Dr. Boland (investigator) to "[p]lease share what you get in writing" regarding COBRA.** Mot., Ex. S, RUTGERS_001082, at -082; Ex. T, RUTGERS_000366 at -366, -082.[4] Per Dr. Hochster's testimony in his deposition, the data in this draft was the same as what was presented at the ASCO-GI conference in January 2024, though he testified he

---

[4] Dr. Boland sharing the abstract seems to have violated the embargo, which warned investigators not to share the abstract or discuss results "with anyone outside of the coauthors included in this email." Ex. T, RUTGERS_000366 at -366. Dr. Hochster is not such a coauthor.

8

did not know if the data would not be modified before being made public at the time he first received it, as data in preliminary abstracts are often modified. Mot., Ex. H, June 18, 2024, Deposition of Dr. Hochster Transcript at 215:17-25; Opp. Ex. 25 (Hochster Dep. Tr.) at 46:9-25, 51:9-18.

- **On August 30, 2023, the day Dr. Hochster received the letter informing him that the study was being shut down he began emailing COBRA investigators about the study closing and made disparaging remarks about Guardant and Reveal.** *See id.* at -310; Mot., Ex. L, RUTGERS_000889, at -889-890, Ex. M., RUTGERS_000713, at -713. In these emails, Dr. Hochster stated: "It's a problem with the way that Guardant Lunar (Reveal) calls out the cancers. I have been skeptical." Ex. K, RUTGERS_000310 -310. He also stated "OMG. What a clusterf@@@!! I never trusted that methylation signature from Guardant." Ex. L, RUTGERS_000889, at -889-890. "I am really sorry to hear this outcome . . . . I think this is the result of believing the Guardant PR on the Lunar test that methylation can identify cancer." Ex. M, RUTGERS_000713, at -713. "[T]he work they [Guardant] did with Parikh was manipulated over multiple iterations. So I am not surprised." *Id.*

- **Dr. Hochster spoke with Quinn Emanuel, Natera's counsel, about the COBRA study being shut down within one month of August 30, 2023, it was not clear then if Dr. Hochster told Quinn that he was in possession of the Preliminary Abstract**. Mot., Ex. H, Hochster Dep. Tr. at 240:11-17 ("Q. So, you recall that you might have had communications with Quinn Emanuel concerning COBRA at or around August 30th, when the study was closed? A. I would say it was sometime within the next month. I'm sure I let them know of this information."). Quinn represents that Dr. Hochster only disclosed that COBRA trial closed, not that he had the early COBRA abstract or data. Opp. at 13 n.8. Quinn directed Dr. Hochster not to respond to any questions about substance of their communications. *See* Mot., Ex. H (Hochster Dep. Tr.) at 240:18-20 ("MS. MAROULIS: Please don't reveal the communication. THE WITNESS: Okay. MS. MAROULIS: He asked for a date. THE WITNESS: Okay. MS. MAROULIS: It's okay to say the date. Try to keep the record clean.").

- **Dr. Hochster displayed skepticism that the investigators could conclude false positives from the study without clinical outcome data and asked them to explain.** Dr. Hochster stated to Dr. Morris, the principal investigator on COBRA, "BTW, I am curious (in looking over this) how they decided the tests were false positive. Compared to what standard of true positive? Do they have a better test? Or deeper WGS of tumor fraction? How?" Mot., Ex. P, RUTGERS_001152, at -152. *See also* Mot., Ex. Q, RUTGERS_001157, at -157.

- **On September 1, 2023, Dr. Hochster told Lisa Martin-Roman, Natera employee that the COBRA study was closed because there were too many false positives.** Mot., Ex. Q, RUTGERS_001157, at -157 ("[T]hey said in the letter to investigators that there were too many false positives . . . . I am not sure how they know this but they did terminate the study.").

- **On September 7, 2023, Dr. Hochster arranged a phone call with one of the COBRA investigators to ask him questions about the study**. Mot., Ex. R., RUTGERS_000796, at -797 ("Quick question on COBRA (I assume you are aware of

9

the issues). Could you call me anytime?").

