Pages 1 - 199

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

GUARDANT HEALTH, INC., a       )
Delaware corporation,          )
                               )
            Plaintiff,         )
                               )
  VS.                          )   NO. 21-cv-04062 EMC
                               )
NATERA, INC., a Delaware       )
corporation,                   )
                               )
            Defendant.         )
_____)

                        San Francisco, California
                        Tuesday, October 15, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                KELLER/ANDERLE LLP
                18300 Von Karman Avenue, Suite 930
                Irvine, California 92612-1034
         BY:    **JENNIFER L. KELLER, ATTORNEY AT LAW**
                **CHASE A. SCOLNICK, ATTORNEY AT LAW**
                **GREGORY M. SERGI, ATTORNEY AT LAW**

                ALLEN OVERY SHEARMAN STERLING US LLP
                300 West 6th Street, 22nd Floor
                Austin, Texas 78701
         BY:    **SAUL H. PERLOFF, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES VIA ZOOM:   (CONTINUED)

 2   For Plaintiff:
                          ALLEN OVERY SHEARMAN STERLING US LLP
 3                        1221 Avenue of the Americas
                          New York, New York 10020
 4                   BY:  CHRISTOPHER L. LaVIGNE, ATTORNEY AT LAW

 5
     For Defendant:
 6                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          555 Twin Dolphin Drive, Fifth Floor
 7                        Redwood Shores, California 94065
                     BY:  KEVIN P.B. JOHNSON, ATTORNEY AT LAW
 8                        BRIAN C. CANNON, ATTORNEY AT LAW
                          ANDREW J. BRAMHALL, ATTORNEY AT LAW
 9                        VICTORIA F. MAROULIS, ATTORNEY AT LAW

10                        QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                          865 South Figueroa Street, Tenth Floor
11                        Los Angeles, California 90017-5003
                     BY:  VALERIE A. LOZANO, ATTORNEY AT LAW
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>**Tuesday - October 15, 2024**</u>                                          <u>**9:07 a.m.**</u>

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Court is calling the case Guardant

vs. Natera, Case Number 21-4062.

Counsel, please state your appearance for the record,

beginning with the plaintiff.

**MS. KELLER:**  Good morning, Your Honor.  Jennifer

Keller on behalf of Guardant Health.

**THE COURT:**  You'll have to remove your mask when you

speak.

**MS. KELLER:**  Jennifer Keller on behalf of

Guardant Health, Your Honor.

**THE COURT:**  All right.  Thank you, Ms. Keller.

**MR. SCOLNICK:**  Good morning, Your Honor.  Chase

Scolnick on behalf of Guardant Health.

**THE COURT:**  Thank you, Mr. Scolnick.

**MR. PERLOFF:**  Good morning, Your Honor.  Saul Perloff

on behalf of Guardant Health.

**THE COURT:**  All right.  Good morning.

**MR. LaVIGNE:**  Good morning, Your Honor.  Chris LaVigne

on behalf of Guardant Health.

**THE COURT:**  Thank you, Mr. LaVigne.

**MR. SERGI:**  Good morning, Your Honor.  Greg Sergi on

behalf of Guardant Health.

1          **THE COURT:**  All right.  Thank you, Mr. Sergi.

2          **MR. JOHNSON:**  Good morning, Your Honor.  Kevin Johnson

3     on behalf of Natera, and with me are Vicky Maroulis, Brian

4     Cannon, Andrew Bramhall, and Valerie Lozano.

5          **THE COURT:**  All right.  Good morning.

6          All right.  So I want to first, well, get an update on any

7     ADR processes, if any, that are ongoing.  What's -- are there

8     talks?  Are there mediations scheduled?  What is happening?

9          **MR. JOHNSON:**  Your Honor, I'm not aware of talks, and

10    there is no mediation scheduled.

11         So as we've said in the past, Natera is willing and able

12    to participate in any mediation process; and if there's an

13    offer that Guardant would like us to consider, we'll consider

14    it.

15         **MS. KELLER:**  Your Honor, the last mediation was pretty

16    much a non-starter.  Even the mediator didn't see --

17         **MR. JOHNSON:**  Your Honor --

18         **MS. KELLER:**  -- it was going anywhere.

19         And so we are -- also remain ready, willing, and able if

20    there's any indication that it might go somewhere.

21         **THE COURT:**  When was the last session?

22         **MS. KELLER:**  Oh, I think it was --

23         **MR. JOHNSON:**  The summer.

24         **MS. KELLER:**  Pardon?

25         **MR. JOHNSON:**  It was the summer.

 1              **MS. KELLER:**  Yes.

 2              **THE COURT:**  And that was before -- who's the mediator?

 3              **MS. KELLER:**  Retired Judge Layn Phillips, Your Honor.

 4              **THE COURT:**  Judge Phillips himself, or was it one of

 5      his --

 6              **MS. KELLER:**  It was Judge Phillips himself.

 7              **THE COURT:**  And where did you leave it with

 8      Judge Phillips?

 9              **MS. KELLER:**  He left it open, Your Honor, should we

10      wish to come back, but did not suggest further sessions on his

11      own.

12              **THE COURT:**  Okay.  Is that your understanding?

13          **MR. JOHNSON:**  Yes, Your Honor.

14              **THE COURT:**  Okay.  All right.  Well, let's deal with

15      the business at hand here.

16          Let's start with the sanctions motion.  How is it that

17      Dr. Hochster has now recovered or found the correspondence, the

18      emails?  He doesn't explain how.  He just says, "I've now found

19      them."  What happened?

20              **MR. CANNON:**  Well, Your Honor, Dr. Hochster submitted

21      a letter to --

22          (Stenographer interrupts for clarification of the record.)

23              **MR. CANNON:**  Sorry.  Brian Cannon for Natera.

24          He did a bad job searching for his emails.  He didn't do

25      an adequate job.  He submitted the letter apologizing for it.

He didn't do the right thing searching for his emails,

Your Honor.

THE COURT:  Be more specific.  What did he not do?

MR. CANNON:  Well, we're not a hundred percent sure,

but we do know the emails were there.  He said he didn't have

any.  We passed that on to the Court, which we apologize for

doing; and, obviously, we regret very much the situation we

find ourselves in.  But he did not do the right thing with

respect to searching for his emails, finding emails, telling us

what he did.  And we passed along that wrong information to

the Court, and for that, we apologize.

THE COURT:  But I'm curious.  He was directed -- he

made representations that he did certain things, he followed

certain search protocol, search terms, et cetera.

MR. CANNON:  Yes.

THE COURT:  How is it that the third, fourth time

around, he found something that he -- what did he do

differently?

MR. CANNON:  You know, Your Honor, I wish -- I wish I

had a clear explanation for you.

THE COURT:  Shouldn't he?

MR. CANNON:  He should have.  He should have.

THE COURT:  Because he multiplied these proceedings.

He's delayed the proceedings, caused a number of motions,

wasted judicial time.  Why doesn't he explain what the heck

1    happened?  And you haven't asked him that?

2            **MR. CANNON:**  We have, Your Honor.

3            **THE COURT:**  What did he say?

4            **MR. CANNON:**  He said he just -- he couldn't find them.

5    Whether he did it incorrectly, whether he looked and didn't

6    recognize what happened, I -- I don't have a good explanation.

7    Neither does he.

8        He made up -- he speculated that he did local deletions of

9    his emails.  That turned out to be not accurate because the

10   emails were on a server.  The forensics exam has shown that the

11   emails were kept on a Rutgers server.  And, you know, he didn't

12   do the right thing, Your Honor.  That's not disputed.

13       And I'm not here to defend what he did because I cannot;

14   but he -- you know, he -- I guess the best I can say was, he

15   didn't -- he didn't set out to mislead the Court, although,

16   obviously, what got represented was wrong, and we do apologize

17   for that because that -- that was not good enough.

18           **THE COURT:**  All right.  You have a comment?

19           **MS. KELLER:**  I do.  Your Honor --

20           **THE COURT:**  You can remove your mask.

21           **MS. KELLER:**  Sorry, Your Honor.

22       Natera represented to the Court that he had conducted two

23   separate searches of his emails.  At his deposition,

24   Dr. Hochster said he never told Natera's counsel that.  And

25   it's unclear if he had done any searches.

1    And, in fact, to this day, he has not produced to us

2    anything.  The only emails that we have so far are the ones

3    that Rutgers gave us, the very limited, quick search that we

4    had them do because we were under such time pressures.  And,

5    apparently, there are 1500 emails now that have hit on the

6    relevant search terms that Rutgers is going through for patient

7    confidentiality, et cetera.

8    But the real problem here, Your Honor -- I think we

9    haven't emphasized this enough -- he didn't want to do any

10   search, and I don't think that Natera did either.  And the

11   reason is what I call the original sin.

12   Way back when he got this embargoed preliminary summary,

13   it was marked all over the place as confidential.

14   Dr. Morris, when he sent it to the principal

15   investigators, said it was not to be disclosed to anyone

16   outside this tight little circle of principal investigators,

17   not to colleagues, not to other interested parties.  He said,

18   "I know you're going to be bombarded with requests.  You can't

19   disclose it."

20   Not to bosses.  And what was important about that is

21   Dr. Hochster was Dr. Boland's boss.  He was his supervisor.

22   Dr. Boland, he got to give him that preliminary summary that he

23   then turned around and sent to Quinn Emanuel, specifically to

24   the attorney who's been -- at least up until now, seemed to be

25   principally responsible for moving this case forward, Andrew

1  Bramhall and Elle Wang.  So Quinn Emanuel knew that there were

2  emails going back and forth because they got it.  They had it

3  in September of 2023, they themselves.

4       So to then say, "There are none.  He never emailed anybody

5  about COBRA.  We have absolutely no idea," it was just false.

6  It was false.  It was a false, blatantly false, representation

7  to the Court.

8       And I think what's happened since then, because

9  Dr. Hochster knew he was not supposed to get that, he probably

10  didn't want to get Dr. Boland in trouble; and, in addition, he

11  didn't want to get in trouble with Rutgers by pressuring a

12  subordinate to give him an embargoed report, which he did; and

13  he certainly didn't want it to come out that he turned around

14  and gave it to Natera's counsel.

15       And he got this report under false pretenses, pretending

16  to just be an interested scientist who was avidly following

17  this and telling no one that he was on Natera's payroll at the

18  time and would immediately turn around and give it to Natera.

19       So this -- as I said, that was the original sin.  That is

20  what has led to all the cover-ups.  And when you think about

21  it, Your Honor, Natera and its counsel and Dr. Hochster didn't

22  feel they could tell anybody that they had had it all along

23  because they would have had to admit what happened and how they

24  got it.  So they had to pretend that they first learned of it

25  in January, when the public learned of it in January.

 1          And that has resulted in a cascade of lies and

 2    misrepresentations to this Court, to Judge Kim, who, of course,

 3    denied our motion to compel by saying, "Well, they say there

 4    aren't any.  I can't compel something that doesn't exist."

 5          And then they fought and fought and fought.  They didn't

 6    want to provide anything.  But when, finally, she reviewed the

 7    materials *in camera*, there she saw the email to Mr. Bramhall

 8    and Elle Wang at Quinn Emanuel, September 15th, 2023, the same

 9    attorney, Mr. Bramhall for Natera, who signed the briefs

10    opposing Guardant's motion and appeared at the February 26 and

11    July 26 hearings, knowing all along that Dr. Hochster had sent

12    them these confidential COBRA results that he had gotten

13    through his emails to the COBRA investigator in September.

14          And, Your Honor, in Natera's supplemental opposition,

15    they're still not coming clean.  They're still not being

16    straight with Your Honor.  They deflect.  They claim the

17    February 22nd statements were insignificant and off the cuff.

18    They don't address the multiple false statements in their

19    initial opposition, saying Natera and its counsel, quote,

20    certainly didn't know because that's about Dr. Hochster's early

21    access.  Once Hochster is caught with early access, their

22    backup position is, "Well, we didn't know about it.  Natera

23    didn't know.  Its counsel didn't know.  We certainly" -- that's

24    how they phrased it.  "We certainly didn't know."

25          And it was a lie, straight-out lie, Your Honor.  I mean, I

```
 1   could say misrepresentation or falsehood, but I prefer lie.

 2           THE COURT:  All right.  Let me ask you, Mr. Cannon.

 3   Page 19, Docket 582, which is Natera's opposition to the motion

 4   for sanctions, line 25 through 27 states, quote (as read):

 5               "Certainly, Natera and its counsel did not know

 6           Dr. Hochster received a draft, until receiving

 7           Rutgers' document production in response to

 8           Guardant's subpoena."

 9       I'll let you find that, and you tell me whether that was

10   an inaccurate statement.

11           MR. CANNON:  Page 19, Your Honor?

12           THE COURT:  19, lines 25 through 27, Docket 582.

13           MR. CANNON:  Your Honor, I think this refers to the

14   draft of the abstract, and we did not know that he had the

15   abstract draft.

16       He had data that he sent to Quinn Emanuel which has come

17   out; but the actual draft abstract, which was the subject

18   matter of the question that I answered at the February hearing,

19   there is a difference, Your Honor -- and I don't believe I'm

20   splitting hairs here -- there's a difference between the draft

21   abstract and the draft slides and the data that Dr. Hochster

22   sent to Quinn Emanuel confidentially in September.  He did send

23   that data.

24       And I personally regret what I said at the February

25   hearing about inside information about data because he did have
```

data and he did send it.  But he did not send the actual
abstract, he did not send the actual slides, and we did not
know he had the actual abstract.

And I will say, Your Honor, there was a lot of speculation
from counsel and counsel's statement and argument, and I don't
think that speculation is fully justified at all.

The abstract, it turns out that Guardant's own expert,
Dr. Parikh, had the abstract as well.  It was apparently
circulating.  I'm not saying that excuses what Dr. Hochster
did, but that abstract was out there.

We did not know he had the abstract, and the abstract was
not sent to Quinn Emanuel.

So if the question is "Did he have the abstract," the
answer is, yes, he did.  Did he send it to Quinn Emanuel?  The
answer is no.

**THE COURT:**  You're telling me what he sent was not the
draft abstract but what?

**MR. CANNON:**  Correct, it was not.  It was --

**THE COURT:**  What was it?

**MR. CANNON:**  -- his summary -- it was his summary of
data.

And he did send data that ended up being in the abstract,
but he did not send the abstract itself.  And you can see --

**THE COURT:**  Well, this says Natera and its counsel did
not know he received a draft.

1      Where else would he have been able to --

2          **MR. CANNON:**  Well, that's --

3          **THE COURT:**  -- get a summary?

4          **MR. CANNON:**  And, Your Honor, I guess what I can say

5      is, we regret not connecting the dots earlier to know that the

6      data came from an abstract.  He gave us preliminary data.  That

7      has come out in the document.  He did not give us the abstract.

8      And he testi- --

9          **THE COURT:**  So you didn't know, even though he had

10     sent a very detailed memo, the so-called confidential memo, the

11     thing that Judge Kim ordered you to produce, from that, you

12     could still make the statement that you didn't know he received

13     a draft abstract?

14         **MR. CANNON:**  That's because we did not know he had the

15     abstract.  And we should have investigated further.  We should

16     have dug down.  Hey, where did you get that data?  We did not.

17     And we do apologize.

18         One thing we said in the briefs, which is true and remains

19     true, is that to some degree, we were learning in real time the

20     significance of all this information and all this data.

21         We knew the trial had been shut down because a public

22     letter had been sent out.  But the significance of the data,

23     the finality of the data, that really -- it truly did not

24     become final and did not become truly relevant until there was

25     the ASCO GI conference in January, when there was -- the

1    fulsome slides were presented and the actual abstract, which

2    was --

3              THE COURT:  What about his memo saying (as read):

4              "Additional confidential" -- underscored in the

5         memo -- "information embargoed until GI ASCO meeting

6         in January includes," quote and in caps, paren, "and

7         please do not discuss the details with anyone else."

8         Is that not a red flag?

9         And then it goes on to talk about the number of patients

10   enrolled, the three out of seven, the clearance.

11             MR. CANNON:  Your Honor --

12             THE COURT:  I mean, what is that supposed to mean?

13   When one reads this, when Mr. Bramhall and Ms. Wang read this,

14   didn't they -- weren't they able to obviously infer that he had

15   possession of something that was highly confidential?

16             MR. CANNON:  I think in hindsight, what we know now,

17   we can look at that; but I think in real time, I do not agree

18   with that, Your Honor.  Obviously, in hindsight, I wish we had

19   known.  I wish we had the full story and had been more

20   accurate.

21        But I -- look, I feel like Your Honor believes we're

22   splitting hairs here, but we're looking back in hindsight to

23   events that happened.  And then there was the big public

24   presentation, because as Dr. Hochster testified in his

25   deposition, until the day that it's final, it's not final.

1    So he did have access to data.  He did send us a memo with

2    his summary of the data.  And in hindsight, well, we should

3    have followed up:  Where did you get it?  Where did this come

4    from?  We did not.  And, obviously, that has led somewhat to us

5    learning in real time and connecting the dots as we moved on.

6         But, you know, all of this information was actually in

7    Guardant's possession because it was their clinical study; it

8    was their trial.  They edited the documents in question.

9         So, obviously, I wish we had been more clear.  I wish our

10   understandings were better, but we truly were learning in real

11   time the significance of it and where this data came from.

12            **MS. KELLER:**  Your Honor, if I could respond.

13            **THE COURT:**  Yeah.

14            **MS. KELLER:**  This is mis -- this is, again,

15   misleading.  Even the forwarding email from Dr. Hochster for

16   that said "as we discussed."  So they had already talked this

17   over with him.  They knew he had the information and he was

18   providing it.  The idea that they wouldn't have asked where he

19   got the information from is nonsensical.

20            **THE COURT:**  Where is the "as we discussed"?

21            **MS. KELLER:**  It's in his forwarding email --

22            **THE COURT:**  Oh.

23            **MS. KELLER:**  -- where he forwards this summary.

24   And it's a summary.  It is -- of course, it's not the

25   final.

1      But they said he had no insider information.  They

2   represented to this Court Dr. Hochster had no early inside

3   information.

4          **MR. CANNON:**  Your Honor, I said those words, and I was

5   wrong to say that to you in the February hearing.

6          **MS. KELLER:**  And they also said there were no emails

7   from Dr. Hochster relating in any way to COBRA.  None, zero.

8   And they had one themselves, forwarding something.  I mean,

9   they -- it's not just hairsplitting, Your Honor.

10      I kept -- I keep expecting the lawyers to understand their

11  duty of candor and to come in and do some serious *mea culpas*

12  with this Court, but we keep saying deflection and, now, it's,

13  "Well, it's just hairsplitting."  It's not hairsplitting.

14         **MR. CANNON:**  I'm not saying we're hairsplitting,

15  Your Honor.  And we do apologize, and we wish it'd not come --

16  had come to this.  I know the lawyers on our team do.

17         **THE COURT:**  Well, there's also the September --

18  February 22nd transcript about Dr. Hochster's access to, quote,

19  inside information.

20      There was a conference in January, I believe.  This is

21  quoting (as read):

22          "But there was an abstract available before the

23      conference.  So I'm certainly not aware of any sort

24      of early access that Dr. Hochster may have had."

25      That statement was made in February of 2024.

1    **MR. CANNON:**  And that was wrong, Your Honor, and I

2    apologize for that.

3    **MS. KELLER:**  The fact is, they've been caught

4    repeatedly.  We've had to do so many different things to try to

5    catch this:  a motion to compel before Judge Kim, a

6    third-party subpoena to Rutgers, a motion for *in camera* review,

7    a motion for sanctions, finding a forensic examiner,

8    negotiating a protocol.

9    We still don't have all his emails, Your Honor.  We've had

10   to deal with Rutgers about the forensic exam.

11   **MR. CANNON:**  And I will say, Your Honor, Natera is

12   paying for the forensic examiner, and we are paying for

13   Rutgers' outside counsel lawyers' fees to review that

14   information.

15   **THE COURT:**  But as a result of the representation that

16   counsel was not aware of any prior communications, Guardant

17   requested meet and confer, and we talked to -- went back to

18   Hochster again, searched his emails, still found nothing,

19   portraying -- and it was represented to the Court several

20   times -- that, you know, we've searched, we haven't found

21   anything, can't find anything, all the while knowing that there

22   was certainly information that he had about the study.

23   Certainly, counsel knew that Hochster had communications

24   with the COBRA investigators.  They knew that by -- as of

25   September, but nothing was told to the Court about that.  And

 1   that's less than being frank.

 2          **MR. CANNON:**  Your Honor, obviously, I wish we had -- I

 3   wish we had put it all together, and I wish we had made the

 4   statements differently than the way we did.

 5          I will say, we did talk to Dr. Hochster to ask him, in

 6   response to the subpoena, "What do you have?" and -- and the

 7   search was inadequate.

 8          We did have the data from him.  We should have -- we

 9   should have connected that better and said, "How did you get

10   this data?  Where did it come from?"  We did not.

11          He speculated at his deposition that he might have deleted

12   emails, although the emails, it turns out, were on a server,

13   not on his computer.

14          But, you know, I feel that we -- we do feel very badly

15   about -- about how this turned out; and we thought, as we

16   learned in real time, we were -- we were making representations

17   we thought were accurate.  We went back to Dr. Hochster many,

18   many times.

19          He ended up wanting to file his own letter with the Court,

20   which we did that for him, and he did that on August the 15th,

21   2024.  And that also was in response to Guardant's allegations

22   that Dr. Hochster had somehow deliberately sabotaged COBRA and

23   was hiding a sabotage of COBRA.

24          That issue is completely put to bed.  I'm not saying that

25   issue excuses the email search he didn't do and the

1  representations we made; but the allegations that that

2  oncologist sabotaged a clinical trial, those are some pretty

3  serious allegations, and they have been completely exonerated

4  by the NRG deposition that recently happened.

5      Again, that's not an excuse for what we did and what

6  Dr. Hochster did with respect to the email search; but that

7  aspect, sort of the nefarious intent aspect of Dr. Hochster

8  with respect to a major clinical trial, that issue has been put

9  to rest.

10      **MS. KELLER:**  Your Honor, I -- I have to correct yet

11  another misrepresentation, this business that:  Oh, he couldn't

12  find them because he only had -- apparently, Rutgers could only

13  find them because of server-level access.

14      Dr. Hochster, in his deposition, said they were still in

15  his email.  They were still there.  He just didn't -- even to

16  this day, he hasn't, apparently, bothered, himself, to run a

17  search.  He was asked about that at his deposition.

18      "Well, now that this has all come up, you've run a search,

19  haven't you?

20      "No.

21      "Well, where are they?

22      "Well, they're still there."

23      **MR. CANNON:**  Your Honor, I have to address that.

24      When we found out he does have emails in his inbox, we

25  wrote a letter to the other side and said, "We know there are

emails there.  Would you like us to produce them?"

And they said, "No.  We want to run the full forensics."

So we did offer to pull the emails that should have been produced earlier, to produce to them.  They declined because they wanted the full forensics analysis, which is ongoing.

So it is inaccurate to say that we never bothered to go back to him or never bothered to offer to produce the emails because we did do that.

**MS. KELLER:**  They offered to produce them immediately before the forensic examiner was to start --

**THE COURT:**  Late in the day?

**MS. KELLER:**  Yes.  It was:  Uh-oh.  Here they come. They're going to find them.  Guess what?  We'll produce them. We found out they're actually there.

And, Your Honor, in addition to all the other prejudice to us, these documents were highly relevant that we still don't have.  Natera's entire position on COBRA and the reason Your Honor was persuaded, even though discovery had long closed, to reopen and let them get into this is because it was supposed to be this incredible blockbuster damaging thing to show that Reveal produced a high rate of real false positives.

That was the whole thing:  Gosh, it's dangerous.  These poor patients are getting chemo who don't need it.

But we now know that the interim COBRA results didn't show any false positives.  There was no outcome data for the

1    patients.  We have no idea if any positive or negative result

2    is a true positive, a true negative, a false positive, a false

3    negative.  And Dr. Morris confirmed this in his recent

4    deposition.

5        Dr. Hochster's emails show he knew this.  He expressed the

6    very same concerns.  His emails undermine his purported expert

7    opinions and Natera's whole narrative about COBRA.  And it's

8    another reason he had to conceal them.

9        Here he was saying:  Gee, how do we -- how do we get false

10   positives out of this?

11       But --

12           MR. CANNON:  That part is not true, Your Honor.  That

13   part is speculation.

14       Putting aside what we should have done differently and our

15   regret about what happened and our apology, it is not true that

16   the emails show some sort of nefarious intent or inconsistency

17   with the expert report.

18       Your Honor addressed the apparent false positive versus

19   clinical false positive issue in Your Honor's recent *Daubert*

20   motion decision, which was, I believe, Docket 663.

21       And Dr. Hochster exactly addressed the issue in his report

22   that we don't have clinic outcomes for the false positive

23   numbers coming out of COBRA or other trials at the time.

24       So the issue of clinical false positive versus apparent

25   false positives, that -- honestly, that is a red herring, and

1   Your Honor addressed that in the September 19th order on

2   *Daubert*.

3         **THE COURT:**  So why shouldn't I impose the sanction --

4   if I were to find willful flaunting of this Court's order,

5   willful failure to produce discovery that is material, why

6   shouldn't an exclusion sanction be imposed at this point?

7   Because we're still not done.  There's still more that's --

8   here we are at the 11th hour because of all this.  We're still

9   in the middle of further discovery issues that are going on,

10  discovery attempts.  Why should not this Court, after, frankly,

11  it's been lied to, not say, "Okay, this is off the table"?

12        **MR. CANNON:**  Your Honor, I -- I would -- I would urge

13  the Court to look at the relevance of COBRA.  And, you know, to

14  the extent any sanction is warranted, I think a monetary

15  sanction is the more appropriate outcome here or an attorney's

16  fee sanction.

17      I think the relevance -- I think if we're having a jury

18  trial on Reveal, on its performance and the fact that now

19  Reveal has changed its design technically as a result of

20  specificity -- and specificity is directly related to false

21  positives -- Reveal has improved its specificity because of the

22  false positives issues.  I think if we're going to have a jury

23  trial on that issue, on the issue of the advertising around

24  specificity and test performance, I think the COBRA information

25  is directly relevant to that.  And I think, you know, it would

not be an appropriate sanction to exclude clearly relevant
evidence from the jury's consideration, and I think it's
important evidence.

And once again, we're very sorry about how it got here
today.  I wish I -- I wish I had said things differently back
in February.  I did not, and I'm sorry about that.  But I do
feel that excluding evidence prejudices Natera in an unfair
way.

**MS. KELLER:**  Your Honor, I think it's the only
sanction that will work because money doesn't mean anything to
them.  And, clearly, the Court's orders haven't really meant
much to them either.  They keep flaunting them, as the Court
said.

Unless the Court -- and we have been prejudiced.  We
haven't been able to even examine him on all these other
emails.  We had to take his deposition with a very incomplete
handful that we had gotten from Rutgers.

And I disagree with counsel.  Dr. Hochster, in his own
emails, did express concerns at the time that "How do we tell
there are false positives here?"  We've got those emails.

So -- and Dr. Morris now says you can't tell without
clinical data.  We didn't have any outcomes data, so you can't
tell.

And that was the whole premise of getting this in because
they want that one really damaging "Dear Patients" letter that

```
 1    Dr. Morris, if he could have a redo, would not be sending.

 2         So, Your Honor, and it's continuing in another -- in

 3    another vein as well.  The same type of misconduct is

 4    continuing with Dr. Andersen in Denmark.

 5         This is why, unless the Court makes it clear you cannot

 6    lie to this Court; you cannot lie to Judge Kim; you can't lie

 7    over and over and not pay a price for it, it'll keep happening.

 8         So what's happening right now with Dr. Andersen, the

 9    Denmark deposition that Your Honor is aware of, more misconduct

10    and efforts to block us.

11         First, Natera told the Danish court that discovery had

12    closed, our time had expired and so we couldn't take the

13    deposition.  Of course, the Court corrected that.

14         Then they tried to stop it by saying -- telling the Danish

15    court that you had ruled that all the evidence we seek was

16    inadmissible.  And, of course, you had to -- we had a hearing,

17    and you corrected that and authorized it to go forward.

18         Then they told the Danish court that it wasn't likely to

19    be admitted in our court.  So under the Hague Convention, it

20    wasn't authorized.  That failed.

21         Then they argued their latest, that we should be

22    sidelined.  The American lawyers for Guardant shouldn't be

23    allowed to participate.  Only Danish counsel can do the

24    questioning.  Okay.  And they cited Danish law.

25         When the Danish court agreed with that, they then said:
```

Well, these documents are confidential, so the Danish lawyers aren't allowed to see them.

So after getting us sidelined, they're now saying not only can the Danish lawyers not see any of our confidential documents, so they won't get the materials they need to conduct the deposition, but they're not allowed to even discuss those with us because the proceedings are not sealed, and no one can talk about or see the documents at the hearing.

This is -- this is where we are.  This is just plain misconduct.

This Court has made it very clear that that deposition needs to go forward and has had its rulings misrepresented to the Danish court repeatedly.

But, I mean, think about that for a minute, Your Honor. What a shenanigan.  Only the Danish counsel can do the depo. Ah, Danish counsel, you can't have any of -- you can't even see any of the documents you need to do the depo.

That is what we have been dealing with throughout this case.

