# EXHIBIT B

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4    GUARDANT HEALTH, INC.,          )
                                      )
 5            Plaintiff,              )
                                      )
 6            vs.                     ) Case No.
                                      ) 3:21-cv-04062-EMC
 7    NATERA, INC.,                   )
                                      )
 8            Defendant.              )
      _____ )
 9
10
11
12      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
13   VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF
14               VAN KARLYLE MORRIS, M.D.
15
16             Tuesday, October 1, 2024
17       Remotely Testifying from Houston, Texas
18
19
20
21
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 6938846
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  disease.
2  So we know that these patients, just by
3  virtue of the Stage IV diagnosis, are, you know, at
4  a higher risk to come back and -- but you -- if you
5  want to see if the -- if, you know, a test in                07:50:31
6  this -- you know, in this clinical context,
7  circulating tumor DNA, can identify patients who
8  are, you know, at a high risk for their cancer to
9  come back, you need to make sure that the cancer
10 does come back -- or you've given enough time for            07:50:47
11 that to -- to declare itself.
12 So -- so, you know, for patients with
13 Stage IV disease, we would, you know, anticipate,
14 you know, probably -- you know, the detection of
15 ctDNA may predate, you know, detection of clinical           07:51:05
16 recurrence, i.e., you know, for example, cancer
17 that's noted on a CT can or a PET scan or an MRI
18 scan by, you know, six to nine months.
19 So, you know, in this -- when -- you know,
20 when we say in patients with a minimum of one-year           07:51:23
21 follow-up, you know, we've given enough time to
22 identify -- to identify -- you know, enough time to
23 wait and see, like is the cancer going to come back.
24 So I think that was probably why, you
25 know, this phrase was inserted here into the                 07:51:40

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   right?
 2        A.   Yes, I believe that's correct.  That's --
 3   yes, that's correct.
 4        Q.   And by 2018, the COBRA study had been
 5   designed; correct?                                     08:16:40
 6        A.   The -- yeah, I mean, I think the schema
 7   for the trial, you know, had been approved by NCI --
 8        Q.   Yeah.
 9        A.   -- in working with NRG Oncology.
10        Q.   The COBRA study did not plan to collect or  08:16:54
11   use clinical data about patients' recurrence;
12   correct?
13        A.   Sorry, can you say that again?
14        Q.   Sure.
15             The COBRA study did not plan to collect or  08:17:04
16   use clinical data about patients' recurrence; right?
17        A.   That is not correct.  You know, we were --
18   we continue to routinely follow study participants
19   with CT scans, clinical assessments, colonoscopies,
20   you know, and the like to -- and -- to assess         08:17:27
21   patients for clinical recurrence.
22        Q.   Do you currently have the clinical
23   outcomes for the patients involved in the COBRA
24   study?  And what I'm focusing on are the 16 that
25   we're focused on.                                     08:17:41
```

Page 134

1       A.   We do not -- I -- I do not personally have
2  that inform- -- knowledge of that information for
3  those 16 patients.
4       Q.   What about for the -- for the 30 -- by the
5  way, let's take a step back.                                08:17:52
6            It sounds like there were 600 patients
7  that were tested for ctDNA and results were obtained
8  for about 600 of them; right?
9       A.   Yeah, I -- yes, that -- those numbers
10 sound accurate.                                             08:18:07
11      Q.   I guess 596, somewhere in that area?
12      A.   That sounds right.
13      Q.   Okay.  And then the first -- was it first
14 30 or 32 were looked at a little bit more closely?
15 Is that right?                                              08:18:22
16      A.   Yeah, so --
17      Q.   Let me rephrase that.  That was a bad
18 question.
19           Of those 600 patients or 596, did around
20 32 or 33 test positive for ctDNA after surgery?             08:18:33
21      A.   I believe, to the best of my knowledge,
22 that that information was made available to us by
23 Guardant after the analysis of the Phase 2 endpoint.
24           For the analysis of the Phase 2 endpoint,
25 we evaluated 16 patients who had detectable                 08:18:50

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1  circulating tumor DNA at baseline.
2       Q.   Okay.  So for those 16 patients, you do
3  not have any clinical data; correct?
4            MR. BRAMHALL:  Objection to form.
5            THE WITNESS:  There is clinical data being        08:19:05
6  collected for these patients.  I do not have
7  personal knowledge of the clinical outcomes for
8  those 16 patients.
9  BY MR. SCOLNICK:
10      Q.   Understood.                                       08:19:19
11           So let me rephrase the question, then.
12           You are not aware of the clinical outcomes
13 for any of those 16 patients; correct?
14      A.   That is correct.
15      Q.   You don't know how many of those patients         08:19:28
16 recurred; correct?
17      A.   That is correct.
18           THE COURT REPORTER:  Counsel, this is the
19 court reporter.  We've been going for a while.
20           MR. SCOLNICK:  Sure.                              08:19:46
21           THE COURT REPORTER:  Could we take a break
22 soon?
23           MR. SCOLNICK:  Off the record.
24           MR. BRAMHALL:  Sure.
25           THE VIDEOGRAPHER:  We are off the record          08:19:52

Page 136

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   BY MR. SCOLNICK:
2       Q.   I'm referring to Table 7.
3       A.   Yeah, this is, yeah, a summary of negative
4   accuracy.
5       Q.   And is that specificity?                          08:49:21
6       A.   So specificity is the -- the ratio of true
7   negatives relative to true negatives plus false
8   positives.  So, yes, specificity does incorporate
9   and consider events true -- true negative events.
10      Q.   And you have no reason to doubt the               08:49:45
11  accuracy of this information; correct?
12      A.   No.  And we --
13           MR. BRAMHALL:  Objection to the form.
14           THE WITNESS:  -- we took this in -- we --
15  yes, we took this in good faith from, you know, our       08:49:55
16  collaborators at Guardant.
17  BY MR. SCOLNICK:
18      Q.   Guardant disclosed that its analytical
19  specificity was around 95 percent; is that true?
20      A.   Now, when look at the --                          08:50:07
21           MR. BRAMHALL:  Objection to form.
22           THE WITNESS:  In this document in Table 7,
23  when you look at the column that says "Final ctDNA
24  result (Genomic" --
25           (Interruption in audio/video.)                    08:50:17

Page 151

