**Saul Perloff (157092)**
saul.perloff@aoshearman.com
**Katharyn Grant** *(pro hac vice)*
kathy.grant@aoshearman.com
**Andre Hanson** *(pro hac vice)*
andre.hanson@aoshearman.com
**Olin "Trey" Hebert** *(pro hac vice)*
trey.hebert@aoshearman.com
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 W. Sixth Street, 22nd Floor
Austin, TX 78701
Telephone (512) 647-1900

**Christopher LaVigne** *(pro hac vice)*
christopher.lavigne@sherman.com
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
Telephone (212) 848-4000

Attorneys for Plaintiff/Counterclaim-Defendant
GUARDANT HEALTH, INC.

Jennifer L. Keller (84412)
jkeller@kelleranderle.com
**Chase Scolnick (227631)**
cscolnick@kelleranderle.com
Craig Harbaugh (194309)
charbaugh@kelleranderle.com
Gregory Sergi (257415)
gsergi@kelleranderle.com
**KELLER/ANDERLE LLP**
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
Telephone (949) 476-0900

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC.<br><br>　　　Plaintiff and<br>　　　Counterclaim-Defendant,<br><br>vs.<br><br>NATERA, INC.<br><br>　　　Defendant and<br>　　　Counterclaim-Plaintiff. | Case No. 3:21-cv-04062-EMC<br><br>**GUARDANT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW** |

DOCUMENT PREPARED
ON RECYCLED PAPER

1  **NOTICE OF MOTION AND MOTION**

2  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3  PLEASE TAKE NOTICE, before the Honorable Edward M. Chen, Plaintiff and Counter-

4  Claim Defendant Guardant Health, Inc. ("Guardant") moves for judgment as a matter of law on

5  each of Defendant and Counterclaim Plaintiff Natera, Inc.'s ("Natera") counter-claims pursuant

6  to Federal Rule of Civil Procedure 50(a). Guardant submits this motion and memorandum in

7  support of the oral motion made on the record on November 18, 2024.

8  Guardant seeks oral argument.

9  **STATEMENT OF RELIEF SOUGHT**

10  Guardant seeks judgment as a matter of law on each and every of Natera's claims.

11

12

13  DATED: November 22, 2024

**ALLEN OVERY SHEARMAN
STERLING US LLP**

14

**SAUL PERLOFF**

15  By:  _/s/ Saul Perloff_
Saul Perloff

16

17  Attorney for Plaintiff
GUARDANT HEALTH, INC.

18

19

20

21

22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

LEGAL STANDARD ..................................................................................................................... 3

ARGUMENT .................................................................................................................................. 4

I.    No reasonable jury would find the Harvard Study to be "fraudulent" or "fabricated"....... 4

A. The Harvard Study was "blinded" ................................................................................. 6

B. The Harvard Study was "prospective"......................................................................... 11

II.    No reasonable jury would find that Guardant's advertising is unsupported by the Harvard Study.................................................................................................................................... 13

A. Guardant never advertised 100% specificity in the surveillance setting ........................ 13

B. Natera's challenge to Guardant's advertising that accurately describes the Harvard Study's definition of "landmark" fails ........................................................................... 15

C. Natera has no evidence of deception ............................................................................. 17

D. Natera has no evidence of injury .................................................................................. 18

III.   Natera's state law claim fails with its Lanham Act claim ................................................. 20

CONCLUSION............................................................................................................................. 21

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Brion Jeannette Architecture v. KTGY Grp. Inc.*,
  No. 07-cv-00691, 2009 WL 10673200 (C.D. Cal. July 30, 2009)..........................................14

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994) ................................................................................................20

*Clorox Co. v. Reckitt Benckiser Grp. PLC*,
  398 F. Supp. 3d 623 (N.D. Cal. 2019) ....................................................................................3

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) ...........................................................................................4, 14

*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*,
  No. 14-cv-1191, 2016 WL 5118530 (S.D. Cal. Sept. 21, 2016)..............................................6

*DSPT Int'l, Inc. v. Nahum*,
  624 F.3d 1213 (9th Cir. 2010) ................................................................................................3

*Lakeside-Scott v. Multnomah Cty.*,
  556 F.3d 797 (9th Cir. 2009) ..................................................................................................3

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013) ...........................................................................1, 4, 5, 6, 16, 17

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
  583 F. Supp. 3d 654 (D.N.J. 2022) .........................................................................................5

*Sigma Dynamics, Inc. v. E. Piphany, Inc.*,
  No. C 04-0569, 2004 WL 2648370 (N.D. Cal. 2004) ............................................................19

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ...........................................................................................3, 4

*Tercica, Inc. v. Insmed Inc.*,
  No. C 05-5027, 2006 WL 1626930 (N.D. Cal. June 9, 2006) ................................................19

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) ................................................................................................18

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
  549 F. Supp. 2d 1168 (N.D. Cal. 2007) ................................................................................14

*Weisgram v. Marley
  Co.*, 528 U.S. 440 (2000) .......................................................................................................3

DOCUMENT PREPARED
ON RECYCLED PAPER

*Wm. H. Morris v. Group W, Inc.*,
    66 F.3d 255 (9th Cir. 1995) ......................................................................................................18

**Statutes**

Cal. Civ. Code § 3294..................................................................................................................20

15 U.S.C. § 1125........................................................................................................................1, 3

**Other Authorities**

Fed. R. Civ. P. 50(a)(1)..................................................................................................................3

GUARDANT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:21-CV-04062-EMC

DOCUMENT PREPARED
ON RECYCLED PAPER

# INTRODUCTION

Guardant respectfully moves for judgment as a matter of law ("JMOL") on Natera's Counterclaims. Following summary judgment, Natera knew what it needed to offer to prove its claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Dkt. 326 at 31-44. Natera had every chance to present such evidence, if such existed, but failed to do so. Because its Counterclaims fail as a matter of law and an utter absence of proof, they should not go to the jury.

