QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
Andrew J. Bramhall (Bar No. 253115)
andrewbramhall@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Valerie Lozano (Bar No. 260020)
valerielozano@quinnemanuel.com
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Anne S. Toker (*pro hac vice*)
annetoker@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Derek L. Shaffer (Bar No. 212746)
1300 I Street, Suite 900
Washington, DC 20005
derekshaffer@quinnemanuel.com
Telephone: (202) 538-8000
Facsimile:  (202) 538-8100

Attorneys for Defendant and Counterclaim-
Plaintiff NATERA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC.<br><br>                 Plaintiff and<br>                 Counterclaim-Defendant,<br><br>          vs.<br><br>NATERA, INC.<br><br>                 Defendant and<br>                 Counterclaim-Plaintiff. | Case No. 3:21-CV-04062-EMC<br><br>**NATERA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL**<br><br>Hearing:     March 27, 2025<br>Time:        1:30 p.m.<br>Place:       Courtroom 5, 17th Floor<br>Judge:       Hon. Edward M. Chen |

1

## NOTICE OF MOTION AND MOTION

2      TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3      PLEASE TAKE NOTICE that on March 27, 2025 at 1:30 p.m. or as soon thereafter as the

4  matter may be heard in the court room of the Honorable Edward M. Chen, Courtroom 5 on the 17th

5  floor of the San Francisco Courthouse located at 450 Golden Gate Avenue, San Francisco,

6  California 94102, Defendant and Counterclaim Plaintiff Natera Inc. will and hereby does move the

7  Court, pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure, for judgment as a

8  matter of law on its claims and all claims brought by Plaintiff Guardant Health, Inc. or, in the

9  alternative, for a new trial or new trial subject to Guardant's rejection of a remittitur.

10      This motion is made on the following grounds:

11      1.      The First Amendment bars Guardant's claims as a matter of law;

12      2.      Guardant failed to present legally sufficient evidence to support its Lanham Act

13  claim;

14      3.      Guardant failed to present legally sufficient evidence to support its California

15  common law unfair competition claim;

16      4.      Guardant failed to present legally sufficient evidence to support its claim for

17  willfulness;

18      5.      Guardant failed to present legally sufficient evidence to support its claim for punitive

19  damages;

20      6.      Natera presented evidence that conclusively establishes that Guardant engaged in

21  false and misleading advertising;

22      7.      Instructional and evidentiary errors caused Natera substantial prejudice;

23      8.      The jury awarded excessive damages because there was no economic rationale for

24  an award of damages for prospective corrective advertising or disgorgement, requiring a new trial

25  conditioned on rejection of a remittitur; and

26      9.      The punitive damages award cannot be reconciled with California law and the Due

27  Process Clause, requiring a new trial conditioned on Guardant's rejection of a remittitur.

28      This motion is based on this notice of motion and motion and the accompanying

1  memorandum of points and authorities, the pleadings and papers filed in this action, and any other

2  written or oral arguments that Natera may present to the Court.

3  DATED: January 17, 2025                    QUINN EMANUEL URQUHART &
4                                             SULLIVAN, LLP

5

6                                    By  /s/ Derek L. Shaffer
7                                        Derek L. Shaffer
                                         Attorneys for NATERA, INC.,
8                                        a Delaware corporation,
                                         Defendant and Counterclaim Plaintiff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2
**Page**

3
INTRODUCTION ..............................................................................................................1

4
BACKGROUND ...............................................................................................................2

5
LEGAL STANDARD ........................................................................................................4

6
ARGUMENT ....................................................................................................................5

7
I.    JUDGMENT SHOULD BE GRANTED FOR NATERA ON GUARDANT'S
      LANHAM ACT CLAIM ........................................................................................5

8

9
      A.    The First Amendment Bars Guardant's Claims ........................................5

10
      B.    Guardant Failed To Present Legally Sufficient Evidence To Support Its
            Lanham Act Claim ...................................................................................8

11
      C.    Guardant Failed To Present Legally Sufficient Evidence To Support Its
            Common Law Unfair Competition Claim..................................................14

12

13
      D.    Guardant Failed To Prove Its Entitlement To Punitive Damages ............16

14
II.   JUDGMENT SHOULD BE ENTERED FOR NATERA ON ITS FALSE
      ADVERTISING CLAIMS ....................................................................................17

15
III.  IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL ................18

16
      A.    Multiple Instructional Errors Prejudiced Natera, Requiring A New Trial ..............19

17
      B.    Multiple Evidentiary Errors Prejudiced Natera........................................22

18
IV.   AT A MINIMUM, THE COURT SHOULD REMIT THE DAMAGES AWARD ...........24

19
CONCLUSION ................................................................................................................25

20

21

22

23

24

25

26

27

28

NATERA'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### <u>Cases</u>

4
*Adray v. Adry-Mart, Inc.*,

5
    76 F.3d 984 (9th Cir. 1995) ............................................................................. 13

6
*Aevoe Corp. v. Pace*,
    2012 WL 13069926 (N.D. Cal. Apr. 6, 2012) ..................................................... 15

7
*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,

8
    2011 WL 2690437 (N.D. Cal. July 8, 2011) ....................................................... 15

9
*Ariix, LLC v. Nutrisearch Corp.*,
    985 F.3d 1107 (9th Cir. 2021) ................................................................... 8, 9, 10

10

11
*Bank of the W. v. Sup. Ct.*,
    2 Cal. 4th 154 (1992) ........................................................................... 2, 14

12
*Binder v. Disability Grp., Inc.*,

13
    772 F. Supp. 2d 1172 (C.D. Cal. 2011) ............................................................. 16

14
*Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*,
    2014 WL 12579802 (C.D. Cal. June 4, 2014) .................................................. 7, 8

15

16
*Callaway Golf Co. v. Slazenger*,
    384 F. Supp. 2d 735 (D. Del. 2005) ............................................................ 11, 12

17
*Chuman v. White*,

18
    76 F.3d 292 (9th Cir. 1996) ............................................................................. 21

19
*City of Cincinnati v. Discovery Network, Inc.*,
    507 U.S. 410 (1993) ................................................................................. 10

20

21
*Clem v. Lomeli*,
    566 F.3d 1177 (9th Cir. 2009) ......................................................................... 19

22
*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
    173 F.3d 725 (9th Cir. 1999) ............................................................................. 8

23

24
*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
    911 F.2d 242 (9th Cir. 1990) .................................................................. 1, 9, 20

25

26
*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ........................................................................... 15, 16

27
*D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*,
    692 F.2d 1245 (9th Cir. 1982) ........................................................................... 5

28

*Dang v. Cross*,
    422 F.3d 800 (9th Cir. 2005) .................................................................................. 19

*Design Res., Inc. v. Leather Indus. of Am.*,
    789 F.3d 495 (4th Cir. 2015) .................................................................................. 19

*Duncan v. Stuetzle*,
    76 F.3d 1480 (9th Cir. 1996) .................................................................................. 16

*Dyson, Inc. v. Garry Vacuum, LLC*,
    2010 WL 11595882 (C.D. Cal. July 19, 2010) ...................................................... 15

*Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*,
    980 F.3d 1117 (7th Cir. 2020) ................................................................................ 25

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
    762 F.3d 829 (9th Cir. 2014) .................................................................................... 5

*Fenner v. Dependable Trucking Co.*,
    716 F.2d 598 (9th Cir. 1983) .................................................................................. 23

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015) ................................................................................ 12

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ................................................................................................ 17

*Guardant Health, Inc. v. Natera, Inc.*,
    580 F. Supp. 3d 691 (N.D. Cal. 2022) ...................................................................... 7

*Hardeman v. Monsanto Co.*,
    997 F.3d 941 (9th Cir. 2021) ................................................................... 2, 16, 17, 25

*Illinois Tool Works, Inc. v. Rust-Oleum Corp.*,
    955 F.3d 512 (5th Cir. 2020) .................................................................................. 11

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
    524 F. Supp. 3d 1007 (S.D. Cal. 2021) .................................................................. 11

*Kasky v. Nike, Inc.*,
    27 Cal. 4th 939 (2002) ............................................................................................ 18

*Kurin, Inc. v. Magnolia Med. Techs., Inc.*,
    473 F. Supp. 3d 1117 (S.D. Cal. 2020) .................................................................... 9

*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*,
    285 F.3d 1146 (9th Cir. 2002) ................................................................................ 25

*Lust by and through Lust v. Merrell Dow Pharm.*,
    89 F.3d 594 (9th Cir. 1996) .................................................................................... 11

*Maheu v. Hughes Tool Co.*,
    569 F.2d 459 (9th Cir. 1977)..................................................................... 17, 22

*Mahone v. Lehman*,
    347 F.3d 1170 (9th Cir. 2003)....................................................................... 23

*Molski v. M.J. Cable, Inc.*,
    481 F.3d 724 (9th Cir. 2007).......................................................................... 5

