Jennifer L. Keller (84412)
jkeller@kelleranderle.com
Chase Scolnick (227631)
cscolnick@kelleranderle.com
Gregory M. Sergi (257415)
gsergi@kelleranderle.com
Craig A Harbaugh (194309)
charbaugh@kelleranderle.com
**KELLER ANDERLE SCOLNICK LLP**
18300 Von Karman Ave., Suite 930
Irvine, CA 92612
Telephone   (949) 476-0900

Saul Perloff (157092)
saul.perloff@aoshearman.com
Kathy Grant *(pro hac vice)*
kathy.grant@aoshearman.com
Andre Hanson *(pro hac vice)*
andre.hanson@aoshearman.com
Olin "Trey" Hebert *(pro hac vice)*
trey.hebert@aoshearman.com
**ALLEN OVERY SHEARMAN STERLING
US LLP**
300 W. Sixth Street, 22nd Floor
Austin, Texas 78701
Telephone      (512) 647-1900

Christopher LaVigne *(pro hac vice)*
christopher.lavigne@aosherman.com
**ALLEN OVERY SHEARMAN STERLING
US LLP**
599 Lexington Ave.
New York, NY 10022
Telephone      (212) 848-4000

Attorneys for Plaintiff/Counterclaim-Defendant
GUARDANT HEALTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC.,<br><br>     Plaintiff/Counterclaim-Defendant,<br><br>vs.<br><br>NATERA, INC.,<br><br>     Defendant/Counterclaim-Plaintiff. | Case No. 3:21-cv-04062-EMC<br><br>**GUARDANT HEALTH INC.'S MOTION FOR ATTORNEYS' FEES & COSTS**<br><br>**[REDACTED FOR PUBLIC FILING]** |

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2        **PLEASE TAKE NOTICE** that on March 27, 2025, or as soon as would be convenient for

3    the Court, the Honorable Edward M. Chen, in Courtroom 5 on the 17th floor of the San Francisco

4    Courthouse located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiff and

5    Counterclaim Defendant Guardant Health, Inc. ("Guardant") will and hereby does move for a

6    determination that this case is "exceptional" under Section 35 of the Lanham Act, 15 U.S.C.

7    § 1117(a), and a corresponding award of attorneys' fees and costs in the following amounts:

8    • Attorney's Fees:        $ 22,089,977.50

9    • Costs:                  $ 4,916,182.55

10   This Motion is based on the Notice of Motion and Motion, the Memorandum of Points and

11   Authorities, the Declaration of Chase Scolnick and Exhibits thereto, as well as other written or oral

12   argument that Guardant may present to the Court.

13    Dated: January 17, 2025          **KELLER ANDERLE SCOLNICK LLP**

14

15                                By:  */s/ Chase Scolnick*
                                      **Chase Scolnick**

16

17                                Attorneys for Plaintiff/Counterclaim-Defendant
                                  GUARDANT HEALTH, INC.

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF ISSUES TO BE DECIDED .................................................... 2

III.    THE CASE IS "EXCEPTIONAL" ENTITLING GUARDANT TO ATTORNEYS' FEES
        AND COSTS ........................................................................................................ 3

        A.     Natera's Willful False Advertising, Even After Litigation Ensued, Warrants an
               Award of Guardant's Attorneys' Fees. .................................................... 3

        B.     Natera's Weak Litigation Position Also Warrants an Award of Guardant's
               Attorneys' Fees.......................................................................................... 9

        C.     Natera's Unreasonable Manner in Litigating the Case Warrants Attorneys' Fees. 11

IV.     GUARDANT'S REQUESTS FOR ATTORNEYS' FEES AND LITIGATION COSTS
        ARE REASONABLE ......................................................................................... 16

    A.  The Rates and Hours Actually Billed by Guardant's Attorneys Are Reasonable. ............. 16

    B.  Guardant's Other Litigation Costs Are Reasonable............................................................ 20

        1.     Taxable Costs ................................................................................................ 20

        2.     Non-Taxable Costs ........................................................................................ 21

V.      CONCLUSION.................................................................................................... 23

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*3M Co. v. Solaryna Energy*, 2022 WL 2903160 (C.D. Cal. June 3, 2022) ................................... 21

4

*Am Prosperity v. Grewal*, 2021 WL 1153194 (D.N.J. March 26, 2021) ...................................... 20

5

*Amarte USA Holdings, Inc., v. Kendo Holdings Inc., et al.*, No. 22-CV-08958-CRB, 2024 WL

6

    5011604 (N.D. Cal. Dec. 5, 2024) ...................................................................................... 19

*Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003) ...................................................................... 18

7

*Baker v. SeaWorld Ent., Inc.*, No. 14-CV-02129-MMA-AGS, 2020 WL 4260712 (S.D. Cal. July

8

    24, 2020) ........................................................................................................................... 22

9

*BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269 (9th Cir. 2024) ............................................... 3

10

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008) ................................................. 17

*Carson v. Billings Police Dep't*, 470 F.3d 889 (9th Cir. 2006) ................................................... 17

11

*Chalmers v. City of Los Angeles*, 796 F.2d 1205 (9th Cir. 1986) ............................................... 19

12

*City of Burlington v. Dague*, 505 U.S. 557 (1992) ...................................................................... 17

13

*City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087 (S.D. Cal. 2012) ................................................ 7

14

*Clarke v. TNSG Health Co.*, No. 2:21-CV-03463-HDV-RAO, 2024 WL 4103563 (C.D. Cal. Aug.

15

    9, 2024) ............................................................................................................................. 18

16

*Colucci v. T-Mobile USA, Inc.,* 48 Cal. App. 5th 442 (2020) ........................................................ 4

*Constr. Indus. & Laborers' Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253 (9th Cir.

17

    2006) ................................................................................................................................. 21

18

*Cornell Univ. v. Hewlett-Packard Co.*, 2009 WL 1405208 (N.D.N.Y. May 15, 2009) ................ 21

19

*Democratic Party of Washington State v. Reed*, 388 F.3d 1281 (9th Cir. 2004) ......................... 19

20

*Dropbox, Inc. v. Thru Inc.*, No. 15-CV-01741-EMC, 2017 WL 914273 (N.D. Cal. Mar. 8, 2017)

21

    .......................................................................................................................................... 22

22

*Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria v. Ceiba Legal, LLP*, 230 F.

23

    Supp. 3d 1146 (N.D. Cal. 2017) ........................................................................................ 16

*Express LLC v. Forever 21*, 09-cv-04514 ODW (VBKx), 2010 WL 11512410 (C.D. Cal. Nov. 15,

24

    2010) ................................................................................................................................. 21

25

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015) ..................... 10

26

*Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557-HSG, 2022 WL 2789496 (N.D. Cal. July 15,

27

    2022) ................................................................................................................................. 17

28

- 2 -

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. CV13-5693 PSG (GJSX), 2017 WL 4685536, (C.D. Cal. May 8, 2017)..................................................................................................... 22

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)............................................................................. 3

*Fox v. Vice*, 563 U.S. 826 (2011) .............................................................................................. 17

*Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992)................................................................ 19

*Gracie v. Gracie*, 217 F.3d 1060 (9th Cir. 2000) ....................................................................... 3

*Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 19-56008, 2021 WL 3702243 (9th Cir. Aug. 20, 2021) .............................................................................................................. 10

*Grove v. Wells Fargo Fin. California, Inc.*, 606 F.3d 577 (9th Cir. 2010) ........................... 20, 21

*H.I.S.C. v. Franmar Int'l*, 2020 WL 6263649 (S.D. Cal. Oct 22 2020)........................................ 4

*Harris v. Marhoefer*, 24 F.3d 16 (9th Cir. 1994) ...................................................................... 22

*HP Inc. v. Wiseta*, No. 23-cv-344-RFL (AGT), 2024 WL 1699564 (N.D. Cal. Mar. 15, 2024)... 17

*In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166 (S.D. Cal. 2007) ............................... 22

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203 (9th Cir. 2023) ............... 3

*Joseph S. v. Kijakazi*, No. 20-cv-09138-DFM, 2023 WL 2628243 (C.D. Cal. Jan. 23, 2023)...... 17

*Kane v. PaCap Aviation Fin., LLC*, No. CV 19-00574 JAO-RT, 2023 WL 5499994 (D. Haw. Aug. 25, 2023).................................................................................................................... 4

*Location Based Servs., LLC v. Niantic, Inc.*, 2018 WL 7569160 (N.D. Cal. Feb. 16, 2018) .......... 9

