QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
Andrew J. Bramhall (Bar No. 253115)
andrewbramhall@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Derek L. Shaffer (Bar No. 212746)
1300 I Street, Suite 900
Washington, DC 20005
derekshaffer@quinnemanuel.com
Telephone: (202) 538-8000
Facsimile: (202) 538-8100

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Valerie Lozano (Bar No. 260020)
valerielozano@quinnemanuel.com
865 Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

Attorneys for Defendant and Counterclaim-
Plaintiff NATERA, INC.

WILMER CUTLER PICKERING
HALE AND DORR LLP
Seth P. Waxman (admitted *pro hac vice*)
seth.waxman@wilmerhale.com
2100 Pennsylvania Avenue
Washington, DC 20037
Telephone:    (202) 663-6000
Facsimile:    (202) 663-6363

WILMER CUTLER PICKERING
HALE AND DORR LLP
Thomas G. Sprankling (Bar No. 294831)
thomas.sprankling@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
Telephone:    (650) 858-6000
Facsimile:    (650) 858-6100

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC., <br><br> Plaintiff and Counterclaim-Defendant, <br><br> vs. <br><br> NATERA, INC., <br><br> Defendant and Counterclaim-Plaintiff. | Case No. 3:21-CV-04062-EMC <br><br> **NATERA, INC.'S OPPOSITION TO GUARDANT HEALTH INC.'S MOTION FOR ATTORNEYS' FEES & COSTS** <br><br> **REDACTED FOR PUBLIC FILING** |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT .......................................................................................................................2

I.     THE COURT SHOULD DEFER CONSIDERATION OF ATTORNEYS' FEES & COSTS UNTIL AFTER MERITS APPEALS ARE RESOLVED ........................................2

II.    THIS IS NOT AN "EXCEPTIONAL" CASE WARRANTING ATTORNEYS' FEES.................................................................................................................................2

    A.    Natera's Asserted Claims And Defenses Were Reasonable, And Natera Put Forth Good Faith Arguments And Evidence ..............................................3

          1.    Natera's Defenses to Guardant's Lanham Act Claim Were Reasonable .......................................................................................4

          2.    Natera Reasonably Pursued Its Affirmative Claims ......................8

    B.    The Jury's Finding Of Willfulness Does Not Warrant Attorneys' Fees ................10

    C.    Natera's Litigation Conduct Does Not Warrant Fees & Costs ................................14

    D.    Attorneys' Fees Are Not Necessary To Deter Natera And Others, Or To Compensate Guardant ................................................................................19

III.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DENY GUARDANT'S REQUEST FOR FEES AND COSTS ........................................................20

    A.    Guardant Fails To Apportion Fees Incurred On The Lanham Act Claims .............20

    B.    Guardant Seeks Reimbursement Of Unrecoverable Fees ........................................22

    C.    Guardant's Request For Costs Is Unsupported And Excessive ...............................23

    D.    Guardant's Request For Non-Taxable Costs Should Be Denied .............................24

CONCLUSION ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Angioscore, Inc. v. Trireme Med., Inc.*,
  2015 WL 8293455 (N.D. Cal. Dec. 9, 2015) ....................................................... 3, 4

*Apple Inc. v. Samsung Elecs. Co.*,
  2014 WL 4745933 (N.D. Cal. Sept. 19, 2014)....................................................... 23

*B & H Mfg. Co. v. Lyn E. Bright*,
  2006 WL 547975 (E.D. Cal. Mar. 3, 2006) ........................................................... 22

*Baden Sports, Inc. v. Kabushiki Kaisha Molten*,
  2007 WL 2790777 (W.D. Wash. Sept. 25, 2007) .................................................. 10

*Baker v. SeaWorld Ent., Inc.*,
  2020 WL 4260712 (S.D. Cal. July 24, 2020).......................................................... 25

*BillFloat Inc. v. Collins Cash Inc.*,
  105 F.4th 1269 (9th Cir. 2024)................................................................ 8, 14, 21

*Blue Bottle Coffee, LLC v. Liao*,
  2024 WL 4004047 (N.D. Cal. July 24, 2024) ............................................. 3, 10, 19

*Cairns v. Franklin Mint Co.*,
  292 F.3d 1139 (9th Cir. 2002) ............................................................................... 21

*Caiz v. Roberts*,
  2017 WL 830386 (C.D. Cal. Mar. 2, 2017) .............................................................. 3

*Derringer v. Sewell*,
  2009 WL 2424662 (D. Ariz. Aug. 7, 2009) .............................................................. 2

*Dominick v. Collectors Universe, Inc.*,
  2013 WL 990825 (C.D. Cal. Mar. 13, 2013) .......................................................... 20

*Dropbox, Inc. v. Thru Inc.*,
  2017 WL 914273 (N.D. Cal. Mar. 8, 2017) ............................................................ 25

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
  2016 WL 4208236 (N.D. Cal. Aug. 10, 2016)................................................. 3, 4, 10

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*,
  742 F.3d 377 (9th Cir. 2014) ................................................................................... 2

*In re Farmers Ins. Exchange Claims Rep. Overtime Pay Litig.*,
  2009 WL 3834034 (Nov. 13, 2009) .......................................................................... 2

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015)............................................................................... 7, 20

*Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.*,
    2017 WL 11420268 (S.D. Cal. Feb. 9, 2017) ............................................................ 2

*Globefill Inc., v. Elements Spirits, Inc.*,
    756 F. App'x 764 (9th Cir. 2019)............................................................................. 3

*Gonzalez v. Tagged, Inc.*,
    2016 WL 4376343 (N.D. Cal. Aug. 17, 2016) .......................................................... 4

*Gracie v. Gracie*,
    217 F.3d 1060 (9th Cir. 2000)........................................................................... 20, 21

*Grasshopper House LLC v. Clean & Sober Media, LLC*,
    2021 WL 3702243 (9th Cir. Aug. 20, 2021)............................................................ 7

*H.I.S.C. v. Franmar Int'l*,
    2020 WL 6263649 (S.D. Cal. Oct. 22, 2020)......................................................... 14

*Hellenberg v. Ford Motor Co.*,
    2020 WL 1820126 (S.D. Cal. Apr. 10, 2020) ........................................................ 24

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*,
    68 F.4th 1203 (9th Cir. 2023)................................................................................ 12

*Jones v. Cnty. of Tulare, Cal.*,
    2024 WL 3673150 (E.D. Cal. Aug. 5, 2024) ........................................................... 2

*Location Based Servs., LLC v. Niantic, Inc.*,
    2018 WL 7569160 (N.D. Cal. Feb. 16, 2018).......................................................... 4

*Luken v. Int'l Yacht Council, Ltd.*,
    581 F. Supp. 2d 1226 (S.D. Fla. 2008)................................................................. 15

*Madrid v. Concho Elementary School Dist. No. 6 of Apache Cnty.*,
    2010 WL 2991562 (D. Ariz. July 26, 2010) ........................................................... 2

*In re Media Vision Tech. Sec. Litig.*,
    913 F. Supp. 1362 (N.D. Cal. 1996) ..................................................................... 24

*Mendoza v. Brewster Sch. Dist. No. 111*,
    469 F. Supp. 2d 905 (E.D. Wash. 2006) ............................................................... 22

*MJC Am., Ltd. v. Gree Elec. Appliances, Inc. of Zhuhai*,
    2015 WL 13917934 (C.D. Cal. July 28, 2015) ...................................................... 23

*Monster Energy Co. v. Integrated Supply Network, LLC*,
    533 F. Supp. 3d 928 (C.D. Cal. 2021)............................................................. 11, 12

*Nahas v. Cont'l Cas. Co.*,
  2010 WL 2176067 (D. Haw. May 26, 2010) ........................................................ 23

*Nat'l Grange of the Ord. of Patrons of Husbandry v. California State Grange*,
  182 F. Supp. 3d 1065 (E.D. Cal. 2016) ............................................................. 13

*Netlist, Inc. v. Diablo Techs., Inc.*,
  2015 WL 5157315 (N.D. Cal. Sept. 1, 2015) ....................................................... 3

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. 545 (2014) ................................................................................ 3, 8, 14

*Parvin v. CNA Fin. Corp.*,
  2014 WL 13109295 (D. Or. Jan. 28, 2014) ........................................................ 23

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
  2020 WL 7626410 (N.D. Cal. Dec. 22, 2020) ..................................................... 25

*Plantronics, Inc. v. Aliph, Inc.*,
  2012 WL 6761576 (N.D. Cal. Oct. 23, 2012) ...................................................... 24

*PNY Techs., Inc. v. Miller, Kaplan, Arase & Co., LLP*,
  2017 WL 3712107 (N.D. Cal. Aug. 29, 2017) ..................................................... 24

*Pop Top Corp. v. Rakuten Kobo Inc.*,
  2022 WL 267407 (N.D. Cal. Jan. 28, 2022) ......................................................... 4

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  2016 WL 4377096 (S.D. Cal. Aug. 17, 2016) ..................................................... 10

*Site Update Sols., LLC v. Accor N. Am., Inc.*,
  2015 WL 581175 (N.D. Cal. Feb. 11, 2015) ....................................................... 19

*Sophia & Chloe, Inc. v. Brighton Collectibles, Inc.*,
  2019 WL 1429588 (C.D. Cal. Mar. 29, 2019) ..................................................... 19

