Jennifer L. Keller (84412)
jkeller@kelleranderle.com
Chase Scolnick (227631)
cscolnick@kelleranderle.com
Gregory M. Sergi (257415)
gsergi@kelleranderle.com
Craig A Harbaugh (194309)
charbaugh@kelleranderle.com
**KELLER ANDERLE SCOLNICK LLP**
18300 Von Karman Ave., Suite 930
Irvine, CA 92612
Telephone   (949) 476-0900

Saul Perloff (157092)
saul.perloff@aoshearman.com
Kathy Grant (*pro hac vice*)
kathy.grant@aoshearman.com
Andre Hanson (*pro hac vice*)
andre.hanson@aoshearman.com
Olin "Trey" Hebert (*pro hac vice*)
trey.hebert@aoshearman.com
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 W. Sixth Street, 22nd Floor
Austin, Texas 78701
Telephone      (512) 647-1900

Christopher LaVigne (*pro hac vice*)
christopher.lavigne@aosherman.com
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Ave.
New York, NY 10022
Telephone      (212) 848-4000

Attorneys for Plaintiff/Counterclaim-Defendant
GUARDANT HEALTH, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC., <br><br>    Plaintiff/Counterclaim-Defendant, <br><br> vs. <br><br> NATERA, INC., <br><br>    Defendant/Counterclaim-Plaintiff. | Case No. 3:21-cv-04062-EMC <br><br> **GUARDANT HEALTH INC.'S OPPOSITION TO NATERA, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL** <br><br> Hearing Date: March 27, 2025 <br> Place:  Courtroom 5, 17th Floor <br> Judge:  Hon. Edward M. Chen |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     NATERA'S MASSIVE FALSE ADVERTISING CAMPAIGN ....................................... 1

III.    THE JURY PROPERLY FOUND NATERA WILLFULLY ENGAGED IN FALSE
        ADVERTISING IN VIOLATION OF THE LANHAM ACT. .......................................... 5

    A.  Natera's false advertisements are neither opinion nor puffery. ................................. 5

    B.  The First Amendment does not protect Natera's false advertisements. .................... 6

    C.  Natera made its false comparisons in commercial advertisements. ......................... 9

    D.  Natera's false advertisements were material. ......................................................... 9

    E.  The jury correctly found Natera caused Guardant injury and awarded damages. .......... 10

IV.     THE JURY PROPERLY AWARDED PUNITIVE DAMAGES ...................................... 13

    A.  Natera's arguments are barred by judicial estoppel, waiver, and forfeiture. .................. 13

    B.  The Court properly instructed the jury on the availability of punitive damages. ............ 15

    C.  The Lanham Act does not preempt common law unfair competition claims. .................. 17

    D.  The evidence supports the jury's award of punitive damages. ................................... 18

V.      NATERA IS NOT ENTITLED TO A NEW TRIAL ...................................................... 19

VI.     NATERA IS NOT ENTITLED TO REMITTITUR ........................................................ 22

VII.    NATERA IS NOT ENTITLED TO JUDGMENT ON ITS COUNTER-CLAIMS .......... 24

VIII.   CONCLUSION ............................................................................................................ 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*4 Pillar Dynasty LLC, v. New York & Co.*,
  933 F.3d 202 (2d Cir. 2019) ............................................................................................. 12

4

*Aetna Cas. and Sur. Co., Inc. v. Centennial Ins. Co.*,
  838 F.2d 346 (9th Cir. 1988) ........................................................................................... 17

5

*Architectural Design Contractors, Inc. v. Builder Servs. Grp.*,
  2021 WL 6804239 (C.D. Cal. Dec. 13, 2021) ................................................................. 15

6

7

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) ...................................................................................... 5, 7

8

*Attrezzi, LLC v. Maytag Corp.*,
  436 F.3d 32 (1st Cir. 2006) ............................................................................................. 18

9

*Bank of the West v. Superior Court*,
  2 Cal.4th 1254 (Cal. 1992) .............................................................................................. 16

10

*Barnes-Hind, Inc. v. Superior Court*,
  181 Cal.App.3d 377 (Cal. Ct. App. 1986) ...................................................................... 16

11

12

*Benshot LLC v. Monkey Trading LLC*,
  2023 WL 11991593 (E.D. Wis. Feb. 14, 2023) .............................................................. 18

13

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 ..................................................................................................................... 23

14

*Bolger v. Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983) ........................................................................................................ 7, 8

15

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) ...................................................................................................... 17, 18

16

17

*Callaway Golf Co. v. Salzenger*,
  384 F. Supp. 2d 735 (D. Del. 2005) ................................................................................ 11

18

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (Cal. 1999) ............................................................................................. 15

19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) ........................................................................................................... 6

20

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994) ........................................................................................... 17

21

22

*Clem v. Lomeli*,
  566 F.3d 1177 (9th Cir. 2009) ......................................................................................... 19

23

*Clorox Co v. Rekitt Benckiser Grp.*,
  398 F. Supp. 3d 623 (N.D. Cal. 2019) ......................................................................... 6, 19

24

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) ........................................................................................ 9, 25

25

*Cohen v. ConAgra Brands, Inc.*,
  16 F.4th 1283 (9th Cir. 2021) .......................................................................................... 15

26

27

*Cornish v. Brazleton*,
  2014 WL 1457768 (C.D. Cal. Apr. 15, 2014) ................................................................ 16

*Dang v. Cross*,
  422 F.3d 800 (9th Cir. 2005) ........................................................................................... 19

28

- ii -

*Davis v. Wakelee*,
   156 U.S. 680 (1895) ................................................................................................... 13

*Eastman Chemical Co. v. Plastipure, Inc.*,
   775 F.3d 230 (5th Cir. 2014) ..................................................................................... 9

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
   774 F.3d 192 (3d Cir. 2014) ...................................................................................... 6

*Hamilton v. State Farm Fire & Cas. Co.*,
   270 F.3d 778 (9th Cir. 2001) ................................................................................... 13

*Harper v. City of Los Angeles*,
   533 F.3d 1010 (9th Cir. 2008) ............................................................................ 5, 21

*Healthpoint, Ltd. v. Ethex Corp.*,
   2004 WL 2359420 (W.D. Tex. July 14, 2004) ...................................................... 14

*Hendricks v. StarKist Co.*,
   30 F. Supp. 3d 917 (N.D. Cal. 2014) ...................................................................... 17

*Honcharov v. Barr*,
   924 F.3d 1293 (9th Cir. 2019) ................................................................................ 15

*Hunt v. City of L.A.*,
   638 F.3d 703 (9th Cir. 2011) ..................................................................................... 7

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ................................................................................... 22

*JCW Investments, Inc. v. Novelty, Inc.*,
   482 F.3d 910 (7th Cir. 2007) ................................................................................... 18

*John R. Sand & Gravel Co. v. United States*,
   552 U.S. 130 (2008) ................................................................................................. 15

*Kingray, Inc. v. NBA, Inc.*,
   188 F.Supp.2d 1177 (S.D. Cal. 2002) .................................................................... 15

*KST Data, Inc. v. DXC Tech. Co.*,
   980 F.3d 709 (9th Cir. 2020) ................................................................................... 15

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986) ................................................................................ 22

*Leatherman Tool Grp. v. Cooper Indus, Inc.*,
   285 F.3d 1146 (9th Cir. 2002) ................................................................................ 24

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) ................................................................................ 12

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
   848 F.2d 34 (2d Cir. 1988) ....................................................................................... 6

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ........................................................................................... 13, 14

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ................................................................................................. 18

*Ojala v. Bohlin*,
   178 Cal.App.2d 292 (Cal. App. Ct. 1960) ............................................................. 16

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013) ............................................................................ 1, 7, 8

*Peer Int'l Corp. v. Pausa Records, Inc.*,
  909 F.2d 1332 (9th Cir. 1990) ................................................................................ 12

*People v. Ashford University, LLC*,
  100 Cal. App. 5th 485 (2024) .................................................................................. 24

*People v. Johnson & Johnson*,
  77 Cal. App. 5th 295 (2022) .................................................................................... 24

*Riley v. Volkswagen Grp. of Am.*,
  51 F.4th 896 (9th Cir. 2022) .................................................................................... 23

*Ruvalcaba v. City of Los Angeles*,
  64 F.3d 1323 (9th Cir. 1995) ................................................................................... 21

*Scavengers' P. Assn. v. Serv-U-Garbage Co.*,
  218 Cal. 568 (1933) ................................................................................................. 15

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ................................................................................. 17

*Show Mgmt v. Hearst Pub. Co.*,
  196 Cal.App.2d 606 (1961) ..................................................................................... 16

*Skydive Arizona, Inc. v. Quattrocchi*,
  673 F.3d 1105 (9th Cir. 2012) ................................................................................. 22

*Smith v. City of Oakland*,
  538 F.Supp.2d 1217 (N.D. Cal. 2008) ..................................................................... 18

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ........................................................................5, 6, 8, 16

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ................................................................................................ 23

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  839 F.3d 1179 (9th Cir. 2016) ................................................................................. 12

*Swinton v. Potomac Corp.*,
  270 F.3d 794 (9th Cir. 2001) ................................................................................... 19

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ................................................................................. 16

