Jennifer L. Keller (84412)
jkeller@kelleranderle.com
Chase Scolnick (227631)
cscolnick@kelleranderle.com
Gregory M. Sergi (257415)
gsergi@kelleranderle.com
Craig A Harbaugh (194309)
charbaugh@kelleranderle.com
**KELLER ANDERLE SCOLNICK LLP**
18300 Von Karman Ave., Suite 930
Irvine, CA 92612
Telephone  (949) 476-0900

Christopher LaVigne (*pro hac vice*)
christopher.lavigne@aosherman.com
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Ave.
New York, NY 10022
Telephone    (212) 848-4000

Saul Perloff (157092)
saul.perloff@aoshearman.com
Kathy Grant (*pro hac vice*)
kathy.grant@aoshearman.com
Andre Hanson (*pro hac vice*)
andre.hanson@aoshearman.com
Olin "Trey" Hebert (*pro hac vice*)
trey.hebert@aoshearman.com
**ALLEN OVERY SHEARMAN STERLING US LLP**
300 W. Sixth Street, 22nd Floor
Austin, Texas 78701
Telephone      (512) 647-1900

Attorneys for Plaintiff/Counterclaim-Defendant
GUARDANT HEALTH, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC., | Case No. 3:21-cv-04062-EMC |
| Plaintiff/Counterclaim-Defendant, | **GUARDANT HEALTH INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ITS REQUEST FOR DISGORGEMENT OF NATERA'S UNJUST PROFITS** |
| vs. | |
| NATERA, INC., | |
| Defendant/Counterclaim-Plaintiff. | |

1        Pursuant to the Court's order dated March 18, 2025, Dkt. 926, Guardant Health, Inc.,

2 respectfully offers these proposed Findings of Fact and Conclusions of Law in support of its request

3 for disgorgement of Natera's unjust profits.

5 Dated: March 25, 2025        **KELLER ANDERLE SCOLNICK LLP**

7        By:   */s/ Chase Scolnick*
                     **Chase Scolnick**

8        Attorneys for Plaintiff/Counterclaim-Defendant

9        GUARDANT HEALTH, INC.

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff/Counter-defendant Guardant Health, Inc. ("Guardant") brought this action on May 27, 2021, against Defendant/Counter-plaintiff Natera, Inc. ("Natera"), alleging false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), unfair competition under the common law of California, and violations of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, 17508, & 17535 ("FAL"), and Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 & 17203 ("UCL"). Natera filed amended Counterclaims on September 7, 2021, raising similar statutory and common law claims. Following pretrial proceedings, including an order on summary judgment, Dkt. 326, this case was tried before a jury over a three-week period beginning on November 5, 2024. After hearing all the evidence, the jury deliberated over two days and returned their verdict on November 25, 2024. The jury unanimously found that:

- Natera engaged in false advertising in violation of the Lanham Act;

- Natera's false advertising actually deceived or had a tendency to deceive a substantial segment of consumers;

- Natera's false advertising was willful;

- Guardant proved, by clear and convincing evidence, it was entitled to recover punitive damages from Natera for violations of California common law because Natera's conduct was undertaken with malice, oppression, or fraud.

Dkt. No. 847 (Jury Verdict). The jury awarded Guardant $75 million in actual damages, $175.5 million in punitive damages, and in an advisory verdict $42 million in disgorgement of Natera's unjust profits. The jury found in favor of Guardant on Natera's Counterclaims.

The Parties briefed and filed post-trial motions regarding disgorgement. The Court heard argument on those motions. Having reviewed the record, the evidence presented at trial, the findings of the jury, and the applicable law, the Court makes the following findings of fact and conclusions of law with regard to Guardant's request for disgorgement of Natera's unjust profits.

## I. Findings of Fact

1. Natera and Guardant each provide diagnostic tests that are used to detect minimal residual disease ("MRD") in post-operative colorectal cancer ("CRC") patients based on analysis of circulating tumor DNA ("ctDNA"). Natera's test, Signatera, was released for clinical use in

2019.  Trial Tr. at 1481:8-11 (S. Moshkevich).  Guardant's test, Reveal, was released for clinical use in February 2021.  Trial Tr. at 361:6-10 (J. Odegaard).  When Reveal launched, it was the only competitor to Signatera for MRD testing with CRC patients.   Trial Tr. at 1323:16-23 (J. Malackowski) ("two-player market").

2.     Natera knew that Guardant's Reveal would present a serious competitive threat to Signatera, as Natera's CEO Steve Chapman stated: "We need to be laser focused on CRC land grab or we will lose to Guardant.  We need to put more intensity – this is a war we are entering."  TX-150.   In Natera's words, Signatera's tumor-dependent approach to MRD testing had "major downsides" compared to Reveal's blood-only approach in terms of "logistical complexity," "turnaround time," and the inability to serve patients with "insufficient tissue to design the bespoke assays" of Signatera.  TX-222; Trial Tr. at 1545:15-25 (S. Moshkevich).  By certain estimates, up to 30% of CRC patients do not have sufficient tissue samples to use Signatera.  Corcoran Dep. 268:20 – 269:1 (as played at trial).  Natera therefore understood that the performance of Signatera would have to be "very superior" to Reveal for Signatera to remain competitive.  TX-150 ("The performance of our test has to be very superior."); Trial Tr. at 1009:21 – 1010:8 (S. Chapman) ("reference to 'performance' is a reference to test sensitivity").