- **Dr. Hochster advocated to COBRA investigators that they substitute Guardant's Reveal with Natera's Signatera so that the study could be continued and offered to be a liaison between the investigators and Natera.** *See, e.g.*, Mot., Ex. N. RUTGERS_000800, at -801 ("Any chance of a 'Mulligan' using Signatera[?]"), Ex. O, RUTGERS_001092, at -092 (suggesting Dr. Morris speak with Natera), Ex. P, RUTGERS_001152, at -152 (offering to call Michael Krainock, Associate Medical Director at Natera to help put Natera in touch with COBRA investigators).

- **Dr. Hochster did not disclose to the COBRA investigators that he was a paid expert witness for Natera when liaising between Natera and the investigators.** *See* Mot., Ex. H, June 18, 2024, Hochster Dep. Tr. at 174:1-10.

- **On September 26, 2023, Dr. Hochster told Chief Medical Officer of Natera that he spoke with Drs. George and Wolmark re-running samples from COBRA with Signatera and Mike Krainock of NRG about the same.** Mot. Ex. U, RUTGERS_000978, at -979 ("Thanks Minetta. I spoke with Thom George and Norm Wolmark. Should we plan a virtual meeting?"), ("Thank you for sending out this email on the COBRA trial. This is a critical point which I keep emphasizing to people. Their methylation signature is 'poo-poo'. I have mainly dealt with Mike Krainock, but wanted to see if you would consider re-running the tissue and blood for these patients. I have brought this up to NRG leadership team.").

Though extensive, none of these communications had been revealed by Dr. Hochster or Natera to Guardant. Once some of the correspondence between Dr. Hochster and the COBRA study investigators came to light through third party production of documents, the Court ordered the parties to hire a forensic investigator to find and collect Dr. Hochster's emails (which were not actually deleted) from the server, his laptop, and computers. Only then did Dr. Hochster represent that he now found some of the emails with the COBRA investigators. He has not explained *how* he discovered these emails. The forensic examination has required extensive work between Rutgers and additional attorneys, to review the emails for patient confidentiality, before being able to produce the emails to Guardant. As of the date of the October 15, 2024 hearing, the full review by Rutgers of the emails, due to the scope and time constraints, had yet to be completed, and the additional emails had yet to be produced to Guardant.

2. <u>Deposition of Dr. Hochster</u>

In the deposition on June 18, 2024, of Dr. Hochster, Dr. Hochster described the following regarding searches that he purportedly conducted in response to Guardant's earlier document

10

requests:

- **The first time that Dr. Hochster saw the document requests from Guardant was on March 26, 2024, one day before the R&Os were sent back to Guardant representing that Dr. Hochster had undertaken a reasonably diligent search yielding no emails.** Mot., Ex. H (Hochster Dep. Tr.) at 141:20-142:11; Mot. Ex. C, (Hochster R&O's to Guardant's document requests, dated March 27, 2024). The requests were served on provided on February 25, 2024, and formally served on March 8, 2024.

- **Dr. Hochster's explanation as to why he said he had no emails is that he simply forgot about the email communications, recognizing that such was hard to believe.** Reply, Ex. Y (Hochster Dep. Tr. at 177:13-23) ("you didn't remember any of these e-mails? A. Actually, I didn't. Q. Right. Okay. A. It does seem kind of unbelievable, now that you put it in this context. But, you know, I think this, at the time, we were all just reacting to the kind of news of the study being closed and -- Q. Okay. A. -- just being collegial.").

- **Hochster testified that he only ever searched once for his emails, and it was untrue to say he searched any more than once.** Mot. Ex. H (Hochster Dep. Tr.) at 154:23-155:11 ("Q: Okay. And how many searches did you do; one search? A: One search. Q: Not two searches? A: No. . . Q: Okay. So it would be untrue, if your Counsel represented to the Court, that you searched twice? A: I searched once. Q: So, I understand that you want that to be the answer. But would it be fair to say, then: It would be inaccurate if your Counsel told the Court that you searched more than once? . . . A: Well, I – I think that's apparent.").