**THE COURT:**  So what do you propose is the proper remedy with respect to the COBRA?

**MS. KELLER:**  Your Honor, I think that the proper remedy would be the dismissal of their counterclaims; and if not that, then to exclude COBRA from this trial.  Enough is enough.  We're two and a half weeks from trial, and we haven't

```
 1   even had a chance to prepare adequately.  What we have been

 2   finding is very helpful; and if we had had more thorough

 3   discovery, honest discovery, we would be a lot farther along.

 4           THE COURT:  What discovery remains on the COBRA issue?

 5           MS. KELLER:  1500 emails of Dr. Hochster that are

 6   sitting out there that the search terms for the forensic exam

 7   picked up.  But they have to be reviewed by Rutgers before

 8   they'll even turn them over to our forensic examiner.

 9       It's not our fault, but it's to our great detriment.  And

10   Natera and Dr. Hochster created this dilemma.  They should have

11   produced all these over six months ago.  And they shouldn't be

12   allowed to benefit from their lies to Judge Kim and to you,

13   Your Honor.

14           MR. CANNON:  Your Honor, can I address a couple of

15   points, please?

16           THE COURT:  Yes.

17           MR. CANNON:  On the discovery issue, Your Honor, we,

18   Natera, were prepared to go to trial back in March; and it was,

19   in fact, Guardant that insisted "We need all of this discovery.

20   We need all of this discovery."

21       Then there was a slowdown in discovery, and we had to go

22   to Your Honor to actually get a deposition from NRG, which we

23   got from an order from Your Honor.

24       But it turns out that Guardant was deeply, deeply involved

25   in COBRA.  They knew more about COBRA than even we possibly
```

1    could have speculated.  They edited the "Dear Doctor" letter.

2    They edited the abstract.  They edited the ASCO GI slides.

3    They were deeply, deeply involved in COBRA.  They had a meeting

4    with Dr. Morris, the principal investigator, back in May, which

5    we didn't know about until the deposition.

6        So to say -- for counsel to say, "We just didn't know

7    anything and we need all this discovery," that's a pretext,

8    Your Honor.

9        And with respect to -- with respect to remedy, I think

10   COBRA really should be part of this trial.  And if there's a

11   lesser remedy of exclusion, perhaps it's to exclude

12   Dr. Hochster as a witness.  I don't believe that's warranted,

13   but that is a lesser remedy than saying COBRA, this relevant

14   information, is out.

15           **THE COURT:**  Well, how would that -- without

16   Dr. Hochster, how would COBRA come in?

17           **MR. CANNON:**  Well, we have -- we have documents that

18   Guardant sent.  Guardant witness- -- because Guardant witnesses

19   were communicating with the PIs, with the principal

20   investigators, of COBRA.

21       We have the deposition testimony of NRG itself, and we've

22   taken Dr. Morris' deposition, and I believe Dr. George's

23   deposition is coming up.  So in that way, evidence about COBRA

24   can come in.

25       Now, that's a significant sanction, Your Honor, to exclude

a witness that Your Honor has already found in two *Daubert*
orders to be, you know, a fully qualified oncologist.  But
that, to me, is -- if Your Honor is considering excluding
evidence, something less than excluding all of COBRA is more
appropriate -- is more appropriate, I believe, than taking away
this actual fulsome, relevant evidence that we had to, to some
degree -- I'm not excusing what we did, but we had to fight to
get it from Guardant, to even understand what Guardant was
doing with NRG and the shutdown of this study.

Because, as Your Honor knows from the briefing, the Reveal
test, as it was originally released, changed.  Guardant changed
it.  It's now a different technical design to improve
specificity.  And as Your Honor knows, specificity is false
positives.

So the issue of getting around the problem of false
positives and dealing with the fact that the chip filter didn't
work in the original version of Reveal, you know, the COBRA --
the COBRA study and the COBRA communications with Guardant and
Guardant's communications with the Government about changing
its tests, you know, the FDA submissions that we only found out
about this summer, those are very, very relevant to the
performance characteristics of the test at issue.

And so COBRA, sort of writ large, and the communications
that Guardant made to NRG, the communications Guardant made to
the Government, that's all very relevant to this jury trial.

And whether Dr. Hochster should be excluded or not, I think
that should be considered a separate question.

      **MS. KELLER:**  Your Honor, excluding Dr. Hochster --

      **THE COURT:**  Hold on.

      **MS. KELLER:**  -- would make --

      **THE COURT:**  What is -- explain to me now, because I
had limited the relevance of this, in the first place, of this
study.

    What is your understanding?  That if Dr. Hochster is not
going to be -- if he were to be excluded from testifying, what
are the points of relevance for admissibility in the trial in
this case of the witnesses that you've just --

      **MR. CANNON:**  Well, the documents show the chip filter
issue, for one thing.  If Your Honor recalls, there's -- a
patient's blood creates biological noise and mutations in the
blood.  And the allegation was that Natera published a white
paper that said tumor naive tests -- there's two types of
tests:  tumor informed, tumor naive -- tumor naive tests are
not -- have problems with specificity, i.e., false positives,
because they can't filter out chip mutations.

    That was accused of being false advertising.  And in the
complaint -- I believe it was paragraph 32 in Guardant's
complaint, Guardant said:  Hey, we've got a hundred percent
specificity, which means no false positives.

    The COBRA communications and the COBRA documents show

1    that's not -- that was not true, that Reveal did not have

2    100 percent specificity.  It had 95 percent specificity, at

3    best.  And, in fact, Guardant took away the chip filter out of

4    the test because the chip filter deals with genomic mutations.

5    So the current version of Reveal doesn't test for genomic

6    mutations.  It only tests for epigenomic mutations.  I can get

7    into that in more detail, if you wish.

8         But sort of the existence of a chip filter, how well it

9    works, that was an issue for trial; and that issue is squarely

10   raised by the COBRA documents and Guardant's communications

11   with NRG and with the Government, the federal government, about

12   changes to its test to improve specificity.

13        **MS. KELLER:**  Once again, Your Honor, counsel doesn't

14   want to talk about the misconduct because the misconduct was

15   horrible.

16        It would make sense to exclude Dr. Hochster if he, acting

17   on his own, unknown to Natera, unknown to counsel, had done

18   what he did.  Then it would make sense to just say:  This

19   witness thinks he can -- he can play games with the Court.  In

20   light of the Court, he's out.  But their counsel participated

21   in it.  Their counsel lied to the Court.

22        It can't be that excluding Dr. Hochster alone is enough.

23   And they did it over and over.  And every time they got caught,

24   they came up with a new story.

25        **THE COURT:**  How does that -- what's the causal

1    relationship to the chip filter issue?

2         **MS. KELLER:**  You know, the chip filter issue,

3    Your Honor, is one that I think, personally, is a red herring.

4         Their purported reason for getting in COBRA was false

5    positives.  That was their reason.  And now the principal

6    investigator, Dr. Morris, has testified that it's not possible

7    to tell, without recurrence data from patients, that there were

8    false positives.  You can't tell.

9         And we only got that from him a week ago.  And, of course,

10   you know, Natera didn't want any of that to come out either.

11        **THE COURT:**  So, but how is that -- why should that be

12   excluded in connection with what we're just talking about and

13   Dr. Hochster's and sort of the -- I don't want to use the word

14   "cover-up" but -- the conduct of counsel with respect to the

15   Hochster files and testimony?

16        **MS. KELLER:**  I'm sorry, Your Honor.  Are you saying

17   why should Dr. Hochster still be -- not be allowed to testify

18   to that?

19        **THE COURT:**  No.  I mean, if Hochster is out --

20        **MS. KELLER:**  Okay.

21        **THE COURT:**  -- what's wrong with -- isn't the issue of

22   the chip filter discrete and sort of separate from them?

23        **MS. KELLER:**  Well, they can -- they can ask about

24   that.  They don't need COBRA for that.

25        **MR. CANNON:**  The COBRA documents, Your Honor,

1    that's -- and Your Honor issued an order on reconsideration

2    relating to the chip filter, which I can get for you.

3         But on the clinical -- the clinical false positives versus

4    apparent false positives issue, again, I direct Your Honor to

5    Your Honor's very long and thoughtful opinion on

6    September the 19th, Docket 663, pages 20 to 21, where

7    Your Honor goes through this exact issue.

8         The Dr. Morris deposition from earlier this month --

9    Dr. Morris was the NRG investigator -- that didn't change the

10   issue of false positives.  There were false positives.  The

11   reason the COBRA trial was shut down was because of false

12   positives.

13        And whether you say, "Well, we didn't have all the

14   clinical data for each of those patients, so we don't know

15   whether there truly were false positives," document after

16   document after document that got produced from NRG and Guardant

17   say there's false positives.

18        I mean, NRG made presentations to the National Cancer

19   Institute with a table setting forth the number of false

20   positives.  So for counsel to say there's no -- there were no

21   actual false positives, that's a little bit of a sleight of

22   hand.

23        As Your Honor pointed out in the order in Docket 663, if

24   you don't have full clinical data on every single patient, you

25   may not know, at the end of the day, whether it's recurred; but

1  you do know at the time whether it's a false positive

2  because -- it's an apparent false positive because you get a

3  positive CT DNA result, a positive test for tumor DNA in the

4  blood when there is, in fact, none there.

5        **MS. KELLER:**  Your Honor, when the Court made its prior

6  ruling, Dr. Morris had not yet been deposed.

7      Mr. Scolnick deposed him, and I would like him to address

8  the Court about these exact issues, if that's all right.

9        **THE COURT:**  How is this causally related -- how is the

10  chip filter question causally related to the problem we're

11  talking now about, about Hochster?

12        **MR. SCOLNICK:**  I'm sorry, Your Honor.  I didn't catch

13  the question.

14        **THE COURT:**  Is the chip filter question and the

15  evidence in dispute that should or should not come in, how is

16  that related to what Hochster did in not being completely

17  forthright?

18        **MR. SCOLNICK:**  Well, Your Honor, I think this whole

19  conversation is premised on a misrepresentation about the chip

20  filter claims.

21      Remember, going back to the ads in the white paper during

22  the relevant time period, what Natera put out was something

23  saying that we don't have a chip filter, that we're not able to

24  filter the chip mutations.

25      So this is an entirely different question with how well

1    the chip filter may or may not work, which is now what they're

2    moving the goalpost to mean.

3         THE COURT:  So you think that's not a relevant

4    question?  How well they work is not relevant in this case?

5         MR. SCOLNICK:  Not when the claim that's at issue is

6    whether we had a chip filter at all.

7         But maybe I can short-circuit this even more, Your Honor,

8    because this COBRA evidence is such a distraction, especially

9    in light of what Dr. Morris has testified to, because that's

10   not all he testified to.  He testified about the design flaw in

11   COBRA.  He testified that -- in addition to "We don't know

12   whether there are any false positives," he testified that

13   there's a design flaw that failed to take into account the

14   impact that the low recurrence rate would have.

15        And so when we're talking about these letters that are the

16   centerpiece of Natera's COBRA argument, these "Dear Patient"

17   letters talking about a higher-than-expected false positive

18   rate, what they failed to mention and what Dr. Morris now

19   confirms is that that was premised on a misunderstanding of how

20   many false positives they should have expected.

21        And this was in our more recent brief we filed a couple of

22   days ago.

23        There should have been -- given the data and the

24   assumptions that apply to the case and the accurate information

25   that Guardant disclosed to NRG, we should have expected an

1    equal number of false and true positives.

2        That was misunderstood.  So when those letters went out,

3    they didn't understand that, and that was a mistake.

4            **MR. CANNON:**  I will say --

5            **MR. SCOLNICK:**  So --

6            **MR. CANNON:**  -- Your Honor --

7            **MR. SCOLNICK:**  So --

8            **MR. CANNON:**  -- that Guardant --

9            **THE COURT:**  Let him finish.

10           **MR. CANNON:**  Sorry.

11           **MR. SCOLNICK:**  So I can continue on.

12       But if -- if the only thing that's keeping COBRA in this

13   entire sideshow that's going to distract the jury and derail

14   our trial, then we'd be prepared to consider dropping the chip

15   filter claim if what's the only thing that's keeping this in.

16           **THE COURT:**  Okay.  Response?

17           **MR. CANNON:**  So, Your Honor, where to begin with this.

18       Guardant -- the "Dear Doctor" letter that NRG sent out

19   that said "Because of the excess false positives, we're

20   shutting down the COBRA trial," Guardant edited and signed off

21   on that letter in August of 2023, last year, before it went

22   out.

23       So to come in and say, "Oh, no one at NRG understood what

24   was going on and this was a big mistake in the study," Guardant

25   signed on to the study when they signed up to do the study, and

1   Guardant signed off and edited the actual letter that went out

2   to doctors and patients last year.  So I think, at best, it's a

3   fact dispute to say, "Oh, there was a mistake in the design of

4   the study."  And Dr. Morris did not say it was a flawed study.

5       And the issue of false positives is very relevant,

6   Your Honor.  It's relevant because the chip filter in the

7   original Reveal product didn't work as advertised; and it's

8   relevant to the fact that when Guardant claims in

9   advertisements that it has 100 percent specificity, what that

10  means is that the test has no false positives.  And we now know

11  from the COBRA documents that it -- that Guardant's assay did

12  not have 100 percent specificity -- in fact, it had 95 percent

13  specificity at best -- and that the COBRA documents showed that

14  Guardant changed its test design to, quote, improve specificity

15  and improve the false positive issue that resulted from the

16  chip filter that it had in the original design.

17      So to say COBRA is not relevant and a sideshow, I think if

18  that's true, then the whole false advertising case is a

19  sideshow because Guardant advertised it had 100 percent test

20  performance.  That's a significant part of this trial,

21  Your Honor, the fact that Guardant said, "Our test is perfect,"

22  100 percent PPV, which is positive predictive value, and

23  100 percent specificity, which means no false positives.

24      So to say that the COBRA documents and the decision to

25  terminate the COBRA study because of excess false positives,

1    which is what NRG Oncology told the world the reason was why

2    they terminated the study --

3         **THE COURT:**  How will that -- if I were to allow that

4    evidence to come in --

5         **MR. CANNON:**  Yes.

6         **THE COURT:**  -- how would that come in without bringing

7    in all this other stuff that is problematic?

8         **MR. CANNON:**  Well, it comes from NRG's files and it

9    comes from Guardant's files.  So these are the documents that

10   NRG produced and the documents that Guardant produced and the

11   communications between Guardant and NRG.

12       And then, also, Guardant submitted what's called a

13   supplemental IDE to the Government to say:  Hey, we've changed

14   Reveal.  We're dropping the genomic mutation, and that will

15   improve the false positive issue and increase specificity.

16       That's part of the COBRA documents.  That was communicated

17   from Guardant to NRG, I believe, in 2023.

18       **THE COURT:**  So the COBRA study itself and the draft

19   would not be used?

20       **MR. CANNON:**  The abstract and the slides and the

21   communications with Guardant would be used, Your Honor.

22       **THE COURT:**  With Guardant?

23       **MR. CANNON:**  With Guardant.

24       **THE COURT:**  Okay.

25       **MR. SCOLNICK:**  And, again, Your Honor, there are a

number of problems with what opposing counsel just said.

First, going back to the initial ad in the case, what we reported is that there was a hundred percent specificity in a given test, in the Parikh study.

Well, guess what?  Now Dr. Morris, under oath, he's looked at that same study, and he reported a hundred percent PPV based on his reading of that data as well.  So that undermines a lot of what counsel is saying here.

And, again, that's one of the main themes of their case. It's now been essentially rejected by the main NRG investigator.

And then just take a step back and think of how prejudicial, how dangerous this is going to be to a jury.  We think about how confused all of these experts are who, day in, day out, year in, year out, are focused on statistics; and they couldn't even -- I don't want to say they couldn't figure this out, but this is something that they overlooked.  And they acknowledge that there's a potential design flaw.

THE COURT:  Wait, wait.

MR. SCOLNICK:  They --

THE COURT:  What was overlooked?  You just said --

MR. SCOLNICK:  Yeah.

THE COURT:  Repeat what you just said.

MR. SCOLNICK:  Sure.  I'll try my best.

But what was overlooked, Your Honor, is the design flaw in

1 the study, the failure to acknowledge, the failure to

2 incorporate and consider the impact of the low prevalence of a

3 Stage 2A cancer population with a 10 percent recurrence rate.

4 They didn't consider that, and they didn't consider how many

5 false positives they would expect on an assay that was

6 accurately reported like ours.

7   And that's now in the record, and we didn't have that -- I

8 know counsel keeps referring back to motions two, three months

9 ago.  We didn't have this information then.  This is hot off

10 the press, from the horse's mouth, from the lead investigator

11 of NRG, and it undermines much of what Natera's counsel has

12 been telling you for about six months.

13   So now we know, when they're talking about these

14 communications going back and forth, talking about what was

15 expected and what they actually saw, that's premised on a

16 misunderstanding.

17   And to be able to unwind that in front of a jury, who

18 doesn't have the technical expertise, doesn't have years in

19 statistics, is tremendously unfair, especially given the small

20 amount of time that we're given to try this case.  It's going

21 to be a sideshow, and it's designed to distract the jury.

22   **MR. CANNON:**  Your Honor, can I address some of those

23 points, please?

24   **THE COURT:**  Briefly.

25   **MR. CANNON:**  Another set of documents out of NRG is

1    that the NRG investigators themselves felt misled about the

2    performance claims that Guardant made about its test.  And the

3    centerpiece of this case is:  What were the representations and

4    advertisements about the performance claims of the product?  Is

5    it a hundred percent performance?  No false positives?  Or is

6    it 95 percent performance, which means quite a few false

7    positives?

8         With respect to the COBRA study, something I want to make

9    very clear, Your Honor, the discussion about what is the

10   prevalence of recurrence, that's because the COBRA study

11   focused on Stage 2 cancer patients, which do have a fairly low

12   rate of recurrence.  However -- and Guardant very much likes to

13   say the design study was flawed because it focused on a

14   low prevalence population, Stage 2 cancer patients; but what

15   Guardant ignores is Guardant's test was advertised for Stage 2

16   cancer populations.  So that cohort of patients, Stage 2 cancer

17   pop- -- Stage 2 cancer patients, that was the point of the

18   Guardant test.

19        So it's really -- they can't come in now and say:  Oh, it

20   was a bad study because it only tested a low prevalence

21   population, so false positives would throw off the numbers.

22        Reveal was intended -- when it was released, it was

23   intended to be used with exactly that population, Stage 2

24   cancer patients.

25        **MR. SCOLNICK:**  Your Honor, if I can briefly respond

1    because that was yet another misrepresentation.

2        Counsel has been questioning witnesses and citing to

3    this Court the suggestion that Guardant was somehow inaccurate

4    or dishonest in reporting its numbers to NRG.

5        Now that Dr. Morris has testified, we know that is

6    completely and entirely false.  We know that, contrary to the

7    suggestions over many months, Guardant accurately reported its

8    analytical specificity.  That's now in the record, and that's

9    been confirmed by the lead COBRA investigator.

10        Another piece of data we used, that Guardant used in its

11    application, the study about -- showing our analytical and,

12    I believe, clinical specificity, was a doctor author -- I'm

13    sorry -- was a study authored by Dr. Morris.

14        So all of these things that they've been able to get away

15    with for many months, it's not over.  We've been able to prove

16    exactly what happened, and we've heard it from the lead

17    investigator from COBRA.  So that's the first part.

18        And as to our tests being used in a Stage 2 population and

19    Stage 3 population, that's true.  There's no dispute there.

20    But what wasn't known is -- and what was misunderstood is the

21    investigators at COBRA failed to consider what that meant when

22    they're designing the study and determining the interim

23    futility analysis and determining what triggers would be at

24    play.  So none of that was -- or much of that was

25    misunderstood.  And that's no longer in dispute.

1           **MR. CANNON:**  It very much is in dispute, Your Honor.

2           **THE COURT:**  Well, let me ask.  Had I not delayed,

3    continued the trial to open the door to COBRA, we wouldn't be

4    talking about this issue.  Is that right?

5           **MR. CANNON:**  No, Your Honor, we would be, because if

6    Your Honor would recall, we wouldn't be talking about this

7    level of detail because we only got that from the discovery

8    that Guardant pushed for.

9           You remember back in February when we had these hearings,

10   Your Honor?  We were prepared to go to trial.  We had

11   Dr. Hochster's original report, which said, "I anticipate there

12   will be false positives potentially, and the COBRA study's

13   ongoing."

14          The COBRA study was publicly presented in January of this

15   year, and we put in a supplemental report to supplement the

16   original opinions.

17          We were prepared to go to trial in March just on that

18   point.  We didn't know that Reveal had actually changed,

19   you know.  We only knew that because of the discovery that,

20   frankly, Guardant should have produced a year ago because

21   that's a very relevant fact, that it actually had to change its

22   product because of -- to improve specificity and get around the

23   false positives problem.

24          So COBRA -- if we'd gone to trial in March, it would have

25   been a limited record, but we would have -- we would -- COBRA

1    still would have been part of this case.  And, in fact,

2    Your Honor, I think, agreed to postpone the trial and agreed to

3    allow limited discovery because of Guardant's representations

4    in February that:  Hey, we need to talk to NRG investigators,

5    and we need to do all this discovery.

6          MR. SCOLNICK:  And of course they wanted to proceed in

7    March, Your Honor, because they knew exactly what was going on.

8    They knew what they were hiding.  They knew what they didn't

9    want to expose, and they knew that if we went in March, that

10   they'd be able to pull one off on the jury without us getting

11   the evidence about Hochster's -- Hochster's communications and

12   Natera's involvement and all of the misconduct that we've been

13   uncovering over the last six months.  So --

14         THE COURT:  If we were to wind the clock back, had I

15   not granted a dispensation and continuance of this trial in

16   order to take into account all this that came out about COBRA,

17   the question is:  What would have been tried on this issue that

18   we're talking about now with respect to the chip filter?

19         MR. SCOLNICK:  What --

20         THE COURT:  What --

21         MR. SCOLNICK:  Right.

22         THE COURT:  What incremental difference -- had I not

23   granted a continuance, we would have gone to trial on what,

24   what aspect of the chip?

25         MR. SCOLNICK:  Of the chip filter?  Well, again, going

```
 1    back to the white paper from 2021 where Natera represented that
 2    we didn't have a chip filter, and their own internal documents
 3    showed that they were aware that we had a chip filter.  So
 4    that's one of the many false statements that they've made in
 5    their ads.  And that would have been the evidence.
 6         And, again, can someone improve a chip filter or any
 7    aspect of any test?  Yes.  But that's not the issue.  It wasn't
 8    that the chip filter doesn't work very well or it needs
 9    improvement.  It was that they have no ability to filter chip
10    mutations.
11         THE COURT:  So if I were to find that the -- frankly,
12    sort of nunc pro tunc, that this Court should not have granted
13    a continuance, which was all occasioned by COBRA, why wouldn't
14    I just simply look at the state of evidence as it existed when
15    we were originally going to go to trial and that's what we
16    would go to trial on?
17         MR. SCOLNICK:  I think that's -- I think that's right
18    before COBRA, or not including COBRA, right.
19         THE COURT:  Anything else that came ancillary to that
20    would not have occurred.  Sort of causally related in the sense
21    that had not there been a continuance, which I granted, making
22    certain assumptions, whatever developed one way or the other,
23    we would just look at the evidence as it existed when we were
24    supposed to go to trial in the first place.
25         MR. SCOLNICK:  Right.  There is one -- I'm not trying
```

1  to complicate things, but there is one potential exception to

2  that, and that is -- that is the Dr. Andersen evidence.  I

3  don't want to confuse issues.

4          **THE COURT:**  I'm sorry.  The doctor?

5          **MR. SCOLNICK:**  The Dr. Andersen evidence in Denmark,

6  which we're finding to be critical.  And what we've been

7  uncovering and digging, it shows that many of Natera's claims

8  and their witnesses' claims that they've been making for years

9  are entirely false.  And that goes directly to their blinding

10  claims and prospective claims, which are at the centerpiece of

11  their case for false advertising.  So I think that testimony is

12  necessary.  It's certainly not -- we have no --

13          **THE COURT:**  Why shouldn't the rule apply, I mean, sort

14  of looking at it sort of *nunc pro tunc*?  That is, had I known

15  that there was involvement by Dr. Hochster early on with the

16  investigators, that there was information that was going to

17  take a long time to extract and, in fact, even as we sit here

18  today, may not be extracted, if I had known all that and

19  knowing that there was limited probative value in the first

20  place -- because this was going to go to certain discrete

21  issues with a limiting instruction -- I may well have said:

22  Let's go forward with trial.  I'm not going to -- we've already

23  continued this thing enough.

24      And it was an extraordinary relief because I thought it

25  was extremely relevant and probative and could be done fairly

1   simply with the introduction of evidence and maybe a witness or

2   two, and now this thing has proliferated.  And had I known

3   now -- then what I know now, I would not have -- I would have

4   just gone forward with trial.

5         **MR. CANNON:**  Your Honor -- sorry.

6         **THE COURT:**  So what's wrong with winding the clock

7   back and say, let's take the record as it was on all fronts, as

8   it was when we were supposed to go to trial -- was it March?  I

9   forget what date it was.  April?  May?  I don't remember when

10   the trial date was.

11         **MR. SCOLNICK:**  Right.

12         **THE COURT:**  And that's the trial?

13         **MR. SCOLNICK:**  Well, my concern, Your Honor, is that

14   it would un- -- unfairly -- excuse me -- punish Guardant.  We

15   have no blame in this.  We did nothing wrong.  This is entirely

16   of Natera's doing, deliberate and intentional.

17         **THE COURT:**  So what is the evidence you feel that some

18   dispensation should be given to your client in terms of an

19   exception to the rule that --

20         **MR. SCOLNICK:**  Yes.

21         **THE COURT:**  -- we'll take the evidence as it existed

22   and discovery as it existed back in the earlier part of 2024?

23         **MR. SCOLNICK:**  It is Dr. Andersen's deposition,

24   Your Honor, because it is necessary to prevent Natera from

25   misleading the Court.

1              THE COURT:  And what is it -- what's the gist of what

2      you would proffer on that?

3              MR. SCOLNICK:  Sure.  Dr. Andersen will testify

4      regarding the steps and analysis that Natera performed in the

5      Reinhardt study after being unblinded, which obviously is at

6      the center of our case here because most of their allegations

7      against Guardant claim that we did something wrong in the

8      Parikh study and that it was not blinded or prospective.  And

9      we would show that much of those same characterizations could

10     be made about -- or many of those same characterizations could

11     be made about Natera's involvement in the Reinhardt study.

12             And also, it will undermine and refute and contradict many

13     of the under-oath statements of Natera's witnesses at

14     depositions, denying what happened during the Reinhardt study.

15             In addition, we know that blood volume is very important.

16     Blood volume is at the heart of the comparative ads, where

17     their test was run on 8 milliliters of blood plasma volume and

18     ours was run on about half that.  So the issue of the impact of

19     plasma volume is very important, central to this case, and it

20     shows that Natera's ads were false.

21             So one of the things that Dr. Reinhardt could testify --

22     I'm sorry -- Dr. Andersen could testify to is the amount of

23     blood included in the Reinhardt study, that there was a

24     negotiated agreement to exclude samples with less than

25     8 milliliters of plasma, and that it appears 150 samples were

1    excluded from the Reinhardt study because they had

2    4 milliliters or less of plasma.

3        And I think --

4        **THE COURT:**  With the effect being what?  What's the

5    effect of that?

6        **MR. SCOLNICK:**  The effect being that Natera was on

7    notice, Natera knew -- when it compared one test to the other

8    without disclosing that they were run on entirely different

9    amounts of blood plasma, they knew that this was an unfair

10   apples-to-apples comparison.  They knew that it gave Natera an

11   unfair and biased comparison.

12       That was entirely dishonest, so dishonest that they

13   themselves demanded a minimum of 8 milliliters of plasma when

14   they engaged in their study.

15       And there are facts about the Hendrickson study too that

16   Natera has now waived any objection to and a number of other

17   matters.

18       But that's -- that's the most -- those are the most

19   important aspects.

20       **THE COURT:**  So if I were to wind the clock back to

21   whenever we were supposed to try this case earlier in the year,

22   you wouldn't have had this information?

23       **MR. SCOLNICK:**  No.  We wouldn't have had

24   Dr. Andersen's testimony, certainly not.

25       **THE COURT:**  All right.  What's your view?

1        **MR. CANNON:**  Your Honor, I want to address the
2    winding-the-clock-back question.

3        I think the public and the jury is entitled to learn some
4    truly relevant facts here.  And some of the documents that were
5    produced from Guardant's files and NRG files were from 2023,
6    and those should have been produced before.

7        So I agree that winding the clock back is perhaps a good
8    way to look at it, but some of these issues, it really would
9    deprive the jury of relevant facts.  And I think chip filter is
10   important.

11       Counsel for Guardant represented to this Court that the
12   COBRA documents and the COBRA trial had nothing to do with the
13   chip filter, and Your Honor relied upon that representation.
14   It turned out that was not the case because we learned from
15   that discovery that, in fact, Guardant had changed its tests to
16   remove the chip filter.  That's a very relevant fact, and we
17   should have known that before January of this year.

18       So I understand Your Honor, you know, winding the clock
19   back, but there's certain facts that I think should not be
20   excluded because they should have been -- they should have been
21   produced before.  And if we rewind the clock back, I think
22   Dr. Hochster's original report should still be relevant, so
23   he'd be a witness in that case.

24       I understand Your Honor's frustration with how this played
25   out, and honestly, I share that frustration.  But some of these

```
1    facts really are relevant to the performance claims about
2    Guardant's Reveal that are at the heart of this case and should
3    have been produced long before.
4        I think it's important to have a trial on the actual
5    facts.  And the actual fact is the original version of Reveal,
6    the subject of the false advertising claims, did not have
7    100 percent performance.  Guardant claimed it had perfect
8    performance.  It did not.
9        And I think the fact that they dropped the chip filter
10   from their product, they dropped the genomic testing line to
11   just focus on epigenomic testing, those sort of technical
12   details, they're important, Your Honor.
13       That's the test that's being sold today, and Guardant
14   seeks lost profits and disgorgement for all of -- you know, all
15   the way up to trial.  And the fact that they changed their test
16   to drop the chip filter is relevant both to liability and to
17   their claim for damages.
18           THE COURT:  So what is the model you would use?  That
19   anything that should have been disclosed at the time of trial
20   that was knowable --
21           MR. CANNON:  Yes.
22           THE COURT:  -- would come in?
23           MR. CANNON:  Yes, Your Honor.
24           THE COURT:  Would that include the Dr. Andersen
25   information?
```

1          **MR. CANNON:**  I'm not -- I mean, I don't quite agree

2    with counsel's description of the Dr. Andersen information; but

3    I think that is one way that Your Honor could craft a solution

4    here, is documents that should have been produced to us about

5    COBRA before January of this year, plus Dr. Andersen's,

6    you know, upcoming testimony.  That seems like a fair path

7    forward to sort of rewind the clock a little bit.