```
 1              THE COURT REPORTER:  Sorry, I can't hear
 2   you very well.  Can you say that slower?
 3              THE WITNESS:  I'm sorry.
 4              When you look at the row in Table 7 that
 5   reads "Final ctDNA result (Genomic plus Epigenomic)"    08:50:21
 6   [as read], they report a percent specificity of
 7   94.6 percent.  So I would agree with that comment.
 8   BY MR. SCOLNICK:
 9        Q.   When is the first time you recall seeing
10   this document?                                          08:50:40
11        A.   I cannot recall that information.
12        Q.   Do you recall discussing this document
13   with anyone at NRG?
14        A.   As -- in 2024, I honestly don't.
15        Q.   Do you recall discussing Guardant's          08:50:57
16   approximately 95 percent specificity with anyone at
17   NRG before 2023?
18        A.   Before 2023?  I don't recall any specific
19   details.  I would suspect that we -- you know, I
20   would suspect, yes, that we did discuss this, but      08:51:18
21   I -- I cannot -- you know, I cannot recall a date or
22   a time or a specific person.
23        Q.   Opposing counsel for Natera asked you some
24   questions about a letter that NRG sent to patients
25   in 2023?                                                08:51:42
```

Page 152

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       A.   I think it --

2            MR. BRAMHALL:  Objection to form.

3            THE WITNESS:  I think that it is possible

4   that with any assay, any circulating tumor DNA

5   assay, it is possible that a report will come back          08:52:48

6   as ctDNA detected when the patient may not have

7   actual cancer present.  I think that it is possible,

8   yes.

9   BY MR. SCOLNICK:

10      Q.   And -- and in a clinical setting, what a           08:53:02

11  false positive is, is a ctDNA result that comes back

12  positive, that you later cross reference with

13  clinical data like a CT scan, and you find out no

14  cancer is visible; right?

15           MR. BRAMHALL:  Objection to form.                  08:53:20

16           THE WITNESS:  I think that that is -- that

17  can -- that is an accepted definition.

18  BY MR. SCOLNICK:

19      Q.   In the COBRA study, there was no clinical

20  data for the 16 patients that were analyzed in the          08:53:31

21  interim futility analysis; right?

22      A.   We did not have that data available.

23      Q.   Let me rephrase that.

24           For the 16 patients that were examined in

25  the futility analysis for COBRA, you're not aware of        08:53:45

Page 154