**Natera's "*ONY* exception" theory fails**. To try and meet the *ONY* exception protecting Guardant's advertising based on peer-reviewed scientific articles, Natera attacked the Harvard Study as insufficiently "blinded" and not "prospective." But Natera failed to present evidence that these statements are false, and also failed to offer evidence that the "results of the study were fabricated or fraudulently created." Dkt. 814 at 37 (Inst. No. 33); *see also* Dkt. 326 at 32. Dr. Betensky, offered by Natera to criticize the Harvard Study, did not analyze the study's results, while Dr. Metzker admitted there was no evidence that the results had been "manipulated." On the other hand, detailed and uncontradicted testimony from Dr. Justin Odegaard, Ms. Victoria Raymond, and Dr. AmirAli Talasaz demonstrated that for the Harvard Study samples, "ctDNA analysis was performed blinded to the clinical data," and that clinical outcome data were never used to change the results for the Harvard Study data. Similarly, patients for the Harvard Study were recruited before the event of interest, and the study *had* a pre-written plan, satisfying the bar relied on by Natera itself for prospective studies. With no contrary evidence, Natera's "*ONY* exception" theory fails as a matter law.

**Natera's "unsupported by the study" theory fails.** Natera next claimed that Guardant's advertising is unsupported by the Harvard Study, but this too necessarily fails. The Harvard Study supports Guardant's advertising that Reveal has shown 91% sensitivity in the surveillance setting, and further supports that Reveal enjoyed 100% specificity in the landmark and longitudinal settings. *See* TX-001 at 4:

> Integrating longitudinal specimens increased sensitivity from 55.6% to 69% [HR, 12.26 (<0.0001)], with specificity remaining 100% (**Fig. 3B**; Supplementary Fig. S1B). Based on the methods employed by Reinert and colleagues (6), we assessed performance in patients with evaluable "surveillance" draws, defined as a draw

DOCUMENT PREPARED ON RECYCLED PAPER

1   obtained within 4 months of clinical recurrence, and observed that sensitivity improved to 91%.

While Natera has complained that 91% sensitivity should not be paired with 100% specificity, numerous witnesses—including lead Harvard Study author Dr. Ryan Corcoran, testified that this is appropriate. *See, e.g.*, Corcoran Dep. 114:05-08.

Moreover, there is no evidence that any such statement was made *in commercial advertising*. Rather, Natera points to a *draft* sales presentation and a smattering of emails that went, at most, to a handful of doctors. This fails to satisfy the Ninth Circuit's definition of "commercial advertising or promotion," which requires ***sufficient dissemination*** of a statement to the market.

Natera also complains about Guardant's description of the Harvard Study's "landmark" time point as being inconsistent with that used by the Harvard Study itself. But Guardant's advertising is a nearly exact quote of the study. *Compare, e.g.*, TX-001 at 2 ("the plasma specimen drawn approximately 1 month after completion of definitive therapy"), *with* TX-576 (blood draw "taken approximately 4 weeks post-curative intent treatment"). Again, Natera's complaint has to do with the well-reported methods of the Harvard Study, not with Guardant's advertising which accurately cites it.

Finally, as the Court recognized, because Guardant's sensitivity and specificity claims are not literally false on their face or by necessary implication, Natera was required to present the jury with proof that the advertising actually conveyed the implied message and deceived a significant portion of the recipients. Dkt. 326 at 27-28. Natera offered no admissible evidence of deception, either directly or through a survey.

**Natera can show no injury.** Natera has never presented any actual evidence of injury. It has no lost sales, and any presumption of injury Natera enjoyed at summary judgment has been rebutted by the undisputed evidence that Project SOLAR was a success, and Natera's sales of Signatera surpassed all its expectations. Natera's sole theory of damages, retrospective corrective advertising, is also fundamentally flawed, because the record definitively breaks any causal link between the damages claimed and Guardant's conduct.

Natera has not met its burden of production, and cannot meet its burden of proof. Because

DOCUMENT PREPARED
ON RECYCLED PAPER

1  no reasonable jury could find for Natera, JMOL is warranted.

2      **Natera's State law claims fail.** Because Natera's claims under California common law

3  rise or fall with its Lanham Act claims, those too must fail. In any case, Natera offers no evidence

4  that Guardant acted with willfulness or malice to support a punitive damages claim. It should not

5  be presented to the jury.

6                                **LEGAL STANDARD**

7      JMOL is warranted where "a party has been fully heard on an issue" and "a reasonable jury

8  would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R.

9  Civ. P. 50(a)(1). Rule 50(a) "allows the trial court to remove cases or issues from the jury's

10 consideration when the facts are sufficiently clear that the law requires a particular result."

11 *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotation marks and footnote

12 omitted). JMOL should be granted "when the evidence permits only one reasonable conclusion."

13 *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010); *see also Lakeside-Scott v.*

14 *Multnomah Cty.*, 556 F.3d 797, 802-03 (9th Cir. 2009) ("JMOL is appropriate when the jury could

15 have relied only on speculation to reach its verdict.").

16     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a cause of action for false

17 advertising. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). For

18 Natera's counterclaims to proceed, it must have presented sufficient evidence from which a

19 reasonable jury could find:

20  (1)   a false statement of fact by Guardant in a commercial advertisement about
            its own or another's product;
21  (2)   Guardant's false statement of fact actually deceived or has the tendency to
            deceive a substantial segment of its audience;
22  (3)   the deception is material, in that it is likely to influence the purchasing
            decision;
23  (4)   Guardant caused its false statement to enter interstate commerce; and
24  (5)   Natera has been or is likely to be injured as a result of the false statement.

25 *Id.*; *see also Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 635 (N.D.

26 Cal. 2019).

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1

2       **ARGUMENT**

Following summary judgment, Natera had remaining three key theories underlying its

3 Lanham Act claim: (1) that the Harvard Study was inadequately blinded; (2) that the Harvard

4 Study was insufficiently prospective; and (3) certain statements purportedly made by Guardant,

5 including 100% specificity in surveillance, were insufficiently supported by the Harvard Study.

6 JMOL is warranted on all three theories based on Natera's fundamental failure of proof.

7 **I.    No reasonable jury would find the results from the Harvard Study to be "fraudulent" or "fabricated"**

8

9 Natera primarily bases its Lanham Act claim on its assertion that the Harvard Study, TX-

001, is unreliable, and thus insufficient to support Guardant's advertising. *E.g.*, Am. Countercl.,

10 Dkt. 90, at ¶ 89; *see also Southland Sod*, 108 F.3d at 1139. But the Harvard Study is a peer-

11 reviewed and published academic paper, TX-001 at 8, based on scientific research undertaken by

12 two of the world's leading oncology scholars. *See* Kimberly Banks, Trial Tr. 883:24-884:24 (Dr.