*Nat'l Prods., Inc. v. Arkon Res., Inc.*,
    294 F. Supp. 3d 1042 (W.D. Wash. 2018) ..................................................... 5

*Nat'l Prods., Inc. v. Gamber-Johnson LLC*,
    734 F. Supp. 2d 1160 (W.D. Wash. 2010) ................................................... 12

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
    523 F.3d 1051 (9th Cir. 2008) ...................................................................... 19

*Nichia Am. Corp. v. Seoul Semiconductor Co.*,
    2008 WL 11342571 (C.D. Cal. Oct. 7, 2008) ............................................... 11

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013).....................................................................*passim*

*Oxycal Lab'ys, Inc. v. Jeffers*,
    909 F. Supp. 719 (S.D. Cal. 1995) ............................................................... 10

*Pamlab, L.L.C. v. Seton Pharms., LLC*,
    2010 WL 4983170 (S.D.N.Y. Dec. 6, 2010) ................................................ 19

*Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*,
    219 F.3d 895 (9th Cir. 2000) .......................................................................... 5

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) ...................................................................................... 10

*Ruvalcaba v. City of L.A.*,
    64 F.3d 1323 (9th Cir. 1995).......................................................................... 22

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997)..................................................................*passim*

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003).................................................................................. 24, 25

*Straw v. Chase Revel, Inc.*,
    813 F.2d 356 (11th Cir. 1987)....................................................................... 17

*Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*,
    519 F. Supp. 3d 839 (D. Or. 2021)................................................................ 18

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) ..................................................................... 2, 14, 15

*United States v. Edge Broad. Co.*,
   509 U.S. 418 (1993) ...................................................................................... 9

*United States v. Moran*,
   493 F.3d 1002 (9th Cir. 2007) .................................................................... 22

*In re Volkswagen*,
   2019 WL 693224 (N.D. Cal. Feb. 19, 2019) ............................................ 16

*Weaving v. City of Hillsboro*,
   763 F.3d 1106 (9th Cir. 2014) ...................................................................... 5

### **Rules/Statutes**

15 U.S.C. § 1117 ...................................................................................... 12, 14

15 U.S.C. § 1117(a) ............................................................................ 13, 16, 21

Cal. Bus. & Prof. Code § 17200 .......................................................... 2, 14, 18

Cal. Bus. & Prof. Code § 17203 .......................................................... 2, 14, 16

Cal. Civ. Code § 3924(a) ............................................................................ 21

Cal. Civ. Code § 3294 ................................................................................ 16

Cal. Civ. Code § 3294(a) ............................................................................ 16

Fed. R. Civ. P. 50(a) ................................................................................ 4, 5

Fed. R. Civ. P. 59(a) .................................................................................... 5

NATERA'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

## INTRODUCTION

In Spring 2021, Defendant and Counter-Plaintiff Natera, Inc. sent three documents to the medical community that compared its test for diagnosing colon cancer (Signatera) to Plaintiff and Counter-Defendant Guardant Health, Inc.'s test (Reveal).  It is undisputed that those few documents compared accurate data for the two competing tests from two published, peer-reviewed studies (Reinert and Parikh).  Nor is there any dispute that Guardant *also* relied on the studies to compare the two competing tests.  Given these facts—and the rest of the evidence from the November 2024 trial—no reasonable jury could have awarded nearly *$300 million* to Guardant and *$0* to Natera.  Indeed, as the Second Circuit recognized, the theory of liability that Guardant advanced at trial cannot be squared with the First Amendment, which protects an author who "draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013).

At trial, Guardant failed to present legally sufficient evidence to support its claims, and no reasonable jury could have awarded nearly $300 million in damages.  Even if Natera's statements were not protected by the First Amendment, Guardant's trial theory that Natera's comparison suggested its product was "superior" (Tr. 208:25-209:2) would, at most, amount to opinion or unactionable puffery under the Lanham Act because "advertising which merely states in general terms that one product is superior is not actionable."  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *see* Dkt. 802 at 15-19.  Nor did Guardant offer legally sufficient evidence of damages, or to support the advisory finding on disgorgement, because Guardant cannot obtain $75 million for *prospective* corrective advertising when Guardant discontinued the product at issue and Guardant never showed that the $42 million in disgorgement was "attributable to" Natera's statements.

Even if the jury's nine-figure verdict could be squared with the trial record and the delivered jury instructions, a new trial is necessary because the jury was misinformed on the law.  The final jury instructions closely followed Guardant's "heads-I-win, tails-you-lose" framework, under which the jury could deem Natera's opinion about how to compare the findings of two studies literally false while precluding the jury from finding that the study on which Guardant relied (Parikh) was

1    itself false or misleading.  Ninth Circuit case law does not support either approach.  The "apples-to-

2    oranges" statement of literal falsity in the jury instructions cannot be squared with the law on falsity

3    by implication—particularly not on the facts here, where everyone agrees the two products and

4    studies are in fact comparable and the comparison, at most, suggests Natera's product is "superior."

5        Finally, punitive damages, $175 million of the award, are undisputedly unavailable under

6    the Lanham Act, and the Ninth Circuit has repeatedly held that the California common law unfair

7    competition claim that served as the basis for the award applies only under narrow circumstances—

8    "passing off"—that are lacking here.  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1137,

9    1147 (9th Cir. 1997); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1153 (9th Cir. 2008).[1]

10   Even if punitive damages were theoretically available, no reasonable jury could find by clear and

11   convincing evidence that Natera engaged in the type of conduct needed to justify such an award—

12   particularly where this case turned on documents that accurately conveyed the results of two studies,

13   without any evidence that Natera intended to deceive.  At a minimum, given the jury's substantial

14   (and wholly unjustified) award of $75 million for prospective advertising and the facts of this case,

15   Due Process requires that the punitive damages award be reduced to no more than $75 million.  *See,*

16   *e.g.*, *Hardeman v. Monsanto Co.*, 997 F.3d 941, 975 (9th Cir. 2021) ("When compensatory damages

17   are substantial, …a lesser ratio, perhaps only equal to compensatory damages" may be required.).

18                                **BACKGROUND**

19       Natera's Signatera and Guardant's Reveal are used to identify the recurrence of colorectal

20   cancer ("CRC").  Dkt. 501 at 4.  Natera's Signatera commercially launched in May 2019, and

21   Guardant's Reveal commercially launched in February 2021.  *Id.*  A chief difference between the

22   two tests is that Signatera requires a tissue sample of the patient's tumor (the "tumor-informed"

23   approach) while Reveal uses a blood sample (the "tumor-naïve" approach).  Dkt. 326 at 3-4; Tr.

24   _____

25   [1] "[T]he statutory definition of 'unfair competition' [in California's Unfair Competition Law
     ('UCL')] cannot be equated with the common law definition—***the two claims are completely***
26   ***distinct***."  *Bank of the W. v. Sup. Ct.*, 2 Cal. 4th 154, 1263-64 (1992) (emphasis added).  While the
     common law definition is "synonymous with the act of 'passing off,'" *Southland Sod*, 108 F.3d at
27   1147, the statutory definition of unfair competition broadly covers "unlawful, unfair or fraudulent
     business act[s] or practice[s]."  Cal. Bus. & Prof. Code § 17200.  And the broader statutory UCL
28   claim does ***not*** authorize punitive damages.  *See id.* § 17203.

283:11-284:23, 287:3-9. (Odegaard).

On May 9, 2019, JAMA Oncology published a peer-reviewed article titled *Analysis of Plasma Cell-Free DNA by Ultradeep Sequencing in Patients With Stages I to III Colorectal Cancer* by Thomas Reinert, PhD and others (the "Reinert Study"). TX-4 at 1. The Reinert Study analyzed Natera's Signatera test. TX-4 at 11-12. Two years later, on April 29, 2021, Clinical Cancer Research published a peer-reviewed paper titled *Minimal Residual Disease Detection using a Plasma-only Circulating Tumor DNA Assay in Patients with Colorectal Cancer* by Aparna R. Parikh and others, including Guardant employees (the "Parikh Study"). TX-1 at 1. The study analyzed Guardant's Reveal test (TX-1 at 3) and invited comparison to the Reinert Study, with multiple references to "comparable" performance between the competing tests (*id.* at 2, 4, 6).

The undisputed evidence shows both parties relied on the results of the Parikh and Reinert studies when discussing their respective product's performance. In November 12, 2020, Guardant presented a document titled "Guardant New Product Introduction" to the Molecular Diagnostic Services (MolDX) Program for Medicare coverage approval; it included a side-by-side comparison between the Reinert Study results and the (then-unpublished) Parikh Study results. TX-585 at 7; Tr. 384:2-386:7 (Odegaard). The presentation asserted, on the same slide, "Performance similar to Signatera." TX-585 at 7. Guardant made similar comparisons in its formal application for Medicare reimbursement, from December 2020. TX-89 at 25. And Guardant made similar comparisons internally—a Guardant witness conceded Guardant "definitely compared Signatera to Guardant Reveal in internal documents, for sure." Tr. 465:12-466:1 (Price); *see* TX-729 at 19 (comparing "Landmark sensitivity," "Surveillance sensitivity," "Landmark PPV," "Surveillance PPV," "Specificity," and "CEA Sensitivity / Specificity" found in the Reinert and Parikh studies).