*Longs Drug Stores California, Inc. v. Fed. Ins. Co.*, No. C 03-01746 JSW, 2005 WL 2072296 (N.D. Cal. Aug. 26, 2005) .................................................................................................. 22

*MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907 (Fed. Cir. 2012) ...................................... 16

*Mauss v. Nuvasive, Inc.*, 2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ...................................... 21

*Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928 (C.D. Cal. 2021) .. 7

*Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV181882JGBSHKX, 2023 WL 8168854 (C.D. Cal. Oct. 6, 2023) ..................................................................................................... 22

*Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536-EMC, 2024 WL 3697030 (N.D. Cal. Aug. 6, 2024) ..................................................................................... 19

*Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) ................................................. 18

*Nat'l Grange of the Ord. of Patrons of Husbandry v. California State Grange*, 182 F. Supp. 3d 1065 (E.D. Cal. 2016) ........................................................................................................ 7

*Netlist Inc. v. Samsung Elecs. Co.*, 341 F.R.D. 650 (C.D. Cal. 2022)......................................... 17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)........................... 3, 11

- 3 -

*Orthopaedic Hospital v. Encore Med., L.P.*, 2021 WL 5449041 (S.D. Cal. Nov. 19, 2021) ........ 20

*Partners for Health & Home, L.P. v. Seung Wee Yang*, 488 B.R. 431 (C.D. Cal. 2012).............. 16

*Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484 (C.D. Cal. Mar. 24, 2015) ........................................................................................................... 19

*Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 2020 WL 7626410 (N.D. Cal. 2020)................................................................................................ 22

*Pop Top Corp. v. Rakuten Kobo Inc.*, No. 20-cv-04482-DMR, 2022 WL 267407 (N.D. Cal. Jan. 28, 2022) .................................................................................................................................. 9

*Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677 (9th Cir. 2012)................................ 21

*Skydiving Sch., Inc. v. GoJump Am.*, LLC, No. CV 23-00292 DKW-WRP, 2024 WL 4988884 (D. Haw. Sept. 30, 2024)....................................................................................................... 22

*Soler v. County of San Diego*, 2021 WL 2515236 (S.D. Cal. June 18, 2021) .............................. 21

*SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323 (Fed. Cir. 2021).................................................. 11

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016)......................... 3, 21

*Thiebes v. Wal-Mart Stores, Inc.*, 220 F. App'x 750 (9th Cir. 2007)..................................... 19, 20

*T-Mobile USA, Inc. v. Terry*, 862 F. Supp. 2d 1121 (W.D. Wash. 2012)....................................... 7

*TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011)............................................ 8

*UM Corp. v. Tsuburaya Prods. Co.*, No. CV 15-03764-AB (AJWx), 2018 U.S. Dist. LEXIS 241753 (C.D. Cal. Aug. 1, 2018)........................................................................................... 20

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403 (9th Cir. 1990) .................... 17

*Vargas v. Howell*, 949 F.3d 1188 (9th Cir. 2020) ........................................................................ 17

*Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152 (9th Cir. 2018) ................................................ 17

*Welch v. Metro. Life Ins. Co.*, 480 F.3d 942 (9th Cir. 2007) ....................................................... 17

*Wyatt Tech. Corp. v. Malvern Instruments, Incorp.*, 2010 WL 11404472 (C.D. Cal. June 17, 2010) ............................................................................................................................................ 21

*Yuga Labs, Inc. v. Ripps*, 2023 WL 7089922 (C.D. Cal. Oct. 25, 2023)...................................... 11

**Statutes**

15 U.S.C. § 1117 ...................................................................................................................... 1, 3

28 U.S.C. § 1920 ...................................................................................................................... 2, 20

**Rules**

Fed. R. Civil P.  54 ........................................................................................................................ 20

1    **I.**    **INTRODUCTION**

2    The Lanham Act states that "in exceptional cases [courts] may award reasonable attorney

3    fees to the prevailing party." 15 U.S.C. § 1117(a). This case is certainly exceptional. Willful

4    misconduct is the hallmark of exceptional cases. As the jury found, Natera's false advertising was

5    willful. Dkt. 847 (Jury Verdict). Natera knew its side-by-side comparisons of metrics from

6    different studies, using different sample volumes, were baseless and dishonest. But, Natera also

7    knew those comparisons would effectively "salt" Guardant's launch of Reveal and increase

8    Natera's sales of Signatera. Natera traded honesty for profits, disregarding the harm to Guardant,

9    oncologists, and cancer patients. The jury therefore not only found Natera's misconduct to be

10   willful, the jury awarded Guardant punitive damages because Natera's false advertising was done

11   with "malice, oppression, or fraud." Dkt. 814 (Jury Instructions) (Instr. 43); Dkt. 847.

12   The willful nature of Natera's misconduct is further shown by Natera's decision to ramp up

13   its false advertising in response to Guardant's cease-and-desist letter and complaint. Even after

14   Guardant and Natera agreed to the Joint Statement prohibiting comparative advertisements (Dkt.

15   25-3), Natera continued sending false comparison emails to oncologists, hosted a webinar to repeat

16   the same false comparisons, and split its "Performance Comparison Chart" (Ex. F,[1] Trial Exhibit

17   ("TX-") 126) into separate pages so it could continue making the same false claims but avoid

18   Guardant's detection.

19   The case is also exceptional given the weakness of Natera's litigation positions. Natera

20   offered no meaningful defense for its false advertising — Natera's own biostatistics expert (Dr.

21   Rebeca Betensky) remarkably provided no defense of Natera's advertisements. The jury readily

22   concluded that Natera's advertising violated the Lanham Act and awarded Guardant $292.5 million.

23   Dkt. 847. The jury resoundingly rejected Natera's counter-claims. *Id.*

24   The unreasonable way Natera litigated this case also renders the case exceptional. Natera's

25   army of attorneys (over 20 active counsel of record compared to just 9 for Guardant) engaged in a

26   scorched-earth strategy that needlessly complicated an already complex case. Natera's vexatious

27

28   [1] "Ex. __" refers to the exhibits attached to the accompanying declaration of Craig Harbaugh.

tactics included re-litigating issues decided by the Court; providing a massive dump of documents right at the discovery cut-off; listing over 1,300 trial exhibits when it introduced less than 100; over-designating and over-objecting to deposition testimony; trying to thwart Guardant's deposition of Dr. Claus Andersen and then asserting frivolous objections to the translation; repeatedly violating the Court's evidentiary orders during trial; and burying Guardant with 321 closing demonstratives it could not possibly have used in the remaining ~90 minutes.

The epitome of Natera's unreasonable litigation tactics were the deliberate misrepresentations it and its expert Dr. Hochster made to Judge Kim and this Court about COBRA-related issues. Those misrepresentations delayed trial by eight months and needlessly tied up Guardant's attorneys for a significant part of 2024. This Court's order imposing evidentiary sanctions on Natera documents the extraordinary, repeated nature of Natera's lies to the Court and Guardant's counsel. Dkt. 730.[2]

Guardant respectfully requests that the Court determine this case is "exceptional" under the Lanham Act and award Guardant its attorneys' fees and related non-taxable costs. Guardant also seeks recovery of its taxable costs under 28 U.S.C. § 1920. The fees and costs are documented herein and in the accompanying declarations of Chase Scolnick and Saul Perloff. Guardant specifically seeks $ 22,089,977.50 in attorney's fees and $ 4,916,182.55 in costs.[3]

## II.    STATEMENT OF ISSUES TO BE DECIDED

1. Whether the case qualifies as "exceptional" justifying attorneys' fees under Section 35(a) of the Lanham Act.

2. Whether the attorneys' fees and costs sought by Guardant are reasonable.

---

[2] In accordance with that Order, Guardant is filing a separate motion to recover, as sanctions, its attorneys' fees attributable to COBRA-related issues. While those fees are included in the total attorneys' fees requested in this Motion, Guardant does not seek a double recovery of any of its attorneys' fees.

[3] The amount of attorneys' fees and costs is through December 2024 with estimates of the additional fees that will be incurred through the March 27, 2025 hearing on post-trial motions. Guardant will supplement the documentation of fees and costs incurred in 2025 as those are realized.

### III.    THE CASE IS "EXCEPTIONAL" ENTITLING GUARDANT TO ATTORNEYS' FEES AND COSTS

The Lanham Act states that "in exceptional cases [courts] may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a).   Courts "examine the 'totality of the circumstances' to determine if the case was exceptional." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016).   "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *BillFloat Inc. v. Collins Cash Inc.*, 105 F.4th 1269, 1278-79 (9th Cir. 2024) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).   Courts base that determination on "a 'nonexclusive' list of 'factors,' including 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Octane Fitness*, 572 U.S. at 554 n.6 (citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)).