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  14 F.4th 1323 (Fed. Cir. 2021) ................................................................. 18, 19

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  839 F.3d 1179 (9th Cir. 2016) ............................................................... 3, 8, 20

*T-Mobile USA, Inc. v. Terry*,
  862 F. Supp. 2d 1121 (W.D. Wash. 2012) ........................................................ 13

*Timmons v. United Parcel Serv., Inc.*,
  2007 WL 3026618 (E.D. Cal. Oct 16, 2007) ........................................................ 2

*Total Recall Techs. v. Luckey*,
  2017 WL 2118297 (N.D. Cal. May 16, 2017) ..................................................... 23

*TrafficSchool.com, Inc. v. Edriver Inc.*,
    653 F.3d 820 (9th Cir. 2011)................................................................................ 11, 19

*VMG Salsoul, LLC v. Ciccone*,
    824 F.3d 871 (9th Cir. 2016)........................................................................................ 8

*Watec Co., Ltd. v. Liu*,
    403 F.3d 645 (9th Cir. 2005)...................................................................................... 10

*Yuga Labs, Inc. v. Ripps*,
    2023 WL 7089922 (C.D. Cal. Oct. 25, 2023) .......................................................... 19

**Rules/Statutes**

15 U.S.C. § 1117(a) .......................................................................................................... 2, 20

35 U.S.C. § 285 ...................................................................................................................... 3

Fed. R. Civ. P. 54(d).............................................................................................................. 2

**Other Authorities**

U.S. Const. amend I ............................................................................................................. 13

# INTRODUCTION

The Court should defer consideration of Guardant's request for attorneys' fees and costs until after Natera's appeal of the merits is resolved. Courts in the Ninth Circuit consistently defer ruling on fees motions until after appeals are resolved to avoid situations where the district court's ruling on a fees motion is premised on considerations that change after appeals are decided.

But if the Court decides Guardant's motion now, it should be denied in its entirety.[1] Guardant is not entitled to any attorneys' fees and costs, much less the over $27 million it seeks, representing the entirety of fees and costs incurred since the inception of this litigation.

An award of attorneys' fees in Lanham Act cases is an extraordinary result, limited to "exceptional" cases under the Act and even then only awarded in the Court's discretion. Here, this case went to the jury because the Court repeatedly determined there were genuine issues of fact regarding both Natera's counterclaims and its defenses against Guardant's claims. It was entirely reasonable for Natera to defend its commercial statements, and to seek relief for Guardant's statements, and to do so vigorously. The scattered issues that Guardant identifies in its motion do not transform this case into an "exceptional" one and certainly do not provide a basis for this Court to exercise its discretion to grant Guardant all of its fees and costs over the entirety of this case.

Guardant's motion also fails because Guardant failed to satisfy its burden to prove that the entirety of fees accrued in this case were incurred for work reasonably performed on Guardant's Lanham Act claim, the only grounds for which it is seeking (or could be entitled to) fees.

Likewise, Guardant's request for costs should be rejected. Guardant's scant supporting documentation—containing questionable entries for obtaining videos of every deposition, excessive travel and lodging, and vague allusions to consultants and experts who never appeared in this case—is woefully inadequate.

---

[1]    Since Guardant addresses its request for fees and costs related to COBRA in its separate Motion For Monetary Sanctions, Natera responds to those points in its opposition to that motion. To the extent Guardant incorporates its arguments from its Motion for Monetary Sanctions into its Motion for Attorneys' Fees and Costs, Natera similarly incorporates its opposition arguments.

# ARGUMENT

## I. THE COURT SHOULD DEFER CONSIDERATION OF ATTORNEYS' FEES & COSTS UNTIL AFTER MERITS APPEALS ARE RESOLVED

Natera's post-trial motion for judgment as a matter of law or, in the alternative, for a new trial, raises several issues related to the jury's findings on Guardant's Lanham Act claim. *See* Dkt. 880. And to the extent the jury's verdict stands, Natera will appeal, raising "a significant potential" that the Ninth Circuit's ruling would modify the liability findings on which Guardant's motion is premised. *Jones v. Cnty. of Tulare, Cal.*, 2024 WL 3673150, at *2 (E.D. Cal. Aug. 5, 2024). In these circumstances, it is "most prudent to defer ruling on the requests for costs and attorney's fees until [any] appeal is resolved." *Id.*; *see also Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 742 F.3d 377, 386 (9th Cir. 2014) (vacating fee award and remanding for reconsideration "because many of the factors on which the district court based its attorneys' fee decision have now changed"); *Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.*, 2017 WL 11420268, at *1 (S.D. Cal. Feb. 9, 2017) (denying without prejudice motion for attorneys' fees pending appeal on the merits); *Madrid v. Concho Elementary School Dist. No. 6 of Apache Cnty.*, 2010 WL 2991562, at *1 (D. Ariz. July 26, 2010) (deferring consideration of fee motion until after resolution of appeal).

Especially given the number and significance of the post-trial issues in this case, "the interests of judicial efficiency weigh strongly in favor of waiting for a mandate from the [appellate court] before awarding or denying attorney fees or costs." *In re Farmers Ins. Exchange Claims Rep. Overtime Pay Litig.*, 2009 WL 3834034, at *3 (Nov. 13, 2009); *Derringer v. Sewell*, 2009 WL 2424662, at *1 (D. Ariz. Aug. 7, 2009) (denying request for fees without prejudice pending appeal); *Timmons v. United Parcel Serv., Inc.*, 2007 WL 3026618, at *1 (E.D. Cal. Oct 16, 2007) (same). The Court should "defer its ruling on the motion, or may deny the motion without prejudice" until after Natera's appeal is resolved. Fed. R. Civ. P. 54(d) advisory committee's note (1993).

## II. THIS IS NOT AN "EXCEPTIONAL" CASE WARRANTING ATTORNEYS' FEES

The Lanham Act provides that a court may award reasonable attorneys' fees to the prevailing party only in "exceptional cases." 15 U.S.C. § 1117(a). An "exceptional" case is one that "stands out from others with respect to the substantive strength of a party's litigating position (considering

both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  In determining whether a case is exceptional, a court should consider "frivolousness, motivation, objective unreasonableness [] and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 1181 (citing *Octane Fitness,* 572 U.S. at 554).[2]

The fact that one party won—even decisively—does not automatically render the case exceptional or the losing party's case unreasonable; otherwise, there would be an award of fees in every case.  "An award of attorneys' fees is not warranted where a party puts forth good faith arguments and evidence supporting those claims." *Blue Bottle Coffee, LLC v. Liao*, 2024 WL 4004047, at *3 (N.D. Cal. July 24, 2024) (citing *Caiz v. Roberts*, 2017 WL 830386, at *5 (C.D. Cal. Mar. 2, 2017)); *see Globefill Inc., v. Elements Spirits, Inc.*, 756 F. App'x 764, 766 (9th Cir. 2019) (affirming determination that the case was not exceptional where the losing party had reasonable litigation positions).  Even where a jury has found willfulness, courts decline to find a case exceptional where the party "did not adopt an objectively unreasonable litigation position." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 2016 WL 4208236, at *9 (N.D. Cal. Aug. 10, 2016), *aff'd in part, vacated in part on other grounds, remanded*, 909 F.3d 398 (Fed. Cir. 2018).

**A.    Natera's Asserted Claims And Defenses Were Reasonable, And Natera Put Forth Good Faith Arguments And Evidence**

Courts in this district consistently hold that a case is not exceptional where the non-prevailing party's litigation positions were reasonable.  *See Angioscore, Inc. v. Trireme Med., Inc.*, 2015 WL 8293455, at *2 (N.D. Cal. Dec. 9, 2015) (although defendant prevailed entirely, no exceptional case where claims survived summary judgment, and the case was reasonably litigated by all parties); *Netlist, Inc. v. Diablo Techs., Inc.*, 2015 WL 5157315, at *2 (N.D. Cal. Sept. 1, 2015) (despite complete defense verdict, no exceptional case where plaintiff submitted credible evidence

---

[2]  The Ninth Circuit explained in *SunEarth* that it "interpret[s] the fee-shifting provisions in the Patent Act, 35 U.S.C. § 285, and the Lanham Act in tandem" because "[t]he fee-shifting provisions in both acts are 'parallel and identical.'"  839 F.3d at 1180 (internal citation omitted).

1    and expert testimony, thereby making the case not objectively unreasonable), *aff'd*, 667 F. App'x

2    774 (Fed. Cir. 2016); *Gonzalez v. Tagged, Inc.*, 2016 WL 4376343, at *3 (N.D. Cal. Aug. 17, 2016)

3    (despite complete defense verdict, no exceptional case where a magistrate judge's recommendation

4    of denial of summary judgment suggested that plaintiff's underlying lawsuit was not objectively

5    unreasonable).[3]   Guardant's reliance on *Location Based Servs., LLC v. Niantic, Inc.*, 2018 WL

6    7569160, at *1 (N.D. Cal. Feb. 16, 2018), cited Dkt. 585-2 at 9, is misplaced.   There, the court

7    ***declined*** to award attorneys' fees where losing party presented "a good faith argument" in opposing

8    a motion to dismiss.