*Tonka Corp. v. Tonk-A-Phone, Inc.*,
  805 F.2d 793 (8th Cir. 1986) ................................................................................... 18

*TrafficSchool.com, Inc. v. Edriver Inc.*,
  653 F.3d 820 (9th Cir. 2011) ............................................................................... 6, 18

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985) ................................................................................. 18

*U-Haul Int'l, Inc. v. Jartran,* Inc.,
  793 F.2d 1034 (9th Cir. 1986) ................................................................................... 6

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
  52 F.4th 1054 (9th Cir. 2022) .................................................................................. 22

*United States v. Scott*,
  705 F.3d 410, (9th Cir. 2012) .................................................................................. 15

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ................................................................................................ 17

- iv -

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985)..................................................................................................................... 6

*Zeltiq Aesthetics, Inc., v. BTL Indus., Inc.*,
   32 F.Supp.3d 1088 (N.D. Cal. 2014) ...................................................................................... 17

**Statutes**

15 U.S.C. § 1117 ................................................................................................................... 11, 23

Tex. Civ. Prac. & Rem. Code § 41.003 ...................................................................................... 14

**Other Authorities**

Adv. Comm. Notes to Rule 50 (1991 Amendment) ..................................................................... 24

*California Antitrust and Unfair Competition Law* §20.02 (2022) ............................................. 16

Ninth Circuit Model Civil Jury Instruction 5.3 .......................................................................... 20

Ninth Circuit Model Civil Jury Instructions 17.37..................................................................... 12

**Rules**

Fed. R. Civ. P. 50.................................................................................................................... 5, 24

Fed. R. Civ. P. 59........................................................................................................................ 19

1    I.    **INTRODUCTION**

2        Guardant respectfully opposes Natera's Motion for Judgment as a Matter of Law or, in the

3    Alternative, a New Trial (Dkt. 880) ("Motion" or "Mot.").

4        Natera does not seriously challenge the evidence as insufficient to support the jury's verdict.

5    Instead, Natera's motion is largely an omnibus reconsideration motion, including of the Court's

6    summary judgment decision.  There, the Court held "[a] reasonable jury could find that many of

7    Natera's advertising statements were literally false," Dkt. 326 at 12, yet Natera now argues its false

8    comparison ads were non-actionable puffery protected by the First Amendment.    Natera's

9    arguments find no support in *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir.

10   2013), and are irreconcilable with the Court's summary judgment decision and the substantial case

11   law condemning false comparative ads as one of the most damaging forms of false advertising.

12       Natera also seeks reconsideration of this Court's rulings on the availability of punitive

13   damages.  Natera, however, consistently took the position that California common law applies and

14   makes available punitive damages.  This Court properly found Natera's attempt to take the opposite

15   position came way too late.  Dkt. 610 at 29-30.  The Court's allowance of a punitive damages

16   instruction correctly applied California common law, and judicial estoppel, waiver, and forfeiture

17   foreclose Natera's opportunistic shift in positions.

18       Natera seeks a new trial based on challenges to certain jury instructions and evidentiary

19   rulings — issues that were thoroughly litigated and properly resolved by the Court.  Natera cannot

20   show those rulings were erroneous, much less the type of prejudice necessary to warrant a new

21   trial.  Further, Natera's request for remittitur should be denied: the evidence directly supports the

22   jury's award of $75 million for damages; and the $175.5 million in punitive damages falls well

23   within the permissible ratio of punitive to compensatory damages.  Finally, Natera's request for

24   judgment on its clams against Guardant is frivolous.  The jury rejected Natera's claims based on

25   the evidence.  There are no grounds for the Court to disturb the jury's determination.

26   II.    **NATERA'S MASSIVE FALSE ADVERTISING CAMPAIGN**

27       After hearing over 20 witnesses and seeing nearly 200 exhibits admitted, the jury found

28   Natera engaged in "false advertising in violation of the Lanham Act."  Dkt. 847.  The jury found

Natera's ads "actually deceive or have a tendency to deceive a substantial segment of consumers" and that Natera's false advertising was "willful" — *i.e.*, Natera "knew its advertising was false or misleading, or it acted with reckless disregard for, or willful blindness to, the false or misleading nature of its advertising." *Id.*; Dkt. 814 (Inst. 45).  The jury awarded Guardant $75 million in actual damages — the amount for corrective advertising that Guardant's expert testified would be "necessary in order to put [Guardant] back in the position they should have been, level the playing field," Ex. F, Trial Tr. at 1324:15-18 (J. Malackowski).[1]  The jury determined Natera should disgorge $42 million in unjust profits, and decided Natera undertook its false ads "with malice, oppression, or fraud," warranting $175.5 million in punitive damages.

The evidence at trial overwhelmingly supports the jury's verdict.  Years before Guardant launched Reveal in early 2021, Natera decided to go to war against Guardant.  *See e.g.*, TX-64; TX-150.  Natera's plans ramped up in early 2021 as it learned of Guardant's imminent commercial launch of Reveal.  TX-151 ("We need to war room and plan."); TX-95 ("training to pound" Guardant); TX-152 ("we need to go to the mat here").  Natera's CEO told the marketing team to "[s]pend whatever is necessary to salt [Guardant's] launch" of Reveal.  TX-109.  Natera's contemporaneous emails exposed the true intent of its false advertising.

Following the CEO's direction, Natera spent $24.8 million on a massive campaign of false ads against Guardant.  TX-98.  Natera's campaign included distributing its false ads by hard copy to nearly all 10,000 oncologists in the U.S. in multiple forms, by email to nearly every oncologist in multiple forms  (Natera's CEO testified that it sent about 100,000 emails as part of its anti-Reveal campaign), in unquantifiable numbers of in-person sales meetings with oncologists, and on Natera's website.   Ex. C, Trial Tr. at 543:21-23, 549:19 - 558:1, 566:3 – 567:7, 573:7 – 574:15, 576:17-21; 581:11-13 (K. Masukawa); Ex. D at 624:21 – 628:4 (K. Masukawa); Ex. E at 1045:25 – 1046:3 (S. Chapman) (Q: "So Natera sent over 100,000 emails to oncologists, didn't it?"  A: "I don't know the exact amount, but there's 10-12,000 oncologists.  So 10 each seems about right."); TX-286.

The centerpiece of Natera's false ads, the one-page chart called "Signatera vs. Reveal

---

[1] "Ex. __" refers to the omnibus declaration of Gregory M. Sergi filed in support of both of Guardant's oppositions to Natera's post-trial motions.

- 2 -

performance comparison," Trial Ex. 126 ("Performance Comparison Chart"), presented a "head-to-head comparison" of Reveal from the Harvard/Parikh Study with the performance of Signatera from the Danish/Reinert Study.  Ex. G, Trial Tr. at 1555:2-6 (S. Moshkevich) ("It's pretty head-to-head comparison.").  Natera repeated many of the same false comparisons in marketing emails sent directly to oncologists.  TX-128, TX-220, & TX-286.  But, Natera's comparisons were blatantly false.  Reveal's performance in the Harvard/Parikh Study derived from sample volumes of 4 mL or less compared to the recommended input of 8-10 mL.  TX-1 at 7.  Signatera's performance in the Danish/Reinert Study, on the other hand, derived from optimal sample volumes of over 8 mL.  TX-4 at 2.  Low sample volumes negatively affect the performance and failure rate of these tests.  Ex. B, Trial Tr. 302:14-18 (J. Odegaard); Ex. D, Trial Tr. at 913:9-13 (K. Banks).  Witness after witness explained how Natera's ads presented false apples-to-oranges comparisons given the different sample volumes used in the two studies.  *See, e.g.*, Ex. B, Trial Tr. at 388:17-20 (J. Odegaard); 406:24 – 407:1 (K. Price); Ex. D, 733:15-17 (H. Eltoukhy); Ex. F, 1240:7-20 (D. Heitjan).[2]

Natera knew its comparisons were false.  The Harvard/Parikh Study highlighted the low sample volumes: "In particular, all of our samples had plasma input volumes of 4 mL or less, versus the recommended input of 8-10 mL, which may have affected overall performance characteristics." TX-1 at 7.  The senior author of the Danish/Reinert Study told Natera that it "makes no sense, scientifically" to compare the results of two different tests that were generated using different input volumes.  TX-400 at 1-2; TX-395 (Dr. Andersen telling Natera such a comparison would be "unfair");  Ex. J, C. Andersen Depo. at 95:6-20 (Day 2) (as played at trial); 104:20-24 (Day 1) (as played at trial) ("[I]t would be a bit like comparing apples and pears.").  And, Dr. Masukawa

---

[2] Beyond the significant difference in sample volumes rendering Natera's comparison ads false, Prof. Heitjan explained that Natera's comparison of lead times was biased in Signatera's favor given the different schedules of CT scans in the Danish/Reinert Study versus the Harvard/Parikh Study, Ex. F, Trial Tr. at 1245:15 – 1248:23;  Natera's comparisons of NPVs were biased in Signatera's favor given the lower prevalence in the population for the Danish/Reinert Study versus the Harvard/Parikh Study, *id.* at 1249:20 – 1252:10; Natera's comparison of hazard ratios ignored the critical confidence interval, which shows the difference in the estimated hazard ratios was "not statistically significant," *id.* at 1252:11 – 1253:23; and Natera's comparison of longitudinal sensitivities was biased in Signatera's favor because of the many more samples per patient in the Danish/Reinert versus the Havard/Parikh Study, *id.* at 1253:24 – 1255:16.