3.     The first clinical validation study using Reveal with CRC patients was the Harvard/Parikh Study.  TX-1.  The lead authors of the Harvard/Parikh Study were Drs. Aparna Parikh and Ryan Corcoran, both well-respected oncologists at Massachusetts General Hospital and professors at Harvard Medical School.   The Harvard/Parikh Study was published in April 2021 in the peer-reviewed journal Clinical Cancer Research.  *Id.*; Trial Tr. at 768:1-14 (H. Eltoukhy).

4.     The Harvard/Parikh Study showed Reveal's performance in a clinical setting was comparable to tumor-informed approaches like Signatera.  TX-1, at 1 ("Plasma-only MRD detection demonstrated favorable sensitivity and specificity for recurrence, comparable with tumor-informed approaches.") & 5 ("Previously reported 'fixed panel' and 'bespoke' tumor-informed MRD assays produced sensitivities of approximately 40%-50% when specifically assessing a single landmark timepoint . . ., which is comparable with the landmark sensitivity of 55.6% produced by this plasma-only tumor-uninformed assay.").  The Harvard/Parikh Study reached those favorable

conclusions regarding Reveal's performance despite relying on patient samples that were about half the recommended volume of 8-10 mL for Reveal.  *Id.* at 7.

5.      As Guardant prepared for the commercial launch of Reveal in early 2021, Natera began its "Project Solar" — Natera's self-described "anti-Reveal" campaign designed to prevent Reveal from gaining traction with oncologists.  TX-0048 ("Key here is to cut off Guardant at the pass and get patients on Signatera prior to Onc decision."); Trial Tr. at 515:21 – 516.7 ("anti-Reveal").  To combat the competitive threat from Guardant's Reveal, Natera's CEO directed the marketing team to "spend whatever is necessary to salt [Guardant's] launch" of Reveal.  TX-109.

6.      Natera's ensuing marketing strategy utilized a series of advertisements comparing the performance of Signatera versus Reveal.  TX-120; TX-126; TX-286; & TX-365.  For the performance comparisons, Natera relied primarily on the Danish/Reinert Study for Signatera, TX-4, and the Harvard/Parikh Study for Reveal, TX-1.  Natera distributed its comparative advertisements to virtually every oncologist in the country through multiple means, including by FedEx, email, and in-person sales meetings.  Trial Tr. at 550:5-24, 557:15 – 558:1, 573:7-14 & 574:3-4 (K. Masukawa); Trial Tr. at 1045:25 – 1046:3 (S. Chapman) (Q: "So Natera sent over 100,000 emails to oncologists, didn't it?"  A: "I don't know the exact amount, but there's 10-12,000 oncologists.  So 10 each seems about right.").  In total, Natera spent $24.8 million on its comparative advertising designed to salt the launch of Guardant's Reveal.  TX-98; Trial Tr. at 543:21-23 (K. Masukawa).  In Natera's view, this was money well spent; Project Solar was a "success" and Dr. Kevin Masukawa, previously Natera's Vice President of Oncology Marketing, was "happy" with it.  Trial Tr. at 637:18-25 (K. Masukawa).

7.      The jury determined that Natera's advertisements — specifically the comparisons in those advertisements — violated the Lanham Act.[1]  The jury also determined that Natera's false

---

[1] This was not the first time a jury in a federal court found Natera's comparative advertising was false or misleading.  At the time the instant action was filed, Natera was a defendant in a false advertising suit brought by CareDX, involving similar negative comparative advertising. A jury found that Natera's advertising in *CareDX* was false and misleading in violation of the Lanham Act.  *CareDX v. Natera, Inc.*, No. 19-cv-662, 2023 WL 4561059, at *1 (D. Del. Jul. 17, 2023); *id.*, 2024 WL 5201130, at *6 (D. Del. Dec. 23, 2024) ("In sum, for the reasons stated above, I find that there was sufficient evidence for the jury to conclude that Claims B, C, D, E, F, G, H, and J were literally false and that, therefore, judgment as a matter of law of no liability is not warranted for those claims.").

1   advertising was willful.  That is, the jury found Natera "knew its advertising was false or

2   misleading, or it acted with reckless disregard for, or willful blindness to, the false or misleading

3   nature of its advertising."  Dkt. 814 (Inst. 45).  The jury further found, in awarding punitive

4   damages, that Natera's false advertising was done with "malice, oppression, or fraud."  *Id*. (Inst.

5   43). The Court finds no basis to disturb the jury's factual findings on these issues.  Ample evidence

6   shows that Natera deliberately designed its advertisements to salt the launch of Guardant's Reveal;

7   and, that Natera knew, or at least recklessly disregarded, the falsity of the comparisons in its

8   advertisements.

9          8.     The Harvard/Parikh Study explicitly noted the low sample volumes used with

10  Reveal as a "key limitation[]" of the Study: "[A]ll of our samples had plasma input volumes of 4

11  mL or less, versus the recommended input of 8-10 mL, which may have affected overall

12  performance characteristics."  TX-1 at 7.  In contrast, the Danish/Reinert Study — which Natera

13  relied on for the performance of Signatera in its comparative advertisements — utilized the optimal

14  sample volumes of 8-10 mL.  TX-4 at 2 ("Cell-free DNA was extracted from a median of 8.5 mL

15  (interquartile range, 7.5-9.5 mL) of plasma.");  Trial Tr. at 1238:18 – 1239:4 (D. Heitjan).

16         9.     Low sample volumes adversely affect the performance and failure rates of these

17  diagnostic tests.  Trial Tr. 302:14-18 (J. Odegaard);  Trial Tr. at 913:9-13 (K. Banks);  Trial Tr.