- **In that search, Dr. Hochster typed "NRG" and "COBRA" into his inbox search bar. There were some emails that appeared. He reviewed them himself and determined none were responsive to the subpoena and testified none of the returned results were emails in the Rutgers production.** Opp. Ex., 25 (Hochster Dep. Tr.) at 144:17-145:10 ("Q: Why don't you tell us the search that you did? A. I used my Outlook, which is our University Outlook, I typed in 'NRG,' 'COBRA' in the search boxes and I really did not find those emails that were subsequently produced by Rutgers. Q: You didn't 'really' you said. You didn't really find them, did you sort of find them? . . . . A. I did not find them, when doing the search . . . . I'm sorry for my less-than-definitive statement. I did not find them when I searched."), Reply, Ex. Y (Hochster Dep. Tr. at 149:5-25).

- **Dr. Hochster stated that he did not specifically delete any email communications regarding COBRA or intend to mislead anyone; he explained he regularly deletes emails as he goes because of limited memory in his email cache and empties his deleted-items folder also; he could provide no other explanation for why his emails did not show up when he searched.** *Id.* at 151:2-25 ("Q. Do you remember at any point in time deleting your communications with NRG, Guardant, Natera, or the study investigators, concerning COBRA? A. I did not, specifically, delete any communications such that you've enumerated. But, you know, I have limited memory in our cache. So, I'm constantly getting messages about how full my memory is getting,

so I try to delete things, as I go along. Q. And did you search your trash, your deleted-items folder? A. I empty that completely frequently. So, I didn't -- but I don't think I would have found anything in the trash.").

- **Dr. Hochster could not testify that if he replicated his search today that the emails in question would not appear.**  Opp., Ex. H, Hochster Dep. Tr. at 150:18-22 ("Q. Is it your testimony, under oath, that if you were to repeat that search today, COBRA, on your computer, that you still would not find those documents, that they did a different search on this? A. I don't know.").

- **Dr. Hochster testified that he has not conducted any searches since learning of the Rutgers production.**  Mot., Ex. H (Hochster Dep. Tr.) at 152:10-13 ("Q. Have you -- since you learned that there were these documents, have you since tried and done the search again? A. No, I have not.").

- **During the deposition Guardant's counsel asked if Natera counsel would type in "COBRA" to Dr. Hochster's email to see what happens and Natera counsel objected**. *Id.* at 152: 1-6.

3. Dr. Hochster's Letter to the Court

Once Dr. Hochster revealed, in the face of an impending forensic examination of his files, that he had finally discovered his correspondence with the COBRA investigators, he filed a letter to the Court on **August 15, 2024, in which he apologized for his "inexcusably deficient" search and review of his emails.** Dkt. No. 624.  Dr. Hochster, however, did not explain (and still has not explained either directly or through Natera's counsel) what exactly happened and how he came to belatedly discover the emails.

4. In Camera Review of Emails between Dr. Hochster and Natera's Counsel

Following Guardant's motion to compel production of email communications between Dr. Hochster and Natera's counsel at Quinn Emanuel which were listed on Natera's privilege log, Dkt. No. 630, Judge Kim ordered the documents produced to the Court for *in-camera* review, Dkt. No. 660.  Judge Kim then ordered the documents be produced to Guardant's counsel after finding that "it appears from the two documents **that Natera's counsel misled the undersigned and the District Court** about the timing of Hochster's knowledge of the COBRA study's results in order both to defeat Guardant's motion to compel and to obtain the Order allowing the late submission of Hochster's supplemental report."  Dkt. No. 675 (emphasis added).  One of the documents produced showed the following:

- **On September 15, 2023, Dr. Hochster sent Counsel for Natera, Elle Wang and Andrew Bramhall of the Quinn Emanuel firm, an email with the subject line "CONFIDENTIAL to QE on COBRA.docx" stating:** "As we discussed. This is the short summary, and nothing else is really known outside of Guardant (unless a few people at NCI or NRG received a more complete discussion." Dkt. No. 692 Ex. B.