8          **THE COURT:**  Okay.  So two ways, if we were to wind the

9    clock back, is state of the record as it was when we were ready

10   to go to trial, even though new things came to light that could

11   have been folded in had --

12         **MR. CANNON:**  Right, because they predate --

13         **THE COURT:**  -- they been disclosed --

14         **MR. CANNON:**  Just to be clear, I'm talking about

15   documents that predate that should have been produced --

16         **THE COURT:**  I understand.

17         **MR. CANNON:**  -- last year, yeah.

18         **THE COURT:**  But you didn't have at the time or --

19         **MR. CANNON:**  Correct.

20         **THE COURT:**  -- testimony you may not have had.

21         **MR. CANNON:**  Correct.

22         **THE COURT:**  So we could say, let's just wind the clock

23   back totally and let's pretend nothing else happened, we were

24   ready to go to trial whenever it was, in earlier 2024; or

25   documents that were available as of that date, one or another,

```
1    even if they weren't produced, even if they weren't knowable
2    but they existed at the time; and, therefore, a sort of more
3    complete trial, as it would have been at the time of the
4    original date, that would include things that had not been
5    obtained, had not been discovered but were in existence, for
6    instance, as of the -- prior to the date of the trial.  That's
7    another model.
8        And it sounds like you're asking for the latter; that is,
9    things that, though they weren't produced and, had we gone to
10   trial, would not have come in, but now you've discovered there
11   were other things that could have been produced, should have
12   been produced --
13           MR. CANNON:  Yes, Your Honor.
14           THE COURT:  -- on both sides, that were kind of making
15   more robust and more complete the record that should have
16   existed --
17           MR. CANNON:  Exactly.
18           THE COURT:  -- back in early --
19           MR. CANNON:  Exactly, Your Honor.
20           THE COURT:  -- 2024.
21                   (Simultaneous speaking.)
22     (Stenographer interrupts for clarification of the record.)
23           MR. CANNON:  I'm so sorry.
24           THE COURT:  -- should have existed as of the original
25   trial date in 2024, not which actually existed.
```

1          **MR. CANNON:**  Exactly, Your Honor.  And that would --

2     and we would include the Dr. Andersen testimony, which has not

3     been obtained yet, but would relate backwards.

4          **THE COURT:**  Okay.  Your view?

5          **MS. KELLER:**  You know, my view, Your Honor, is that

6     COBRA should be excluded, period.  And COBRA is at the heart of

7     all of the problems and all of the misconduct here.  It should

8     just be out.

9          With respect to Dr. Andersen, he has nothing to do with

10    COBRA.  That goes to the heart of the case before the sideshow

11    started, which is the comparison -- the unfair comparison,

12    apples-to-oranges comparison of the two tests.  That's what

13    he's all about.

14         And I think to do anything else rewards them.  To say,

15    well, documents that existed but maybe weren't produced at the

16    time -- well, that would include -- that would include

17    Dr. Hochster's -- all his stuff.  That would include --

18         **THE COURT:**  But if we exclude -- if you use the time

19    frame what was in existence as of the time the trial was

20    originally scheduled, which would, by definition, exclude COBRA

21    because that was after, but it might include other things --

22    maybe it would include the Dr. Andersen stuff; maybe it would

23    include some of the 2023 stuff that your opponent says should

24    have been produced.

25         **MS. KELLER:**  Now I think we're getting into the realm

```
 1   of false equivalency between the two sides.  We have not
 2   committed misconduct.  We have not lied to the Court.  We
 3   haven't lied once, let alone --
 4         THE COURT:  And the consequence of that pos- --
 5   potential consequence of the misconduct is to exclude the
 6   evidence, COBRA evidence, anything post, and looking -- go
 7   back, wind the clock back to what should have been the record
 8   or could have been the record in twenty-twenty- -- earlier in
 9   2024.  Or is it 2023?  Whenever the --
10         MS. KELLER:  But I don't think it's fair to punish us
11   for, for example, non-COBRA evidence that we are prepared to
12   produce that Dr. Andersen -- without that, the jury does not
13   have a clear picture of the comparison of the two tests,
14   because he is the one who's going to say --
15         THE COURT:  What about the other side's non-COBRA
16   evidence that they say -- what about the other side's non-COBRA
17   evidence that could have been produced and obtained as well?
18         If we're removing COBRA, should each side be able to then
19   supplement the record with things that maybe weren't produced
20   in time for the original trial but have since been produced,
21   but still within the time frame that we're talking about,
22   pre-COBRA?
23         MS. KELLER:  I think that would be a case-by-case
24   decision for the Court.
25         THE COURT:  But what principle should the Court --
```

1      **MS. KELLER:**  The principle being that one party should

2  not be rewarded and the other party punished.

3      These delays, you know, that we've had this so-called

4  benefit of delays so that we could get some new information,

5  including from Dr. Andersen, that's been a wild scramble

6  because of what happened with COBRA.  And to then say, "Okay.

7  Well, we're going to bar you from using that because that seems

8  fair since they can't produce COBRA," I don't think that's

9  right, Your Honor, especially because this is evidence that

10  directly goes to the heart of the matter.  It's not -- this is

11  evidence that goes to the false advertising.  That's what the

12  case is supposed to be.

13      **THE COURT:**  So besides COBRA, what would be excluded

14  and what would be included that's not -- that wasn't already in

15  the record before the originally scheduled trial?

16      One is the Dr. Andersen evidence.  That's what you want to

17  get in; right?

18      **MS. KELLER:**  Yes.  And I don't think, if COBRA is --

19  if COBRA is not coming in, I don't think we need the Dr. Morris

20  testimony --

21      **THE COURT:**  Right.

22      **MS. KELLER:**  -- because that goes to that.

23      **THE COURT:**  Right.

24      **MS. KELLER:**  May I have a moment to consult with my

25  colleagues, Your Honor?

1          **THE COURT:**  Yes.

2          **MR. CANNON:**  Your Honor, I want to -- can I address

3    something?

4       We talked about --

5          **THE COURT:**  Well, let her --

6          **MR. CANNON:**  Oh, I'm sorry.

7          **THE COURT:**  Let me finish with --

8          **MR. CANNON:**  Yeah.

9          **THE COURT:**  -- what they've got.

10         **MS. KELLER:**  Your Honor, that would be fine with us.

11         **THE COURT:**  Okay.

12         **MR. CANNON:**  So we talk about COBRA and -- but what

13   we're also talking about is documents that we learned from the

14   COBRA discovery, which are actually a little bit separate from

15   the COBRA trial itself.  And what those are, are the changes to

16   Reveal, the fact that Reveal was changed in 2023, I believe, to

17   remove the chip filter.  That's a relevant fact that's not

18   exactly a COBRA document but we only learned this summer

19   because of the COBRA discovery, and we feel that should have

20   been produced to us a long time ago.  So the fact that Reveal

21   changed and the fact that it changed to improve specificity,

22   that is a doc- -- that is a fact that is, to some degree,

23   outside of COBRA but we only learned because of COBRA.

24       And I think the issue in terms of misconduct -- and I

25   don't want -- I don't want to make sort of broad accusations,

1    but we do feel that information should have been produced.  And

2    the fact that counsel represented that the documents relating

3    to COBRA did not relate to the chip filter, that was just plain

4    wrong.  The chip filter was very much at issue in the

5    documents, we learned, because they -- Guardant dropped that

6    aspect of its technical design.  That's still a live issue in

7    the case in terms of false advertising.

8              **MS. KELLER:**  Your Honor --

9              **THE COURT:**  So the chip filter question is something

10   you feel would be in --

11             **MR. CANNON:**  Yes, Your Honor.

12             **THE COURT:**  -- irrespective of exclusion of anything

13   having to do with COBRA?

14             **MR. CANNON:**  That's right.  And that would be

15   documentary evidence.

16        So some of the documentary evidence about the performance,

17   in particular the chip filter and specificity -- because the

18   chip filter and specificity are quite connected.  Specificity

19   relates to false positives.  And so the chip filter was

20   intended to deal with false positives, but it didn't work.

21        And I know we have a fact dispute of how well it worked,

22   did it not work; but the fact of the matter is, it's been

23   dropped now; so, clearly, it didn't -- it didn't work.

24        But that is an issue that, I think, if the jury is going

25   to consider was there false advertising about the performance

claims of Reveal, those documents that we only learned about because of the COBRA discovery that should have been produced before, I think that's relevant to a fair trial on the false advertising.

**MS. KELLER:** Your Honor, I completely disagree.

All scientific and medical tests are constantly being improved and changed, modified, tinkered with. But this trial isn't about 2023. It's about what the state of the record was at the time of the false advertising.

Was there a chip filter? Yes. That -- if -- it would -- this could go on endlessly if, every time there's any kind of improvement made as science progresses, counsel's allowed to go back in time and say: Aha, that's evidence that your previous test was crummy. It's like saying: That iPhone of yours from 2010, it's got a lot of serious flaws, and we can prove that because we have the iPhone from 2024 that's been improved.

That would --

**THE COURT:** The question is: What state of evidence existed or was available as of the time of the intended trial earlier in 2024?

**MS. KELLER:** Well, I think counsel just said, they learned of this -- of Reveal altering its current test to remove the chip filter, that they learned of that recently. That wasn't something --

1          **THE COURT:**  When was the actual alteration of the

2   test?

3          **MS. KELLER:**  That, I'm not sure of.  May --

4          **THE COURT:**  Yes.

5          **MS. KELLER:**  -- Mr. Perloff address that?

6          **MR. PERLOFF:**  Yes.  So the question is:  What was the

7   state of the evidence if we had gone to trial *nunc pro tunc*?

8          **THE COURT:**  Yes.

9          **MR. PERLOFF:**  Because discovery cut off in 2022,

10  neither side was producing anything, any updates on their tests

11  at all.

12      When the chip -- the change from Reveal 1.0 or 1.2 to the

13  new Infinity happened at the beginning of -- or was

14  implemented, I guess, in the spring of 2023 and fully

15  implemented by the fall of 2023.

16      But, again, for them to say we should have produced that,

17  neither side was producing anything about any of the changes to

18  their products.

19         **THE COURT:**  Well, but -- yeah, but I could say the

20  same thing, then, about Dr. Andersen.

21         **MR. PERLOFF:**  The Dr. -- the reason why the

22  Dr. Andersen is different, it's not that there is, like, new

23  documents.  The problem was, when we sought to take the

24  deposition of Natera's corporate representative, they -- just

25  like us, they worked together with Dr. Andersen, Natera worked

1    with.  They designated Shruti Sharma, one of their, you know,

2    in-house technical people who was the point of contact.  And

3    every time we asked her questions about exactly what

4    Mr. Scolnick was raising, her answer was "I don't remember.  I

5    don't know."  So we didn't have an option but to go, as it

6    were, straight to the horse's mouth, to Dr. Andersen.  It's a

7    very different situation.

8        All of these new developments, including all of the

9    changes and issues that have come up with theirs in the Galaxy

10   study and other studies, we're not going to get to take

11   advantage of.

12       If -- if the parties had agreed and the Court had ordered

13   updates, we're talking about a very different scenario.  We

14   were going to trial based on the record that was closed on fact

15   discovery in July of 2022 and expert discovery in September of

16   2022.

17       Again, I do think that this one issue, because we had

18   raised it with the Court, the Court had sent the letters of

19   request to Denmark, that does merit a special exception in

20   light of the fact that their corporate representative could not

21   answer the questions.  And presumably, if we put her on the

22   stand today at trial, she still will presumably not remember.

23           **MS. KELLER:**  And, Your Honor, additionally, we're not

24   asking about anything new.  We're not saying, "Aha.  We want to

25   ask you about '22 and '23 and '24 tests."  The questions

1  that'll be asked of Dr. Andersen relate to the study that was

2  done in 2018 and 2019.

3     And the fact that so many of the things that Natera is

4  criticizing us for are part of their own protocol and, also,

5  undergird the apples-to-oranges false advertising that they did

6  when they didn't point out, for example, the difference in

7  blood volume in the two tests.

8     So we're not -- unlike Natera, we're not saying, "Well, we

9  need to be able to get into this stuff that's recent."

10    This goes to the heart of the case, and we're going back

11  in time to talk about the -- the way the study was done.

12         **MR. CANNON:**  Your Honor, if we're going to go back in

13  time, I want to raise the issue of damages because there's been

14  a number of supplemental damages reports that have come in

15  throughout the course of this year.  And, in fact, the

16  disgorgement number has risen from 20 million to 162 million

17  over the course of this year, just as a result of the delay in

18  trial.

19    So I think if we're going to rewind the clock, we should

20  rewind the clock as well on damages and just have the damages

21  reports as they were back in February or March of this year and

22  not have all of this additional financial reporting that's gone

23  on throughout 2024.

24         **THE COURT:**  So as a matter of principle, if what I'm

25  looking at is that I should have never granted a continuance in

the first place in order to accommodate this -- each side may

have gained some advantage here and there, various aspects by

the continuance, some update of various things -- why shouldn't

I just simply turn the clock back?

**MR. PERLOFF:** As far as damages are concerned, and

particularly disgorgement, that's an issue that at the end of

the day, you're going to decide. Presumably, you're going to

ask the jury or you're going to decide what the proper amount

is as of the date of judgment. Whether you take that in the

form of the update that we have offered -- and I think the

parties probably would have done a final exchange of, you know,

sales numbers had we gone to trial in 2023 -- presumably, you

also, Your Honor, when forming the judgment in the case, would

look to future disgorgement as part of your overall package

that you would formulate as the final judgment in the case.

So --

**THE COURT:** And that's not a jury issue? That's a

judge issue?

**MR. PERLOFF:** The issue of disgorgement, Your Honor,

is equitable and belongs to you. You've issued it -- you've

given it to them as an advisory; but you, under the Lanham Act,

in fact, you have the option to adjust all of the damages, both

legal and equitable.

Let me shut up and let the real expert talk.

**MR. LaVIGNE:** Thank you, Your Honor.

1          One of the concerns I have is Natera has raised the idea

2     that there should be this cap on corrective advertising,

3     you know, which does impact the value.  And in terms of

4     assessing the value, obviously, the experts have looked

5     prospectively, you know, which can run in tension with some of

6     the Court's rulings.

7          I think it would be appropriate, though, since it's their

8     burden, you know, given everything we've discussed today, not

9     to permit them to make that argument.

10         And if we are going to go back to the state of the record

11    in 2022 for disgorgement, Your Honor has the ability to

12    essentially adjust what the jury does in an advisory capacity.

13    I think had we proceeded to trial in February 2024, we

14    certainly would have wanted to exchange updated financials.

15    And I think the jury should see the differences in performance

16    between February 2024 -- or, sorry -- at February 2024 between

17    Natera and Guardant.

18         Just to be candid with Your Honor, it can get a little

19    complicated when you're, you know, assessing potential value

20    for that corrective advertising cap, which the damages experts

21    had done before.  Again, that's Natera's burden.

22         And one of the requests I would have, if we want to take

23    it back to the state of play in 2022, that they not be

24    permitted to raise that argument.

25              **THE COURT:**  All right.  Comments?

1      **MS. LOZANO:** Good morning, Your Honor. This is

2  Valerie Lozano.

3      I apologize. I'm not actually sure I'm clear on what

4  Mr. LaVigne is asking for. But just to remind the Court, the

5  whole reason that we had supplemental reports and

6  Mr. Malackowski has put in these eight different value

7  calculations was all related to the Court's order that COBRA

8  may be relevant to a cap.

9      If COBRA is out, all of that should be out. None of those

10  value calculations should be in. They're just not relevant.

11      **THE COURT:** Response?

12      **MR. LaVIGNE:** Your Honor, I think -- I think they are

13  relevant.

14      I'd candidly want to think a little bit about -- I mean,

15  in part, it depends on what Natera's going to be arguing,

16  honestly.

17      If they're going to argue that the corrective advertising

18  amount, 75 million, is not reasonable because that exceeds the

19  value of Reveal, then I think we have an issue, and we have to

20  be permitted to respond to it. But at minimum, given

21  everything that's been discussed today, I don't think they

22  should be permitted to make that argument.

23      I'd like to speak with my colleagues in terms of what the

24  recourse is here.

25      Ms. Lozano is right. You know, this issue about harm,

et cetera, I mean, it did come up; but it was because they
raised the corrective advertising cap, not necessarily just
because of COBRA.  So they can't have their cake and eat it
too.

I mean, they can't, on the one hand, say you can introduce
evidence of value -- we had extensive briefing on this -- which
went out until 2026 and, on the other hand, say because you
can't introduce that evidence, you know, due to issues with
their performance -- candidly, they can't then turn around and
essentially be permitted to say, well, Guardant hasn't offered
sufficient evidence of the 75 million.

I'd want to think with my colleagues about the
implications of that, Your Honor, if I could just have a
moment.

**THE COURT:**  Go ahead.

(Pause in proceedings.)

**MR. LaVIGNE:**  Your Honor, I think from our
perspective, if we're going to look at the state of play in
February 2024 -- and I think you were discussing this with
Mr. Cannon, this concept of documents that could have been
available, could have been produced -- I think we should be
permitted to introduce financial information up to
February 2024.  That's honestly what Natera produced that went
up to February 2024.  We produced that too.  So I think that
evidence should come in.

1          **THE COURT:**  So up to, but not beyond?

2          **MR. LaVIGNE:**  For purposes of disgorgement, it would

3   be up to February 2024.  I agree with that.

4       In terms of the concept of this corrective advertising cap

5   and broader value and broader harm, again, that's their burden.

6   So it would depend, in part, on whether they're permitted or

7   whether they seek to raise that defense to the corrective

8   advertising amount.

9          Certainly, if they're going to argue that, I should be

10   entitled to have the expert come in and say, "Members of the

11   jury, this is how I assess the value of Reveal," and to

12   demonstrate that it does exceed the 75 million and the

13   75 million is reasonable.

14          **THE COURT:**  But that would not be frozen in time.

15   That would be based on a current --

16          **MR. LaVIGNE:**  I honestly --

17          **THE COURT:**  -- going forward?

18          **MR. LaVIGNE:**  -- think it could not -- Judge, I

19   really -- I don't think it could realistically be frozen in

20   time.  I think that's an artificial measurement and assessment.

21       I mean, I think you can segregate the two, you know, the

22   evidence of liability and the question of value.

23          **MS. LOZANO:**  Your Honor --

24          **THE COURT:**  Okay.

25          **MS. LOZANO:**  -- if I may --

1          **THE COURT:**  Response?

2          **MS. LOZANO:**  -- briefly.

3     I mean, *Adray* has been the law for a long time.  The only

4     reason that Mr. Malackowski has these new calculations is

5     because discovery was reopened for COBRA, and they go up to

6     $1 billion.  Like, he could have done those calculations in his

7     original report to justify his $75 million corrective

8     advertising number.  He could have always done these

9     calculations.

10     *Adray* has been the law for a long time.  In most cases, a

11     defendant is going to make some form of an argument that the

12     plaintiff's damages are unreasonably high, as always.  He could

13     have done any sort of these value calculations back in the day.

14     But to allow in his new report, while also excluding COBRA,

15     does not make sense because that is the only purpose that that

16     report was prepared for.

17          The damages reports were done in September of 2022, and

18     there's no reason that those reports shouldn't be the universe

19     right now.

20          **MR. LaVIGNE:**  Your Honor, may I just briefly respond

21     to that?

22          **THE COURT:**  Yes.

23          **MR. LaVIGNE:**  That's not accurate.  The supplemental

24     expert reports were not -- for damages were not done because of

25     COBRA.  When the Court allowed COBRA in, the Court did allow

1   it, in part, due to damages and this corrective advertising

2   cap.  That's something that Natera had never raised.  We sought

3   leave to address that issue, which the Court permitted.

4       So, again, if they're going to -- if they're going to

5   argue some type of corrective advertising cap or the

6   reasonableness of the corrective advertising based on the value

7   of the deal, we should be permitted to respond to that based on

8   Mr. Malackowski's opinion.

9       I don't think this is -- we don't have the time, candidly,

10  with the 18-hour limit, to get into excruciating detail on

11  this.  But to do a faithful assessment of value, you know, what

12  he did -- and we went through this -- he looked at various

13  financial metrics; he went out until 2026.  I submit it was

14  conservative.

15      **THE COURT:**  So the difference between the original

16  report and what is proposed now is what?

17      **MR. LaVIGNE:**  So the original --

18      **THE COURT:**  How would you describe the difference?

19      **MR. LaVIGNE:**  Yeah.  The original report, Your Honor,

20  looked at the state of play as of essentially the end of

21  May 2022.  It looked at what were the lost profits, what was

22  the disgorgement.

23      And on the disgorgement, I'll note Natera didn't give us

24  complete information.  They gave us a projection.  So the

25  amount has actually gone down by $5 million, and corrective

 1   advertising.  That was the -- that was the state of the play.

 2       The new report, that addressed this concept of value and

 3   harm to value; and it did, you know, assess the impact of

 4   COBRA.  But in terms of value and harm to value, he used these

 5   four metrics and basically said, overall in the aggregate, the

 6   value of Reveal CRC is in the hundreds of millions of dollars.

 7   So that essentially justified the reasonableness of the

 8   75 million.

 9           **THE COURT:**  75 million being the --

10           **MR. LaVIGNE:**  Corrective advertising amount.

11           **THE COURT:**  And remind me.  Is that opinion -- how

12   much of that is contingent on the whole -- and reliant upon the

13   whole COBRA?

14           **MR. LaVIGNE:**  It's not at all.  I mean, the 75 million

15   corrective advertising has nothing to do with COBRA.  I mean,

16   that opinion was issued before COBRA was even part of the case.

17       His supplemental opinion, he essentially said, "I've

18   looked at COBRA, and it doesn't impact the value of Reveal."

19           **THE COURT:**  So your position, it's an update

20   independent of COBRA.  It is a function of time, the fact that

21   there's been more time to reexamine issues and reanalyze the

22   damage analysis, but it's not tied to COBRA.

23           **MR. LaVIGNE:**  Right.  The 75 million is not tied to

24   COBRA.

25           **THE COURT:**  But it is something that is new that

hadn't been -- it's a new number that hadn't been in the

original?

        **MR. LaVIGNE:**  Right.  The new opinion that deals with

COBRA and the impact on COBRA, if COBRA is out, that's

obviously not coming in.

     The new information on valuation, it does include recent

financial information; but if we're going to take the

February 2024 as a cutoff, that's effectively what that

financial information was based on.  So I don't think there's

any prejudice or anything there.  They're not relying on stuff

beyond 2024.  Maybe for one month or something.

     But those overall value assessments, that can be

compatible with the bright line the Court is issuing.  In other

words, the most recent financial data we have from Natera ends

in February 2024.  He did not look at data that went beyond

that.

        **THE COURT:**  So what's new in the supplemental report

is sort of the more expansive assessment of value?

        **MR. LaVIGNE:**  It's the more expansive assessment of

value and harm to value.  Again, those are not damages

Guardant's seeking.  We're not seeking, you know, harm to the

enterprise value or harm to net present value.  You know,

we're -- you know, we've expanded disgorgement, but the lost

profits has actually shrunk.

     We did this in response to the argument from Natera that

COBRA has hurt the value of Reveal and, essentially, that

75 million is not reasonable, given all these various factors.

Mr. Malackowski, with the permission of the Court, made an

assessment of what these different value metrics of Reveal are.

That's the key difference.

**THE COURT:** Okay. What's wrong with that?

**MS. LOZANO:** So I'd like to just reorient us, so I'd

like to just remind the Court of where we were when

Mr. Malackowski was given leave, which is from the Court's

order at Docket 493.

(As read):

". . . in evaluating Guardant's corrective

advertising award, it is entirely reasonable for the

jury to consider the impact of the COBRA results on

Guardant's future profits since that could limit the

award. If consumers were dissuaded from using Reveal

because of the results of COBRA, the cap on

recoverable future advertising could be affected."

So Mr. Malackowski went and performed all sorts of various

complicated enterprise value projected profit streams

calculations to say: Look, it's all higher than my 75 number;

so my $75 million corrective advertising number is reasonable.

And, oh, by the way, COBRA didn't matter.

If those calculations are now going to be allowed back in,

even though we're otherwise freezing time, and they were done

only because of the expanded discovery into COBRA, then we have
to be able to talk about COBRA with him and say:  Your
calculations don't make any sense.  You're seriously saying
this really bad study did not impact the future profit stream
of this product?

That was the whole point of the exercise.  But now we're
not going to be able to use COBRA, but they're going to get to
inject these massive numbers to tell the jury "Look how
conservative we're being.  We're only seeking 200 million in
disgorgement and 75 million in corrective advertising, but this
product is worth $1 billion"?

Those calculations don't have any relevance anymore and
especially if COBRA is out and we're not allowed to
cross-examine Mr. Malackowski on how COBRA could possibly not
have any impact on the future projected profit stream.

**THE COURT:**  So isn't that unfair to say, "All right,
my revised analysis includes X, Y, and Z, an upward number, but
it ignores what we're excluding"?  What I'm inclined to exclude
is the whole COBRA issue.  You've got to take the good with the
bad, don't you?

**MR. LaVIGNE:**  I hear what you're saying, Your Honor.

My fundamental concern with this proposition has been the
following:  Their expert -- and this is to the best of my
recollection -- in his rebuttal report, he never criticized the
75 million corrective advertising by saying that exceeds the

value of Reveal, for example.  Mr. Malackowski's assessment was

essentially done because counsel started making these

arguments, like I've said.

    And I think the Court's order that Ms. Lozano just read,

I think the Court may have been envisioning future lost

profits, but we haven't increased our lost profits.  Our lost

profits end as of May 2022.  That hasn't changed.  So we're not

formally seeking lost profits beyond that.

    If -- I understand there's some tension, but at the end of

the day, you know, Dr. Stec, their expert, hasn't done an

analysis -- actually, Dr. Stec, their expert, hasn't done an

analysis to show how COBRA does impact the potential value of

Reveal.

    Mr. Malackowski concluded it doesn't.  So if this concept

of the 75 million being unreasonable, if that comes up, he

should be permitted to offer his expert opinion in terms of

these four different metrics and how they exceed $75 million.

And I don't think this is going to trigger anything because

Dr. Stec never did his own analysis to say that COBRA lessens

them below 75 million.

    **MS. LOZANO:**  I don't need my expert to do his own

analysis.  I get to cross-examine Mr. Malackowski on his

opinions about why COBRA isn't relevant and doesn't impact the

future projected profit stream of this product, which was the

whole point of the exercise to say:  You shouldn't spend more

1  on something than it's really worth, that it's actually going

2  to make for you in the future.

3      We should be back to the expert discovery reports back in

4  the day.  And I think that my colleague is correct that

5  Dr. Stec, at that time, did not tether his criticisms of the

6  75 million to any value of the overall product or value, so

7  we're limited to that.

8      But it makes absolutely no sense to allow in these various

9  value calculations but say that we cannot test those on cross

10  using the idea that COBRA has absolutely no impact on this

11  product.

12      **THE COURT:**  What's wrong with winding the clock back

13  and having the trial that we were going to have had it not been

14  for my agreeing to the extension, which -- on the theory that

15  had I known what was going to ensue, and, frankly, seeing what

16  has happened, I could have easily said that the probative value

17  of all this stuff is going to be greatly outweighed by all the

18  complications and all the other problems?

19      And so if I were to just wind the clock back -- and I

20  forget when we were supposed to go to trial.  Was it March or

21  April?  I can't remember.

22      **MS. LOZANO:**  I think it was March.

23      **THE COURT:**  March.  I know it's hard to ignore

24  everything that's been done, but let's just take the record.  I

25  had closed the record at that point.  Things were done.  We

1    were ready to go to trial.

2        I know each of you wants to put in something.  You want to

3    put in some new information.  But every time you add something,

4    there's a problem.  It implicates certain things, and then it

5    suggests, well, then the other side be given a chance to do X

6    in response to Y.

7        If the simple remedy is just to go back -- and we were at

8    a point where I believe we had witness lists and all that, or

9    did we?

10        **MR. LaVIGNE:**  I believe we did, Your Honor.  I believe

11    we did.

12        The one thing -- my one request, Judge, is that both sides

13    be permitted to introduce financial information relating to one

14    another as of February 2024.  I think it's only fair -- the

15    jury is going to want to know -- there's going to be just a --

16    everybody's going to want to know:  Well, what the hell has

17    happened -- pardon me -- what the heck's happened over the last

18    couple of years?  How have these two companies done?

19        **THE COURT:**  And right now, the state of the record was

20    information up through when?

21        **MR. LaVIGNE:**  Right now, the state of the record

22    actually is through February 2024.  We produced one additional

23    month.  I want to get that evidence in.

24        And in terms of limiting Mr. Malackowski from doing the

25    enterprise value and some of those other issues, I'm happy to

confer with Ms. Lozano and frankly see what they're going to

argue.  I mean, they definitely can't have Stec, their expert,

talk about how this, you know, 75 million is above the value of

Reveal.  I'm happy to have a discussion with her about what the

type of cross would be without asking for her questions.  I'm

hopeful that's something we can work out.