```
 1   whether or not they recurred; right?
 2        A.   For the futility analysis, the endpoint
 3   was the clearance of circulating tumor DNA, but any
 4   objective was to compare the clearance of ctDNA
 5   among patients with detectable ctDNA betweens          08:54:05
 6   [verbatim] -- between Arms A and B.
 7        Q.   Is it true that because you do not have
 8   clinical data, that you're not aware of clinical
 9   data for any of those 16 patients, you don't know
10   whether they recurred?                                 08:54:21
11        A.   I do not know whether or not any of the 16
12   patients recurred.
13        Q.   Is it also true with respect to those 16
14   patients, you're not aware -- you don't know whether
15   any of those were clinical false positives?            08:54:33
16        A.   I'm sorry, can you --
17             MR. BRAMHALL:  Objection to form.
18             MR. SCOLNICK:  Sure.
19             THE WITNESS:  Can you ask the question
20   again?                                                 08:54:39
21   BY MR. SCOLNICK:
22        Q.   Yeah.  With respect to those 16 patients
23   that were examined in the futility analysis for
24   COBRA, you're not aware of whether any of their
25   results were false positives -- clinical               08:54:50
```

Page 155

```
1    performed, we were made aware that perhaps with an
2    updated calling system, that there may be examples
3    for which there was discordance between the protocol
4    specified assay determination and what the Guardant
5    team felt may -- you know, may be the case according        08:56:57
6    to updated, you know -- the updated technologies.
7         Q.   Okay.  I'm going to ask you some questions
8    about statistics.
9         A.   Okay.
10        Q.   So we had about 600 patients who were              08:57:20
11   tested for ctDNA in COBRA; right?
12        A.   Okay.
13        Q.   These were Stage IIA patients; right?
14        A.   Yes.
15        Q.   And would we expect about 10 percent of            08:57:33
16   them to recur?
17        A.   Yes.  That's -- I think a fair -- it's a
18   fair -- it's -- that's in the ballpark, yes.
19        Q.   CtDNA tests are around -- strike that.
20             Is it true that ctDNA tests have about             08:57:55
21   50 percent sensitivity, more or less, at landmark?
22        A.   I mean, we would have to go back and refer
23   to, you know, clearly specified data.  But -- but if
24   that's consistent with the data, yes.
25        Q.   So in a -- in the population of 600                08:58:17
```

Page 157

1  patients where there's 10 percent recurrence, that
2  means 60 people would recur with cancer; right?
3       A.   Yes.
4       Q.   And if there's a test with 50 percent                08:58:30
5  sensitivity, that means you'd expect about 30 of
6  them to test positive for ctDNA; right?
7       A.   Yes, that's correct.
8       Q.   Now, let's assume we're using a test with
9  a 95 percent specificity.  That means a 5 percent
10 false positive rate; right?                                    08:58:49
11      A.   95 percent -- yes, like, more -- yeah.
12      Q.   So in a cohort with -- of 600 with a
13 10 percent recurrence rate, that means 90 percent
14 are not recurring; right?
15           MR. BRAMHALL:  Objection to form.                    08:59:08
16           THE WITNESS:  Yes.
17 BY MR. SCOLNICK:
18      Q.   So that means we'd expect 540 people to
19 not recur?
20      A.   Yes.                                                 08:59:15
21      Q.   And if we're trying to determine how many
22 of those people would be false positives, then we
23 multiply that 540 times 5 percent; right?
24           MR. BRAMHALL:  Objection.  Let me just
25 ru- -- have a running objection to these questions             08:59:30

Page 158