13 Corcoran is "a well-renowned expert," and Dr. Parikh is "an international expert in liquid biopsy").

14 In granting in part Guardant's summary judgment motion, this Court held the Second Circuit's

15 decision in *ONY, Inc. v. Cornerstone Therapeutics, Inc.,* 720 F.3d 490 (2d Cir. 2013), controls

16 whether Guardant's advertising, which accurately describes the Harvard Study, can be false or

17 misleading. Dkt. 326 at 32-35; *see also* Dkt. 509 at 25-26 (order on motions in *limine*).

18 Under *ONY*, statements in peer-reviewed, published scientific articles—and advertising

19 describing such articles—are entitled to protection under the First Amendment and are not

20 actionable under the Lanham Act. *ONY,* 720 F.3d at 498-99. As *ONY* reasoned, scientific

21 scholarship is akin to "statements of pure opinion," and therefore, alleging that "the inferences

22 drawn from those data were the wrong ones, and that competent scientists would have included

23 variables that were available to the defendant authors but that were not taken into account in their

24 analysis" is not a basis for liability. *Id.* at 497; *see also Coastal Abstract Serv., Inc. v. First Am.*

25 *Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (opinion is not "capable of being proved false or

26 of being reasonably interpreted as a statement of objective fact," and therefore cannot "give rise

27 to liability under . . . the Lanham Act"). In other words, "the trial of ideas" must play out "in the

28

DOCUMENT PREPARED
ON RECYCLED PAPER

pages of peer-reviewed journals," not this Court. *ONY*, 720 F.3d at 497.

As *ONY* held, and this Court agreed, "to the extent a speaker or author draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of false advertising under the Lanham Act." *ONY*, 720 F.3d at 498; *see also* Dkt. 326 at 32-35; Dkt. 509 at 25-26. "To hold otherwise would chill robust and open debate about the efficacy of drugs within the medical community." *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 659 (D.N.J. 2022).

ONY excepts from protection studies wherein the results are "fabricated or fraudulently created." *ONY*, 720 F.3d at 497. Rather than pointing to any fraudulent or fabricated *results,* Natera merely challenges descriptions that the Harvard Study is *blinded* and *prospective*:

> For the current study, ctDNA analysis was performed blinded to the clinical data.

TX-001 at 3.

> We report results from a prospective, observational study in patients with stage I to IV colorectal cancer treated with curative-intent therapy to assess the ability of a plasma-only ctDNA assay to identify patients with MRD who would ultimately recur.

TX-001 at 2.

No percipient witness testified that the Harvard Study was unblinded or non-prospective. Instead, fact witnesses who conducted the study—both from Harvard and Guardant—uniformly confirmed that the Harvard Study was blinded. *See, e.g.*, Dr. Justin Odegaard, Trial Tr. 328:15 ("The Harvard study was blinded"); *id.* at 328:18-19 ("In a clinical study blinding basically means purposefully withholding certain information so that results don't influence how you conduct the study."); Ms. Victoria Raymond, Trial Tr. 1114:18-25 (Harvard Study's statement that "ctDNA analysis was performed blinded to the clinical data" was "entirely accurate"); Dr. AmirAli Talasaz, Trial Tr. 1658:6-16 (same); *see also* Dr. Ryan Corcoran, Dep. 133:22-134:07; Dr. Aparna Parikh Dep. (2022) at 187:01-21. They also confirmed it was prospective. *See, e.g.*, Dr. Odegaard, Trial Tr. 328:24-329:14; Ms. Raymond, Trial Tr. 1221:16-1222:5; Corcoran, 275:02-09.

Natera has not offered actual *evidence* to challenge this testimony, and instead relies on

DOCUMENT PREPARED
ON RECYCLED PAPER

attorney argument and expert *ipse dixit* to contend that the Harvard Study was not blinded or prospective. The uncontradicted evidence, however, proves these allegations false. Even more importantly, Natera fails to present any evidence that the Harvard Study's *results* were derived from fabrication or fraud. And this is the whole point of the *ONY* exception: Natera must prove, through evidence, that the underlying data are false, not merely that a statement in the publication is inaccurate or subject to debate. *See, e.g.*, *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, No. 14-cv-1191, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016) (allowing a claim to proceed because "a reasonable fact finder could conclude that the NSCA fabricated the injury data and published them in the JSCR knowing they were false with the intention of protecting its market share in the fitness industry and diminishing the burgeoning popularity of the CrossFit program").

## A.    The Harvard Study was "blinded"

While Natera would argue that *any* disclosure of clinical outcome data to *any* Guardant personnel would render the Harvard Study "unblinded," the language used by the Harvard Study dispels this notion. Because the Harvard Study did not say that its *authors* remained blinded throughout the study, nor would such a suggestion make sense. The authors *must* have access to clinical outcome data to assess the performance of the assay and meaningfully report the study's results. Instead, the Harvard Study accurately stated that: "For the current study, ctDNA analysis was performed blinded to the clinical data. Neither treating physicians nor patients were informed regarding the results of the ctDNA analyses." TX-001 at 3.

In this context, "Blinding" means "purposely withholding certain information so that the results don't influence how you conduct the study." Odegaard, Trial Tr. 328:16-20. In short, it means "the lab team," "those people in the lab that were running the tests" were not "looking at these clinical data." Parikh (2022) 187:07-14 (observing: "Victoria [Raymond] is not the one actually sitting there running the test.").

The evidence is consistent and uncontradicted that, throughout Guardant's "ctDNA analysis," Guardant's testing personnel were blinded to clinical outcome data:

> So ctDNA analysis here is referring to testing those blood samples we talked about,
> and the process for that – and throughout the process for that, the testing personnel

DOCUMENT PREPARED
ON RECYCLED PAPER

1    would have been blinded as to -- or not informed as to what had happened to these
     patients, whether they had recurred or not.

2

3    Odegaard, Trial Tr. 330:24-331:3. This holds true during DNA extraction, analysis in the

4    bioinformatics pipeline, and manual quality control by Guardant's "tumor board"—a process Dr.

     Odegaard described in detail, beginning with the "wet lab"
5

6            where we're dealing with the blood, the DNA, the physical parts of the
             sample. And then the dry lab is basically in the computers. So we're dealing
7            with the data from the samples.
        Q.   So it sounds like in the wet lab, the samples are prepped and then they're
             run in the sequencing machine; is that correct?
8       A.   Yeah. So we get the blood sample. We extract the DNA, which is what
             we're looking at here, and then we prepare it and eventually put it on the
9            sequencing machine.
        Q.   Are you putting just one sample at a time in the machine?
10      A.   No. So these machines are very, very large and they take lots of samples to
             run. And so we tend to process the samples in batches.
11      Q.   **Can the clinical data be used to change the results in the wet lab side**?
        A.   **No. So this process is -- it's a clinical test, so it has to be done exactly the**
12           **same way every time so you don't introduce variability for clinical results**.