In May 2021, Natera prepared a seven-page document titled *A comparison of tumor-informed and tumor-naïve approaches for early stage molecular residual disease (MRD) detection* (the "White Paper"). TX-120. Like the Reinert and Parikh studies, the White Paper provides a background on the emerging technology and includes 32 references, primarily to peer-reviewed papers in the field. TX-120 at 7. The White Paper also explains the different approaches to detecting MRD/recurring colon cancer, "tumor-informed" and "tumor-naïve," and an explanation of the

"[k]ey requirements for a ctDNA assay suitable for MRD detection" (TX-120 at 1-2), none of which is accused of being false or misleading. The White Paper also included a side-by-side table of accurate data from the Reinert and Parikh studies, referencing both with endnotes. TX-120 at 3. Along with the White Paper, Natera provided a grid (TX-126) with accurate data and cites to sources, including the Reinert and Parikh studies. Natera also sent out a Dear Doctor email (TX-220), attaching "Evidence Review" slides (TX-365).

At trial, Guardant's false-advertising case turned on three pages that Guardant claimed drew erroneous conclusions from the admittedly accurately summarized data from the Reinert and Parikh studies. Specifically, Guardant pointed to the comparison on page 6 of the Evidence Review (TX-365 at 6; *see* Tr. 547:7-25 (Masukawa)), page 3 of the White Paper (TX-120 at 3), and the performance grid (TX-126). Natera's comparison of the two published, peer-reviewed studies was the basis for Guardant's liability theory at trial. Tr. 209:19-20, 217:10 (Opening); Tr. 567:8-9; 579:6-8 (Masukawa); Tr. 309:7-9; 21-23 (Odegaard); Tr. 406:24-407:1 (Price); Tr. 1249:20-22 (Heitjan). In contrast, Natera's claims were based on evidence Guardant made literally false statements, such as that Reveal achieved 91% sensitivity in the clinical surveillance setting, which Guardant's own witnesses admitted was false. TX-559 at 1 ("[W]e cannot say that … the tests sensitivity will be 91 percent.").

On November 25, 2024, the jury returned a verdict in favor of Guardant, finding that Natera had engaged in false advertising under the Lanham Act, awarding Guardant $75 million in compensatory damages, and recommending disgorgement of $42 million. Dkt. 847 at 2. The jury was also permitted (over Natera's objections) to award $175.5 million in punitive damages under the theory that a finding of Lanham Act liability necessarily violates the California common law prohibition on unfair advertising. Dkt. 847 at 3. Finally, the jury found Natera had not proven either of its own false advertising claims. Dkt. 847 at 3-4.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 50, this Court may "grant a motion for judgment as a matter of law against [a] party on a claim or defense" if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). "It is error to deny [such

1    relief] when it is clear that the evidence and its inferences cannot reasonably support a judgment in

2    favor of the opposing party."  *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014).

3        A new trial is warranted under Rule 59(a) where "the verdict is against the weight of the

4    evidence," "the damages are excessive," or "for other reasons, the trial was not fair to the [movant]."

5    *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation omitted).  Unlike a Rule 50

6    motion, the Court need not "view the trial evidence in the light most favorable to the verdict."

7    *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

8        "Remittitur is a remedy available to correct excessive verdicts," *Nat'l Prods., Inc. v. Arkon*

9    *Res., Inc.*, 294 F. Supp. 3d 1042, 1063 (W.D. Wash. 2018), when, *e.g.*, "a jury may have been

10   outraged by the defendant's conduct to the point of awarding excessive damages," *Pershing Park*

11   *Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 905 (9th Cir. 2000).  In remitting

12   damages, the district court should "remit[] the judgment to the maximum amount sustainable by the

13   proof." *D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).

## ARGUMENT

## I.    JUDGMENT SHOULD BE GRANTED FOR NATERA ON GUARDANT'S LANHAM ACT CLAIM

### A.    The First Amendment Bars Guardant's Claims

        As Natera has shown (Dkt. 802 at 21-25), the First Amendment precludes the liability theory

Guardant advanced at trial because the challenged statements arise "from non-fraudulent data, based

on accurate descriptions of the data and methodology underlying those conclusions, on subjects

about which there is legitimate ongoing scientific disagreement."  *ONY*, 720 F.3d at 498.[2]

        While the Lanham Act generally prohibits false or misleading advertising, "[b]ecause the

Act proscribes conduct that, but for its false or misleading character, would be protected by the First

Amendment, free speech principles inform [the] interpretation of the Act."  *Id.* at 496.  Courts "have

been careful not to permit overextension of the Lanham Act to intrude on First Amendment values."

---

[2] Natera asserted the First Amendment as an affirmative defense (Dkt. 48 at 47) and raised the issue in the Joint Pretrial Statement (Dkt. 362 at 20-21) and its Rule 50(a) motion (Dkt. 802 at 21-23).

1   *Id.* (citation omitted). "Generally, statements of pure opinion—that is, statements incapable of being

2   proven false—are protected under the First Amendment." *Id.*

3   "Scientific academic discourse poses several problems for the fact-opinion paradigm of First

4   Amendment jurisprudence." *Id.* "Most conclusions contained in a scientific journal article are, in

5   principle, capable of verification or refutation by means of objective proof." *Id.* (citation omitted).

6   But "conclusions of empirical research are tentative and subject to revision, because they represent

7   inferences about the nature of reality based on the results of experimentation and observation." *Id.*

8   "Importantly, those conclusions are presented in publications directed to the relevant scientific

9   community, ideally in peer-reviewed academic journals that warrant that research approved for

10  publication demonstrates at least some degree of basic scientific competence." *Id.* at 496-97.

11  "These conclusions are then available to other scientists who may respond by attempting to replicate

12  the described experiments, conducting their own experiments, or analyzing or refuting the

13  soundness of the experimental design or the validity of the inferences drawn from the results." *Id.*

14  at 497. "In a sufficiently novel area of research, propositions of empirical 'fact' advanced in the

15  literature may be highly controversial and subject to rigorous debate by qualified experts." *Id.*

16  "[C]ourts are ill-equipped to undertake to referee such controversies." *Id.*

17  Based on these principles, the Second Circuit held in *ONY* that the First Amendment barred

18  a Lanham Act claim that the defendant engaged in false advertising by co-authoring a peer-reviewed

19  paper and then sending out promotional materials touting the results. *Id.* at 498. As *ONY* explained,

20  "while statements about contested and contestable scientific hypotheses constitute assertions about

21  the world that are in principle matters of verifiable 'facts,'" in the Lanham Act context, "***they are***

22  ***more closely akin to matters of opinion***." *Id.* at 497 (emphasis added). And the *ONY* plaintiff had

23  alleged only "that the inferences drawn from those data were the wrong ones, and that competent

24  scientists would have included variables that were available to the defendant authors but that were

25  not taken into account in their analysis." *Id.* "But when the conclusions reached by experiments

26  are presented alongside an accurate description of the data taken into account and the methods used,

27  the validity of the authors' conclusions may be assessed on their face by other members of the

28  relevant discipline or specialty." *Id.* at 497-98. In light of this, the Second Circuit held "that, to the

1    extent a speaker or author draws conclusions from non-fraudulent data, based on accurate

2    descriptions of the data and methodology underlying those conclusions, on subjects about which

3    there is legitimate ongoing scientific disagreement, those statements are not grounds for a claim of

4    false advertising under the Lanham Act." *Id.* at 498; *see Biolase, Inc. v. Fotona Proizvodnja*

5    *Optoelektronskih Naprav D. D.*, 2014 WL 12579802, at *4 (C.D. Cal. June 4, 2014) (relying on

6    *ONY* to dismiss Lanham Act claim because "attacking the validity of experiments and conclusions

7    … in peer-reviewed scientific journal articles is better done in the scientific, not legal, realm").

8        *ONY*'s reasoning applies here.  This Court previously ruled that "all Natera's advertising

9    statements at issue are directly derived from the Reinert study and the Parikh study."  Dkt. 326 at

10    13.  "The numbers are not literally false on their face."  *Id.*  Rather, Guardant accused Natera of

11    comparing results from those two studies to give "the false impression" that Natera's product was

12    "superior."  Tr. 208:25-209:2 (Opening).  But, to the extent Natera's comparison implied, for

13    example, that Natera's Signatera was "superior" to Guardant's Reveal or that the studies were

14    comparable, such an assertion is the subject of "legitimate ongoing scientific disagreement."  *ONY*,

15    720 F.3d at 497.  Given that Natera's comparison provides citations to both studies, "the validity of

16    [Natera's implied] conclusions may be assessed … by other members of the [field]."  *Id.* at 497-98.