### A.    Natera's Willful False Advertising, Even After Litigation Ensued, Warrants an Award of Guardant's Attorneys' Fees.

Although no longer necessary to prove an exceptional case, *SunEarth*, 839 F.3d at 1180-81, evidence of defendant's willful misconduct remains the hallmark of an exceptional case. *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223-24 & n.13 (9th Cir. 2023) *cert. denied*, ─── U.S. ────, 144 S. Ct. 550 (2024) ("Because the *SunEarth* test is less stringent than the previous 'willful infringement' standard, it stands to reason that this case of willful infringement would satisfy the *SunEarth* test."); *Gracie v. Gracie*, 217 F.3d 1060, 1069 (9th Cir. 2000) ("The district court's decision to make a fee award to Rorion thus flows quite naturally from the jury's finding of willful infringement").   Thus, an award of attorneys' fees is appropriate where the defendant persists in its illegal conduct despite receiving a cease-and-desist letter, filing a complaint, or entry of a preliminary injunction. *Jason Scott Collection, Inc.* 68 F.4th at 1223 (upholding award of attorney's fees based on "willful and brazen infringement" where defendant "intentionally and precisely copied [plaintiff's] design, ignored [ ] cease and desist letters, and

- 3 -

1    resisted compliance with the court's injunction").

2        The jury found Natera's false advertising was willful.  Dkt. 847.  This Court included that

3    question on the verdict form (along with the corresponding instruction) precisely to inform the

4    Court's post-trial analysis of issues such as a request for attorneys' fees.  Dkt. 719 at 3 ("[T]he

5    Court may consider the totality of the circumstances, including the jury's determination of whether

6    the defendants acted willfully."); *see also Kane v. PaCap Aviation Fin., LLC*, No. CV 19-00574

7    JAO-RT, 2023 WL 5499994, at *3 (D. Haw. Aug. 25, 2023) ("Advisory juries are also useful to

8    "allow[ ] the judge to get some appreciation for the common sense or standard of the community.").

9    In this context, "willfulness" means that Natera "knew its advertising was false or misleading, or it

10   acted with reckless disregard for, or willful blindness to, the false or misleading nature of its

11   advertising." Dkt. 814 (Inst. 45).  In addition to finding Natera's false advertising was willful, the

12   jury awarded punitive damages after finding "by clear and convincing evidence" that Natera acted

13   "with malice, oppression or fraud."  Dkt. 814 (Instr. 43); Dkt. 847.[4]

14       Natera's anticompetitive motivation for pursuing its false advertising campaign further

15   supports willfulness. *See, e.g., H.I.S.C. v. Franmar Int'l*, 2020 WL 6263649 (S.D. Cal. Oct 22 2020)

16   (finding exceptional case and awarding attorney's fees based on plaintiff trying to "drive

17   Defendants out of business" and pursuing litigation in "attempt to corner the market for the products

18   at issue").Natera deliberately set out to sabotage Guardant's launch of Reveal, and did so by

19   creating grossly false apples-to-oranges comparisons, which Natera distributed to essentially every

20   oncologist in the country.

21       Natera was determined to attack Guardant's Reveal years before its commercial launch and

22   years before publication of the Harvard/Parikh Study. ██████████████████████

23   ████████████████████████████ In September 2019 — 1.5 years

24   before Guardant's commercial launch of Reveal — Natera's CEO directed his team: "We need to

25   be laser focused on CRC land grab or we will lose to Guardant.  We need to put more intensity –

---

[4] The jury's factual determination for punitive damages is binding.  *See Colucci v. T-Mobile USA, Inc.,* 48 Cal. App. 5th 442, 454 (2020) ("our task is to determine whether substantial evidence supports the jury's finding, by clear and convincing evidence, that Robson's actions were malicious or oppressive").

this is a war we are entering." Ex. K, TX-0150 at 2.  As Guardant prepared for the launch of Reveal in early 2021, Natera began its "Project Solar" — Natera's anti-Reveal campaign designed to prevent Reveal from gaining traction with oncologists.  *See* Ex. D, TX-0095 ("[sales] training to pound" Guardant); Ex. L, TX-0152 at 2 ("we need to go to the mat here"); Ex. B, TX-0048 ("Key here is to cut off Guardant at the pass and get patients on Signatera prior to Onc decision."). Natera's CEO directed his team to "ring fence all oncologists and hit their social, web very hard" and "*[s]pend whatever is necessary to salt [Guardant's] launch"* of Reveal.  Ex. E, TX-0109 at 3 (emphasis supplied).

Natera knew its tumor-dependent Signatera had "major downsides" compared to the blood-only Reveal.  Ex. X, 11/15/2024 Trial Tr. at 1545:15-25 (S. Moshkevich); Ex. N, TX-0222 ("Major downsides are the logistical complexity of obtaining both tissue and blood, its impact on turnaround time, and what happens when there is insufficient tissue to design the bespoke assays.").  Thus, Natera also knew that to be competitive Signatera's performance would have to far exceed Reveal's.  Ex. K, TX-0150 ("The performance of our test has to be very superior."); Ex. V, 11/13/2024 Trial Tr. at 1009:21 – 1010:8 (S. Chapman) ("reference to 'performance' is a reference to test sensitivity").  The Harvard/Parikh Study — published April 29, 2021 — therefore presented a serious threat to Natera because it showed Guardant's Reveal had favorable sensitivity and specificity compared to tumor-informed tests like Natera's Signatera.   Ex. A, TX-0001 at 8.

Natera responded to that serious threat first by attacking two highly-respected Havard Medical School professors (Dr. Corcoran and Dr. Parikh). Not content to stop there, Natera then designed and distributed false comparative ads based on cherry-picking certain metrics from the Harvard/Parikh Study on Reveal and the Danish/Reinert Study on Signatera.  Natera, however, knew one could not reasonably compare the results from the Harvard/Parikh Study to the Danish/Reinert Study to claim superiority of Signatera.  Among all the differences between those two studies, the most obvious is that the Harvard/Parikh Study used sample volumes less than half the size of those in the Danish/Reinert Study.  Ex. W, 11/14/2024 Trial Tr. at 1238:18 – 1239:4 (D. Heitjan).  The Harvard/Parikh Study specifically highlighted how the low sample volume likely affected the performance of Reveal: "In particular, all of our samples had plasma input volumes of

4 mL or less, versus the recommended input of 8-10 mL, which may have affected overall performance characteristics." Ex. A at 7. Witness after witness explained how Natera's advertisements presented false apples-to-oranges comparisons because the two studies used different sample volumes. *See, e.g.*, Ex. S, 11/06/2024 Trial Tr. at 388:17-20 (J. Odegaard); 406:24 – 407:1 (K. Price); Ex. U, 11/12/2024 Trial Tr. at 733:15-17 (H. Eltoukhy); Ex. W, 11/14/2024 Trial Tr. at 1240:7-20 (D. Heitjan) ("It's known that if you do not have the recommended amount of blood plasma to conduct the this test, then the sensitivity of the test can be substantially reduced.").

Even Natera's own collaborator, Dr. Andersen from Aarhus University (the senior author of the Danish/Reinert Study), testified that one cannot reasonably compare results generated with different input volumes. Ex. CC, 10/25/2024 C. Andersen Dep. Day 2 at 95:6-20 (as played at trial) ("[I]f you provide one with 4 milliliters and the other with 8, then you have made it more difficult for one than for the other . . . . [I]f you want to provide both tests with the same opportunity, then you should provide them with the equal amount of material."). Dr. Andersen explained it "would be a bit like comparing apples and pears." *Id*. Ex. BB, 10/23/2024 C. Andersen Dep. Day 1 at 104:20-24. And, Dr. Andersen had made that exact point to Natera in an analogous context long before Natera started its false advertising against Guardant. Ex. P, TX-0400 at 2 ("As I have explained the ddPCR results were generated using much less input than used for Signatera. Therefore, the comparison makes no sense, scientifically. It is biased towards showing Signatera as more sensitive.").