9        Here, Natera at all times put forward objectively reasonable defenses to Guardant's Lanham

10   Act claim and reasonably pursued its own claims against Guardant.

11                    1.   Natera's Defenses to Guardant's Lanham Act Claim Were Reasonable

12       Guardant knows that it cannot carry its burden to establish this is an "exceptional" case

13   warranting fees, so it is forced to resort to the false exaggeration that "Natera never offered a

14   meaningful defense of its false comparisons."   Dkt. 885-2 at 9.   The record, however, proves

15   otherwise.   Most notably, the Court *granted* Natera's motion for summary judgment as to

16   Guardant's quantitation claim, finding that "Natera's quantitation claim is not literally false nor has

17   it actually deceived consumers." Dkt. 326 at 25. And, on the eve of trial, Guardant stopped pursuing

18   its claim that Natera's statements regarding the "CHIP Filter" were false in light of Natera's strong

19   evidence to the contrary.   These facts all indicate that Natera's litigation positions were objectively

20   reasonable.   *See Angioscore*, 2015 WL 8293455 at *2; *Enplas Display Device Corp.* 2016 WL

21   4208236, at *8 (finding the defendant did not adopt an objectively unreasonable litigation position

22   where its defense had survived summary judgment and the prevailing party had dropped some

23   claims before trial).

24       Even as to Guardant's claims that went to the jury, the Court found that "all Natera's

25   advertising statements at issue are directly derived from the Reinert study and the Parikh study" and

---

[3]    The strength of Natera's case—although it did not prevail—distinguishes it from *Pop Top Corp. v. Rakuten Kobo Inc.*, 2022 WL 267407, at *3, *5 (N.D. Cal. Jan. 28, 2022), cited Dkt. 585-2 at 9, where plaintiff "never advanced factual support for its position," "never offered evidence supporting its claim," and "did not submit any evidence in opposition to Kobo's summary judgment motion."

that the advertised "numbers are not literally false on their face." Dkt. 326 at 13. At trial, Natera proffered evidence that it believed all of the data in its advertisements were true. *See* Tr. 662:12-14 (Masukawa) ("Q. As you sit here today, are you still comfortable presenting this information in this format? A. Yes."); Tr. 1075:20-22 (Chapman) ("Q. Do you believe that Natera's advertisements and what Natera put out into the community are true and accurate? A. Yes."); Tr. 1481:23-1482:23 (Moshkevich) (describing steps Natera takes to ensure accuracy of statements). Guardant agrees the advertisements cited accurate data from scientific studies—including its own Parikh study. Tr. 460:14-461:9 (Price); Tr. 1271:4-9 (Heitjan). Dr. Metzker, Natera's expert, also testified the performance comparisons in Natera's advertisements were scientifically valid, and "all the data that are described in [Natera's] advertisements are accurately reported." Tr. at 1739:10-20 (Metzker).

As to Guardant's claim that it was false by implication to **compare** data from the Parikh and Reinert studies, Natera adduced evidence throughout the case, and presented it at trial, showing it was reasonable, and not misleading, to directly compare data from the studies. For example, Guardant internal documents showed that, long before any of Natera's advertisements, Guardant ***itself*** was comparing data from the studies, side-by-side, without any caveats about supposed differences in sample volumes, scanning frequencies, or patient populations. *E.g.* TX585.7; TX507; TX729. Guardant even directly and explicitly compared data from these studies in its own advertisements to doctors. TX554; TX1810. The Parikh study further invites comparison— mentioning the Reinert study ***four*** times and drawing express comparisons to tumor-informed assays (i.e. Signatera) ***seven*** times. TX1. As the lead author and Guardant's expert witness, Dr. Parikh specifically testified that the Parikh study was intended to be and designed to be comparable to Reinert. Dkt. 809-3 (Parikh Tr.) at 25:16-22. She also explained that the reason she personally preferred Signatera to Reveal was that Reveal did not have enough data supporting its performance—exactly the point Natera had been conveying to the oncology community to combat misinformation about Reveal's efficacy. Dkt. 809-4 (Parikh Tr.) at 91:19-24 ("I've expressed this to Guardant, kind of time and time again, I think the onus is on them to [] provide the community more data. So I think that's why I have leaned away a little bit more, is just the robustness and [] volume of data that we have for Signatera.").

1     Indeed, even Guardant's **own** witnesses confirmed that comparing data from Parikh and
2 Reinert was not false or misleading.  Tr. 385:17-386:7 (Odegaard) ("Q. You and Guardant believe
3 this is a fair comparison to make [between Parikh and Reinert]?  A. It is.").  Guardant's expert, Dr.
4 Heitjan, testified that certain comparisons in Natera's advertisements (*e.g.* hazard ratio) were apples-
5 to-apples.  Tr. 1296:10-17 ("Q: So it's apples-to-apples in your [opinion]? A: Yes.").  And the
6 evidence at trial showed that Guardant's own salespeople compared Reveal's and Signatera's
7 respective performance metrics from Parikh and Reinert, including when communicating with
8 oncologists.  TX554; TX1810; Trial Tr. 446:17-19 (Price) ("Q. And in any of those sales trainings,
9 did you compare some of the data from Signatera with Reveal?  A. Yes, I did."); Tr. 482:7-9 (Price)
10 ("Q. So Mr. Outzen is comparing the performance metrics he's writing about to Signatera's
11 performance; correct?  A. Similarly to how it's worded in the Parikh paper, yes.").

12     In response to Guardant's argument that different plasma sample volumes used in the Parikh
13 and Reinert studies rendered Natera's comparisons misleading, Natera offered evidence that, in
14 designing the Parikh study to be comparable to the Reinert study, Guardant readily approved the
15 sample volume used in the Parikh study.  TX501.8 ("Re: plasma amounts, great[.] 4-5 mL will work
16 for those timepoints with more limited volume.").  Natera also elicited testimony from Guardant
17 witnesses that Guardant itself does not disclose sample volumes in its advertising for Reveal.  Tr.
18 971:7-14 (Banks).  Moreover, Guardant scientist Victoria Raymond testified that Reveal did not
19 require a minimum sample volume or amount of DNA (measured in nanograms (ng)) to detect
20 ctDNA.  Tr. 1130:24-1132:19 (Raymond).  In fact, Guardant used an approach based entirely on
21 samples passing Quality Control (QC) and Quality Assurance (QA) metrics to confirm reliability of
22 the test's cancer detection results irrespective of sample volume.  Tr. 1132:13-23, 1134:13-1136:7
23 (Raymond); TX501.9-10.  Dr. Metzker further testified that the sample volume does not necessarily
24 affect a test's ability to detect cell-free DNA because "there are ways of delivering the same amount
25 of cell-free DNA even if the volume of plasma is different."  Tr. 1681:8-1681:20 (Metzker).
26 Guardant's expert, Dr. Heitjan, confirmed this, testifying that it is conceivable to have a low-volume
27 sample that "still has a lot of cell-free DNA."  Tr. 1275:24-1276:6 (Heitjan) ("Q. [Y]ou can have a
28 low-volume sample that still has lot of cell-free DNA; right?  A. Yeah, conceivably. . . Q. [T]he

1    cell-free DNA input is what the Reveal and the Signatera tests actually test; right?  A. Right.").

2           Unable to identify anything about Natera's defense that rendered it objectively unreasonable

3    (as opposed to just ultimately unsuccessful), Guardant instead makes several *non sequitur* attacks

4    about Natera's experts' trial testimony.  Guardant first argues, without citing any authority at all,

5    that Natera's defense was unreasonable because Dr. Betensky—one of Natera's three experts—

6    "offered no defense for Natera's advertisements."  Dkt. 885-2 at 9.  But Dr. Betensky's expertise is

7    "biostatistics and statistical methods for the design and analysis of clinical studies."  Tr. 1817:23-

8    25 (Betensky).  As such, Dr. Betensky opined "about the Parikh study and, in particular, issues

9    regarding blinding and prospectiveness."  Tr. 1823:19-20 (Betensky).  In short, Dr. Betensky opined

10   on Natera's affirmative claims, while Natera's two other experts—Dr. Metzker and Dr.

11   McDonald—both provided opinions defending Natera's advertisements.  Guardant identifies

12   nothing unreasonable about the subject matter Dr. Betensky actually addressed, nor does any

13   authority suggest that a party's defense is somehow unreasonable where the scope of an expert's

14   testimony is appropriately supported.  Guardant's assertion that Natera "tried to mislead the jury"

15   with Dr. Metzker's testimony (Dkt. 885-2 at 9) is similarly baseless and unsupported by the record.

16   Dr. Metzker has decades' worth of expertise in human genetics and diagnostic technology

17   leveraging cell-free DNA, and the Court recognized that Dr. Metzker's "opinions on whether

18   Natera's marketing statements accurately reflect published data are factual and within his scientific

19   expertise."  Dkt. 323 at 16.  Guardant's complaint that Dr. Metzker has "no medical degree" (Dkt.

20   885-2 at 9) is particularly puzzling given that none of Guardant's own experts have medical degrees.