1  admitted that the Performance Comparison Chart was "not apples-to-apples" and it would be wrong

2  if Natera's sales force characterized it that way to doctors.  Ex. C, Trial Tr. at 580:15-25.

3        Mischaracterizing the Harvard/Parikh Study, Natera argues it "invited comparison to the

4  Reinert Study, with multiple references to 'comparable' performance between the competing tests."

5  Mot. at 3.  In fact, the Harvard/Parikh Study concluded Reveal's sensitivity "at the landmark

6  timepoint" — despite the very low sample volumes — "was comparable with the performance of

7  many tumor-informed assays." TX-1 at 5.  Natera's ads do not include any comparison of landmark

8  sensitivity — likely because Signatera's landmark sensitivity in the Danish/Reinert Study (41%)

9  was much lower than that of Reveal in the Harvard/Parikh Study.  *Id.*; *see also* TX-22.[3]

10        Natera's false advertising campaign, timed intentionally to "salt" the launch of Reveal,

11  worked.  Dr. Eltoukhy explained the devastating and lasting harm caused by Natera's false ads:

> Just the -- the damages that have been done to the reputation of this product, to the whole field of thinking about a blood-only approach that can potentially help millions of cancer patients that don't -- and cancer survivors that don't have tissue.

> It's just irreparable harm and we're going to have to go out and reeducate the field, do corrective messaging.  And, you know, our it's going to take an enormous amount of time and money, and I don't know if we can ever sort of get back to sort of where we . . .  would have been without this campaign.

17  Ex. D, Trial Tr. at 740:11-25.  Guardant's expert explained: "[T]he extent of the campaign; because

18  of the timing of the campaign, that it was spent at the launch, which has long-term effects; because

19  there's only a two-player market, so what hurts Guardant is beneficial for Signatera; and, frankly,

20  because Natera admitted that it worked, that they did blunt the sales of Guardant."  Ex. F, Trial Tr.

21  at 1323:7-25 (J. Malackowski).  Mr. Malackowski showed that Guardant lost over $12 million in

22  profits from July 2021 through May 2022.  *Id.* at 1321:1-19.  He further explained how after the

23  start of Natera's false advertising, Natera's sales skyrocketed and exceeded its own projections,

24  while Reveal's sales languished and missed Guardant's own projections.  *Id.* at 1316:18 – 1320:2.

---

[3] Natera's reference to Guardant's comparisons of the two studies in internal discussions and for MolDX, Mot. at 3, are entirely misplaced.  Natera points to no advertisement by Guardant that compares metrics from the two studies.  Moreover, the many differences between the two studies all artificially inflate the performance of Signatera relative to Reveal, not the other way around.

1    **III.    THE JURY PROPERLY FOUND NATERA WILLFULLY ENGAGED IN FALSE**

2    **ADVERTISING IN VIOLATION OF THE LANHAM ACT.**

3    Judgment as a matter of law requires the moving party to show "that a reasonable jury would

4    not have a legally sufficient evidentiary basis to find" for the other party.  Fed. R. Civ. P. 50(a)(1).

5    "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence

6    adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."

7    *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).  "[T]he court must not weigh

8    the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to

9    support the jury's conclusion."  *Id.*  The Court must "view all evidence in the light most favorable

10   to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard

11   all evidence favorable to the moving party that the jury is not required to believe."  *Id.*

12   Natera argues that its false ads are non-actionable because they are opinion or puffery, were

13   not made in commercial advertisements, and were not material to purchasing decisions.  Natera

14   also argues that the First Amendment shields it from liability.  These arguments fail.

15   **A. Natera's false advertisements are neither opinion nor puffery.**

16   A statement of fact is a "specific and measurable claim, capable of being proved false or of

17   being reasonably interpreted as a statement of objective fact."  *Ariix, LLC v. NutriSearch Corp.*,

18   985 F.3d 1107, 1121 (9th Cir. 2021).  "'Puffing' is exaggerated advertising, blustering, and boasting

19   upon which no reasonable buyer would rely."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d

20   1134, 1145 (9th Cir. 1997).  "While product superiority claims that are vague or highly subjective

21   often amount to nonactionable puffery, 'misdescriptions of specific or absolute characteristics of a

22   product are actionable.'"  *Id.*  "A specific and measurable advertisement claim of product

23   superiority based on product testing is not puffery."  *Id.*

24   Natera's false statements are neither opinion nor puffery. By comparing specific

25   performance metrics, Natera's advertisements implicitly claimed that Signatera outperforms Reveal

26   along those metrics, including presurgical sensitivity, failure rate, serial longitudinal sensitivity,

27   lead time, PPV, NPV, and hazard ratio.  TX-126.  Those metrics are measurable and have an

28   "objective" meaning.  *Ariix,* 985 F.3d at 1121.  Claims about their value are fact, not opinion or

- 5 -

1  puffery, because they are "capable of being proved false." *Id.* The jury was instructed on this

2  precise point and necessarily determined that Natera's false comparisons were "statements of fact

3  that are capable of being proven true or false." Dkt. 814 (Instr. 38).

4        To argue otherwise, Natera frames its implicit claim as "Signatera is 'superior' to Reveal,"

5  and asks the Court to ignore the specific metrics compared in Natera's advertisements. Mot. at 9.

6  That argument fails. "When evaluating whether an advertising claim is literally false, the claim

7  must always be analyzed in its full context." *Southland Sod*, 108 F.3d at 1139. Natera's comparison

8  of specific metrics served as an indispensable part of its false advertising, providing the foundation

9  for its claim that Reveal was "inferior" while showing that Signatera was superior. Indeed, the

10  point of *every* false comparative ad is to show that one product or service is superior to another.

11  Natera's argument thus is contrary to and irreconcilable with the substantial case law holding false

12  comparative advertising is not mere puffery but violates the Lanham Act and as one of the most

13  pernicious forms of false advertising. *See* Dkt. 326 at 14; *U-Haul Int'l, Inc. v. Jartran,* Inc., 793

14  F.2d 1034, 1041 (9th Cir. 1986); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192,

15  198-203 (3d Cir. 2014); *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988);

16  *Clorox Co v. Rekitt Benckiser Grp.*, 398 F. Supp. 3d 623, 637 (N.D. Cal. 2019).

17     **B. The First Amendment does not protect Natera's false advertisements.**

18        Natera erroneously argues the First Amendment bars Guardant's claims. Mot. at 5. But as

19  *false* commercial speech, Natera's statements ***receive no constitutional protection***. "[F]alse or

20  misleading commercial statements aren't constitutionally protected." *TrafficSchool.com, Inc. v.*

21  *Edriver Inc.*, 653 F.3d 820, 829-830 (9th Cir. 2011). There is no First Amendment interest in "the

22  dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer v. Office of*

23  *Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985). Because the "First

24  Amendment's concern for commercial speech is based on the informational function of advertising"

25  there can be "no constitutional objection to the suppression of commercial messages that do not

26  accurately inform the public about lawful activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv.*

27  *Comm'n of New York*, 447 U.S. 557, 563 (1980).

28

Natera's false ads bear all three hallmarks of commercial speech: "[1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983)). Determining whether speech is commercial is a "common-sense" and "fact-driven" analysis. *Ariix*, 985 F.3d at 1116 (cleaned up).

Here, Natera made its false claims in commercial advertisements, as Natera conceded throughout this litigation. *See, e.g.*, Ex. G, Trial Tr. at 1513:23 – 1514:10 (S. Moshkevich) (characterizing TX-126 as a Natera "advertisement"); Ex. D, Trial Tr. at 642:7-10 & 675:15-25 (K. Masukawa) ($24.8 million is what Natera "spent to put these ads out"). Natera's Performance Comparison Chart was "provided to the sales force" and used by the sales force in meetings with oncologists and physicians. Ex. C, Trial Tr. at 576:17-578:13. Natera's sales force was responsible for distributing thousands of the false email ads. *See, e.g.*, TX-286. Moreover, Natera's false ads refer to specific products: the Performance Comparison Chart explicitly compared "Signatera" and "Reveal" using both products' trade names, TX-126, and Natera's false email ads referred to Signatera and "Guardant's MRD test," which could only mean Reveal, TX-286. Finally, Natera made its false claims with express economic motive. Natera viewed the nascent MRD-testing market as ripe for a "land grab" and poured considerable resources to "salt [the] launch" of Guardant's Reveal. TX-0150; TX-0109. The economic motive behind Natera's false advertisements is beyond dispute. *See Ariix*, 985 F.3d at 1116-17.

Even so, Natera argues that the First Amendment protects its false advertisements under the reasoning of *ONY v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2nd Cir. 2013). There, the Second Circuit held "scientific conclusions" presented in a peer-reviewed journal article cannot support Lanham Act liability for false advertising if the authors based their conclusions on "non-fraudulent data" and "accurate descriptions of the data and methodology." *Id.* at 498. *ONY* also concluded the defendant was not liable for tortious interference under state law for "presenting accurately the article's [non-actionable] conclusions" in advertisements. *Id.* at 499. Such "secondary distribution" of non-actionable scientific conclusions is likewise non-actionable, the

1    court explained, unless the advertisement contains "additional misleading statements" or

2    "mislead[s] a reader about the conclusions of the article." *Id.* at 492, 499.