18  1240:7-20 (D. Heitjan) ("It's known that if you do not have the recommended amount of blood

19  plasma to conduct this test, then the sensitivity of the test can be substantially reduced.").  The

20  much larger sample volumes used in the Danish/Reinert Study compared to the Harvard/Parikh

21  Study, therefore, unfairly biased the comparisons in Natera's advertisements in favor of Signatera.

22  Trial Tr. at 409:4-8 (J. Odegaard).  Witnesses explained how Natera's advertisements presented

23  false apples-to-oranges comparisons given the different sample volumes in the two studies.  Trial

24  Tr. at 388:17-20 (J. Odegaard);  Trial Tr. at 406:24 – 408:6 (K. Price);  Trial Tr. 733:15-17 (H.

25  Eltoukhy);  Trial Tr. 1239:8 – 1240:24 (D. Heitjan).

26         10.    It is reasonable to infer that a company of Natera's size and sophistication — with

27  extensive experience in clinical studies — knew well the impact of low sample volumes.  If there

28  were any doubt about Natera's knowledge in that respect, Natera's own collaborator Dr. Claus

- 4 -

Andersen (the senior author of the Danish/Reinert Study) had told Natera — prior to any of Natera's false advertising against Guardant's Reveal — that it "makes no sense, scientifically" to compare the results of two different tests that were generated using different input volumes. TX- 400 at 1-2; *see also* TX-395 ("[C]an we look at the methods to understand how much sample they used for the analysis?  [Dr. Andersen] sounded like this was why the comparison is unfair . . ."). Dr. Andersen further testified that "if you want to provide both tests with the same opportunity, then you should provide them with the equal amount of material." C. Andersen Depo. at 95:6-20 (Day 2) (as played at trial). Otherwise, "it would be a bit like comparing apples and pears." *Id*. at 104:20-24 (Day 1) (as played at trial).

11.    Other fundamental statistical reasons demonstrate that Natera falsely compared the performance of the two assays. Natera biased its comparison of lead times in Signatera's favor due to different schedules of CT scans in the Danish/Reinert Study versus the Harvard/Parikh Study. Trial Tr. at 1245:15 – 1248:23 (D. Heitjan). Natera biased the comparisons of NPVs in Signatera's favor due to the lower prevalence in the population for the Danish/Reinert Study versus the Harvard/Parikh Study. *Id*. at 1249:20 – 1252:10 (D. Heitjan). Natera's comparison of hazard ratios ignored the critical confidence interval, which shows the difference in the estimated hazard ratios was "not statistically significant." *Id.* at 1252:11 – 1253:23. Natera biased the comparison of longitudinal sensitivities in Signatera's favor due to the significantly greater number of samples per patient in the Danish/Reinert versus the Harvard/Parikh Study. *Id*. at 1253:24 – 1255:16.

12.    Natera offered no credible response to the testimony of Guardant's biostatistics expert, Prof. Daniel Heitjan, regarding the statistical invalidity of Natera's comparisons. Natera's biostatistics expert, Prof. Rebecca Betensky, offered no opinions about Natera's advertisements. Trial Tr. at 1834:16-19 (R. Betensky) ("I'm not addressing Natera's ads, yes."). Natera's DNA expert, Dr. Michael Metzker, opined that Natera's comparisons would have been valid if the extracted cfDNA levels — as opposed to the input plasma volumes — from the patient samples were similar. Trial Tr. at 1738:25 – 1739:9 (M. Metzker). But, Dr. Metzker confessed on cross-examination that while he had data on the cfDNA levels, he did not calculate any of the relevant figures to support his opinion. Trial Tr. at 1774:15 – 1775:3 (M. Metzker) ("I did see that

spreadsheet, and did not calculate that."); 1775:5-7 (Q: "So you did have the data, but you didn't calculate it; correct?" A: "I had the data. I did not calculate it. You're correct."). Guardant's Victoria Raymond showed the cfDNA levels in the Harvard/Parikh Study, like the input plasma volumes, were about half of those used in the Danish/Reinert Study. Trial Tr. at 1122:15 – 1123:1 (V. Raymond).

13.     Dr. Masukawa notably admitted it would have been wrong for Natera's sales force to describe one of Natera's comparative advertisements as an "apples-to-apples comparison, and Signatera outperforms Reveal." Trial Tr. a 580:21-25 (K. Masukawa). But, that is exactly what Natera designed the advertisement, TX-126, to show, Trial Tr. at 1555:2-6 (S. Moshkevich) ("It's pretty head-to-head comparison."), and how Dr. Masukawa himself described the advertisement to Natera's sales force, Trial Tr. at 578:18-25 (K. Masukawa) ("I believe the term I used was 'as close to apples-to-apples as you can get.'").

14.     Natera, furthermore, deliberately continued dissemination of its false advertisements after being apprised by Guardant of the falsity of those comparisons. Guardant sent a cease-and-desist letter, dated May 21, 2021, to Natera. TX-127. Rather than discontinue its false advertisements, Natera continued distributing those advertisements. Trial Tr. at 583:13-17 (K. Masukawa). On the same day that Guardant filed its Complaint, Natera ramped up distribution of its false advertisements by directing its sales force to send an email containing the false comparisons to "all your contacts." Trial Ex. 220; Trial Tr. 625:8-10 (K. Masukawa).