- Attached to the September 15, 2023 email was a memo describing the actual results of the COBRA study that then later appeared in the actual abstract "To: Andrew Bramhall and Elle Wang." *See* Dkt. No. 692 Ex. C. In this memo, Dr. Hochster further explains the memo contains "<u>confidential</u> information embargoed until the GI ASCO meeting in January […] (AND PLEASE DO NOT DISCUSS DETAILS with anyone else)." (emphasis in original).

5. <u>Misrepresentations to the Court in Natera's Oppositions</u>

- **In its brief to the Court filed on July 19, 2024, Natera (through its counsel at Quinn Emanuel) stated that Natera had not acted in bad faith, that Dr. Hochster could not and did not disclose the abstract to anyone at Natera, and that Natera did not know of Dr. Hochster's early access to the abstract and study results until the Rutgers' production**. Opp. at 19 (emphasis added). ("As Dr. Hochster testified during his deposition, he only received an early draft abstract that was under strict embargo and could not (and did not) disclose it to anyone, including anyone at Natera.")

- Natera also told this Court: "**Certainly, Natera and its counsel did not know Dr. Hochster received a draft, until receiving Rutgers' document production in response to Guardant's subpoena**." Opp. at 19 (emphasis added).

At the hearing on Guardant's motion for sanctions, Quinn Emanuel apologized for not "connecting the dots" in representing to the Court that Dr. Hochster had no written correspondence with the COBRA investigators and no early access to the abstract. But the newly disclosed email shows that Quinn Emanuel did not simply fail to "connect the dots." The dots were patently connected, and Quinn Emanual knowingly hid that connection from Guardant and from this Court. Its correspondence with Dr. Hochster establishes that Quinn Emanuel knew Dr. Hochster had correspondence with the COBRA investigators and that he had a copy of the abstract.

As to Dr. Hochster's testimony that he had no memory of any correspondence with the COBRA study investigators, despite the extensiveness of his exchanges with them and their recency, this Court found this purported lack of memory implausible. While the Court labeled Natera's counsel a "fool" for (purportedly) believing Dr. Hochster's testimony, it turns out that counsel was more than foolish. Quinn Emanuel deliberately and knowingly misled this Court.

13

Given the correspondence Dr. Hochster had with Quinn Emanuel, counsel knew full well there had to have been email communications between Dr. Hochster the COBRA investigators.

### III. LEGAL STANDARD

A. Court's Inherent Power

Federal courts have "inherent powers" to "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962). Courts are also able to use this "inherent power" to impose "an appropriate sanction for conduct which abuses the judicial process." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017)). "As the Supreme Court has explained, a sanction may be awarded either for willful disobedience of a court order or when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 1090. It is certainly "permissible to infer bad faith from [a party's] action[s] plus the surrounding circumstances." *Miller v. City of Los Angeles*, 661 F.3d 1024, 1029 (9th Cir 2011). Sanctions may be warranted "when a party misrepresents the law or the facts to the court." *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899, 924-25 (N.D. Cal. 2023) (emphasis added); *see also Fallbrook Hosp. Corp. v. Cal. Nurses Ass'n/Nat'l Nurses Org. Comm.*, 2014 WL 4385465, at *2 (S.D. Cal. Sept. 4, 2014) ("Misstatements of both fact and law can support sanctions based on the court's inherent power."); *In re Hawaiian Airlines, Inc.*, 2011 WL 5190931, at *7 (D. Haw. Oct. 28, 2011) ("Courts have found bad faith where a party makes knowing misrepresentations to the court."), *aff'd in part, rev'd in part sub nom. Konop v. Hawaiian Airlines, Inc.*, 641 F. App'x 689 (9th Cir. 2015).

The nature of the sanctions warranted is informed by the prejudice caused by the misconduct. *See Rousseau*, 985 F.3d at 1089-90. Under the Court's inherent authority, the Court may "among other things, dismiss a case in its entirety, bar witnesses, exclude other evidence, award attorneys' fees, or assess fines." *Id.* at 1088. Sanctions are compensatory, as opposed to punitive, if the sanction is "calibrated to the damages caused" by the sanctionable conduct on which it is based. *Goodyear*, 137 S. Ct. at 1186. A district court acting under its inherent

14

authority to impose compensatory sanctions must apply a "but-for" causation standard. *Id*. at 1187. The Court should ask "but for the sanctionable misconduct, would there be any harm warranting compensatory relief?" *Rousseau*, 985 F.3d at 1089-90. If the answer is yes, the sanction is likely compensatory, whereas if the answer is no, the sanction is likely punitive and warrants a higher degree of due process afforded to the sanctioned party. *Id*.