But the one piece of evidence I do think we should be

permitted to admit is that financial information because that's

highly relevant to the jury.

**MS. LOZANO:**  Your Honor, if I may.

**THE COURT:**  Last comment.  Then we need to take a

break.

**MS. LOZANO:**  The expert reports were done in

September 2022.  There was no financial information after that.

If we are now going to introduce financial information

which they only got because of COBRA discovery reopening --

they want to put that in because they have substantially

increased their disgorgement number -- we have every right to

introduce the facts that have happened in that time frame,

including COBRA and how that made -- possibly had an impact on

us being more successful than Guardant with respect to these

tests.  It's just a slippery slope.

There -- it is actually unfair for them to say, "We can

talk about financial results so we can disgorge hundreds of

millions of dollars through February 2024, but you can't say

1    what's happened in the market during that time."

2         That is not fair.

3              **MR. LaVIGNE:**  Well --

4         **THE COURT:**  One comment.  Then we're going to take a

5    break.

6              **MR. LaVIGNE:**  Yeah.  Final point, Your Honor.

7         As Mr. Perloff indicated, the Court ultimately has the

8    discretion over the disgorgement number.  I mean, the jury is

9    issuing an advisory opinion on that, and the Court can modify

10   that or tweak that, what have you.

11        If this case were going to trial and if we didn't have the

12   financial information, I would have cross-examined their CEO on

13   how they've done in terms of revenue and growth over the last

14   few years.

15        So this is coming in either way.  I just think, for the

16   jury to think about this case and look at the difference and

17   look at the harm -- I mean, the reality is Signatera has taken

18   a lion's share of market as of February 2024 compared to

19   Guardant.  And I think freezing it in time financially as of

20   March -- May 2022, you know, I think the jury should be given

21   the whole picture.  That's the one piece of information I would

22   want.

23              **THE COURT:**  So the information that would have gone to

24   trial is up through May 2022?

25              **MS. LOZANO:**  Exactly.

1          THE COURT:  That's what we were going to do at trial?

2          MS. LOZANO:  Yes.

3          MR. LaVIGNE:  Yes.

4          MS. LOZANO:  Yes.

5          THE COURT:  Okay.  We're going to take a break.  Come

6     back in ten minutes.

7          THE CLERK:  Court is in recess.

8                    (Recess taken at 10:46 a.m.)

9                    (Proceedings resumed at 11:03 a.m.)

10         THE COURT:  So remind me, Counsel.  This case was

11    originally scheduled for trial -- remind me.  Was it March of

12    this year?

13         MS. KELLER:  Yes, Your Honor.

14         THE COURT:  And filings, do you think I'd received the

15    pretrial filings at that point?

16    Somebody can --

17         MR. PERLOFF:  I know that we even gave you early

18    versions of jury questionnaires.  We had witness lists.  We had

19    exhibit lists.  They were still the monster exhibit lists that

20    both parties have subsequently added to but then reduced.  We

21    had a final pretrial statement.  So all of that was submitted.

22    I even think we had binders to you, and we had to come and take

23    them back.  I remember that.

24         THE COURT:  Yeah.  Good.  I hope you kept those.

25    You may not need those because you've got new ones.

1          You know, it seemed to me that had I known that the course

2     of events regarding the disclosures, the non-disclosures, the

3     difficulty in obtaining evidence, there was still ongoing

4     discovery, weighed against the somewhat limited probative

5     value -- because I wasn't going to let this in for all

6     purposes.  It was based on -- it was for limited purposes, and

7     some of it was conditionally relevant, but there was a general

8     limited purpose.

9          Had I known that we would have these problems in the fact

10    of non-disclosures that should have been made, this case simply

11    would have gone to trial as it was planned.

12         So my default is -- I know it's hard to turn the clock

13    back, but if we look at the state of the record when this was

14    supposed to go to trial, that's what we go on.  I know that

15    means certain advantages are lost; certain disadvantages are

16    lost as well.  But that is the general principle that seems to

17    me that ought to govern here.

18         **MS. KELLER:**  Your Honor, returning things to the

19    *status quo ante* really does not serve the objective of

20    punishing a party for repeatedly lying to the Court.  It just

21    doesn't.  And in some respects, it punishes us because we've

22    had to spend a massive amount of time and money trying to

23    uncover this evidence and --

24         **THE COURT:**  And there may be a remedy for the

25    resources spent.  I'm not saying that that's off the table.

1      **MS. KELLER:**  But that's not enough.  It really isn't.

2  That's nothing to Natera.  It doesn't deter them.

3      One of the things I think the Court needs to do is deter

4  this kind of misconduct.  I just can't imagine a worse case of

5  it.  I've been practicing for 46 years now.  I realize I'm

6  dating myself.  But I don't think I've seen anything quite this

7  bad, where somebody -- where lawyers, as well as the witness,

8  just repeatedly, brazenly lied to the Court.  And it was kind

9  of a dare:  Catch us if you can.  And then each time we caught

10  something, new lie; and we'd catch that, new lie.  I think

11  there has to be a more severe sanction.

12      And cutting our damage numbers in half is really rewarding

13  Natera.  I think at the very minimum, the Court should allow us

14  to introduce evidence regarding Natera's profits through

15  August 2023.  That was before the COBRA results were known.

16  COBRA couldn't have had any effect on those numbers.  And we

17  could have asked about them if we had had the trial in March of

18  2024.  So this is consistent with the Court's --

19      **THE COURT:**  You're saying of Natera's profits through

20  what?

21      **MS. KELLER:**  August 2023.

22      **THE COURT:**  Why that date?

23      **MS. KELLER:**  Because that's before the COBRA results

24  were known.  That's before any COBRA anything came out; so

25  COBRA couldn't have had any impact on those numbers.

1      And I also think that it's important to let us take

2  Dr. Andersen's deposition because Dr. Andersen's -- what he's

3  going to be asked goes right to the heart of the false

4  advertising case, not COBRA related.  And it's nothing new.

5  It's not about new tests of Natera's.  It goes to how the study

6  was done back in 2018 and 2019 that undergirds the false

7  advertising claims.

8      And so I think --

9          **THE COURT:**  What do you hope to elicit more

10  specifically?

11         **MS. KELLER:**  A couple of things.

12     One, that Natera, in its own testing, was unwilling to use

13  the same blood volume that Guardant had to use in its testing,

14  was using twice as much in terms of the blood that was tested.

15  And that makes a huge difference in outcomes, and it led to the

16  apples-and-oranges comparison.

17     That is one aspect that we want to get into.

18  Mr. Scolnick, who took his deposition, can tell you the others.

19     But it's -- it goes right to the heart of the original

20  case before any COBRA came up.

21         **MR. SCOLNICK:**  Your Honor, Dr. Andersen's testimony

22  will also refute Natera's affirmative claims of false

23  advertising against Guardant.

24     Specifically, they claim that the Parikh study was

25  unblinded and not prospective, and Dr. Andersen can testify

1    that many of the same methods were used in the Reinhardt study.

2    And so the same definition should apply to both parties.  And

3    it prevents the -- it prevents Natera from misleading the jury

4    on this point.

5        And it's also going to directly contradict a number of the

6    representations that Natera's witnesses have made under oath

7    about what did or didn't happen after they received the

8    clinical data for the patients.

9        So not only is it essential to contradict their claims;

10   it's essential to impeach their witnesses and prevent them from

11   affirmatively misleading the Court and the jury.

12       **THE COURT:**  So your proposal would be to allow,

13   subject -- as an exception to turning the clock back totally,

14   allowing Andersen's testimony and including profits, Natera's

15   profits, through August of 2023?

16       **MR. SCOLNICK:**  Yes, Your Honor.

17       **THE COURT:**  Okay.  Response?

18       **MR. JOHNSON:**  Your Honor, Kevin Johnson.

19       So I want to go back to -- and, Your Honor, I'm

20   sympathetic to what Your Honor said with respect to trying to

21   rewind the clock and try to -- but we are in a -- frankly, just

22   in a different position at this point because of the facts that

23   we've learned.

24       And, Your Honor, I think the evidence that COBRA is

25   probative is, how many times has Guardant tried to exclude

1  COBRA from the very, very beginning, over and over and over

2  again, repeatedly, because they know the evidence, the facts

3  are devastating to their side of the case?

4       **THE COURT:**  Okay.  But if COBRA is out --

5       **MR. JOHNSON:**  So I just want to -- I just want to go

6  back to it because I think this is a trial that involves two

7  public companies, and there is evidence now that their

8  statements -- there are going to be witnesses who take the

9  stand who are going to testify and not give the full story of

10 what has happened on their side of the -- on their side of the

11 world with respect to what's happened, you know, with their

12 test.

13      **THE COURT:**  Well, it's what would have happened had

14 this case gone to trial but for the late filed declarations and

15 evidence that you filed on behalf of your client that then

16 opened the door for a delay in this trial and discovery.

17      **MR. JOHNSON:**  Understood.  That's why, Your Honor, I

18 think the two alternatives, frankly, are, you let in the

19 evidence that we know that existed and Hochster is out on that

20 new evidence and we will drop him on that new evidence and his

21 supplemental report.  So we go back in time, but you keep in

22 the facts.  They can have Andersen.  We bring in what we know

23 are the facts associated with COBRA, and we drop Hochster and

24 he's out.

25      Or you go back to where it was in February of 2024 and the

state of the record at that point, which means Hochster is in

on his first report.

And, you know, they mentioned they want to do damages

through August of 2023.  Their -- neither side's experts have

used a date of August 2023.  That's not in any reports.  They'd

need to redo -- there'd need to be new reports associated with

that and new analysis.

And frankly, the Andersen issue is, you know, an issue

that -- we heard, you know, Mr. Perloff talk about a 30(b)(6)

witness that Natera had on our side.  They never filed a motion

to compel on that witness at the time.  They never sought the

evidence at the time from Dr. Andersen.  They're obviously

pursuing it now in response to COBRA and the fact that we have

time associated with it.  But that was not something that they

ever pursued in the course of the regular discovery.

So my point simply is, the alternatives are let the

evidence come in on both sides and -- and, by the way, the

exclusionary evidence, the exclusion is we're losing our

oncologist in this, an expert who came in -- and I'm not

defending his actions at all.  What I'm saying to you is that

is incredibly prejudicial to us because he's somebody that we

designated from the beginning.  He was supposed to get up there

and testify about what all these documents mean.  We'll drop

that.  We'll drop him, rather, if we're allowed to talk about

the state of the facts that existed on both sides.

```
 1        And, again, you know, from my standpoint, he's -- he

 2   was -- he would have been a very important witness because he's

 3   the only oncologist who's going to testify in this case.

 4        So we designated him.  If you recall, they tried to

 5   preclude him from testifying from the very beginning, over and

 6   over again, because they didn't have an oncologist.

 7        So it's incredibly -- it is a severe and significant

 8   sanction on our part that we would withdraw him to testify on

 9   the COBRA evidence, you know, if that evidence is allowed to

10   come in because we believe -- again, this is -- this is a --

11   this is a -- this is going to be a jury trial on:  Who's

12   telling the truth here?  Who's telling the truth to the

13   marketplace, and who's telling the truth about how their

14   products operate?

15        And we know now, what -- good or bad, we know now that the

16   statements that they've made to the marketplace are not true,

17   and that's what's come out through the COBRA discovery and

18   their own internal documents, which they should have produced.

19        And, again, there's -- we all recognize that the Federal

20   Rules of Evidence have a duty to supplement.  They should have

21   supplemented this discovery and provided it to us in the

22   regular course of discovery.

23        So, Your Honor, I go back and I say, the monetary

24   sanctions, we -- you know, we believe that that's also another

25   form of sanction that we could deal with a lot of this.  But
```

```
 1   we're willing to drop Hochster if, in fact, we -- you know,

 2   this other evidence is able to come in on both sides.  They get

 3   Andersen, and COBRA facts come in.

 4        And if not, the alternative is we go back to

 5   February 2024, where the state of the record was at that point,

 6   and Hochster is in on his first report.

 7             THE COURT:  So the second alternative, instead of just

 8   dropping Hochster and let everything else come in, is to keep

 9   the state of the record as of -- as it would have been --

10             MR. JOHNSON:  Right.

11             THE COURT:  -- in 2024?

12             MR. JOHNSON:  And then the way to deal with these --

13   you know, the issues that we've been dealing with now is

14   through Your Honor -- and Your Honor made reference to it a

15   couple of times -- is through monetary sanctions.

16        And, again, we're losing the ability, which is

17   significant, of Dr. Hochster getting up there and being able to

18   tell the story that's in his second report.

19             THE COURT:  He can only testify on the first report?

20             MR. JOHNSON:  That's right, Your Honor.

21             MR. SCOLNICK:  And, Your Honor --

22             THE COURT:  And the rest of the trial would look --

23   would appear as it was going to?

24             MR. JOHNSON:  Yes.

25             MR. SCOLNICK:  Your Honor, simply excluding
```

1     Dr. Hochster would be a massive windfall for Natera.  It does

2     nothing to address their misconduct, their repeated lies to

3     the Court, their repeated lies to us, their obstruction, their

4     lies to Judge Kim.

5        The bottom line is, with COBRA, as I've said again and

6     again, we now know that it isn't relevant.  We now know that

7     many of the statements that they've been making about the

8     evidence, about the relevance are simply not true.  And we know

9     that from Dr. Morris' testimony.

10      **THE COURT:**  What's an example of that?

11      **MR. SCOLNICK:**  An example is that, definitively, we

12     know that there are no -- we know -- we do not know whether

13     there are any false positives or true positives or false

14     negatives.  We just don't know, without clinical data, what the

15     state of the record is.  That's the first part.

16      **THE COURT:**  You may not know for sure, but one could

17     draw some inference.

18      **MR. SCOLNICK:**  Well, that's just speculation then, and

19     that's why it's -- that's why it's so unfair to Guardant for

20     them to be allowed to speculate.

21       And when we're talking about the letters that went out,

22     the evidence, the documentary evidence that Natera wants to

23     introduce on COBRA, we know that those were premised on a

24     misunderstanding of the statistics.  And that's what

25     Dr. Andersen -- I'm sorry.  That's what Dr. Morris testified

1    to.

2        So all of the promises that they've been making about the

3    relevance of COBRA, they're simply not true, Your Honor.

4        And given the misconduct here, given all of the

5    misstatements -- we're talking about a very short amount of

6    time to try this case -- if a team of statisticians and experts

7    at NRG couldn't figure the relevance of the low prevalence and

8    the impact that it would have on COBRA, then how is it we can

9    expect this jury to do so?

10        And the reason why we tried to exclude COBRA all of these

11    times isn't because it's damaging to Guardant.  It's because

12    it's unfairly prejudicial; it's because it's misleading to a

13    jury, and we know how they're going to try to mischaracterize

14    that evidence.

15        So, Your Honor, Dr. -- putting that aside, Dr. Andersen is

16    entirely detached from COBRA.  It's a witness who is going to

17    discuss evidence from 2018 to 2019; it's a witness that is to

18    the -- goes to the center of the case; and it's a witness who

19    we tried to, and the Court authorized us to, depose going back

20    to 2022.

21        So regardless of where we end up, we think that

22    Dr. Andersen should be able to testify because doing otherwise

23    would allow Natera to mislead the jury, which is what they've

24    been doing so far.

25        And it's not just that the 30(b)(6) witness says they

don't know.  A number of witnesses have affirmatively misstated

the evidence and misstated what happened or what didn't happen

in the Reinhardt study, and we simply can't allow that to

happen.

      **THE COURT:**  All right.  So why not take the record as

it is, but what the request is, as I understand, is allow

Andersen to testify?

      **MR. BRAMHALL:**  Your Honor, Andrew Bramhall for Natera.

      With respect to Dr. Andersen, I think -- the deposition

has not occurred yet.  So counsel is representing what he's

going to say.  I'm not sure what that's based on.  I don't

think it's going to go the way that counsel believes it is.

Nobody knows.  We haven't seen him.  He hasn't testified.  So

we'll see.  We're not worried about that evidence, Your Honor;

that if they're eliciting evidence about what happened at the

time, sure, they can do that, and we'll see what Dr. Andersen

has to say.

      **THE COURT:**  You say "what happened at the time."  At

the time of what?

      **MR. BRAMHALL:**  The study, because the study was back

in 2019, which, Your Honor, may explain why our 30(b)(6)

witness didn't have everything at top of mind when being

deposed, even as a 30(b)(6).  That's a long time ago.  I think

it was a five-year period at that time or four years.

      I just need to address the notion that all of these

1    arguments about COBRA have been refuted by Dr. Morris.  I'm

2    happy, Your Honor, to walk through that testimony with you and

3    the documents.  I don't think it's going to be necessarily what

4    is being represented to you.  But I don't need to get into that

5    game of misrepresentations and untruths that counsel is doing

6    non-stop at this hearing.

7        I will tell you this:  Guardant, when it applied for the

8    COBRA study, represented, through its application, that it had

9    99.99 percent analytical specificity, near-perfect specificity.

10    So if you wonder why the NRG thought "Hey, we're not going to

11    have a lot of false positives," it's because Guardant told them

12    it wouldn't.

13        Now, subsequent data has come out.  And after the results

14    were as bad as they were, then Guardant said:  Hey, you guys

15    should have realized that we're going to get one-to-one true

16    positives and false positives.

17        Well, there's two issues with that.  One, that's admitting

18    that there are false positives in the results, which they're

19    telling you, at this hearing, there were not.  Mr. Van Morris,

20    in presenting to the NCI, said there were false positives.

21    I think we have a factual dispute, Your Honor, over whether

22    there were false positives or not.  It's not refuted.  It's not

23    resolved.  The reality is, everybody drew inferences about the

24    data because it was backwards.

25        And then what Guardant did, they went to the NRG and said:

Hey, hold on.  Don't worry.  We've improved our test to change
the specificity so to reduce false positives.  That's all that
specificity does.

After they do that, they're now arguing to Your Honor --
this is evidence we didn't know about.  We found through NRG,
not through Guardant, although I think they did produce it
right before we got it from NRG.  We learned they were telling
the NRG, "We had issues with false positives.  We've now
resolved them."  That's effectively what they were saying.

I'm shocked that they're now in court saying you can't
know it's false positives.  Sure, with respect to clinical
false positives, you might not know; but there can be,
obviously, inaccurate results at the time.

And so if you look at the evidence, even their own
witnesses said they're either originally false positive results
or now they're false negatives.  These are not accurate
results, Your Honor.

So I just want to get on the record that we don't agree
that this has all been refuted.  We're happy to brief what
Dr. Morris said in the documents.  The reality is it's just
not -- this, Your Honor, in the same way the Dr. Andersen
evidence goes to, as Ms. Keller said, the heart of the case,
COBRA goes to the heart of the case.  We just never would have
known about it but for us learning about the failure of COBRA
before trial.

1    And we tried to get this evidence in.  It's evidence they

2    had at every moment.  They had more evidence, more knowledge

3    than us at every step.  And, yeah, it's come out in kind of a

4    haphazard and --

5         **THE COURT:**  So if I go the route of excluding and

6    turning the clock back, excluding COBRA for all the reasons we

7    talked about, what's being proposed by your opponent is that

8    there be an exception.  One is Andersen's possible testimony,

9    which you say we don't know which way that's going to come out,

10   but it's not going to be related to COBRA.  And, two, they want

11   to be able to introduce updated profit information on Natera up

12   to the date of COBRA in August 2023, instead of going back to

13   whenever that was to update the profit.

14        Those are the two things, as I understood, that's being

15   requested; correct?

16        **MR. SCOLNICK:**  Yes, Your Honor.

17        **THE COURT:**  So, and you say we don't know what

18   Andersen is going to say, which way that's going to go; and the

19   profit thing is really more of an update, unaffected by COBRA.

20        **MR. BRAMHALL:**  However, Your Honor, within that

21   period, up to August of 2023, I believe they made the change to

22   their product where they got rid of the chip filter.

23        So there are relevant facts, again, that we only learned

24   about from COBRA discovery, that they fought at every turn,

25   that would -- if this is the case and that's where we are in

1    terms of the world, that should come in as well; the fact that

2    they had to -- "had to" -- they abandoned the genomic variant

3    approach of their test in part because they had these false

4    positive issues.

5         **THE COURT:**  All right.  So if they're allowed to

6    update damages and Natera's profits through -- updated through

7    August 2023, you would, as a counter, be able to -- want to be

8    able to put in evidence about the chip filter developments?

9         **MR. BRAMHALL:**  Certainly.  Like, whatever we know

10   about in terms of what happened with their product behind the

11   scenes up to that point I think should be fair game.

12        **THE COURT:**  Is there anything else about their

13   products?

14        **MR. BRAMHALL:**  Well, Your Honor, I heard Chris --

15   Mr. LaVigne say that he is going to ask our CEO about profits

16   up to today.  So, I mean, if that's the world we're living in,

17   then all the COBRA evidence should come in too.

18        If we're not living in that world and we're talking about

19   August 2023 and we're not talking about anything after that

20   point, I believe there's -- I mean, I'll have to go back and

21   look through the evidence, Your Honor, but one of the big

22   events is obviously the change of the product to go to that new

23   test platform such that they only use one of the two signals

24   and they don't have the chip filter.

25        And they told the FDA the change -- this change was to

1   reduce false positives from chip.  I think we cited that

2   document to Your Honor.  It's a supplemental IDE,

3   investigational device exemption, I believe.  And they've

4   represented in that document that the reason why -- one of

5   the reas- -- the changes that was being made when you remove

6   the variant filter --

7          **THE COURT:**  So any changes in their product up through

8   the date of damages, if we're going to change the damages date,

9   then any changes to the product would come in commensurate with

10  that?

11         **MR. BRAMHALL:**  I would think so, Your Honor.  And they

12  also retired the version.  So Version 1.2 was the version that

13  was in the study that was -- that was the focus of the ads.

14  Eventually, it changed to something else.  You know, we talked

15  about this at a prior hearing, the Infinity platform.  I

16  believe the fact that they retired that test is also relevant.

17         **THE COURT:**  Okay.

18         **MR. PERLOFF:**  Infinity went live, I believe, August of

19  2023.  So it actually meshes.  I'm not sure what they're going

20  to ask.  They could have said:  You're fixing to introduce a

21  new product.  That's fair enough.  They could ask that, I

22  suppose.

23         **THE COURT:**  Okay.

24         **MR. BRAMHALL:**  Your Honor, they gave up on the old

25  product.  They moved to a new product.  They told the FDA that

1    it was because of false positives from chip.

2            **MR. PERLOFF:**  Yeah, that's --

3            **THE COURT:**  Whatever the evidence will come in --

4            **MR. PERLOFF:**  That's just not true.

5            **THE COURT:**  -- they should bring that evidence up to

6    August 2023.

7        If they're going to introduce damages numbers through

8    August '23, any events, qualitative events commensurate with

9    that would be relevant, it seems to me.  That's what you're

10   asking for?

11           **MR. BRAMHALL:**  Sure, Your Honor.

12       And there's one other issue that we think should come in.

13   We were able to depose Dr. Parikh.  You recall she's the first

14   author, principal investigator on the study that's on their

15   side --

16           **THE COURT:**  Yeah.

17           **MR. BRAMHALL:**  -- for Reveal.

18       We were able to depose her because she was hired as an

19   expert.  She's not being paid.  She's giving to charity.  We

20   have a dispute over whether that's compensated or not.

21       But the point is, we deposed her and got a number of

22   pieces of highly relevant information from her about what she

23   knew about the test; how it differs from their advertising;

24   and, in fact, her own preferences in her practice, which are to

25   use Signatera because it has more data than Reveal.

1    These are highly, highly relevant facts, Your Honor.  And,

2    in fact, Dr. Morris testified as well that he uses Signatera.

3    I mean, these are all highly relevant facts about what's

4    happened in the market and where preferences are and why

5    physicians have these preferences.  And it goes back, again and

6    again and again, to the amount of data that Natera has on its

7    test.

8         **MR. PERLOFF:**  Well, the only reason Dr. Parikh was

9    testifying as a rebuttal expert for COBRA is because of COBRA.

10        Now, having said that, if we bring her live -- because she

11   was deposed as a fact witness because of her work on the Parikh

12   study.  If we do bring her live to testify in this case, I'm

13   sure they will ask her, and she will answer, what product she

14   uses and why.  But the -- her intent was to come and testify as

15   a rebuttal witness.  I'm sure she would have covered all of

16   that.

17        If we make the decision, then of course they're going to

18   be allowed.  She wouldn't testify about her rebuttal report.

19   She would focus on her clinical practice and the original study

20   if we bring her live.  Right?

21        **THE COURT:**  So the intent now is to have her -- what

22   is the intent?

23        **MR. PERLOFF:**  Yeah, let me explain again.  I

24   apologize.

25        She was deposed at the very beginning of the case because

1    she was the principal author --

2         **THE COURT:**  Right.

3         **MR. PERLOFF:**  -- on the Parikh study; and her

4    deposition testimony, which we had designated back when we were

5    going to trial, has to do about that.

6         **THE COURT:**  She was going to appear --

7         **MR. PERLOFF:**  She did talk about, by the way, using

8    their test.

9         She -- because she knew about the COBRA study, she agreed

10   to be an unpaid rebuttal expert to COBRA and agreed to come

11   here to testify in that capacity.

12        So if we choose to bring her to testify, she's obviously

13   not going to talk about COBRA.  She would just go back to

14   testifying about the same things that were covered in her

15   original deposition.  That's all that I'm saying.

16        **THE COURT:**  And your intent, if she doesn't, is that

17   she would appear via the already reported depositions; not

18   going --

19        **MR. PERLOFF:**  Correct.

20        **THE COURT:**  Not going to be a live witness if COBRA is

21   out, so she's probably not going to testify live?

22        **MR. PERLOFF:**  That's probably correct.

23        **MR. BRAMHALL:**  Although, Your Honor, you ordered that

24   she appear live after we pointed out that they obviously had

25   her under their control.  She's their expert.  She's available.

1    And we would -- we would potentially call her live.  We think

2    she should be here live.  I think they're now saying:  Oh, we

3    might not bring her live.  I think there's an order that is

4    requiring her to come.

5         **MR. PERLOFF:**  No.  I actually would love for her to be

6    able to come.  She -- again, unlike any of the -- Dr. Hochster,

7    who is being paid for this and doesn't have the same clinical

8    practice, she's busy.  She can come on the 18th.  This is the

9    date that she has available to be able to come out.  She would

10   fly out on the Sunday, and we would put her on then if we put

11   her on live.

12        And, you know, to suggest that we can control her, that's

13   just not true.  She wanted to come out to testify about the

14   rebuttal report.  I would want to go back to her and say, "Hey,

15   we're going to just talk about your original testimony.  Can

16   you still come out?"  I assume she will.

17        And, again, they are more than entitled to cross-examine

18   her on things like which test do you use and why.

19        **THE COURT:**  All right.  So the question is -- so

20   there's not a problem, if she appears live, that you will be

21   able to ask these questions.

22        **MR. BRAMHALL:**  We think --

23        **THE COURT:**  The question --

24        **MR. BRAMHALL:**  -- she should appear live; she's their

25   expert.

1          **THE COURT:**  Right.  The question is:  If there's a

2   possibility that she would not appear live, what do we do about

3   that?

4          **MR. PERLOFF:**  Yeah.  And her testimony -- they did ask

5   her at her deposition what test she used, and she answered she

6   used both and explained why, as of her knowledge on that date.

7   That's --

8          **MR. BRAMHALL:**  Your Honor, there's a lot of backstory

9   with Dr. Parikh.  They only gave us three hours of deposition

10   with her as their expert.  They refused to make her available

11   again.

12          **THE COURT:**  So are you asking that I order that she

13   appear live?

14          **MR. BRAMHALL:**  You already have, Your Honor; so I

15   don't think we need a new one.  I don't know why it's an option

16   all of a sudden --

17          **THE COURT:**  Okay.

18          **MR. BRAMHALL:**  -- given there's an order.

19          **THE COURT:**  He says -- I can't remember --

20          **MS. KELLER:**  Your Honor --

21          **THE COURT:**  -- every order that I issue.

22          **MS. KELLER:**  Your Honor, if I may.

23          **THE COURT:**  It is represented to me that I did order

24   her to appear.

25          **MS. KELLER:**  Your Honor, if COBRA is out, she's no

longer testifying as our expert.  She now is just a percipient

witness who was deposed like any other.  And that's why we had

originally cut deposition excerpts for her.

So she is -- she would be -- I guess if we're doing the

winding the clock back, she'd be back to just being a

percipient witness because there's nothing for her to rebut.

**MR. BRAMHALL:**  Your Honor, we shouldn't have to

pretend that she's not on their team.  She literally agreed to

be their expert in this case.  I mean, that's the reality.

This is, again, a fact that's come to light.  We didn't know

she had such a strong connection with Guardant.  It turns out

they were communicating with her all the time, including about

COBRA, sharing the abstract with her.

She is highly relevant.  She's not an independent witness.

She's working as their expert.  She should come to trial.

It is Docket 683, Your Honor, for Dr. Parikh, in terms of

you ordering her to appear live.

**MS. KELLER:**  Your Honor, unlike Dr. Hochster, she is

not in our pocket.  She is not our person.  Anybody who saw her

deposition would know that, where she talks about using both

Reveal and Signatera and she thinks they're both good tests.

If she were in our pocket, she would have a lot of criticisms

of Natera's test, but she didn't.  She was very objective.

But we're happy to have her come.  We'd love to have her

come.  If she can do it, we would like to have her here.

1          **THE COURT:**  I'm going to --

2          **MS. KELLER:**  We'll try.

3          **THE COURT:**  -- order that you use all efforts, all

4    reasonable effort to secure her appearance.  I want her to

5    appear.  I think it would be a benefit.  She's going to be a

6    valuable witness.  A live witness is going to be much more

7    beneficial to the Court.

8          **MS. KELLER:**  I think so too, Your Honor, and we'll try

9    our best.