```
 1    on statistics with this hypothetical.
 2              THE WITNESS:  I -- and I'll just say,
 3    like -- I mean, if I had, like, a piece of paper, I
 4    could crunch these numbers, I would feel more
 5    comfortable --                                         08:59:44
 6    BY MR. SCOLNICK:
 7         Q.   Okay.
 8         A.   -- answering this.  I do feel that
 9    perhaps, you know, if it's my place to even say
10    this -- and, Liz, please step in -- may- -- maybe a   08:59:50
11    question like that is better suited for a
12    statistician for definitive, like, correct answers.
13    But, I mean, I think that, in general, what you're
14    saying, you know, seems correct.
15              MR. SCOLNICK:  Okay.                         09:00:08
16              Well, why don't we go off the record
17    quickly so you can get a pen and paper, and we may
18    need to visit -- revisit this with someone else, but
19    hopefully not.
20              So can we go off the record?                 09:00:17
21              THE WITNESS:  Sure.
22              THE VIDEOGRAPHER:  We are off the record
23    at 11:00 a.m.
24              (Off the record.)
25              THE VIDEOGRAPHER:  This is the beginning     09:01:46
```

```
 1   of Media File Number 6.  We are back on the record
 2   at 11:01 a.m.
 3   BY MR. SCOLNICK:
 4        Q.   Okay.  So we left off, and I asked a
 5   question of -- in a -- in a population -- a cohort      09:02:04
 6   of about 600 people, as we had in COBRA --
 7        A.   Right.
 8        Q.   -- using it at 95 percent specificity, is
 9   it true that you'd expect -- you'd expect to see
10   about 27 false positives?                               09:02:19
11        A.   So 95 percent specificity, .95 equals true
12   negative, plus true negative, plus false positive.
13   So the true negatives, it's going to be .95 times
14   540.  I'm pulling out my phone right now.  And if I
15   just pull my calculator out, 540 times .95 is 500 --   09:02:41
16   true negatives equals 513.  So false positives is
17   540 minus 5 -- sorry, 540 minus 513, which is 27
18   false positives.
19        Q.   Right.
20             So is it true that a test with 95 percent    09:03:03
21   specificity in the COBRA cohort, you would expect to
22   see about as many false positives as true positives?
23             MR. BRAMHALL:  Sorry.  I meant to object.
24             Objection to form.  Calls for speculation.
25   Hypothetical.  Expert testimony.                       09:03:25
```

Page 160

| | | |
|---|---|---|
| 1 | THE WITNESS:  So if you just do the math | |
| 2 | with the 50 percent sensitivity -- sorry. | |
| 3 | I'm just writing this down.  That's .5 -- | |
| 4 | I'm sorry.  I'm just on the spot.  So true positive | |
| 5 | plus false negative -- so the true positive is 30. | 09:03:46 |
| 6 | False negative is 30 as well.  So, yes, I believe | |
| 7 | that what you're saying is more or less correct. | |
| 8 | BY MR. SCOLNICK: | |
| 9 | Q.   Do you recall discussing with anyone at | |
| 10 | NRG between 2019 and 2023, that you should expect | 09:04:00 |
| 11 | about as many false positives and true positives in | |
| 12 | the COBRA cohort? | |
| 13 | A.   I don't recall that conversation.  And we | |
| 14 | were, you know, speaking -- we were acting in good | |
| 15 | faith with, you know, what we believed was the -- | 09:04:20 |
| 16 | the, you know, best assay to conduct the studies | |
| 17 | when the clinical trial was activated. | |
| 18 | Q.   Why did Roche -- you told us first that | |
| 19 | Roche had a -- a test that was selected for the | |
| 20 | COBRA study; right? | 09:04:39 |
| 21 | A.   Yes. | |
| 22 | Q.   Do you recall why they dropped out of the | |
| 23 | study? | |
| 24 | A.   It was for -- they told us it was for | |
| 25 | financial reasons, and that they were not committed | 09:04:49 |