13   Odegaard, Trial Tr. 332:9-333:3 (emphasis added).

14           As Dr. Odegaard testified without contradiction, there is no means whereby a lab worker

15   could manipulate the results, or even learn of the clinical outcome data for patients for whom

16   samples are processed, as the samples themselves are anonymized:

17           And so everything within the laboratory is only identified by a barcode, or basically
             a sample identifier. There's no knowledge of the patient behind it. And even if there
18           was, there's no real opportunity for this. You load a machine and the machine does
             -- the robot does all the pipetting and all the fluid transfers.
19
             And then the DNA sequencer is, again, another machine. You load the entire rack
20           of samples on it, and it goes through and sequences or reads all the little pieces of
             DNA in there. **There's no real possibility of having a human influence on this**.
21
     Odegaard, Trial Tr. 333:4-14 (emphasis added).
22
             Nor are Guardant personnel unblinded when the process moves to the automated dry lab
23
     that implements Guardant's locked bioinformatics pipeline:
24
             So the end of the wet lab process is the DNA sequencer, which outputs basically a
25           giant computer file that has all the different sequences of the different DNA
             molecules that were in there.
26
             That sequencer passes it right to sort of a big computer cluster that's right next-
27           door, and that computer cluster starts to analyze the files. So basically, it goes
             through something we call a bioinformatics pipeline. So it's a series of software
28

DOCUMENT PREPARED
ON RECYCLED PAPER

modules, one after another, like an assembly line, that takes that big mass of data and transforms it into a result, "yes" or "no," for each patient sample that was in that batch.

Odegaard, Trial Tr. 333:23-334:9. No human is involved in this process: "this is all entirely contained within a closed environment within the server. . . .[I]t's *a closed software environment. There's no possibility of a human interacting with it*." *Id.* 334:12-15 (emphasis added).

Consistent with clinical testing laboratory regulations, only in the final quality check step does a human become involved:

So up to this point, no human's involved. The software is sort of making a decision, but there's lots of things that the software looks at and some of the we call quality control metrics, or, you know, making sure everything's okay. And so the software can say, hey, this one is a little bit different than normal or that's not usual or I think I see a problem here. And so the software flags these.

And so after the information comes off -- or the result comes off of the bioinformatics pipeline, what we have is experts, basically, in how that functions that look at the results. And they look at anything that was flagged by the software and then they sort of analyze it and they adjudicate it, from an expert perspective, of what does an expert human think is the right thing to do with this sample.

Odegaard, Trial Tr. 334:18-335:7 (noting this final step is called a "tumor board"). The tumor board is necessary because, while "the software is very good," "software is software, and we want to make sure there's a pair of human eyes on this before that result goes out to the patient. And that's something that's actually required, again, also by the – some of the regulations governing clinical testing in laboratories." *Id.* 335:10-15.

Natera offers an alternative definition of "blinded," that "everybody who is involved in any way in the ctDNA analysis was unaware of the clinical outcomes, meaning the recurrences." Dr. Rebecca Betensky, Trial Tr. 1821:18-20; *see also* Dr. Michael Metzker, Trial Tr. 1751:19-1752:8. Natera's definition, however, is not one used in the field, including by Natera itself. The Danish Study also referred to itself as a "blinded" study. *See* TX-004 at 2 ("The ctDNA analyses were performed retrospectively by Natera Inc., with analysts blinded to patient outcome and sample order.") But the lead author of the Danish Study, Dr. Claus Andersen, now admits that after Natera was unblinded, it continued to analyze samples and changed the results.

[Q.]    You confirmed on Wednesday, and earlier, your explanation, Natera reanalyzed some of the samples after they were unblinded; correct?

DOCUMENT PREPARED
ON RECYCLED PAPER

A.    Yes.
Q.    And you confirm that, after my review, you also remembered and agreed that the reanalysis of some of the 16 patients' samples changed some of the tests changed some of the CtDNA results?
A.    Correct.

Andersen Day 2 Dep. 146:08-19; *see also id.* 150:25-151:07 (Natera unblinded to sample order).

Natera further asserts that "there's evidence that [Guardant] used the Parikh samples to help train the bioinformatics pipeline to develop better ways of detecting cell-free – or circulating-tumor DNA," and that "there are actual examples of what are called flip calls." Metzker, Trial Tr. 1752:7-16. But Natera—and its well-paid expert—know that is not what the evidence shows.

After initial sample analyses, the Harvard Study samples were re-run on Guardant's updated assay to ensure that the data presented would as informative as possible. *See, e.g.*, Raymond, Trial Tr. 1115:21-1116:6, 1116:9-17. But as Ms. Raymond testified (again, without contradiction), this was done with the approval of the Harvard doctors. *Id.* 1116:7-8 ("Q. Who made that final decision? A. The Harvard investigators.").

Both Dr. Odegaard and Ms. Raymond testified in detail about the re-analysis of the Harvard Study samples. None of this testimony is contracted by any evidence, and it is contrary to the spin presented by Natera's experts:

[Q.]    Did Guardant change any of those results because of the results of the clinical data they received?
A.    No. So I think to be clear, the tumor board process is only looking at the results of the ctDNA analysis. It's looking to see how that sample functioned, how it worked through the testing process and whether anything might have gone wrong.
It doesn't use any information whatsoever from outside, including information about the patient or clinical information from the study in this case.
Q.    I want to talk to you about how Guardant updated the test from 3.8 to 3.10 during the -- while the Parikh study or the Harvard study was ongoing. Can you tell us what changes were made?
A.    There were several changes that were made, but mostly there were small changes made to the bio -- the components of that bioinformatics pipeline, that BIP.

So in the software, again we introduced some new quality control metrics. We also changed some of the -- basically, the rules that were in this. So for a specific mutation that's identified in the past, it may have said, we don't think that's mutation, or we think that's associated with a tumor, so a "yes." We're now saying we've learned it's not, so we're going to change that to a "no." So it made some of these small changes in a variety of software modules.

9

DOCUMENT PREPARED
ON RECYCLED PAPER

Odegaard, Trial Tr. 338:18-339:18.