17        *ONY* applies to Natera's challenged statements (even though those statements were not

18    published in scientific journals) because they compared peer-reviewed studies and the First

19    Amendment protection extends to "conclusions from non-fraudulent data, based on accurate

20    descriptions of the data and methodology underlying those conclusions."  *Id.* at 498. The court in

21    *ONY* specifically considered whether touting and distributing statements from the scientific journal

22    articles "for promotional material" was tortious, and held that it was not because the defendant

23    "present[ed] accurately the article's allegedly inaccurate conclusions."  *Id.* at 498-99.  And the court

24    in *Biolase*—an opinion on which this Court has relied—adopted that reasoning to rule that "where

25    statements in the underlying articles are not actionable for false advertising, accurate restatements

26    of the article's conclusion in advertising are not actionable either."  2014 WL 12579802, at *4 (cited

27    in *Guardant Health, Inc. v. Natera, Inc.*, 580 F. Supp. 3d 691, 708 (N.D. Cal. 2022)).  At trial,

28    Guardant's theory of liability rested on Natera's presentation, in a comparative context, of accurate

data.  On these facts, judgment should be granted in favor of Natera because, as in *ONY* and *Biolase*, Natera's comparison of peer-reviewed-study results and any conclusions implicit therein "are non-actionable scientific conclusions to which neither the Lanham Act … nor [California] common law … apply."  *ONY*, 720 F.3d at 498; *see Biolase*, 2014 WL 12579802, at *5 (plaintiff "has sufficient recourse in scientific discourse" if it believed "portrayed results of the studies are misleading").  Holding otherwise would chill free speech and discourage scientific debate—precisely what the First Amendment was crafted and enacted to prevent.

### B.    Guardant Failed To Present Legally Sufficient Evidence To Support Its Lanham Act Claim

As Natera demonstrated (Dkt. 802 at 14-21), Guardant did not present legally sufficient evidence to prove the elements of a Lanham Act claim:  "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement."  *Southland Sod*, 108 F.3d at 1139.

***False Statement of Fact.***  As Natera has explained (Dkt. 802 at 14-19), no reasonable jury could find that Guardant met its burden to show that the three comparison pages at issue contained "a false statement … in a commercial advertisement," much less that "the statement actually deceived or has the tendency to deceive a substantial segment of its audience."  *Southland Sod*, 108 F.3d at 1139.  To be actionable, a statement must be "a specific measurable claim, capable of being proved false or being reasonably interpreted as a statement of objective fact."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).  A "statement[] of opinion" is not enough.  *Ariix, LLC v. Nutrisearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021).

Here, the accused comparisons are not false on their face—they undisputedly discussed accurate data.  Guardant's case necessarily relied on showing that the comparison documents were either literally false by necessarily implication or that the statement was sufficiently misleading that Natera's audience (the medical community) was or could have been deceived.  Guardant's trial

1    presentation was explicitly based on an "apples to oranges" theory—that Natera's comparison of

2    the accurate results from two studies was misleading.  *See* Tr. 208:13-14 ("Natera came up with an

3    ingenious plan to make false comparisons between the two tests."), 208:17-22 ("Natera's

4    presentation on the surface looked pretty compelling and looked like it had proven facts" but it was

5    an "apples-to-oranges comparison[].").  Per Guardant, this "apples to oranges" comparison gave the

6    "false impression" that Signatera is "superior" to Reveal.  Tr. 208:25-209:2.

7        No reasonable jury could find that Guardant met its burden because an implication that

8    Signatera is "superior" to Reveal is mere puffery—not a verifiable statement of fact.  *See, e.g.*, Dkt.

9    326 at 40 ("corporate puffery" is "non-actionable").  Indeed, had Natera expressly made the

10    assertion supposedly implied by its comparison—that its product is "superior" (Tr. 208:25-209:2)—

11    no liability would lie, as such a statement is unactionable puffery.  *See, e.g.*, *Cook*, 911 F.2d at 246

12    ("[A]dvertising which merely states in general terms that one product is superior is not actionable.").

13        At best, the implied assertion that Signatera is "superior" to Reveal is a statement of opinion

14    in a novel area of research that is subject to debate.  *See, e.g.*, *Ariix*, 985 F.3d at 1121 (comparative

15    "five-star ratings" for nutritional supplements were not actionable as they were "simply statements

16    of opinion about the relative quality").  Such comparisons involve "an inherently subjective element

17    in deciding which scientific and objective criteria to consider," precluding Lanham Act liability.  *Id.*

18    That is particularly true here.  The accused comparisons were accompanied by extensive scientific

19    discussion regarding tumor-informed and tumor-naïve approaches for MRD detection, directed to

20    doctors with the expertise to evaluate the statements (Tr. 295:21-296:20 (Odegaard)), and supported

21    with references to the underlying studies (TX-120 at 3).  Put simply, the accused documents were

22    "directed to a sophisticated audience" who had all the tools needed to evaluate Natera's statements.

23    *See Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1131 (S.D. Cal. 2020)

24    (considering that advertisement was marketed directly to "hospitals … and medical professionals"

25    in concluding that statements regarding medical data were not literally false).

26        Regardless, Guardant failed to offer legally sufficient evidence that the challenged

27    statements were made in "a commercial advertisement."  *Southland Sod*, 108 F.3d at 1139.  Natera's

28    White Paper and its related publications do not "propos[e] a commercial transaction."  *United States*

NATERA'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

1    *v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993).  Nor do they fit the other common definitions of

2    commercial speech, such as speech "related solely to the economic interests of the speaker and its

3    audience," *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993), given their

4    educational purpose, *see also Ariix*, 985 F.3d at 1115-17.  Rather, Natera's publications are

5    educational materials distributed to doctors and those working in the medical field.  *See* TX-120;

6    TX-365.  The White Paper (TX-120) includes a copious amount of unchallenged scientific

7    discussion, supported by over 30 references to scientific publications, regarding tumor-informed

8    and tumor-naïve approaches for early-stage MRD detection.  *See* TX-120 at 7.  Even Guardant's

9    own witness conceded that publications like the White Paper are "educational material" for doctors.

10   Tr. 295:21-296:20 (Odegaard).  The Evidence Review likewise contains extensive and unchallenged

11   scientific discussion, supported with references to scientific studies.  *See* TX-365.  And even if some

12   aspects of Natera's publications, such as the "Dear Doctor" email, are commercial speech, when

13   that speech is "inextricably intertwined" with non-commercial speech, courts may not "parcel out

14   the speech, applying one test to one phrase and another test to another phrase."  *Riley v. Nat'l Fed'n*

15   *of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988).  On this record, Natera's challenged

16   statements were not made in "commercial advertisements," and thus are outside the scope of the

17   Lanham Act.  *See, e.g.*, *Oxycal Lab'ys, Inc. v. Jeffers*, 909 F. Supp. 719, 725 (S.D. Cal. 1995)

18   (plaintiff had "low likelihood" of establishing that cancer-prevention book was commercial speech).

19       ***Materiality.***  Even if a reasonable jury could find that Natera's anodyne statements were

20   false or misleading, no reasonable jury could find a Lanham Act violation because Guardant failed

21   to offer legally sufficient evidence establishing the statements were of any commercial consequence.

22       Guardant failed to establish that anything falsely implied by Natera's comparisons was

23   material—i.e., "likely to influence [a] purchasing decision."  *Southland Sod*, 108 F.3d at 1139.

24   Guardant's survey expert conceded his survey did not ask people "whether they made any

25   purchasing decisions based on the Natera email" and that he did not analyze "any purchasing

26   decisions at all by any … oncologists."  Tr. 850:21-851:7 (Sowers).  And Guardant's expert

27   Dr. Heitjan conceded that he does not "know anything about any purchasing or ordering decisions

28   [for] Signatera and Reveal."  Tr. 1268:15-20 (Heitjan).  The complex question of what drives

purchasing decisions when selecting tests used to detect recurrence of CRC is certainly "outside the common knowledge of lay jurors," necessitating expert testimony on the subject. *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1033 (S.D. Cal. 2021) (granting summary judgment where plaintiffs had "no expert evidence to show a causal relationship between … therapies and pancreatic cancer"); *Lust by and through Lust v. Merrell Dow Pharm.*, 89 F.3d 594, 598 (9th Cir. 1996) (similar).  Accordingly, there was not legally sufficient evidence that Natera's comparison of two peer-reviewed studies was likely to influence any purchasing decision.

  ***Causation and Damages.***  Guardant failed to offer legally sufficient evidence that it was injured "as a result" of the challenged comparisons, *Southland Sod*, 108 F.3d at 1139, or that any of Natera's profits were "attributable to" them, Dkt. 814 at 46.  Indeed, Guardant never disclosed in investor calls that it missed any revenue projections or was harmed by Natera's actions (Tr. 757:14-22, 805:2-4), and its expert conceded he was not aware of a single sale that Guardant lost because of Natera (Tr. 1368:3-13).  And, as Natera has explained (Dkt. 802 at 19-21), both of Guardant's theories for monetary recovery (corrective advertising and disgorgement) fail as a matter of law.