During trial, Guardant's counsel used the apt analogy of comparing the range of two pickup trucks in an advertisement, but not disclosing that the range for one was determined with a full tank of gas and the range for the other was determined with only a half tank of gas. That is an obviously false comparison and analogous to Natera's comparisons of Signatera's performance using ideal sample volumes to Reveal's performance using less than half those volumes. Dr. Masukawa — one of the people with primary responsibility for Natera's advertisements — admitted that it would be wrong for Natera's sales force to have told oncologists that Natera's comparative advertisement, Trial Ex. 126, was an "apples-to-apples comparison, and Signatera outperforms Reveal." Ex. T,

- 6 -

1    11/07/2024 Trial Tr. at 580:21-25 (K. Masukawa).  Yet, that's exactly how Natera presented the

2    data—as a head-to-head comparison claiming superiority of Signatera over Reveal.  *See, e.g.*, Ex.

3    X, 11/15/2024 Trial Tr. at 1468:7-11 & 1555:2-6 (S. Moshkevich) ("It's pretty head-to-head

4    comparison.").  And Natera willfully distributed those knowingly false comparisons by FedEx and

5    by email to virtually every oncologist in the country.  Ex. T, 11/07/2024 Trial Tr. at 573:7-13 &

6    574:3-4 (K. Masukawa); Ex. V, 11/13/2024 Trial Tr. at 1045:25 – 1046:3 (S. Chapman).

7         Natera persisted in its false advertising after Guardant's cease-and desist letter, Guardant's

8    filing of its complaint, and after entering the judicially enforceable Joint Statement.  Courts

9    repeatedly have held a defendant's continued false advertising (or infringement) after a cease-and-

10   desist letter, filing a complaint, or entry of a preliminary injunction is evidence of "willfulness" that

11   justifies finding the case to be "exceptional" under the Lanham Act for an award of attorneys' fees.

12   *See, e.g., Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D.

13   Cal. 2021) (finding willfulness where "[d]efendant continued to sell the infringing products after it

14   received [p]laintiff's cease and desist letters and after [p]laintiff filed the instant lawsuit").[5]

15   Guardant sent its cease-and-desist letter on May 21, 2021.  Ex. G, TX-0127.  In the days after

16   receiving that letter, Natera put together the template and plans for its massive e-mail advertising

17   campaign, which repackaged the false comparative claims from Natera's Performance Comparison

18   Chart.  Ex. H, TX-0128 at 2; Ex. M, TX-0220 & Ex. O, TX-0286 (excerpted).  Natera continued to

19   send those emails after Guardant filed its complaint on May 27, 2021, and after Natera agreed to

20   the Joint Statement on June 4, 2021.  Ex. I, TX-0133 (Jun. 7, 2021 email); Ex. J, TX-0135 (Jul. 9,

21   2021 email); Ex. O, TX-0286 (excerpted) at 32-32 (Sep. 27, 2021 email).  During it Project Solar

22   campaign, Natera sent those emails multiple times to virtually every oncologist in the country —

23   in total about 100,000 emails.  Ex. V, 11/13/2024 Trial Tr. at 1045:25 – 1046:3 (S. Chapman).

---

[5] *See also Nat'l Grange of the Ord. of Patrons of Husbandry v. California State Grange*, 182 F.
Supp. 3d 1065, 1084 (E.D. Cal. 2016) (finding defendant acted willfully warranting the grant of
attorneys' fees based in part on defendant's continuing infringing conduct despite an injunction);
*City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1109 (S.D. Cal. 2012) (awarding attorneys' fees
based upon willfulness where the defendant "persisted in using the [plaintiff's trademark] even
after the summary judgment ruling"); *T-Mobile USA, Inc. v. Terry*, 862 F. Supp. 2d 1121, 1135
(W.D. Wash. 2012) (finding exceptional case and awarding attorneys' fees in part because the
defendant "refused to cooperate in discovery, repeatedly violated Court Orders and continued to
violate the Preliminary Injunction").

1

2        After entering the Joint Statement, Natera also hosted a webinar where it repeated many of

3 the same false comparisons. Natera's email campaign invited recipients to a webinar on June 10,

4 2021, where Natera would "discuss new Signatera performance data, and review tumor informed

5 vs tumor-uninformed tests in more detail." Ex. O, TX-0286 at 1-2. The webinar's purpose was to

6 further publicize the same false comparative claims. During its webinar, Natera presented the same

7 false comparisons from its Performance Comparison Chart and e-mail campaign. *See* Dkt. 43-13,

8 Exhibit 7, at 9-12, 14, 19, & 21.

9        To continue its false advertising despite having entered the Joint Statement, Natera split its

10 Performance Comparison Chart into two 1-page grids for its sales representatives to use in meetings

11 with oncologists. Dr. Masukawa explained those two 1-page grids "contained similar information

12 to what was in the side-by-side comparison."-- "Just that one side had information on Guardant;

13 the other side had information on Natera." Ex. U, 11/12/2024 Trial Tr. at 637:3-14. ████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████

17        Natera's willful false comparative advertising — including Natera's willful continuation of

18 that false advertising after Guardant sued and the parties entered the Joint Statement — justifies a

19 determination that this is an exceptional case and an award of Guardant's attorneys' fees. An award

20 of Guardant's attorneys' fees would advance the goals of compensation to Guardant for the

21 substantial expenses it incurred to litigate this case for over 3 years and deterrence of such blatant

22 false advertising. *See Octane Fitness,* 134 S. Ct. at 1756 n.6 (court's "discretion [to award fees]

23 should be exercised 'in light of . . . the need in particular circumstances to advance considerations

24 of compensation and deterrence" (citations omitted)); *Sunearth*, 839 F.3d at 1181 (same).

25 Reimbursement to Guardant for attorney's fees would also recognize the benefit of the verdict to

26 the cancer community, especially those doctors and patients who were wrongfully deterred from

27 using Reveal, especially when there was no other DNA diagnostic available. *See*

28 *TrafficSchool.com, Inc. v. Edriver Inc*., 653 F.3d 820, 832 (9th Cir. 2011) (finding district court

erred in denying attorney's fees by failing to consider "substantial benefits on the public" resulting from the judgment and injunction, which ended confusion created by defendant's behavior, including "stop[ping] consumers from mistakenly transferring sensitive personal information to a commercial website.").

### B. Natera's Weak Litigation Position Also Warrants an Award of Guardant's Attorneys' Fees.

A party's weak litigation position also can support an exceptional-case finding. A weak litigation position exists where the party "persists with a clearly untenable claim or adduces no evidence in support of its position." *Location Based Servs., LLC v. Niantic, Inc.*, __cv__, 2018 WL 7569160, at *1 (N.D. Cal. Feb. 16, 2018) (collecting cases); *Pop Top Corp. v. Rakuten Kobo Inc.*, No. 20-cv-04482-DMR, 2022 WL 267407, at *4 (N.D. Cal. Jan. 28, 2022) (concluding that the plaintiff's case was objectively unreasonable and substantively weak, noting that "the record establishes that [the plaintiff] never advanced factual support for its position that the Kobo App infringed claim 1 of the '623 patent," and "[a]t the end of the day, [the plaintiff] never offered evidence supporting its claim").

Natera never offered a meaningful defense of its false comparisons. The telltale of Natera's weak position is that its own biostatistics expert, Dr. Rebecca Betensky, offered no defense for Natera's advertisements. Ex. Y, 11/18/2024 Trial Tr. at 1834:16-19 (R. Betensky) ("I'm not addressing Natera's ads, yes."). Natera did not present a single medical doctor — let alone an experienced oncologist — to defend its false comparisons. Instead, Natera tried to mislead the jury with expert testimony from a person with no medical degree, no degree in statistics, and no experience in clinical studies. *Id.* at 1762:7-8 (M. Metzker) (Q: "You've never participated in any clinical studies; right?" A: "Not directly, no."). Natera had Dr. Metzker testify about cfDNA levels, rather than the amount of blood/plasma, but Dr. Metzker did not calculate the actual cfDNA levels involved, despite having access to that data. *Id.* at 1774:15 – 1775:3 (M. Metzker) ("I did see that spreadsheet, and did not calculate that."); 1775:5-7 (Q: "So you did have the data, but you didn't calculate it; correct?" A: "I had the data. I did not calculate it. You're correct."). The undisputed evidence from Guardant's Victoria Raymond shows the cfDNA levels in the

1    Danish/Reinert Study were about twice those in the Harvard/Parikh Study.  Ex. V, 11/13/2024 Trial

2    Tr. at 1122:15 – 1123:1 (V. Raymond).

3    Thus, the jury readily concluded that Natera's advertisements violated the Lanham Act,

4    "actually deceive or have a tendency to deceive a substantial segment of consumers," and that

5    Natera's false advertising was "willful," and awarded a significant amount to Guardant in actual

6    damages, disgorgement, and punitive damages.  Dkt. 847.  Generally, "[a] monetary award should

7    *support* the decision to assess fees."  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d

8    1059, 1080 (9th Cir. 2015) (emphasis in original).*Grasshopper House, LLC v. Clean & Sober*

9    *Media, LLC*, No. 19-56008, 2021 WL 3702243, at *4 (9th Cir. Aug. 20, 2021) (remanding for

10   reconsideration of the denial of attorneys' fees based on remand for denial of disgorgement "to

11   determine whether its ruling on disgorgement on remand affects its ruling on the award of attorneys

12   fees").