21          Guardant also argues that the jury's "substantial" monetary award should "support the

22   decision to assess fees."  Dkt. 885-2 at 10 (citing *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,

23   778 F.3d 1059, 1080 (9th Cir. 2015)).  But Guardant's own authority belies that position.  In *Fifty-*

24   *Six Hope*, the district court ***denied*** the prevailing party's request for attorneys' fees, and the Ninth

25   Circuit affirmed that decision.  *Id.*  And in *Grasshopper House* (cited Dkt. 885-2 at 10), the Ninth

26   Circuit vacated the district court's ruling on disgorgement, and remanded for consideration of

27   attorneys' fees because the court "must consider the totality of circumstances"—it by no means

28   granted a motion for fees, let alone pronounced some rule that any substantial damages award

necessitates a fee award. *Grasshopper House LLC v. Clean & Sober Media, LLC*, 2021 WL 3702243, at *4 (9th Cir. Aug. 20, 2021) (citing *SunEarth, Inc*., 839 F.3d at 1181). Guardant cites no other authority to support its assertion that the jury's award warrants attorneys' fees. Nor can it—it is well settled that "a positive result does not transform a claim into an 'exceptional case.'" *BillFloat Inc. v. Collins Cash Inc*., 105 F.4th 1269, 1278 (9th Cir. 2024).

2.    <u>Natera Reasonably Pursued Its Affirmative Claims</u>

To establish that this is an "exceptional" case, Guardant would need to show that Natera's affirmative claims were "frivolous" or "objectively unreasonable" (*Octane Fitness,* 572 U.S. at 554), but Guardant cannot come close to meeting that burden. Most of Natera's claims survived summary judgment, which establishes that the claims were not frivolous or objectively unreasonable, as this Court determined there were genuine disputes of material fact that needed to be resolved by the jury. *See* Dkt. 326 (denying in part Guardant's motion to dismiss Natera's claims because a "reasonable jury" could find for Natera); *VMG Salsoul, LLC v. Ciccone,* 824 F.3d 871, 887 (9th Cir. 2016) (vacating award of fees because where "a claim . . . hinges on disputed facts sufficient to reach a jury, that claim necessarily is reasonable because a jury might decide the case in the [claimant's] favor."); *BillFloat*, 2023 WL 2333879 at *7 (case was not exceptional because non-prevailing party's "claim survived summary judgement," and "a positive result does not transform a [] claim into an 'exceptional case'"), *aff'd*, 105 F.4th 1269, 1278 (9th Cir. 2024). Indeed, Guardant does not cite a single case in support of its argument that Natera's counterclaims were so weak as to justify an award of fees. *See* Dkt. 885-2 at 10-11.

As the Court recognized, a "reasonable jury could find that the Parikh study's claim that the analysis was 'blinded' was false." Dkt. 326 at 35-36 (finding that "[d]epending on the definition of 'prospective' accepted by the jury, a jury could reasonably find the statements that the Parikh study is a 'prospective' study was false."). The Court also denied Guardant's summary judgment motion as it related to Natera's claim that Guardant's statements of 100% specificity and 91% sensitivity were literally false or false by necessary implication. *Id.* at 40. And the Court found that Guardant's "blindedness," "prospectiveness," and "sensitivity and specificity" claims "could influence oncologists' purchasing decisions" as they are "key" metrics in assessing "whether a ctDNA assay

1    is suitable for MRD detection." *Id.* at 41.  There was nothing frivolous about these claims.

2        Nor was it "objectively unreasonable" for Natera to pursue these claims through trial,

3    especially given the evidence Natera obtained supporting them.  Guardant advertised that the Parikh

4    study established Reveal's performance in the surveillance setting—i.e., where patients are tested

5    at regular intervals over time to monitor for recurrence.  TX573; TX576; TX554; TX1810.  But Dr.

6    Parikh herself testified that the Parikh Study ***did not evaluate Reveal in the surveillance context***,

7    and "has not established that Reveal has any particular specificity, sensitivity, or PPV for patients

8    who are undergoing surveillance monitoring."  Dkt. 809-3 (Parikh Tr.) at 30:4-7; 32:12-15; 32:17-

9    18.  Guardant went further, advertising that Reveal had 100% specificity in the surveillance setting

10    "for recurrence detection[.]"  TX573; *see also* TX554; TX1810.  Internally, however, Guardant

11    employees acknowledged that they "do not know the specificity [] in the surveillance setting because

12    we did not do this analysis with patients who did not recur."  TX559.  Even six months into

13    Guardant's advertising campaign claiming 100% surveillance specificity, employees continued to

14    warn, "we don't have surveillance specificity for CRC - landmark specificity only."  TX637.2.  At

15    trial, Guardant's first witness admitted that "it would not be accurate to say in marketing materials

16    that this was 100 percent specificity in the surveillance setting" and that the surveillance specificity

17    calculation Guardant advertised was "not clinically meaningful."  Tr. 380:12-18, 381:21-382:5

18    (Odegaard).  Guardant's witnesses went on to testify that the Parikh study did not—and could not—

19    establish surveillance specificity for Reveal, contrary to Guardant's advertisements for Reveal that

20    did claim 100% surveillance specificity.  Tr. 131:16-20 (Odegaard) ("Q: Since there are

21    nonrecurring patients in there, you can't calculate a specificity from that; right?  A: Correct."); Dkt.

22    809-3 (Parikh Tr.) at 31:18-22 (Q. "your study does not establish Reveal's clinical performance in

23    the Surveillance Program, right?  [A.] No, it does not."); *see also* TX576.  Guardant similarly

24    claimed it had 100% PPV in the surveillance setting, again based on the Parikh Study.  TX538.9.

25    But Dr. Parikh testified at her deposition that Reveal does not have 100 percent PPV ***at all***.  Dkt.

26    809-4 (Parikh Tr.) at 51:3-13 ("Q. Reveal doesn't actually have 100 percent PPV; right?  A. No,

27    Reveal doesn't have 100 percent PPV.").

28        Guardant also widely circulated advertisements claiming that Reveal detects ctDNA with

91% sensitivity in the surveillance setting, supporting the use of Reveal in "regular, 3-month interval blood draws for increased sensitivity." TX576. Yet, in internal email communications, Guardant's own employees acknowledged that Guardant "cannot" make such claims because it had not done any analysis to support them. TX559 ("[W]e cannot say that with blood draws every 3-4 months in the surveillance setting the tests sensitivity will be 91%.").

Regardless of whether Natera prevailed at trial, Natera's claims were objectively reasonable, and attorneys' fees are not warranted. Indeed, "[if] every case in which a [party] prevailed on a motion or at trial on [their] claim[s] required an award of attorneys' fees, the Lanham Act's instruction to courts to award attorney's fees only in exceptional cases would be meaningless." *See Blue Bottle Coffee, LLC*, 2024 WL 4004047, at *4 (declining to award fees, even where plaintiff failed to establish standing, lost "many" motions, and lost at summary judgment).

### B.    The Jury's Finding Of Willfulness Does Not Warrant Attorneys' Fees

Willful conduct is not "the hallmark of exceptional cases" as Guardant claims. Dkt. 885-2 at 1, 3. To the contrary, case law is clear that a jury's finding of willfulness does not compel a finding of an exceptional case warranting attorneys' fees. *Watec Co., Ltd. v. Liu,* 403 F.3d 645, 656 (9th Cir. 2005) (holding that the determination as to whether a "case is exceptional is a question of law for the district court, not the jury" (internal quotation marks and citation omitted)). In *Watec*, the court awarded fees because the "jury expressly found that defendant … intentionally infringed on plaintiff's trademarks, and recommended an award of fees." *Id.* The Ninth Circuit noted that this approach to awarding fees was "problematic" because "the jury's finding that [defendant] 'intentionally infringed' does not necessarily equate with malicious, fraudulent, deliberate or willful conduct that we usually require before deeming a case exceptional." *Id.* Indeed, courts routinely decline to award attorneys' fees even where the jury has found willfulness. *See, e.g.*, *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777, at *7 (W.D. Wash. Sept. 25, 2007) (declining to award attorneys' fees after finding of willful false advertising where party "reasonably disputed the Lanham Act claim"); *Enplas*, 2016 WL 4208236, at *9 (N.D. Cal. 2016) ("although [defendant] willfully infringed the patents … this case does not warrant [] attorneys' fees" because defendant "did not adopt an objectively unreasonable litigation position … and advanced reasonable claims []

1    at trial"); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp*., 2016 WL 4377096, at *22 (S.D.

2    Cal. Aug. 17, 2016) (declining to award attorneys' fees following willful infringement finding in a

3    "garden-variety hard-fought patent infringement action between two competitors"), *aff'd in part,*

4    *vacated in part on other grounds, remanded*, 875 F.3d 1369 (Fed. Cir. 2017).

5        *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 834 (9th Cir. 2011), on which

6    Guardant relies (Dkt. 885-2 at 8), is not to the contrary.  There, the Ninth Circuit remanded for

7    consideration of attorneys' fees where defendants indisputably knew their website confused and

8    misled consumers.  *Id.* at 833.  Guardant presented no such evidence here.  Indeed, the only

9    consumer of the parties' products who testified in this case was Dr. Parikh, who explained that she

10   preferred Signatera to Reveal not because she was confused by Natera's advertisements (much less

11   that Natera ***intended*** to confuse consumers), but because there was more data supporting the

12   performance of Signatera.  Dkt. 809-4 (Parikh Tr.) at 91:8-11.