3        While *ONY* significantly undercuts Natera's counterclaims, which were based on attacking

4    the Harvard/Parikh Study, it has no bearing on Guardant's claims.  Natera's false comparisons were

5    not published in scientific journals, and Natera's apples-to-oranges comparisons were not made in

6    either the Harvard/Parikh or the Danish/Reinert Studies.  Instead, Natera cherry-picked data points

7    from these two different studies, and then compared them, out of context, in commercial advertising

8    to communicate the literally false message that the data were derived using fairly comparable

9    methods.  As Natera's collaborator Dr. Anderson explained, comparing studies that used different

10   sample volumes "makes no sense, scientifically."  TX-400 at 1-2.  By presenting this apples-to-

11   oranges comparison as apples-to-apples, Natera necessarily and falsely claimed Signatera

12   outperforms Reveal.  That false statement is actionable under the Lanham Act because neither the

13   Harvard/Parikh nor the Danish/Reinert Studies make the comparative assessments found in

14   Natera's ads.  *See Southland Sod*, 108 F.3d at 1139 ("'[i]f the plaintiff can show that the tests [cited

15   by the defendant], even if reliable, do not establish the proposition asserted by the defendant, the

16   plaintiff has obviously met its burden' of demonstrating literal falsity").

17       Natera asks the Court to misapply *ONY* to afford constitutional protection to an *advertiser*'s

18   false and misleading claims about the results of scientific studies — including Natera's false claims

19   that "Signatera was superior" and "the [Parikh and Reinert] studies were comparable" — so long

20   as the advertiser's claims are "the subject of 'legitimate ongoing scientific disagreement.'"  Mot. at

21   7 (quoting *ONY*, 720 F.3d at 498).  The Court should reject that invitation.  This Court already

22   declined to apply *ONY* that way when ruling on the parties' cross motions for summary judgment.

23   *See* Dkt. 326 at 40.  Moreover, extending *ONY* to shield an advertiser's distortion of scientific

24   research exceeds the limits of the Second Circuit's reasoning, which emphasizes a court's inability

25   to "referee" debates among "scientists*"* over "novel area[s] of research," in the context of peer-

26   reviewed scientific articles that have been published in academic journals.  *See* 720 F.3d at 496-98.

27   Indeed, extending *ONY* to protect Natera's false advertising runs up against cornerstone First

28   Amendment precedent. The Supreme Court has long "made clear that advertising which 'links a

1    product to a current public debate' is not thereby entitled to the constitutional protection afforded

2    noncommercial speech." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983).  If the First

3    Amendment barred liability for false advertisers "simply because their claims are open to scientific

4    or public debate," as Natera urges, "the Lanham Act would hardly ever be enforceable." *Eastman*

5    *Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230, 236 (5th Cir. 2014) (distinguishing *ONY*).

6         **C.  Natera made its false comparisons in commercial advertisements.**

7         Natera erroneously argues its false comparisons were not "commercial advertisements" but

8    rather mere "educational materials."  Mot. at 10.  Nonsense.  In evaluating the evidence, the jury

9    necessarily determined Natera's comparisons were "made in commercial advertising or

10   promotion." Dkt 814, Instr. 32.  The Court's jury instructions properly defined "commercial

11   advertising or promotion" under Ninth Circuit authority.  *Compare id.* to *Coastal Abstract Serv.,*

12   *Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999).  Natera does not challenge that

13   instruction, and the evidence overwhelmingly supports the jury's determination.  Natera's false ads

14   meet all three *Bolger* factors distinguishing commercial from non-commercial speech.  *Supra* pp.

15   6-7. And the evidence was overwhelming that Natera's ads were widely disseminated within the

16   relevant market for the purpose of influencing customers to purchase Signatera.  *Supra* p. 2.

17        **D.  Natera's false advertisements were material.**

18        Natera challenges the sufficiency of the evidence for the jury's determination that Natera's

19   false comparison ads were material, Mot. at 10-11, but this Court aptly rejected the same arguments

20   on summary judgment.  Dkt. 326 at 26-29.  "A false or misleading statement is material if . . . it

21   misrepresents an inherent quality or characteristic of the product that was the subject of the

22   statement."  Dkt. 814 (Instr. 35); *see also* Dkt. 326 at 28.  Sensitivity, failure rate, lead time, NPV

23   and PPV, hazard ratios are all inherent characteristics of these tests.  Natera promoted pre-surgical

24   sensitivity, failure rate, lead time, and hazard ratios as "meaningful measures" for MRD detection.

25   TX-69 at 23.  Natera's "white paper" for doctors described NPV and PPV as "key metrics."  TX-

26   120 at 3.  And Natera's blast email claimed its comparison demonstrated "significant differences"

27   in performance.  TX-286.  The plain language of Natera's ads readily established their materiality.

28

1    Moreover, ample evidence showed Natera's false ads were "likely to influence customer

2    purchasing decisions."  As this Court held, Mr. Sowers's survey "demonstrates that Natera's

3    advertisements do affect survey respondents' perception of assay quality."  Dkt. 326 at 27; *see also*

4    Ex. D, Trial Tr. at 839:4-16 (B. Sowers).  Thus, consumers took away the belief that Signatera

5    performed better than Reveal, a belief likely — indeed intended — to influence their purchasing

6    decisions.  Dr. Odegaard explained that medical doctors rely upon the materials provided by

7    companies marketing their diagnostic tests for patient care.  Ex. B, Trial Tr. at 296:1-20 (J.

8    Odegaard).  And the expert testimony of Mr. Malackowski showed that Natera's false ads had an

9    impact on sales, *i.e.*, those ads influenced purchasing decisions.  *Supra* p. 4.  Even Natera's expert

10   Dr. Stec testified Natera's false ads increased Signatera sales by at least $32 million, Ex. H, Trial

11   Tr. at 1862:14-22 (J. Stec) — a massive impact on purchasing decisions.

12   **E.  The jury correctly found Natera caused Guardant injury and awarded damages.**

13   Mischaracterizing the law and ignoring the evidence, Natera argues Guardant failed to

14   present sufficient evidence to support (1) the jury's finding that Natera caused Guardant injury, (2)

15   the jury's award of actual damages; (3) the jury's disgorgement award; and (4) the jury's finding

16   that Natera's false advertising was "willful."  Mot. at 11-14.  Natera's arguments are simply wrong.

17   As the Court correctly instructed the jury: "Injury may be proven by showing the diversion

18   of its sales or the lessening of the goodwill that a party's products enjoy with the buying public.

19   Because Guardant and Natera are direct competitors, [one] may presume that a misrepresentation

20   that tends to mislead consumers caused commercial injury."  Dkt. 814 (Instr. 46); *see also* Dkt. 326

21   at 29-30.  Natera's motion does not address the applicable presumption of commercial injury.  *See*

22   Mot. at 11-14.  Moreover, Guardant showed Natera's false advertising devastated sales of Reveal.

23   *Supra* p. 4.  Guardant also showed it needs $75 million for corrective advertising to level the playing

24   field to where it should have been but for Natera's false advertising.  *Supra* p. 2.  Thus, the jury's

25   finding that Natera's false ads caused injury to Guardant is well supported by the evidence.

26   With respect to actual damages, Mr. Malackowski testified at length about the need for $75

27   million to correct the misimpressions created by Natera's false ads.  Natera's challenge to the jury's

28   damages award turns on a gross mischaracterization that Guardant Reveal is no longer being sold

and was "discontinued." Mot. at 1 & 11. Guardant Reveal is still on the market with the same brand name. In the same way Natera offered upgraded iterations of Signatera during this lengthy litigation, so too Guardant upgraded the commercial version of Reveal from what was known as L1.2 to what is now referred to as Guardant Reveal powered by the Infinity platform. Ex. F, Trial Tr. at 1360:3-14 (J. Malackowski). But Natera's false ads were directed at Reveal, and not merely one iteration of Guardant's "MRD test." The damage caused by Natera was to the reputation of the Reveal product brand and "to the whole field of . . . a blood-only approach." Ex. D, Trial Tr. at 740:11-25 (H. Eltoukhy). Thus, Reveal *continues* to be well behind where it should be in the market, despite its advantages over Signatera. Ex. F, Trial Tr. 1311:12-15, 1316:9-24 ("Guardant sales were below expectation" through August 2023) (J. Malackowski).

The case relied upon by Natera, *Callaway Golf Co. v. Salzenger*, 384 F. Supp. 2d 735 (D. Del. 2005), does not support overturning the jury's verdict. In that case, the false ad related to specific models of golf balls, both of which had been taken off the market. *Id*. at 741. The court found that "it makes no sense for Callaway to receive damages for 'prospective corrective advertising' to correct some possible public misunderstanding about golf balls that have long since been off the market." *Id*. Here, both products — Signatera and Reveal — are still on the market.