15.     Following the June 3, 2021 hearing on Guardant's application for a temporary restraining order, the Parties entered into a "Joint Statement" by which each party agreed to refrain from comparative advertising. Dkt. 25-3. Natera, however, continued sending its false comparison emails to oncologists. Trial Exhibit 286 compiles thousands of versions of those emails sent by Natera—many of them sent *after* the parties entered the Joint Statement on June 4, 2021. TX-286, at NATERA_014474 (June 21, 2021); TX-286, at NATERA_014478 (July 9, 2021); TX-286, at NATERA_014481 (July 19, 2021); TX-286, at NATERA_014484 (Sept. 27, 2021). Natera invited oncologists to a webinar on June 10, 2021, where Natera presented the same false comparisons that featured in its false advertisements. Dkt. 43-13 (Ex. 7 at 9-12, 14, 19, & 21). In an apparent effort

to evade detection that it was violating the Joint Statement, Natera divided data from its comparison advertisement, TX-126, into two 1-page grids for its sales force to use in meetings with oncologists: those two 1-page grids "contained similar information to what was in the side-by-side comparison," but "one side had information on Guardant; the other side had information on Natera."  Trial Tr. at 637:3-14 (K. Masukawa).

16.     Natera's anti-Reveal campaign succeeded.  Dr. Masukawa testified that Natera's advertising tactics "worked."  Trial Tr. at 637:21–638:4 (K. Masukawa).  The timing of Natera's false advertising — targeted to "salt" the launch of Reveal — deliberately ensured maximum impact.  Trial Tr. at 735:6-14  (H. Eltoukhy) ("[T]hese early launch dates are extremely important to depart the right information."); *id.* at 741:20 – 742:9 ("[T]he first impression is the most important one.  It's where people make a judgment call, and it becomes very hard to change that initial impression, that initial judgment."); Trial Tr. at 1312:3 – 1313:1 (J. Malackowski) (False advertising targeted at a competitor's product launch "suggests two things: The results will be immediate, and they will be long-lasting.").  By one credible estimate from Guardant's expert, Mr. Malackowski, Guardant lost over $12 million in profits from just July 2021 through May 2022 as a result of Natera's false advertising.  *Id.* at 1320:19 – 1321:19.

17.     Despite Guardant's well-established reputation in the oncology space, the multiple benefits of Reveal's blood-only approach, and the favorable performance of Reveal reported in the Harvard/Parikh Study, sales of Reveal languished and failed to meet internal projections; in contrast, after the start of its false advertising against Guardant, Natera's sales of Signatera skyrocketed, exceeding even Natera's own projections before Reveal's launch.  Trial Tr. at 1310:25 – 1311:15, 1316:18 – 1317:3, & 1318:21 – 1320:2 (J. Malackowski); Malackowski Demonstrative Slide No. 9 & 11-13.  Mr. Malackowski opined that "all else being equal, you would expect Guardant to be the leader in this marketplace," given the 20-30% of patients who cannot use Signatera, Reveal's faster turnaround time, and Guardant's established brand reputation at the time of Reveal's launch.  *Id.* at 1311:4-15 & 1313:2-23 ("[W]hen I look to the inherent advantages and the brand recognition. . . . I would expect that Guardant would outperform Signatera in this marketplace.").  Mr. Malackowski, however, demonstrated the extreme disparity in sales of Reveal

1    compared to Signatera: from Q1 2021 through Q3 2023, Signatera generated over $186 million

2    more in revenue, earned $97 million more in gross profits, and sold over 154,000 more units than

3    Reveal. *Id.* at 1316:18 – 1317:23; Malackowski Demonstrative Slides No. 9-11.

4        18.    Natera's false advertising campaign against Reveal was substantial and targeted

5    Reveal's launch into the multi-billion dollar MRD market. *Id.* at 1310:1-21. Natera made $280

6    million in sales from Signatera through August 31, 2023. *Id*. at 1321:20 – 1322:11. In conducting

7    his disgorgement analysis, Mr. Malackowski excluded Signatera sales from non-CRC tests, non-

8    clinical sales, sales outside the U.S., and sales before Reveal's launch to calculate $198.4 million

9    in Signatera sales for clinical use with CRC patients in the U.S. only. *Id*. Mr. Malackowski then

10   deducted $103 million of production-related costs claimed by Natera to calculate Natera's profits

11   for purposes of disgorgement to be $95.4 million. *Id.* at 1322:12 – 1323:6. Mr. Malackowski

12   sufficiently explained that 100% of those profits should be subject to disgorgement because of the

13   extent of Natera's false advertising, the timing of Natera's false advertising, the success of Natera's

14   false advertising in salting Guardant's launch, and the two-player nature of the market. *Id.* at 1323:7

15   – 1324:2; Malackowski Demonstrative Slide 17.

16       19.    Natera's expert, Dr. Jeffrey Stec, did not contest Mr. Malackowski's calculation of

17   $198.4 million in Signatera sales for clinical use with CRC patients in the U.S. Dr. Stec also did

18   not contest Mr. Malackowski's deduction of $103 million in costs claimed by Natera. Dr. Stec

19   opined that additional costs should be deducted to the point that Natera earned no actual profits that

20   could be disgorged. Trial Tr. at 1867:7-20 (J. Stec). Dr. Stec characterized those additional

21   deductions as sales commissions and "oncology sales costs, the oncology marketing expenses, and

22   then the overhead portion of cost of goods sold." *Id*. at 1864:20 – 1865:10. Dr. Stec provided no

23   explanation of those categories of additional deductions, what documents or data he relied upon to

24   determine those deductions, how he calculated the amounts of those deductions, or how (if at all)

25   those deductions were in any way attributable to U.S. Signatera CRC clinical sales in the relevant

26   timeframe. *Id*. at 1864:20 – 1866:1. Natera presented no other witness to explain those additional

27   deductions. Natera did not offer into evidence any exhibits supporting or otherwise substantiating

28   those additional deductions.

20.     Dr. Stec presented a regression analysis that purported to show Signatera sales attributable to Natera's false advertising.  Dr. Stec testified that his regression showed $32,278,685 in Signatera sales "are potentially due to the alleged false or mislead[ing] statements."  *Id*. at 1862:14-22.  Dr. Stec's regression, therefore, implies that 16.3% of U.S. Signatera CRC sales ($32.3 million out of $198.4 million) are potentially attributable to Natera's false advertising.