### IV.     ANALYSIS

#### A.     Sanctionable Conduct

Federal courts have power to sanction conduct that "abuses the judicial process." *Rousseau*, 985 F.3d at 1088. To this end, where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," sanctions may be awarded. *Id.* Dr. Hochster and Quinn Emanuel on behalf of Natera, made misleading and false statements to Judge Kim, Guardant, and the undersigned, regarding Dr. Hochster's email communications with COBRA investigators and the NRG, and his access to the study results, including his receipt of the draft abstract months in advance of his supplemental declaration seeking to introduce the COBRA study. These false and misleading statements that Dr. Hochster had no such documents were made with full knowledge of the truth to the contrary. And those misleading statements and untruths were used to gain a litigation advantage – to get this Court to reopen evidence to allow the introduction of the COBRA study long after discovery had closed and on the eve of trial. Relying on these misleading and false statements, this Court was duped into believing the COBRA evidence was late breaking and warranted reopening discovery and disrupting the trial schedule.

The Court continued the trial date from March 2024 to November 2024. Dkt. 472 (Transcript of Proceedings Held on 2/15/2024). ("Well, this is all triggered by the release of the abstract which triggered the report. . . I don't want to pin it on whether they delayed with Dr. Hochster.") The Court did not know Dr. Hochster was deeply involved in the study at a much earlier stage, had a draft of the abstract, and shared its contents with Natera's Counsel five months earlier in September of 2023. Natera gave no indication to the Court in September 2023 that it anticipated the release of a significant study that could warrant a change in the pretrial and trial schedule set by this Court. And although Guardant may have known about the study and its

termination, Natera did not inform Guardant it anticipated making this an issue at trial long after discovery closed.

Judge Kim also relied on Dr. Hochster's and Natera's misrepresentations in denying Guardant's motion to compel the correspondence with the COBRA investigators. This delayed, prolonged and multiplied discovery relative to COBRA which remains to be completed to this day, less than two weeks before trial is to commence. In reopening discovery and continuing the trial, the Court intended efficient and focused discovery. Because of the conduct of Dr. Hochster and Natera through its counsel in resisting discovery and asserting the non-existence of documents they knew existed, that discovery has been anything but focused and efficient. Had the Court anticipated that reopening discovery would have opened a pandora's box, the consequence of which has been exacerbated and multiplied by these ensuing proceedings, it would not have reopened discovery and allowed the COBRA evidence to come in and delayed trial.

1. <u>Evidentiary Sanctions</u>

The Court finds evidentiary sanctions are warranted. The Court excludes COBRA, any mention of COBRA, and any evidence from or implicating COBRA. Should Dr. Hochster continue to testify regarding his previous reports, an adverse instruction will be given regarding his credibility. The Parties have been ordered to file a proposed instruction. *See* Dkt. No. 719 (Minute Entry for October 15, 2024, Motion Hearing).

This evidentiary sanction is compensatory in nature—the Court is essentially turning back the clock on this issue, viewing the trial as that which would have proceeded in March 2024 in the absence of Natera seeking to submit Dr. Hochster's supplemental testimony on COBRA, with the limited exceptions listed at Dkt. No. 719. (Minute Entry for October 15, 2024, Motion Hearing).

The Ninth Circuit has sanctioned parties for the actions of their lawyers. *Goodyear*, 813 F.3d at 1246 ("Any attempt by Goodyear to argue that the district court abused its discretion in preventing Goodyear from passing the blame on to its attorneys is unavailing. Goodyear is deemed bound by the acts of [its lawyers] and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (quotation marks and citation omitted).