10         **THE COURT:**  All right.  If for some reason --

11         **MS. KELLER:**  I just wanted to correct the record.

12         **THE COURT:**  -- she can't, I'd like to know what the

13   problem is.

14         **MS. KELLER:**  We will let you know.

15         **MR. PERLOFF:**  As I said, Your Honor, the 18th was the

16   day she was able to clear with Harvard University and

17   Mass General, and so that would be the day.

18      If I say, "The Court would like you to come live, even

19   though you're not going to cover COBRA," I believe she will say

20   yes, but it might be that she's a little bit out of order.

21         **THE COURT:**  That's okay.  We'll take her out of order.

22         **MR. PERLOFF:**  Then I will make that happen.

23         **THE COURT:**  Okay.  Good.

24         **MR. PERLOFF:**  My commitment.

25         **THE COURT:**  Good.

1      **MR. BRAMHALL:**  Your Honor, just one more pitch here.

2      Again, she -- she's going to come to trial and then

3  pretend she doesn't know anything about COBRA?  I mean, she --

4  Your Honor, when COBRA failed, she reached out to Guardant and

5  said, "Uh-oh, what does this mean for my study?"

6      She is -- again, I'm just going back to the point,

7  Your Honor, that we should be dealing with the facts as they

8  are in the real world, including as they relate to COBRA.  I

9  don't know if Your Honor is past that at this point.  But we

10 think it's highly important, in the same way that the Andersen

11 testimony is, to have the COBRA testimony and the evidence --

12 the facts, Your Honor, the facts.  Not asking for Dr. Hochster

13 to opine on it, but the facts that we --

14     **THE COURT:**  Once we get into the COBRA thing, I don't

15 know where you stop it.

16     **MR. PERLOFF:**  Right.

17     **MR. BRAMHALL:**  Well, just the COBRA facts, Your Honor.

18     **THE COURT:**  Well --

19     **MR. PERLOFF:**  Just the COBRA facts.

20     **THE COURT:**  -- there's no such thing as just the COBRA

21 facts.

22     It is out.  And I'm going to sort of turn the clock back.

23 If I knew then what I know now, I wouldn't have continued the

24 trial; I wouldn't have opened this door, for many of the

25 reasons we discussed.  And I will get out an order so stating.

1  But the representations and, frankly, the misrepresentations

2  that have been made to this Court warrant turning the clock

3  back.

4      And so -- but I will allow the Andersen testimony.  Since

5  nobody knows what it is that is going to be testified to,

6  maybe at this point it may be helpful; but it's independent --

7  whatever it is, it's independent of the COBRA situation.

8      And I'm going to allow updated evidence with respect to

9  Natera's -- I guess the request is Natera's profits through

10  August of 2023.  But along with that, that will open the door

11  to evidence regarding what's happened to the chip filter.

12  It'll open the door to having Parikh testify live.

13      And so that's what's going to happen.

14      **MR. BRAMHALL:**  And, Your Honor, just to clarify,

15  Dr. Hochster's first report, which was not the subject of any

16  of this, is that still fair game?

17      **THE COURT:**  That is -- remind me what that report is

18  on.

19      **MR. BRAMHALL:**  The first report is on -- so he's our

20  oncologist expert.  He's testifying about patient care when it

21  comes to CRC, as well as the design of the test and how it's

22  more prone to false positives.  He has a reference to COBRA in

23  there.  I suppose we can just ignore that, strike it out.  But

24  it was not -- COBRA hadn't read out; the results weren't

25  available; so he didn't have opinions on it.

1          **THE COURT:**  Yeah, if it's unaffected by COBRA, I don't

2    see why he wouldn't be able to.

3          **MS. KELLER:**  Your Honor, I think he should be excluded

4    in general.  He has lied to the Court repeatedly.  We can't

5    trust anything he says.  I think, given that -- and we can't

6    really cross-examine him about it either without getting into

7    COBRA.

8       So we're -- here's a person who has zero credibility,

9    which the Court knows, and he's going to be allowed to testify,

10   but we can't cross him --

11         **THE COURT:**  There have been pretrial motions regarding

12   this witness?

13         **MS. KELLER:**  Well, we didn't know what we know now.

14         **MR. JOHNSON:**  Your Honor, they filed a *Daubert* on him

15   originally on that -- on the first report; and Your Honor

16   denied it largely, I think entirely.

17         **MS. KELLER:**  And the Court didn't know then what it

18   knows now.

19         **MR. JOHNSON:**  And, again, I want to go back.  I mean,

20   you know, obviously, you've heard me talk about the importance

21   of COBRA and why the facts matter here; but that's an

22   incredibly -- that's an incredibly significant sanction.

23       And then to then lose Dr. Hochster, who put in his first

24   report, which was never objected to, you know, or, frankly -- I

25   mean, you know, I don't think it's the subject of the sanctions

1    associated with, you know, keeping COBRA out.  I mean, he

2    should be allowed to come and testify.  Again, he's the only,

3    only witness here who's an oncologist, who is -- who these

4    tests are directed to.  He's the actual, you know, person who

5    uses these tests or recommends them for patients.

6         **MS. KELLER:**  Well, Dr. Parikh is an oncologist.  She's

7    fairly famous, actually.

8         Your Honor, if Dr. Hochster is permitted to testify, which

9    we think is not enough of a sanction, then I would ask that

10   the Court instruct the jury that Dr. Hochster has lied to

11   the Court on another matter at least several times, and that

12   the jury can consider that in determining what credibility they

13   wish to assign to him.

14        **THE COURT:**  Well, I mean, that's similar to the -- I

15   forget what the wording is about "View this witness's testimony

16   with suspicion."

17        **MS. KELLER:**  That's right.

18        **THE COURT:**  Don't necessarily use the word "lie."

19        There's standard language about special scrutiny for a

20   particular witness.

21        **MR. JOHNSON:**  Your Honor --

22        **MS. KELLER:**  Yes.  The witness --

23        **MR. JOHNSON:**  -- that's effectively --

24        **MS. KELLER:**  -- willfully false --

25                    (Simultaneous speaking.)

1    (Stenographer interrupts for clarification of the record.)

2        **THE COURT:**  One at a time.

3        **MR. JOHNSON:**  That's effectively precluding him.

4    I mean, you know, he's -- he is -- he's -- again, we're

5    beyond it.  I'm not here to make excuses for -- you know, for

6    what was done with respect to COBRA and the emails, et cetera.

7        But there's been no complaint with respect to what was

8    done with his original report.  They filed a *Daubert*.  That

9    motion was denied.  And so, you know, he should be able to come

10   and talk about the issues that are fairly disclosed in his

11   first report.

12       **MS. KELLER:**  It's axiomatic --

13       **MR. JOHNSON:**  And they will have Dr. Parikh, now, come

14   and testify.  To -- you know, to the extent that she wants to

15   say things that are -- that are contradictory to what

16   Dr. Hochster says, that's -- that's fine.

17       But, again, this comes from a place of, this jury that'll

18   be impaneled should be permitted to hear and evaluate

19   credibility on their own.  To hear a statement from Your Honor

20   about the -- you know, this particular oncologist, who is a

21   pretty well-known oncologist, basically be told by this Court

22   to the jury that, you know, "This person's not to be trusted"

23   is effectively saying he's not coming and testifying about

24   anything, because we're not going to call him if that's the

25   case.

1        **MS. KELLER:** It's axiomatic that a witness, willfully

2   false in one respect, can be regarded with suspicion in others.

3   And it's in the same proceeding.  And it's not even just

4   fudging a little bit on the stand.  It's directly lying to

5   Your Honor and to Judge Kim repeatedly.

6        **THE COURT:** I'm going to give some instruction.  I'm

7   going to have to look at what that instruction is.  But I can't

8   just treat him as nobody -- as if it never happened.

9        He made testimony -- he gave testimony under oath which

10  appears to me not to be forthright.  And so even if he's going

11  to testify on Subject A and not Subject B, if somebody tells an

12  untruth under oath on Subject B, you can't just ignore that.

13  This is a federal court.  So there's going to be some

14  instruction.

15       Now, if you decide to withdraw him, that's up to you; but

16  you're not getting away with no instruction at all.

17       **MR. JOHNSON:** I guess, Your Honor --

18       **THE COURT:** If you want to work with counsel to find

19  out what the best instruction is with respect to credibility,

20  you know, you should get together with them.

21       But the idea that there's going to be no instruction when

22  he gave misimpressions to this Court, at least I so find, I'm

23  not going to tolerate that.

24       **MR. JOHNSON:** I'm not debating that, Your Honor.  It

25  will depend on the instruction, Your Honor.

1          **THE COURT:**  And I'd like --

2          **MR. JOHNSON:**  So --

3          **THE COURT:**  -- for you to get together and see if you

4    can come up -- it's not going to be an instruction that says

5    he's a liar, but you should see if you can work out an

6    inference instruction.

7          **MR. JOHNSON:**  And, Your Honor, we have an issue that's

8    related that involves Mr. Morris.

9          **MR. BRAMHALL:**  So, Your Honor, Andrew Bramhall again

10   for Natera.

11         Just quickly, we had a deposition of Dr. Morris, who was a

12   30(b)(6) for NRG, last week, I think.  I'm losing track.  He

13   said nothing but positive things about Dr. Hochster, who's a

14   very well-known oncologist in the field, not a subject of any

15   of these allegations ever previously as far as I'm aware.  I'm

16   sure they would have found it if he had been.

17         Your Honor, he essentially exonerated Dr. Hochster as to

18   the baseless allegations that were made in court about

19   Dr. Hochster influencing the study in some way.

20         We should be able to rehabilitate Dr. Hochster, if there

21   is some kind of instruction, with testimony from somebody

22   important in the field, been his reputation and experience with

23   him.

24         So -- and I ask because that's a COBRA deposition, and so

25   I'm not sure if that's within the scope of the world we're

1    living in.  But that seems to me to be separate from --

2            THE COURT:  You're saying testimony that vouches for

3    Hochster's credibility --

4            MR. BRAMHALL:  Exactly, Your Honor.

5            THE COURT:  -- should come in?

6            MR. BRAMHALL:  Exactly, Your Honor.  If we're going

7    down this route of some instruction, we have a very

8    well-regarded, another oncologist -- we don't have to talk

9    about COBRA but -- who said nothing but positive things about

10   Dr. Hochster.  And I believe that's the case with Dr. Parikh

11   and others too.

12       But I'm just asking, because that's in the COBRA realm, we

13   would ask that that be something that we are permitted to use.

14       I don't believe Dr. Morris is coming to trial; so it'd be

15   playing deposition.

16           MR. SCOLNICK:  The problem with that, Your Honor, is

17   that Dr. Morris contradicted Dr. Hochster.  The material

18   misrepresentations were about whether he had emailed and

19   communicated with others about COBRA, and Dr. Morris testified

20   that that was not true.

21       Now, it's another subject --

22           THE COURT:  I'm sorry.  Say that -- you used "he," and

23   I'm not sure --

24           MR. SCOLNICK:  I'm sorry.

25           THE COURT:  -- who "he" is.

1    **MR. SCOLNICK:**  So Dr. Morris testified that

2    Dr. Hochster's representations were untrue, that he had never

3    emailed with anyone else about COBRA because Dr. Hochster

4    emailed Dr. Morris himself.

5    So with respect to Dr. Morris' other statements about

6    Dr. Hochster, saying that he liked him or he's a good

7    oncologist, that was all before he knew that Dr. Hochster had

8    received, surreptitiously, a copy of the embargoed draft and

9    then forwarded it to Mr. Bramhall.

10    And when he learned that, I asked him, I said, "When you

11    gave all those witness opinions about Dr. Hochster being such a

12    wonderful guy, when you told us about that, did you know about

13    him forwarding that draft abstract to Natera's litigation

14    counsel in this case for strategic advantage?"  And he said no.

15    And after that, Mr. Bramhall went back and he had said,

16    "Do you have any doubt that he puts cancer patients first," and

17    it was a very lukewarm answer.  It was, "Well, look, all I know

18    is the way he operates with me.  I don't know anything else

19    about this."

20    So that testimony was without the benefit of knowledge,

21    and to the extent he has anything material to say about the

22    misrepresentations that are at the heart of this case, he

23    contradicted them and verified that Dr. Hochster's statements

24    were entirely false.

25    **MR. BRAMHALL:**  Your Honor, we're happy to present the

1    testimony to you so you can take it, you know, form your own

2    conclusions --

3            **THE COURT:**  I'm going to exclude --

4            **MR. BRAMHALL:**  -- about it.

5            **THE COURT:**  I'm going to exclude Dr. Morris'

6    testimony, if for nothing else, 403 makes this incredibly

7    complicated.  It's not particularly on point.  It's not

8    particularly probative to whether Dr. Hochster was entirely

9    forthcoming and truthful to this Court.  It's a different

10   issue.  And given the variabilities here and the

11   back-and-forth, to spend a lot of time on this vouching is not

12   fruitful and is likely to be confusing to the jury.  So I'm

13   going to exclude it under 403.

14           **MR. BRAMHALL:**  Thank you, Your Honor.

15           **THE COURT:**  Thank you.

16           **MS. LOZANO:**  Your Honor, may I raise one issue with

17   respect to the damages, more logistics really?  If you --

18           **THE COURT:**  Yes.

19           **MS. LOZANO:**  If Your Honor is going to allow them to

20   expand the disgorgement period to August 2023, as Mr. Johnson

21   alluded to earlier, you know, no expert has used that date, so

22   there's no reports that have been provided with the opinions

23   they're going to give about that date.

24       And so -- and if Your Honor might recall, Dr. Stec

25   performs a regression as part of his rebuttal to their

1    disgorgement opinions that every single sale should be

2    disgorged because it's all tied to the false activity.  And I

3    obviously have not had a chance to confer with Dr. Stec, but I

4    imagine he'll need to rerun that with the new time frame.

5         So I would ask that we get what should be a very simple

6    report from Mr. Malackowski, which is just what are the

7    revenues up to August 2023, so that we can have time to prepare

8    our rebuttal report, given how soon trial is.

9              **THE COURT:**  Okay.  What about that?

10             **MR. LaVIGNE:**  Your Honor, at this point, the experts

11   have been through, I think, four different rounds of reports.

12   This is going to be essentially a haircut of the disgorgement.

13   I honestly --

14             **THE COURT:**  "This" being -- what is "this"?

15             **MR. LaVIGNE:**  So --

16             **THE COURT:**  When you say "this," what is "this"?

17             **MR. LaVIGNE:**  So the "this" is going to be the

18   disgorgement.

19        As I understand the Court's order, we're permitted to seek

20   disgorgement up until August 2023 as opposed to February 2024.

21   So what Ms. Lozano is saying is you need to take a three-month

22   haircut.

23        I'm happy to speak with our expert about that.  I think

24   we're beyond the point of having full-blown reports back and

25   forth and new regressions.

1          **THE COURT:**  Wait, wait, wait.  I'm not sure I

2     understood --

3          **MS. LOZANO:**  I'm not following.  All I'm saying is we

4     don't have a regression in the record that spans this time

5     frame because it's a brand-new time frame.

6          **THE COURT:**  What time do you have, what time frame?

7          **MS. LOZANO:**  So we have the -- from the -- from the

8     original reports, which went through whatever, 2022, and then

9     we have a new set of reports that goes through their date,

10    through 2024.  Right?  And so he just -- I think he needs to

11    just rerun the regression through this time frame, and I

12    assume --

13         **THE COURT:**  Now it's a different time frame.  It's a

14    shorter time frame.

15         **MS. LOZANO:**  There's a shorter one, and then there's

16    the more expanded one, but there's not one on this.  And so we

17    don't have -- I mean, if they don't want to see it before,

18    we'll run our regression and we'll put it up at trial.  But I

19    assume that they'd like to have a report that has his -- the

20    regression he's going to offer with the time frame that they've

21    proposed.

22         **THE COURT:**  Since we're using an -- the proposal is to

23    use an August 2023 time frame before COBRA.

24         **MS. LOZANO:**  Right.  And there's just -- there's no --

25    there's no record evidence with that --

1          **THE COURT:**  Okay.

2          **MS. LOZANO:**  -- that time frame.

3          **THE COURT:**  So what's wrong with that?

4          **MR. LaVIGNE:**  I've made my position before,

5    Your Honor, on how the regression is of limited utility.  I was

6    obviously overruled on that.

7          I think if they're going to rerun a regression to

8    August 2023, I would just ask -- I would just ask that we be

9    given it, you know, within a week, if that's doable, so I can

10   have a couple of weeks to look at it, prepare for trial.

11         **MS. LOZANO:**  So am I understanding that you're not

12   going to provide an updated report from Mr. Malackowski?  If

13   you don't want to -- I'm just asking.  So are we waiting for

14   you, or are we just going to run a regression using this time

15   frame if we need to update it?

16         **MR. LaVIGNE:**  I mean, I'm happy to talk with you about

17   that.  I think Mr. Malackowski's update to August 2023 is

18   basically going to take 100 percent.  There could be a couple

19   of deviations.  I'd have to talk to him about that.  But,

20   you know, I can talk with you about it.

21         **MS. LOZANO:**  If we're going to get a report from him,

22   I'd rather see that before we prepare our rebuttal.  If we're

23   not going to get one, we'll proceed as best we can with this

24   time frame.  So...

25         **MR. LaVIGNE:**  All we would need to do is update the

1    figures.  This would be a small update.  The regression, I

2    would ask that if we have a small update from Mr. Malackowski,

3    I'll try and do that within a couple of days, that we get the

4    regression back within five days.  I think the regression is

5    pretty easy to do.  There should not be a lot more analysis in

6    this.

7              **THE COURT:**  Yep.

8              **MR. LaVIGNE:**  That's what I would propose.

9              **THE COURT:**  Okay.  So within five days?

10             **MS. LOZANO:**  After we --

11             **MR. LaVIGNE:**  Five days after we serve our update.

12             **MS. LOZANO:**  And you're going to do that in a couple

13   of days?

14             **MR. LaVIGNE:**  I hope so, yeah.  I have to check with

15   Mr. Malackowski's schedule.

16             **THE COURT:**  Just make sure I've got --

17             **MR. LaVIGNE:**  We'll do it as soon as we can.

18                     (Simultaneous speaking.)

19     (Stenographer interrupts for clarification of the record.)

20             **THE COURT:**  Just make sure I've got this part.  What's

21   the first thing that's going to be exchanged?

22             **MR. LaVIGNE:**  The first thing that's going to be

23   exchanged is we'll update our disgorgement calculation.  I'm

24   going to try and do that within two days.  That will be very,

25   very short.  It'll just be the number.

1          **THE COURT:**  Okay.

2          **MR. LaVIGNE:**  And then I request that a regression be

3    sent back from Ms. Lozano within five.

4          **MS. LOZANO:**  And I -- I have a vague recollection that

5    Dr. Stec is in trial right now.  But we will endeavor to do

6    that.

7        And then I will talk with you if we can't, and if we need

8    to raise that back with the Court --

9          **THE COURT:**  So you will update the disgorgement

10   calculation.  And then the regression analysis from the

11   defendant thereafter?

12         **MR. LaVIGNE:**  Yeah, five days.

13         **MS. LOZANO:**  Yes, sir.

14         **THE COURT:**  And then something else?

15         **MS. LOZANO:**  My recollection is that was the main

16   rebuttal to the disgorgement, was the regression; but to the

17   extent that he had other disgorgement-related rebuttal points,

18   we would include those as well.  But my recollection is it's

19   just really the regression.

20         **THE COURT:**  We're talking --

21         **MR. LaVIGNE:**  From my perspective, the rebuttal -- not

22   to make it more complicated, Judge, it's like cross.  The

23   rebuttal should not exceed the scope of the direct.

24         **MS. LOZANO:**  Of course.

25         **MR. LaVIGNE:**  I'm going to talk with my expert.  The

```
1   number is going to go from X to Y based on maybe two months,

2   and the regression should just be the regression.  I don't

3   think we need more analysis or anything else.

4          MS. LOZANO:  Nothing new, Your Honor.  I'm just saying

5   to update whatever --

6          THE COURT:  Right.

7          MS. LOZANO:  -- was previously and to the right time

8   frames.

9       That's all --

10         THE COURT:  Right.

11         MS. LOZANO:  That's all I'm saying.

12         THE COURT:  Same formula.  Same --

13         MS. LOZANO:  Same -- yes.

14         THE COURT:  All right.  And when you say -- so it's

15  two days -- we're talking about court dates, I take it -- and

16  then five court days?

17         MS. LOZANO:  Yes.

18         THE COURT:  Okay.  Good.

19      All right.  I will get out an order, hopefully accurately

20  summing up what we're doing.  But essentially, we're turning

21  the clock back, with a couple of exceptions.  But we're going

22  to proceed -- my goal is to proceed as if we hadn't gone down

23  this road in the first place.

24      So let's --

25         MS. LOZANO:  Thank you, Your Honor.
```

1          **THE COURT:**  Let's talk about the rest of the case

2     management issues here.

3          There's a -- I don't know if you call it an MIL, but the

4     Rabinowitz filing.  I said I was not going to entertain further

5     motions.  On the other hand, I will indicate that if the scope

6     of the testimony exceeds what I think is proper, I'm going to

7     shut it down.

8          **MR. SCOLNICK:**  We can short-circuit this, Your Honor.

9          Rabinowitz was a witness who was announced after the

10    cutoff.  He was deposed for the first time after the cutoff.

11    This all happened after the period of time we're going back to.

12    So he's one of the witnesses who should not be able to testify.

13    He wasn't noticed before then.  He wasn't included in discovery

14    responses.  He wasn't included in 26 -- Rule 26 disclosures.

15    So that was the issue we had back then.

16         So if we are going back and not allowing -- and not

17    allowing Natera to benefit from everything that's happened with

18    COBRA, then he would be excluded as well.

19         **MS. MAROULIS:**  Your Honor, Victoria Maroulis, counsel

20    for Natera.

21         Dr. Rabinowitz was offered for a very limited purpose, and

22    it had nothing to do with COBRA.  It had to do with witness

23    supplementation.

24         And he was going to address the origins of Natera,

25    Natera's invention story, and talk in a very limited way

1    about -- introducing the company to the jury.

2         His testimony has nothing to do with COBRA.  It doesn't

3    have to do anything with exclusions that were discussed here

4    today.

5         And as Your Honor pointed out, the time to bring any

6    motions *in limine* has past.  And the Court expressly denied

7    this particularly motion at the prior hearing that we had with

8    the Court.

9              **THE COURT:**  So if his testimony is so limited, I'm not

10   sure what -- what's the fight here?

11             **MR. SCOLNICK:**  Well, Your Honor, it is their corporate

12   witness who's going to tell the background of Natera, and it's

13   an important enough witness to their case that they made this

14   11th hour addition to their witness list.

15        So, again, it was clearly after the Court's deadlines, not

16   by months but by years.  And had we gone forward when we were

17   going to before COBRA, he would not have been a witness because

18   he was not noticed.

19             **THE COURT:**  So --

20             **MS. MAROULIS:**  Your Honor, the --

21             **THE COURT:**  -- he was not timely disclosed,

22   essentially, and I should sanction that by barring his

23   testimony?

24             **MR. SCOLNICK:**  Right.  And not by months, but by

25   years.

1          **MS. MAROULIS:**  Your Honor, he was disclosed well

2     before the Court continued the trial date, and his testimony

3     relates to the events prior to 2023, which is the universe that

4     we're operating in now.  In fact, his testimony mostly is going

5     to be about the origins of the company.

6          And we supplemented the witness list and presented to the

7     Court, not in connection with COBRA, but prior to trial and

8     prior to the extension of the trial.  So --

9          **THE COURT:**  Prior to the original trial date?

10          **MS. MAROULIS:**  No, Your Honor.  Prior to -- it did

11     happen prior to March.  So it happened after the close of

12     discovery but prior to the March trial date.

13          **THE COURT:**  Was there an objection back in March?

14          **MR. SCOLNICK:**  There was.  We objected vigorously

15     about the late notice because it was just this year that he was

16     disclosed out of nowhere.

17          And importantly, Your Honor, we went and we asked

18     Judge Kim for documents related to Dr. Rabinowitz because, had

19     he been disclosed timely, we would have had the opportunity and

20     the benefit of his documents to examine him and see how he --

21          **THE COURT:**  Did I issue a ruling then on that?

22          **MS. MAROULIS:**  Yes, Your Honor.  There was an order at

23     Docket Number 493, which is denying motion to strike

24     Dr. Rabinowitz.

25          **MR. SCOLNICK:**  And after that, Your Honor, we

1    requested discovery.  And this was a disputed issue because

2    Natera would provide us with no documents related to

3    Dr. Rabinowitz, which, again, would have and should have been

4    disclosed had he been disclosed timely.  But we were denied

5    that opportunity.  So we didn't get his documents over Natera's

6    objection.

7        **MS. MAROULIS:**  Your Honor, this is only coming up now

8    in the context of this motion *in limine*.  But at the time, they

9    did not renew their request for documents.  And they took the

10   deposition in June, and the first we started hearing about

11   their complaints about this deposition was the last hearing we

12   had with the Court here in late August or September.

13       **THE COURT:**  So my ruling, you say, at 493 allowed his

14   testimony?

15       **MS. MAROULIS:**  Correct, Your Honor.  It was denying

16   motion to strike this witness.

17       **MR. SCOLNICK:**  And, Your Honor, I think one of the

18   reasons is because we had enough time.  It was an extension of

19   time, given COBRA.  So it was COBRA that allowed him to

20   testify.  And, again, we did seek timely -- as timely as we

21   could have -- his documents, and Natera refused his documents.

22   And then we went to Judge Kim, and Judge Kim ruled that it's

23   not appropriate to disclose his documents.  So we tried, and

24   we've been prejudiced by their late disclosure.

25       **MS. MAROULIS:**  Your Honor, they never contested

1    Judge Kim's order to this Court.  They never appealed it or --

2         **THE COURT:**  I'm going to allow his testimony.  I had

3    already ruled on the motion to strike.  And whatever remedies

4    were available in terms of getting documents, notwithstanding

5    this, even though I'm sort of winding the clock back, the clock

6    did run, there was time.  But his testimony will be limited.

7         **MS. MAROULIS:**  Thank you, Your Honor.

8         **THE COURT:**  It'll be very limited.

9         **MS. MAROULIS:**  Understood.

10         **MR. SCOLNICK:**  Thank you, Your Honor.

11         And that leaves us with the other issue here, though, is

12    that there's some asymmetry between the Court's rulings as they

13    apply to Natera and as they apply to Guardant.

14         As we pointed out in our motion, Natera is permitted to,

15    under 608, elicit impeachment or credibility-type evidence

16    against -- against our founders; and this hasn't been raised

17    yet because, at the time of the *in limine* motions, we didn't

18    have the opportunity to address Dr. Rabinowitz's specific

19    misconduct.  So we are seeking -- if he's going to testify,

20    we'd ask for the rules to apply evenly to both sides, and that

21    would be 608(b), so that specific instances of misconduct can

22    be elicited and introduced against both parties, at least the

23    questions.  And I understand that Rule 608(b) bars collateral

24    evidence, but the questions themselves should be asked.

25    There's no reason to have a different set of rules for Natera

and to Guardant.  So that's the first issue that we were

addressing.

     **THE COURT:**  What are the different rules that exist

now?

     **MS. MAROULIS:**  Your Honor, may I address this?

     **THE COURT:**  Let him finish.

     **MR. SCOLNICK:**  Right.  So right now, the Court ruled,

at the *in limine* stage, that Natera is permitted to ask

questions of our founders about alleged acts of dishonesty that

occurred many years ago that haven't been substantiated.  And

those go back to a case with Illumina, and there's really no

"there" there.  But the Court allowed this type of questioning,

over our objection because we think it's irrelevant and

distraction, but the Court allowed it.

    So if Dr. Rabinowitz is going to testify, then we believe

that, certainly, more recent and more probative questions about

his dishonesty should be introduced.  What's good for the goose

is good for the gander.

    And we put forth in our motion that these aren't just

unsubstantiated allegations.  They're allegations that the

United States Department of Justice found credible enough to

join an action in the Western District of Kentucky.  And that

claim wasn't dismissed.  In fact, it was settled for over

$10 million.

    And there are a number of other acts of dishonesty that we

1  briefly referenced in our motion.  And, again, it's not a

2  404(b) issue or a fishing expedition.  We believe that we can

3  tie these acts of dishonesty directly back to Dr. Rabinowitz.

4      **MS. MAROULIS:**  Your Honor, this is entirely

5  prejudicial.  When we submitted the motions *in limine*, we had

6  specific pieces of evidence that the Court was able to evaluate

7  and rule on.

8      Here, this is a motion that they ambushed us with.  They

9  did not give us any information regarding it until they filed

10  it several business days ago.  They make no proffer of why this

11  evidence -- alleged evidence is related to Dr. Rabinowitz

12  himself.

13      We put forward extensive evidence regarding the spoliation

14  by the specific founders, and the Court already ruled on those

15  motions.  To the extent this is an attempt to overturn or

16  somehow change the Court's *in limine* order, it's not a proper

17  motion for reconsideration.

18      This was basically their limited deposition of

19  Dr. Rabinowitz, and now they're seeking to ask him about

20  completely unrelated questions, things that they didn't ask him

21  in deposition, and it is not proper, Your Honor.

22      **MR. SCOLNICK:**  And all we're asking for is the rules

23  to apply evenly.  So if neither side is going to ask these

24  types of questions about the other side's witnesses, fine.  So

25  be it.

1          But if they're going to introduce evidence, unestablished

2     allegations against our founders that haven't been proven, that

3     we believe are false, it has a severe prejudicial impact.  And,

4     again, we think it should be excluded; but if not, then what's

5     good for the goose is good for the gander.  They should not --

6          **THE COURT:**  Well, yeah.  Ganders and gooses may be in

7     different pots.  So they're not -- as you know, it's not

8     just -- I have to see.  I'm going to have to take a closer look

9     as to the scope of that proper cross that you want to bring in.