```
 1    to funding conduct of ctDNA for two time points for
 2    1,400 patients -- for -- it -- it was conveyed to us
 3    to the best of my recollect- -- recollection that it
 4    was a financial decision.
 5         Q.   Do you recall having a conversation            09:05:10
 6    with -- first of all, who is Dr. Gr- -- Greg
 7    Yothers?  Do you know who he is?
 8         A.   He's the study statistician for the COBRA
 9    trial.
10         Q.   Do you recall having a discussion with         09:05:31
11    Dr. Yothers regarding a design flaw in the study?
12              MR. BRAMHALL:  Objection to form.
13              THE WITNESS:  Can you specify at what
14    point?
15    BY MR. SCOLNICK:                                         09:05:41
16         Q.   Sure.
17              Last year, in the second half of last
18    year, do you recall Dr. Yothers acknowledging a
19    potential design flaw with the COBRA study?
20         A.   In -- in reviewing the documents for           09:05:57
21    preparing for this deposition, we did review an
22    e-mail that was written after completion of the
23    analysis of the Phase 2 endpoint.
24         Q.   Do you recall Dr. Yothers acknowledging a
25    potential design flaw with the study before the          09:06:12
```

Page 162

| | |
|---|---|
| 1 | MS. LOCKWOOD: Yeah. |
| 2 | BY MR. SCOLNICK: |
| 3 | Q.  What, if anything, do you remember |
| 4 | about -- about Dr. Yothers discussing a potential |
| 5 | design flaw of the study last year?  09:07:14 |
| 6 | A.  You know, I think in preparing for this |
| 7 | deposition, I reviewed with -- |
| 8 | MS. LOCKWOOD: Wait, Dr. Morris. I'll |
| 9 | remind you, don't discuss any of the substance of |
| 10 | the conversations that we've had.  09:07:30 |
| 11 | This is why we need the document in front |
| 12 | of him, Chase. |
| 13 | MR. SCOLNICK: Got it. |
| 14 | Okay.  I am introducing Exhibit 379. |
| 15 | (Morris Deposition Exhibit 379 was marked  09:07:37 |
| 16 | for identification.) |
| 17 | BY MR. SCOLNICK: |
| 18 | Q.  And if I could have you look at -- well, |
| 19 | first of all, this is an e-mail from Dr. Yothers to |
| 20 | you and Dr. George; correct?  09:07:55 |
| 21 | A.  Mm-hmm.  Yes. |
| 22 | Q.  And he wrote in the last paragraph at the |
| 23 | top e-mail, "I noticed you didn't include the slide |
| 24 | proposed by Guardant showing how the combination of |
| 25 | sensitivity and prevalence of ctDNA may have  09:08:06 |

1       affected the study.  I know it may be awkward to
2       wade into this, but this really is the take home
3       message that needs to be disseminated." [As read]
4              Do you remember what Dr. Yothers was
5       referring to here?                                          09:08:24
6          A.   Kimberly Banks from Guardant Health had
7       provided us kind of a -- an Excel file that kind of
8       calculated, you know, rates of false positive, false
9       negatives, you know, according to expected rates of
10      recurrence at various specificity levels.                   09:08:43
11         Q.   And was it pointed out in that e-mail that
12      NRG would expect to see about as many true and false
13      positives in a cohort like COBRA with a 10 percent
14      recurrence rate?
15             MS. LOCKWOOD:  Object to the form.                   09:09:04
16             MR. BRAMHALL:  Objection.  Form.
17             MS. LOCKWOOD:  But if you want to put the
18      document in front of him.  He can't speculate, so --
19             THE WITNESS:  Yeah, I would -- I would
20      have to review the e-mail.                                  09:09:11
21      BY MR. SCOLNICK:
22         Q.   Well, going back to 415, which is
23      Dr. Parikh's presentation --
24         A.   Mm-hmm.
25         Q.   -- do you recall in that presentation              09:09:21

Page 165

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   (Proceedings concluded, 12:19 p.m., CDT,
2   on October 1, 2024.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              CERTIFICATE OF REPORTER
 2          I, Hanna Kim, a Certified Shorthand
 3   Reporter, do hereby certify:
 4          That prior to being examined, the witness
 5   in the foregoing proceedings was by me duly sworn to
 6   testify to the truth, the whole truth, and nothing
 7   but the truth;
 8          That said proceedings were taken before me
 9   at the time and place therein set forth remotely via
10   videoconference and were taken down by me in
11   shorthand and thereafter transcribed into
12   typewriting under my direction and supervision;
13          I further certify that I am neither
14   counsel for, nor related to, any party to said
15   proceedings, not in anywise interested in the
16   outcome thereof.
17          Further, that if the foregoing pertains to
18   the original transcript of a deposition in a federal
19   case, before completion of the proceedings, review
20   of the transcript [X] was [ ] was not requested.
21          In witness whereof, I have hereunto
22   subscribed my name.
23   Dated: 10/2/24
24
                         Hanna Kim
25                       CLR, CSR No. 13083
```

Page 215