Dr. Odegaard explained, without contradiction, that while some Harvard Study samples were used to *test* the updated and locked algorithm, they were not used to *train* the 3.10 version:

> Q.    Did Guardant use any of the Harvard study samples to train or improve the pipeline from 3.8 to 3.10?
> A.    No. So from 3.8 to 3.10, we were not redoing algorithms, and so there was no training involved. The training had been done previously for BIP 3.8. Most of these are small, discrete changes, tweaks, software improvements, if you will, to make sure the software was running better. And so no training was done. And none of these changes were based on the Harvard study samples.

Odegaard, Trial Tr. 339:19-340:2. Ms. Raymond similarly testified, again at length and without contradiction, that she analyzed the variances between the original results on the older algorithm and the updated assay, and none of the changes were due to "manipulation." Raymond, Trial Tr. 1118:15-1121:22 (concluding: "There is no way that the data could be manipulated. These were run on locked assays, locked algorithms. No clinical data was used to inform any results. I don't even know how the data would be manipulated."); *see also* Talasaz, Trial Tr. 1642:8-15 ("The answer is, no, they did not use the clinical information to change the call.").

In the end, even Natera's expert admitted the obvious: there is no evidence the Harvard Study's results were the result of manipulation. *See* Metzker, Trial Tr. 1778:20-1779:11:

> Q.    You also made an allegation regarding Guardant not being blinded during the Harvard Parikh study; right?
> A.    That's correct.
> Q.    Now, to be clear, it is not your testimony that anybody manipulated the bioinformatics pipeline in order to flip calls; correct?
> A.    What do you mean by "manipulate"?
> Q.    I'm just using your words, sir.
>        Isn't it true that you were asked at your deposition [as read]:
>        "QUESTION: Is it your testimony that anybody manipulated the bioinformatics pipeline in order to flip calls?"
>        Your answer was [as read]:
>        "ANSWER: I'm not aware of that."
>        Did I read that correctly?
> A.    That's probably true, then.

*Accord,* Betensky, Trial Tr. 1827:24-1828:2 ("We just don't know how the—how the unblinded data was used.")

Moreover, the modest changes from the samples analyzed on the commercial version of

DOCUMENT PREPARED
ON RECYCLED PAPER

Reveal were immaterial, and had almost no impact on the study's results—and indeed *reduced* Reveal's reported performance:

> [Q.]    What, if any, impact did that have on the overall Harvard study?
> A.    Very, very minimal, if at all. There was maybe one or two samples that increased the landmark sensitivity by 1 percent.
>
> And what was interesting is actually some of those calls actually were detrimental to the performance of the final reported assay when you compared 3.8 and 3.10.
> Q.    ***So do I understand that correctly, that some of the calls that changed from the old version to the new version actually decreased the performance?***
> A.    ***Yes, that's correct***.

Raymond, Trial Tr. 1121:2-12. Natera's expert admits there is no evidence the modest changes from re-analysis had any statistically significant impact on the Harvard Study's results. *See* Betensky, Trial Tr. 1842:14-1843:15 (did not analyze and cannot claim that any changes to the results by Guardant were statistically significant).

In short, Natera offered no evidence that the ctDNA analysis in the Harvard Study was unblinded much less any evidence that the Harvard Study was fabricated or fraudulent.

### B.    The Harvard Study was "prospective"

The Harvard Study appropriately described itself as "a prospective, observational study." TX-001 at 2. As Dr. Odegaard explained, this means that the patients are recruited in advance of the outcome of interest:

> THE WITNESS: So in clinical -- in clinical studies, "prospective" basically means looking forward.
>
> So in this particular case, what the Harvard doctors did is they wanted to study colorectal cancer recurrence. So they collected patients, they collected patient samples, and then they waited and saw what happened to those patients. So that's prospective.

Odegaard, Trial Tr. 329:8-14. Dr. Corcoran agreed with this definition: A "prospective study is something that you set out to do from the beginning." Corcoran, 274:2-3; *accord,* Raymond, Trial Tr. 1221:20-22 ("A prospective study means that you are enrolling individuals into a study before they have developed the event. So you're longitudinally following people over time.")

The Harvard Study was prospective because its investigators recruited subjects, collected samples, and "then waited and saw what happened to those patients." Odegaard, Trial Tr. 329:8-

DOCUMENT PREPARED
ON RECYCLED PAPER

14; *see also* Corcoran, 273:25-274:15, 275:02-09 (confirming study was prospective).

Natera's expert, Dr. Betensky, asserted a study can only be "prospective," if it is run according to a pre-established protocol. Betensky, Trial Tr. 1828:22-1829:7. But as Ms. Raymond explained, the Harvard Study *had* a "pre-established protocol," created before the study launched:

> A. The plan, the original plan, for the study was conceptualized in 2018.
> Q. And I understand that, and the question is: When, if at all, did you ever see the written plan?
> A. In 2018 is when we conceptualized the plan and came up with the overarching goals of the study.
> Q. So --
> THE COURT: Was there a writing, I think he's asking.
> THE WITNESS: Yes. There was an email. There was an email.
> THE COURT: 2018?
> THE WITNESS: Yes.
> THE COURT: Okay. There's your answer.

Raymond, Trial Tr. 1222:22-1223:9. And again, outside of this litigation, Natera necessarily agrees that this is sufficient to satisfy Dr. Betensky's standard. The Danish Study, authored by over twenty Natera personnel, also described itself as "prospective." TX-004 at 2. Yet as Dr. Andersen conceded, it had no written statistical analysis plan ("SAP") at all (though he had thought about it). Andersen Day 1 Dep. 98:21-24; *see also* Andersen Day 2 Dep. 77:06-12 ("We had thought about it. It was not formulated in writing").

There is no evidence that Guardant used any supposed lack of prospectiveness to manipulate the Harvard Study's results or methods. The uncontradicted evidence shows that the Harvard authors of the study made the decisions about which analyses to include in their study, including, *e.g.*, the decision to report landmark specificity with all patients, and to also report landmark specificity with a one-year follow-up. *See* Parikh, 158:17-22:

> Q. Who ultimately decided that for the ESMO poster to use a one year minimum followup for the analysis?
> [Dr. Parikh]: Yeah, ultimately our team felt that that was, you know, the best way of portraying that data.

*See also* TX-001 at 4 (reporting data for all landmark patients, and patients with 1 year follow-up); *cf.* Corcoran, 233:15-234:10 (explaining rationale for choosing a one-year follow-up period); Banks, Trial Tr. 903:4-6 (one-year minimum follow-up a common requirement).