  As to corrective advertising, Guardant failed to establish that ***prospective*** corrective advertising is a proper form of damages given the facts of this case.  "Although corrective advertising damages are usually for costs incurred prior to trial, damages may be awarded to allow an aggrieved party to conduct corrective advertising after trial." *Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 740 (D. Del. 2005).  "To grant such damages, however, there must be an economic rationale." *Id.*  And "an award of money for post-trial corrective advertising must be justifiable as 'a surrogate for plaintiff's damages or defendant's profit.'" *Id.* at 741; *see also Nichia Am. Corp. v. Seoul Semiconductor Co.*, 2008 WL 11342571, at *10 (C.D. Cal. Oct. 7, 2008) (citing *Callaway* and ruling there was no basis to order defendant to engage in corrective advertising when "the infringing product has … been discontinued"); *Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 516 (5th Cir. 2020) (no basis for corrective-advertising damages where plaintiff "never even asserted that it plans to run corrective advertising").

  Here, like the plaintiff in *Callaway*, Guardant sought an award of damages for prospective corrective advertising without (1) evidence that any of its "advertising budget had been spent on

corrective advertising prior to … trial," or (2) establishing it still sold the product at issue (there, golf balls). *Id.* at 741. Specifically, Guardant's damages expert conceded that the version of Guardant's Reveal (1.2) that was the subject of the challenged comparison is "no longer being sold" and that Guardant had released an "upgraded version" (Tr. 1360:2-7 (Malackowski)), which operates differently (Tr. 955:4-9 (Banks)). Guardant's CEO confirmed this, too. Tr. 791:4-6 (Eltoukhy). And the Parikh Study tested Reveal (1.2), not the new test. Tr. 361:11-16 (Odegaard). Nor was there evidence that Guardant planned to re-market its discontinued test or engage in corrective advertising. As such, there is "no economic rationale to support an award of 'prospective corrective advertising' damages," and it makes "no sense for [Guardant] to receive a damages award for 'prospective corrective advertising' to correct some possible public misunderstanding" about a product that "have long since been off the market." *Callaway*, 384 F. Supp. 2d at 741.

As to disgorgement, the jury recommended disgorgement of $42 million (Dkt. 847 at 2), but it is ultimately for this Court to determine whether disgorgement is appropriate and, if so, the amount. *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075-76 (9th Cir. 2015).[3] Under 15 U.S.C. § 1117, courts may award a "defendant's profits," "subject to the principles of equity," and only to the extent the award constitutes "compensation and not a penalty." Thus, an award of profits "is not automatic" and cannot constitute a "windfall." *Id.* at 1073. Any disgorged profits must be "attributable to" the unlawful conduct. Dkt. 814 at 46; *Nat'l Prods., Inc. v. Gamber-Johnson LLC*, 734 F. Supp. 2d 1160, 1169 (W.D. Wash. 2010) (adjusting jury's disgorgement finding of $22.5 million to $492,332 when there was no evidence that all of defendant's sales during the relevant period were result of false advertisement).

Here, Guardant failed to offer legally sufficient evidence to support any disgorgement. Guardant's damages expert made no effort to calculate Natera's profits that were "attributable to" (Dkt. 814 at 46) the allegedly false advertising. Instead, he simply opined that the disgorgement should be "100 percent of Natera's gross profit" (Tr. 1341:3-7 (Malackowski))—***without regard to***

---

[3] Because the parties expressly provided that the jury's finding on disgorgement was purely advisory, Natera is filing proposed findings of fact and conclusions of law as to the impropriety of the jury's advisory finding on disgorgement.

1  ***whether Natera would have made that same profit had it not made the challenged statements*** (*id.*

2  1341:17-1342:5).  In this regard, Guardant's damages expert failed to account for a variety of facts

3  that could explain Natera's profits that had nothing to do with the challenged statements, including

4  doctor preference for Signatera over Reveal based on it being tumor informed and providing more

5  robust information.  *Id.* 1333:12-22, 1334:8-12, 1335:25-1336:13; Dkt. 809-4 at 4-5 (Parikh).

6  Indeed, Guardant's damages expert could not identify a single sale or customer that Guardant lost

7  because of Natera's statements.  Tr. 1368:3-13 (Malackowski).  Instead, he conceded his

8  disgorgement figure would serve "as a penalty for the false advertising" (*Id.* 1341-1342:5), contrary

9  to the Lanham Act's directive awards of profits must "constitute compensation," "not a penalty."

10  15 U.S.C. § 1117(a).  Thus, Guardant failed to offer evidence on two key points:  (1) the amount of

11  Natera's profits "attributable to" the allegedly false advertising, and (2) the extent to which an award

12  of profits would serve as "compensation" but "not a penalty."  That alone precludes disgorgement.

13      Moreover, disgorgement is not appropriate here given the substantial award for corrective

14  advertising.  As noted, "[a]n award of cost of corrective advertising, like compensatory damage

15  awards in general, is intended to make the plaintiff whole."  *Adray v. Adry-Mart, Inc.*, 76 F.3d 984,

16  988 (9th Cir. 1995).  Here, the substantial award for corrective advertising for a test that Guardant

17  has abandoned, even if remitted, is more than enough to compensate Guardant.  Awarding

18  disgorgement on top would constitute an impermissible penalty.  *See* 15 U.S.C. § 1117(a).

19      Natera also offered evidence that, once appropriate costs are factored into a disgorgement

20  analysis, there is a "negative profit number of negative $2,841,722," so "there are no profits to

21  disgorge."  Tr. 1864:20-1865:14 (Stec).  Guardant's damage expert factored in only costs of goods

22  sold, without accounting for sales commission expense, oncology sales costs, oncology marketing

23  expenses, and the overhead portion of costs of good sold—"all costs that were incurred by Natera

24  to actually produce the sales that [it made]."  *Id.* 1863:9-1865:10.  Even if the Court deducted only

25  the sales commission expense—"commissions that the salespeople earn[ed] for making the sales of

26  the products at issue"—the disgorgement amount would drop to $13,650,888.  Tr. 1864:7-18.  For

27  these reasons, the Court should not award any disgorgement or, at a minimum, depart downward

28  from the recommended amount, to $13.65 million.

1      Finally, no reasonable juror could conclude Guardant proved willfulness, militating against

2  disgorgement.  Guardant needed to show that Natera "knew its advertising was false or misleading,

3  or it acted with reckless disregard for, or willful blindness to, the false or misleading nature of its

4  advertising."  Dkt. 814 at 50; 28 U.S.C. § 1117.  Guardant presented no evidence Natera knew its

5  advertising was false or misleading, or that Natera recklessly disregarded the truth.  And Natera's

6  witnesses consistently testified to the contrary.  Tr. 660:7-12, 1075:1-15.  Thus, the record shows

7  Natera had a good-faith belief that its advertisements were accurate and not misleading.

**C.**     **Guardant Failed To Present Legally Sufficient Evidence To Support Its Common Law Unfair Competition Claim**

      Judgment also should be entered for Natera on the common-law unfair competition claim

because Guardant failed to introduce any evidence of passing off—the only type of unfair

competition recognized under California common law, distinct from a broader statutory UCL

claim.[4]  As the Ninth Circuit explicitly held, "[t]he common law tort of unfair competition is

generally thought to be synonymous with the act of 'passing off' one's goods as those of another …

or acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person

exploits a competitor's reputation."  *Southland Sod*, 108 F.3d at 1147.

      In *Southland Sod*, because the plaintiffs' allegations did "not amount to 'passing off' or its

equivalent," the Ninth Circuit affirmed the dismissal of their unfair competition claim, *id.*, which

was based on allegations the defendants "ran advertisements claiming that their turfgrass was better

than Plaintiffs' in certain key characteristics."  *Id.* at 1137.  Specifically, the plaintiffs alleged the

"tests upon which Defendants based their product-comparison advertisements were faulty."  *Id.* at

1138.  The Ninth Circuit reached a similar result in *Sybersound*, dismissing an California common

law unfair competition claim based on allegations the defendants made false and misleading

statements about karaoke records, as the plaintiff did not allege the defendants "passed off their

---

[4] As noted, "the statutory definition of 'unfair competition' [in California's UCL] cannot be equated with the common law definition," *Bank of the W.* 2 Cal. 4th at 1263-64, because the statutory definition broadly covering "unlawful, unfair or fraudulent business act[s] or practice[s]."  Cal. Bus. & Prof. Code § 17200.  And the UCL claim does ***not*** allow for punitive damages.  *Id.* § 17203.