13   Natera's counter-claims were also remarkably weak.  As the jury correctly found, each of

14   Natera's allegations of false advertising against Guardant were meritless.  Dkt. 847.  Natera, for

15   example, challenged Guardant's advertising of 91% sensitivity and 100% specificity for Reveal.

16   But those figures came directly from the peer-reviewed, published Havard/Parikh Study.  Ex. A,

17   TX-0001 at 1, 4, & Fig. 3B.  Natera persisted with those claims throughout this litigation even after

18   learning (over 2.5 years ago) that Dr. Corcoran had reviewed Guardant's 2021 JP Morgan

19   presentation, and found it correct and based on the results reported in the Harvard/Parikh Study.

20   Ex. AA, 6/15/2022 Corcoran Dep. at 244:3-245:2 (played at trial).

21   Natera realized the weakness of those challenges to Guardant's advertising, so it pivoted to

22   attacking the integrity of the Harvard/Parikh Study's representation that the ctDNA analysis was

23   "blinded."   In its opening statement, Natera went so far as to claim it would prove that the

24   Harvard/Parikh study was fraudulent.  Ex. S, 11/06/2024 Trial Tr. at 256:12 – 257:21.  Yet, Natera

25   knew there was no evidence — and it presented none — anyone at Guardant ever used the outcomes

26   data to change the ctDNA results reported in the Harvard/Parikh Study.  Natera's own expert, for

27   example, testified that he was not aware of any evidence that Guardant "manipulated the

28   bioinformatics pipeline in order to flip calls" as part of the Harvard/Parikh Study.  Ex. Y,

1    11/18/2024 Trial Tr. at 1779:3-11 (M. Metzker).  And Natera's biostatistics expert testified that

2    while she was aware of some changes by Guardant to the ctDNA results, she "did not analyze the

3    statistical effect of any changes," *id.* at 1843:1-8 (R. Betensky), and that she was not claiming "any

4    changes to the results by Guardant were statistically significant," *id.* at 1843:9-15.

5         Natera's attack on the Harvard/Parikh Study was not only baseless, Natera knew it had done

6    in the Danish/Reinert Study the things it was accusing Guardant of doing.  The entire basis of

7    Natera's challenge to the integrity of the Harvard/Parikh Study was that a few ctDNA results

8    changed when Guardant ran the samples on the new version of Reveal.  In the Danish/Reinert

9    Study, however, Natera did the same thing — re-running samples on Signatera and updating the

10   results, after Natera employees received the outcome data.  Dr. Andersen confirmed that "Natera

11   reanalyzed some of the samples after they were unblinded." Ex. CC, 10/25/2024 C. Andersen Dep.

12   Day 2 at 146:8-11 (as played at trial). As with the Harvard/Parikh Study, the Reinert Study also

13   claimed that the "ctDNA analyses were performed . . . blinded." Ex. DD at 2 (TX-004) (excerpted).

14        Despite over three years of litigation and massive efforts by Natera to smear Guardant and

15   the lead authors of the Harvard/Parikh Study, Natera's counter-claims against Guardant were

16   remarkably weak, as reflected in the jury's decision rejecting all of Natera's counter-claims.

17        **C.  Natera's Unreasonable Manner in Litigating the Case Warrants Attorneys' Fees.**

18        "A case may be exceptional based on the unreasonable manner in which it was litigated."

19   *Octane Fitness*, 572 U.S. at 442.  Conduct need not rise to the level of sanctionable misconduct to

20   be considered unreasonable.  *Id.* at 555 ("a district court may award fees in the rare case in which

21   a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless

22   so 'exceptional' as to justify an award of fees.").  Courts recognize many circumstances that qualify

23   as unreasonable, including "aggressive tactics" or "creat[ing] a substantial amount of work for both

24   [plaintiff] and the court, much of which work was needlessly repetitive or irrelevant or frivolous."

25   *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1331–32 (Fed. Cir. 2021); *Yuga Labs, Inc. v. Ripps*,

26   2023 WL 7089922, at *19 (C.D. Cal. Oct. 25, 2023) (finding an exceptional case warranting

27   attorney's fees based on "Defendants' repeated attempts to re-litigate issues already addressed and

28   rejected by the Court [which] unnecessarily complicated this litigation.").

Natera's unreasonable litigation strategy started before Guardant even filed its complaint. When Guardant sent Natera a cease-and-desist letter on May 21, 2021, Natera claimed it needed more time to consider it.  S. Perloff Decl., ¶ 3(A).  In reality, Natera was buying time as its attorneys were secretly drafting Natera's own complaint, hoping to beat Guardant to the courthouse.  *See Natera, Inc. v. Guardant Health, Inc.,* Case No. 6:21-cv-540 (W.D. Tex.) Dkt. No. 1 (May 28, 2021). After Guardant sued, Natera blasted nearly every oncologist in the country with emails containing the same false comparisons Guardant was challenging and inviting the recipient to a webinar where Natera would further emphasize those false comparisons.  *Supra* p. 8.

Once Guardant sought a temporary restraining order, and the Court directed the parties to reach agreement regarding comparative advertising, Natera had to change tack.  Natera knew its email campaign and upcoming webinar would violate the Joint Statement so it made a preemptive strike by boldly claiming that Guardant violated the Joint Statement.  The allegation was frivolous. And this Court recognized Natera's true ulterior motive:  "At the June 24, 2021 hearing on Defendant's motion for an order to show cause, it became evident to the Court that said motion was Defendant's attempt to walk back its agreement—embodied in the joint statement—not to make direct head-to-head comparisons between Signatera and Reveal."  Dkt. 86 at 4.

Natera sought to undo the Joint Statement after it had already violated it.  On November 19, 2021, counsel for Natera again broached dissolving the Joint Statement. Dkt. 119 (Nov. 19, 2021 Tr. of Hrg.) at 74:2-75:18. This Court rejected Natera's request. *Id.* at 77:20-23. Later that evening, Natera produced some of its communications with doctors—over a hundred of which reflected a post-Joint Statement violation of the agreement.  E.g., Ex. O, TX-0286(excerpted).[6]

The Joint Statement is just one of the many issues Natera sought to re-litigate through these

---

[6] This, of course, was not Natera's only discovery-related misconduct. For example, the Parties had expressly agreed that they would not engage in any "document dumps" as part of written discovery, and instead would produce documents through rolling productions. Guardant complied with this agreement; Natera did not, and instead produced over 95% of its documents at (or shortly after) the deadline for such productions. E.g., Dkt. 162 at 13:22-14:1 (describing Natera's "document dump" of about half a million pages "five minutes before the deadline"). Natera would go on to renege on agreements related to the close of written discovery, Dkt. 171 at 3, and the number of fact-witness depositions. Dkt. 546 at 7.

proceedings.  Natera would accept no ruling that recognized Lanham Act liability on a theory of falsity by necessary implication based on an "apples-to-oranges" comparison.  Natera unsuccessfully raised this issue in its motion for summary judgment (Dkt 220), its first motion *in limine* (Dkt 363), and round (Dkt. 375) after round (Dkt 507) of objections to the jury instructions.  Undeterred, Natera relitigated the issue even after trial started (Dkt 788).

Another example of Natera's unreasonable litigation tactics was its efforts to stop the deposition of Dr. Claus Andersen.  Despite Natera making the definitions of "blinded" and "prospective" central to its attacks on the Harvard/Parikh Study, Natera fought to prevent any scrutiny of how those terms were used by the lead authors of the Danish/Reinert Study.  After this Court ruled in the motions *in limine* that evidence regarding the Danish/Reinert Study would be relevant and admissible because it "sheds light on the meaning of 'prospective' and 'blinded,'" Dkt. 509 at 15, Natera falsely represented to the Danish authorities that any evidence from Dr. Andersen "is unlikely to be admissible in the US trial."  Dkt. 664 (Letter from C. Scolnick explaining status of Danish discovery).