13       The evidence that Guardant's motion cites, and often mischaracterizes, as supposedly

14   establishing Natera's willfulness falls far short of what courts have found to render a case

15   exceptional.  As an initial matter, Natera did not ignore Guardant's pre-suit cease-and-desist letter

16   or Guardant's complaint as Guardant suggests.  Dkt. 885-2 at 7.  After receiving Guardant's cease-

17   and-desist letter on May 21, 2021, Natera reviewed the letter, looked into Guardant's claims, re-

18   evaluated the underlying data, and concluded that Natera's "data and [] advertisements remained

19   valid."  Tr. 1523:18-1524:2; 1524:19-1525:12.  Natera also held a training to educate its salespeople

20   on Guardant's claims and ensure they were familiar with the relevant supporting data so that they

21   would not misstate any data.  TX76.  On May 27, 2021, a mere six days after sending the cease-and-

22   desist, Guardant filed its complaint.  Dkt. 1.  By June 4, Natera had agreed to discontinue its

23   comparative advertisements, and the parties entered the Joint Statement.  Dkt. 25.

24       Guardant also argues that Natera's two weeks of "continued" advertising is "evidence of

25   'willfulness' that justifies finding the case to be 'exceptional[.]'"  Dkt. 885-2 at 7.  Unable to support

26   that position with relevant law, Guardant relies on a single quote from the disgorgement analysis in

27   *Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021),

28   where the court held that a party's continued advertising ***all the way through trial*** could support a

1   disgorgement award, but did not even address attorneys' fees. In addition, *Monster Energy* is easily

2   distinguishable. There, the defendant sold infringing products for ***eight years***, including ***through***

3   ***the jury's verdict***. *Id.* at 932, 937. By contrast, here, within ***eight days*** of Guardant filing its

4   complaint (and barely two weeks after Guardant sent its pre-suit cease-and-desist letter), Natera

5   agreed to discontinue ***any*** comparative advertisements.[4] Dkt. 1; Dkt. 25; TX127.

6       Contrary to Guardant's assertions (Dkt. 885-2 at 12), Natera's requests to dissolve the Joint

7   Stipulation prior to trial were not made in bad faith, and do not make this an "exceptional" case. If

8   anything, it was Guardant that manipulated the Joint Stipulation. The parties entered the Joint

9   Stipulation as a temporary stopgap to maintain the status quo until Guardant ███████████████

10  ████████████. Dkt. 25.3 at 1 ("███████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████████████████

12  ██"). The parties both expected, and expressly represented in the Joint Statement, that Guardant

13  would ███████████████████████████████████████████████████████ *Id.* at 3.

14  Instead, Guardant never filed its motion, ████████████████████████████████

15  ████████████████████████████████. While the Court disagreed with Natera's position

16  that the Joint Stipulation had expired or should sunset given the changed circumstances, Natera's

17  position on the question was not unreasonable or sanctionable, and Guardant does not cite (and

18  never cited at the time) a single case suggesting otherwise.

19      Guardant is also wrong that Natera's supposed "violation" of the Joint Stipulation "justifies

20  a determination that this is an exceptional case." Dkt. 885-2 at 8. There was never a finding of any

21  such violation; indeed, Guardant never even sought one. All that Guardant points to is a webinar

22  less than one week following the entry of the Joint Stipulation (Dkt. 885-2 at 8)[5] and one instance

23  ──────────────

24  [4]  Guardant's other authority, *Jason Scott Collection, Inc. v. Trendily Furniture, LLC* (cited Dkt.
    885-2 at 3), is even further afield. In that case, the defendant "precisely copied" plaintiff's

25  trademarks and repeatedly ignored multiple cease-and-desist letters over more than three months.
    68 F.4th 1203, 1223 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 550 (2024).

26  [5]  Guardant cites no evidence to support its assertion that Natera "repeated many of the same false
    comparisons" during its June 10 webinar. Instead, it alleges that "review[ing] tumor informed vs.

27  tumor-uninformed tests in more detail" is automatically a "false comparison." Dkt. 885-2 at 8. But

28  Guardant's own sales team compared Reveal and Signatera to customers, describing Signatera as
    "tissue dependent" and explaining how Reveal "would take the place of Signatera." TX1810.

1   where one salesperson sent an e-mail *three days* after the Joint Stipulation was entered (Dkt. 885-2

2   at 12).  If Guardant actually thought these constituted violations, it needed to ███████████████████

3   ████████████████████████.  Dkt. 25-3, ¶ 5.  Only after ████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████████████.  *Id.*  But

6   Guardant never followed this process, because it would never be able to establish an actual violation.

7   In fact, the only time Guardant ever sought relief for an alleged violation (consisting of a single e-

8   mail to a single recipient) was in the midst of trial, and Guardant plainly did that only to seek an

9   advantage in trial—as demonstrated by the fact that Guardant ignored the mandatory process for

10  asserting an alleged breach of the Joint Stipulation, *rejected* Natera's offer to send an immediate

11  curative email, and instead sought only the relief of "allotting some of Natera's [trial] time to

12  Guardant" without any meet and confer or demonstration of bad faith.  Dkt. 803; Dkt. 807 (Natera

13  explaining it proposed a curative statement and committed to providing the information Guardant

14  requested).  Guardant cites *Nat'l Grange of the Ord. of Patrons of Husbandry v. California State

15  Grange*, 182 F. Supp. 3d 1065 (E.D. Cal. 2016) and *T-Mobile USA, Inc. v. Terry*, 862 F. Supp. 2d

16  1121 (W.D. Wash. 2012), but those cases involved a defendant repeatedly violating a preliminary

17  injunction, in truly egregious circumstances, and where—unlike here—the preliminary injunction

18  did not include a mandatory process to resolve, cure, or potentially raise perceived violations.  *Nat'l

19  Grange*, 182 F. Supp. 3d at 1085 (defendant used the name "Grange" on its public website, billing

20  statements, and endorsed checks for over six months following injunction, even though it could have

21  corrected or removed the information at any time); *T-Mobile USA*, 862 F. Supp. 2d at 1133, 1135

22  (defendant found in contempt for violating preliminary injunction by continuing to advertise and

23  sell infringing product, refusing to cooperate in discovery and repeatedly violating court orders).[6]

24

---

25  [6]    Nor is it appropriate for Guardant to analogize the Joint Stipulation to an injunction, when
    Guardant's primary argument to sustain it over Natera's objection was that it *did not* function as an
26  injunction.  *See* Dkt. 122-2 (Guardant describing the Joint Stipulation as "██████████████"); Dkt.
    144-2 (Joint Stipulation "████████████████████████████████████████████████.");
27  Dkt. 151 ("████████████████████████████████████████████████████████████████");
    Dkt. 423 ("████████████████████████████████████████████████████████████████████
28  ████████████████.").

1      Finally, Guardant's assertion that Natera's "anticompetitive motivation for pursuing its false

2  advertising campaign further supports willfulness" is similarly baseless.  Dkt. 885-2 at 4.  The only

3  case Guardant cites to support that proposition does not even address the issue of willfulness and,

4  in any event, is nothing like this case.  In *H.I.S.C. v. Franmar Int'l*, 2020 WL 6263649 (S.D. Cal.

5  Oct. 22, 2020), the plaintiff had used information obtained from a three-year working relationship

6  with the defendant to set up a competing enterprise and then filed a lawsuit in an attempt to "drive

7  Defendants out of business."  *Id.* at *3.  The court found that plaintiffs had an anti-competitive

8  motivation for ***filing the meritless lawsuit***, thus establishing an "unreasonable litigation position"

9  warranting fees.  *Id.*  Here, Guardant initiated this lawsuit, and Guardant does not allege (and

10  certainly has never proven) that Natera's counterclaims were filed for anti-competitive purposes.

11      **C.      Natera's Litigation Conduct Does Not Warrant Fees & Costs**

12      This is not "the rare case" in which litigation conduct warrants fees.  *Octane Fitness, LLC*,

13  572 U.S. at 555.  This was a hard-fought case in which both sides zealously represented their clients

14  and advocated for their client's best interests.  Courts have rejected requests for attorneys' fees even

15  where a party alleges far worse litigation conduct than Guardant (inaccurately) does here.   In

16  *BillFloat*, for example, the court held that a party's litigation conduct did not render the case

17  exceptional, despite the party "fail[ing] to conduct pre-suit investigation, producing roughly 98,000

18  documents without an index, refusing to produce basic documents, obstructive deposition conduct,

19  joining [a] defendant in bad faith, and proceeding to trial [] without sufficient evidence."  *BillFloat*

20  *Inc.*, 2023 WL 2333879, at *7.  Guardant points to a smattering of perceived grievances (Dkt. 885-

21  2 at 13-16)—most of which occurred during the four-week trial—but none rises to the level of

22  misconduct justifying a fee award at all, much less a $27 million award representing the entirety of

23  Guardant's attorneys' fees and costs across nearly four years of litigation.   There is nothing

24  "exceptional" about the cherrypicked instances Guardant selects; they are the same sort of run-of-

25  the-mill complaints that any party could cite after any hotly-contested case.

26      At the end of the day, Guardant merely reasserts various complaints it raised during trial,

27  and that the Court already addressed.  None of these—alone or in combination—entitles Guardant

28  to fees.  Guardant attempts to fault Natera for supposedly seeking to "re-litigate" issues through

1  these proceedings (Dkt. 885-2 at 12), but the fact a legal proposition is repeatedly rejected "does not

2  necessarily mean that the legal position was objectively unreasonable or frivolous at the time that it

3  was taken." *Luken v. Int'l Yacht Council, Ltd.*, 581 F. Supp. 2d 1226, 1240 (S.D. Fla. 2008) (noting

4  that the trial court's repeated rejection of a theory did not make it unreasonable as it pertained to

5  assessing attorney fees).  Indeed, to properly preserve issues for appeal—of which there are many

6  in this case—it is often necessary to repeat or renew previously rejected arguments.  *Id.*  This applies

7  to essentially all of the examples Guardant cites, including Natera's disagreement with the novel

8  jury instruction that incorporated the colloquial turn of phrase, "apples-to-oranges" (*see* Dkt. 627;

9  Dkt. 880), and Natera's position that a California common law false advertising claim is limited to

10  "passing off" one's goods as those of another.  Dkt. 627 at 5.