Natera also argues the evidence was insufficient to support a disgorgement award. Guardant responds more fully in its Opposition to Natera's Motion for Judgment on Equitable Claims. In short, Natera's argument that Guardant failed to show "Natera's profits that were 'attributable to' the allegedly false advertising" is false, contrary to this Court's *Daubert* decision, and completely misconstrues Natera's own burden. Mr. Malackowski satisfied Guardant's burden to show the relevant amount of Natera's sales. *See* 15 U.S.C. § 1117(a) ("[T]he plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."); Ex. F, Trial Tr. at 1321:20 – 1322:11 (J. Malackowski). Mr. Malackowski further explained why 100% of Signatera sales/profits in the U.S. for CRC clinical use should be disgorged. *Id*. at 1323:7-25; *see also* Dkt. 322 at 10. Beyond that, it was Natera's burden to show which, if any, of its sales were "not attributable" to its false advertising. *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400,

1  1408 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*,

2  839 F.3d 1179 (9th Cir. 2016).[4]  Natera failed to meet this burden.

3         Natera also mischaracterizes the nature of the jury's damages and disgorgement awards.

4  The damages award is for future corrective advertising to level the playing field to where it should

5  have been since early 2021 but for Natera's false ads.  In contrast, the disgorgement award deprives

6  Natera of the unjust profits it already earned from its false ads, and further serves to compensate

7  Guardant for the past harm from the start of Natera's false advertising in Q2 2021 through August

8  2023.  While both awards are entirely compensatory, they serve different purposes and are not

9  duplicative.  Indeed, the jury was correctly instructed that it was not to "include in any award of

10 profits any amount that you took into account in determining actual damages."  Dkt. 814 (Instr. 42).

11        Natera devotes one paragraph to arguing the evidence was insufficient to support the jury's

12 finding that Natera's false advertising was "willful."  Mot. at 14.  Natera's argument completely

13 ignores the mountain of evidence supporting the jury's determination.  *See supra* pp. 2-4; Guardant

14 Mot. for Equitable Monetary Remedies, Dkt. 883-1, at 3-8; Guardant Mot. for Attys' Fees & Costs,

15 Dkt. 885-2, at 3-9; Guardant Mot. for Permanent Injunction, Dkt. 882-1, at 4-9.  The only evidence

16 Natera musters for its argument is the self-serving, incredible, and discredited testimony of Dr.

17 Masukawa and Mr. Chapman that Natera's false comparison ads were an attempt to correct

18 Guardant's claims.  Mot. at 14 (citing Tr. 660:7-12, 1075:1-15).  The testimony cited by Natera

19 does not begin to explain how it was reasonable for Natera to believe that its comparison ads were

20 not false or misleading given the significant, obvious differences between the Harvard/Parikh Study

21 and the Danish/Reinert Study.  *See* Ninth Circuit Model Civil Jury Instructions 17.37 (quoting *Peer*

22 *Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990)) ("To refute evidence of

23

24  _____

25 [4] Natera mischaracterizes the testimony of Mr. Malackowski as suggesting disgorgement is a
   "penalty."  Mot. at 13 (quoting Trial Tr. at 1341-1342:5).  Mr. Malackowski stated "it's my

26 understanding that the law requires that they have to return those as a penalty for the false
   advertising --- or as a measure of damage."  Ex. F, Trial Tr. at 1342:2-5.  That is consistent with

27 the case law stating Lanham Act disgorgement exists "to avoid unjust enrichment," "as a proxy for
   plaintiff's damages," or "to deter infringement."  *4 Pillar Dynasty LLC, v. New York & Co.*, 933

28 F.3d 202, 212 (2d Cir. 2019).  In any event, the Court properly instructed the jury on disgorgement.

- 12 -

1   willful infringement, the defendant must 'not only establish its good faith belief in the innocence

2   of its conduct, it must also show that it was reasonable in holding such a belief.'").

3   **IV.        THE JURY PROPERLY AWARDED PUNITIVE DAMAGES.**

4        **A.  Natera's arguments are barred by judicial estoppel, waiver, and forfeiture.**

5            Natera seeks reconsideration of this Court's decision rejecting its arguments that California

6   common law unfair competition does not apply to false advertising and thus punitive damages are

7   not available.  Dkt. 610 at 29-30.

8            Under the doctrine of judicial estoppel, "'[w]here a party assumes a certain position in a

9   legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because

10  his interests have changed, assume a contrary position, especially if it be to the prejudice of the

11  party who has acquiesced in the position formerly taken by him.'"  *New Hampshire v. Maine*, 532

12  U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).  Courts invoke judicial

13  estoppel "not only to prevent a party from gaining an advantage by taking inconsistent positions,

14  but also because of 'general consideration[s] of the orderly administration of justice and regard for

15  the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the

16  courts.'"  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).  Although

17  the circumstances that call for judicial estoppel "are not reducible to any general formula," three

18  factors "firmly tip the balance of equities" in favor of estoppel: (1) the party's later position is

19  "clearly inconsistent" with its earlier one; (2) the party "succeeded in persuading a court" to accept

20  the earlier position; and (3) the party asserting an inconsistent position would "derive an unfair

21  advantage" or "impose an unfair detriment to the opposing party" if not estopped.  *New Hampshire*,

22  532 U.S. at 750-51; *see also Hamilton*, 270 F.3d at 783.

23           All three factors favor estoppel here.  First, Natera's arguments — that common law unfair

24  competition is limited to "passing off" and that the Lanham Act preempts claims where punitive

25  damages are available — are clearly inconsistent with how Natera litigated this case since the

26  beginning.  In its Amended Counterclaims, Natera asserted claims under the Lanham Act and for

27  "Common Law Unfair Competition" and sought "punitive damages" based on allegations that

28

1   "Guardant made false and misleading statements." Dkt. 90 at 74-75. Natera thus pursued the same

2   claims, same theory of liability, and same punitive damages its now says are unavailable.

3       Second, Natera successfully persuaded the Court that its initial position was correct. In

4   opposing Guardant's motion to dismiss, Natera argued that its common law claim was "adequately

5   pled for the same reasons the Lanham Act false advertising claim is adequately pled" — those

6   claims are "substantially congruent." Dkt. 100 at 10 n.12. The Court agreed and denied Guardant's

7   motion in part on that basis. Dkt. 121 at 27. The Court again applied the "substantially congruent"

8   standard when ruling on the parties' cross motions for summary judgment. Dkt. 326 at 11 n.2. And

9   Natera continued to press that standard and the availability of punitive damages in the parties' joint

10  pretrial statement. Dkt. 362 at 13 & 17. Throughout this case, the parties litigated their common

11  law claims under the substantial-congruence standard because Natera asserted that was correct.

12      Third, entertaining Natera's contrary position at this late stage would unfairly advantage

13  Natera and unfairly disadvantage Guardant. Natera waited until after discovery was closed, after

14  summary judgment was decided, and essentially until the eve of trial to reverse its position on the

15  common law, when it was far too late for Guardant to amend its pleadings. As this Court held,

16  "Natera's dispute is belated and no longer the proper subject for adjudication in the context of jury

17  instructions." Dkt. 610 at 29. Tellingly, Natera fails to offer "'any good explanation'" for switching

18  positions, which leaves little doubt that the change was born of gamesmanship. *New Hampshire*,

19  532 U.S. at 749. Plus, revisiting the substantial-congruence standard would unfairly prejudice

20  Guardant. As explained below, California courts have recognized the kinds of false advertising at

21  issue here as actionable under common law unfair competition. But if the Court were to accept

22  Natera's new position, and had Natera timely raised it, Guardant could have amended its complaint

23  to allege a different state law claim.[5] Instead, Natera assured the Court and Guardant for years that

24  common law unfair competition was the correct theory and punitive damages were available.

25  _____

    [5] Under Texas law, the state where Natera is headquartered (and where it sued Guardant in its failed
26  "race to the courthouse"), a claim for common law unfair competition allows for punitive damages
    and is "analyzed under the [same] elements [as] false advertising in violation of the Lanham Act."
27  *Healthpoint, Ltd. v. Ethex Corp.*, 2004 WL 2359420, *9 (W.D. Tex. July 14, 2004); Tex. Civ. Prac.
    & Rem. Code § 41.003; *see also* Dkt. 526 at 13 (raising argument); Dkt. 610 at 30 (denying
28  Guardant's request to add Texas law jury instruction).

Waiver and forfeiture further prevent Natera's dramatic change in positions. "Waiver is 'the intentional relinquishment or abandonment of a known right,' whereas forfeiture is 'the failure to make the timely assertion of [that] right.'" *United States v. Scott*, 705 F.3d 410, 415 (9th Cir. 2012). "Waiver and forfeiture . . . encourage the orderly litigation and settlement of claims by preventing parties from withholding 'secondary, back-up theories' . . . thus allowing party-opponents to appraise frankly the claims and issues at hand and respond appropriately." *Honcharov v. Barr*, 924 F.3d 1293, 1296 (9th Cir. 2019). Natera intentionally relinquished or abandoned its "limited to passing off" and preemption arguments because Natera took a plainly inconsistent position throughout this litigation. *See, e.g., Kingray, Inc. v. NBA, Inc.*, 188 F.Supp.2d 1177, 1193 n.6 (S.D. Cal. 2002). Natera failed to timely raise those arguments by waiting until the eve of trial when amending pleadings or additional discovery was not practical. *See, e.g., Architectural Design Contractors, Inc. v. Builder Servs. Grp.*, 2021 WL 6804239, at *4 (C.D. Cal. Dec. 13, 2021).