21.     Dr. Stec's regression included just three independent variables: price of Signatera, a spline variable meant to "represent the false or misleading statements," and a "time-squared" variable meant to represent "a number of other factors."  *Id*. at 1859:15-18.  Dr. Stec did not explain what data or values he used for the spline variable or the time variable or how those variables accurately represented what they were designed to measure.  Dr. Stec did not explain how the price or time variables accurately captured factors, other than Natera's false advertising, that drove Signatera sales.  Dr. Stec ultimately did not identify any specific factor from his regression — other than Natera's false advertising — that explained Signatera sales.  Dr. Stec admitted that his regression did not take into account the extent of Natera's false advertising.  *Id*. at 1904:2-4  ("I wasn't asked to look into the liability portion which would, in my opinion, include the scope of the false and misleading statements."); *id*. at 1909:15-25 (explaining how spline variable is "supposed to represent the false advertising" but did not incorporate the "actual money that went into Project Solar" and did not account for the "number of false ads that went out to doctors").

22.     In an advisory verdict, the jury awarded $42 million in disgorgement of Natera's profits.  It appears the jury accepted Mr. Malackowski's calculation of $95.4 million in profits, but credited additional deductions claimed by Dr. Stec of $11.5 million.  That results in about $84 million in profits.  The jury appears to have attributed half of those profits to Natera's false advertising — $42 million.  The jury's decision to attribute $42 million of Natera's profits to its false advertising — about half of Natera's profits using the above formulation — is a reasonable approximation of disgorgement and is well-supported by the evidence, including for the reasons set forth in paragraphs 16-18 above.

23.     The Court finds that Natera did not satisfy its burden to establish the additional deductions claimed by Dr. Stec.  Natera presented no explanation, documentation, or analysis of

those additional deductions.  The Court also finds that Dr. Stec's testimony concerning his regression analysis is entitled to little or no weight in determining the extent to which Natera's profits were attributable to factors other than Natera's false advertising campaign against Guardant. In particular, by not taking into account the extent of Natera's false advertising — the $25 million spent by Natera on those advertisements, the total number of advertisements disseminated by Natera, or the number of oncologists who received those advertisements — Dr. Stec ignored one of the most important factors in assessing the impact of Natera's false advertising.  Dkt. 322 at 17 ("Stec's choice of the kind of spline variable is grounds for cross-examination, including the fact that the value of the regression may be limited because the spline variable does not purport to represent the amount of advertising but the combination of other unidentified factors.").  By not controlling or accounting for the extent of Natera's false advertising, Dr. Stec's analysis suggests the effect of Natera's false advertising on Signatera sales would have been the same whether Natera spent $1 or $25 million on its false advertising.

24.    Pursuant to the Court's rulings, the financial information and disgorgement analyses presented to the jury only went through August 2023.  Dkt. 719 & 730.  Mr. Malackowski and Dr. Stec, however, performed their disgorgement-related calculations based on financial information through February 2024.  Mr. Malackowski's analysis, based on the same methodologies, showed that Natera earned an additional $66 million in profits from September 2023 through February 2024.  Dkt. 603-11 (filed under seal).[2]  Dr. Stec did not present any evidence or opinions suggesting that the effects of Natera's false advertising ended at any point or time, or that those effects diminished in any way over time.

25.    The Court decided that for purposes of presenting evidence to the jury, the cut-off for damages and disgorgement would be August 2023 based on the exclusion of Natera's evidence regarding the COBRA Study.  Dkt. 719.  Mr. Malackowski, however, analyzed the impact, if any, of the COBRA Study on Reveal's sales and concluded "the COBRA Study has had little, if any, measurable impact on Reveal's CRC Clinical revenue or samples."  Dkt. 603-11 at 40.  "I do not

[2] One can readily calculate that amount as the difference between the $95.4 million in profits Mr. Malackowski presented at trial for February 16, 2021 through August 21, 2023 and the $161.8 million in profits Mr. Malackowski calculated in his June 14, 2024 report through February 2024.

1    see evidence that Reveal's clinical customers have been 'dissuaded from using Reveal because of

2    the results of COBRA.'" *Id.* In response, Dr. Stec did no analysis of his own regarding the COBRA

3    Study's impact on sales. Dkt. 603-12 at 39-40 (filed under seal).

4    **II.    Conclusions of Law**

5        1.    The Lanham Act states that "the plaintiff shall be entitled, . . . subject to the

6    principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff,

7    and (3) the costs of the action." 15 U.S.C. § 1117(a). There are "three categorically distinct

8    rationales" for the Lanham Act's disgorgement remedy: "(1) to avoid unjust enrichment; (2) as a

9    proxy for plaintiff's actual damages; and (3) to deter infringement." *4 Pillar Dynasty LLC, v. New*

10   *York & Co.*, 933 F.3d 202, 212 (2d Cir. 2019). In determining monetary remedies for a Lanham

11   Act violation, "the trial court's primary function should center on making any violations of the

12   Lanham Act unprofitable to the infringing party." *Playboy Enters. v. Baccarat Clothing Co.*, 692

13   F.2d 1272, 1274 (9th Cir. 1982); *see also Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132,

14   1135 (9th Cir. 1986) ("Remedies that do not remove the economic incentive 'would encourage a

15   counterfeiter to merely switch from one infringing scheme to another as soon as the infringed owner

16   became aware of the fabrication.'") (quoting *Playboy*, 692 F.2d at 1274).