Courts have granted evidentiary sanctions, and even dismissals with prejudice, where

parties engaged in deliberate falsity to gain a litigation advantage, as is this case here. *See e.g.*, *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992) (affirming the district court's use of its inherent powers to exclude expert testimony that would unfairly prejudice the defendant and "preclude the court's ability to conduct a fair trial" after the plaintiff destroyed key evidence); *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007 (9th Cir. 2007) (finding the district court did not err in granting a *motion in limine* to exclude evidence under the court's "inherent power" to sanction for abuses in discovery after the party lied to the magistrate judge); *Xped LLC v. Entities Listed on Exhibit 1*, 690 F. Supp. 3d 831 (N.D. Ill. 2023) (dismissing a case with prejudice after finding plaintiffs had lied "to the court in order to receive a benefit from it," and the plaintiff had "abused the judicial process by seeking relief based on information that the plaintiff knows is false.") (citing *Sanders v. Melvin*, 25 F.4th 475, 482 (7th Cir. 2022)). As stated above, had the Court known fully about the matters about which Dr. Hochster and Quinn Emanuel mislead the Court, it would have not reopened the case for the COBRA study and would have proceeded to trial as originally scheduled for March 2024.

Additionally, but-for Natera's sanctionable conduct, there would still be a much larger Fed. R. Evid. 403 problem that would warrant COBRA's exclusion. There already was a difficult question of cabining the COBRA evidence so that the jury would not afford the study too much significance on the issue of the core Lanham Act claims. There was a risk that the COBRA results could affect the jury's view of Reveal generally (beyond that which is relevant to the claims herein), as opposed to viewing it only for its limited relevance to a cap on future profits, and conditional relevance to two very discrete issues identified by the Court, Dkt. 493 at 12-13 (Guardant's defense of 100% specificity claim and materiality of Natera's claim of manipulation of Parikh data on specificity and sensitivity). Now, due to the huge proliferation of side issues, (*e.g.*, the evolution of the study, Dr. Hochster's possible role, Dr. Hochster's credibility (and thus the issue about the emails, his misleading testimony to the Court and counsel, sharing an embargoed abstract with Natera, etc.,) the rebuttal experts to Dr. Hochster's supplemental report, Natera's objections to Guardant's rebuttal experts, the additional COBRA discovery and depositions of COBRA investigators, etc.), COBRA has become an issue that would result in

countless mini-trials within the trial, when COBRA was only to be admitted for a limited purpose to begin with. For all the foregoing reasons, at this junction, the Court finds the prejudice, possible complications, and confusion engendered by all the COBRA evidence substantially outweighs its limited probative value. This problem is underscored by the fact that discovery into Dr. Hochster's emails has still not been completed.

### 2. Monetary Sanctions

As for monetary sanctions, Guardant may be entitled to reimbursement for the fees and costs related to the unwarranted extension of discovery into COBRA related to the misconduct discussed herein. *See Lu v. United States*, 921 F.3d 850, 859-60 (9th Cir. 2019) (quoting *Goodyear*, 581 U.S. at 108) (finding that monetary sanctions should compensate the wronged party for the attorneys' fees "incurred because of the misconduct at issue").

The Court will set a briefing schedule for such sanctions after trial. The briefs must address specific individual attorney responsibility within Quinn Emanuel for the misconduct found herein. Moreover, should the Court find ethical breaches by any attorney, the Court reserves the authority to refer the matter to appropriate entities.

## V.    CONCLUSION

The Court **GRANTS** Guardant's motion for evidentiary sanctions to exclude from trial any COBRA evidence, including Dr. Hochster's supplemental report. The case will be tried largely as that which would have proceeded in March 2024 in the absence of the continuance with the limited exceptions listed at Dkt. No. 719. The Court **DEFERS** the motion for monetary sanctions.

//

//

At this juncture, the Court instructs the Clerk of the Court to file this order, in its entirety, under seal. The Court orders the parties to meet and confer to determine which portions of this order may be publicly filed. The parties shall jointly file their request to file under seal **within a week of the date of this order.**

**IT IS SO ORDERED**.

Dated: October 23, 2024

_____
EDWARD M. CHEN
United States District Judge