10         So I will adjudicate that, but I will allow him -- allow

11    that testimony.

12         **MR. SCOLNICK:**  Thank you, Your Honor.

13         And there was one other aspect to the motion, which is

14    what we believe is more asymmetry between the Court's rulings.

15         The Court is allowing Natera to introduce a number of

16    other acts that we believe are news, public statements about

17    Guardant that we believe are irrelevant.  And the reason

18    the Court is allowing them to introduce that is because they

19    provide an alternative explanation for the harm to Guardant.

20    So that was part of the *in limine* order.  But we believe that

21    that rule should apply equally to Guardant and Natera, going

22    the other way as well.

23         And what I'm talking about is, Dr. Rabinowitz testified

24    extensively about the alleged harm that Guardant caused to

25    Natera.  And this echoes statements by Steven Chapman.  So they

are alleging that Guardant's ads or statements caused them

harm, caused loss in value of their company, loss of

reputation; and, in fact, going back to their damages claim,

they're asking for a lot of money for corrective advertisement.

So we believe that we should be able to introduce evidence

showing alternative reasons for the alleged loss in value.  So

it's not Guardant.  We believe those statements are false.  We

should be able to present other reasons and justifications

which we think are far more credible and explain the loss in

value that they've been complaining about.

And this is a theory that's been accepted by the Court in

their motion to include this type of evidence; and we believe,

in light of Dr. Rabinowitz's testimony --

THE COURT:  Is this in the form of a motion that

you're now asking for?

MR. SCOLNICK:  Yes, Your Honor.  We moved for leave to

file this motion.

THE COURT:  And what is the evidence that you're

seeking to introduce?

MR. SCOLNICK:  So there are a number of different

things.  One is, is the *CareDx* case, and it's not under a

404(b) theory; it's under just the public impact of that

verdict.  We believe that, if anything, it damaged

significantly Natera's credibility, Natera's standing in the

marketplace, and is an alternative explanation -- excuse me --

for the alleged harm that Natera claims it suffered.

There was a story in *The New York Times* in 2022,
I believe, about false information that Natera was putting on
the market and -- including with some of their test products.
We think that that led to a significant loss in value to
Natera, and the -- I think the stock prices prove it.  We think
that this is an equally or more credible explanation for the
harm that Natera claims it suffered.

There are class action cases against Natera, including
against -- that name some of the employees, including
Dr. Rabinowitz, talking about opportunistic stock trades,
knowing something bad was going to come out, that
*New York Times* piece, dumping millions and millions of dollars
of stock before the public knew about it.

So whether or not those items are true, they certainly
would provide -- they were very public, and they certainly
would provide another alternative explanation for the harm that
Natera's trying to put on Guardant's doorstep and claim that we
were responsible for.

And that's been the testimony.  I think that the Court has
accepted this theory, and it's allowed this type of evidence
against Guardant.  So, again, we think it should apply both
ways.

**MS. MAROULIS:**  Your Honor, the Court has already
addressed all of these motions that Mr. Scolnick is now making.

1    It's the sealed Order Number 509 issued on April 16th, 2024,

2    starting with page 18 through page 24.

3        The Court granted Natera's motion to exclude references to

4    the CareDx trial, granted the motion to exclude other related

5    coverage to various lawsuits and other things that Mr. Scolnick

6    is now mentioning.  So counsel's expressly seeking

7    reconsideration of the court order, which is not proper, both

8    procedurally and substantively.

9        And as the Court ruled on these issues, the Court noted

10    that Guardant put their own goodwill and reputation at issue

11    through the damages report of Mr. Malackowski.

12        So it is both entirely a different situation; but, in any

13    event, the Court has already addressed these issues in the

14    order of April 16.

15        **MR. SCOLNICK:**  Your Honor, that's not accurate.

16    First, the order didn't touch upon 608(b), which is the first

17    theory of admissibility.  Second, Dr. Rabinowitz hadn't

18    testified and hadn't testified extensively about the alleged

19    damage to the reputation and brand of Natera at the time

20    the Court issued the *in limine* ruling.  And while the Court

21    addressed one of the arguments about the alleged harm to Natera

22    and their reputation, I don't recall -- I haven't looked at it

23    in a few weeks, but I don't recall that there was ever a

24    finding on that point.

25        And as --

1          **THE COURT:**  Why is this being brought now?

2          **MR. SCOLNICK:**  Well, Your Honor, I attempted to bring

3     this -- to raise this issue weeks ago, when it was timely,

4     which was before the Court's deadline for *in limine* motions.

5     And at that point, the Court, I think -- it was a long day and

6     there were a lot of people here, and the -- I don't know that

7     the Court had time to address it.

8          **THE COURT:**  Are you saying there was a written motion

9     *in limine* that I have not addressed fully?

10          **MR. SCOLNICK:**  No.  No, that's not at all what I'm

11     saying.

12          What I'm saying is a few months ago, when we were here in

13     person, I raised this issue with the Court and indicated that

14     I'd like to file an *in limine* motion.

15          Now, at that point, the Court believed that it was

16     untimely to raise this.  I didn't -- to be honest, I didn't do

17     the best job of articulating all these bases, and the Court

18     found it to be untimely.

19          But what we didn't discuss then and what I didn't raise --

20     because I went back and looked at the Court's order -- is that

21     it was timely.  It was well in advance of the deadline

22     the Court set for *in limine* motions.  And by my count, we still

23     have one *in limine* motion left.

24          And we couldn't have raised this much earlier, Your Honor,

25     because it relates to Dr. Rabinowitz's testimony; and

1    Dr. Rabinowitz's testimony, as we just discussed, was delayed

2    by about two years because they never disclosed him.

3        So if we're talking about delay in bringing this on the

4    eve of trial, I agree it's very late, but that's not our fault.

5    Two years of that delay is on -- is on Natera.

6        **MS. MAROULIS:**  Your Honor, Dr. Rabinowitz was deposed

7    on June 7 of this year, so it's months after the fact.

8        But more importantly, he's going to testify on very narrow

9    subjects, which is history of Natera, its invention story, its

10   products.  He was asked questions in deposition that elicited

11   testimony about harm, but that is not the intent of his

12   testimony.  He's there to introduce Natera to the jury and

13   describe Natera's innovative products to the world.

14       **MR. SCOLNICK:**  And Natera put its reputation on the

15   line when it disclosed its damage report.  I mean, they're

16   asking for corrective advertising.  So something had to be

17   corrected.  So it's certainly our -- we should have the ability

18   to show that, to the extent correction was needed and there's

19   any loss in value, it's based on their own conduct and not on

20   Guardant.

21       So, Your Honor, all we're asking for is the ability to

22   just address this in a very short *in limine* motion so we can

23   explain it and have the Court consider it.  And if it's denied,

24   we understand, but we think that the rule should apply evenly

25   between the parties.  And we think that as they are right now,

it's grossly unfair to Guardant because one side is allowed to
introduce prejudicial evidence that we believe is irrelevant
and we're being denied the right to introduce the same type of
evidence under the same types of theories that the Court has
already accepted.

MS. MAROULIS:  Your Honor, this request is highly
untimely, and it seeks to overturn prior court rulings, and it
also misportrays the theory of corrective advertising, which
Ms. Lozano can address, if needed.  But the mere fact that this
was brought on the eve of trial, months after testimony of
Dr. Rabinowitz, and it's, frankly, a pretext to go back to some
of the Court's *in limine* rulings, unfortunately, because had it
been related to Mr. Rabinowitz alone, we would have seen this
motion sooner, right after his deposition.

THE COURT:  All right.  I'm not going to reconsider
what I've already ruled.  The motion is denied.

MS. MAROULIS:  Thank you.

THE COURT:  Let's talk about a number of other things
I need to get through.

So I want to talk about the depo designations and the
objections on the Corcoran and Sood matters.  And I had
forewarned the parties that if there was not stipulation and an
attempt to narrow those differences, that I reserve the power
to charge time I spend on resolving these objections against
trial time.

```
 1          And my observation is that the scope of Natera's
 2   objections and the scope of the counter-designations were
 3   excessive and almost limitless.  And so just on those two
 4   depositions, we spent hours, at least seven hours, going
 5   through those and having to go through that.  So why shouldn't
 6   I dock time from trial from your client?  And I'm looking at
 7   Natera.
 8          MR. BRAMHALL:  Yeah.  Andrew Bramhall, Your Honor, for
 9   Natera.
10          So, Your Honor, in terms of the depo designations, we're
11   talking about two witnesses here; right?  Dr. Corcoran from
12   MGH.  And there's a whole separate issue for him.  He's now, as
13   of September 23rd, I believe, or maybe 20th, he's identified as
14   a live witness for the first time on Guardant's witness list.
15   This is new news to us.  So he may appear live, and so this
16   exercise -- entire exercise may have been for naught.  That's
17   not on Natera, Your Honor.  That's entirely something that
18   Guardant has now disclosed.  So with Dr. Corcoran, I'd say we
19   have a whole separate issue to discuss.
20          With respect to Dr. --
21          THE COURT:  Well, but prior to the -- I mean, still,
22   under my instructions, before it was revealed that he was going
23   to appear live, my instructions were to narrow the objections
24   to a reasonable number.
25          And so I don't know -- you know, the time that we spent
```

here in chambers, the time that each side spent, maybe it was

obviated if he indeed appears live; but pursuant to my

instructions, I -- and I warned the parties that I am in a

position to charge unreasonable time that is spent with

overbroad designations and objections and I wanted the parties

to act in good faith, and I'm not sure I got that.

**MR. BRAMHALL:** So, Your Honor, I'll say, I think --

**THE COURT:** We had to spend a lot of hours.

**MR. BRAMHALL:** I understand, Your Honor, and we did as

well.  And so perhaps there should be --

**THE COURT:** Yeah --

**MR. BRAMHALL:** -- indication --

**THE COURT:** -- I bet you did because you objected to

just about everything.

**MR. BRAMHALL:** Your Honor, I think we did the best we

could based on the scope of the universe of the case as we

understood it.  There are -- both sides still have many, many

issues involved in the case.  I think you can see that both our

designations and their counters are broad.  I think that's the

reason for it.

I understand Your Honor's frustration.  I apologize for

saddling your team with too much to do.  Your Honor, I think

the reality is, there is a lot of testimony that is

objectionable in those designations.  And, again, we don't know

what they're going to present, so we're trying to preserve our

1    rights so we don't lose something unnecessarily.  We're trying

2    not to have trial by ambush, where people are missing certain

3    parts of the evidence that they gathered in good faith in the

4    case and then now can't present because they dropped something.

5        But I apologize, Your Honor.  We should have done a better

6    job.  It sounds like you've already gone through it, and so I

7    have a feeling a lot of those objections are going to be out

8    the window.

9            **THE COURT:**  So what's the situation?

10           **MR. SCOLNICK:**  Your Honor, you should absolutely dock

11   their time.  They're grossly excessive.  They're widely

12   unreasonable.

13       And I've gone back to Natera several times, and I said:

14   You can't do this to the Court.  We have to be efficient.  Look

15   at the Court's order.  Please revise your designations.  Please

16   revise your objections.

17       Nothing.  Nothing.  So they've been warned not only by

18   you, but by me as well.  And I pleaded with them, and they

19   rejected it.  They rejected it all.  There's zero respect for

20   Guardant's time and, unfortunately, very little respect for

21   the Court's time too because most of those objections are

22   meritless.

23           **MR. BRAMHALL:**  Your Honor, this is a high-stakes case

24   where the parties are fighting over every inch.  I think the

25   parties are acting in kind.  From my perspective, everyone's

fighting for every inch they can get.

And that's what we did in these designations.  And if it was fighting too hard, again, I apologize.  I'm not sure what the answer is other than we redo it, which we're happy to do.

But, Your Honor, I mean, the reality is, this case, everyone fights about everything and no -- the reality is, I think there's not a lot of objections that they've dropped or counter-designations that they've dropped.  We are sort of in the same boat here.

And, obviously, we can take this going forward.  And we know Your Honor's going to be very strict about what's provided.

I think in the latest exchange of exhibits, we very much limited the number of objections we're raising, although, again, there's a lot of objectionable evidence for a variety of reasons.  But I think, Your Honor, a lot of this is a product of the fact that a lot of what Guardant is trying to get in through these witnesses is objectionable on a number of grounds.  And it's hard for us to waive those objections when we believe they're meritful.

MR. SCOLNICK:  Your Honor, this is not in kind.  This is not tit for tat.  This is not equal.

I designated Dr. Corcoran, if I remember correctly, and there's a gross disparity in the amount of objections that we're raising versus theirs.  Could we have objected to more

testimony?  Of course.  But we realize that it wouldn't have

been in good faith.

     So we took the Court's admonition seriously, and we spent

a lot of time cutting down our objections.

          **MR. BRAMHALL:**  Your Honor --

          **MR. SCOLNICK:**  Apparently, it's unfortunate that

Natera didn't.

          **THE COURT:**  Well, there's not -- it's not symmetrical.

          **MR. BRAMHALL:**  Fair enough, Your Honor.  I mean, I --

Your Honor, I don't know why we did Dr. Corcoran at all if now

they're going to call him live, which raises a whole nother

issue as to whose control he's under.

     Your Honor, this is a major issue that they're now saying

they're going to call Dr. Corcoran live.  We deposed him back

in June.  They insisted on half of the time, the three and a

half hours.  But now he's going to come testify in their case

and they've been talking to him; and that raises a whole

separate issue and, again, calls into question why we did these

deposition designations in the first place, which is something

we only learned in September, Your Honor.

     So while we could have perhaps done a better job and

objected less and been less zealous, we are learning things in

real time about their trial strategy that would have obviated

the need to do any of this, saved everybody the time,

Your Honor.

1          **MR. SCOLNICK:**  And, Your Honor, he --

2          **THE COURT:**  Response.

3          **MR. SCOLNICK:**  I'm sorry to interrupt you.

4     He's almost certainly going to testify by deposition.  We

5     asked -- we reached out to him and asked him if he would

6     testify in person, having in mind the Court's preference for

7     live testimony instead of deposition testimony.  It was our

8     preference too.  He hasn't responded.

9          So when we started reaching out to him, we advised

10    opposing counsel by updating our witness list to say that he

11    may testify live or by deposition.  But he hasn't responded.

12    All indications are that he is going to testify by deposition.

13    But if that changes, opposing counsel and Your Honor will be

14    the first to know.

15         But when we submitted these, we certainly didn't believe

16    that he was going to testify by -- testify live.  So we

17    operated in good faith --

18          **MR. BRAMHALL:**  Your Honor --

19          **MR. SCOLNICK:**  -- and we still are.

20          **MR. BRAMHALL:**  -- we learned that he's going to be a

21    live witness not because they told us or said, "Hey, we're

22    having discussions with Dr. Corcoran."

23         We learned when they submitted a new amended witness list

24    and, all of a sudden, he was a live witness.  Raises a number

25    of questions of what's going on behind the scenes.

1    And, Your Honor, if he does come live, we're in a very

2    disadvantaged position because if he's their witness, we should

3    have had a full seven hours with him at deposition.  We didn't

4    get that because we thought he was independent, like we thought

5    Dr. Parikh was independent.  Turns out both of those witnesses

6    now, one is their expert and the other apparently is

7    potentially coming live.  So, Your Honor --

8         **THE COURT:**  Well, that's a different issue.

9         **MR. BRAMHALL:**  Sure.

10         **THE COURT:**  If you think that you've been misled, and

11    to your detriment in some way, in the way you conducted the

12    deposition or whatever, not knowing he was going to be live,

13    you know, you can bring a motion to strike a witness or exclude

14    a witness.

15    That doesn't answer the question about the depo

16    designations and the extensiveness of the objections and the

17    scope of all the many counter-designations that required an

18    extraordinary amount of time for this Court and staff to go

19    through.  And there was just almost no effort to make this

20    meaningful.  And that's exactly what I said not to do.

21    So I'm going to -- although this Court spent roughly,

22    court time, seven hours on just these two witnesses, going

23    through this and going through the designations and the

24    objections, and a good substantial part of that was, in my

25    view, not reasonable, not tailored, I'm going to count one hour

1    of that time with respect to the trial time, as I promised I

2    would if I found that the conduct of designations and

3    objections was not reasonable.  And that's a discount over what

4    we actually spent.  So, one hour.

5              **MR. BRAMHALL:**  Your Honor, could I just raise one more

6    point?

7         Your Honor, what I wanted to raise, which I didn't raise

8    and I feel like I should, we aren't even finished with the

9    discovery.  So we have Dr. Andersen, who they are saying is

10   relevant to what blinded and prospective means.  That's why

11   they're going to depose him next week.  We didn't have that

12   information.  The universe is not closed, Your Honor.

13        So I'm just letting Your Honor know that we're not

14   operating in a universe where we normally would be, where all

15   the discovery is done.  We are operating in a world where

16   there's still big open questions as to what their case is going

17   to be in terms of the evidence.

18        And so I just appeal to Your Honor for some mercy here

19   because we didn't know the full universe, and things are

20   evolving in this case every single day, including next week

21   they're going to evolve further.  So we did make an effort.

22             **THE COURT:**  Should have gone to trial back in March.

23             **MR. BRAMHALL:**  That would have been great for

24   everybody in a lot of ways.

25        But, Your Honor, I'd just make an appeal because that's a

1  massive amount of time.  That's almost 5 percent of the time we

2  would have for the entire trial, which, again, is extremely

3  high stakes.  So I just appeal to Your Honor for --

4       **THE COURT:**  Well, I gave fair warning, I think,

5  multiple times on this question.

6       **MR. SCOLNICK:**  Mm-hmm.

7       **THE COURT:**  And this Court spent a substantial amount

8  of time looking at these issues.

9       And at some point, I've got to enforce what I said I was

10  going to enforce, and I am going to enforce it.  I'm giving you

11  a big discount as it is.

12      So that's my ruling.  I understand.  That's my ruling.

13      **MR. SCOLNICK:**  Your Honor, on that same point, and in

14  the spirit of saving even more time for the Court, we have gone

15  back and tried to reduce some of our objections to the

16  exhibits.  I think that if the parties put their heads

17  together, we can probably go over the long, long list of many

18  exhibits and reduce some additional ones.

19      **THE COURT:**  Good.

20      **MR. SCOLNICK:**  I'm sure that would be welcome news to

21  the Court.

22      **THE COURT:**  That would be welcome news.

23      **MR. SCOLNICK:**  So I think we'll probably -- if we give

24  you an updated list of objections sometime next week, would

25  that be appropriate?

1          **THE COURT:**  All right.  That's fine.

2      I forgot whether I mentioned to you that also, if I run

3   into a situation where I'm loaded down with many, many items of

4   objections that I've got to then resolve each morning before

5   trial, I generally allocate a certain number of minutes of sort

6   of free time.  But if it starts taking more than 15, 20

7   minutes, takes a half hour, 45 minutes, there's a price to be

8   paid for that, and that's coming off the trial time.

9      So I'm giving you warning right now.  Yeah, I'll resolve

10  any good faith efforts; but if it takes -- if you've got a lot

11  of exhibits, you got 50 exhibits and 50 objections, there's a

12  price to be paid for that.

13         **MR. BRAMHALL:**  And, Your Honor, we'll be on extra good

14  behavior in the hope that we can convince Your Honor to give us

15  a little bit of that time back at some point.  We will

16  absolutely do that.

17         **THE COURT:**  Okay.  Don't count on it, but you can ask.

18         **MR. BRAMHALL:**  Hope springs eternal.

19         **THE COURT:**  Yes.

20         **MR. SCOLNICK:**  And of course we would object to that,

21  given that we can't get our time back responding to all the

22  unnecessary and excessive objections.

23         **THE COURT:**  Well, all right.  So then we have -- I do

24  want to talk about --

25      I don't know if you need a break.

1          (Discussion off the record.)

2          **THE COURT:**  I have a couple of questions about jury

3     instructions.  So I'm going to rule and -- and provide final

4     instructions, but I've got a couple of questions.

5          So one is Instruction Number 35, false and misleading

6     statement -- and this is the whole, literally, false, false by

7     implication, misleading instruction.  And Natera renews its

8     request to include language that includes "considering in

9     context the entire advertisement."

10         Now, the way the proposed instruction is drafted now with

11    respect to literal falsity by implication, there is a

12    language -- there's similar language that says "but considering

13    the advertisement in its entirety."  So that sort of covers

14    that to a certain extent, but it doesn't appear in the first

15    part of the instruction, literal falseness, falseness on its

16    face.

17         I guess the question is:  Should there be some statement

18    about considering -- generally, to consider, in determining

19    whether an advertisement is false and misleading, you consider

20    it in the context of the entire advertisement.  What's the

21    downside of inserting that statement somewhere early on?

22         **MR. PERLOFF:**  I think that what we were focused on is

23    really what the case law said, and that language about

24    determining -- or considering an ad in its context is used when

25    deciding if an ad is literally false by necessary implication

1    or misleading, but not in the literal falsity.

2        I don't -- and that's not necessarily a reason not to have

3    it earlier, but that was the basis for why we didn't have it

4    earlier.  I would -- if I could see what it looks like, that

5    may be perfectly reasonable because you're just saying consider

6    the ad in its context.  Hopefully, that's what they're going to

7    do anyway.

8        **THE COURT:**  Yeah, they're -- you're right that many of

9    the cases are talking about by implication situations.  But

10   there are a couple of cases that also say look at the statement

11   in its entirety, consider it in full context in that.

12       So I don't think the courts have, frankly, thought through

13   exactly what -- there's been no rejection.  It's been just kind

14   of as it appears.  And I'm not sure I see the downside of

15   making a contextual statement earlier.

16       **MR. PERLOFF:**  I think if we -- we certainly don't want

17   to keep repeating it unnecessarily; but I think if you put it

18   up at the top, when considering advertising, considering its

19   full context or something.

20       **THE COURT:**  All right.  So let me ask the parties to

21   meet and confer.  It's kind of a narrow point, but I think, as

22   a matter of general principle, I don't see a huge problem with

23   that.  I'd rather you-all wordsmith that.  Maybe it's adding a

24   couple of words in the beginning.  I don't know if you need a

25   whole sentence or not.

1      **MR. CANNON:**  Understood.  Thank you, Your Honor.

2      **THE COURT:**  Why don't you meet and confer on that.

3  That seems fair.

4      Then we have the one about the -- this whole question

5  about when a statement is in a peer-reviewed, published study.

6  And, again, I'm not sure what is not covered, what the

7  difference is between what Natera wants and what's already in

8  there.  I mean, the words are slightly different.  I'm not sure

9  what the difference is.

10      I think perhaps one difference is we're talking about

11  statements that are not supported by a peer-reviewed, published

12  study.  Even if that study is reliable, it's not in there.

13  Maybe it's the notion that it's -- accepting it's a reliable

14  statement, you can still have something that is not supported.

15  I don't know if that was the main point or --

16      **MR. CANNON:**  That was the point.  I think -- I think

17  we've moved on to Instruction 37.  Is that right?  We were just

18  talking about Instruction 35.

19      **THE COURT:**  This is now 38.

20      **MR. CANNON:**  37, 38 was the establishment instruction

21  issue.

22      **THE COURT:**  Yeah.

23      **MR. CANNON:**  Yeah.  So -- so moving on from 35, which

24  is the full context issue, Instructions 37 and 38, we thought

25  the correct language should use the establishment phraseology

from *Southland Sod* because that is the actual statement of law.

The proposed language that Your Honor had included in the instruction is, I believe, it's not, on its face, supported by the peer review; but I think the correct -- or the more correct language is to say that it doesn't establish -- I'm just trying to find my notes here.

**THE COURT:**  I think what you want is "The statement in the advertisement is supported by testing that, even if the test is reliable, does not establish the proposition asserted."

**MR. CANNON:**  That's correct, Your Honor.  So that's on the bottom of page 4 of our objections, and that's a quote from *Southland Sod*, which is the Ninth Circuit case.

So, Your Honor, that's correct.  So we believe that that is the language that should be used either to replace, or in addition to, the supporting language that Your Honor had in the instruction.

**MR. PERLOFF:**  Your Honor, I haven't had a chance to go over that and consider that.  I will.  And I'm willing to sit down and talk to them.

I do remember this, though.  Because in this case -- and if you remember, they wanted to structure that instruction purely as it relates to *Southland Sod* without taking into consideration the *ONY* piece, and we took a lot of time and worked with your clerk and then you to craft one that incorporated, that sort of brought the *ONY* concept into

1    *Southland Sod* --

2            **THE COURT:**  Yeah.

3            **MR. PERLOFF:**  -- which is why I'm terrified -- I don't

4    want to here say, yes, that sounds fine without making sure we

5    haven't undone something that was --

6            **THE COURT:**  I agree.  We worked quite a bit of time on

7    this.

8        I will tell you my initial reaction -- and maybe this is

9    why we went the way we did -- is that that quote, maybe that's

10   a statement that the Court made.  It's not a great -- it's not

11   a simple thing to understand for the jury.  It's just not a

12   well -- it was written by a circuit court for the rest of us,

13   not for the jury.

14       So I think the purpose of the way we -- if I recall, we

15   phrased Number 1 was to kind of make it in the affirmative,

16   make it a little clearer.

17           **MR. PERLOFF:**  Yeah.

18           **THE COURT:**  But I'm certainly willing, if you can meet

19   and confer.  One way to do this is to add to what I had written

20   a parenthetical, something along the lines of "Even if the

21   study is reliable" or something like that, get into that

22   reliability, maybe work that in.

23       But just the way that quote from page 1139 of

24   *Southland Sod*, just it's an awkward sentence.  It may be good

25   for lawyers, not so great for jurors.

1          **MR. CANNON:**  We can take a crack, Your Honor.  I

2     thought it was pretty clear; but, obviously, we'll take a look.

3          And just so we're all on the same page, Counsel, we're

4     talking Instruction 38, subpart 1.

5          **THE COURT:**  Yes.  Yeah.

6          **MR. CANNON:**  So we're not going to change the rest of

7     it which --

8          **THE COURT:**  I'm not proposing change --

9          **MR. CANNON:**  -- addresses *ONY*; it's just that

10    establishment concept in --

11         **THE COURT:**  Yes.

12         **MR. CANNON:**  -- subpart 1.

13         Your Honor, can I revisit a question on Instruction 35,

14    please?  Because --

15         **THE COURT:**  Yes.

16         **MR. CANNON:**  -- that is an important issue for us.

17         It's the apples-to-oranges analogy that appears in

18    Instruction 35.

19         And we've preserved the objection to that, but I do want

20    to raise it because I do feel using an analogy, essentially

21    plaintiff's analogy, in an instruction is argumentative and

22    unfair.  The legal standard doesn't use an analogy.  The

23    Lanham Act doesn't use an analogy.  And to use, basically,

24    plaintiff's catchphrase in an instruction I feel is

25    prejudicial, Your Honor.

1      And the concept of comparative advertising can be --

2  this Court can certainly instruct the jury on comparative

3  advertising without using the analogy or the catchphrase that

4  we know plaintiffs are going to use in their opening statement.

5      So I feel apples to oranges is just -- it's just not an

6  accurate statement of the law.  It implies that no comparisons

7  can be made.  I think it boils down a complicated case into an

8  analogy, and I think it's not appropriate.

9      I know it appears in some district court decisions,

10  including your own, Your Honor, the *Clorox* decision.  But to

11  me, the way Your Honor used "apples to oranges" in the *Clorox*

12  decision was to explain Your Honor's legal conclusion, not as a

13  sort of statement of the law.  And so I feel like the

14  instruction -- if the instruction could not use an analogy and

15  just state the law more plainly, I think that would be a more

16  fair instruction.

17      **MR. PERLOFF:**  And we disagree, obviously.  I would

18  love to take credit for coming up with the idea that talking

19  about an apples-to-oranges comparison as a way of understanding

20  false advertising, that I came up with that; but we did -- that

21  came straight from the *Clorox* decision.

22      And it is -- I think if the purpose of these instructions

23  are to help guide and focus the jury, it's critical.

24      And just to be clear, it's not as though the lawyers here

25  or Guardant came up with this idea of apples and oranges.  Both

1  parties talked, in their internal documents, about whether they

2  should be doing apples to apples or apples to oranges.  It's

3  very helpful.  It will help focus the jury on what is otherwise

4  an extremely complicated case.

5      THE COURT:  Okay.  Objection is overruled.

6      So you're going to look at 38.  And one way is to add

7  something to the effect that even if a study -- wait a minute.

8      You could say something that statement -- oh, did we talk

9  about -- no.

10     MR. CANNON:  We just were talking about 38 --

11     THE COURT:  Yeah.

12     MR. CANNON:  -- subsection 1, on establishment.

13     THE COURT:  38, Subsection 1.

14     MR. CANNON:  Yeah.  And I -- sorry -- derailed you,

15 Your Honor.  I'm back to 35.

16     But I think we were done talking about 38.  We were going

17 to --

18     THE COURT:  Yeah.  We were going to --

19     MR. CANNON:  -- discuss --

20     THE COURT:  -- try to meet and confer --

21     MR. CANNON:  Yeah.

22     THE COURT:  -- to see whether there's a clear way of

23 saying it.

24     MR. CANNON:  Correct.

25     THE COURT:  Maybe you can add a parenthetical that,

1  even if the peer-reviewed, published study is reliable, the key

2  is, is it not supported by --

3          **MR. PERLOFF:**  I will --

4          **THE COURT:**  I'll let you work with that, massage that.

5      Next question I have is Number 48 on damages.  In 2(a), I

6  was going to propose a little bit of clarifying so the jury

7  doesn't get confused.  2(a) could read -- should read -- or I

8  propose that it read as follows (as read):

9              "Corrective advertising costs must be

10         attributable to correcting the false or misleading

11         advertising by the other party."