DOCUMENT PREPARED
ON RECYCLED PAPER

Finally, there is no evidence that Guardant's advertising relies on touting the Harvard Study as "prospective" (or "blinded," for that matter). *See, e.g.*, TX-546 at 6-10 (describing Harvard Study data and conclusions, but not referring to it as blinded or prospective); TX-576 (Clinical Update) (describing Harvard Study and its conclusions but never referring to study as "blinded" or "prospective"). There is no evidence that the Harvard Study's reference to itself as "blinded" or "prospective" was material to any clinician's purchasing decision, or any reason why it would. The evidence shows that the Harvard Study accurately reported its methods and its results, and the Harvard authors offered their honest interpretation of those results. With no evidence that any of those results were fraudulent or fabricated, Natera's attacks on the Harvard Study should, finally, be put to an end. *See* Dkt. 326 at 36 ("the Court declines to evaluate scientific conclusions from non-fraudulent data which are based on accurate descriptions of the data and methodology").

## II.    No reasonable jury would find that Guardant's advertising is unsupported by the Harvard Study

Natera's remaining theory of falsity asserts that Guardant's advertising is unsupported by the Harvard Study.[1]

### A.    Guardant never advertised 100% specificity in the surveillance setting

Natera primarily asserted that Guardant's advertising impermissible paired the Harvard Study's 91% sensitivity in the surveillance setting with its finding of 100% specificity in the landmark and longitudinal settings. *See, e.g.*, Dkt. 326 at 38-39 (assessing allegation). As the Court explained in sparing Natera's claim based on this theory:

> As a preliminary matter, Guardant contends that the only references to Reveal's 100% specificity are in the draft of Reveal's advertising presentation. ***If this draft was shown only internally and later corrected prior to being made public, there would be no evidence that the "100% specificity claim" was material, that Guardant caused the statement to enter interstate commerce, or that the advertising statement actually harmed Natera***. The parties dispute the extent to

---

[1] During argument and questioning, Natera seemed to suggest that certain vague and generalized statements made, e.g., during earnings calls remained within the scope of its counterclaims. Steve Chapman, Trial Tr. 1092:6-10 ("best in class"); Chapman, Trial Tr. 1098:21-25 ("industry-leading"). The Court already held that such statements are non-actionable puffery, and dismissed them from this case. Dkt. 326 at 40-41 (reference to "industry-leading performance" "is mere non-actionable corporate puffery").

DOCUMENT PREPARED
ON RECYCLED PAPER

which the draft version was released and what information was included in the final version disseminated to the public. These genuine disputes of material fact cannot be resolved on summary judgement.

*Id.* at 39 (emphasis added).

At trial, Natera conspicuously failed to make these necessary evidentiary showings. Ms. Kristen Price testified that Guardant's draft of the Reveal core sales aid, TX-1376, was modified when still in draft form. *See* Price, Trial Tr. 444:4-22. The final, approved version of the deck, TX-546, did not refer to 100% specificity with 91% sensitivity. *Id.* 444:23-445:1; *see also* TX-546 at 8. There is no evidence in the record that the draft sales aid that Natera relied on to avoid summary judgment was sent to any customers. In this same vein, Natera has cited several emails from Guardant's sales force, including one from Mr. Marcus Outzen, TX-554. But this email not been approved for use, and Ms. Price testified that "this wasn't a template to our marketing," and while it "did go to multiple doctors," it only went to a handful of potential customers. Price, Trial Tr. at 482:13-15.

Statements "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Coastal Abstract*, 173 F.3d at 735. "A handful of statements to customers does not trigger protection from the Lanham Act unless 'the potential purchasers in the market are relatively limited in number,' which is not the case here." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal. 2007) (quoting *Coastal Abstract*, and granting summary judgment of no false advertising); *see also Brion Jeannette Architecture v. KTGY Grp. Inc.*, No. 07-cv-00691, 2009 WL 10673200, at *4 n.2 (C.D. Cal. July 30, 2009) ("One person is not a sufficient segment of an entire market."). Here, the relevant market consists of at least 10,000 oncologists. Dr. Kevin Masukawa, Trial Tr. 551:20-25, 555:21-25. While Natera's anti-Reveal advertising went to virtually the entire market ten times over, *id.* at 556:14-557:1, there is no evidence of any meaningful dissemination of the unapproved emails cited by Natera.

However, if Guardant *had* advertised Reveal as having 91% sensitivity and 100% specificity in the surveillance setting, such a statement would not be *false*. Multiple witnesses explained that the Harvard Study in fact establishes 100% specificity in each of the landmark,

DOCUMENT PREPARED
ON RECYCLED PAPER

longitudinal, and surveillance settings. *See, e.g.*, Odegaard, Trial Tr. 347:16-19; Price, Trial Tr. 442:13-17; Banks, Trial Tr. 976:14-977:1; Corcoran, 113:24-08. The logic is straightforward:

> So the surveillance group was a subset of the longitudinal group. So if there's 100 percent specificity, which, again, means no false positives in the larger group, any subset can't have something that wasn't in the larger group. So it can't have a false positive.
>
> So by definition, it would be 100 percent specificity.

Odegaard, Trial Tr. 350:3-8; *see also id.* 392:4-9; Price, Trial Tr. 454:2-3 ("the surveillance setting specificity was 100 percent and the PPV was 100 percent").

### B.  Natera's challenge to Guardant's advertising that accurately describes the Harvard Study's definition of "landmark" fails

During argument on Monday, November 18, 2024, Natera's counsel represented that Dr. Metzker's proposed testimony would state that Guardant's advertising's description of the Harvard Study's definition of "landmark" was unsupported by the study itself. Trial Tr. 1708:15-1709:18. In this vein, counsel insisted: "We're just going to have Dr. Metzker disclose -- talk about the facts of what's in those studies to show that the advertising was incorrect and misrepresenting the study. That's what we're going to do." Trial Tr. 1712:16-19. The Court allowed the testimony, "so long as it's clear what he's doing is comparing the ad with the study." Trial Tr. 1713:6-7. However: "If it looks like criticism of the study and choice made by the study in how to exclude people, include people, ***how it characterized landmark***, et cetera, et cetera, or longitudinal, that's a different topic." *Id.* 1713:9-12.

Dr. Metzker thereafter testified that Guardant's description of the Harvard Study's landmark draws as "taken approximately four weeks post-curative intent treatment," Trial Tr. 1741:2-4, was unsupported because the Harvard Study's "swimmer plot" published in the supplemental data showed "there many samples that are well beyond the one-month time point." Trial Tr. 1742:5-1743:6. Dr. Metzger did not, however, challenge that the swimmer plot supports the Harvard Study author's calculation of a 31.5 day median for landmark sample collection, nor did he suggest 31.5 days is not a period of "approximately 1-month" or "4 weeks."