1    goods as those of another nor that they exploit trade names or trademarks." 517 F.3d at 1153[5]

2          *Southland Sod* and *Sybersound* compel entry of judgment in Natera's favor on Guardant's

3    common law unfair competition claim and the accompanying punitive damages claim.  Here, as in

4    *Southland Sod* and *Sybersound*, there are neither allegations nor evidence that Natera's conduct

5    "amount[ed] to 'passing off' or its equivalent." *Southland Sod*, 108 F.3d at 1147.  Guardant did not

6    contend that Natera passed off its products as Guardant's.  Dkt. 814 at 3.  Rather, as in *Southland*

7    *Sod*, Guardant contended that Natera "engaged in false advertising" only by making misleading

8    comparisons—here, between two peer-reviewed studies.  Dkt. 814 at 3.  That is not "'passing off'

9    or its equivalent," *Southland Sod*, 108 F.3d at 1147, and therefore Natera is entitled to judgment on

10   Guardant's common law claim for unfair competition, *see id.*; *Sybersound*, 517 F.3d at 1153; Dkt.

11   802 at 26-28.  Holding otherwise would contravene clear Ninth Circuit authority.

12         Even if Ninth Circuit precedent allowed for a broader reading of California's common law

13   (it does not), Guardant did not have legally sufficient evidence of misappropriation, misuses of

14   confidential information, or other such deceptive acts.  *See* Dkt. 802 at 28-29.  Moreover, to recover

15   for common law unfair competition, Guardant needed to establish that it "was injured" by the unfair

16   competition.  *Dyson, Inc. v. Garry Vacuum, LLC*, 2010 WL 11595882, at *9-10 (C.D. Cal. July 19,

17   2010).  And as discussed above (*see supra* pp. 11-13), there was not legally sufficient evidence that

18   Guardant was injured by the accused comparison.

19         Finally, judgment should be granted for Natera because the common law unfair competition

20   claim is subject to conflict preemption.  Dkt. 802 at 29-30.  "Even without an express provision for

21   preemption, [courts] have found that state law must yield to a congressional Act in at least two

22   circumstances."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  "When

23   Congress intends federal law to 'occupy the field,' state law in that area is preempted," and "even

24   if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict

25   _____

26   [5] District courts routinely apply *Southland Sod* and *Sybersound* to dismiss common law unfair
     competition claims not based on "passing off."  *See, e.g.*, *Amaretto Ranch Breedables, LLC v.*

27   *Ozimals, Inc.*, 2011 WL 2690437, at *2 (N.D. Cal. July 8, 2011); *Aevoe Corp. v. Pace*, 2012 WL
     13069926, at *5 (N.D. Cal. Apr. 6, 2012) (similar).

28

1    with a federal statute," *id.*, such as "when two separate remedies are brought to bear on the same

2    activity," *id.* at 380 (cleaned up).

3         That is precisely the situation here.  Guardant's common law unfair competition claim was

4    deemed "congruent" with the Lanham Act (Dkt. 814 at 43)[6] and included by Guardant solely to

5    convince the jury to award punitive damages under California common law (Dkt. 847 at 3).  *See,*

6    *e.g.*, Cal. Civ. Code § 3294; *Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996).  But "[p]unitive

7    damages are not available under the Lanham Act."  *Binder v. Disability Grp., Inc.*, 772 F. Supp. 2d

8    1172, 1183 (C.D. Cal. 2011).  Rather, the Act provides a comprehensive damages framework

9    authorizing compensatory but not punitive damages—damages "shall constitute compensation and

10   not a penalty."  15 U.S.C. § 1117(a).  Thus, if the Lanham Act were "congruent" with California

11   common law unfair competition (Dkt. 814 at 43), but California common law authorizes excessive

12   penalties, a conflict would exist and the claim would be preempted under the circumstances here.

13        **D.    Guardant Failed To Prove Its Entitlement To Punitive Damages**

14        Even if Guardant could permissibly seek punitive damages (*but see supra* pp. 14-16), it

15   failed to prove the legal requirements for punitive damages.

16        ***First***, as explained above, California common law unfair competition claims are limited to

17   "passing off," which Guardant neither alleged nor proved. *See supra* pp. 14-15.  Because punitive

18   damages were available under California common law only, not under the Lanham Act or

19   California's statutory UCL, the failure to advance a viable common law unfair competition claim

20   forecloses any entitlement to punitive damages.  *See* 15 U.S.C. § 1117(a) (damages "shall constitute

21   compensation and not a penalty").

22        ***Second***, to recover punitive damages under California law, Guardant needed "clear and

23   convincing evidence that [Natera] [was] guilty of oppression, fraud, or malice."  Cal. Civ. Code

24   § 3294(a).  But Guardant lacked legally sufficient evidence to support such a finding.  *Cf. In re*

25   *Volkswagen*, 2019 WL 693224, at *7 (N.D. Cal. Feb. 19, 2019) (fraudulently presenting engines as

26   low-emission and using software to deliberately evade testing); *Hardeman v. Monsanto Co.*, 997

27   ───────────────

28   [6] Guardant's **statutory** UCL is congruent with the Lanham Act in that it does not permit punitive
     damages.  *See* Cal. Bus. & Prof. Code § 17203.

1    F.3d 941, 971 (9th Cir. 2021) (consciously disregarding risks that Roundup pesticide causes cancer).

2        **Third**, Guardant's stated theory was that Natera implied that its product was "superior" to

3    Guardant's.  Tr. 208:25-209:2.  But, at a minimum, the First Amendment prohibits imposing

4    punitive damages on a company for comparing accurate data from peer-reviewed studies in a way

5    that implies that its products are superior to a competitor's.  Indeed, as the Ninth Circuit has held,

6    in the First Amendment context, "[p]unitive damages cannot constitutionally be awarded to a

7    plaintiff who has met a standard of proof less demanding than 'actual malice.'"  *Maheu v. Hughes*

8    *Tool Co.*, 569 F.2d 459, 479 (9th Cir. 1977).  But here, the jury made no specific finding that Natera

9    acted with "actual malice" as to truth; rather, the jury was told that it could award punitive damages

10   if it found a "party engaged in conduct with malice, oppression, or fraud."  Dkt. 814 at 47.  Such a

11   finding cannot support an award of punitive damages when the First Amendment is at issue.  *See,*

12   *e.g.*, *Maheu*, 569 F.2d at 479; *Straw v. Chase Revel, Inc.*, 813 F.2d 356, 363 (11th Cir. 1987)

13   (reversing punitive damages when unclear whether the jury found "common law malice or actual

14   malice").  And allowing punitive damages in a case like this would set a dangerous precedent,

15   impermissibly chilling free speech because simply engaging in scientific debate could result in

16   punishment—even if the data and studies relied on are entirely accurate and subject to the peer

17   review.  *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) (requiring "actual malice"

18   for punitive damages, as "juries assess punitive damages in wholly unpredictable amounts bearing

19   no necessary relationship to the actual harm caused").

20   **II.    JUDGMENT SHOULD BE ENTERED FOR NATERA ON ITS FALSE**
     **ADVERTISING CLAIMS**
21

22       Natera is entitled to judgment on its claims because the record conclusively establishes that

23   Guardant engaged in false advertising.

24       Under a heading titled "Surveillance," Guardant's advertisement (TX-576) claimed "Reveal,

25   a plasma-only ctDNA test, reached 91% sensitivity to detect ctDNA in patients who had a blood

26   draw withing 4 months of recurrence."  TX-576 at 1.[7]  Guardant made this claim in other

27   ────────────────────────────
     [7] "Sensitivity" is the "ability of [a] test to correctly identify those patients *with* disease"; "specificity"
28   is the "ability of [a] test to correctly identify those patients *without* disease."  Dkt. 775-1 at 1.

advertisements.  TX-94 at 2; TX-542 at 3; TX-554 at 1.  But Natera conclusively proved it false because the Parikh Study does not establish 91-percent surveillance sensitivity, as Guardant acknowledged at the time.  TX-559 at 1 ("We cannot say that the … test sensitivity will be 91 percent.  We can't say it.  We have not done this analysis with Guardant Reveal.").  Guardant's advertisements also claimed Reveal had 100-percent specificity in surveillance (TX-554 at 1), but again, this was false—Natera conclusively proved that the Parikh Study did not, and could not, establish 100-percent specificity (Tr. 381:20-382:7 (Odegaard) ("[I]t would not be accurate to say in marketing materials that this was 100 percent specificity in the surveillance setting.")).  Such statements are not protected by the First Amendment or *ONY*,[8] as a statement is literally false when "tests, even if reliable, do not establish the proposition asserted."  *Southland Sod*, 108 F.3d at 1139.