When Natera's initial attempts to thwart the deposition of Dr. Andersen failed, Natera insisted that despite Dr. Andersen being fluent in English (Natera only communicated with him in English) that the deposition be in Danish.  Dkt. 765 at 1.  Natera further insisted that only Danish counsel should be allowed to question him. Dkt. 765-2 (Natera "objects to allowing Guardant's American lawyers to conduct the questioning"). Natera then demanded, with a straight face, that Danish counsel not be allowed access to *any* confidential materials.  Dkt. 765.  Guardant jumped through multiple hoops, including providing a simultaneous English translation by an E.U. certified interpreter and a simultaneous transcription by a U.S. certified court reporter.  Rather than object to that translation — or retain its own interpreter — Natera laid in wait and right before trial raised frivolous objections to the admissibility of Dr. Andresen's testimony.  Dkt. 763.

Natera was motivated to exclude Dr. Andersen's testimony, not only to hide evidence that the Reinert and Parikh studies applied the same definitions but also to conceal actual misconduct in the Reinert study. Throughout the case, Natera's witnesses testified that the study showed only Signatera's performance and did not include the results of Natera's "Pool 2" ddPCR analysis, a test

- 13 -

developed by Aarhus University which is completely independent of Signatera.   Natera repeated these lies to the Court and represented, "Dr. Andersen's [Pool 2] comparison of Signatera with ddPCR did not serve to bolster Signatera's performance."  Dkt. No. 277-5, page 15 n. 15.  This Court relied on Natera's misrepresentations and granted its motion for summary judgement, precluding Guardant from offering evidence of Natera's misconduct.    Dkt. No. 326, at 43.  Dr. Andersen's testimony revealed Natera's representations to Guardant and the Court were entirely false.  Natera reran many of the Reinert study samples after being unblinded, including by rerunning some samples Natera called incorrectly on Aarhus University's Pool 2 ddPCR test.  *See* Ex. BB, Andersen Dep. at 90 (confirming the Reinert Study combined the results of Signatera and Pool 2, which was designed after Natera was unblinded to clinical data).  Aarhus's Pool 2 test found some patients' cancer that Signatera missed.  *See* Ex. BB, Andersen Dep. at 89:22-90:23.  ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████     █████████████████████     █████████████

████████████     Natera     ██████████████████████     used the results from Aarhus's test to boost Signatera's performance in the Reinert Study.  Ex. CC, Andersen Dep. II at 146:08-149:08 (confirming Reinert Study published patient's improved results from Pool 2).

Natera's unreasonable litigation tactics extended to the entire process of exchanging trial exhibits, deposition designations, and demonstratives.  Natera put a staggering 1,300 exhibits on its list for trial.  Guardant's attorneys had to review each listed exhibit, assert objections where appropriate, and meet and confer repeatedly with counsel.  After all that, Natera sought to offer fewer than 100 of those exhibits.  In the time set aside by the Court for this trial, a list of 1,300 exhibits is beyond preposterous — it implies that Natera would have had to introduce one exhibit every 50 seconds during their 18 hours for trial.  Regarding deposition designations, Natera designated extensive testimony from every Guardant and third-party witness deposed—some eleven witnesses in all—claiming it would play over 3,300 page-line designations – a page/line *list* that exceeded a hundred single-spaced pages that, at a conservative estimate, would have more than exhausted the totality of Natera's time allotment.  At trial, Natera played a fraction of testimony

- 14 -

1  from just five witnesses. This Court found that for deposition designations "the scope of Natera's

2  objections and the scope of the counter-designations were excessive and almost limitless.  And so

3  just on those two depositions, we spent hours, at least seven hours . . . ." Ex. Z, 10/15/2024 Hearing

4  Tr. at 131:20 – 132:7.  Natera persisted in its gamesmanship to the end, dumping on Guardant's

5  attorneys at the eleventh hour over 300 slides for a closing argument limited to about 90 minutes.

6  These tactics by Natera increased exponentially the time Guardant's attorneys had to spend getting

7  this case through trial.

8          During trial, Natera disregarded the Court's evidentiary rulings on multiple occasions.  For

9  example, in response to Natera's own motion in limine, the Court ruled all evidence or argument

10 of MolDX's motivation in delaying Medicare was inadmissible.  Yet Natera repeatedly tried to

11 introduce evidence regarding its preferred take on MolDX's motivation, obviously hoping that the

12 Court's order would prevent Guardant from responding.  Guardant was forced to scramble in trial

13 to file a brief asking the Court to repeat its prior order.  Dkt. 798.   Despite the Court explicitly

14 reaffirming its earlier rulings, Natera persisted in its efforts to reintroduce the same excluded

15 evidence through yet another witness. *E.g.*, Ex. X, 11/15/2024 Trial Tr. at 1561:4-18; 1566:9-15

16 ("MS. KELLER: Objection, Your Honor, based on what the Court just ruled. THE COURT:

17 Sustained. It's to be disregarded."); *id.* at 1568:24-1569:2 ("MS. KELLER: Your Honor, I'm going

18 to object to any use of this document unless we can get into it ourselves. THE COURT: Take the

19 document down for the reasons I stated.").

20         The same pattern occurred regarding the Joint Statement.  Dkt. 878, n. 1. Natera moved *in*

21 *limine* to prevent Guardant from arguing the Joint Statement prevented it from engaging in false

22 advertising.  Dkt. 363-3. The Court granted the motion with an important exception: "to the extent

23 that Natera argues that Guardant had an obligation and failed to mitigate damages by engaging in

24 comparative corrective advertising, the Court is inclined to find that it is permissible and necessary

25 for Guardant to introduce at least portions of the Joint Stipulation."  Dkt. 509 at 17.  At trial, Natera

26 repeatedly ignored this warning by eliciting testimony from its own expert that directly violated the

27 Court's order.  While this "troubling" behavior might not independently justify sanctions given

28 Guardant's overriding success at trial, Dkt. 878 n. 1, it shows the unreasonable way Natera litigated

- 15 -

1   this case.

2         The most egregious examples of Natera's unreasonable litigation strategy are the deliberate

3   misrepresentations it made to this Court and to Judge Kim in the context of the COBRA-related

4   materials.  Dkt. 730.  This Court already made the extraordinary determination that Natera (through

5   its counsel at Quinn Emanuel) and its expert Dr. Hochster made "deliberated misrepresentations to

6   Judge Kim and the undersigned of this Court."  Dkt. 730 at 2.  Guardant is filing a separate

7   submission seeking its attorneys' fees specifically related to COBRA-related issues.  However,

8   Natera's repeated intentional lies to the Court and Guardant, through a significant part of 2024, is

9   *per se* unreasonable and alone warrants the determination that this case is exceptional.  *See, e.g.*,

10  *Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria v. Ceiba Legal, LLP*, 230 F.

11  Supp. 3d 1146, 1150-51 (N.D. Cal. 2017) (awarding attorneys' fees where plaintiff made

12  misrepresentations and misleading statements to the court); *MarcTec, LLC v. Johnson & Johnson*,

13  664 F.3d 907, 919 (Fed. Cir. 2012) ("It is well-established that litigation misconduct and

14  'unprofessional behavior may suffice, by themselves, to make a case exceptional").

15        Thus, the unreasonable way that Natera litigated this case independently justifies this

16  Court's determination that it is exceptional.

17  **IV.    GUARDANT'S REQUESTS FOR ATTORNEYS' FEES AND LITIGATION**

18  **        COSTS ARE REASONABLE**

19        Based on the exceptional nature of this case, Guardant seeks to recover $ 22,089,977.50 in

20  attorneys' fees and $4,916,182.55  in costs.  *See* C. Scolnick Decl., ¶¶ 6-7&37; S. Perloff Decl., ¶5.

21        **A.  The Rates and Hours Actually Billed by Guardant's Attorneys Are Reasonable.**

22        The determination of reasonable attorneys' fees under 15 U.S.C. § 1117(a) begins by

23  calculating the "lodestar."  *Partners for Health & Home, L.P. v. Seung Wee Yang*, 488 B.R. 431,

24  438 (C.D. Cal. 2012), *aff'd*, 671 F. App'x 475 (9th Cir. Nov. 30, 2016)).  "The 'lodestar' is

25  calculated by multiplying the number of hours the prevailing party reasonably expended on the

26  litigation by a reasonable hourly rate."  *Vargas v. Howell*, 949 F.3d 1188, 1194 (9th Cir. 2020).