11      Regardless, Guardant itself repeatedly raised and reraised its own issues throughout this

12  case.  For example, even after Guardant **stipulated** to the admissibility of earnings call transcripts

13  (Dkt. 732 at 3), Guardant objected to their use during opening statements (Dkt. 766), and again twice

14  during Helmy Eltoukhy's testimony (Tr. 788:13-790:25; Tr. 795:20-25).   Similarly, Guardant

15  repeatedly objected to use of TX-585.  Guardant first objected to its use in opening statements (Dkt.

16  766) and then again to its use during closing arguments (Dkt. 828), despite the extensive discussion

17  that had taken place of the exhibit prior to that time.

18      Guardant also repeatedly sought to relitigate Natera's motion *in limine* regarding MolDX.

19  Natera brought the motion to prevent Guardant from arguing that Natera interfered with Guardant's

20  ability to receive Medicare approval.  Dkt. 509.  Nevertheless, from the very start it was ***Guardant***

21  that tried to make MolDX the centerpiece of its case, offering a slanted story on the issues that the

22  *in limine* orders actually excluded.  *See e.g.*, Tr. 202:11-12 ("The second part of the war was to lie

23  to Medicare, behind the scenes, about Reveal."); Tr. 206:14-206:19 ("Medicare's internal experts []

24  considered Natera's argument, including many of the same attacks Natera will repeat to you, and

25  they rejected them.  They approved Reveal for Medicare coverage.  So Natera's claims to Medicare

26  were false[.]").  After framing its entire case around these issues, Guardant attempted to use the *in*

27  *limine* order that precluded ***Guardant*** from introducing MolDX evidence to instead prevent ***Natera***

28  from refuting Guardant's false assertions that MolDX agreed with Natera's criticisms of Reveal's

1    advertised performance and underlying data.  It is obvious why Guardant fought so mightily to keep

2    this evidence out, given Guardant's own Vice President of Reimbursement *agreed* with the concerns

3    Natera expressed to MolDX.   TX612.   But the fact that Natera introduced (over Guardant's

4    objection, *e.g.*, Tr. 318:10-13) this highly relevant, and permissible, information is not litigation

5    misconduct, and Guardant does not cite any order Natera violated in presenting the evidence it did.

6         Guardant also mischaracterizes Natera's presentation of mitigation evidence.  The Court's

7    ruling on Natera's Motion *in limine* No. 4 recognized that "███████████████████████

8    ██████████████████████████████████████████████████████

9    ██████████████████████████████████."  Dkt. 509 at 17.  Accordingly, and

10   as Guardant acknowledges (Dkt. 885-2 at 15), Natera was permitted to introduce evidence that

11   Guardant could have, but did not, engage in mitigation of its purported damages.  Natera's questions

12   were aimed at doing just that.  Tr. 1868:11-1869:1 (Dr. Stec testifying that Guardant had the

13   resources to conduct corrective advertising but did not).  Indeed, Guardant's motion does not point

14   to a single instance in which Natera asked about *comparative* corrective advertising.  Regardless,

15   the Court has already rejected Guardant's attempt to seek sanctions based on this line of questioning.

16   Dkt. 878.  Guardant should not be permitted to do an end-run around that order by seeking fees

17   based on the same conduct.

18        Guardant also complains that Natera put too many exhibits on its exhibit list, but points to

19   no authority supporting its position that the number of exhibits was "beyond preposterous," or that

20   an exhibit list of this size (in this complex case) warrants an award of a party's fees throughout the

21   entire litigation. Dkt. 885-2 at 14.  Nor could it. As the defendant in a large, complex case regarding

22   technical cancer recurrence assays, Natera needed to preserve flexibility to respond to Guardant's

23   presentation of its case.[7]  Guardant reiterates its complaint that Natera exchanged too many closing

24

25   [7]  This was all the more true given Guardant's history of opportunistically shifting its allegations
     throughout this litigation. For example, Guardant first argued that Natera's commercial statements
26   were necessarily false because there had been no head-to-head study between Reveal and Signatera.
     *See* Dkt. 12-1 at 8; Dkt. 12-3 ¶ 16.  But discovery showed that Guardant itself was making
27   comparative statements without any head-to-head study when doing so would be advantageous to
     Guardant.  *See e.g.*, TX507.1; TX585.7; TX641.1; TX729.19.  Guardant then changed its tack,
28

slides, once again without citing any supporting authority.  Dkt. 885-2 at 15.  This Court has twice rejected Guardant's complaints on this issue, and Guardant is the one that acted improperly in this exchange—first by refusing to meet and confer, and then by raising objections (and forcing Natera to submit briefing) on essentially every single slide, only to have the Court reject essentially every objection.  *See* Tr. 1198:18-19 (recognizing this "is a complicated case with complicated issues"); Dkt. 878 (denying Guardant's request to move for sanctions based on closing slides).

Guardant further argues that Natera's deposition designations were excessive (Dkt. 885-2 at 14-15), but those designations were appropriate in light of the continued uncertainty regarding which witnesses Guardant intended to bring to trial.  Indeed, Guardant unexpectedly dropped witnesses throughout trial (including Dr. Parikh herself and Thereasa Rich), rendering their deposition testimony, and Natera's designations, necessary.  Additionally, although the Court deducted one hour of trial time from Natera due to the number of objections it made to Guardant's deposition designations (10/15 Hearing Tr. at 138:21-139:4), those objections were warranted and in good faith, as the trial presentation bore out.  Most notably, Natera properly objected to Guardant's designation of testimony where Dr. Corcoran cried about being upset by being served with a subpoena, and the Court overruled that objection.  Once the designation was actually played at trial, however, Natera's objection that the testimony was prejudicial was borne out, and the Court gave a curative instruction.  Tr. 1150:8-11; 1382:10-16.[8]

Guardant also cherry picks a handful of complaints from the discovery period.  For example, Guardant complains that Natera produced documents immediately before the substantial completion deadline, but points to no violation of any deadline or even any prejudice that resulted from the timing of Natera's production.  Dkt. 885-2 at 12 n.6.  And while Guardant asserts that Natera "renege[d]" on a purported agreement regarding the close of discovery (*id.),* the Court **agreed with**

---

arguing that its own side-by-side comparisons were appropriate, while Natera's were unlawful.  *See* Tr. 490:4-13 (Price) ("Internally I think it was okay [to compare Reinert and Parikh]); Tr. 384:24-385:23 (Odegaard) ("Q. And you don't see anything false or misleading in this presentation [comparing Reinert and Parikh]; right, sir?  A. Not at all.").

[8]  Even if fees were appropriate for the time Guardant spent reviewing Natera's trial exhibits, closing slides, and deposition designation (they are not), Guardant does not limit its fees request to the incremental time it contends resulted from these incidents.

1    *Natera* that its discovery requests were timely and ordered Guardant to respond.  Dkt. 176.  This

2    was an example of **Guardant** taking an unreasonable position that multiplied proceedings.[9]

3         Finally, Guardant flings baseless complaints regarding the deposition of Dr. Claus Andersen.

4    Dkt. 885-2 at 13-14.  At no point did Natera make any false representations to the Danish authorities

5    regarding the evidence from Dr. Andersen.  Natera accurately informed the Danish authorities that

6    this Court indicated that evidence of the Reinert Study could be used only for a very limited

7    purpose:  to "shed[] light on the meaning of 'prospective' and 'blinded'—which are the subject of

8    Natera's counter-claims against Guardant (asserting the Parikh study is fraudulent because those

9    terms were mischaracterized) is properly admitted for purposes of impeaching Natera's

10   assertions."  Dkt. 572 at 15.  Natera objected to Guardant's Letters of Request because, despite the

11   Court's rulings, Guardant's requests did not use the terms "blinded" or "prospective," and, instead,

12   sought broad categories of information regarding the Reinert Study unrelated to those

13   terms.  Indeed, Guardant's own submissions to the Danish authorities indicated that it intended to

14   seek information regarding Dr. Andersen's "additional research" related to the Reinert Study and

15   also about how the Reinert Study was conducted more generally—even though the Court dismissed

16   Guardant's affirmative defense based on those subjects at summary judgment.  Dkt. 326 at 43

17   (dismissing unclean hands affirmative defense).  And this was further confirmed in Dr. Andersen's

18   deposition when Guardant's two days of questioning went well beyond seeking information

19   regarding the terms "blinded" or "prospective."  Dkt. 821-1 (Andersen Tr.) at 83:2-95:17.  The

20   information sought was in no way targeted as Guardant suggests.