Waiver and forfeiture bar Natera's preemption argument for an additional reason. "Preemption is an affirmative defense, so the defendant bears the burden of pleading and supporting its preemption argument." *Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283, 1289 (9th Cir. 2021). "Generally, an affirmative defense that is not asserted in an answer to the complaint is waived or forfeited by the defendant." *KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 714 (9th Cir. 2020) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)). Here, Natera failed to raise preemption as an affirmative defense in either its original or first amended answer. *See* Dkt. 48 at 34-36; Dkt. 90 at 36-38. Natera cannot now raise that issue for the first time.

**B. The Court properly instructed the jury on the availability of punitive damages.**

Natera's new arguments also fail on the merits. Dkt. 610 at 29-30 ("[T]he Court finds Guardant's position more persuasive."). Under California common law, a claim for unfair competition covers at least three types of conduct. "Originally, it was the deceptive 'passing off' of one's goods or services as those of another." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 192 (Cal. 1999) (Kennard, J., concurring in part). Courts also recognized "trade secret misappropriation." *Id.* 193 n.1 (citing *Scavengers' P. Assn. v. Serv-U-Garbage Co.*, 218 Cal. 568 (1933)). The claim expanded to cover "false advertising . . . of such nature that its

- 15 -

1   effect is to disparage the product or enterprise of another," *Show Mgmt v. Hearst Pub. Co.*, 196 Cal.

2   App. 2d 606, 616 (1961), a form of unfair competition called "trade libel." *Barnes-Hind, Inc. v.*

3   *Superior Court*, 181 Cal. App. 3d 377, 385-86 (1986); *see also California Antitrust and Unfair*

4   *Competition Law* §20.02 (2022) ("common law unfair competition" includes "[t]rade libel").

5   Common law unfair competition continues to develop. As one court explained, the "scope of unfair

6   competition may not be limited to a particular type of deception. The legal concept of unfair

7   competition has evolved as a broad and flexible doctrine with a capacity for further growth to meet

8   changing conditions." *Ojala v. Bohlin*, 178 Cal. App. 2d 292, 301 (Cal. App. Ct. 1960).

9       Ignoring this weight of authority, Natera relies on two Ninth Circuit decisions rejecting

10  unfair competition claims because the plaintiff did not allege acts of "passing off" or the equivalent.

11  *See Southland Sod*, 108 F.3d at 1147; *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th

12  Cir. 2008). In both cases, the court disposed of the unfair competition claim in a one-paragraph

13  discussion quoting the California Supreme Court's statement in *Bank of the West v. Superior Court*

14  that the "common law tort of unfair competition is generally thought to be synonymous with the

15  act of 'passing off' one's goods as those of another." 2 Cal.4th 1254, 1263 (Cal. 1992). That

16  statement was *dictum*. The case involved an insurance contract dispute over a clause that

17  indemnified the policyholder for "damages" for "unfair competition." *Id.* at 1262. The court

18  concluded that the contract referred to common law unfair competition because statutory claims do

19  not allow for damages. *Id.* at 1265-66. The court had no occasion to consider the substantive scope

20  of common law unfair competition. And the court's hedged description of common law unfair

21  competition as being "generally thought [of as] synonymous with the act of 'passing off'" was not

22  meant to be an exhaustive statement. Indeed, California courts expressly disclaimed the view "that

23  unfair competition consists only of palming off." *Ojala*, 178 Cal. App. 2d at 300-01.

24      *Southland Sod's* and *Sybersound*'s cursory discussions of common law unfair competition

25  do not bind this Court because they failed to follow earlier precedent to the contrary. "'[W]hen a

26  subsequent three-judge-panel opinion conflicts with the opinion of an earlier three judge panel, it

27  is the earlier decision that controls.'" *Cornish v. Brazleton*, 2014 WL 1457768, at *2 (C.D. Cal.

28  Apr. 15, 2014). Before *Southland Sod* and *Sybersound*, the Ninth Circuit "consistently held that

- 16 -

1   state common law claims of unfair competition … are 'substantially congruent' to claims made

2   under the Lanham Act." *Cleary*, 30 F.3d at 1262-63.  And the Ninth Circuit had already recognized

3   that trade libel—the type of false advertising at issue in this case—is "akin to unfair competition"

4   under California common law.  *Aetna Cas. and Sur. Co., Inc. v. Centennial Ins. Co.*, 838 F.2d 346,

5   351 (9th Cir. 1988).  *Cleary* came before the *Southland Sod* and *Sybersound*, so the rule in *Cleary*

6   controls.  *See, e.g., Seltzer v. Green Day, Inc.,* 725 F.3d 1170, 1180 n.1 (9th Cir. 2013); *Zeltiq*

7   *Aesthetics, Inc., v. BTL Indus., Inc.*, 32 F. Supp. 3d 1088 (N.D. Cal. 2014) (following *Cleary* in a

8   post-*Southland Sod* false advertising case).  As the Court has concluded throughout this litigation,

9   under *Cleary*'s substantial-congruence standard, Guardant's proof that Natera violated the Lanham

10  Act is sufficient to establish liability for common law unfair competition.  *See* Dkt. 326 at 11 n.2

11  (summary judgment); Dkt. 610 at 29 (jury instructions).

12      **C. The Lanham Act does not preempt common law unfair competition claims.**

13      Natera contends that the Lanham Act implicitly preempts Guardant's common law unfair

14  competition claim.  Mot. at 16.  That is wrong under settled preemption doctrine.  Without an

15  express statement from Congress, federal law preempts state law only in two circumstances.  The

16  first is field preemption.  "[W]hen Congress intends that federal law occupy a given field, state law

17  in that field is pre-empted." *California v. ARC Am. Corp.*, 490 U.S. 93, 100-01 (1989).  The second

18  is conflict preemption.  "[W]here Congress has not occupied the field, state law is nevertheless pre-

19  empted to the extent it actually conflicts with federal law" — either because "compliance with both

20  state and federal law is impossible" or because "state law 'stands as an obstacle to the

21  accomplishment and execution of the full purposes and objectives of Congress.'" *Id.*  In deciding

22  whether a state cause of action is preempted, courts "must begin with the presumption that unless

23  a 'clear and manifest purpose of Congress' exists, federal acts should not supersede the states'

24  historic police powers."  *Hendricks v. StarKist Co.*, 30 F. Supp. 3d 917, 925 (N.D. Cal. 2014)

25  (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).

26      Natera bases its argument on conflict preemption, but there is no conflict.  "Ordinarily, state

27  causes of action are not pre-empted solely because they impose liability over and above that

28  authorized by federal law." *California*, 490 U.S. at 105.  Nothing makes it "impossible" to comply

- 17 -

1    with both the Lanham Act and California common law because the Lanham Act "does not expressly

2    forbid punitive damages." *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 918 (7th Cir. 2007)

3    (rejecting Lanham Act preemption of state common law claim based on availability of punitive

4    damages).  Nor does awarding punitive damages alongside Lanham Act remedies pose an obstacle

5    to Congress's objective of prohibiting false and misleading advertising.  Natera falls far short of

6    carrying its burden to show conflict preemption. *California*, 490 U.S. at 101; *see also Attrezzi, LLC*

7    *v. Maytag Corp.*, 436 F.3d 32, 42 (1st Cir. 2006) (rejecting Lanham Act preemption of state unfair

8    competition statute based on availability of attorney's fees); *Tonka Corp. v. Tonk-A-Phone, Inc.*,

9    805 F.2d 793, 795 (8th Cir. 1986) (same).  Natera notably cites no case finding preemption in the

10   circumstances here.  To the contrary, many courts have allowed punitive damages awards under

11   state law "when a compensatory award was also given under the Lanham Act." *Benshot LLC v.*

12   *Monkey Trading LLC*, 2023 WL 11991593, at *3 (E.D. Wis. Feb. 14, 2023) (collecting cases);

13   *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1024-25 (9th Cir. 1985).

14       **D.  The evidence supports the jury's award of punitive damages.**

15       Natera argues the First Amendment bars punitive damages because the jury "made no

16   specific finding that Natera acted with 'actual malice'" — that is, with "knowledge that [a

17   statement] was false or with reckless disregard of whether it was false or not." Mot. 17; *see New*

18   *York Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964).  This argument fails three times over.  To

19   start, Natera failed to "seek a jury instruction on this issue.  As such, it was waived." *Smith v. City*

20   *of Oakland*, 538 F.Supp.2d 1217, 1236-37 (N.D. Cal. 2008); *see* Dkt. 507 at 110-14.  The argument

21   also fails on the merits.  Actual malice is a First Amendment standard that applies only if the

22   defendant's false statements "are of a character which the principles of the First Amendment …

23   protect." *New York Times*, 376 U.S. at 285.  The First Amendment does not protect Natera's false

24   advertisements because "false or misleading commercial statements aren't constitutionally

25   protected." *TrafficSchool.com, Inc.*, 653 F.3d at 829-30).  Lastly, in finding Natera's false

26   advertising was "willful," the jury necessarily found Natera "knew its advertising was false or

27   misleading, or it acted with reckless disregard for, or willful blindness to, the false or misleading

28   nature of its advertising." Dkt. 814 (Instr. 45).  Thus, the jury's finding equates to actual malice.