17       2.    "[W]here trademark infringement is deliberate and willful both the trademark owner

18   and the buying public are slighted if a court provides no greater remedy than an injunction. . . .

19   [T]his court's clear mandate in *Maier* [is] to make willful trademark infringement unprofitable."

20   *Playboy*, 692 F.2d at 1275 (citing *Maier Brewing Co. v. Fleishmann Distilling Corp.*, 390 F.2d 117

21   (9th Cir. 1968)). Recently, the Supreme Court held in *Romag Fasteners, Inc. v. Fossil Inc.*, 590

22   U.S. 212 (2020), that willfulness is not a strict prerequisite for disgorgement under the Lanham

23   Act, but the "defendant's mental state is a ***highly important*** consideration in determining whether

24   an award of profits is appropriate." *Id.* at 219 (emphasis added). *Romag* confirms that a defendant's

25   "[w]illfulness . . . generally supports disgorging ill-gotten gains." *Harbor Breeze Corp. v. Newport*

26   *Landing Sportfishing, Inc.*, 2023 WL 2652855, at *4 (C.D. Cal. Mar. 13, 2023).

27

28

1        3.      Here, Natera's willful violation of the Lanham Act, as found by the jury, is a highly

2  important factor that strongly supports disgorgement of Natera's ill-gotten gains.[3]

3        4.      The jury was not presented with evidence of the Joint Statement, Dkt. 25-3, by

4  which the parties agreed on June 4, 2021, to stop any direct comparison advertising.  The Court,

5  however, finds it is appropriate, in assessing the equitable considerations for disgorgement, to

6  consider that Natera continued to disseminate its false advertisements after agreeing to the Joint

7  Statement.  That evidence shows Natera deliberately violated its agreement with Guardant and its

8  direct representations to this Court.

9        5.      Natera's decision to continue its false advertising after receiving Guardant's cease-

10  and-desist letter, after Guardant filed its complaint, and after agreeing to the Joint Statement

11  provides even further support for the jury's finding of willfulness and disgorgement.  *See Fifty-Six*

12  *Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074 (9th Cir. 2015) (affirming finding of

13  willfulness based on evidence that defendant was made aware its products would infringe before

14  beginning to sell those products); *Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F.

15  Supp. 3d 928, 933 (C.D. Cal. 2021) ("There was also evidence offered at trial demonstrating

16  Defendant continued to sell the infringing products after it received Plaintiff's cease and desist

17  letters and after Plaintiff filed the instant lawsuit.  Such evidence demonstrates Defendant's bad

18  motive for its infringement which weighs in favor of disgorgement of profits."); *E. & J. Gallo*

19  *Winery v. Consorzio del Gallo Nero*, 782 F. Supp. 472, 475 (N.D.Cal.1992) ("Use of an infringing

20  mark, in the face of warnings about potential infringement, is strong evidence of willful

21  infringement.").

22        6.      In deciding whether to order disgorgement of a defendant's profits for a Lanham

23  Act violation, some courts have considered the following equitable factors:  "(1) a defendant's

24  mental state . . .; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any

25  unreasonable delay by the plaintiff in asserting [its] rights; (5) the public interest in making the

---

[3] In resolving equitable issues, this Court must follow the jury's "implicit or explicit" factual determinations. *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) ("in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and those claims are based on the same facts, the trial judge must follow the jury's implicit or explicit factual determinations in deciding the equitable claims") (cleaned up).

1  misconduct unprofitable; and (6) whether it is a case of palming off." *Yuga Labs, Inc. v. Ripps*,

2  2023 WL 7089922, at *10 (C.D. Cal. Oct. 25, 2023) (quoting *Harbor Breeze*, 2023 WL 2652855

3  at *4).

4        7.    For the reasons explained above, Natera's mental state strongly supports

5  disgorgement.

6        8.    With respect to diversion of sales, "in false *comparative* advertising cases, . . . it's

7  reasonable to presume that every dollar defendant makes has come directly out of plaintiff's

8  pocket." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2011) (emphasis in

9  original). Furthermore, testimony from each party's expert demonstrated significant diversion of

10  sales.

11        9.    Other remedies are inadequate to prevent Natera's unjust enrichment, to compensate

12  Guardant adequately for the harm inflicted by Natera's false advertising, and to deter the type of

13  false advertising at issue in this case. The jury's $75 million damages award is the amount Guardant

14  will need to spend *in the future* to correct the misimpressions in the marketplace caused by Natera's

15  false advertisements. The damages award does not account for Natera's ill-gotten gains from 2021

16  through the present; and, the damages award does not compensate Guardant for the harm caused

17  by Natera's false advertising from 2021 through the present.[4]

18        10.    Guardant demonstrably did not delay filing suit against Natera. Guardant brought

19  this case very shortly after Reveal's commercial launch and Natera's initiation of Project Solar.

20        11.    "There is a strong public interest in preventing false advertising of products in the

21  marketplace." *POM Wonderful LLC v. Purely Juice, Inc.*, 2008 WL 4222045, at *16 (C.D. Cal.

22  July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009). The public interest is particularly strong

23  in this case. Natera's false advertising involved medical diagnostic tests ordered by oncologists

24  and cancer surgeons in the course of making potentially life-saving treatment decisions for cancer

25  patients. The public interest in truthful advertising is certainly heighted in the healthcare industry

26

---

[4] In assessing disgorgement under the Lanham Act, it is not appropriate to consider the jury's
separate award of $175.5 million in punitive damages under California law, which necessarily
serves a purpose beyond the scope of the Lanham Act. *See* 15 U.S.C. § 1117(a) (disgorgement of
profits "shall constitute compensation and not a penalty").

1    where false advertising can have adverse, life or death, consequences for patients.