12     It just clarifies what we're talking about; right?  It's,

13  you attribute it to correcting the false advertising by the

14  other side.

15         **MR. PERLOFF:**  Yes.

16         **MR. LaVIGNE:**  Yeah.

17         **THE COURT:**  I think that's implied, but just in case

18  the jury looks at this and said, well, who's -- you can confuse

19  who's doing what.

20     But it is that "attributable."  I mean, I know we would

21  use "corrective" twice, but I think that makes it clear what

22  corrective advertising cost is.

23         **MR. PERLOFF:**  We're talking now about 2 --

24         **MS. LOZANO:**  2(a).

25         **MR. PERLOFF:**  -- and adding the specificity that it's

1 the other side's false advertising.  Is that --

2    **THE COURT:**  It would add the words "must be

3 attributable to" and add the words "correcting the false or

4 misleading advertising" and then add the words "by the other

5 party."

6    **MR. LaVIGNE:**  I'm sorry.

7    **MR. PERLOFF:**  It's right here.  It's right here

8 (as read):

9     "Corrective advertising must be attributable to

10   the false or misleading advertising by the other

11   side."

12    **MS. LOZANO:**  That's fine with me.

13    **MR. PERLOFF:**  Yeah.

14    **MR. LaVIGNE:**  Yeah, I think that's fine, Your Honor.

15    **MR. PERLOFF:**  I think that makes sense.

16    **THE COURT:**  Okay.  And I know there's a dispute over

17 some of the other language, which I've considered.  And I'm

18 inclined to use the words (as read):

19     "To avoid overcompensation" -- this is Part 2b

20   -- "your award of such future costs should not exceed

21   the value of the party's product that was the subject

22   of the false advertising.  The liable party has the

23   burden of proving that an award for corrective

24   advertising would constitute" -- "burden of proving

25   that the award for corrective advertising would

1      constitute overcompensation."

2          **MR. LaVIGNE:**  I believe that's consistent with the

3      language we proposed, Your Honor.

4          **THE COURT:**  Right.

5          **MR. LaVIGNE:**  We certainly agree with that.

6          **MS. LOZANO:**  Your Honor, I would just say, based on

7      the events that occurred today, I'm not sure that instruction

8      makes sense at all anymore because there's not going to be any

9      evidence of any of that.  All of those calculations are no

10     longer in.  We're back in the pre-damages period, with the

11     exception of disgorgement.  So we're giving them an instruction

12     where they're going to have no evidence about the value of any

13     product, to the extent that was ever what Mr. --

14         **THE COURT:**  There won't be evidence of what now?

15         **MS. LOZANO:**  The value of the product; right?  Their

16     calculations that -- those were done during the COBRA discovery

17     period; and we've now decided we're going back to the damages

18     case as it was, with the exception of the August 2023 period

19     for disgorgement.

20         So those calculations that purported to measure the value

21     of Reveal are no longer in, as we discussed earlier today, for

22     all the reasons we discussed earlier today, that then they

23     would elicit COBRA cross-examination.

24         So I just -- all I'm saying is putting that language in

25     seems confusing, given that that's -- there is not evidence in

1    the record.

2        **THE COURT:**  So which language would you propose is no

3    longer applicable?

4        **MS. LOZANO:**  The language that I think you were

5    proposing that I think is currently not in there, which was to

6    change where it says "To avoid overcompensation," I think you

7    said, "your award should not exceed the value of the party's

8    product."

9        And I'm saying I'm not sure -- the language that's in

10    there now, I think it suffers from the same potential issue

11    too, which we don't -- we are no longer looking at these caps

12    of projected profit streams because all that evidence was tied

13    with COBRA.

14        So perhaps the parties should go back and meet and confer

15    on how to adjust this in light of the state of affairs, because

16    I think both sides' objections were obviously made with the

17    assumption that some of the evidence was coming in that is no

18    longer coming in.

19        **MR. LaVIGNE:**  Your Honor, I think value is still

20    certainly relevant.  I think the founders can testify about the

21    value.  I think Mr. Malackowski can certainly testify about the

22    value at least as of August 2023.

23        All those calculations, I agree.  I think, to the extent

24    they rely on data, I suppose, from 2024, we need to adjust

25    those or ensure they're not out.

1    But, again, this is their burden; and if they're going to

2    come in and argue, implicitly or explicitly, by crossing

3    Mr. Malackowski, by crossing the founders, by making the

4    argument that this is a worthless product, they have to put on

5    evidence.  And I want it to be crystal clear it's their burden

6    because they don't have an expert opinion to that effect, and I

7    want to be able to rebut that.

8    So, you know, if they're willing to stipulate it out of

9    the case, I'll talk internally and see if we're willing just to

10   forgo the instruction entirely.  But I do have a concern that

11   if they're going to argue this is excessive because the

12   75 million exceeds the value, I want it to be crystal clear

13   that's their burden.

14   **MS. LOZANO:**  Your Honor, I'm a little troubled by what

15   I'm hearing because we spent a lot of this morning deciding

16   what the scope of the case was.  And as I understood it, it was

17   we are going back to how the record was when we were going to

18   start a March trial, with two exceptions:  They can expand

19   their disgorgement calculations to August 2023 and the related

20   evidence that we can put in as a result of that, and the

21   Dr. Andersen TBD testimony.

22   Now I'm hearing that the value calculations that were not

23   in the record when we had a March trial date at all, that is a

24   supplement report that came in June of 2024 or something, are

25   apparently -- Mr. LaVigne thinks that those are still at play

1  and those just need to be chopped up to the August 2023 time

2  frame.

3      That is not what we discussed this morning.  We had a

4  lengthy conversation about why, if those calculations are in,

5  it necessarily brings COBRA in as the cross.  We had a long

6  discussion about it.

7      So I'm not sure I understand what --

8          **THE COURT:**  Let me --

9      **MS. LOZANO:**  -- I'm hearing at all, but that is not

10 consistent with what I understood.

11     **MR. LaVIGNE:**  I'm not saying that.  If they're going

12 to stip- -- they have been the ones raising that the 75 million

13 exceeds the value of the mark and, therefore, it's deficient.

14     If they're no longer going to raise that defense, then

15 I'll speak internally, but I don't know that we need this

16 instruction, period.  It should be out.  It should not be

17 relevant.

18         **THE COURT:**  When you say "this instruction," which

19 instruction?

20     **MR. LaVIGNE:**  The instruction that corrective

21 advertising cannot exceed the value of the mark.  If they want

22 that instruction in, then it has to be crystal clear that it's

23 their burden.  They have to put on evidence.  We can rebut it.

24 But it's their burden, and they haven't put in any expert

25 testimony to that effect.

1     I'm just concerned that we're in this loosey-goosey world

2     where they're going to make that argument; they're going to

3     refer to the jury instructions.  If they want to do that, we

4     can rebut it.  And it has to be crystal clear that it's their

5     burden.

6     If they're going to stipulate that out and if they're not

7     going to make the argument and, as a matter of law, they're

8     going to say, "For the reasonableness of corrective

9     advertising, you know, you just look at whether it's associated

10    and in response to the false and misleading statements," I

11    frankly think we can live with that.

12    But, again, if they want to say, as a matter of law, this

13    is deficient because it exceeds the value, it has to be clear

14    its value; it has to be clear it's their burden.

15    **MS. LOZANO:**  I'm -- I apologize.  I really am not

16    following what he keeps saying is our burden.

17    They have a damages number.  I assume that as, in most

18    cases, we're going to cross their expert and try to point out

19    why we think it's excessive.  I have not thought through

20    whether -- after the state of affairs today, whether there is

21    any universe in which value of the product comes into that.

22    But I still don't understand why this instruction makes

23    any sense, given the world that we're living in; and so I'm

24    suggesting that we all go back to the drawing table and figure

25    out what might make sense.  But I still don't quite know what

1    I'm being asked to stipulate to or --

2            **THE COURT:**  Well, then why don't you meet and confer

3    and see whether there really is a difference and whether

4    there's something that's material that needs to be included in

5    here or not.  I'm hearing that it may not be necessary,

6    depending on what the arguments are.

7            **MR. LaVIGNE:**  That's fine.

8            **MS. LOZANO:**  Thank you, Your Honor.

9            **MR. LaVIGNE:**  The law is clear, and we cited this in

10    the papers.  It's straight from *Adray*, it's from other district

11    court cases, that if a party wants to say corrective

12    advertising is deficient or excessive because it exceeds the

13    value of the mark, it is the liable party's burden to show

14    that.  That's clear.

15        So when Ms. Lozano says it's our burden, it's not our

16    burden.  It's our burden to say what the corrective advertising

17    should be.  If they want to say that exceeds the value of the

18    product, they need to argue it.  And if she's saying now that

19    they're not going to raise that issue, then I don't know that

20    we need the instruction on the limiter period in the case.  And

21    I'm happy to confer with her about that, but that's my point.

22            **THE COURT:**  Okay.  Why don't you meet and confer and

23    tell me -- it probably depends what your substantive position

24    is.  It may be obviated; it may be not.

25            **MS. LOZANO:**  Understood, Your Honor.  We'll meet and

1    confer.

2         THE COURT:  Okay?  Why don't you report back to me.

3         The last comment I have is on Instruction Number 49

4    regarding Lanham Act false advertisement, disgorgement of

5    profits.  The way it's drafted, the term "plaintiff" is used in

6    the first paragraph and "defendant"; and then later on, it's

7    about -- "the liable parties" is used in the other -- the last

8    two paragraphs.

9         First of all, is this -- why is that?  Why does it refer

10   to plaintiffs in the first and defendant and then, later on,

11   talks about the liable parties?  Is there some reason why we

12   just don't use the word -- I don't know -- "wronged party" and

13   "liable party"?

14        MR. LaVIGNE:  I think it says "plaintiff" initially

15   because we're the only -- Guardant is the only party that's

16   seeking disgorgement.  Natera is not.

17        THE COURT:  Well, then should it be consistent?

18        MR. LaVIGNE:  It can be consistent, but I also don't

19   want there to be any doubt.  I mean, I think this is

20   self-evident on the verdict form, frankly, but Natera is not

21   seeking disgorgement.  So I think we just want to --

22        THE COURT:  So you would prefer the term "plaintiff"

23   because it's accurate because it's a one-way -- this was a

24   one-way --

25        MR. LaVIGNE:  Right.

1          **THE COURT:** -- instruction?

2      And, if anything, we change reference to "liable parties"

3  to "defendant"?

4          **MR. LaVIGNE:** Or we could say -- I mean, we could say

5  Guardant and Natera because I know they have their own

6  counterclaims. So it might make more sense to be more

7  specific, Guardant and Natera.

8          **THE COURT:** Yeah, that's true, because we've got

9  counterclaims and a jury -- if you start using terms like

10  "plaintiff" --

11          **MR. LaVIGNE:** Right. I would suggest we change it to

12  Guardant and Natera.

13          **THE COURT:** Any objection to that?

14          **MS. LOZANO:** Sorry. If I can just have a moment to

15  confer with my colleagues. I'm not sure that we used the names

16  in any other...

17                    (Pause in proceedings.)

18          **MS. LOZANO:** Yeah. It seems to jump out because, of

19  the 50 instructions, I don't think we're ever using the

20  parties' names. And so it seems odd to use them in this

21  particular instruction.

22          **THE COURT:** Okay. So you would prefer to keep just

23  the nomenclature plaintiff and defendant?

24          **MS. LOZANO:** I think so, Your Honor, yes.

25          **THE COURT:** And then liable party would be defendants,

1  then, to be consistent?

2          **MS. LOZANO:**  I think that's fine.

3          **THE COURT:**  All right.  Let me ask one final question.

4  Guardant suggests language that, where the liable party's false

5  advertisement is willful, that there's a sort of penalty of not

6  deducting overhead expense; correct?

7          **MR. LaVIGNE:**  Yeah.

8          **THE COURT:**  What's the response to that?

9          **MS. LOZANO:**  I don't think that they have cited any

10 on-point case law or any jury instruction that has ever used

11 that language, including the Ninth Circuit Model Instructions,

12 and other instructions out of this Court never used them.  I

13 can cite you to that, but I think it's in our objections and

14 our responses.

15     That does, though, raise an issue that I don't know if we

16 want to get into now.  But I'm not sure there's even an

17 instruction on willfulness.  And I don't know if that was an

18 oversight by both parties.  I'm not quite sure.  But it seems

19 odd to have willfulness be potentially on the verdict form but

20 not have an instruction.

21     I don't think what Guardant wants for the damages makes

22 any sense or is at all consistent with controlling law, but now

23 that we raise the word "willfulness," I did want to flag that.

24          **MR. LaVIGNE:**  May I respond to that, Judge?

25          **THE COURT:**  Yeah.

1          **MR. LaVIGNE:**  Yeah.  We cite in our brief, and we

2     researched this carefully, the *Frank Music* case.  It's a

3     Ninth Circuit case, 1985.  Quoting from the case.  It's in the

4     copyright infringement context, which I think is analogous.

5          (As read):

6               "A portion of an infringer's overhead properly

7          may be deducted from gross revenues to arrive at

8          profits, at least where the infringement was not

9          willful, conscious, or deliberate."

10         And that cites the *Kamar International* case, also from the

11    Ninth Circuit, 1984.  A defendant may not deduct overhead

12    expenses if conduct was willful.

13         And another case we cite from the Ninth Circuit talks

14    about how taxes can't be deducted from infringing profits,

15    which is effectively a form of overhead, you know, if it's

16    willful.

17         So this is a problem, a fundamental problem I have with

18    Dr. Stec's analysis, which, you know, is something we'll be

19    crossed on.  But what they're doing is they're taking

20    essentially $161 million in gross profit -- that's

21    undisputed -- and then he's tacking on these sales commissions,

22    these wages, all this other stuff he calls direct assistance

23    cost, which is actually part of net profit, if anything, and

24    getting that $161 million profit number down to, like, negative

25    95, which is candidly absurd.  And it's inconsistent with the

1    law; it's inconsistent with the instruction, because the costs

2    have to go with producing the good, not, you know, the sale of

3    the good but --

4           **THE COURT:**  And there's an instruction on that.

5           **MR. LaVIGNE:**  Yeah.  And that's why I want the

6    instruction, which is the most important part here, where, to

7    the extent the deduction is for activity related to the false

8    and misleading advertising, that cannot be deducted because, at

9    its core, all these different amounts, in addition to not

10   relating to production costs, they're also essentially

11   rewarding the wrongdoers, the sales force, the marketers,

12   et cetera.  That would be a windfall, and that's completely

13   antithetical to Ninth Circuit law.

14      We've cited our cases in here.  We've cited cases from

15   other circuits.  So if they're going to have Dr. Stec make this

16   analysis, we can have our expert, you know, disagree with some

17   of the amounts; but at the end of the day, this really does

18   come down to a question of law, and we want to be able to make

19   that argument.

20      So on the disgorgement, which is the core -- a core piece

21   of the damages right now, that's the one piece we feel most

22   strongly about.

23          **MS. LOZANO:**  Your Honor, the cases they cite are not

24   on point.  And in fact, the *Kamar* case -- they're all copyright

25   cases, which is actually fundamentally different in an

1   infringement case.  And the *Kamar* case actually disagreed with

2   the idea that a court has -- can automatically deny a willful

3   infringer a deduction of profits.

4       The law is not at all as crystal clear as my colleague is

5   suggesting.  And there is not a single instruction in the

6   Ninth Circuit, or even elsewhere, that has actually instructed

7   a jury at this level.

8       Perhaps they can make these fruit-of-the-poisonous-tree

9   arguments, but this is just their theory of the case.  This is

10  not -- this is not what should be in a jury instruction.

11      I think the jury instruction is appropriate as given, and

12  I do not believe that they have actually provided any

13  controlling law that that is an appropriate instruction to

14  give.

15          **MR. LaVIGNE:**  Your Honor, Ms. Lozano is just

16  misrepresenting our papers.  I mean, all you have to do is look

17  at our objections.  I mean, I'm quoting from them.

18      The restatement -- the restatement of unfair competition,

19  I mean, that specifically says (as read):

20          "The value of a defendant's own labor and

21      salaries or wages paid to persons responsible for the

22      tortious conduct are not ordinarily deducted."

23      And that --

24          **MS. LOZANO:**  Ordinarily.

25          **MR. LaVIGNE:**  -- cites numerous cases.

1    I mean, this is the law.  I don't see how counsel can sit

2    there with a straight face and say it's not.

3    Just because there's not something in a model instruction

4    doesn't mean you can't modify the instruction.  I mean,

5    candidly, I don't know if there have been any other cases

6    where, when you're trying to deduct gross profit, you actually

7    throw in the entire wages of the entire sales force.

8    **MS. LOZANO:**  Well, that's not true because that is --

9    **MR. LaVIGNE:**  I mean, that's beyond --

10    **THE COURT:**  But, in any event, there's no instruction.

11    **MS. LOZANO:**  Right.

12    **THE COURT:**  Has any court given such an instruction in

13    a Lanham Act case?

14    **MS. LOZANO:**  No.

15    **MR. LaVIGNE:**  I -- I don't know.  I mean, I haven't --

16    **THE COURT:**  Yeah.  Exactly.

17    **MR. LaVIGNE:**  I haven't looked at every single jury

18    instruction, but I've cited a ton of law for the Court that

19    essentially says these types of expenses and wages should not

20    be deducted, you know, if they're going to, you know,

21    essentially compensate for the unlawful conduct.  So that's the

22    reason why we want that instruction.  That's the law.  There's

23    black-letter law on that.

24    Otherwise, they're going to be able to take an incredibly

25    profitable business, have an expert get up there and

1  essentially point to all these unrelated expenses, and we're

2  not going to be able to argue to the jury that they should not

3  reward those because that would be rewarding the unlawful

4  conduct.  I mean, that's the purpose of disgorgement in the

5  Lanham Act, to deter --

6       **THE COURT:**  Well, it's a little more complicated

7  because now you're talking about what's causally related.

8       I could see an argument that you would not be able to

9  deduct the wages of the -- let's say the one person who

10  generated this false information, et cetera, et cetera.

11      But it gets complicated.  There's a causal analysis.

12  Where does the line stop?  Somebody who -- a supervisor who

13  approved it?  The person in production who printed it, even

14  though they weren't the culpable party, didn't have *scienter*?

15  The various costs of getting it out, even though those costs

16  went to five things, one of which was not true?

17      There's a whole causal link --

18      **MR. LaVIGNE:**  Right.  And that's --

19      **THE COURT:**  -- argument here that gets more

20  complicated.

21      So if you give this instruction, I think you'd have to say

22  more about that, which is what?  Proximately caused or

23  proximately related?  And how does that get defined?

24      **MR. LaVIGNE:**  Well, but --

25      **MS. LOZANO:**  That's why there aren't any instructions

1    that do this, Your Honor.  They haven't cited a single one

2    because of all of the reasons that you're saying.  It's not

3    appropriate in the instruction.

4          **THE COURT:**  Go ahead.

5          **MR. LaVIGNE:**  Your Honor, it's their burden to show

6    deductible expenses.

7          **MS. LOZANO:**  Correct.

8          **MR. LaVIGNE:**  Again, that's the law.  It is their

9    burden to show what expenses are prop- --

10          **THE COURT:**  But what's deductible and what's not?

11    Putting aside who's got the burden, the definition of what's

12    deductible in this context seems amorphous to me.

13          **MR. LaVIGNE:**  Well, I think the definition is that it

14    should relate to the production of the goods.  I don't believe

15    it should relate to the sales of the goods.  And that's what

16    they're throwing in in terms of all these different wages.

17    They're throwing in marketing costs.  They're throwing in

18    everything.  They need to tie that directly to the production

19    of the goods.

20          **MS. LOZANO:**  Completely in a different --

21          **MR. LaVIGNE:**  And on top of that --

22                    (Simultaneous speaking.)

23      (Stenographer interrupts for clarification of the record.)

24          **MS. LOZANO:**  I'm sorry.

25          **THE COURT:**  One at a time.

1          **MS. LOZANO:**  I apologize.

2          **MR. LaVIGNE:**  And on top of that, you know, the big

3    thing is, there are numerous cases out there that essentially

4    say you can't deduct expenses that are associated with the

5    wrongful activity.

6          And at the end of the day, it's their burden to show what

7    expenses are properly deductible.  They're going to get in and

8    they're going to have Dr. Stec essentially say this $75 million

9    is relating to the sales force, or however much it is.  And we

10   want to be able to argue to the jury that is inappropriate

11   because the sales force was responsible for these false and

12   misleading statements.  And at the end of the day, it's

13   Natera's burden to show what expenses are properly deductible

14   or not.

15         And the jury is going to have to make a decision:  Okay.

16   Of these expenses we've heard, you know, this we can allocate;

17   this we cannot allocate.

18         But, ultimately, that's a question they need to consider

19   in their factual assessment.  And we want to make sure we have

20   that instruction in there.  It's an accurate statement of the

21   law, and ultimately, this is something that can be argued to

22   the jury.

23         **THE COURT:**  All right.  Give you the last word.

24         **MS. LOZANO:**  I don't have a lot more to add except we

25   appear to be now going backwards because now we're talking

1    about which type of expenses are deductible, which that has

2    been resolved.  Those aren't objections that are in the -- that

3    are currently in the record.

4        It is absolutely correct to have that -- cases say this

5    over and over again, just as the current instruction is

6    drafted -- that deductible expenses may include things like

7    overhead, sales, wages and commissions.  And yes, it will be

8    our burden to show why those are expenses that should be

9    deducted, and we intend to do that.

10       So that's kind of a done deal that I thought was all --

11   you know, we briefed this.  We are where we are.

12       The issue that they're still objecting to is that we

13   haven't -- there's not an instruction saying that:  If Natera

14   is found willful, then you can't deduct X expense.

15       And I continue to say there is -- they have not been able

16   to provide a single jury instruction where that was given, and

17   it's -- and that makes sense because it is not the law in the

18   Lanham Act false advertising case.  These are copyright cases.

19       And even more so for all of the problems Your Honor

20   identified about the kind of slippery slope and who's willful

21   and is it this person, it does not make sense for this to come

22   through a jury instruction, which is why they haven't cited

23   any.

24           **THE COURT:**  All right.  I'm not going to have this

25   proposed language.  I don't see any precedent for it that's on

1  point in a Lanham Act case.

2          **MS. LOZANO:**  Thank you, Your Honor.

3          **THE COURT:**  And I think it raises more questions and

4  could be confusing to the jury.  And so I don't find any

5  precedent for that.

6      So I'd like you to work on the matters that we've talked

7  about.  Submit to me something within the next three days so I

8  can get that squared away.

9          **MR. CANNON:**  Your Honor, thank you.  Your Honor, I

10  know it's been a very long day so far, Your Honor, but can I

11  bring up an issue on the punitive damages instructions?

12          **THE COURT:**  What's that?

13          **MR. CANNON:**  First two -- first point is, in the last

14  hearing, you discussed bifurcating punitive damages if they're

15  in.  I'm not sure how Your Honor feels about that.  I thought

16  Your Honor was leaning towards that.

17      But I think more fundamentally -- this is Brian Cannon for

18  Natera -- we objected to the inclusion of the California common

19  law instruction because California common law is limited to

20  passing-off type of cases, and Your Honor overruled that

21  instruction.  And that comes from the *Sybersound* case, a

22  Ninth Circuit case from 2008.

23      In the instructions that Your Honor issued, you overruled

24  that objection, and you cited California cases that,

25  respectfully, Your Honor said, has called the rule -- the

1    *Sybersound* rule into question.

2        And I just want to point out that the cases that

3    Your Honor cites do not call *Sybersound* into question because

4    the cases that Your Honor cites are 17200 cases, which is

5    congruent with the Lanham Act.  It's the California common law

6    unfair competition that's not fully congruent with the

7    Lanham Act.

8        So we've preserved the objection in our objections that we

9    filed; but I really do want to point out that the Ninth Circuit

10   has ruled, and that's still the law, that California common law

11   is limited to passing-off type of cases, and that's not what we

12   have.

13       So if we don't have a California common law instruction,

14   which we should not, then there is no need for punitive

15   damages, bifurcated or not.

16       And I would respectfully direct the Court to pages 5 and 6

17   of our objections -- that was Docket 627 -- in which we point

18   out that the three cases that Your Honor relies upon for a

19   California common law instruction are not actually applicable

20   in this case.

21       **THE COURT:**  All right.  I'll give you chance to

22   respond on that.  Then we're going to --

23       **MR. PERLOFF:**  This is -- they're raising this now.

24   I'd like a chance to review it.

25       But the case law that we cited, I think, made it clear

1    that punitive damages wouldn't only be limited to what is known

2    as passing off under California common law.  And I think that

3    we, in our briefing and the reason why you overruled the

4    objection is set forth there.

5         But, you know, the idea that a willful false advertiser

6    making false comparative claims is somehow treated differently,

7    all else being equal, because it wasn't passing off doesn't

8    really make a lot of sense.

9         **THE COURT:**  All right.  I'm going to await your

10   comments and see what you can agree on on the matters that we

11   talked about with respect to the instructions and make final

12   instructions and issue those final jury instructions.

13        I'm going to tweak slightly, not in a major way, some

14   language in the proposed verdict form, but I intend to square

15   that away.

16        I have the exhibit objections, but you're going to give me

17   a new set.  Is that what I heard, that after meet and confer,

18   that the objections are going to be --

19        **MR. PERLOFF:**  On the exhibits?

20        **THE COURT:**  Yes.

21        **MR. PERLOFF:**  Yes.  We've got some more that, if we

22   can sit down and go over specific questions we have, we believe

23   that we can significantly reduce ours.  I'd love it if they can

24   reduce theirs.

25        **MR. BRAMHALL:**  Your Honor, I'm sure we can do the

 1   same.

 2       **THE COURT:**  Good.

 3       On the jury voir dire, I've been told to limit, by our

 4   jury administrator -- that I can't add more than ten to the

 5   list.  And so I'm going to add some of those.  I will say that

 6   my intent is to ask -- I'm going to see if I can get a couple

 7   more in so we can save some time, but I don't know if we will.

 8       But I -- the way I will go about it is I will ask -- I

 9   will do the hardship analysis.  I will also do some of the

10   obvious conflict questions about whether they know any of the

11   witnesses or any of the parties, any of the attorneys, this

12   sort of thing.  I may ask some general questions about their

13   familiarity with the plaintiff and the defendant and the tests

14   in question because I think we need to elicit that.  But as we

15   get into -- and I may ask questions about English speaking

16   ability and a few other things.

17       But after going through some kind of basic information and

18   cause questions and hardship questions, I'm going to turn it

19   over to the parties.  You've got a lot of questions here.  I'm

20   not guaranteeing you're going to get through all of those

21   because I'm going to impose a time limit of 20 to 30 minutes a

22   side of voir dire.  That's after you get the questionnaires,

23   after I've gone through some voir dire of my own, I'll give

24   each party -- I'll have to decide how much time we have once I

25   look at everything.

1          But I do want to get the jury selected.  My intent is to

2     choose -- since this is a prolonged period, I intend to seat

3     nine instead of eight.  I just don't want to lose people and

4     have this all go for naught.

5          And I intend to, once we select the jury, swear them in,

6     give some initial instructions, and then proceed.  So I expect

7     that we will get the trial starting on the first day.

8          **MS. KELLER:**  Your Honor, I know you had previously

9     mentioned getting the questionnaire -- the completed

10    questionnaires to the attorneys at least -- I think you were

11    talking about a week or at least a few days before.  Is that

12    still the plan?

13         **THE COURT:**  I've been told by our jury administrator

14    that she intends to sort of finalize -- or we've got to get to

15    her soon, within the next couple of days.  How long it takes

16    for them to turn it out.

17         But you will get the questionnaires and the questions --

18    the completed questionnaires in our format.  The hope is that

19    you'd get it the week before, that's my goal, so that we can --

20    I don't know if we have a date convened, prior to them actually

21    coming in, to go through any obvious cause problems or hardship

22    problems.

23         Did we set a date?

24             **THE CLERK:**  November 4th by Zoom, Your Honor.

25             **THE COURT:**  November 4th?

1              **THE CLERK:**  Yes.  You were going to --

2              **THE COURT:**  I guess that's right.

3              **THE CLERK:**  -- the Diaz trial.

4              **THE COURT:**  Right.  Right.  We did set a time to kind

5      of tell people "Don't bother to come in."

6          But we will start selection in earnest after we deselect

7      the next today.

8              **MS. KELLER:**  Okay.

9              **THE COURT:**  So, hopefully, you get the questionnaires

10     on Thursday or something like that before.  The earlier, the

11     better for me too.

12             **MS. KELLER:**  Definitely the earlier, the better.

13             **THE COURT:**  All right.  I think that's what I have at

14     this point.  We've got a few things.  I'm awaiting a couple

15     things back from you on some of the instructions.  I will

16     commemorate what we've agreed on today in terms of the scope of

17     the trial.

18         And then I've got to get -- once I get from you the update

19     on the evidentiary exhibit objections, I will then start my

20     process of going through those.

21             **MR. JOHNSON:**  Just at the interest -- just a couple of

22     questions I had, Your Honor, about procedures during the trial.

23             **THE COURT:**  Yeah.

24             **MR. JOHNSON:**  First is, Your Honor, you know, given

25     the time constraints, especially now, 17 hours, you know, we

 1    want to be able to -- we believe that it's permitted for us to

 2    actually play 30(b)(6) deposition testimony, even if a witness

 3    is going to come and testify.  If that person testified as a

 4    corporate representative, it's going to be much more efficient

 5    for us to basically play a very short deposition clip as the

 6    corporate representative.  We believe that the federal rules

 7    permit us to do that, and certainly, the case law in the

 8    Ninth Circuit also confirms that we can do that, to use the --

 9         **THE COURT:**  So these are witnesses who are appearing,

10    but you want to play their deposition transcript as part of

11    their testimony?