The Harvard study expressly defined landmark draws as taken "1-month (median, 31.5

---

DOCUMENT PREPARED
ON RECYCLED PAPER

days) after definite therapy . . . ." TX-001 at 1. ***The Harvard Study repeated this definition twice***:

> "Landmark" timepoint was defined as the plasma specimen drawn approximately 1 month after completion of definitive therapy (surgery alone or completion of adjuvant therapy for patients who received adjuvant treatment).

*Id.* at 2;

> For the primary analysis, a single "landmark" plasma specimen drawn approximately 1 month after completion of definitive therapy (median, 31.5 days) was assessed[.]

*Id.* at 4.

Entirely consistent with the Harvard Study, Guardant also described "landmark" as a blood draw "taken approximately 4 weeks" post-surgerys:



TX-576. Guardant's statements regarding the Harvard Study's definition of "landmark" are drawn directly from the Study itself.

The Court's limitation on Dr. Metzker's testimony was consistent with its summary judgment ruling. There, the Court adopted the First Amendment/Lanham Act analysis of *ONY,* and held that "[s]tatements in peer-reviewed, published scientific articles are entitled to protection against Lanham Act liability," unless there is proof that data were "'fabricated' or 'fraudulently created.'" Dkt. 326 at 32-33.. On the basis of *ONY,* this Court rejected Natera's Lanham Act claim to the extent it was based on "Natera's 'artificially inflated clinical performance metrics'"

DOCUMENT PREPARED
ON RECYCLED PAPER

1    allegations. *Id.* at 36.  The Court explained:

> the Court declines to evaluate scientific conclusions from non-fraudulent data which are based on accurate descriptions of the data and methodology. Unlike the blindness and prospectiveness issues above, Natera's challenge to the performance metrics does not concern whether the study is "fabricated"—i.e., literally false on its face—but rather how the study could be improved, optimized, or clarified. It is a challenge to the study's methodology.

*Id.* at 36. Importantly: "***Guardant is under 'no obligation to second-guess the methodology of that study' so long as it accurately reported the results.***" *Id.* (emphasis added, citation omitted).

Just as critically, "***the Parikh study has accurately reported its results and methodology***." *Id.* (emphasis added). The Court thus rejected Natera's attack on "the Parikh study's specificity assessment for landmark subjects with a one-year follow-up" as "'arbitrary,' 'unexplained,' unjustified, and implemented 'at Guardant's behest.'" *Id.* Consistent with its summary judgment ruling, the Court's *Daubert* ruling excluded Dr. Metzker from offering testimony that:

- Parikh's "landmark" analysis should only have included patients with landmark sample drawn 2-8 weeks post definitive treatment, and patients with draws outside this time period should have been excluded.

Dkt. 323 at 13 (formatting in original) (citing Metzker Rpt. at ¶¶ 95-96, 99-103, 114).

Because Dr. Metzker was not allowed to testify that the *study* misreported its own methodology, he tried to portray Guardant's advertising as somehow inconsistent with the study. But he failed to demonstrate that Guardant close paraphrasing of the Harvard Study's description of its own methodology was actually at odds with the Harvard Study's express language. While Natera and its expert may disagree with the study authors' conclusion that a collection of time points with a median of 31.5 days is "approximately 1 month," such a disagreement of opinion cannot create liability for Guardant's accurate description of the study. E.g., *ONY*, 720 F.3d at 497 (press release and promotional materials citing challenged study not actionable as false advertising).

**C.    Natera has no evidence of deception**

Guardant's description of the Harvard Study's definition of "landmark," and its citation to the study for a 91% sensitivity in the surveillance setting and 100% specificity at landmark and in

DOCUMENT PREPARED
ON RECYCLED PAPER

the longitudinal setting (and, hypothetically, in surveillance), would all be literally true, as they irrefutably are published in the Harvard Study, TX-001. *See* Dkt. 326 at 37 (Guardant's advertising of 91% sensitivity and 100% specificity are "not literally false on its face or by necessary implication.") To the extent Natera would claim these statements are nevertheless *misleading,* it must have sufficient "proof that the advertising actually conveyed the implied message and ***thereby deceived a significant portion of the recipients*.** *Id.* (quoting *Wm. H. Morris v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (emphasis added)). Natera has offered no such evidence at trial. Its survey expert, Dr. Susan McDonald, conducted no survey, and offered no opinions in support of Natera's counterclaims. Trial Tr. 1611:15-19, 1612:4-7, 1616:4-6. Natera has presented no customer testimony or any other cognizable evidence of actual deception. Natera accordingly cannot proceed to the jury on a theory of merely misleading advertising.

### D.  Natera has no evidence of injury

As Guardant's direct competitor, Natera is entitled to a presumption of commercial injury. Dkt. 326 at 42 (citing *TrafficSchool.com, Inc. v. Edriver Inc.,* 653 F.3d 820, 826 (9th Cir. 2011)). However, the evidence in the record overwhelmingly rebuts this presumption, and no reasonable jury could find that Natera has been injured by Guardant's advertising.

To begin, there is no evidence that Natera lost any customers:

> Q.    You were head of oncology marketing, but you weren't able yourself to identify a single lost customer as a result of Guardant's advertising; is that true?
> A.    That is correct.

Masukawa, Trial Tr. 640:7-10. Instead, the record shows that "Project SOLAR was a success," *id.* 637:21-25, and the tactics Natera had deployed worked. *Id.* at 638:1-4 (answering: "Sure. Yes.") Thus, Natera dramatically exceeded its own sale projections for Signatera. James Malackowski, Trial Tr. 1318:10-1319:13.

Moreover, Natera seeks only retrospective "corrective advertising" damages. Jeffrey Stec, Trial Tr. 1881:16-19. But Natera launched its $24.8 million Project SOLAR budget as a counter-sales strategy in response to Guardant's pre-launch earnings call and JP Morgan presentation. *See, e.g.*, Chapman, Trial Tr. 1094:13-22.

DOCUMENT PREPARED
ON RECYCLED PAPER

Such communications with investors are not "advertising." Dkt. 509 at 5-6 (citing *Sigma Dynamics, Inc. v. E. Piphany, Inc.,* No. C 04-0569, 2004 WL 2648370 at *3 (N.D. Cal. 2004) ("Statements made during an earnings conference call primarily to influence investors that may have an incidental effect of promoting goods to customers are not within the reach of the Lanham Act."); *Tercica, Inc. v. Insmed Inc.,* No. C 05-5027, 2006 WL 1626930, at *17-18 (N.D. Cal. June 9, 2006) (no claim where statements were made to potential investors during conference calls and in press releases because no consumer attended the call)). Notably, the evidence at trial demonstrates that the JP Morgan conference is an investors conference. Masukawa, Trial Tr. 655:20-656:2 ("JPMorgan is an annual conference held here in San Francisco with investors and companies presenting their -- some of their data."); *see also* Helmy Eltoukhy, Trial Tr. 726:16-727:7 ("An investor conference is mostly focused on the financial performance of, you know, companies that are presenting there, their financial outlook"). The anti-Reveal campaign was not aimed at "advertising" at all.

Nor did Natera's Project SOLAR advertising attempt to correct any of Guardant's advertising that is actually challenged by Natera's remaining Counterclaims. For example, while TX-126 covers a wide range of purported failings in Reveal, it never addresses whether the as-yet unpublished Harvard Study was "blinded" or "prospective," nor did it challenge (or even refer to) Reveal's specificity:

GUARDANT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:21-CV-04062-EMC

DOCUMENT PREPARED
ON RECYCLED PAPER

1    In support of its Lanham Act claim, Natera fails to present sufficient evidence that

2    Guardant made any false or misleading statements in commercial advertising, or that any

3    misleading claims deceived any customers, or that Natera was injured. On these facts, Natera has

4    no right to proceed to the jury. The Court should grant JMOL in favor of Guardant.

5    **III.    Natera's state law claim fails with its Lanham Act claim**

6    Natera's state-law counterclaim asserting a violation of California's common law of unfair

7    competition fails for the same reasons as its Lanham Act claim. *See* Dkt. 326 at 11 n.2 ("state

8    common law unfair competition [claims] are treated as 'substantially congruent' to claims under

9    the Lanham Act" (quoting *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)).

10    Moreover, Natera has shown no evidence that would make it eligible for an award of

11    punitive damages. Pursuant to Cal. Civ. Code § 3294, Natera must show, by *clear and convincing*

12    *evidence,* that Guardant is "guilty of oppression, fraud, or malice," each of which is defined in

13    connection with intentional misconduct *aimed at Natera*:

14    (1)    "Malice" means conduct which is ***intended by the defendant to cause***
15    ***injury to the*** plaintiff or despicable conduct which is carried on by the
      defendant with a willful and conscious disregard of the rights or safety of
16    others.

17    (2)    "Oppression" means despicable conduct that subjects a person to cruel and
      unjust hardship ***in conscious disregard of that person's rights***.

18    (3)    "Fraud" means ***an intentional misrepresentation, deceit, or concealment***
19    of a material fact known to the defendant with the intention on the part of
      the defendant of thereby ***depriving a person of property or legal rights or***
20    ***otherwise causing injury***.

21    (emphasis added).

22    For its part, Natera has made the targeting of competitors with negative comparative

23    advertising its signature market strategy:

24    Q.    Isn't it true that your company engages in advertising in which you compare
      your company's product with other companies' products in performance
25    grids similar to this?
      A.    Yeah. Absolutely
26

27    Solomon Moshkevich, Trial Tr. 1539:2-5. Guardant has gone a very different route. *See, e.g.,*

28

DOCUMENT PREPARED
ON RECYCLED PAPER

Eltoukhy, Trial Tr. 749:2-5 ("we really do believe in the sort of Golden Rule. Like, you know, kind of treat, you know, competitors and so on like you want to be treated. Treat other companies like you want to be treated.") Thus, Guardant did not target Natera with negative ads, as Ms. Price testified:

> Q.    Did you ever instruct your staff to trash Signatera?
> A.    No.
> Q.    Did you ever tell your staff to go to war with Natera or Signatera?
> A.    No.
> Q.    Why not?
> A.    That -- it's certainly not in my own ethos and not in the ethos of our company to trash a competitor. Of course, you know, any company is going to be competitive, but I -- I truly believe that MRD testing can have a huge impact on oncology care for patients.
>
> And, honestly, it's a new field, not a lot -- not every physician knows about it. And I wouldn't have wanted to trash our competitor because I wanted patients to have access to this testing. And that's -- that's genuinely honest.
>
> I -- if a patient was going to have a Signatera test, so be it. I wanted them to get access to testing. And Guardant Reveal provided access that wasn't already available on the market. So that's – that's my reason I would never want to trash a competitor.

Price, Trial Tr. 412:3-22. The most any Natera witness could point to was vague puffery. Chapman, Trial Tr. 1098:21-25 (claiming that a reference to "industry leading" was "a direct comparison to Natera's performance"); *see also* Dkt. 326 at 40 ("Guardant's 'industry-leading performance' statement is mere non-actionable corporate puffery.")

There is simply no evidence whereby a rational jury could conclude that Guardant acted with ill-will towards Natera, much less targeted it for destruction. On this clear record, Natera has no possible claim for punitive damages.

## **CONCLUSION**

Because no reasonable jury could find for Natera, the Court should GRANT this motion for judgment as a matter of law in favor of Guardant on Natera's counterclaims.

GUARDANT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:21-CV-04062-EMC

DOCUMENT PREPARED
ON RECYCLED PAPER

Respectfully submitted,

Dated: November 22, 2024

**ALLEN OVERY SHEARMAN STERLING US LLP**

**SAUL PERLOFF**
By:    */s/ Saul Perloff*
         Saul Perloff

Attorney for Plaintiff
GUARDANT HEALTH, INC.

GUARDANT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:21-CV-04062-EMC

DOCUMENT PREPARED
ON RECYCLED PAPER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on November 22, 2024, to the counsel of record via email to qe-natera-guardant@quinnemanuel.com.

### <u>Counsel for Defendants:</u>

Kevin P.B. Johnson

Victoria F. Maroulis

Andrew J. Bramhall

Anne S. Toker

Valerie Lozano

Andrew Naravage

Ryan Landes

Elle Wang

Margaret Shyr

Ryan Hudash

Brian Cannon

Jocelyn Ma

Kaitlin Keohane

Victoria Parker

*/s/ Saul Perloff*
Saul Perloff

GUARDANT'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:21-CV-04062-EMC

DOCUMENT PREPARED
ON RECYCLED PAPER