Nor was there any dispute that Guardant's assertions were likely to influence purchasing decisions, and because they were literally false, harm to Natera is presumed.  *See Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*, 519 F. Supp. 3d 839, 846 (D. Or. 2021) ("When an advertisement is shown to be literally or facially false, consumer deception is presumed, and the court may grant relief without reference to the advertisement's actual impact on the buying public."); TX-553 at 29, 49-53 (marketing research showing doctors relying on Guardant's false statements).  Finally, Natera established it was damaged by the statements with unrebutted evidence—it spent over $20 million in corrective advertising.  Tr. 543:12-23 (Masukawa), 659:11-660:12; Tr. 1881:14-19, 1899:16-19 (Stec).  Therefore, Natera is entitled to judgment on its claims.[9]

## III.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL

In the alternative, the Court should grant a new trial because multiple instructional and

---

[8] This Court adopted the reasoning from *ONY* in instructing the jury that "[s]tatements … based on test results from a peer-reviewed, published scientific study cannot be literally false," subject to certain exceptions, such as when the "results of the study were fabricated or fraudulently created." Dkt. 814 at 37; *see ONY*, 720 F.3d at 496-98.

[9] The jury's verdict does not preclude Natera from seeking equitable relief under California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL").  As explained in Natera's concurrently filed proposed findings of fact and conclusions of law, the UCL and FAL claims are more expansive than the Lanham Act and California common law claims submitted to the jury—the UCL covers "unlawful, unfair or fraudulent business act[s] or practice[s]," Cal. Bus. & Prof. Code § 17200, and the FAL requires that "members of the public are likely to be deceived," *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002), rather than a likely impact on purchasing decisions.

1    evidentiary errors prejudiced Natera.

2    **A.        Multiple Instructional Errors Prejudiced Natera, Requiring A New Trial**

3    "An error in instructing the jury in a civil case requires [a new trial] unless the error is more

4    probably than not harmless." *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009). "[J]ury

5    instructions must fairly and adequately cover the issues presented, must correctly state the law, and

6    must not be misleading." *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005). "[A] party is entitled

7    to an instruction about his or her theory of the case if it is supported by law and has foundation in

8    the evidence." *Id.* at 805. "A party is not entitled to an instruction unsupported by the record."

9    *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1064 (9th Cir. 2008). If there was

10    an error, the burden shifts to the nonmovant to establish that it was harmless. *Clem*, 566 F.3d at

11    1182. Here, multiple instructional errors prejudiced Natera:

12    **First**, the jury was erroneously instructed that "[a]dvertisements using an 'apple-to-oranges'

13    comparison are literally false by necessary implication where things that are non-comparable are

14    portrayed as otherwise equivalent." Dkt. 814 at 35. A statement can be false by necessary

15    implication only if it is unambiguous. *Pamlab, L.L.C. v. Seton Pharms., LLC*, 2010 WL 4983170,

16    at *8 (S.D.N.Y. Dec. 6, 2010). "The greater the degree to which a message relies upon the viewer

17    or consumer to integrate its components and draw the apparent conclusion, … the less likely it is

18    that a finding of literal falsity will be supported." *Design Res., Inc. v. Leather Indus. of Am.*, 789

19    F.3d 495, 502 (4th Cir. 2015). Claims that are "implicit, attenuated, or merely suggestive usually

20    cannot fairly be characterized as literally false." *Id.*

21    This instruction erroneously ignores that even items that are dissimilar in some ways can be

22    similar in others. For instance, it would not be "literally false by necessary implication" to state that

23    apples are superior to oranges if the target audience was looking for a fruit that can be grown in a

24    colder climate and does not need to be peeled. For that reason, determining whether a comparison

25    between two items is flawed almost always requires considering whether the particular audience

26    would be deceived by it and rely on it—the exact Lanham Act elements that the erroneous

27    instruction allowed the jury to skip over. Yet, as the Court instructed the jury, a statement "may be

28    literally false by necessary implication," "when it does not explicitly state something that is untrue,

but considering the advertisement in its entirety, the only reasonable interpretation of the statement is that it is untrue." Dkt. 814 at 35.  But it is not the case that the "only reasonable interpretation" of an "apples-to-oranges" comparison, when considered "in its entirety," is that what is implied by the comparison "is untrue," *id.*, either as a general matter or on the facts here.

Guardant's theory at trial was that the comparison gave "the false impression" that Natera's product was "superior."  Tr. 208:25-209:2.  But such an implicit representation is not an unambiguous "statement of fact, actionable under the Lanham Act," *Cook*, 911 F.2d at 245, because "[a]dvertising which merely states in general terms that one product is superior is not actionable," *id.* at 246.  Thus, by Guardant's own admission, one reasonable interpretation of Natera's comparison—that its product is "superior" (Tr. 208:25-209:2)—is a non-actionable statement incapable of being proven false.  *See* Tr. 406:20-407:1 (Price) (testifying that the "misleading apples-to-oranges comparison" was that Natera's product was "represented at its best side" whereas Guardant's was "represented in its worst context").  Nor was "superiority" the "only reasonable interpretation," because Guardant's own survey showed that the majority of the respondents did not interpret the comparison in that way.  Tr. 863:16-864:3 (Sowers).

The prejudice to Natera from these instructions was palpable and pervasive.  Guardant's counsel repeatedly referred to Natera's comparison as an "apples-to-oranges" comparison.  Tr. 208:20-22 (Opening).[10]  When Natera raised this issue, the Court warned Guardant's counsel that her questions were argumentative in that she was "load[ing]" them with "loaded terms."  Tr. 613:18-24.  Nevertheless, in closing, Guardant's counsel falsely told the jury that an "apples-to-oranges" comparison is "one of the elements of the Lanham Act," such that if a company makes such a comparison "it is necessarily a false and misleading statement."  Tr. 2006:20-24 (Closing).  And

---

[10] Tr. 209:19-20 (Opening) ("[W]e're going to show you a number of these apples-to-oranges comparisons.  Let's just look at one of them."); Tr. 210:10-12 (Opening) ("For its apples-to-oranges comparison, Natera chose what we're going to be calling the Reinert, or Danish study."); Tr. 217:10-11 (Opening) ("So Natera weaponized their apples-to-oranges chart."); Tr. (Odegaard) 309:21-310:9 (asking witness if he would "be able to determine that this is an unfair apples-to-oranges comparison"); Tr. 321:12-16 (Odegaard) (prefacing a question with, "[s]o we talked about the comparison, the apples-to-oranges comparison that Natera made"); Tr. 567:8-13 (Masukawa) (prefacing a question with, "I want to shift gears and discuss with you Signatera's apples-to-oranges comparison chart"); Tr. 2023:23-24 (Closing) ("These were the apples-to-oranges comparisons.").

counsel went on to argue that the "apples-to-oranges thing, necessary implication," is a "presumption built into the Lanham Act," which says they "can presume that consumers were deceived." *Id.* 2008:1-7. In short, Guardant's counsel used the phrase "apples-to-oranges"—which has no basis in Ninth Circuit precedent—to confuse and mislead the jury into believing that Natera's comparison was false by necessary implication even though there were reasonable interpretations of Natera's comparison that were not necessarily false. *See, e.g.*, *Chuman v. White*, 76 F.3d 292, 294 (9th Cir. 1996) (remanding for new trial when term "team effort" was added to jury instruction).

**Second**, the jury was erroneously instructed on punitive damages. As discussed above, because Guardant sought punitive damages based solely on its unfair competition claim under California common law, and there was no evidence that Natera passed off its products as Guardant's or engaged in similar conduct, Guardant's claim fails as a matter of law. *See supra* pp. 14-15. Accordingly, the jury should not have been instructed on punitive damages. Moreover, doing so prejudiced Natera because Guardant argued throughout trial that Natera had engaged in reprehensible conduct, *see* Cal. Civ. Code § 3924(a)—warranting punishment. *See, e.g.*, Tr. 2039:16-22 (Closing) (arguing punitive damages are meant to "[p]unish the wrongdoer for reprehensible conduct and deter others"). Guardant's counsel even argued that Natera "play[ed] with the lives and health of other human beings" and that Natera's conduct was "despicable." *Id.* 2040:14-19. And Guardant's counsel told the jury it should punish Natera for "lying, cheating, stealing, [and] smearing doctors and companies just to make money." *Id.* 2042:1-8. To the contrary, the record shows Natera acted out of concern for the medical community, which was being misinformed by Guardant about a test that it ultimately abandoned. Tr. 660:7-12 (Masukawa); Tr. 1075:11-15 (Chapman); Tr. 1492:12-20 (Moshkevich). Regardless, Guardant's accusations were not supported by the record and had no place in this civil trial regarding whether comparing results from two peer-reviewed studies was false or misleading. Allowing these accusations before the jury, without a basis for punitive damages, tainted the Lanham Act's directive that any damages cannot be "a penalty." 15 U.S.C. § 1117(a).

**Third**, the jury was erroneously not instructed on the parties' duty to mitigate damages. After the close of evidence, Guardant's counsel requested that the Court withdraw the mitigation

1  instruction on the ground that there was "zero evidence" that "the party bringing the claim for false

2  advertising failed to use reasonable efforts and the amount by which damages would have been

3  mitigated," and the Court agreed to do so over Natera's objection.  Tr. 1931:12-1936:5.  But there

4  was sufficient evidence to support the instruction:  Guardant undisputedly did not engage in any

5  corrective advertising (Tr. 1345:5-16 (Malackowski)), and Guardant's own personnel believed it

6  could have engaged in corrective advertising for $18 to 39 million, not $75 million (*id.* 1325:7-23

7  (admitting Guardant prepared a corrective-advertising estimate ranging from $18 to 39 million)).

8      **Fourth**, if this Court rules that the reasoning in *ONY* does not foreclose Guardant's theory

9  of liability (*see supra* Part I.A), it was error to instruct the jury that statements based on "test results

10  from a peer-reviewed, published scientific study"—such as those made by Guardant regarding the

11  Parikh Study—"cannot be literally false."  Dkt. 814 at 37.  Such an error would have been highly

12  prejudicial in that it allowed Guardant to adopt a "heads-I-win, tails-you-lose" framework—under

13  which the jury could deem Natera's opinion about how to compare the findings of two studies

14  literally false while precluding the jury from finding that the Parikh study Guardant relied upon was

15  itself false or misleading.  Thus, if *ONY* does not apply to Guardant's claims (*see supra* Part I.A),

16  then the adoptions of its principles in Instruction No. 33 warrants a new trial.

17      **Finally**, the verdict form did not include the predicate question of whether a violation of

18  California common law occurred, tainting the punitive-damages award.  Dkt. 628 at 4; *see* Dkt. 847

19  at 3.  Nor did the jury award any damages in connection with Guardant's unfair competition claim;

20  rather, the jury awarded compensatory damages and recommended disgorgement solely based on

21  Guardant's Lanham Act claim.  Dkt. 847 at 2.  Because the jury made no liability finding for the

22  unfair competition claim and awarded no damages on the claim, the verdict did not support the

23  punitive damages award.  That, too, warrants a new trial. *See, e.g.*, *Maheu*, 569 F.2d at 480.

24      **B.**      **Multiple Evidentiary Errors Prejudiced Natera**

25      A new trial is warranted "when an erroneous evidentiary ruling 'substantially prejudiced' a

26  party."  *Ruvalcaba v. City of L.A.*, 64 F.3d 1323, 1328 (9th Cir. 1995).  That occurs when, e.g., a

27  defendant is erroneously prevented from presenting (1) evidence going "to the heart" of one of its

28  defenses, *see United States v. Moran*, 493 F.3d 1002, 1014 (9th Cir. 2007), or (2) evidence that

would rebut damaging evidence presented by the plaintiff, *see Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 602 (9th Cir. 1983). Here, multiple evidentiary errors substantially prejudiced Natera.

To start, Guardant was erroneously permitted to use Natera's communications with MolDX to allegedly show Natera's "state of mind." Tr. 746:17-19. In fact, Natera's communications with MolDX were irrelevant to showing whether Natera knew that its comparison of two peer-reviewed studies were false or misleading. *Mahone v. Lehman*, 347 F.3d 1170, 1174 (9th Cir. 2003) ("irrelevant and prejudicial" testimony was grounds for a new trial). Rather, Guardant used this evidence to prejudice the jury by continuously hammering the false theme that Natera "lie[d] to Medicare" (Tr. 202:11-12), although the Court ruled such statements were unactionable (Dkt. 509 at 3-8).[11] Indeed, the fact that Natera made statements to MolDX that were similar to the challenged statements does not show that Natera knew that the challenged statements were misleading. If anything, it shows the opposite—that Natera believed the challenged statements were accurate and, for that reason, made similar statements to a governmental body, MolDX. Guardant was effectively allowed to use Natera's communications with MolDX not to show Natera's state of mind but to instead make the highly prejudicial argument that Natera "lie[d]" to Medicare. This prejudice was compounded because Natera was precluded from introducing evidence showing that MolDX, after its own experts conducted an independent analysis, ***agreed*** with Natera's assessment of the Parikh Study. *See* Tr. 1199:24-1201:17 (Court not allowing evidence of "Guardant's VP of reimbursement reacting to MolDX's technical assessment and sharing MolDX's concerns with Reveal's performance and data"). In short, Guardant flipped this Court's ruling on Natera's MIL No. 2 on its head to attack Natera while hiding MolDX's conclusions from the jury.

In addition, Natera was erroneously prevented from presenting evidence that showed Natera's sales resulted from the fact that Signatera had broader Medicare coverage for more settings than Reveal—not the accused statements. Although the Court allowed Natera to present evidence that "it had obtained Medicare approval" for Signatera before the commercial release of Guardant's

---

[11] *See* Tr. 204:7-10 ("Natera had secret discussions with Medicare to convince them to deny coverage."); Tr. 206:17-19 ("Natera's claims to Medicare were false."); Tr. 746:6-9 ("[T]hey were emailing the Medicare directors misinformation.").

Reveal to support Natera's "first … mover argument," Tr. 1810:11-19, it precluded Natera from offering evidence to show that the difference in the parties' sales was due to Reveal's "limited scope of … Medicare coverage." *Id.* This was highly prejudicial because, for disgorgement damages, it was Guardant's burden to establish that the "profits earned by" Natera were "attributable to the false advertisement," not some other factor. Dkt. 814 at 46. The exclusion of this evidence prevented Natera from showing that Guardant's damages expert's disgorgement opinion failed to account for other factors that could have driven Natera sales, which is relevant to the requirement that disgorged profits must be "attributable to the false advertisement." *Id.*

## IV.    AT A MINIMUM, THE COURT SHOULD REMIT THE DAMAGES AWARD

As set forth above (*see supra* Part I.B), this Court should reduce the award of compensatory damages to zero. But if the Court does not do so, it should reduce the damages award for prospective advertising from $75 million to at most $24.8 million. Guardant's damages expert opined that Guardant was entitled to $75 million by taking Natera's advertising budget for project SOLAR, $24.8 million and multiplying it by three without any analysis of whether a multiplier was necessary or appropriate. Tr. 1325:7-1328:4 (Malackowski). Given the lack of any support for corrective advertising damages here (*see supra* Part I.B), if this Court does not eliminate such damages in their entirety, it should, at a minimum, remove the arbitrary 3x multiplier that Guardant's expert applied and remit compensatory damages to at most $24.8 million, which is also in the range of what Guardant's own personnel predicted would be the cost of corrective advertising. *See* Tr. 1325:7-23.

Finally, the punitive damages award is improper under the Due Process Clause, especially once the damages for prospective advertising are properly remitted. When punitive damages are "grossly excessive," they violate the Due Process Clause. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). Whether punitive damages are grossly excessive depends on: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* at 418. "The precise award in any case … must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* at 425.

1    Here, these factors counsel against the jury's punitive damages award. The harm found by

2    the jury was purely "economic," not "physical"; the target of the conduct (Guardant) is not

3    "financial[ly] vulnerable[]"; and the alleged misconduct was relatively isolated (i.e., a limited

4    amount of advertising for a limited duration), not ongoing. *Id.* at 419. A large disparity exists

5    between the "actual or potential harm" allegedly suffered by Guardant ($75 million, assuming no

6    remittitur) and the punitive damages award ($175.5 million), and—because the punitive-damages

7    analysis focuses on the harm to the plaintiff—any disgorgement awarded is irrelevant. *See State*

8    *Farm*, 538 U.S. at 417 (focusing on "the disparity between ***the actual or potential harm*** suffered"

9    and the amount of punitive damages); *see also Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, 980

10   F.3d 1117, 1143 (7th Cir. 2020) (questioning whether punitive damages are appropriate where

11   compensatory damages were based on the "benefit" to defendant, not "harm suffered" by plaintiff).

12   The punitive damages vastly exceed the civil penalties imposed in comparable cases or cases

13   where the conduct was far more reprehensible. *Cf. Leatherman Tool Grp., Inc. v. Cooper Indus.,*

14   *Inc.*, 285 F.3d 1146, 1152 (9th Cir. 2002) (reducing punitive damages award of $4.5 million to

15   $500,000 in false advertising case); *Hardeman*, 997 F.3d at 974-75 (affirming reduction of punitive

16   damages from $75 million to $20 million in case where Monsanto sought to "undermine or explain

17   away" claims that its product caused cancer). Considering these factors, this Court should, at a

18   minimum, reduce the punitive damages award to at most $24.8 million—particularly given the

19   absence of any physical harm to Guardant, *see Hardeman*, 997 F.3d at 975; *id.* at 981 (N.R. Smith,

20   J., dissenting) (ratio of punitive damages should have been 1:1 given "borderline" award of $2

21   million for future noneconomic damages).

## **CONCLUSION**

23   This Court should enter judgment as a matter of law in favor of Natera on all claims.

1    DATED: January 17, 2025              QUINN EMANUEL URQUHART &
2                                         SULLIVAN, LLP

3                                         By /s/ Derek Shaffer
4                                           Derek L. Shaffer
                                            Attorneys for NATERA, INC.,
5                                           a Delaware corporation,
6                                           Defendant and Counterclaim Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28