27  There is "a 'strong presumption' that the lodestar represents the 'reasonable fee.'"  *City of*

28  *Burlington v. Dague*, 505 U.S. 557, 562 (1992).  "The essential goal in shifting fees (to either party)

1  is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

2  "[T]he established standard when determining a reasonable hourly rate is the rate prevailing

3  in the community for similar work performed by attorneys of comparable skill, experience, and

4  reputation." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (quotation

5  omitted). "[T]he relevant community is the forum in which the district court sits." *Vogel v. Harbor

6  Plaza Ctr., LLC*, 893 F.3d 1152, 1158 (9th Cir. 2018) "Affidavits of the plaintiffs' attorney and

7  other attorneys regarding prevailing fees in the community, and rate determination in other

8  cases . . . are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v.

9  Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990); *see also, Welch v. Metro. Life Ins. Co.*,

10 480 F.3d 942, 947 (9th Cir. 2007). That "a lawyer charges a particular hourly rate, and gets it, is

11 evidence bearing on what the market rate is, because the lawyer and his clients are part of the

12 market." *Carson v. Billings Police Dep't*, 470 F.3d 889, 892 (9th Cir. 2006).

13 The hourly rates for Guardant's attorneys were reasonable. Those rates reflect what

14 Guardant has actually paid. *See* C. Scolnick Decl., ¶ 6; S. Perloff Decl., ¶5C. The hourly rates are

15 completely in line with the rates for lawyers in California, including in San Francisco, handling

16 comparable types of cases. *See, e.g.*, *HP Inc. v. Wiseta*, No. 23-cv-344-RFL (AGT), 2024 WL

17 1699564, at *4 (N.D. Cal. Mar. 15, 2024) (approving $1,075 per hour for a partner and $625–$725

18 for associates); *Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557-HSG, 2022 WL 2789496, *9

19 (N.D. Cal. July 15, 2022) (finding hourly rates ranged from $760 to $1,325 for partners, $895 to

20 $1,150 for counsel, and $175 to $520 for associates "in line with prevailing rates in this district for

21 personnel of comparable experience, skill, and reputation"); *Netlist Inc. v. Samsung Elecs. Co.*, 341

22 F.R.D. 650, 675 (C.D. Cal. 2022) (in 2022, finding rates ranging $1,160 to $1,370 for partners and

23 associate rates ranging from $845 to $1,060 reasonable); *Joseph S. v. Kijakazi*, No. 20-cv-09138-

24 DFM, 2023 WL 2628243, *2 (C.D. Cal. Jan. 23, 2023) ("The Court's own research, as well as

25 Plaintiff's counsel's own recent fee awards, suggest that an effective attorney hourly rate in the

26 range of $1,300-$1,600 is appropriate").

27

28

The number of hours[7] spent by Guardant's attorneys are also reasonable given the nature of this litigation, the unreasonable litigation tactics by Natera's counsel, and ultimately the jury's verdict that awards Guardant $292.5 million. *See Clarke v. TNSG Health Co.*, No. 2:21-CV-03463-HDV-RAO, 2024 WL 4103563, at *3 (C.D. Cal. Aug. 9, 2024) ("The Court has reviewed all these billing records and finds that the work conducted was reasonable given the breathtaking amount of work that was necessitated by TNSG's unreasonable litigation conduct."). An "award of fees should cover 'every item of service which, at the time rendered, would have been undertaken by a reasonably prudent lawyer to advance or protect his client's interest' in the case at bar." *Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003). "By and large, the district court should defer to the winning lawyer's professional judgment as to how much time he or she was required to spend on the case." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (cleaned up).

From inception, Guardant maintained a lean litigation team, especially compared to the number of attorneys for Natera. During the initial years, Guardant's team included just five attorneys of record from A&O Shearman (including the same team who had been with Norton Rose Fulbright, and later Shearman & Sterling LLP, which merged with Allen & Overy to form A&O Shearman). S. Perloff Decl., ¶5. In the last year, Guardant's team expanded to include four more primary attorneys from Keller Anderle Scolnick. C. Scolnick Decl.,¶ 7. In contrast to Guardant's team of just nine attorneys of record, Natera deployed over twenty attorneys of record.[8] *See, e.g, Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536-EMC, 2024 WL 3697030, at *7 (N.D. Cal. Aug. 6, 2024) ("Some overlap among Moonbug's team in attending trial

---

[7] Roughly 26,000 hours over more than two and a half years were spent by attorneys and paralegals working on this case. Scolnick, Decl. ¶ (8097.2 hours); Perloff, Decl. ¶ 5A (18,341.8 hours)  This amount is reasonable. *See In re Heritage Bond* Litig., 2005 WL 1594389, at *9 (C.D. Cal. June 10, 2005) (basing attorneys' fees award on "approximately 35,000 hours of attorney and paralegal time over the three-and-a-half years the action has been pending").

[8] According to the docket, the following attorneys currently serve as counsel of record for Natera: Kevin P.B. Johnson, Andrew Jonathan Bramhall, Andrew Edward Naravage, Anne S. Toker, Brian Paul Biddinger, Brian C. Cannon, Catlin Williams, Chase J. Cooper, David Leon Bilsker, Derek Lawrence Shaffer, Elle Xuemeng Wang, Jocelyn Ma, John C.C. Sanders, Jr., Kaitlin Elizabeth Keohane, Margaret H. Shyr, Ryan Hudash, Ryan Sadler Landes, Tara Srinivasan, Thomas M. Melsheimer, Valerie Anne Lozano, Victoria F. Maroulis, and Victoria Blohm Parker.

1   and reviewing documents is reasonable given the relatively sparse team of nine attorneys compared

2   to BabyBus's team of at least seventeen attorneys.").

3          The reasonableness of Guardant's requested attorneys' fees is also clearly supported by the

4   number and complexity of the issues. *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1212 (9th

5   Cir. 1986) (identifying "the novelty and complexity of the issues" in evaluating the reasonableness

6   of attorneys' fees."). The massive docket (877 items and counting) reveals the enormous amount

7   of work necessary to litigate this matter. Guardant had to prove its own case — which involved

8   dissecting the complex technology involved with ctDNA testing and the technical peer-reviewed

9   publications validating those tests — and respond to Natera's constantly changing counter-claims.

10  *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB SHX, 2015 WL 1746484 at *27 (C.D.

11  Cal. Mar. 24, 2015), *aff'd*, 847 F.3d 657 (9th Cir. 2017) ("Though large, the fee award comports

12  with the Court's overall sense of the amount of effort it took to successfully litigate this high-stakes

13  action over the course of four years, and the Court finds it appropriate under the circumstances.").

14  "When a defendant employs a scorched earth strategy, unreasonably increasing a plaintiff's

15  litigation expenses, the defendant can expect to pay for the attorney fees it forces the plaintiff to

16  incur." *Thiebes v. Wal-Mart Stores, Inc.*, 220 F. App'x 750, 751 (9th Cir. 2007); *Amarte USA*

17  *Holdings, Inc., v. Kendo Holdings Inc., et al.*, No. 22-CV-08958-CRB, 2024 WL 5011604, at *6

18  (N.D. Cal. Dec. 5, 2024) ("Amarte cannot in good faith claim that the work Defendants' counsel

19  performed in response to Amarte's repeated efforts to balloon the scope of this litigation are

20  unreasonable"); *Democratic Party of Washington State v. Reed*, 388 F.3d 1281, 1287 (9th Cir.

21  2004) ("Litigation has something of the tennis game, something of war, to it; if one side hits the

22  ball, or shoots heavy artillery, the other side necessarily spends time hitting the ball or shooting

23  heavy artillery back.").

24         "The party opposing the fee application has a burden of rebuttal that requires submission of

25  evidence to the district court challenging the accuracy and reasonableness of the hours charged or

26  the facts asserted by the prevailing party in its submitted affidavits." *Gates v. Deukmejian*, 987 F.2d

27  1392, 1397-98 (9th Cir. 1992); *McGrath v. County of Nevada*, 67 F.3d 248, 255 (9th Cir. 1995)).

28  In anticipation of filing this motion, Guardant sent discovery requests to Natera regarding the

amount Natera spent on attorneys' fees.  The purpose of those requests was simply to show the

reasonableness of the rates and hours of Guardant's attorneys, given what the opposing party spent.

The Court said it would not require Natera to produce that information unless it became necessary.

To the extent Natera objects to the reasonableness of the rates or hours by Guardant's attorneys,

Guardant renews its request for the information it has sought from Natera.  It is likely that the rates

and hours by Guardant's attorneys will seem imminently reasonable, if not surprisingly low,

compared to the rates and hours of Natera's attorneys.[9] *See Thiebes*, 220 F. App'x at 751 (noting

"Wal-Mart 'did not elect' to disclose its defense expenses.").

### B.  Guardant's Other Litigation Costs Are Reasonable.

#### 1.  *Taxable Costs*

As the prevailing party, Guardant has the right to an award of costs under 28 U.S.C. § 1920.

*See* Fed. R. Civil P.  54(d)(1); *Grove v. Wells Fargo Fin. California, Inc.*, 606 F.3d 577, 579 (9th

Cir. 2010) ("These expenses—known as 'taxable costs'—may be recovered by the prevailing

party.").  Section 1920 defines "costs" to include: "[f]ees for printed or electronically recorded

transcripts necessarily obtained for use in the case;" "[f]ees and disbursements for printing and

witnesses;" "[f]ees for exemplification and the costs of making copies of any materials where the

copies are necessarily obtained for use in the case;" and "compensation of interpreters."

Guardant seeks to recover approximately $932,616.96 in taxable costs.

C. Scolnick Decl., ¶37; S. Perloff Decl., ¶¶ 5E.

---

[9] Quinn Emanuel Urquhart & Sullivan, LLP, has charged as high as $1,350 for partners and $1,065 for associates from years earlier.  *See, e.g.*, *Orthopaedic Hospital v. Encore Med., L.P.*, 2021 WL 5449041, at *13 (S.D. Cal. Nov. 19, 2021) (rates from $1,225-$1,260 for partner/lead trial counsel; up to $1,140 for another partner, $875 for a fifth-year associate; $1,065 for another fifth-year associate); *UM Corp. v. Tsuburaya Prods. Co.*, No. CV 15-03764-AB (AJWx), 2018 U.S. Dist. LEXIS 241753, at *37-41 (C.D. Cal. Aug. 1, 2018) (approving hourly rates as high as $960 in a copyright action, "which were allegedly 20% lower than what Quinn Emanuel would typically charge"); *Am Prosperity v. Grewal*, 2021 WL 1153194, at *11 (D.N.J. March 26, 2021) (seeking approval for rates of $1,395 for lead partner, $846-$1,080 for additional partners, $589.50-$895.50 for associates, and $297-$319.50 for paralegals).

- 20 -

### 2.  *Non-Taxable Costs*

Costs not covered by Section 1920 are considered non-taxable costs and are recoverable "where statutes authorize attorney's fees awards to prevailing parties." *Grove,* 606 F.3d 577, 580 (9th Cir. 2010);  *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co.*, 668 F.3d 677, 690 (9th Cir. 2012), *abrogated on other grounds*, *SunEarth*, 839 F.3d at 1181 ("[A]ttorney's fees under the Lanham Act may also include reasonable costs that the party cannot recover as the 'prevailing party.'").  Non-taxable costs are "reasonable out-of-pocket litigation expenses that would normally be charged to a fee-paying client." *Grove*, 606 F.3d at 581.  Categories of non-taxable costs that may be recovered as part of an attorneys' fee award include:

(a) data hosting;[10]

(b) computerized research;[11]

(c) non-transcription deposition expenses, including video recording;[12]

(d) messenger and delivery expenses;[13]

(e) trial visual presentations;[14]

(f) travel expenses;[15]

---

[10] *3M Co. v. Solaryna Energy*, 2022 WL 2903160, at *11 (C.D. Cal. June 3, 2022); *Mauss v. Nuvasive, Inc.*, 2018 WL 6421623, at *9 (S.D. Cal. Dec. 6, 2018)

[11] *Constr. Indus. & Laborers' Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258-59 (9th Cir. 2006)  (holding that "reasonable charges for computerized research may be recovered.").

[12] *Soler v. County of San Diego*, 2021 WL 2515236, at *13 (S.D. Cal. June 18, 2021) ("District courts allow recoupment of video deposition expenses if those expenses were reasonably incurred.").

[13] *Wyatt Tech. Corp. v. Malvern Instruments, Incorp.*, 2010 WL 11404472, at *3 (C.D. Cal. June 17, 2010) ("messenger and delivery costs" are recoverable "nontaxable costs").

[14] *Cornell Univ. v. Hewlett-Packard Co.*, 2009 WL 1405208, at *2 (N.D.N.Y. May 15, 2009) (awarding costs of "outside trial graphics vendor" because it provides "tremendous assistance")

[15] Partners for Health & Home, L.P., 488 B.R. at 440-441 (identifying non-taxable costs to include "travel costs"); *Express LLC v. Forever 21*, 09-cv-04514 ODW (VBKx), 2010 WL 11512410 (C.D. Cal. Nov. 15, 2010) (awarding non-taxable costs including "travel costs");  *Harris v. Marhoefer*, 24 F.3d 16, 19–20 (9th Cir. 1994) (affirming award of costs for "hotel bills"); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177–78 (S.D. Cal. 2007)

1    (g) jury consultant services,[16] including mock jury presentations;[17]

2    (h) expert fees;[18] and

3    (i) mediation fees.[19]

4    *See, e.g., Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV181882JGBSHKX, 2023 WL

5    8168854, at *24 (C.D. Cal. Oct. 6, 2023) (upholding non-taxable costs of $6.4M including data

6    hosting, video depositions and recordings, messenger and delivery costs, mediation, hotel stays,

7    and trial graphics).

8    Guardant seeks to recover $ 3,983,565.59 in non-taxable costs as part of the attorneys' fees

9    award for this being an "exceptional" case under the Lanham Act. C. Scolnick Decl., ¶¶ 37

10    ($47,434.95); S. Perloff Decl., ¶5E (3,936,130.64; total costs $ 4,836,130.64 - $900,000 taxable

11    costs).

12

13

14

15

16

17

18

_____

19    [16] *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress*, 2020 WL
7626410 (N.D. Cal. 2020) (granting request for non-taxable costs, including costs for jury
20    consulting services); *Baker v. SeaWorld Ent., Inc.*, No. 14-CV-02129-MMA-AGS, 2020 WL
4260712, at *11 (S.D. Cal. July 24, 2020) (same).

21    [17] *Longs Drug Stores California, Inc. v. Fed. Ins. Co.*, No. C 03-01746 JSW, 2005 WL 2072296,
at *3 (N.D. Cal. Aug. 26, 2005) (finding reasonable $90,000 to prepare for trial by conducting a
22    mock trial); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. CV13-5693 PSG (GJSX), 2017 WL
4685536, at *10 (C.D. Cal. May 8, 2017) (granting request of $1.6M in non-taxable costs, including
23    the costs associated with "a mock trial").

24    [18] *Dropbox, Inc. v. Thru Inc.*, No. 15-CV-01741-EMC, 2017 WL 914273, at *6 (N.D. Cal. Mar. 8,
2017) (awarding full $416K request of non-taxable costs, including $160K in expert fees), *aff'd*,
25    728 F. App'x 717, 719 (9th Cir. 2018) (affirming general award of fees and costs based upon a
finding that the case was "exceptional").

26    [19] *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV181882JGBSHKX, 2023 WL 8168854, at
*24 (C.D. Cal. Oct. 6, 2023) (awarding mediator fees under the Lanham Act); *Skydiving Sch., Inc.*
27    *v. GoJump Am.*, LLC, No. CV 23-00292 DKW-WRP, 2024 WL 4988884, at *10 (D. Haw. Sept.
30, 2024), *report and recommendation adopted*, 2024 WL 4892574 (D. Haw. Nov. 26, 2024)
28    (same).

- 22 -

1

## V. <u>CONCLUSION</u>

This is an "exceptional" case in every way. In the nature and willfulness of Natera's false advertising. In the strength of Guardant's claims—on their own, and relative to the weakness of Natera's counter-claims. In the unreasonable manner that Natera litigated this case from the beginning through the closing arguments to the jury. And in the substance of the jury's verdict. Accordingly, Guardant respectfully requests a determination that this case was "exceptional" under the Lanham Act and a corresponding award of Guardant's attorneys' fees and costs.

Dated: January 17, 2025          **KELLER ANDERLE SCOLNICK LLP**


                                 By:  */s/ Chase Scolnick*
                                      **Chase Scolnick**

                                 Attorneys for Plaintiff/Counterclaim-Defendant
                                 GUARDANT HEALTH, INC.