21        Nor does Guardant's reliance on *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323 (Fed. Cir.

22   2021) support an exceptional-case finding here.  There, the Federal Circuit allowed an award of fees

23   in a patent infringement case in which the district court found that the defendant had, among other

24   things, maintained nineteen invalidity theories but only presented two at trial, and presented non-

25

---

26   [9]     Unsurprisingly, there are countless other instances of Guardant acting unreasonably and
     multiplying proceedings.  For example, it refused to produce **any** documents from Dr. Helmy
27   Eltoukhy, or to present him for a deposition, even though he was a central figure in this case.  *See*
     Dkt. 199.  And it refused to run any searches on the records of its former Senior Director of
28   Corporate Communications until ordered to do so by the Court.  Dkt. 194.

1   infringement theories that were contrary to both the claim construction ruling and the defendant's

2   internal documents. *Id.* at 1332. No similar facts are present here. And in *Yuga Labs, Inc. v. Ripps*,

3   2023 WL 7089922 (C.D. Cal. Oct. 25, 2023), *appeal docketed* No. 24-879, (9th Cir. Feb. 20, 2024),

4   the district court made a finding that defendants "made disgraceful and slanderous comments,"

5   including referring to plaintiff's counsel as "criminals" who support "racism, antisemitism,

6   beastiality [sic], pedophilia," and accused them of "using cartoons to market drugs to young

7   children." *Id.* at 20. Nothing remotely similar can be said of Natera's conduct in this case.[10]

8       **D.    Attorneys' Fees Are Not Necessary To Deter Natera And Others, Or To**

9           **Compensate Guardant**

10          Where, as here, a party's litigation positions were neither baseless nor frivolous, "there is no

11  need to deter future plaintiffs or to compensate Defendants." *Blue Bottle Coffee*, 2024 WL 4004047

12  at *5; *see also Site Update Sols., LLC v. Accor N. Am., Inc.*, 2015 WL 581175, at *4 (N.D. Cal. Feb.

13  11, 2015), *aff'd sub nom. Site Update Sols., LLC v. CBS Corp.*, 639 F. App'x 634 (Fed. Cir. 2016)

14  (where a party's litigation position was "not entirely frivolous or objectively unreasonable, the court

15  also does not need to find th[e] case exceptional in order to deter others from imitating [the party's]

16  conduct"); *Sophia & Chloe, Inc. v. Brighton Collectibles, Inc.*, 2019 WL 1429588 at *5 (C.D. Cal.

17  Mar. 29, 2019) (same). As discussed above, Natera's litigation positions were objectively

18  reasonable, not frivolous, and Natera introduced ample evidence to support its claims and defenses.

19          Guardant cites *TrafficSchool.com, Inc.*, 653 F.3d at 832, to argue that an award of attorneys'

20  fees "would also recognize the benefit of the verdict" to the public. Dkt. 885-2 at 8. In *Traffic

21  School*, however, the judge presiding in a bench trial awarded no monetary relief. Thus, the court

22  held "[i]t would be inequitable to force plaintiffs to bear the entire cost" of obtaining judgment and

---

[10]  Guardant, by contrast, repeatedly likened Natera's commercial statements to murdering babies. Tr. 740:8-10 (Eltoukhy) ("I mean, it's like you gave birth to a beautiful baby and then someone just ripped that baby out of your hands and slammed its head against the wall."); Tr. 190:8 (Keller) ("The goal was to kill Guardant's new test in the crib."); 8/8/24 Hearing Tr. 20:11-13 (LaVigne) ("The goal was to destroy, literally destroy Reveal in the crib to eliminate the competitor"); 5/1/24 Hearing Tr. 58:17-18 (Perloff) (Natera was "strangling the product in the crib"); Dkt. 600-2 ("Natera ignores that it did its best to smother Reveal in its virtual crib by falsely comparing *Signatera* to *Reveal*."). And Guardant's counsel had such excessive improper questioning that the Court admonished them. Tr. 1057:7-23 (Court instructing counsel to ask "crisp, non-compound loaded question[s]").

1    relief in the form of an injunction. *Id.* Here, by contrast, the jury already awarded Guardant $250.5

2    million in damages and recommended that Guardant be awarded an additional $42 million in

3    disgorgement.  Thus, Guardant does not have to bear the "entire cost" of obtaining judgment and

4    relief against Natera; there is little need for further deterrence or compensation given the substantial

5    jury award.

6    **III.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DENY GUARDANT'S**

7    **REQUEST FOR FEES AND COSTS**

8         Even if a court determines a case is "exceptional," it then must determine whether an award

9    of attorneys' fees is reasonable. *SunEarth*, 839 F.3d at 1180.  The "plain language of the statute

10   allows the court to choose whether to award fees, even after finding the case exceptional." *Fifty-*

11   *Six Hope*, 778 F.3d at 1079 (citing 15 U.S.C. § 1117(a)).  For all the reasons set forth above that this

12   is not an "exceptional" case, the Court should exercise its discretion to deny Guardant's motion

13   because Guardant's requested fees are not adequately supported.  But at a minimum, this Court

14   should not award Guardant all of the $27 million in attorneys' fees and costs that it seeks.  Guardant

15   failed to apportion its requested fees between Lanham Act and non-Lanham Act claims, did not

16   remove non-recoverable fees from its request, and failed to provide adequate documentation for its

17   millions of dollars of requested costs.

18        **A.    Guardant Fails To Apportion Fees Incurred On The Lanham Act Claims**

19        "As a general matter, a prevailing party in a case involving Lanham Act and non-Lanham

20   Act claims can recover attorneys' fees only for work related to the Lanham Act claims." *Gracie v.*

21   *Gracie*, 217 F.3d 1060, 1069 (9th Cir. 2000); *see also Dominick v. Collectors Universe, Inc.*, 2013

22   WL 990825, at *4 (C.D. Cal. Mar. 13, 2013) ("Defendants' success on their Lanham Act claim (had

23   exceptional circumstances existed here) would have entitled them *only* to fees fairly attributable to

24   their work on the Lanham Act claim and no more—not all of their fees, as they contend in their

25   motion papers").

26        Despite this clear limitation, Guardant seeks essentially all of the fees it has incurred since

27   the inception of this case over 3.5 years ago.  Guardant has not made *any* attempt to apportion its

28   fees to those incurred in connection with its Lanham Act claim, as opposed to those incurred in

1  connection with its common law false advertising claim, or its statutory unfair competition and false

2  advertising claims, or to defend against Natera's non-Lanham Act counterclaims.  Although some

3  of Guardant's fees may have gone to both Lanham Act and non-Lanham Act claims, much of its

4  work demonstrably did not.  For example, Guardant does not separate out non-recoverable fees

5  incurred for time spent to ███████████████████ or "████████████████████

6  ██████████████████" (*e.g.*, Dkt. 885-4 at 6, 104).  *See also* Dkt. 891-

7  5 (T. Herbert entry: "████████████████████"; N. Romo entry:

8  "████████████████████████████████████

9  ████████████").  Guardant must separate these plainly non-Lanham Act related fees out from

10 its request, as the Court may not award fees for work unrelated to the Lanham Act.

11      For the remaining entries that do ostensibly relate to the Lanham Act claims, Guardant fails

12 to account for the fact that some of that time was spent on issues not specific to the Lanham Act.

13 For example, Guardant does not apportion its fees for summary judgment briefing (*e.g.*, Dkt. 885-

14 10 at 74-98), which must be reduced to account for the fact that Guardant's motion addressed

15 Natera's state law UCL and FAL claims (Dkt. 226), and Natera likewise moved on Guardant's UCL

16 and common law claims (Dkt. 220).  The jury instructions and verdict form also addressed the

17 parties' common law claims, as well as willfulness, which is not an element of the Lanham Act

18 claims.  *See* Dkts. 507, 543-5, 610, 612.

19      Where a party makes no effort to apportion out fees for non-Lanham-Act claims, the court

20 must adjust the fee award.  *Gracie*, 217 F.3d at 1070.  Even if "an *exact* apportionment" of fees is

21 impossible, the district court still has a "duty to make *some* attempt to adjust the fee award in an

22 effort to reflect an apportionment."  *Id.* at 1069 (emphasis in original).  Reducing a total attorney

23 fee amount by a percentage that represents work on non-recoverable non-Lanham Act claims is one

24 method courts have used to apportion attorneys' fees.  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139,

25 1158 (9th Cir. 2002) (affirming district court's decision to reduce attorneys' fees sought by twenty-

26 six percent where defendant did not apportion fees related to Lanham Act claims); *BillFloat Inc.*,

27 2023 WL 2333879 at *7 (finding case not exceptional and thus finding no entitlement to fees under

28 the Lanham Act, but reducing fees awarded based on contract claims by 25 percent "because the

1  record makes it difficult to discern with any degree of precision which portion of the fees may have

2  been devoted to the Lanham Act claim"); *B & H Mfg. Co. v. Lyn E. Bright*, 2006 WL 547975, at \*4

3  (E.D. Cal. Mar. 3, 2006) (reducing fees related to specific motions by 50 percent where motions

4  related to both Lanham Act and non-Lanham Act claims).

5      The Court should reject Guardant's unsupported attempt to shift its entire legal bill onto

6  Natera.  At minimum, the Court should reduce Guardant's fee request by at least 25 percent to

7  account for Guardant's requested fees for work exclusively related to non-Lanham Act claims (*e.g.*,

8  Dkt. 891-5 at 156 ("█████████████████████")), and an additional 50 percent

9  to account for Guardant's failure to apportion fees for work related to both Lanham Act and non-

10 Lanham Act claims (*e.g.*, *id.* at 148 ("████████████████████████████

11 ████")).

12     **B.    Guardant Seeks Reimbursement Of Unrecoverable Fees**

13     In addition to failing to allocate fees incurred in connection with Guardant's Lanham Act

14 claim, Guardant seeks to tax Natera for fees that resulted from Guardant's mistakes and misconduct

15 in this action, or that are wholly unrelated to the merits of the case.  To take just a few examples,

16 Guardant taxes Natera for "████████████████████████████," and

17 "████████████████████████████████" Dkt. 891-5 at 122, 123.

18 This is a reference to Guardant filing Natera's confidential materials on the public docket in this

19 case, in violation of the Protective Order.  *See* Dkt. 57 (Stipulated Protective Order); Dkt. 339

20 (Guardant Motion to Remove Incorrectly Filed Document); Dkt. 377 (same); Dkt. 431 (same).

21 Guardant's mishandling and improper disclosure of Natera's confidential material unfortunately

22 happened multiple times, and there is no legitimate basis for Guardant to shift the fees resulting

23 from its own violation of a Court order onto Natera.

24     Guardant also requests that Natera pay for it to ████████████████████

25 ████████████████ (Dkt. 891-5 at 135) and ████████████████████████

26 ████████████████" (*id.* at 137).  Such ministerial tasks have no relation to the merits

27 of the case and should not be taxed. *See Mendoza v. Brewster Sch. Dist. No. 111*, 469 F. Supp. 2d

28 905, 917 (E.D. Wash. 2006), *judgment entered*, 2007 WL 1140259 (E.D. Wash. Apr. 17, 2007)

(excluding administrative tasks from award of costs); *Nahas v. Cont'l Cas. Co.*, 2010 WL 2176067, at \*10 (D. Haw. May 26, 2010) (deducting "time for clerical or ministerial tasks" from fee award).

Guardant next requests $█████ in fees incurred by the law firm Jones Day, which never entered an appearance in this case. Based on a review of the billing entries, it appears Jones Day was retained for the sole purpose of █████████████████ Guardant has not justified this expense. *See Parvin v. CNA Fin. Corp.*, 2014 WL 13109295, at \*1 (D. Or. Jan. 28, 2014) (declining to award costs incurred in connection with mock trial where the prevailing party "has not justified the mock trial costs as reasonably necessary in the circumstances of this case"); *cf. MJC Am., Ltd. v. Gree Elec. Appliances, Inc. of Zhuhai*, 2015 WL 13917934, at \*4 (C.D. Cal. July 28, 2015), *on reconsideration in part*, 2015 WL 13917932 (C.D. Cal. Sept. 14, 2015) (granting a partial award of costs (not fees) "incurred in the preparation of trial graphics for use at the mock trial," but only because many of the graphics were also used at trial).

### C.    Guardant's Request For Costs Is Unsupported And Excessive

Since Guardant has failed to supply "adequate documentation" supporting the $4,916,182.55 of costs it seeks, exclusion of the entire amount is warranted. *Apple Inc. v. Samsung Elecs. Co.*, 2014 WL 4745933, at \*9 (N.D. Cal. Sept. 19, 2014) (excluding all copying costs where the prevailing party failed to supply adequate documentation to support its request).

For example, Guardant's attempt to recover $63,051.26 for video recordings of what appears to be *every* deposition taken in this case is an overreach. *See Total Recall Techs. v. Luckey*, 2017 WL 2118297, at \*1 (N.D. Cal. May 16, 2017) (rejecting a "blanket omnibus approach to videotap[ing] every deposition"). While impossible to know for sure, given that Guardant provided no back-up documentation supporting the costs, it appears Guardant even paid (and seeks to stick Natera with the bill) for the videos of depositions of Guardant's own witnesses within its control and who it had committed to bring to trial. These are not recoverable, especially since no disputes in this case "involved deposition conduct or any other issue that might have been resolved with videotapes." *Id.* at \*1. Likewise, Guardant's request of $227,629.39 (Dkt. 891-22) for what appears to be transcripts from every deposition, and without any underlying invoices, is excessive and unsupported. Although it is impossible to know for sure given the lack of supporting documentation,

1    this averages to $5,836.65 per deposition across the 39 depositions listed, which likely means that

2    Guardant's bill includes rush transcripts, extra fees for multiple real time feeds, or other

3    impermissible costs. *Plantronics, Inc. v. Aliph, Inc.*, 2012 WL 6761576, at *6 (N.D. Cal. Oct. 23,

4    2012) (costs of expedited delivery of deposition transcripts not recoverable); *PNY Techs., Inc. v.*

5    *Miller, Kaplan, Arase & Co., LLP*, 2017 WL 3712107, at *2 (N.D. Cal. Aug. 29, 2017) (holding

6    that costs for "Realtime" fees, "reporters' fees for preparation of rough copies of deposition

7    transcripts," and "Litigation Package" charges were not recoverable).

8         **D.    Guardant's Request For Non-Taxable Costs Should Be Denied**

9         Guardant acknowledges that it seeks reimbursement for non-taxable costs; the Court should

10   decline to award them.

11        Guardant requests $418,306.45 for "TravelMealsLodging" (Dkt. 891-22 at 1) but provides

12   no itemized breakdown for any portion of that amount. One cannot determine, for instance, which

13   hotels Guardant used, at what rate, and for what purpose. Nor can one determine what class of

14   airfare Guardant purchased. This type of information is necessary to determine whether the costs

15   incurred were reasonable—even if they were taxable in the first place. *In re Media Vision Tech.*

16   *Sec. Litig.*, 913 F. Supp. 1362, 1372 n.10 (N.D. Cal. 1996) (finding it "unacceptable that some firms

17   expect reimbursement for first class airline tickets or last minute ticket purchases which doubles the

18   cost of airfare, luxury hotel accommodations," and expensive meals); *Hellenberg v. Ford Motor*

19   *Co.*, 2020 WL 1820126, at *7 (S.D. Cal. Apr. 10, 2020) (reducing requested costs where first-class

20   air travel was not "reasonably necessary").

21        Guardant's request for $650,875.39 in "Document Mgmt" (Dkt. 891-22 at 1) is likewise

22   improper, as it is entirely unsupported by any invoices or other backup detail.

23        Guardant's request for $1,283,808.21 for what is vaguely referred to as "Legal Consultants"

24   (*id.*) should likewise be stricken. Guardant identifies four different companies who apparently acted

25   as "consultants" but provides no information as to what any of the companies did for Guardant, how

26   that work differed from the legal work that Guardant's attorneys provided, or why the costs incurred

27   from their services were reasonably necessary to this case. In support of the request, Guardant relies

28   on one inapposite case in which the supporting declarations "provide[d] a sufficient description of

1   the costs," but Guardant did not provide *any* description here, much less a sufficient one.  *Planned*

2   *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 2020 WL 7626410, at \*8 (N.D. Cal. Dec.

3   22, 2020), *aff'd*, No. 21-15124, 2024 WL 4471745 (9th Cir. Oct. 11, 2024).  And in *Baker v.*

4   *SeaWorld Ent., Inc.*, 2020 WL 4260712, at \*11 (S.D. Cal. July 24, 2020), cited Dkt. 585-2 at 22, the

5   court specifically noted that there had been no objection to the expense request.  Here, with no

6   attempt to support these costs, they must be denied.

7       In addition to the over $1.28 million of "Legal Consultants," Guardant also requests

8   $100,345.50 for an expert named "Ogenstad," who Guardant says provided "Consulting & Expert

9   Services" in 2022.  (Dkt. 891-22 at 11).  Ogenstad, whose subject of expertise is not identified,

10  provided no expert reports in this matter and played no role at trial.  Yet Guardant seeks to tax Natera

11  for the entirety of the work he or she did (whatever it was).  That request should be stricken.

12      In addition to the expert that Guardant never used, Guardant seeks an additional

13  $1,821,712.13 in costs related to three experts—Malackowski, Sowers, and Heitjan—again without

14  any supporting documentation to support those amounts.  Guardant cites *Dropbox, Inc. v. Thru Inc.*,

15  but there, this Court approved expert fees in the amount of $162,936 only after finding that Dropbox

16  has "adequately explained the necessity of the costs incurred, and it has thoroughly documented its

17  specific expenditures."  2017 WL 914273, at \*6 (N.D. Cal. Mar. 8, 2017), *aff'd*, 728 F. App'x 717

18  (9th Cir. 2018).  No such explanation or documentation has been provided here.  In fact, counsel

19  has not even included the invoices that the experts surely provided to either counsel or Guardant

20  accounting for their time.  Instead, counsel merely identifies the top line number of costs incurred

21  and then declares that "the non-taxable costs incurred by Guardant were reasonable and necessary."

22  Dkt. 885-9 ¶¶ 5F, 5G.  Guardant's request is deficient.

23                                      **CONCLUSION**

24      Guardant's unsubstantiated request for attorneys' fees and costs amounts to an excessive

25  windfall.  For the reasons set forth above, Guardant's motion should be denied.

26

27

28

1   DATED:  February 14, 2025                QUINN EMANUEL URQUHART &
2                                            SULLIVAN, LLP

3

4                                   By  /s/ Kevin P.B. Johnnson
                                        Kevin P.B. Johnson
5                                        Attorneys for NATERA, INC., a Delaware
                                         corporation, Defendant and Counterclaim Plaintiff
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28