1    **V.    NATERA IS NOT ENTITLED TO A NEW TRIAL**

2            Rule 59(a) allows the court to grant "a new trial on all or some of the issues" "after a jury

3    trial, for any reason for which a new trial has heretofore been granted in an action at law in federal

4    court." Fed. R. Civ. P. 59(a). "[J]ury instructions must fairly and adequately cover the issues

5    presented, must correctly state the law, and must not be misleading." *Dang v. Cross*, 422 F.3d 800,

6    804 (9th Cir. 2005). A court does not err when it rejects proposed jury instructions that are not

7    "properly supported by the law and the evidence." *See Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th

8    Cir. 2009). If an "error in the jury instruction is harmless, it does not warrant" a new trial. *Dang*,

9    422 F.3d at 805. "In evaluating jury instructions, prejudicial error results when, looking to the

10   instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered."

11   *Id*. (quoting *Swinton v. Potomac Corp.,* 270 F.3d 794, 802 (9th Cir. 2001)).

12           Natera presents five challenges to the Court's jury instructions, none of which have merit.

13   Instruction 31 explained the concepts of literal falsity, literal falsity by necessary implication, and

14   whether a statement is "misleading." Dkt. 814 (Instr. 31). The instruction aptly stated:

15   "Advertisements using an 'apples-to-oranges' comparison are literally false by necessary

16   implication where things that are non-comparable are portrayed as otherwise equivalent." This

17   states the law, as set forth in this Court's summary judgment decision, Dkt. 326 at 13-14, and its

18   decision in *Clorox Co.*, 398 F. Supp. 3d at 637. Natera cites no case law suggesting the instruction

19   was in any way erroneous. Instead, Natera argues there are hypothetical cases where dissimilar

20   items could be compared given the target audience. Mot. at 19. That is precisely the question for

21   the jury: whether the things being compared are comparable or non-comparable given the context

22   of the specific ad at issue. Here, the jury reasonably determined that the Harvard/Parikh Study and

23   the Danish/Reinert Study were not comparable for Natera's purpose of claiming superior

24   performance of Signatera with respect to the specific metrics in its ads.

25           Natera next challenges the punitive damages instruction. That challenge fails for the

26   reasons discussed above with respect to Natera's arguments on the availability of punitive damages.

27           Natera challenges the Court's determination not to provide a mitigation instruction, but the

28   Court correctly withdrew that instruction given the lack of evidence presented by Natera. Ex. H,

- 19 -

1    Trial Tr. at 1931:12 – 1936:5 ("There's no evidence to support it.  We talked about it.  The parties

2    had a chance to bring it up.  It wasn't done.").  Natera's motion still does not cite any evidence to

3    support a mitigation instruction.  Natera's burden was to show that Guardant "failed to use

4    reasonable efforts to mitigate damages" and "the amount by which damages would have been

5    mitigated."  Ninth Circuit Model Civil Jury Instruction 5.3.  Natera cites only Mr. Malackowski's

6    testimony about Guardant's estimate of what corrective advertising might cost, without knowing

7    the full extent of Natera's false advertising.  Ex. F, Trial Tr. at 1325:16-23.  That falls far short of

8    Natera's burden to warrant a mitigation instruction.  Natera's argument is also disingenuous given

9    its position at trial and representation to the Court (which it later violated) that it did not intend to

10    open the door to evidence regarding the Joint Statement, Dkt. 25-3, by arguing that Guardant failed

11    to engage in corrective advertising.  *See* Ex. D, Trial Tr. at 695.

12         Natera next challenges Instruction 33, claiming it created a "heads-I-win, tails-you-lose"

13    framework.  Mot. at 22.  Natera does not argue that Instruction 33 — which accurately stated the

14    law from *ONY*, *Southland Sod*, and this Court's summary judgment decision — somehow misstated

15    the law.  Rather, Natera's argument turns on its refusal to acknowledge that its comparison ads

16    went far beyond simply stating the results of a peer-reviewed, published scientific study.  Natera

17    took two different studies and presented cherry-picked results from those studies as though there

18    had been a direct "head-to-head comparison," when in fact the studies involved different patients,

19    different methods, different sample volumes, and different standards of care.   In contrast,

20    Guardant's ads simply reported the peer-reviewed and published results of the Harvard/Parikh

21    Study.  Instruction 33 correctly allowed the jury to distinguish Natera's false comparison ads from

22    Guardant's ads; and the jury properly determined Natera's ads were not subject to the protections

23    for statements based on peer-reviewed publications.

24         Natera further argues it was erroneous not to ask the jury whether Natera violated California

25    common law of unfair competition.  Mot. at 22.  Natera objected to Guardant's attempt to include

26    such an instruction.  Dkt. 507 at 86-88.  In any event, the Lanham Act and common law claims are

27    "substantially congruent," as the Court correctly instructed the jury.  Dkt. 814 (Instr. 39).  There

28    was no reason to separately ask the jury to decide liability on the common law claim.

Natera also challenges two of the Court's evidentiary rulings. Mot. at 22-24. The court has broad discretion with respect to evidentiary rulings. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." *Id.* (quoting *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995)). Natera's arguments relate to the Court's ruling granting in part Natera's MIL No. 2 about MolDX. Essentially, Natera complains about the careful evidentiary lines this Court had to draw because of granting Natera's request to exclude evidence about the effect of Natera's communications with MolDX.

The Court correctly allowed limited evidence regarding those communications to show "Natera's state of mind when it embarked upon its advertising against Guardant's product, Reveal." Dkt. 509 at 8. Natera's state of mind was relevant to Natera's intent to deceive consumers — *i.e.*, the willfulness of its false advertising. *Id.* The Court's ruling also correctly anticipated that Natera would "contend at trial that in challenging Reveal, it was motivated by altruism and a desire to save patients and educate oncologists." *Id.* at 8-9. Guardant thus was entitled to show the full extent of Natera's war on Guardant's Reveal, and to rebut Natera's claims of altruistic motives by showing that Natera asserted the same claims from its false advertisements to MolDX with the goal of delaying or denying Medicare coverage for Reveal because that would be more profitable for Natera. Natera had every opportunity to explain to the jury its intent and to defend its statements to MolDX. Natera strategically decided not to do so in any meaningful way; thus, it did not call its witnesses who were chiefly responsible for its communications with MolDX. Natera fails to show any error in the Court's evidentiary rulings and cannot show "substantial prejudice."

Relatedly, Natera argues it was erroneously prevented from showing Natera's sales resulted from "broader Medicare coverage for more settings than Reveal." Mot. at 23-24. The Court correctly recognized the unfairness — the "403 problem" — if Natera were to argue it had broader Medicare coverage, while preventing Guardant from explaining Natera's influence on the extent of Reveal's Medicare coverage. Ex. H, Trial Tr. at 1810. This again illustrates the careful line this Court had to draw in granting in part Natera's MIL No. 2. Furthermore, there was no prejudice. Natera never developed evidence to show a difference in the scope of Medicare coverage impacted

- 21 -

1    sales (including through its damages expert); thus, the Court found a broad qualitative statement

2    by Natera's expert (without quantitative analysis) would unfairly open the door, inviting further

3    evidence regarding why the scope of coverage differed.   *See id.* at 1805:4 – 1808:12.

4    **VI.    <u>NATERA IS NOT ENTITLED TO REMITTITUR</u>**

5           "[A] jury's award of damages is entitled to great deference."   *In re First All. Mortg. Co.*,

6    471 F.3d 977, 1001 (9th Cir. 2006).  A jury's damages award must be upheld "unless the amount is

7    grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation

8    or guesswork."  *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th

9    Cir. 1986).  "[T]he purpose of remittitur is to maintain the jury's verdict while 'lopping off an

10   excrescence.'"  *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1087 (9th Cir.

11   2022). "[T]his is best achieved by 'minimiz[ing] the extent of judicial interference with a matter

12   that is otherwise within the jury's domain.'"  *Id.*

13          The jury awarded $75 million in damages — precisely the amount Guardant's expert

14   testified is necessary to level the playing field.  Natera's argument for remittitur is the same

15   challenge to Mr. Malackowski's 3x multiplier that Natera raised in its *Daubert* motion and this

16   Court rejected.  Dkt. 322 at 2-7.  This Court held that Mr. Malackowski properly used Natera's

17   actual advertising costs and that the 3x multiplier "was rational and supported."  *Id.*  "Questions of

18   evidentiary admissibility and credibility are properly challenged either before or during trial."

19   *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012).   At trial, Mr.

20   Malackowski explained his corrective advertising calculation, and in particular why corrective

21   advertising costs so much more than the cost of the original false advertising.  Ex. F, Trial Tr. at

22   1325:3 – 1328:4.  Thus, the jury's award is fully supported by the evidence. "[T]he fact that the

23   jury may have agreed with the plaintiff's expert and rejected the defendant's contentions does not

24   render the verdict 'grossly excessive or monstrous.'"  *Skydive Arizona*, 673 F.3d at 1115.

25          Natera also seeks remittitur of the jury's $175.5 million punitive damages award.  Mot. at

26   24-25.  "Compensatory damages are intended to redress the concrete loss that the plaintiff has

27   suffered by reason of the defendant's wrongful conduct," while "punitive damages serve a broader

28   function; they are aimed at deterrence and retribution."  *State Farm Mut. Auto. Ins. Co. v. Campbell*,

- 22 -

1    538 U.S. 408, 416 (2003).  The jury's award falls comfortably within the Supreme Court's guidance

2    on the ratio of punitive damages to compensatory damages:

3              We cited that 4–to–1 ratio again in *Gore*.  The Court further referenced a long
              legislative history . . . providing for sanctions of double, treble, or quadruple
4              damages to deter and punish.  While these ratios are not binding, they are instructive.
              They demonstrate what should be obvious: Single-digit multipliers are more likely
5              to comport with due process, while still achieving the State's goals of deterrence
              and retribution, than awards with ratios in range of 500 to 1 or, in this case, of 145
6              to 1.

7    *Id*. at 425 (citations omitted).  The jury awarded $75 million in actual damages, and a further $42

8    million in disgorgement based on Natera's unjust enrichment.  Combined, the punitive damages

9    ratio is only 1.5.  While Natera argues the disgorgement amount should not be included in the ratio,

10   the Lanham Act makes clear that disgorgement of unjust profits is "compensation and not a

11   penalty."  15 U.S.C. § 1117(a).  In any event, without the disgorgement amount, the ratio of 2.3

12   remains well within any constitutional limitations.  *See Riley v. Volkswagen Grp. of Am.*, 51 F.4th

13   896, 902 (9th Cir. 2022) ("We have limited punitive damages to a 4 to 1 ratio where there are

14   significant economic damages . . . but behavior is not particularly egregious.").

15             Courts also consider "the degree of reprehensibility of the defendant's misconduct" and

16   "the difference between the punitive damages awarded by the jury and the civil penalties authorized

17   or imposed in comparable cases."  *State Farm*, 538 U.S. at 418.  "Perhaps the most important

18   indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the

19   defendant's conduct."  *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575.  "[T]rickery and deceit are

20   more reprehensible than negligence."  *Id.*  Natera's false ads involved a deliberate attempt to

21   sabotage a competitor's product with "willfully" false comparative ads.  Natera's scheme deceived

22   oncologists, who were treating cancer survivors, about the relative merits of potentially life-saving

23   tests.  Natera intended its ads to convince doctors that Reveal was not "a safe alternative."  Ex. E,

24   Trial Tr. 1049:24-1050:3 (S. Chapman). Thus Natera effectively tried to prevent the significant

25   percent of CRC patients who did not have sufficient tumor tissue for Signatera from benefiting

26   from any MRD assay.  Ex. B, Trial Tr. 285:19-23 (Odegaard).   The jury's judgment on the

27

28

1    reprehensibility of Natera's misconduct is well-supported.[6]

2        Natera notably fails to address available civil penalties in comparable cases.  California's

3    FAL and UCL authorize civil penalties of up to $2,500 *per violation*.  Under the FAL and UCL,

4    each false communication constitutes a violation.  *See People v. Ashford University, LLC*, 100 Cal.

5    App. 5th 485, 516 (2024) ("Thus, no legal authority requires the trial court to count violations on a

6    per-victim rather than a per-communication basis.").  Natera sent hard copies of its false ads to

7    nearly all 10,000 oncologists in the U.S., it sent multiple emails with its false comparisons to every

8    oncologist, it used the false ads in an unquantifiable number of sales meetings, and posted its false

9    comparisons on its website.  *Supra* p. 2.  With a $2,500 civil penalty for each false communication,

10    Natera had ample notice that its massive false advertising campaign could lead to penalties in the

11    hundreds of millions.  *See, e.g.*, *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 316-18 &

12    351-61 (2022) (over $300 million in civil penalties for violations of California's FAL and UCL).

13    **VII.    <u>NATERA IS NOT ENTITLED TO JUDGMENT ON ITS COUNTER-CLAIMS</u>**

14        Natera devotes 1-page to the absurd argument it is entitled to judgment as a matter of law

15    on its false advertising claims against Guardant.  Mot. at 17-18.  The jury firmly rejected Natera's

16    claims against Guardant.  A motion for judgment as a matter of law must be premised on the lack

17    of a "legally sufficient evidentiary basis" for the jury's verdict.  Fed. R. Civ. P. 50(a)(1).  That is,

18    "a party is unable to carry a burden of proof that essential to that party's case."  Adv. Comm. Notes

19    to Rule 50 (1991 Amendment).  That is not the basis of Natera's argument, and it cites no legal

20    authority allowing the Court to nullify the jury's verdict in Natera's favor on its affirmative claims.

21        In any event, the evidence fully supports the jury's rejection of Natera's claims.  Despite its

22    counsel's rhetoric, Natera completely failed to show that anything in Guardant's ads were false or

23    misleading.  Guardant supported its advertising by citing the Harvard/Parikh Study:

24        This study, published in ***Clinical Cancer Research*** analyzed plasma samples from
25        84 patients with stage I-IV colorectal cancer being treated with curative intent and
        correlated post-treatment ctDNA detection with risk of recurrence.  Guardant

26    ───────────────────────────
27    [6] Natera cites *Leatherman Tool Grp. v. Cooper Indus., Inc.*, 285 F.3d 1146 (9th Cir. 2002), but in
    that case there was no "evidence of any significant actual harm to consumers or to [the plaintiff].
    [And the defendant's] conduct was more foolish than reprehensible."  *Id*. at 1151.  Nevertheless,
28    the Ninth Circuit awarded punitive damages 10x the actual damages.  *Id*. at 1150-52.

Reveal, a plasma-only ctDNA test, reached 91% sensitivity to detect ctDNA in patients who had a blood draw within 4 months of recurrence.

TX-576 at 1. Guardant's citation accurately described the Harvard/Parikh Study: "[W]e assessed performance in patients with evaluable 'surveillance' draws, defined as a draw obtained within 4 months of clinical recurrence, and observed that sensitivity improved to 91%." TX-1 at 4; *see also id*. at 1 (91% sensitivity with "surveillance" samples) & 6, Fig. 3B ("Surveillance analysis Sensitivity: 90.9%").[7] Natera also refers to purported claims by Guardant of "100-percent specificity in surveillance," Mot. at 18, but only cites a single email that (a) attached a copy of the Harvard/Parikh Study; and (b) summarized "Highlights" from the study. A single (or handful) of emails to a market of 10,000 oncologists does not constitute "advertising." *See Coastal Abstract,* 173 F.3d at 735. In any event, the Harvard/Parikh Study and the testimony provide ample support for the statement. *See* TX-1 at 4 ("Integrating longitudinal specimens increased sensitivity . . . with specificity remaining 100%."); Ex. C, Trial Tr. at 443:8-16 (K. Price) ("[S]urveillance analysis was a subset . . . so there were no new patients introduced. . . . I do believe the Harvard study supports this 100 percent specificity."). Ex. I, Corcoran Dep. at 113:25 – 114:8 (as played at trial) ("91 percent sensitivity and 100 percent specificity in the surveillance analysis" were "part of the overall study" and thus it would not "be improper to say it.").

Natera also failed to present any evidence, such as a survey, on how oncologists interpreted Guardant's ads, and there is no evidence that Guardant's ads actually deceived or had a tendency to deceive a substantial number of consumers. The jury thus properly rejected Natera's claims. Natera provides no legal or factual basis for the Court to disturb the jury's determination.

## VIII.   CONCLUSION

Natera's motion for judgment as a matter of law or a new trial should be denied in its entirety. The jury rendered a thoughtful verdict on liability and damages that is, in all aspects, well-supported by the evidence. The Court has no reason or basis to disturb the jury's verdict.

---

[7] Natera mischaracterizes TX-559. The document says: "if you use 91% make sure you use it correctly." TX-559 at 1. Natera also fails to address the credible testimony of Kristin Price regarding what she meant in TX-559. Ex. C, Trial Tr. at 452:1-23 ("Now, the 91 percent sensitivity is clearly established in the study . . . . So I wasn't saying here they couldn't use this number. What I wanted to make sure is that they're tying it back to the paper.").

1

Dated: February 14, 2025        **KELLER ANDERLE SCOLNICK LLP**

2

3                                        By:  _/s/ Chase Scolnick_
                                                  **Chase Scolnick**

4

5                                        Attorneys for Plaintiff/Counterclaim-Defendant
                                         GUARDANT HEALTH, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2          In accordance with Local Rule 5-5, I certify, that on February 14, 2025, this document, filed

3   with the Court through the CM/ECF system, will be sent electronically to the registered participants

4   at their e-mail addresses as identified in the Notice of Electronic Filing (NEF).   Non-CM/ECF

5   participants will be served via First-Class Mail.

6          I certify under penalty of perjury that the foregoing is true and correct.  Executed this 14th

7   day of February, 2025.

8                                                        */s/ Chase A. Scolnick*
                                                          Chase A. Scolnick
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28