2        12.    While this is not a case of palming off, false comparative advertising is similarly

3    harmful to competition, competitors, and the public. "[A] misleading comparison to a specific

4    competing product necessarily diminishes that product's value in the minds of the consumer."

5    *Healthport Corp. v. Tanita Corp. of Am.*, 563 F. Supp. 2d 1169, 1181 (D. Or. 2008) (quoting

6    *McNeilab, Inc. v. Am. Home Products Corp.*, 848 F.2d 34, 38 (2nd Cir. 1988)). The Ninth Circuit

7    recognized this in explaining why "cases of palming off" and "cases of deceptive comparative

8    advertising" use similar "surrogate measures of damages." *Harper House, Inc. v. Thomas Nelson,*

9    *Inc.*, 889 F.2d 197, 209 n.8 (9th Cir. 1989). Interpreting this factor as a judicial determination of

10   the type of Lanham Act violations that are most harmful and therefore most require deterrence, it

11   weighs in favor of disgorgement.

12       13.    In sum, the Court concludes that disgorgement is warranted based on consideration

13   of Natera's willful false comparative advertising, the need to prevent unjust enrichment and deter

14   willful false advertising, and the other equitable factors discussed above.

15       14.    "In assessing profits the plaintiff shall be required to prove defendant's sales only;

16   defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Guardant's

17   burden, therefore, is to establish Natera's sales from the false advertising with "reasonable

18   certainty." *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993); *Oracle Am.,*

19   *Inc. v. Google*, 2016 WL 1743154, at *3 (N.D. Cal. May 2, 2016) ("[A]pportionment only requires

20   a reasonable approximation."). Once Guardant demonstrates the amount of those sales, they are

21   presumed to be the result of Natera's false advertising. *Lindy Pen*, 982 F.2d at 1408.

22       15.    Natera "thereafter bears the burden of showing which, if any, of its total sales are

23   not attributable to" its false advertising. *Id.*; *see also Nintendo of Am., Inc. v. Dragon Pac. Int'l*,

24   40 F.3d 1007, 1012 (9th Cir. 1994) ("The burden is upon defendant to prove that sales were

25   demonstrably not attributable to the infringing mark.") (internal quotation marks omitted); ); Dkt.

26   814 (Instr. 42) (Natera "has the burden of proving . . . the portion of the profits that is not attributable

27   to the false advertising but which is attributable instead to other factors."). Natera also bears the

28   burden to establish any costs to be deducted from the sales figure. "If the infringing defendant

- 14 -

1   does not meet its burden of proving costs, the gross figure stands as the defendant's profits." *Frank*

2   *Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985).  "Any doubt as to

3   the computation of costs or profits is to be resolved in favor of the plaintiff."  *Id.*; *see also*

4   *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207 (1942) ("There may

5   well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are

6   attributable to the use of the infringing mark.  But to hold otherwise would give the windfall to the

7   wrongdoer.").

8        16.    Guardant carried its burden with respect to the disgorgement amount.  Guardant's

9   expert calculated Natera's sales in the market targeted by the false advertisements, deducted $103

10  million in production-related costs claimed by Natera, and provided a sufficient basis for his

11  determination that 100% of the resulting profits were attributable to Natera's false advertising.

12       17.    Natera did not meet its burden with respect to any claimed costs, beyond the $103

13  million deducted by Mr. Malackowski.  Natera offered no testimony or documents explaining,

14  substantiating, or attributing those costs to Signatera CRC production or sales.  Thus, only the $103

15  million in costs deducted by Mr. Malackowski should be included in the disgorgement calculation.

16  *See Frank Music*, 722 F.2d at 516 (reversing disgorgement decision because defendant failed to

17  "show that the categories of overhead actually contributed to sales"); *Paige LLC v. Shop Paige*

18  *LLC*, 2024 WL 3594450, at *5-6 (C.D. Cal. July 10, 2024) ("Courts in this Circuit have similarly

19  found that summary financial documents, absent any evidence, were insufficient to satisfy the

20  defendant's burden to prove deductions."); *Vital Pharms*, 2022 WL 2952495 at *4 (C.D. Cal. July

21  26, 2022) ("Defendant claims a total of over $9.5 million in cost deductions, yet it has produced

22  troublingly little evidence to support that figure.  Not a single invoice, receipt, or other original

23  source document has been produced to support the costs and expenses Defendant claims.");

24  *Brighton Collectibles, LLC v. Believe Prod., Inc.*, 2018 WL 1381894, at *7 (C.D. Cal. Mar. 15,

25  2018) (finding witness testimony and spreadsheets insufficient to satisfy burden to deduct costs);

26  *Am. Rena Int'l v. Sis-Joyce Int'l Co.*, 2016 WL 11967001, at *4 (C.D. Cal. Dec. 29, 2016) (declining

27  to deduct costs because defendants did not explain "who received the $578,093 in commissions");

28  *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, 2009 WL 10674076, at *10 (S.D. Cal. Aug.

12, 2009) (rejecting costs because defendant "did not submit any documentary evidence such as invoices to substantiate its claimed deductions"). "[T]here is ample authority for the Court's decision to award the plaintiff the entirety of the defendant's infringement-related revenues if the defendant fails to carry its burden of proving costs." *H-D Michigan Inc. v. Biker's Dream Inc.*, 1998 WL 697898, at *9 (C.D. Cal. July 28, 1998), *aff'd in part, dismissed in part*, 230 F.3d 1366 (9th Cir. 2000).

18.     Natera failed to present sufficient evidence to support additional costs, and, in any event, the Court concludes that such costs should not be deducted in determining the appropriate disgorgement amount.  Most of Natera's proposed additional costs appear to be various categories of overhead — including what Dr. Stec vaguely referred to as "oncology sales costs, the oncology marketing expenses, and then the overhead portion of cost of goods sold."  Trial Tr. at 1864:20 – 1865:10 (J. Stec).  "A portion of an infringer's overhead properly may be deducted from gross revenues to arrive at profits, at least where the infringement was not willful, conscious, or deliberate." *Frank Music*, 772 F.2d at 515; *see also Brighton Collectibles v. Believe Prod.*, 2017 WL 486233, at n. 1 (C.D. Cal. Feb. 6, 2017) (holding in Lanham Act case that "if the infringement is willful, defendant's indirect costs (overhead) may not be deductible from its infringing sales revenue when calculating the amount to be disgorged.").  Given the willful nature of Natera's false advertising, Natera should not be rewarded with the benefit of deducting overhead expenses.  *See Polo Fashions,* 793 F.2d at 1135 (declining to deduct costs and finding that all sales should be disgorged because "any lesser remedy would not remove the incentive for [Lanham Act violations].").

19.     The only other category of additional costs claimed by Natera is "sales commissions," which includes amounts Natera allegedly paid to its sales force to disseminate the false advertisements at issue.  Trial Tr. at 1323:1-6 (J. Malackowski).  In addition to failing to introduce sufficient evidence of these costs or their attribution to Signatera CRC sales, Natera also has not met its burden in establishing the propriety of these deductions because they are directly associated with the false advertising; namely, incentive payments to the sales force who disseminated the false advertisements and made the very sales that are subject to disgorgement.

1    *See, e.g.*, *L.P. Larson, Jr., Co. v. Wm Wrigley, Jr., Co.*, 277 U.S. 97, 100 (1928) ("[I]t does not

2    follow that the [infringer] should be allowed [to deduct] what he paid for the chance to do what he

3    knew that he had no right to do."); *Wolfe v. National Lead Co.*, 272 F.2d 867, 873 (9th Cir. 1959)

4    ("compensation to [infringer] and his partners for services rendered to the business. . . . is not a

5    proper deduction"); Restatement (Third) of Unfair Competition § 37(g) (Computation of net

6    profits) ("The value of a defendant's own labor, however, and salaries or wages paid to persons

7    responsible for the tortious conduct, are not ordinarily deductible."); *id.*, Cmt. G ("Compensation

8    paid to persons directly responsible for the infringement is not ordinarily deductible."); 4 McCarthy

9    on Trademarks and Unfair Competition § 30:69 ("The infringer's expenses of changing infringing

10   labels is certainly not deductible, as it is an expense due to the very wrong which prompted the

11   litigation.")

12         20.    Natera also had the burden to show which, if any, of its total sales were not

13   attributable to its false advertising.  *Lindy Pen*, 982 F.2d at 1408; *Nintendo*, 40 F.3d at 1012.  As

14   explained above, the Court finds that Dr. Stec's regression is entitled to little or no weight and he

15   did not otherwise quantify any Signatera sales that were not attributable to the false advertising.  In

16   assessing the entirety of the evidence — including the two-player nature of the market, Mr.

17   Malackowski's opinions that absent Natera's false advertising Guardant would have been the

18   market leader, the relative timing of when Reveal and Signatera were each made available for

19   clinical use, the extent and timing of Natera's false advertising, and the success of Natera's false

20   adverting campaign against Guardant —  the Court concludes, as the jury apparently also found,

21   that 50% of Natera's profits from February 16, 2021 through August 31, 2023, as determined in

22   Mr. Malackowski's analysis, should be disgorged.

23         21.    Accordingly, the Court's analysis shows the proper disgorgement amount is $47.7

24   million.  In its post-trial motions, Guardant asked the Court only to adopt the jury's advisory award

25   of $42 million.  As that is lower than what the Court would otherwise find, the Court adopts the

26   jury's disgorgement award of $42 million for the period from February 16, 2021 through August

27   31, 2023.  That amount is fair and reasonable given the nature and extent of Natera's false

28   advertising, the harm caused to Guardant, and the success of Natera's false advertising campaign

including the substantial increase in Natera's sales and profits that followed its false advertising.

22.     The Court further concludes that the disgorgement amount should be increased by $29 million to account for Natera's unjust profits after August 31, 2023.  Mr. Malackowski showed that Natera earned an additional $66 million in profits from September 2023 through February 2024.  Applying the same percentage of profits implied by the $42 million in disgorgement ($42 million/$95.4 million = 44%) to Natera's additional $66 million in profits results in $29 million in disgorgement for September 2023 through February 2024.

23.     The Lanham Act provides that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).  It would be fundamentally unjust and contrary to the purpose of the Lanham Act to allow Natera to retain ill-gotten gains earned after the time period covered by the evidence presented to the jury.  The total disgorgement amount remains highly conservative as it does not account for profits earned by Natera after February 2024.

24.     For all of the reasons stated herein, the Court awards Guardant $42 million in disgorgement of Natera's unjust profits for the period prior to September 2023 and an additional $29 million in disgorgement of Natera's unjust profits for September 2023 through February 2024.


DATED:_____


                                        _____
                                        HONORABLE EDWARD M. CHEN
                                        United States District Court Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

In accordance with Local Rule 5-5, I certify, that on March 25, 2025, this document, filed with the Court through the CM/ECF system, will be sent electronically to the registered participants at their e-mail addresses as identified in the Notice of Electronic Filing (NEF).  Non-CM/ECF participants will be served via First-Class Mail.

I certify under penalty of perjury that the foregoing is true and correct.  Executed this 25th day of March, 2025.

*/s/ Chase A. Scolnick*
Chase A. Scolnick