12         **MR. JOHNSON:**  I mean, to the extent that there is --

13    they testified as a corporate representative on a particular

14    issue -- I don't know what they're going to come and testify in

15    Guardant's case but -- we want to be able to basically play

16    that deposition testimony that we rely upon as their corporate

17    representative.

18         And, again, I mean, I don't think this is very

19    controversial.  I mean, I think the federal rules permit it,

20    that they can be used for any purpose when a party is deposed

21    and testifies on behalf of the company as a corporate

22    representative.  And this -- the Ninth Circuit's case law makes

23    it plain as well.

24         So, again, it's driven by efficiency more than anything.

25    Playing the depositions --

1      **THE COURT:**  How many witnesses are you planning to do

2  this for?

3      **MR. JOHNSON:**  I'm not sure.  It's never more than just

4  a few, but there will be -- there will be some for sure.

5      **THE COURT:**  Okay.  Response?

6      **MS. KELLER:**  Your Honor, the rules permit it, but they

7  don't require it.  And I think the Court's decision to have

8  live witnesses only testify live makes a lot more sense.

9    It's going to be very confusing if they see a witness get

10  up in our case, be crossed, and then, in Natera's case, they

11  see a depo clip played.  That doesn't make much sense to me,

12  and it doesn't sound very efficient either.

13      **THE COURT:**  Yeah, I'm not sure why this is more

14  efficient.  If you know what the witness -- what you want to

15  elicit, why not just elicit it live rather than having a hybrid

16  and a mix?

17      **MR. JOHNSON:**  Because, in one sense, the witness

18  coming -- I mean, the testimony that he or she gave at

19  deposition is an admission as opposed to -- on behalf of the

20  company, as opposed to somebody testifying in their personal

21  capacity.

22    But more specifically, Your Honor, Federal Rule of Civil

23  Procedure 32(a)(3) says (as read):

24        "The deposition of party, agent, or designee.

25    An adverse party may use for any purpose the

1      deposition of a party or anyone who, when deposed,

2      was the party's officer, director, managing agent, or

3      designee under Rule 30(b)(6) or 31(a)(4)."

4      And the Ninth Circuit's holding in *Pursche v. Atlas*

5 *Scraper*, an engineering company, 300 F.2d. 467 --

6           **THE COURT:**  What's the cite?

7           **MR. JOHNSON:**  300 F.2d at 488.

8      It specifically found -- the Ninth Circuit specifically

9 found that a trial court's requirement that a live witness must

10 be called live and could not use his deposition testimony to be

11 error.  And specifically, the Court held (as read):

12           "Federal rules permit an adverse party to use

13      the deposition of a party for any purpose and imposes

14      no preliminary condition to this use of the

15      testimony.  This is but a tacit way of saying that

16      the deposition can be used as original evidence,

17      regardless of the presence or absence of the

18      deponent."

19           **THE COURT:**  So you're saying it's not in the Court's

20 discretion?

21           **MR. JOHNSON:**  We are.

22           **MS. KELLER:**  I don't -- I didn't hear it read that

23 way.  You know, this isn't talking about a situation where

24 somebody is live anyway and also, apparently, counsel then

25 wants to play their deposition testimony in their case.

1      It's -- of course, if somebody's not available and is not

2    coming live, you can always play an adverse witness's

3    deposition testimony, but that's not what this is.

4      And I want to make sure that we don't have snippets of

5    Guardant witness testimony played out of order.  That's going

6    to create chaos and paralyze our trial.

7          **THE COURT:**  All right.  I'm going to ask each side, by

8    tomorrow, file a one-page brief about whether this is mandatory

9    or is it within the Court's discretion to make this

10   determination as to whether to allow a hybrid of prerecorded

11   deposition testimony in addition to live testimony.

12          **MR. JOHNSON:**  We will do that, Your Honor.

13     And we believe it is required.  But even if it's not,

14   Your Honor, I mean, again, we're going to be under the clock.

15   And a witness up there changing his or her testimony and then

16   having to impeach that witness and go through all of that,

17   that's -- and whether, you know, he or she is testifying in her

18   personal capacity versus testifying on behalf of the company

19   when that person was designated, that's the whole importance

20   and the reasons, you know, why 30(b)(6) depositions are so

21   important, because they're viewed as party admissions.

22          **THE COURT:**  So who do you want -- tell me who it is

23   that you would like to use this procedure on.

24          **MR. JOHNSON:**  I think what -- we'd need to meet and

25   confer -- we'd need to sort of discuss it internally.  And

1    given where we are with COBRA and -- you know, but we can

2    identify a few, and we can put it in the paper tomorrow for

3    sure.

4         **THE COURT:**  Why don't you put that in your filing.

5         Are we talking about one person?  Two people?  Five

6    people?

7         **MR. JOHNSON:**  No.  It's probably -- it's probably

8    somewhere between -- you know, two, three, four.  Something

9    like that.

10         **MR. BRAMHALL:**  Yeah.  Your Honor, Andrew Bramhall.

11         A handful at most.  But some of these folks, just, again,

12    as Mr. Johnson said, we can just very quickly go through, in a

13    handful of minutes -- not a lot of testimony designated -- get

14    these points in without having to deal with the back-and-forth

15    of live witnesses.  We can play them in our case, potentially,

16    which I don't think will be confusing at all.

17         **THE COURT:**  These are adverse witnesses, all?

18         **MR. JOHNSON:**  Yes.

19         **MS. KELLER:**  Well, presumably, we would have advance

20    notice and an opportunity to object to improper testimony.

21         **THE COURT:**  Well, it raises a question about

22    completeness.

23         **MS. KELLER:**  Yes, it does.

24         **THE COURT:**  I mean, every time that we -- I'm

25    concerned that this could take up -- with the objections, if

1    there are going to be objections, it's going to take up more

2    time than actually just eliciting the testimony.

3        I mean, your concern is that the testimony at trial will

4    deviate.  Then now you've got to spend time with prior

5    inconsistent statements.  And I have no way of judging at this

6    point, but I could see a problem of -- I mean, frankly, I've

7    never seen this done.

8            **MR. JOHNSON:**  Your Honor, I would say, I mean, in the

9    four trials I've done this year, I mean, this has been -- this

10   has been standard operating procedure.  So it's unique for me,

11   actually, to not be able to play deposition testimonies of

12   party deponents in a case.

13           **THE COURT:**  Not as impeachment, but as --

14           **MR. JOHNSON:**  As affirmative evidence.

15           **THE COURT:**  -- the testimony in main?

16           **MR. JOHNSON:**  Right.

17       We'll submit a -- we'll submit a brief on it.

18           **THE COURT:**  Why don't you submit within the next day.

19           **MR. JOHNSON:**  We will.

20           **THE COURT:**  By the end of tomorrow.  And I will --

21           **MR. JOHNSON:**  Yes.

22           **THE COURT:**  I will make that judgment.

23           **MR. JOHNSON:**  Yes.

24       And, Your Honor, one other thing.  You know, in reading

25   through Your Honor's guidelines with respect to civil cases, we

believe that it's important, as Your Honor points out in there,
that cross exhibits be provided and be exchanged before being
used with a witness.  That's what Your Honor's guidelines
talked about.

        **THE COURT:**  Yes.

        **MR. JOHNSON:**  And we have notice that the other side
intends to call five Natera witnesses -- five, may call; two,
will call; and three, may call -- witnesses in their
case-in-chief.  So we want to know what exhibits they intend to
use with our witnesses through that process.

     And I think the whole purposes of Your Honor's guidelines
is to try to eliminate or reduce as much as possible the
objections that Your Honor is going to have to hear and the
trial-by-ambush aspect.

     So we proposed with the other side exchanging
demonstratives -- sorry -- exchanging cross exhibits and direct
exhibits, you know, a few days before a witness goes on so that
if there is any remaining issue, we can get those -- that paper
to you, frankly, before midnight the night before a witness
goes on.

        **THE COURT:**  Well, my usual rule, first of all, is
witnesses and any exhibits be shared and announced to the other
side 48 hours, 48 court hours, in advance.  And then -- and
this will be in my order -- meet and confer about any
objections by 6 o'clock that day, and then report to the Court

1   24 hours in advance of the trial -- i.e., the next day, next

2   morning -- what objections are remaining.

3          **MR. JOHNSON:**  And that's what we are -- we have that

4   in mind.  And Your Honor, also in your guidelines, points out

5   that if it's an adverse witness, like the five that they want

6   to call, it's actually 72 hours in advance.  That's all laid

7   out in your guidelines.  And so in the meet and --

8          **THE COURT:**  I didn't realize that.  Okay.  I'll have

9   to relook at my guidelines.

10          **MR. JOHNSON:**  So my point simply is, in the meet and

11   confer leading up to this, we heard that the other side doesn't

12   want to disclose any of the cross exhibits.  And I'm just here

13   saying we understand your guidelines to say otherwise, and so

14   we anticipate following Your Honor's guidelines.

15          **THE COURT:**  Okay.

16          **MR. SCOLNICK:**  Yeah.  We looked at this a little bit

17   more closely, Your Honor; and in light of the Court's standing

18   order, we'll agree -- it's the order, so of course we're going

19   to agree -- to exchange the -- I don't think they're

20   necessarily cross, but adverse witness exhibits and our direct

21   witness exhibits.

22       My reading of the Court's order -- maybe I misread it --

23   is that it's the day before, each party would exchange -- or

24   the calling party would exchange their exhibits at 2:00 or

25   4:00.  In this case, we're going later, so perhaps 5:00.

1    And then the opposing party, an hour or two later, will

2    provide (a) their objections, and (b) their cross-examination

3    exhibits.

4    And then I think two hours after that, it would be

5    appropriate for the cross-examining party to -- I'm sorry --

6    for the calling party to provide their objections.

7    And then perhaps we meet and confer, file notice of

8    objections at, say, 10:00 p.m. the night before the witness

9    testifies.

10    **THE COURT:**  Well, maybe I need to revise my standing

11    order because I moved that up so that I --

12    **MR. JOHNSON:**  Actually, your standing order is clear.

13    That's not what counsel just described.

14    **THE COURT:**  Yeah.  I don't recall that.  Maybe I used

15    that in an earlier case.

16    **MR. JOHNSON:**  Under his -- under his version of your

17    order, you'd get the paper at midnight.

18    **THE COURT:**  Yeah.

19    **MR. JOHNSON:**  And then you'd have a hearing the next

20    morning.  That's -- Your Honor, I think the whole purpose of

21    the guidelines is to avoid that.

22    **THE COURT:**  All right.  I will include in this

23    pretrial order that timeline.

24    **MR. JOHNSON:**  Thank you.

25    **THE COURT:**  But my goal is to get the information so I

1   can look at it 24 hours in advance so I can have an intelligent

2   response for you-all come trial day or before that trial day.

3       **MR. JOHNSON:**  Thank you, Your Honor.

4       And then I assume -- and this is just for clarification.

5   And I'm really trying to -- I see the finish line right there.

6   I can taste it.

7       We assume fact witnesses, except for a client rep, will be

8   sequestered during trial.

9       **THE COURT:**  Yes.

10      **MR. JOHNSON:**  Great.

11      **THE COURT:**  Yes.

12      **MR. SCOLNICK:**  We'd ask that 615 exclusion apply to

13  experts as well, Your Honor, including rebuttal experts.

14      **THE COURT:**  Well, now that's -- let me ask your views

15  on that.

16      I've heard some arguments in some situations where the

17  expert may base their testimony, in part, on what comes out at

18  trial.  I don't know if that's going to be here.

19      And this is going to apply to both sides.  So what's the

20  preference?

21      **MR. SCOLNICK:**  Well, we'd suggest that's

22  inappropriate, Your Honor.  The rules of discovery require a

23  full disclosure of any experts' reports, and their testimony

24  has to be confined for what was in their reports, and then

25  we're able to depose them on that.

1          If you have an expert sitting here and hears something

2     that he thinks is relevant, he can change his opinion entirely

3     and can form his opinion to assist one of the other parties or

4     to fix a problem with the witness, and we would have no notice

5     of that changed testimony, nor would we have the opportunity to

6     depose them.

7          **THE COURT:**  Okay.

8          **MR. JOHNSON:**  Your Honor, I mean, experts, obviously,

9     can sit through the entire trial and read whatever portion of

10    the transcripts that they deem is necessary; right?  There's no

11    disagreement there.

12         **MR. SCOLNICK:**  Of course there is.

13         **MR. JOHNSON:**  Well --

14         **MR. SCOLNICK:**  I think that's -- I'm sorry to

15    interrupt you.

16         **THE COURT:**  What?

17         **MR. JOHNSON:**  I hear that he's disagreeing, that

18    experts can't sit through the whole trial or read the

19    deposition -- or, sorry -- read the trial transcripts.

20         We believe -- I mean, the whole purpose of an expert is to

21    take all the evidence into consideration and be able to testify

22    about that consistent with what's in his or her report.  And

23    that's the purpose of the report, is to provide notice.

24         But it's important that the experts be able to read the

25    transcripts of the trial or, hopefully, sit through the trial

1    to be able to testify about what he or she --

2         **THE COURT:**  So let me ask.  If there's an exclusion

3    order, would the expert not be able to read the transcript of

4    what went on earlier in the trial?

5         **MR. SCOLNICK:**  Consistent with Rule 615, yes,

6    Your Honor.

7         **MR. JOHNSON:**  Are you talking about with respect to

8    Dr. Hochster, for example?

9         **THE COURT:**  Well, I think we're talking about all

10   experts would not be able to hear what's happening prior to

11   their testimony.

12        **MR. JOHNSON:**  Yeah, we would disagree with that.  I

13   mean, the purpose of the expert is, like I said, to be able to

14   render opinions.  And the opinions can't deviate from what's

15   disclosed -- from what's inside the four corners of the report.

16   But the whole purpose is for them to provide opinions based

17   upon the facts in the case.

18        **MR. SCOLNICK:**  And the purpose of discovery and a

19   deposition is for us to be able to depose and question and

20   analyze the expert's testimony, including all items relied

21   upon.

22      So if he's relying on something new --

23        **THE COURT:**  The exclusion order applies to the

24   experts.

25        **MR. JOHNSON:**  So does that mean that an expert who

1    hasn't been excluded can -- will still read -- can still sit

2    through the trial and read the trial transcripts to be able to

3    testify about what's happened up until that point?

4        **THE COURT:**  Well, all right.  So let me ask you this:

5    I mean, are you saying that there can be no communication with

6    the expert during the trial and the expert can't be updated and

7    say, "Well, here's what came out with respect to this.  How

8    would you respond?"  Are you saying there's no communication

9    between counsel and the expert?

10       **MR. SCOLNICK:**  No, I'm not saying that.  I think that,

11   certainly, the expert and counsel should be able to

12   communicate, but not about matters that have occurred, not

13   about matters that are outside of the record that we had at the

14   deposition.

15       Because either by sitting in the court or by getting it in

16   deposition transcripts -- or, I'm sorry -- trial transcripts or

17   by hearing it from counsel, they're considering new information

18   that we didn't have the chance to test and evaluate at a

19   deposition.

20       **MR. JOHNSON:**  I guess I'm really confused on what

21   counsel is proposing.

22       Experts -- if an expert can't sit through the trial, how

23   is the expert going to know what's in and out of evidence and

24   what exhibits have been admitted and, you know, talk about

25   what's happened during the trial?

1      Obviously, I mean, like I said, they're limited to what's

2  disclosed in their expert report.  But an expert that just

3  comes in and doesn't have the benefit of sitting through any

4  part of the trial, you know, to inform --

5          **THE COURT:**  So if they're limited --

6          **MR. JOHNSON:**  -- their opinion --

7          **THE COURT:**  -- by what's in the expert report and then

8  they hear something in the courtroom that's new, that supports,

9  let's say, their opinion, can they cite that?

10          **MR. JOHNSON:**  If it's not in the report and they

11  didn't rely upon it, I don't think that comes in.

12          **THE COURT:**  So then what's the benefit of having them

13  sit in the courtroom and listening to evidence?

14          **MR. JOHNSON:**  Because there's going to be things that

15  happen during the course of the trial that -- ultimately, when

16  we look at the trial and where we -- where we are in the last

17  several years, there's an incredible amount of information.

18  It's all going to get distilled down to those issues that

19  Guardant feels is necessary to win the case and the issues that

20  we feel are necessary to win the case.  And those -- those

21  issues and that evidence is going to be a small fraction of

22  what the parties have done in discovery to this date.

23      So if they come in here without the proper background of

24  what's actually at issue in this trial and what the evidence is

25  that's in and not in and what's been considered, what theories

     1    have been dropped, it's going to be two ships passing in the

     2    night.

     3              THE COURT:  I haven't heard what the benefit of

     4    having -- the expert is properly prepared.  What's the benefit

     5    of having them sit through this trial if it's not somebody

     6    that's here to judge the demeanor of somebody or, you know,

     7    something like that?  I mean, if they're here based on what

     8    they've been prepared to and what they've been deposed on, why

     9    should they sit through this trial?

    10              MR. JOHNSON:  I mean, so -- so they can also make a

    11    determination of what to cover in their own testimony and what

    12    not to cover in their own testimony.  If something's already

    13    been covered by some other witness --

    14              THE COURT:  Well, that would be --

    15              MR. JOHNSON:  -- somewhere --

    16              THE COURT:  -- counsel's role.

    17         I mean, you can direct.

    18              MR. JOHNSON:  Yes and no.  I mean, that's part of it.

    19         But part of it is going to be, you know, this witness that

    20    was on the -- you know, that was -- the opposing expert was

    21    supposed to testify about ten different issues.  They talked

    22    about three.  And, you know, they should be able to read the

    23    transcript or sit through the trial and listen to what this

    24    witness had to say to make a determination as to, you know,

    25    what the rebuttal points are that they're going to address

1  consistent with their expert report.

2      **THE COURT:**  You're saying the expert witness can't

3  talk to counsel about what happened the day before, can't read

4  any transcripts?

5      **MR. SCOLNICK:**  I am saying that, Your Honor.

6      Obviously, Mr. Johnson and his team are excellent trial

7  attorneys.  I'm sure they can tailor their questions to fit

8  what has happened before each witness testifies.

9      And it shouldn't be up to the witness to say:  You know

10  what?  Here's how you should try your case.  I don't think this

11  is as important in light of this other person's testimony.

12      That's what the attorneys are getting paid to do, and they

13  can tailor their questions appropriately.

14      **MR. JOHNSON:**  Your Honor --

15      **MR. SCOLNICK:**  I just don't think -- anything else,

16  we're allowing the witnesses, either directly, indirectly,

17  witnessing it or reading the transcript -- we're allowing the

18  witnesses to consider testimony, consider evidence that wasn't

19  included in their report.

20      And, again, it disadvantages the opposing party,

21  especially the opposing party who goes first, whose opponent's

22  experts are going to sit through the entire trial and watch all

23  of it, and then there's a risk they're going to conform their

24  testimony to what's happened before them.

25      **THE COURT:**  So in addition to exclusion from the

1  courtroom, there would be an order not to share transcripts

2  or --

3       **MR. SCOLNICK:**  Right.

4       **THE COURT:**  -- to summarize what was testified to

5  during the course of the trial to the expert witness?

6       **MR. SCOLNICK:**  Yes.  And I think that's consistent

7  with the 615.

8       **MR. JOHNSON:**  Your Honor, in the 30 years I've been

9  doing this, I've never seen this happen.

10      And let me also just say, you know, what I tell the expert

11 happened or didn't happen in court, that's not evidence.  For

12 them to be able to talk about the evidence that the jury's

13 considering, they need to be able to say "As you heard

14 so-and-so testify to," or "As the evidence came in on this

15 issue, or this document was shown to" -- there needs to be some

16 context to what these experts are testifying to.

17      Relying upon what I tell them is not evidence.

18      **MR. SCOLNICK:**  And, again, I think counsel can

19 accomplish that by carefully tailoring his or her questions to

20 the expert.

21      **THE COURT:**  I'm going to allow the experts to attend.

22 However, of course, if they stray from the testimony -- from

23 their prior testimony or from their disclosure reports, that'll

24 be enforced at that time.

25      **MR. SCOLNICK:**  Thank you, Your Honor.

1          **MR. JOHNSON:**  Thank you, Your Honor.

2          **MR. SCOLNICK:**  And we are at the finish line.

3    10 seconds.

4          We are going to Denmark next week, and Danish counsel

5    is -- at the request or demand of opposing counsel, Danish

6    counsel is going to have to ask the questions.  So necessarily,

7    they're going to have to see the documents.  They've signed the

8    confidentiality order, the protective order in the case, and

9    they're going to have to discuss those at the hearing.

10         So I just want to put an end to the gamesmanship here, and

11   we're all on the same page.

12         **THE COURT:**  Okay.

13         **MR. SCOLNICK:**  And, finally, in order to expedite the

14   case, some of the witnesses on our list, we may be reserving

15   for rebuttal.  We're looking for --

16         **THE COURT:**  I'd like an updated list, if you can, an

17   updated list if you are moving some people off of one list to

18   another.

19         **MR. SCOLNICK:**  Yes, Your Honor.

20         **MR. JOHNSON:**  So, Your Honor, just, again, for

21   clarification, let's talk about that.

22         What is rebuttal?  I mean, so they're going to go first on

23   their affirmative case.  Then we're going to go second and

24   respond to their affirmative case and then put on our

25   affirmative case.  And then they go next, and they address what

1    we said only about our affirmative case; right?

2         **THE COURT:**  Yes.

3         **MR. SCOLNICK:**  I think that's what we envision, with

4    the exception of Dr. Parikh, if she comes live, because that's

5    the only time she's available, is on the 18th.

6         **THE COURT:**  And are you expecting, then, on your case,

7    then, a rebuttal -- a further rebuttal to their rebuttal?

8         **MR. JOHNSON:**  Yes.

9         **MR. SCOLNICK:**  Your Honor, that wouldn't make any

10   sense, with all due respect, because we've got our case, and

11   then opposing counsel is putting on their case.  The only thing

12   we're doing is rebutting their case; right?

13        So giving them a surrebuttal would be unfair and outside

14   the scope of what we're talking about.

15        **MR. JOHNSON:**  Just to cut through it at the end of a

16   long morning, I mean, I think, Your Honor, it's going to depend

17   upon what actually gets said in the rebuttal case.  And we can

18   make that determination then.

19        **THE COURT:**  Well, the theory is if what they say in

20   rebuttal is truly just rebuttal, then there's not a door

21   that -- that doesn't open a door to then surrebuttal.

22        But if they answer the case-in-chief on your -- I don't

23   know if you call it a counterclaim or whatever it is -- your

24   claim, then that might open a door.

25        So it depends on the scope of your, quote --

1          **MR. JOHNSON:**  Okay.  And, Your Honor --

2          **THE COURT:**  -- rebuttal case.

3          **MR. JOHNSON:**  -- I can say, I mean, we will be

4    listening very carefully to when they open the doors on

5    anything.

6          **THE COURT:**  Okay.  So I'm going to put the burden on

7    you to tell me whether they are going beyond rebuttal, which

8    would then open the door for your --

9          **MR. JOHNSON:**  I will --

10         **THE COURT:**  -- surrebuttal.

11         **MR. JOHNSON:**  I will, Your Honor.  And if they have a

12   witness up there that testifies inconsistently with what we

13   know the facts to be with respect to ultimately what happens

14   later on, I'm going to put my hand up, and I'm going to raise

15   the issue at that point as well, Your Honor.

16       We're just going to be listening for, you know, what we

17   think -- we understand what the case to be about now, and we'll

18   be ready to proceed --

19         **THE COURT:**  Well, it's not just --

20         **MR. JOHNSON:**  -- accordingly.

21         **THE COURT:**  -- about whether they say something that,

22   you know, you think is untruthful.

23       The question is scope.  Is it truly rebuttal that they're

24   offering, even if you disagree with it?

25       It's when they exceed the scope of rebuttal and then start

 1    to do an opposition to your claims that that opens the door to

 2    your rebuttal.

 3         **MR. JOHNSON:**  Right.  And what I don't want to have

 4    happen, Your Honor, and what I'll be trying to avoid because

 5    I'll be managing my time, is if a witness should have come and

 6    testified in their affirmative case but they're holding that

 7    witness back to testify in rebuttal when it's only part of

 8    their -- should have been part of their affirmative case, we're

 9    going to have a problem with that.

10         **THE COURT:**  Well, then you have a ground for

11    exclusion.  You can't bring in a witness that -- rebuttal is

12    rebuttal, not a --

13         **MR. JOHNSON:**  Right.

14         **THE COURT:**  -- chance for a second -- unless there's a

15    scheduling issue, which we talked about.

16         **MR. JOHNSON:**  Right.

17         **MR. SCOLNICK:**  Right.

18         **THE COURT:**  So your move there would be to say to

19    exclude that witness as beyond the scope, beyond the scope of

20    rebuttal.

21         **MR. SCOLNICK:**  Yeah.  I --

22         **MR. JOHNSON:**  Thank you.

23         **MR. SCOLNICK:**  I envision our rebuttal case to be

24    rebutting and responding their affirmative case, which is the

25    false -- alleged false advertising claims against Guardant,

1    which wouldn't be in our direct case.

2         **THE COURT:**  Okay.  That's not really rebuttal.

3    That's --

4         **MR. JOHNSON:**  That's --

5         **THE COURT:**  That's an opposition to the counterclaim.

6    So we'll have to be clear what it is, because if you

7    start -- if you have a response to their counterclaim that's

8    not within the scope of rebuttal of your affirmative claim,

9    then that opens the door for their rebuttal on their

10   counterclaim.

11        **MR. JOHNSON:**  I agree.  Thank you.

12        **THE COURT:**  That's the principle.  Okay?

13        **MR. SCOLNICK:**  Understood.

14        **THE COURT:**  All right.

15        **MR. LaVIGNE:**  Your Honor, may I just make one point

16   before we break since -- this just has to do with the jury

17   instructions.  We're not instructing the jury for a long time.

18        **THE COURT:**  Yes.

19        **MR. LaVIGNE:**  On this point about the appropriateness

20   of the deductions, I know we've been here a long day; I don't

21   want to rehash the whole thing; but I did just want to clarify

22   one thing.

23        I said I was unaware of a case where a jury was instructed

24   in a Lanham Act case on that.  That's accurate.  I don't have a

25   case I can show you where this issue was litigated and the jury

1    was so instructed.

2        But we do cite the *Wolfe* case, 272 F.2d at 867, in the

3    Ninth Circuit, where the Court essentially said it was improper

4    to deduct the salaries received by the tortfeasors.

5        And we cite in our objections a pre-Lanham Act trade dress

6    decision from the U.S. Supreme Court where it espouses that

7    same principle.

8        And I can tell you, based on my background -- I do a lot

9    of criminal defense work -- when it does come to disgorgement,

10   I mean, there is a principle that is typically used when you're

11   trying to make a deduction from any profits earned.  If those

12   deductions relate to the, you know, activity for which you've

13   been found liable or convicted, you can't do it.

14       I think that's well accepted across the gamut for all

15   tortious conduct.  So I -- just because we can't find one for a

16   Lanham Act decision I don't think should be dispositive.

17       I'm happy to -- again, it's not something we need to

18   decide now; but I do just want to flag, before Your Honor

19   instructs the jury, I would like the opportunity to be heard on

20   that because I think it's a --

21            **THE COURT:**  Well --

22            **MR. LaVIGNE:**  -- significant issue.

23            **THE COURT:**  -- is this something you've already

24   tendered or something you're now supplementing?

25            **MR. LaVIGNE:**  No.  This is something that you already

1    have, Your Honor.  You already have these cases.

2          **THE COURT:**  I mean, your argument, what you are

3    arguing and what you're intending to argue, is this something

4    that's --

5          **MS. LOZANO:**  We --

6          **THE COURT:**  -- already --

7          **MS. LOZANO:**  We've already --

8          **THE COURT:**  -- that argument's presented?

9          **MR. LaVIGNE:**  We presented this in our objections.

10         **THE COURT:**  Yeah.

11         **MR. LaVIGNE:**  And I'm just saying, if the Court's made

12   a decision, I'd like to be able to be heard on that again

13   before the jury gets instructed.

14         **THE COURT:**  Why would I reopen this?

15         **MS. LOZANO:**  We just argued this.

16         **THE COURT:**  Everybody's made their best shot.

17         **MS. LOZANO:**  Yes.

18         **THE COURT:**  And I'll look at the arguments you made.

19      Now, you now want me -- you're basically asking me --

20         **MS. LOZANO:**  We argued --

21         **THE COURT:**  -- to relook at your papers.

22      Hold on.

23      I'll look at them, but I'm not going to take more

24   authorities now.

25         **MR. LaVIGNE:**  No, I understand that.  These are all in

1    what we submitted.  I just wanted to --

2              **THE COURT:**  And I'll look at your authorities.

3              **MS. LOZANO:**  Your Honor, we argued this earlier today,

4    and you overruled it and said you weren't going to add this in.

5         So I'm just saying we already had this discussion, and

6    they're not bringing anything new.  So I'm not sure --

7              **THE COURT:**  I don't know if -- I'm not sure if we

8    argued this regarding --

9              **MS. LOZANO:**  We did.  We did, actually.  This is the

10   willful cost issue.

11             **THE COURT:**  I will rule based on how I think is

12   correct.  So I'm not going to --

13             **MS. LOZANO:**  Thank you, Your Honor.

14             **MR. LaVIGNE:**  Thank you, Your Honor.

15             **THE COURT:**  Thank you.

16             **MR. LaVIGNE:**  Thank you.

17             **THE CLERK:**  This hearing is concluded.

18                  (Proceedings adjourned at 1:34 p.m.)

19                           ---o0o---

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Monday, October 21, 2024

_Ana Dub_

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter