**quinn emanuel** trial lawyers | washington, dc

1300 I Street NW, Suite 900, Washington, District of Columbia 20005-3314 | TEL (202) 538-8000 FAX (202) 538-8100

WRITER'S DIRECT DIAL NO.
**(202) 538-8123**

WRITER'S EMAIL ADDRESS
**derekshaffer@quinnemanuel.com**

April 18, 2025

**VIA ECF**

The Honorable Judge Chen
United States District Court
Northern District of California
San Francisco Courthouse
Courtroom 5, 17th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

**Re: Guardant Health, Inc. v. Natera, Inc., Case No. 3:21-cv-04062-EMC**

Dear Judge Chen:

We write to report inappropriate public commentary about these proceedings by Guardant's trial counsel, Jennifer Keller and Chase Scolnick from the law firm Keller Anderle Scolnick LLP, at a recent event hosted by the Association of Business Trial Lawyers ("ABTL") in Los Angeles. Although I personally was not present at the public event, a series of consistent reports have reached me from multiple colleagues as well as from a series of attendees outside of my law firm— who came to us unsolicited to express concerns about what they observed. Those concerns are corroborated by various recordings and by a transcript of them, as attached.

For the reasons stated herein, counsel's conduct seems inappropriate (to understate the point). If it continues, it may imperil public perception of these proceedings and the fairness thereof. It should have gone without saying that counsel should not—especially while post-trial motions are pending and awaiting this Court's adjudication, and while an appeal may be looming by either or both sides—be mocking witnesses and forecasting Your Honor's upcoming rulings before a roomful of lawyers and judges. Because counsel's recent conduct was to the contrary, however, I am obliged to alert Your Honor while respectfully asking that counsel refrain from any recurrence.

On April 10, 2025, Ms. Keller and Mr. Scolnick presented an ABTL dinner program event: "*The Verdict that Shook the Industry – Guardant Health's $292.5 Million Triumph Over Natera.*" As

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

the ABTL aptly explains on its website, it "is unique in providing a forum in which litigators and judges meet together to address issues important to business trial lawyers."[1]

Present at this particular event were more than 100 observers, including judges. Ms. Keller and Mr. Scolnick took the opportunity to deride Natera and its MRD test, mock trial witnesses (whose faces and names they displayed to the audience) as "business bros" who cared only about money, cat-call from the podium to Quinn Emanuel attendees when discussing sanctions, and point out the supposed inadequacies of Guardant's co-counsel at A&O Shearman. Most regrettably, before this audience including judges and lawyers—which could have included, for instance, future Ninth Circuit clerks—Ms. Keller and Mr. Scolnick predicted what Your Honor will rule and mocked the pending issue of jury confusion regarding "apples to oranges."

By our respectful lights, the presentation did not reflect "appropriate civility, professional integrity, personal dignity, and respect for the legal system." *See, e.g.*, Northern District of California Guidelines for Professional Conduct. Indeed, counsel's approach to the presentation undercuts the professional, constructive, respectful interactions between counsel that stand to maximize agreement and minimize dispute as litigation continues. Even more concerningly, the presentation was replete with "extrajudicial statement[s] that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." Rule 3.6 of the ABA Model Rules of Professional Conduct. To be sure, judges and law clerks are cut from different cloth than potential jurors, but it does not follow that counsel should be deploying extrajudicial statements that stand to color the perceptions of would-be decisionmakers and suggest prejudgment of matters that this Court has yet to decide. The obvious prospect of an appeal by either side makes it especially problematic for one side's lawyers now to be putting a heavy gloss on these proceedings before an audience that could include judicial decisionmakers. These concerns are magnified to the extent counsel plans to make the same or similar presentations in other venues.

A few key excerpts from the presentation are set forth below. A transcript made from audio recordings that together cover most of the presentation has been attached for the Court's reference (no official recording of the entire event is available to counsel).

- After having attacked Natera and its witnesses at length, Ms. Keller and Mr. Scolnick focused the last ten or so minutes of their presentation on sanctions. Most notably, Ms. Keller predicted this Court's ruling on Guardant's pending sanctions motion by stating: "there are further sanctions coming. Judge Chen has made it clear he's going to award attorney's fees for the months that we spent chasing this -- this non-existent, fabulous, groundbreaking study, which he also found was misrepresented substantively. It didn't say what they said it said. And then he's going to have further sanctions -- according to his order, he's going to explore exactly who was responsible, and he's going to report that to the appropriate authorities." Transcript 56:18-57:3. Suffice it to note that Ms. Keller's account of what (according to her) has *already* been decided by this Court is out of step

---
[1]  https://abtl.org/about/

with what (in actuality) *remains* to be decided, as reflected in the parties' pending submissions and upcoming hearings. *See* Dkts. 884-13 and 887, 929.

- Ms. Keller described Natera's conduct in terms that simply do not match the evidence, including by claiming that Natera sought to "bully" a junior female faculty member while deliberately avoiding her supervisor (Transcript 30:4-18), and had been "spying on oncologists at home, in their workplace, their IP addresses. It could be their kids doing their homework. It didn't matter." Transcript 38:1-3.

- Ms. Keller and Mr. Scolnick commented on evidentiary and instruction issues on which the Court has yet to rule, including the "apples to oranges" instruction that Natera argues departed from the law. Dkt. 880 at 19-21. Notwithstanding Natera's pending motion, Ms. Keller informed the audience that, under the Lanham Act, "apples to oranges" comparisons are per se misleading (Transcript 42:13-20), and Mr. Scolnick joked about bringing a fruit basket to counsel table for their closing arguments to drive that point home to the jury (Transcript 47:21-48:2)—a point directly related to Natera's arguments regarding jury confusion and prejudice.

In our respectful view, such statements go well beyond the bounds[2] of what is appropriate for a Continuing Legal Education program presented by the ABTL, or, for that matter, any such event. Such statements are all the more concerning to the extent they are directed at members of the judicial community (among others) and are suggesting Guardant and its counsel can control or predict rulings that Your Honor has yet to make.

To be clear, we are not writing to restrain counsel's zealous advocacy before this Court. Nor would we seek to muzzle anyone from sharing the public record of this proceeding or informative accounts thereof. But it is inappropriate for either party or its counsel to be distorting—in self-serving, inflammatory, and derisive fashion—the proceedings to date in ways that could be seen by the public as prejudicing forthcoming decisions and/or treating them as foreordained. That is what, regrettably, occasions this letter.


Respectfully submitted,

*/s/ Derek L. Shaffer*

Derek L. Shaffer


Enclosure

---

[2] Certainly such editorializing should not be mistaken for straightforward, faithful recounting of "information contained in a public record," of the sort contemplated by ABA Rule 3.6(b).

```
1              UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF CALIFORNIA
3

   GUARDANT HEALTH, INC.,           )
4  A DELAWARE CORPORATION,          )
                                    )
5                  PLAINTIFF,       )  CASE NO.
          VS.                       )  3:21-cv-04062-EMC
6                                   )
   NATERA, INC., A DELAWARE         )
7  CORPORATION,                     )
                                    )
8                  DEFENDANT.       )
   _____ )
9
10
11
12       REPORTER'S TRANSCRIPT OF AUDIO RECORDING
13              FILE TITLES (COMBINED):
14     "New Recording 316" and "New Recording 317"
15        AUDIO RUN TIMES:  0:57:56 and 0:10:06
16
17
18
19
20
21
22
23
24  JOB NO. 7330554
25  TRANSCRIBED BY:  WHITNEY HESTER, CSR 14658
```

                                              Page 1

```
 1                    AUDIO RECORDING
 2                 FILE TITLES (COMBINED):
 3        "New Recording 316" and "New Recording 317"
 4           AUDIO RUN TIMES: 0:57:56 and 0:10:06
 5

 6           (Whereupon, the audio recording titled "New
 7           Recording 316" started at timestamp
 8           0:00:00.)
 9           HOST:  Justin Sanders of Sanders Roberts, our
10    dinner chair -- our co-chair to introduce the speakers,
11    and along with Justin, the speakers can come up.
12    [Inaudible].
13           (Applause.)
14           HOST:  Good evening.
15           (Inaudible background sounds.)
16           HOST:  It's my distinct pleasure to see you
17    [inaudible] wonderful guests [inaudible].
18           As they take their seats, first, I'll try to
19    [inaudible] Jennifer Keller.  Jennifer is a very fine
20    lawyer who has tried somewhere north of 150 cases to
21    jury verdict.
22           She began her career as a deputy public
23    defender, who was known for having one jury out
24    [inaudible].  She then spent over a decade in private
25    practice working criminal defense case- -- criminal
```

Page 2

1    defense matters before she switched gears to try civil

2    cases.

3            Jennifer has won a long list of awards.  She has

4    won three separate CLAY awards for three jury wins in

5    three different areas: white collar, intellectual

6    property, and municipal law.

7            She's a member of the California Lawyers

8    Association, Trial Lawyer Hall of Fame, a law-guided

9    legend, and she's ranked in the Band 1 by Chambers USA

10   and Chambers Global for trials and commercial

11   litigation.

12           The Daily Journal has named Jennifer one of

13   California's Top 100 Lawyers for 17 years straight.

14           She's worked hard to assemble a boutique firm of

15   16 lawyers that she says are smarter than her.

16           That's pretty scary.

17           And they're crazy enough to try cases before a

18   jury.

19           And if you've ever been to her office, they also

20   have a beautiful art collection [inaudible].

21           (Inaudible background sounds.)

22           HOST:  So, first, give a warm round of applause

23   for Jennifer.

24           (Applause.)

25           HOST:  And seated next to Jennifer is Chase

1    Scolnick.  And, yes, he is the brother of our current

2    president, in case you were wondering.

3         Chase is one of the most accomplished trial

4    lawyers of his generation, having tried over 50 jury

5    trials to verdicts, all in federal court.

6         (Inaudible background sounds.)

7         HOST:  As we -- or according to his counsel,

8    "with remarkable success."

9         Chase began as a deputy federal public defender,

10   and, approximately a decade ago, he made a transition to

11   business litigation in the intellectual property cases

12   with Keller/Anderle.

13        He's also won many awards, including his own

14   CLAY award, the Daily Journal's Top 100 Lawyers in

15   California and the Lawdragon 500 Leading Lawyers in

16   America.

17        Along the way, Chase has become a trusted

18   advisor to several general counsels of major companies.

19   He was the architect of the Guardant versus Natera case

20   we're going to hear about today and that trial strategy.

21        And he, along with Jennifer, has successfully

22   defended notable individuals, such as Kevin Spacey in

23   the Southern District of New York.

24        (Inaudible background sounds.)

25        HOST:  So without further ado, I'd like to

Page  4

```
 1    introduce Chase Scolnick.
 2              (Applause.)
 3              HOST:  So enjoy the program and have a good
 4    evening.
 5              (Inaudible background sounds.)
 6              JENNIFER KELLER:  The firm name now is Keller
 7    Anderle & Scolnick.  So...
 8              (Applause.)
 9              JENNIFER KELLER:  Not [inaudible].
10              (Laughter elicited.)
11              JENNIFER KELLER:  And that was really in
12    recognition of your superb job that Chase did for us.
13              Our firm very deliberately assembled some people
14    who had significant experience in the criminal justice
15    system.  We had the U.S. Attorney's office, the federal
16    public defender, county public defender, county DA's
17    office, on the one hand; and then the other -- the other
18    side of the office was people who had various
19    significant civil litigation experience from big firms,
20    who keep us from "stepping in it" too bad.
21              So, anyways, we are here for the sole purpose of
22    shamelessly bragging about our verdict.
23              (Laughter elicited.)
24              JENNIFER KELLER:  We intend to tell you many war
25    stories.
```

Page 5

1           No.

2           Anyway, let me tell you a little bit about our

3    case and what it was about.

4           We represent -- and we still represent -- a

5    company called Guardant Health.  Guardant Health is in

6    the forefront of what are now known as liquid biopsies

7    for cancer detection.

8           What that means is that instead of having to

9    take a piece of tissue or tumor and look at it to

10   determine if the cancer is present, Guardant Health has

11   come up with a unique way to measure these

12   infinitesimally, small amounts that were known as ctDNA,

13   circulating tumor DNA, because cancer, cancer tissue,

14   just like heathy tissue, as the cells die, they shed

15   into the bloodstream.

16          And so the two founders of Guardant Health, who

17   were engineers, PhDs from Stanford in -- in electrical

18   engineering and computer science, they figured out a way

19   to do these measurements.

20          They started with colorectal cancer because

21   it's -- it's a very prevalent cancer, and there was a

22   huge data set of data because of all the colonoscopies

23   that were done.

24          They were not oncologists; they were data

25   scientists.  They learned how to see data sets, but they

```
 1   brought in oncologists to work with them.  And they
 2   created this fantastic company.
 3            (Inaudible background sounds.)
 4            JENNIFER KELLER:  So fast forward to about 2018.
 5   They have come up with this incredible test that they
 6   later called Reveal that would be able to detect the
 7   recurrence of what's known as Minimal Residual Disease
 8   in colorectal cancer patients who had had surgery, and
 9   they needed chemotherapy or radiation.
10            The biggest fear you have as a cancer patient
11   who has had that surgery is "Did they get it all?" or
12   "Did they miss something?  Is it going to come back and
13   kill me?" and so monitoring to see if there's any
14   Minimal Residual Disease is really critical to survival.
15            There's a company out there, Natera.  Natera was
16   the only company that was doing that kind of testing,
17   but they didn't have a blood-only test.  Their tests
18   required tissue.
19            So when the doctors did the surgery, they would
20   take a tissue sample; they'd send it out to be typed.
21   The person would then have chemo or radiation.  30 days
22   later, they'd take a blood sample; they'd send that out
23   to another lab.  They'd try to crossmatch the two.
24   They'd try to figure out if there was Minimal Residual
25   Disease.  And it took a long time.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1              It took six or eight weeks, Chase?

 2              He's the brains of the operation; so I ask him

 3      these questions.

 4              Meanwhile, Guardant's test is a simple blood

 5      test.  At the 30-day mark, they take a blood test, send

 6      it out, and five days later, you got your answer.

 7              So instead of lying awake at night, wondering,

 8      "Did they get it all?" you know right away.

 9              And that early stage, of course, is the most

10      treatable stage.

11              So Natera got wind of the fact that Guardant had

12      developed this test.  They panicked.  They decided to

13      "destroy" the company's test in the "crib," to "kill it"

14      before it ever got off the ground, do anything they had

15      to do to kill it because they saw it as an existential

16      threat.

17              So, Chase, take it away.

18              CHASE SCOLNICK:  Thank you, Jennifer.

19              And thank you all for having us here tonight.

20      It's really an honor to be here.

21              And thank you to my brother, Kahn, who's the

22      president.

23              And if you all think that we both look like each

24      other now, we were dead ringers in high school.  I tell

25      people my high school years were four years of breaking
```

1    the rules and having Kahn pick up the tab.

2            (Laughter elicited.)

3            CHASE SCOLNICK:  The teachers couldn't tell us

4    apart.  So I would always say my name was Kahn.  So Kahn

5    found his way to the principal's office pretty

6    frequently.

7            (Laughter elicited.)

8            CHASE SCOLNICK:  So hopefully he's not holding a

9    grudge [inaudible].

10           Okay.  So what we want to start out with this is

11   talking about just how complex this case was.

12           So Jennifer broke it down and gave us an intro,

13   but -- but, really, we're talking about complex science

14   and advertisements that deal with statistics and

15   analysis and -- and numbers that are so complicated that

16   most oncologists don't even understand them.

17           So we have here on the slide a statement from

18   Judge Chen, who, to anyone who has litigated in Northern

19   California, is a brilliant judge, a wonderful man.  And

20   after two or three years of knowing the case, this is

21   what he said.  Right.  That, even after reading all the

22   papers, he struggled to understand it.

23           And if he struggled to understand it, if it was

24   going to be Greek to him, it was going to be Latin to a

25   jury.  And that's something that we struggled with

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

 1    throughout the case.

 2            So this is an example of the material.

 3            And, Jennifer, if you want to talk about it, how

 4    we came into the case...

 5            JENNIFER KELLER:  Yes.

 6            There was a large international firm handling

 7    the case.  The lawyers were very, very bright and expert

 8    in the -- in the law of false advertising and expert in

 9    the science.

10            Because Natera's defense was "everything we said

11    is true.  We have the superior test.  They were

12    dangerous.  We had to alert the public," And that's why

13    they put all this stuff out.

14            Of course, none of that was true.  But...

15            CHASE SCOLNICK:  Right.

16            So when we came into the case, as Jennifer said,

17    there was another firm on the case.  And one of the --

18    the issues we had is picking up where they left off.

19            I think general counsel looked at the -- at the

20    case and -- and saw them as being wonderful through

21    summary judgment, but the case wasn't dismissed on

22    summary judgment.  So we had to pick up and proceed to

23    trial.

24            And when we came in, it was specifically for the

25    purpose of -- of trying the case and turning this case

                                                    Page 10

1  from something that was very dense and -- and scientific

2  at the -- at the motion stage and try to translate that

3  to a jury.

4          So although they were wonderful, they didn't

5  have as much experience in front of the jury as we have.

6

7          So we -- we looked at the case and immediately

8  noticed that the -- the outlines with the questions that

9  were put to the jury were a bit alienating and -- and

10  over the juror's head.

11          And so this is a perfect example of a question

12  here that we started off with and -- and how we changed

13  it.  Right.

14          I mean, immediately you see this, if you're

15  trial attorneys, that the -- that the introductory

16  phrase is going to alienate the jury:  "For the benefit

17  of the jury."  Right.

18          And -- and almost every outline we looked at 30

19  or 40 or 50 times, you see these phrases.

20          And if you're telling the jury or asking the --

21  the witness in front of the jury "for the benefit of the

22  jury," what are you really saying?

23          You're saying, "Well, the jury is not as smart

24  as I am" -- right -- "and so I am going to dumb this

25  down for them."

Page 11

1          So immediately we eliminated those types of

2     phrases, and we drove things down.

3          These complex concepts -- hazard ratios,

4     confidence intervals -- were easily translated into --

5     into more fundamental concepts that were understandable.

6          Ultimately, if you start off with what a hazard

7     ratio is and you can explain exactly what it is, or you

8     can just break it down and say, "This is just another

9     measurement of how good a test is at detecting cancer."

10          So this is a perfect example of what we came in

11     to accomplish.

12          JENNIFER KELLER:  Chase and I both began our

13     careers, as you heard, as deputy public defenders.

14          And in my own case, I would hear many deputy DAs

15     say things like, "Ladies and gentlemen of the jury, I

16     submit to you."  And I would think, "Oh, that's good

17     because who talks like that?"  Right.

18          (Laughter elicited.)

19          JENNIFER KELLER:  It's very alienating.

20          Or -- or just, you know, "Did you have occasion

21     to observe the light from the vehicle?"  You know, who

22     talks like that?

23          And so this was the scientific version of that:

24     "I'm so much smarter than you are that I need to speak

25     to you in these phrases.  Unfortunately, you will be

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    unable to understand them."

2           And so it's kind of like the elevator pitch.  I

3    tell people sometimes, "If you can't explain to me your

4    case in a 30- to 60-second elevator pitch, you're going

5    to lose."

6           So Chase and I spent a lot of time trying to

7    figure out how to translate these complex concepts

8    into "more understandable."

9           We didn't have a stupid jury at all.  We had a

10   great jury.  It was a Northern District of California,

11   San Francisco, Bay Area jury.  Bright people.

12          The foreperson was a graduate of the London

13   School of Economics.

14          But we also had some people who were

15   working-class jurors; very bright but not necessarily

16   highly educated in the sciences.

17          And so we started working on that fairly

18   immediately.

19          CHASE SCOLNICK:  So this is the ad.  Right.

20          Also, this was a false advertising case.  And

21   this was the ad that was put out to physicians around

22   the country.

23          Normally, when we think about an advertiser,

24   we're thinking about Coke versus Pepsi; something that's

25   easily -- easy to understand and grasp, but the target

                                                    Page 13

1    audience was oncologists.

2         So if you look at this, it does look like Greek

3    or Latin, or pick your foreign language that you don't

4    understand, because most -- most any juror wouldn't

5    understand this.  You've got very highly complex

6    scientific concepts and comparisons.

7         So what this is meant to represent is on the

8    left side you have Signatera, which is our competitor,

9    Natera's product; and

10        On the right side, you have Guardant's product:

11   Reveal.

12        And if you look at it as a comparison in all

13   those different metrics -- right -- and without knowing

14   anything else, you see that the numbers on the left look

15   better than the numbers on the right.

16        So without knowing anything else, it looked

17   like -- and to oncologists it looked like, oncologists

18   who were very busy, who have a practice, who are --

19        And if any of you have the misfortune of having

20   to go to an oncologist's office, you know that you have

21   to wait.  Right.  There's a long waiting list, and

22   they're very in demand.  And they don't have time to

23   look at all the footnotes and tiny print at the bottom.

24        So this was -- this was targeting them and --

25   and, as we're going to explain, is highly misleading.

Page 14

```
 1            But how do we translate this to a jury.  Right.
 2     A jury who, although smart and sophisticated, probably
 3     don't have the scientific background to understand all
 4     of these concepts, statistical and medical.
 5            So what we did is we used a number of
 6     strategies.  And we're gonna talk about those strategies
 7     for the balance of this evening.
 8            And I can't see all of them here; although, I
 9     wrote the outline.
10            (Laughter elicited.)
11            CHASE SCOLNICK:  You all can see them.  And
12     we're going to go through them one by one.
13            [Inaudible].  Got [inaudible].
14            UNIDENTIFIED SPEAKER:  The first is "Compelling
15     Stories."
16            "Compelling Story."  Thank you.
17            [Inaudible], Folks.
18            (Laughter elicited.)
19            CHASE SCOLNICK:  Okay.  So as Jennifer said at
20     the top, we had the honor of representing Guardant
21     Health.
22            Guardant Health was created by two scientists
23     who were not doctors.  They were not oncologists.  They
24     had no medical background.  They were engineers, and
25     they sought to conquer cancer with data.
```

Page 15

1          Although they were studying engineering at

2    Stanford, they became part of the Human Genome Project,

3    which was involved in decoding the human genome.

4          And under their watch, they brought decoding the

5    human genome from a one- or two-billion-dollar project

6    down to about a thousand dollars.  That was a huge

7    accomplishment.

8          But what they saw in the companies they were

9    working for was that this technology was not being

10   leveraged to -- to help people.  So they started

11   Guardant Health.  And they realized that there was a

12   wonderful application to cancer.

13         So this is an example of their technology.

14         And with cancer what you have is a disease of

15   tumors.  Right.  Regardless of where it is, there are

16   tumors that grow on the body.  And these tumors are

17   quickly growing.  And as they grow, they're also dying.

18   And when they die, they shed little, tiny microscopic

19   pieces of tumor.  And those pieces of tumor are called

20   ctDNA, or circulating tumor DNA.  And they're -- they

21   circulate throughout the blood.

22         So the folks at Guardant, they developed a test

23   that detects these tiny pieces of tumor in the blood.

24   So you don't need to have a biopsy.  You don't need to

25   have some -- a full body scan.  You only need a simple

Page 16

1    blood test to determine whether the cancer is in the
2    body.
3            And why is this important?
4            In the context of Minimal Residual Disease, for
5    example, in colorectal cancer, people, if you find it
6    early enough, you have a surgery, you have it removed,
7    But sometimes, unfortunately, it comes back.  It depends
8    on what stage you're at.  Obviously, the later the
9    stage, the greater the likelihood it's going to come
10   back.
11           So the standard of care is on the right side.
12   And it's CT scans.  And we all are familiar with the
13   CT scans.
14           The problem with CT scans is that for a tumor to
15   become detectable on a CT scan, it takes about
16   one billion cells.  That's how big it has to be
17   physically.
18           And by the time you have one billion cells in a
19   tumor, after it's recurred, the cancer is pretty much
20   inoperable.  Okay.  It spread too far.
21           So what we have at Guardant is 30 days after
22   your surgery, you're able to take this simple blood
23   test, and it searches for the markers that are
24   consistent with cancer.  And this gives people a
25   tremendous advantage -- right -- because at that point

Page 17

1    it's truly [inaudible].

2         And that brings us to our competitor:

3    [Inaudible].

4         While ours was a simple blood test, they need

5    tumor, they need a biopsy. [Inaudible].  And for their

6    test to work, they have to sequence that tumor, break

7    off a piece of that tumor, send it off to a third party;

8    and they look at that tumor and decode it.

9         And then a month, two months later, you take a

10   blood test, and they look for markers of that specific

11   tumor in the blood.

12        And that sounds like a great program, but the

13   problem is in the details.

14        Now what I mean by that is there are all kinds

15   of problems logistically with -- with that first stage:

16        People lose the tumor.  If you're undergoing the

17   modern-cancer treatment, is -- before you have surgery,

18   you have chemotherapy.  And if you have chemotherapy

19   before surgery, the tumor is too small to sequence.

20        So there's a large group of people -- and I'm

21   going to explain and show you a graphic for -- who

22   cannot use this test.

23        And this is Dr. Corcoran.  He's one of the

24   leading oncologists in the world.  He is a doctor at

25   Harvard -- he is a teaching doctor at Harvard Medical

                                                    Page 18

1    School.

2          And he explains that there are some times where

3    you just don't have sufficient tumor tissue to use

4    Natera's test.

5          And Natera themselves, while they told people

6    publicly, and they told the jury at trial that their

7    test can be used for everybody, that's just not true.

8          Behind the scenes, when no one was looking, you

9    can see in this email here, they acknowledge that there

10   are significant problems logistically with their test.

11         It takes weeks to months for them to get a

12   result, tissue is lost, and people just can't use their

13   test.

14         And it sounds like it's not a big deal if you

15   are discussing a week -- I'm sorry -- a month, two

16   months, three months, four months of a delay to get the

17   results for Signatera.  But if you think about it, if

18   you're a cancer patient and you're desperate to learn

19   the results of -- of your test, you want to find out if

20   it came back.

21         If you're up all night thinking about this, and

22   thinking about it for two months, three months, whatever

23   the delay is for Signatera, it's huge.  It's

24   life-changing.

25         And what's happening during those three months?

1   The cancer is growing.  It's becoming closer to being

2   inoperable.

3          So...

4          JENNIFER KELLER:  And if you're one of those

5   people who cannot use Signatera's test at all, you're

6   going to have to wait until it's big enough to be seen

7   on a scan, at which point it's probably too late.

8          So the people who testified, who said that

9   Dr. Corcoran was wrong -- one of the premiere

10  oncologists in the entire world and an expert, in

11  particular, in this technology and in this kind of

12  cancer -- one was an MBA and the other had a bachelor's

13  in biology, and they were executives, But they were

14  certain about that.

15         They didn't even put an oncologist on the stand.

16         Gee, why could that be?

17         I don't know.  Why would you put a bunch of

18  "business bros" on the stand instead of an oncologist to

19  talk about this.  Anyway...

20         The jurors had the same question.

21         (Laughter elicited.)

22         CHASE SCOLNICK:  So the business bros and the

23  MBAs at Natera, they claim that "there are only about

24  2 percent, if that, who couldn't use their test," but

25  that's -- that's just not true.

Page 20

1          In truth -- and we had multiple oncologists

2     testify at trial.  There are about 30 percent of

3     CRC patients who cannot use the Natera's -- Natera's

4     test because they just don't have sufficient tissue.

5     There are other issues with it.

6          And when you think -- when you think about CRC,

7     there are tens of thousands or hundreds of thousands of

8     people in the country and -- and millions around the

9     world who suffer from CRC and who recovered, 30 percent

10    is a tremendous number.  And Natera's leaving those

11    folks out in the cold.

12         Guardant, on the other hand, everyone can use

13    Guardant's test.  Right.  Regardless of whether they

14    have sufficient tissue or not, it's a simple blood test.

15         So this made up for that 30 percent of those

16    tens of thousands of people, and it brought them in from

17    the cold.

18         JENNIFER KELLER:  But Natera was determined that

19    no one would be able to use these tests, including that

20    third of patients.  And they did whatever they could to

21    sabotage us from getting into the market.

22         CHASE SCOLNICK:  So, again, we're not able to

23    look at all these emails, but for the next phase of our

24    presentation, we want to show you the internal emails

25    from Natera, from the senior management, including the

Page 21

1    CEO, the vice presidents.

2            And when they learned that Guardant was coming

3    out with this test that could be used by everybody, that

4    didn't have the logistical problems of their test, they

5    panicked.

6            Think we can [inaudible].  Take a look.

7    [Inaudible].

8            (Laughter elicited.)

9            CHASE SCOLNICK:  [Inaudible] singer.

10           (Laughter elicited.)

11           CHASE SCOLNICK:  Okay.  So this is an email from

12   Natera's CEO.

13           And, of course, our product development was --

14   was called LUNAR.  So what they did, they set up a

15   project -- a project that was designed to target our

16   test.  Right.

17           And if you look at some of the -- some of the

18   fears and the internal concerns, you have:

19           "This can crush our growth," and

20           "We need to have a war room."  Right.

21           "This is high priority, priority number one."

22           "This will completely derail us if we messed up

23   here.  We need to go to the mat."

24           JENNIFER KELLER:  And, incidentally, they

25   started on this campaign before there was even a

Page 22

1    clinical study published about our test.  They just got

2    wind of it, and it was, "Uh-oh.  'Blood only.'  'Liquid

3    biopsy.'  This could kill us.  So we're going to start

4    to destroy them.  We're going to put together a plan now

5    to destroy them" Years before we even had a publication.

6            CHASE SCOLNICK:  And here we go again with

7    another example.

8            Remember that these are health care

9    professionals.  Right.  They're supposed to be focused

10   on defeating cancer.  The war should be attacking the

11   cancer and saving people's lives.

12           But, unlike Guardant, which was focused on that

13   war, the only war that Natera was focused on was it was

14   a war for profits and a war against Guardant.

15           And here you see the CEO again saying, "We need

16   to be laser focused on the CRC" -- which is colorectal

17   cancer -- "land grab or we will lose to Guardant.  We

18   need to put more intensity.  This is the war we're

19   entering."

20           So, as you can imagine, this language was -- was

21   wonderful for the jury.  Thematically.  Instead of the

22   war against cancer, you've got a war with competitors, a

23   war for profit, a war that prioritizes the bottom line,

24   instead, over public health.

25           Oh, here we are.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1           This is the CEO Steve Chapman.

2           (Laughter elicited.)

3           CHASE SCOLNICK:  We all have these -- we all

4    have these unfortunate emails in our case, but I think

5    you can imagine this one.

6           For Natera, this was the entire theory and

7    strategy:  "We need to be more aggressive here.  We need

8    to spend whatever is necessary to salt [phonetic] their

9    launch."  Right.

10          JENNIFER KELLER:  Notice what it doesn't say.

11    It doesn't say, "Their test is dangerous.  To protect

12    public health, we must educate oncologists immediately."

13          They didn't say that.

14          (Laughter elicited.)

15          CHASE SCOLNICK:  So, needless to say, this is

16    fun impeachment because when Mr. Chapman came into court

17    and explained that this was all benevolence and to

18    correct the record and try to make sure that the public

19    is safe, you know, this email is, obviously,

20    inconsistent.

21          So here's an email from their president of

22    Clinical Diagnostic, who I was fortunate enough to

23    cross-examine during trial.

24          This is just another example of his emails.

25          And, again, it wasn't focused on -- on some

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    legitimate advantage that their product had over -- had
 2    over ours or concern for public safety.
 3           They wanted to "pound GH," "pound Guardant
 4    Health."  Right.
 5           (Inaudible background sounds.)
 6           CHASE SCOLNICK:  And you think about how
 7    offensive that is in the space that they are in.  A
 8    company that is supposed to be fighting cancer; they
 9    only care about competition.
10           The fact that their test did not cover tens of
11    thousands of cancer patients whose only hope for
12    detection was our test, And they're talking about
13    pounding us to prevent us from entering the market and
14    preventing those patients from having access to our
15    life-saving test.
16           And it goes on.
17           I mean, we have dozens of these emails
18    throughout the case.
19           This is the "Lunar War Room," Which is, again,
20    targeting our product, Reveal.
21           It says, "We should get updates at least two
22    times a week and meet weekly.  Number one priority: This
23    can crush our growth and completely derail us if we mess
24    up here.  We need to go to the mat here," again.
25           And here's another example:
```

Page 25

1          "The key is to cut off GH at the pass and to get

2     patients on Signatera prior to onc" -- meaning,

3     oncologist -- "decision."

4          So the goal was to get these patients using

5     Signatera before their oncologist had a choice to use

6     our product.

7          This is Dr. Kevin Masukawa.  He is the VP of

8     marketing.

9          And, again, he's talking about "War Solar" which

10    is the anti-Guardant campaign.

11         He said, "We need to come up with more -- with

12    some more innovative ideas to blunt Guardant."

13         And they even -- I showed you they had a

14    competition of who could come up with the most

15    anti-Guardant ideas in the company.

16         I don't know if they had, like, a party and gave

17    out free pizza or what the deal was, but this was the --

18    the corporate culture inside -- inside the Natera.

19         JENNIFER KELLER:  He was the most fun to cross

20    examine, I will say, perhaps, or the CEO, Mr. Chapman,

21    who had a canned answer no matter what question you'd

22    ask him.

23         If you said, "Sir, is it Monday?" he would say,

24    "We had no choice but to educate the public and

25    oncologists about [inaudible]" --

```
 1                (Laughter elicited.)

 2                JENNIFER KELLER:  -- to the point where I

 3       finally said, "Is that just a canned answer you've been

 4       practicing to just give to whatever question I ask?"

 5                "Objection.  Argumentative."

 6                And the Judge said, "Overruled."

 7                (Laughter elicited.)

 8                JENNIFER KELLER:  "You have to answer the

 9       questions they ask."

10                So that was -- that was fun.

11                But Dr. Masukawa made some admissions.

12                He was the head of oncology marketing, and so he

13       was right at the epicenter of their "Kill Reveal, and

14       take this cancer test away from these patients who need

15       it."

16                And that was -- that was, I guess, in some weak

17       moments he made some admissions that he probably

18       regretted.  And he tried to walk back a little bit at

19       trial, and it didn't work out too well.

20                CHASE SCOLNICK:  So let's talk about those

21       innovative ideas that Natera came up with.

22                Their project Solar resulted in a three-part

23       campaign that included suppressing researchers' findings

24       on Reveal's strong performance, pressuring Medicare to

25       deny access to Guardant's lifesaving test and
```

Page  27

```
 1   carpet-bombing cancer doctors with false advertisements.
 2           JENNIFER KELLER:  "Carpet bombing" [inaudible]
 3   was [inaudible].
 4           (Inaudible background sounds.)
 5           CHASE SCOLNICK:  So first is [inaudible].
 6           I'd like to play some testimony of
 7   Dr. Aparna Parikh and Dr. Ryan Corcoran.
 8           JENNIFER KELLER:  These two doctors are in the
 9   forefront of blood-only cancer detection biopsies.  They
10   are absolutely brilliant.
11           Dr. Corcoran is tenured and has his own lab at
12   Harvard;
13           Dr. Parikh is an up-and-comer, brilliant young
14   woman, but she did not yet have tenure; so she was in a
15   more precarious position than Dr. Corcoran.
16           So what -- what Natera did, finding out that the
17   Journal of the Clinical Oncology was going to publish
18   their -- their clinical study [inaudible] value in the
19   [inaudible], they decided to try to persuade the
20   Journal, the [inaudible] not to run it.
21           (Inaudible background sounds.)
22           JENNIFER KELLER:  So they put a huge amount of
23   pressure on the Journal of Clinical Oncology, all behind
24   the scenes, and they were doing it anonymously and
25   telling them that these "doctors were terrible; they did
```

Page 28

```
1    terrible work; they didn't know what they were doing;
2    They had, you know, tainted samples."
3            They really attacked them as researchers.  They
4    had -- they had done nothing wrong.
5            And the Journal of Clinical Oncology declined to
6    be bullied like that.
7            Dr. Corcoran was particularly shocked that any
8    company would do this because he had never heard of it
9    before.
10           (Representation was made that the
11           deposition testimony of Ryan Corcoran,
12           M.D., Ph.D., was played as follows:)
13           QUESTION:  Could you read for the jury your
14    response?
15           ANSWER:  Yeah, my response to Dr. Parikh was
16    that this is super inappropriate, and I'm glad that the
17    Journal directed them to us.
18           And I made the point that trying to undermine
19    the study, you know, under the veil of anonymity was
20    super shady.
21           QUESTION:  Do you stand by that belief that that
22    was really inappropriate and super shady?
23           ANSWER:  I would say that this is probably the
24    most inappropriate thing I've ever seen a company do to
25    any study I've been involved in my entire career.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1              (Representation was made that the

2              deposition testimony of Ryan Corcoran,

3              M.D., Ph.D., concluded.)

4         JENNIFER KELLER:  And what they did is they went

5    after Dr. Parikh first.  They waited until Dr. Corcoran

6    was gone and they went after Dr. Parikh and they tried

7    to bully her.

8         They were the 300-pound gorilla in the room in

9    terms of these tests.  They were the only ones who had a

10   test for colorectal cancer at the time.  And if they

11   didn't fund her, if they withdrew her grants, if they

12   took away any money for her lab, that was it.  And they

13   were very, very heavy-handed.

14        So Dr. Corcoran was pretty upset that they would

15   do that to a junior faculty member.  And he felt that

16   they should at least have the decency to come to him,

17   the senior person, and raise with him any problems that

18   they had.

19        CHASE SCOLNICK:  But not only did they attack

20   Dr. Parikh, they also went directly to the Journal,

21   under the cloak of anonymity, and they claimed to be

22   concerned scientists, and they asked for the letters to

23   be edited -- I'm sorry, the Journal to be edited or

24   retracted.

25        And that had a profound impact on Dr. Parikh,

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1   who is a scientist and a -- and a doctor, who's focused
 2   on curing cancer and advancing research, And this is Dr.
 3   Parikh's reaction:
 4           (Representation was made that the
 5           deposition testimony of Aparna Parikh,
 6           M.D., played as follows:)
 7           QUESTION:  How did it make you feel, as a
 8   professional, to have to respond to a letter to the
 9   editor like this?
10           ANSWER:  Again, it really bothered me and made
11   me sort of, like, question why we're doing what we're
12   doing, and are we -- like, you know, we -- we think
13   we're trying contribute to the field and to patient
14   care, and it feels entirely demoralizing.
15           And, you know, we're coming out of kind of
16   pandemic and all the demands of, like, sick patients and
17   GI cancers and clinical demands, and just to feel like
18   something we were trying to do just to add value for
19   patients is just sort of being attacked and not -- and,
20   like, not letting us just do our work and dragging us in
21   just felt, like, entirely upsetting.
22           (Representation was made that the
23           deposition testimony of Aparna Parikh,
24           M.D., concluded.)
25           JENNIFER KELLER:  The Journal of Clinical
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1  Oncology did not bow to the pressures and refuse to

2  publish the article, but they did give a bow to the

3  extent of publishing Natera's letter to the editor

4  attacking Drs. Corcoran and Parikh and their study.

5          However, they also allowed Drs. Corcoran and

6  Parikh to publish right next to that their response,

7  which was devastating and really showed that Natera was

8  absolutely in the wrong here.

9          But that's the lengths they were willing to go

10 to try to destroy these young doctors' career, smear

11 them, go after them, threaten to withhold grant money.

12 Really, all-out warfare.  They didn't care what it took

13 to win.

14         CHASE SCOLNICK:  But it gets better.

15         (Laughter elicited.)

16         CHASE SCOLNICK:  So not only did they try to

17 intimidate and pressure the scientific journals and

18 these doctors, they also tried to pressure Medicare to

19 deny access to Guardant's lifesaving test.

20         Let me give you some examples here.

21         JENNIFER KELLER:  Also, behind the scenes and

22 without anybody knowing about it.

23         CHASE SCOLNICK:  And what Natera did is they

24 went to an organization called MolDx.

25         And this is -- this is the organization that

Page 32

1  screens these medical diagnostic tests for -- for

2  Medicare.

3          And they back-channeled these false claims.  The

4  same false claims they made in our case, by the way.

5  And they tried to persuade them to deny coverage to --

6  to all these people.

7          And, again, why that's so offensive is the folks

8  who are on Medicare are some of the most desperate and

9  destitute in our country.  Right.  They're folks who

10 can't afford to pay out of pocket.

11          And when you put that in the context of there

12 being 30 percent of people or up to 30 percent of people

13 who cannot use Natera's test and then to try to deny

14 those folks coverage, or any access, to the only test

15 that worked with them is particularly egregious.

16          So, at trial, again, as they had to come up with

17 some explanation, at trial, Natera's witnesses claimed

18 that they were doing this because our test wasn't safe

19 or because they were trying to protect the public or be

20 stewards of -- of tax dollars.

21          But, of course, none of that was true because

22 the internal emails told a very different story.

23          JENNIFER KELLER:  Yes.

24          And, of course, if you really do want to air

25 concerns about a test, you would want it to be out in

                                              Page 33

1    the open where everybody can comment.  You wouldn't be

2    trying to stab somebody in the back where they don't

3    even know about it.

4            And -- and it was a problem for a while.

5    Guardant couldn't figure out what was happening.  "Why

6    were they being slowed down?"  They didn't know.

7            The jurors knew, though.  They got to see the

8    whole thing.

9            CHASE SCOLNICK:  Right.

10           And this email says it all, really, that we got

11   from Mr. Chapman, who was really a gift throughout the

12   trial.

13           (Laughter elicited.)

14           CHASE SCOLNICK:  And, again, this wasn't about

15   public health.  It wasn't about public welfare.  It

16   wasn't about concern that our test or product was

17   somehow unsafe or inferior.  It was about money.  It was

18   about the bottom line.  It was about greed because

19   that's -- that's what the evidence showed that Natera

20   cared most about.

21           And so here you have a text from Mr. Chapman:

22           "Reveal is making massive progress in Florida.

23   They are everywhere.  We need to make sure our Medicare

24   plan is on point."

25           And, again, what was their Medicare plan?

Page 34

```
 1            The evidence showed that their Medicare plan was
 2      to try to persuade Medicare from denying coverage for
 3      our test.
 4            JENNIFER KELLER:  Secretly.  Secretly.
 5            CHASE SCOLNICK:  Behind the scenes.
 6            But -- oh.
 7            JENNIFER KELLER:  This -- this was fun.  Okay.
 8            I apologize in advance that all my cross
 9      questions ended with "Right?  Right?"  [Inaudible].
10            (Laughter elicited.)
11            CHASE SCOLNICK:  Yeah.  We've got two different
12      screens.  I'm sorry.
13            So this was what I was referring to earlier, the
14      Medicare plan being on point and Mr. Chapman.
15            And then -- here you go.
16            JENNIFER KELLER:  Okay.  Here's the apology
17      part.
18            And so I asked Dr. Masukawa, "Would it be a good
19      outcome for your company, for Natera, if MolDx did not
20      approve Guardant's application for coverage; right?"
21            He said, "That is true."
22            (Laughter elicited.)
23            JENNIFER KELLER:  "QUESTION:  Now, Signatera is
24      not an option for patients without sufficient tumor
25      tissue for the Signatera test; right?"
```

                                                    Page 35

1          "ANSWER:  That is correct."

2          "QUESTION:  And so, and then, of course, not all

3     patients could pay for it out of pocket?"

4          "ANSWER:  That's correct."

5          "QUESTION:  Most of them are going to need

6     insurance or Medicare coverage?"

7          "ANSWER:  Yeah.  Sure.  Yes."

8          "QUESTION:  But, of course, it was a good

9     outcome for the company to deprive those people of any

10    test?"

11         That was not well received by the jurors.  Some

12    of them, like me, were on Medicare.

13         CHASE SCOLNICK:  I'm only a few years away

14    myself.  So...

15         (Laughter elicited.)

16         JENNIFER KELLER:  I know.  I was particularly

17    outraged.

18         CHASE SCOLNICK:  Okay.  But, ultimately,

19    Medicare did approve coverage for Reveal.  And in doing

20    so, they considered all the same arguments -- or many of

21    the same arguments that Natera advanced to the jury and

22    rejected them, which is an important point.

23         So they had the -- some of the world's leading

24    experts consider the same false statements, the attacks,

25    that -- that were levied on the jury and rejected them.

                                        Page 36

1    I think was a -- was a good point.

2         JENNIFER KELLER:  I want to make one point about

3    the prong "Carpet-bomb cancer doctors with false

4    advertisements."

5         Remember earlier the CEO of Natera, Steve

6    Chapman, said, "Spend whatever it takes."  They did.

7         CHASE SCOLNICK:  And if there's one ally that

8    all companies in this space should have it's oncologists

9    because oncologists are on the frontlines.  They're the

10   people who sacrifice many years of their lives to go to

11   medical school and to treat people who are -- who are

12   suffering from cancer.

13        So, of course, to Guardant, they are allies.

14   They are on the frontline.  But to Natera, this is how

15   they referred to them internally in emails.

16        JENNIFER KELLER:  Like they're cattle:  "Ring

17   fence all the oncologists and hit their social web very

18   hard."

19        But it -- it was actually worse because they

20   said their algorithms are pretty sophisticated in terms

21   of tracking people.  They're -- the people they hired,

22   Natera hired.  They're pretty good at tracking people

23   based on cell phone, IP information combined with public

24   data on the location of their home and workplace.

25        Nice.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1           So they were spying on oncologists at home, in
 2     their workplace, their IP addresses.  It could be their
 3     kids doing their homework.  It didn't matter.
 4           That was also not well received by the jury.
 5           CHASE SCOLNICK:  And what did they do with all
 6     that information?  How did they leverage it?
 7           Well, take a look at this massive advertising
 8     campaign.
 9           JENNIFER KELLER:  They spent almost 25 million
10     dollars in one year sending over 100,000 emails to
11     oncologists.  They called it the "drip campaign" because
12     they would send it out at different intervals.  All
13     attacking our product.  Over 20,000 of our top doctors
14     were [inaudible] our product.
15           (Inaudible background sounds.)
16           JENNIFER KELLER:  And then they gave -- they
17     outfitted their sales reps with these little tablets
18     that had massive attacks on them.  And, in fact, they
19     were told not to print those and not to leave those
20     tablets behind.
21           And we can only imagine how bad those attacks
22     were.
23           But 25 million in a year.  And our -- one of our
24     founders, Dr. Eltoukhy, when he was on the stand, he
25     found out for the first time about this because this has
```

Page 38

1    all been attorneys' eyes only, confidential.  And so he
2    didn't know -- the other [inaudible] didn't know that
3    this amount had been spent.
4         And he was, obviously, stunned when he saw it,
5    and said, "That's more than we spent in our whole launch
6    of our product."
7         And, yeah, all to "Educate the public about this
8    really scary product."
9         CHASE SCOLNICK:  So the first strategy that we
10   laid out was simplifying this very complex comparison
11   and turning it into these compelling stories.
12        And the story that we've told to you today is an
13   abbreviated version of what we told to the jury.  And
14   there were many more emails.  But it was very helpful
15   for us to lay this out as part of a three-pronged
16   approach because it provided context to something that
17   was far more difficult to understand and technical.
18        So our next strategy we used was graphic
19   representations.
20        Remember, we started off with this very complex
21   comparison ad.  And, again, on the left side, we have
22   Signatera; on the right side, we have Reveal.  And just
23   by looking at this, the left side, Signatera, looks far
24   better than the right side.  Okay.  And what we have
25   here are a number of footnotes.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          So all the numbers on the left --

2          UNIDENTIFIED SPEAKER:  [Inaudible].

3          CHASE SCOLNICK:  Okay.  Thank you.

4          Okay.  I think it's up.  Okay.

5          Oh, sorry.  I appreciate that.  So, sorry.

6          Starting over again.

7          We've got the comparative ad, you've seen it a

8    few times, Exhibit 126 at trial.

9          And on the left side, you have Natera; on the

10   right side, you have Guardant.

11         And the left numbers are based on Natera's

12   study; and the right -- the numbers on the right side

13   are based on the Guardant's study.

14         So rather than try to tackle each one of these

15   numbers and address them, the -- the hazard ratio, and

16   the confidence intervals, things that would be very,

17   very complex and difficult to explain to the jury in a

18   20-hour chess-clock trial, we looked for a common theme.

19         And there was a fundamental difference between

20   those two studies that made this a very unfair

21   comparison.  And that was -- [inaudible].  Okay.  If you

22   look, you have -- on the left side that would be the

23   Natera's study; and the farthest on the right side would

24   be our study.

25         But what they're not showing is that the amount

Page 40

1     of blood between the two trials are very different.  In

2     fact, Natera's study had twice the amount of blood per

3     sample as ours.  And that's very significant in this

4     space.

5          JENNIFER KELLER:  The Signatera study, they

6     wouldn't allow any samples of less than 8.5 milliliters

7     of blood.

8          Our -- our samples were taken from real-time,

9     actual doctors gathering them with patients.

10         The difference -- it's a huge difference of how

11     much blood you have.  The more blood you have, the more

12     likely you are to be able to find that circulating tumor

13     DNA.

14         And one of our oncologists said, "Hey, if you

15     have a two-story house and you lose your cell phone,

16     your chances of finding it are a lot greater if you can

17     search both stories.  If you're only allowed to search

18     one story, you might not see it."

19         And so...

20         CHASE SCOLNICK:  Which brings us to our next

21     topic, which is analogies.

22         JENNIFER KELLER:  Yes.

23         CHASE SCOLNICK:  Right.

24         So one that I used in our case was the example

25     of a car ad.  Right.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          We've got two different cars: Pickup Truck A;

2     Pickup Truck B.  And if you look at the advertisement,

3     you can stop here and say, "Well, Car A is better than

4     Car B because, man, it gets 300 miles, and Car B only

5     gets 200 miles," but what they're not telling you is

6     that the 300 miles is based on the full tank of gas; and

7     Pickup Truck B, the 200 miles is based on half tank of

8     gas.  So it's actually more fuel efficient or it gets --

9     it gets better mileage.  Right.

10          And this is the analogy to our test because, of

11     course, their test had seemingly better numbers, but it

12     was based on twice the amount of blood.

13          JENNIFER KELLER:  And under the Lanham Act false

14     advertising case law, apples-to-oranges comparisons are,

15     per se, misleading.

16          So you have to have -- if you're gonna have

17     comparative advertising, it has to be apples to apples

18     or oranges to oranges.  That's actually the language in

19     the case law.

20          (Laughter elicited.)

21          CHASE SCOLNICK:  Which brings us to our next

22     topic:  "Relatable Language."  Right.

23          This -- this case was so rich with these complex

24     scientific concepts that no one could understand or had

25     ever heard of that we wanted to make it more relatable

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

 1    And apples to oranges was a wonderful example.

 2          So early in the case, we started using the

 3    language of "apples to oranges."

 4          Here are two -- the testimony one -- here's the

 5    testimony of two of our witnesses.

 6          The vice president of clinical development on

 7    the left.  Justin Odegaard.

 8          "QUESTION:  And to be clear, the comparison that

 9    Natera used between the two tests that was sent to all

10    these doctors is that an apples-to-apples comparison?"

11          "ANSWER:  No, it is not."

12          And, again, on the right side:

13          "QUESTION:  Do you think that this was a

14    misleading apples-to-oranges comparison?"

15          "ANSWER:  Yes."

16          This is one of our favorite slides.

17          So this is actually Dr. Claus Andersen.

18          Dr. Claus Andersen was the lead author for

19    Natera's study.  And he is a researcher from Aarhus

20    University in Denmark.

21          So he had important testimony to give, and we

22    appreciated that.

23          And, although, this case was pending for a

24    number of years and we came in shortly before trial, he

25    had not been deposed.  So one of the things we wanted to

                                              Page 43

```
 1    do when we came in is to depose him, and we secured this
 2    good testimony for trial.
 3            And Natera tried to move heaven and earth to
 4    prevent us from doing so.  And the tactics are really
 5    extreme.  Right.
 6            So we finally got -- got the avenue to get in
 7    front of a Danish judge.  And it was in Copenhagen.
 8            And Natera told the Danish judge that the --
 9    even though there's a letter authorizing the deposition,
10    Natera had represented that it was unauthorized, that
11    this was beyond the scope of the Judge's letter.
12            So we had to go back to Judge Chen in the
13    Northern District, and he had to confirm that this was,
14    in fact, allowed.
15            And then Natera told the judge in Denmark that
16    American counsel -- American counsel cannot ask
17    questions because, under Danish code, it has to be a
18    Danish attorney.
19            So they said, "Okay.  Fine."
20            And the next step was, "Well, because you're
21    using Danish attorneys, they haven't signed a protective
22    order."  So, "They can't ask me in the United States --
23    yeah, in the United States, so they can't ask any of the
24    relevant questions.  The people that we said had to ask
25    the questions can't ask the questions they need to ask."
```

Page 44

1          JENNIFER KELLER:  And they can't see any
2     documents.
3          CHASE SCOLNICK:  Oh, yeah.  So, of course, that
4     was rejected.
5          And then I flew out to Denmark.  And it was very
6     accommodating, really.  There was no space in
7     Copenhagen.  There was no space in Aarhus.  So I found
8     myself -- found myself in rural Denmark at a small port.
9          And -- And, again, wonderful people.  We took
10    over, basically, the whole courthouse.
11         But once we were there, Natera, of course,
12    was -- was saying that the European Union Conventions
13    prevented them from disclosing any of the important
14    material.
15         Of course, that was rejected.
16         So we end up with this transcript in -- in
17    Danish, because that's what they demanded, and then we
18    come back to the United States and tried to use this
19    wonderful testimony.
20         And they said, "Well, the translation's wrong,
21    Judge.  We can't use it."
22         And we said, "Okay.  Why is it wrong?"
23         "Well, we don't know why it's wrong.  We have no
24    example.  We have no alternative translation.  But it's
25    wrong.  And you can't use it."

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          So, of course, after all those steps, we finally

2     were able to present Dr. Claus Andersen's testimony.

3          And we asked him the same questions.  It wasn't

4     apples to oranges.

5          Apparently, they have a lack of citrus fruits --

6          (Laughter elicited.)

7          CHASE SCOLNICK:  -- in Denmark -- or

8     Scandinavia.  But it was "apples to pears" because

9     that's a thing there.

10          So he confirmed that it was, in fact, apples to

11     pears.  And this is from the horse's mouth.  Right.  You

12     have their own lead author of their study confirming

13     that it was apples to pears, or apples to oranges.

14          JENNIFER KELLER:  And that would be very unfair.

15          CHASE SCOLNICK:  Right.

16          But, by the way, that's not all he said.  When

17     we were there, he also told us that many of the claims

18     made in the Natera's study, those on the left side of

19     that advertisement, were -- well, how do I say it? --

20     they weren't entirely accurate.

21          Natera claimed that their study was blinded,

22     which is a big deal in this space, whether you know the

23     results of the study before you're conducting it,

24     whether you know who's going to recur or not recur

25     before you start writing the blood samples.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          And, of course, Natera represented that they did

2     not know.  That wasn't exactly true.

3          He also provided testimony that Natera's numbers

4     were based, in part, on running a test other than their

5     own, in certain forms.

6          JENNIFER KELLER:  Ouch.

7          (Laughter elicited.)

8          JENNIFER KELLER:  Back to Dr. Masukawa:

9          "QUESTION:  When communicating with the sales

10    force about this performance review, you indicated these

11    were apples-to-apples comparisons, didn't you?  Your on

12    the sales force, what were they told?"

13         "ANSWER:  Yes, in terms of the metrics we were

14    looking at."

15         "QUESTION:  So if the sales representatives went

16    around saying, 'Look, this is an apples-to-apples

17    comparison and Signatera outperforms Reveal,' that would

18    be wrong; right?"

19         "ANSWER:  That would be a mischaracterization."

20         This was their director of oncology marketing.

21         CHASE SCOLNICK:  So, as I'm sure you can

22    imagine, during closing argument, we had a huge fruit

23    basket on our table.

24         (Laughter elicited.)

25         CHASE SCOLNICK:  Apples, oranges, pears,

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    everything.

2              (Inaudible background sounds.)

3              CHASE SCOLNICK:  [Inaudible].

4              JENNIFER KELLER:  Yeah, the other thing that was

5    important to us was to establish a relationship with the

6    jury and credibility with the jury, because many times,

7    particularly if you're dealing with very dense silence,

8    the jurors really want to figure out who they can trust.

9              They may not understand all the science, but

10   they understand who you can trust.

11             Chase and I did almost all the questioning.  Our

12   opponents had, I think, eight different lawyers doing

13   the questioning.  But we felt we had a very good

14   relationship with the jurors.

15             And we also established credibility with our

16   witnesses.  We spent a lot of time with our witnesses.

17   So they trusted us.

18             Because that's a tough thing.  You know you're

19   going to get attacked.  You know people are going to

20   come after you the way they come after your company.

21   "Can you trust your attorneys to protect you?"

22             And we also made it very clear to our witnesses

23   that they were not to use canned answers, that they were

24   to answer questions honestly, in a straightforward way.

25   If they had made a mistake, they would own it, apologize

                                                  Page 48

1    for it and be honest about it.  And they did.

2         So the contrast between the Natera witnesses

3    with all their canned answers, that really sounded like

4    they were being read off an index card, and our

5    witnesses was quite, quite remarkable.  And the jurors

6    clearly bonded with our witnesses.

7         They also really liked Chase.

8         At the conclusion of the case, Chase had --

9    before the verdict, he had to be on vacation with his

10   family.  So I was there with our opposing counsel, and

11   we were talking to the foreperson and one of the other

12   jurors, and I couldn't help but noticing that they would

13   address our opposing counsel as "Mr." or "Ms. Whatever,"

14   and then turn to me and say, "Where's Chase?"

15        (Laughter elicited.)

16        JENNIFER KELLER:  "We'd really like to talk to

17   Chase, Jennifer."

18        (Laughter elicited.)

19        JENNIFER KELLER:  I'm not sure if our opposing

20   counsel even noticed it, but I -- I sure noticed it.  I

21   knew right then that we had established that

22   relationship.

23        CHASE SCOLNICK:  Chase was on the beach in

24   Israel with his best friend.

25        (Laughter elicited.)

1          CHASE SCOLNICK:  Celebrating the verdict.

2          Okay.  This is an example of the ethos and of

3     the testimony that we presented.

4          This is one of our first witnesses for Guardant,

5     and -- and she made it clear that there's a contrast

6     between the advertising strategy at Natera, which is to

7     attack and demean and belittle their competitors, and

8     Guardant, "We don't do that at Guardant.  We never

9     have."  Right.

10         So if there's a competitor that has a product

11    that has an advantage, then, look, everyone wins.

12    That's what we're looking for.  Right.  Because this is

13    about cancer.  And having more access, having more

14    accountability is good for every user.  And I think that

15    really resonated with the jury.

16         JENNIFER KELLER:  We know it resonated with the

17    jury because we saw the verdict form.

18         (Laughter elicited.)

19         CHASE SCOLNICK:  One more -- one more strategy

20    here, which is, I believe, is on the next page.

21         Yeah, "Persuasive Themes."

22         So we're gonna look at this one.

23         And, again, this is something that we use

24    throughout the trial that really we're speaking on

25    behalf of the 30 percent of the tens of thousands of

```
 1   people who couldn't use Signatera, the tens of thousands
 2   of people around the world --
 3            (Whereupon, the audio recording titled "New
 4            Recording 316" concluded at timestamp
 5            0:57:56, and audio recording titled "New
 6            Recording 317" started at timestamp
 7            0:00:00.)
 8            JENNIFER KELLER:  -- some serious misconduct
 9   that occurred in that case by opposing counsel, who made
10   a number of misrepresentations, both to us and to the
11   Court, about a test that they -- a test that they, more
12   or less, very late in the game, said was critical and
13   should be admitted even though the discovery had closed,
14   and it was a blockbuster, and they hadn't known about it
15   until then, and they had just found out about it.  And
16   their expert hadn't known either.  He had just found out
17   about it.
18            And I love their expert's name: Dr. Hochster.
19            (Laughter elicited.)
20            JENNIFER KELLER:  It turned out that not -- and
21   Dr. Hochster had -- he was keen that he had never had
22   any emails with the authors of this other study.  It was
23   called the Cobra Study.  "What Cobra Study?"  You know,
24   he had heard of it, but he didn't have any involvement
25   in it.  He had never had an email about it, not one, not
```

Page 51

1    ever.

2          And they had had him search his emails, not once
3    but twice, and there weren't any emails.  We didn't
4    believe it at all.  We thought he had been very
5    involved.

6          And, ultimately, Chase said, "Hey, I know.  We
7    made a motion to compel, and the magistrate judge, they
8    made the same representation to her, and she said, 'I
9    can't compel something that doesn't exist,'" Chase said,
10   "Hey, let's send discovery to Rutgers, who Hochster
11   worked for them, And we'll make it very limited.  We're
12   down to the wire here.  We don't have much time.  So
13   we'll make it very limited."

14         Boom.  Came back the initial transfer of
15   75 emails from Hochster, which we pointed out to the
16   Court, needless to say.

17         And the Court said, "What?  What's going on?"

18         And our opponents said, "Well, Dr. Hochster
19   couldn't have found those.  Rutgers was only able to
20   find these due to a server-level search that they did.
21   That poor Dr. Hochster just forgot that he was involved.
22   I mean, his search is fine [phonetic]."

23         So server-level access, I think, we said, "We
24   really need it.  Your Honor, we would like to have a
25   forensic exam of his laptop and his desktop."

Page 52

1          Of course:  "No.  That's outrageous."

2          Of course:  "Granted."

3          (Laughter elicited.)

4          JENNIFER KELLER:  So, the night before the

5    forensic examiner was supposed to do this work,

6    Dr. Hochster found out, lo and behold, gosh, he actually

7    did have all emails.

8          (Laughter elicited.)

9          JENNIFER KELLER:  And it turned out he didn't

10   need server-level access, and he denied having been

11   asked twice to run searches for them, but here they all

12   were.

13          Gosh.

14          And then the opposing counsel said, "Well, we

15   had no way of knowing about this.  We have no way of

16   knowing.  You know, that this is news to us."

17          We didn't believe that either.

18          They started asserting privilege over a whole

19   bunch of these.

20          We asked the magistrate judge to please review

21   several, in particular, in camera.

22          We saw there was an email from the author of the

23   study to Hochster, and it turned out the author of the

24   study was a subordinate of Hochster's.  That he had

25   twisted his arm to send him a summary of the study when

                                              Page 53

```
 1    it was embargoed and no one but the three examiners was

 2    supposed to have it.

 3         And we then saw that the very next day there was

 4    an email with an attachment that went to the very person

 5    of opposing counsel who said they had no clue.  Right.

 6         So we asked the magistrate judge to examine it.

 7         And they said, "This is an outrage.  No."

 8         "Granted."

 9         (Laughter elicited.)

10         JENNIFER KELLER:  And she came out afterwards

11    and -- and said, essentially -- I don't remember her

12    exact words but "It appears that this Court has been

13    lied to, and Judge Chen has been lied to.  And, of

14    course, this summary had been sent to opposing counsel

15    months earlier.  And -- By Hochster, who was trying to

16    manipulate his subordinate."

17         So don't take our word for any of the findings.

18    Take a look at what Judge Chen found.

19         Who, by the way, is one of the nicest and most

20    patient judges I've ever been in front of.  To the point

21    where sometimes I would just say, "Oh, don't be so

22    patient."

23         (Laughter elicited.)

24         JENNIFER KELLER:  But he was really pretty

25    horrified because I don't think he ever expected that of
```

Page 54

1    counsel of that caliber.

2        CHASE SCOLNICK:  And just some of the highlights

3    here.  Because there were many of these.

4        It says, "Quinn Emanuel's conduct, simply put,

5    was unjustified, unacceptable, and sanctionable."

6        Quinn Emanuel.

7        (Laughter elicited.)

8        CHASE SCOLNICK:  "Quinn Emanuel did not simply

9    fail to connect the dots thus were patently connected.

10   And Quinn Emanuel knowingly hid the connection from

11   Guardant and from this Court."

12       JENNIFER KELLER:  "While the Court labeled

13   Natera's counsel a fool for purportedly believing

14   Dr. Hochster's testimony, it turns out that counsel was

15   more than foolish."

16       "Quinn Emanuel deliberately and knowingly misled

17   this Court."

18       "Dr. Hochster and Quinn Emanuel on behalf of

19   Natera made misleading and false statements to

20   Judge Kim, Guardant, and the undersigned.  These false

21   and misleading statements that Dr. Hochster had no

22   documents, when they had full knowledge of truth to the

23   contrary, and those misleading statements of untruth

24   were used to gain a litigation advantage."

25       And the Court found that evidentiary sanctions

1   were warranted.  The study was excluded.  Hochster's

2   testimony about it was excluded.

3          Counsel then said that they still wanted to use

4   Dr. Hochster on related issues.

5          And I, drawing quickly on my criminal law

6   background, said, "Your Honor, in that case, we would

7   ask that the Court instruct the jury that Dr. Hochster

8   has lied deliberately to two federal judges in this very

9   case and that a witness willfully false in one area may

10  be disbelieved in every other area."

11         And he said, "Draft it, Ms. Keller."

12         I said, "Happily," and before I could even

13  finish my draft, he had been withdrawn as a witness.

14         (Laughter elicited.)

15         JENNIFER KELLER:  So the criminal law background

16  does come in handy.

17         (Laughter elicited.)

18         JENNIFER KELLER:  But -- but there are further

19  sanctions coming.

20         Judge Chen has made it clear he's going to award

21  attorney's fees for the months that we spent chasing

22  this -- this non-existent, fabulous, groundbreaking

23  study, which he also found was misrepresented

24  substantively.  It didn't say what they said it said.

25         And then he's going to have further sanctions --

Page 56

```
 1    according to his order, he's going to explore exactly
 2    who was responsible, and he's going to report that to
 3    the appropriate authorities.
 4           So, the truth will out, you know, eventually, if
 5    you're -- if you're dogged enough.
 6           But I'll tell you, the person who was dogged is
 7    sitting to my left.  It wasn't me.  It was Chase.  He
 8    wouldn't give up.  He kept saying, "I know this is
 9    false.  I'm going to find it out.  I'm going to prove
10    it."
11           And we said, "But you need to sleep."
12           (Laughter elicited.)
13           JENNIFER KELLER:  He said, "I only need two
14    hours a night."
15           I said, "You have to quit drinking Monster
16    Energy drinks."
17           (Laughter elicited.)
18           JENNIFER KELLER:  I didn't want him to have a
19    meltdown in the middle of trial.
20           No, he wouldn't give up.  He was like a dog
21    working a bone, and he unearthed all this.
22           And it was very disappointing to me in my --
23    what am I now? -- 47th year as an attorney.  Having
24    often, in the vast majority of my career, dealt with
25    very honorable opposing counsel.  And in criminal cases,
```

Page 57

1    you know, I would sometimes have a handshake agreement

2    with the prosecutor that, "Okay" -- I sat down in a

3    murder trial one time.  The DA and I went over

4    everything beforehand, And he said, "Yeah, you're right

5    about this, that should be excluded.  I won't put that

6    in."

7            And I said, "You're right about this question.

8    I don't want to ask that."

9            I think there were two objections in a whole

10   murder trial, which, I mean, he might have changed his

11   mind afterwards about our -- our motions practice, but I

12   was used to that level of civility.

13           And most of the civil litigators that we have

14   dealt with have also been honorable.  And this was just

15   really disappointing, very, very disappointing as an

16   officer of the Court.

17           And the disrespect shown to Judge Chen and

18   Judge Kim, in many ways, not just by this but, talking

19   over the Judge on the stand and rolling their eyes at

20   things that he said.

21           And I don't think that -- I don't think that

22   that's necessarily appreciated by the jury either.

23           But, any event, you know, the right thing

24   happened.  The company was a little bit surprised,

25   especially us versus a very large group of lawyers from

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    an international law firm that were pretty relentless.

2            And -- but the right thing happened.  And it's

3    what our system's all about.  The honorable company that

4    exists to cure cancer won.  That's it.

5            (Applause.)

6            JENNIFER KELLER:  And stay tuned.

7            (Laughter elicited.)

8            (Inaudible background sounds.)

9            (Whereupon, the audio recording titled "New

10           Recording 317" concluded at timestamp

11           0:10:06.)

12                        --- oOo ---

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1   STATE OF CALIFORNIA                              )
2   COUNTY OF LOS ANGELES                            )  SS.
3
4        I, Whitney Hester, CSR No. 14658, in
5   and for the State of California, do hereby certify:
6        That the foregoing is a true and accurate
7   transcription of the audio recording provided to me done
8   to the best of my ability;
9        That I am neither attorney or counsel for nor
10  related to any of the parties of said matter;
11       Furthermore, that I am not a relative or
12  employee of any attorney or counsel employed by the
13  parties hereto or financially interested in the action.
14       IN WITNESS WHEREOF, I have hereunder serve my
15  hand this 17th day of April, 2025.
16
17
18
19       _____
20       Whitney Hester, CSR No. 14658
21       for the State of California
22
23
24
25
```

Page 60

**[& - alternative]**

| & | | |
|---|---|---|
| **&**  5:7 | | |

**0**

**04062**  1:5
**0:00:00**  2:8
  51:7
**0:57:56**  1:15
  2:4 51:5

**1**

**1**  3:9
**100**  3:13 4:14
**100,000**  38:10
**126**  40:8
**14658**  1:25
  60:4,20
**150**  2:20
**16**  3:15
**17**  3:13
**17th**  60:15

**2**

**2**  20:24
**20**  40:18
**20,000**  38:13
**200**  42:5,7
**2018**  7:4
**2025**  60:15
**25**  38:9,23

**3**

**30**  7:21 8:5
  11:18 13:4
  17:21 21:2,9
  21:15 33:12,12
  50:25

**300**  30:8 42:4,6
**316**  1:14 2:3,7
  51:4
**317**  1:14 2:3
  51:6 59:10
**33542**  60:19
**3:21**  1:5

**4**

**40**  11:19
**47th**  57:23

**5**

**50**  4:4 11:19
**500**  4:15

**6**

**60**  13:4

**7**

**7330554**  1:24
**75**  52:15

**8**

**8.5**  41:6

**a**

**aarhus**  43:19
  45:7
**abbreviated**
  39:13
**ability**  60:8
**able**  7:6 17:22
  21:19,22 41:12
  46:2 52:19
**absolutely**
  28:10 32:8
**access**  25:14
  27:25 32:19

33:14 50:13
52:23 53:10
**accommodati...**
  45:6
**accomplish**
  12:11
**accomplished**
  4:3
**accomplishm...**
  16:7
**accountability**
  50:14
**accurate**  46:20
  60:6
**acknowledge**
  19:9
**act**  42:13
**action**  60:13
**actual**  41:9
**actually**  37:19
  42:8,18 43:17
  53:6
**ad**  13:19,21
  39:21 40:7
  41:25
**add**  31:18
**address**  40:15
  49:13
**addresses**  38:2
**admissions**
  27:11,17
**admitted**  51:13
**ado**  4:25
**advance**  35:8

**advanced**
  36:21
**advancing**  31:2
**advantage**
  17:25 25:1
  50:11 55:24
**advertisement**
  42:2 46:19
**advertisements**
  9:14 28:1 37:4
**advertiser**
  13:23
**advertising**
  10:8 13:20
  38:7 42:14,17
  50:6
**advisor**  4:18
**afford**  33:10
**aggressive**  24:7
**ago**  4:10
**agreement**  58:1
**air**  33:24
**alert**  10:12
**algorithms**
  37:20
**alienate**  11:16
**alienating**  11:9
  12:19
**allies**  37:13
**allow**  41:6
**allowed**  32:5
  41:17 44:14
**ally**  37:7
**alternative**
  45:24

**[america - background]**

america 4:16
american 44:16
  44:16
amount 28:22
  39:3 40:25
  41:2 42:12
amounts 6:12
analogies 41:21
analogy 42:10
analysis 9:15
anderle 4:12
  5:7
andersen 43:17
  43:18
andersen's
  46:2
angeles 60:2
anonymity
  29:19 30:21
anonymously
  28:24
answer 8:6
  26:21 27:3,8
  29:15,23 31:10
  36:1,4,7 43:11
  43:15 47:13,19
  48:24
answers 48:23
  49:3
anti 26:10,15
anybody 32:22
anyway 6:2
  20:19
anyways 5:21

aparna 28:7
  31:5,23
apart 9:4
apologize 35:8
  48:25
apology 35:16
apparently
  46:5
appears 54:12
applause 2:13
  3:22,24 5:2,8
  59:5
apples 42:14,17
  42:17 43:1,3
  43:10,10,14
  46:4,8,10,13,13
  47:11,11,16,16
  47:25
application
  16:12 35:20
appreciate 40:5
appreciated
  43:22 58:22
approach
  39:16
appropriate
  57:3
approve 35:20
  36:19
approximately
  4:10
april 60:15
architect 4:19
area 13:11 56:9
  56:10

areas 3:5
argument
  47:22
argumentative
  27:5
arguments
  36:20,21
arm 53:25
art 3:20
article 32:2
asked 30:22
  35:18 46:3
  53:11,20 54:6
asking 11:20
assemble 3:14
assembled 5:13
asserting 53:18
association 3:8
attachment
  54:4
attack 30:19
  50:7
attacked 29:3
  31:19 48:19
attacking 23:10
  32:4 38:13
attacks 36:24
  38:18,21
attorney 44:18
  57:23 60:9,12
attorney's 5:15
  56:21
attorneys 11:15
  39:1 44:21
  48:21

audience 14:1
audio 1:12,15
  2:1,4,6 51:3,5
  59:9 60:7
author 43:18
  46:12 53:22,23
authorities
  57:3
authorizing
  44:9
authors 51:22
avenue 44:6
awake 8:7
award 4:14
  56:20
awards 3:3,4
  4:13

**b**

b 42:2,4,4,7
bachelor's
  20:12
back 7:12 17:7
  17:10 19:20
  27:18 33:3
  34:2 44:12
  45:18 47:8
  52:14
background
  2:15 3:21 4:6
  4:24 5:5 7:3
  15:3,24 25:5
  28:4,21 38:15
  48:2 56:6,15
  59:8

Page 2

**[bad - carpet]**

**bad** 5:20 38:21
**balance** 15:7
**band** 3:9
**based** 37:23
  40:11,13 42:6
  42:7,12 47:4
**basically** 45:10
**basket** 47:23
**bay** 13:11
**beach** 49:23
**beautiful** 3:20
**becoming** 20:1
**began** 2:22 4:9
  12:12
**behalf** 50:25
  55:18
**behold** 53:6
**belief** 29:21
**believe** 50:20
  52:4 53:17
**believing** 55:13
**belittle** 50:7
**benefit** 11:16
  11:21
**benevolence**
  24:17
**best** 49:24 60:8
**better** 14:15
  32:14 39:24
  42:3,9,11
**beyond** 44:11
**big** 5:19 17:16
  19:14 20:6
  46:22

**biggest** 7:10
**billion** 16:5
  17:16,18
**biology** 20:13
**biopsies** 6:6
  28:9
**biopsy** 16:24
  18:5 23:3
**bit** 6:2 11:9
  27:18 58:24
**blinded** 46:21
**blockbuster**
  51:14
**blood** 7:17,22
  8:4,5 16:21,23
  17:1,22 18:4
  18:10,11 21:14
  23:2 28:9 41:1
  41:2,7,11,11
  42:12 46:25
**bloodstream**
  6:15
**blunt** 26:12
**body** 16:16,25
  17:2
**bomb** 37:3
**bombing** 28:1,2
**bonded** 49:6
**bone** 57:21
**boom** 52:14
**bothered** 31:10
**bottom** 14:23
  23:23 34:18
**boutique** 3:14

**bow** 32:1,2
**bragging** 5:22
**brains** 8:2
**break** 12:8 18:6
**breaking** 8:25
**bright** 10:7
  13:11,15
**brilliant** 9:19
  28:10,13
**brings** 18:2
  41:20 42:21
**broke** 9:12
**bros** 20:18,22
**brother** 4:1
  8:21
**brought** 7:1
  16:4 21:16
**bullied** 29:6
**bully** 30:7
**bunch** 20:17
  53:19
**business** 4:11
  20:18,22
**busy** 14:18

**c**

**caliber** 55:1
**california** 1:2
  3:7 4:15 9:19
  13:10 60:1,5
  60:21
**california's**
  3:13
**called** 6:5 7:6
  16:19 22:14
  32:24 38:11

51:23
**camera** 53:21
**campaign**
  22:25 26:10
  27:23 38:8,11
**cancer** 6:7,10
  6:13,13,20,21
  7:8,10 12:9
  15:25 16:12,14
  17:1,5,19,24
  18:17 19:18
  20:1,12 23:10
  23:11,17,22
  25:8,11 27:14
  28:1,9 30:10
  31:2 37:3,12
  50:13 59:4
**cancers** 31:17
**canned** 26:21
  27:3 48:23
  49:3
**car** 41:25 42:3
  42:4,4
**card** 49:4
**care** 17:11 23:8
  25:9 31:14
  32:12
**cared** 34:20
**career** 2:22
  29:25 32:10
  57:24
**careers** 12:13
**carpet** 28:1,2
  37:3

Page 3

**[cars - company]**

| | | | |
|---|---|---|---|
| **cars** 42:1 | **channeled** 33:3 | **chess** 40:18 | **code** 44:17 |
| **case** 1:5 2:25 | **chapman** 24:1 | **choice** 26:5,24 | **coke** 13:24 |
| 4:2,19 6:3 9:11 | 24:16 26:20 | **circulate** 16:21 | **cold** 21:11,17 |
| 9:20 10:1,4,7 | 34:11,21 35:14 | **circulating** | **collar** 3:5 |
| 10:16,17,20,21 | 37:6 | 6:13 16:20 | **collection** 3:20 |
| 10:25,25 11:7 | **chase** 3:25 4:3 | 41:12 | **colonoscopies** |
| 12:14 13:4,20 | 4:9,17 5:1,12 | **citrus** 46:5 | 6:22 |
| 24:4 25:18 | 8:1,17,18 9:3,8 | **civil** 3:1 5:19 | **colorectal** 6:20 |
| 33:4 41:24 | 10:15 12:12 | 58:13 | 7:8 17:5 23:16 |
| 42:14,19,23 | 13:6,19 15:11 | **civility** 58:12 | 30:10 |
| 43:2,23 49:8 | 15:19 20:22 | **claim** 20:23 | **combined** 1:13 |
| 51:9 56:6,9 | 21:22 22:9,11 | **claimed** 30:21 | 2:2 37:23 |
| **cases** 2:20 3:2 | 23:6 24:3,15 | 33:17 46:21 | **come** 2:11 6:11 |
| 3:17 4:11 | 25:6 27:20 | **claims** 33:3,4 | 7:5,12 17:9 |
| 57:25 | 28:5 30:19 | 46:17 | 26:11,14 30:16 |
| **cattle** 37:16 | 32:14,16,23 | **class** 13:15 | 33:16 45:18 |
| **celebrating** | 34:9,14 35:5 | **claus** 43:17,18 | 48:20,20 56:16 |
| 50:1 | 35:11 36:13,18 | 46:2 | **comer** 28:13 |
| **cell** 37:23 41:15 | 37:7 38:5 39:9 | **clay** 3:4 4:14 | **comes** 17:7 |
| **cells** 6:14 17:16 | 40:3 41:20,23 | **clear** 43:8 | **coming** 22:2 |
| 17:18 | 42:21 45:3 | 48:22 50:5 | 31:15 56:19 |
| **ceo** 22:1,12 | 46:7,15 47:21 | 56:20 | **comment** 34:1 |
| 23:15 24:1 | 47:25 48:3,11 | **clearly** 49:6 | **commercial** |
| 26:20 37:5 | 49:7,8,14,17,23 | **clinical** 23:1 | 3:10 |
| **certain** 20:14 | 49:23 50:1,19 | 24:22 28:17,18 | **common** 40:18 |
| 47:5 | 52:6,9 55:2,8 | 28:23 29:5 | **communicating** |
| **certify** 60:5 | 57:7 | 31:17,25 43:6 | 47:9 |
| **chair** 2:10,10 | **chasing** 56:21 | **cloak** 30:21 | **companies** 4:18 |
| **chambers** 3:9 | **chemo** 7:21 | **clock** 40:18 | 16:8 37:8 |
| 3:10 | **chemotherapy** | **closed** 51:13 | **company** 6:5 |
| **chances** 41:16 | 7:9 18:18,18 | **closer** 20:1 | 7:2,15,16 25:8 |
| **changed** 11:12 | **chen** 9:18 44:12 | **closing** 47:22 | 26:15 29:8,24 |
| 58:10 | 54:13,18 56:20 | **clue** 54:5 | 35:19 36:9 |
| **changing** 19:24 | 58:17 | **cobra** 51:23,23 | 48:20 58:24 |
| | | | 59:3 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[company's - csr]

**company's**
8:13
**comparative**
40:7 42:17
**comparison**
14:12 39:10,21
40:21 43:8,10
43:14 47:17
**comparisons**
14:6 42:14
47:11
**compel** 52:7,9
**compelling**
15:14,16 39:11
**competition**
25:9 26:14
**competitor**
14:8 18:2
50:10
**competitors**
23:22 50:7
**completely**
22:22 25:23
**complex** 9:11
9:13 12:3 13:7
14:5 39:10,20
40:17 42:23
**complicated**
9:15
**computer** 6:18
**concepts** 12:3,5
13:7 14:6 15:4
42:24
**concern** 25:2
34:16

**concerned**
30:22
**concerns** 22:18
33:25
**concluded** 30:3
31:24 51:4
59:10
**conclusion** 49:8
**conduct** 55:4
**conducting**
46:23
**confidence**
12:4 40:16
**confidential**
39:1
**confirm** 44:13
**confirmed**
46:10
**confirming**
46:12
**connect** 55:9
**connected** 55:9
**connection**
55:10
**conquer** 15:25
**consider** 36:24
**considered**
36:20
**consistent**
17:24
**context** 17:4
33:11 39:16
**contrary** 55:23
**contrast** 49:2
50:5

**contribute**
31:13
**conventions**
45:12
**copenhagen**
44:7 45:7
**corcoran** 18:23
20:9 28:7,11
28:15 29:7,11
30:2,5,14 32:4
32:5
**corporate**
26:18
**corporation**
1:4,7
**correct** 24:18
36:1,4
**counsel** 4:7
10:19 44:16,16
49:10,13,20
51:9 53:14
54:5,14 55:1
55:13,14 56:3
57:25 60:9,12
**counsels** 4:18
**country** 13:22
21:8 33:9
**county** 5:16,16
60:2
**course** 8:9
10:14 22:13
33:21,24 36:2
36:8 37:13
42:11 45:3,11
45:15 46:1

47:1 53:1,2
54:14
**court** 1:1 4:5
24:16 51:11
52:16,17 54:12
55:11,12,17,25
56:7 58:16
**courthouse**
45:10
**cover** 25:10
**coverage** 33:5
33:14 35:2,20
36:6,19
**crazy** 3:17
**crc** 21:3,6,9
23:16
**created** 7:2
15:22
**credibility** 48:6
48:15
**crib** 8:13
**criminal** 2:25
2:25 5:14 56:5
56:15 57:25
**critical** 7:14
51:12
**cross** 24:23
26:19 35:8
**crossmatch**
7:23
**crush** 22:19
25:23
**csr** 1:25 60:4
60:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[ct - disease]**

**ct**  17:12,13,14
   17:15
**ctdna**  6:12
   16:20
**culture**  26:18
**cure**  59:4
**curing**  31:2
**current**  4:1
**cut**  26:1
**cv**  1:5

**d**

**da**  58:3
**da's**  5:16
**daily**  3:12 4:14
**dangerous**
   10:12 24:11
**danish**  44:7,8
   44:17,18,21
   45:17
**das**  12:14
**data**  6:22,22,24
   6:25 15:25
   37:24
**day**  8:5 54:3
   60:15
**days**  7:21 8:6
   17:21
**dead**  8:24
**deal**  9:14 19:14
   26:17 46:22
**dealing**  48:7
**dealt**  57:24
   58:14
**decade**  2:24
   4:10

**decency**  30:16
**decided**  8:12
   28:19
**decision**  26:3
**declined**  29:5
**decode**  18:8
**decoding**  16:3
   16:4
**defeating**  23:10
**defendant**  1:8
**defended**  4:22
**defender**  2:23
   4:9 5:16,16
**defenders**
   12:13
**defense**  2:25
   3:1 10:10
**delaware**  1:4,6
**delay**  19:16,23
**deliberately**
   5:13 55:16
   56:8
**demand**  14:22
**demanded**
   45:17
**demands**  31:16
   31:17
**demean**  50:7
**demoralizing**
   31:14
**denied**  53:10
**denmark**  43:20
   44:15 45:5,8
   46:7

**dense**  11:1 48:7
**deny**  27:25
   32:19 33:5,13
**denying**  35:2
**depends**  17:7
**depose**  44:1
**deposed**  43:25
**deposition**
   29:11 30:2
   31:5,23 44:9
**deprive**  36:9
**deputy**  2:22 4:9
   12:13,14
**derail**  22:22
   25:23
**designed**  22:15
**desktop**  52:25
**desperate**
   19:18 33:8
**destitute**  33:9
**destroy**  8:13
   23:4,5 32:10
**details**  18:13
**detect**  7:6
**detectable**
   17:15
**detecting**  12:9
**detection**  6:7
   25:12 28:9
**detects**  16:23
**determine**  6:10
   17:1
**determined**
   21:18

**devastating**
   32:7
**developed**  8:12
   16:22
**development**
   22:13 43:6
**diagnostic**
   24:22 33:1
**die**  6:14 16:18
**difference**
   40:19 41:10,10
**different**  3:5
   14:13 33:22
   35:11 38:12
   41:1 42:1
   48:12
**difficult**  39:17
   40:17
**dinner**  2:10
**directed**  29:17
**directly**  30:20
**director**  47:20
**disappointing**
   57:22 58:15,15
**disbelieved**
   56:10
**disclosing**
   45:13
**discovery**
   51:13 52:10
**discussing**
   19:15
**disease**  7:7,14
   7:25 16:14
   17:4

Page 6

**[dismissed - evening]**

dismissed
  10:21
disrespect
  58:17
distinct 2:16
district 1:1,2
  4:23 13:10
  44:13
dna 6:13 16:20
  41:13
doctor 18:24,25
  31:1
doctors 7:19
  15:23 28:1,8
  28:25 32:10,18
  37:3 38:13
  41:9 43:10
documents
  45:2 55:22
dog 57:20
dogged 57:5,6
doing 7:16
  28:24 29:1
  31:11,12 33:18
  36:19 38:3
  44:4 48:12
dollar 16:5
dollars 16:6
  33:20 38:10
dots 55:9
dozens 25:17
dr 18:23 20:9
  26:7 27:11
  28:7,7,11,13,15
  29:7,15 30:5,5

30:6,14,20,25
31:2 35:18
38:24 43:17,18
46:2 47:8
51:18,21 52:18
52:21 53:6
55:14,18,21
56:4,7
draft 56:11,13
dragging 31:20
drawing 56:5
drinking 57:15
drinks 57:16
drip 38:11
drove 12:2
drs 32:4,5
due 52:20
dumb 11:24
dying 16:17

**e**

earlier 35:13
  37:5 54:15
early 8:9 17:6
  43:2
earth 44:3
easily 12:4
  13:25
easy 13:25
economics
  13:13
edited 30:23,23
editor 31:9
  32:3
educate 24:12
  26:24 39:7

educated 13:16
efficient 42:8
egregious
  33:15
eight 8:1 48:12
either 51:16
  53:17 58:22
electrical 6:17
elevator 13:2,4
elicited 5:10,23
  9:2,7 12:18
  15:10,18 20:21
  22:8,10 24:2
  24:14 27:1,7
  32:15 34:13
  35:10,22 36:15
  42:20 46:6
  47:7,24 49:15
  49:18,25 50:18
  51:19 53:3,8
  54:9,23 55:7
  56:14,17 57:12
  57:17 59:7
eliminated 12:1
eltoukhy 38:24
email 19:9
  22:11 24:19,21
  34:10 51:25
  53:22 54:4
emails 21:23,24
  24:4,24 25:17
  33:22 37:15
  38:10 39:14
  51:22 52:2,3
  52:15 53:7

emanuel 55:6,8
  55:10,16,18
emanuel's 55:4
embargoed
  54:1
emc 1:5
employed
  60:12
employee 60:12
ended 35:9
energy 57:16
engineering
  6:18 16:1
engineers 6:17
  15:24
enjoy 5:3
entering 23:19
  25:13
entire 20:10
  24:6 29:25
entirely 31:14
  31:21 46:20
epicenter 27:13
especially
  58:25
essentially
  54:11
establish 48:5
established
  48:15 49:21
ethos 50:2
european 45:12
evening 2:14
  5:4 15:7

[event - foreperson]

| | | | |
|---|---|---|---|
| **event** 58:23 | **experience** 5:14 | **fantastic** 7:2 | **finish** 56:13 |
| **eventually** 57:4 | 5:19 11:5 | **far** 17:20 39:17 | **firm** 3:14 5:6 |
| **everybody** 19:7 | **expert** 10:7,8 | 39:23 | 5:13 10:6,17 |
| 22:3 34:1 | 20:10 51:16 | **farthest** 40:23 | 59:1 |
| **evidence** 34:19 | **expert's** 51:18 | **fast** 7:4 | **firms** 5:19 |
| 35:1 | **experts** 36:24 | **favorite** 43:16 | **first** 2:18 3:22 |
| **evidentiary** | **explain** 12:7 | **fear** 7:10 | 15:14 18:15 |
| 55:25 | 13:3 14:25 | **fears** 22:18 | 28:5 30:5 |
| **exact** 54:12 | 18:21 40:17 | **federal** 4:5,9 | 38:25 39:9 |
| **exactly** 12:7 | **explained** | 5:15 56:8 | 50:4 |
| 47:2 57:1 | 24:17 | **feel** 31:7,17 | **five** 8:6 |
| **exam** 52:25 | **explains** 19:2 | **feels** 31:14 | **flew** 45:5 |
| **examine** 24:23 | **explanation** | **fees** 56:21 | **florida** 34:22 |
| 26:20 54:6 | 33:17 | **felt** 30:15 31:21 | **focused** 23:9,12 |
| **examiner** 53:5 | **explore** 57:1 | 48:13 | 23:13,16 24:25 |
| **examiners** 54:1 | **extent** 32:3 | **fence** 37:17 | 31:1 |
| **example** 10:2 | **extreme** 44:5 | **field** 31:13 | **folks** 15:17 |
| 11:11 12:10 | **eyes** 39:1 58:19 | **fighting** 25:8 | 16:22 21:11 |
| 16:13 17:5 | **f** | **figure** 7:24 | 33:7,9,14 |
| 23:7 24:24 | | 13:7 34:5 48:8 | **follows** 29:12 |
| 25:25 41:24 | **fabulous** 56:22 | **figured** 6:18 | 31:6 |
| 43:1 45:24 | **fact** 8:11 25:10 | **file** 1:13 2:2 | **fool** 55:13 |
| 50:2 | 38:18 41:2 | **finally** 27:3 | **foolish** 55:15 |
| **examples** 32:20 | 44:14 46:10 | 44:6 46:1 | **footnotes** 14:23 |
| **excluded** 56:1,2 | **faculty** 30:15 | **financially** | 39:25 |
| 58:5 | **fail** 55:9 | 60:13 | **force** 47:10,12 |
| **executives** | **fairly** 13:17 | **find** 17:5 19:19 | **forefront** 6:6 |
| 20:13 | **false** 10:8 13:20 | 41:12 52:20 | 28:9 |
| **exhibit** 40:8 | 28:1 33:3,4 | 57:9 | **foregoing** 60:6 |
| **exist** 52:9 | 36:24 37:3 | **finding** 28:16 | **foreign** 14:3 |
| **existent** 56:22 | 42:13 55:19,20 | 41:16 | **forensic** 52:25 |
| **existential** 8:15 | 56:9 57:9 | **findings** 27:23 | 53:5 |
| **exists** 59:4 | **fame** 3:8 | 54:17 | **foreperson** |
| **expected** 54:25 | **familiar** 17:12 | **fine** 2:19 44:19 | 13:12 49:11 |
| | **family** 49:10 | 52:22 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[forgot - handshake]**

| | g |
|---|---|

**forgot** 52:21
**form** 50:17
**forms** 47:5
**fortunate** 24:22
**forward** 7:4
**found** 9:5
38:25 45:7,8
51:15,16 52:19
53:6 54:18
55:25 56:23
**founders** 6:16
38:24
**four** 8:25 19:16
**francisco** 13:11
**free** 26:17
**frequently** 9:6
**friend** 49:24
**front** 11:5,21
44:7 54:20
**frontline** 37:14
**frontlines** 37:9
**fruit** 47:22
**fruits** 46:5
**fuel** 42:8
**full** 16:25 42:6
55:22
**fun** 24:16 26:19
27:10 35:7
**fund** 30:11
**fundamental**
12:5 40:19
**further** 4:25
56:18,25
**furthermore**
60:11

**g**

**gain** 55:24
**game** 51:12
**gas** 42:6,8
**gathering** 41:9
**gears** 3:1
**gee** 20:16
**general** 4:18
10:19
**generation** 4:4
**genome** 16:2,3
16:5
**gentlemen**
12:15
**getting** 21:21
**gh** 25:3 26:1
**gi** 31:17
**gift** 34:11
**give** 3:22 27:4
32:2,20 43:21
57:8,20
**gives** 17:24
**glad** 29:16
**global** 3:10
**go** 14:20 15:12
22:23 23:6
25:24 32:9,11
35:15 37:10
44:12
**goal** 26:4
**goes** 25:16
**going** 4:20 7:12
9:24,24 11:16
11:24 13:4
14:25 15:12

17:9 18:21
20:6 23:3,4
28:17 36:5
46:24 48:19,19
52:17 56:20,25
57:1,2,9,9
**gonna** 15:6
42:16 50:22
**good** 2:14 5:3
12:9,16 35:18
36:8 37:1,22
44:2 48:13
50:14
**gorilla** 30:8
**gosh** 53:6,13
**grab** 23:17
**graduate** 13:12
**grant** 32:11
**granted** 53:2
54:8
**grants** 30:11
**graphic** 18:21
39:18
**grasp** 13:25
**great** 13:10
18:12
**greater** 17:9
41:16
**greed** 34:18
**greek** 9:24 14:2
**ground** 8:14
**groundbreaki...**
56:22
**group** 18:20
58:25

**grow** 16:16,17
**growing** 16:17
20:1
**growth** 22:19
25:23
**grudge** 9:9
**guardant** 1:3
4:19 6:5,5,10
6:16 8:11
15:20,22 16:11
16:22 17:21
21:12 22:2
23:12,14,17
25:3 26:10,12
26:15 34:5
37:13 40:10
50:4,8,8 55:11
55:20
**guardant's** 8:4
14:10 21:13
27:25 32:19
35:20 40:13
**guess** 27:16
**guests** 2:17
**guided** 3:8

**h**

**half** 42:7
**hall** 3:8
**hand** 5:17
21:12 60:15
**handed** 30:13
**handling** 10:6
**handshake**
58:1

Page 9

**[handy - intellectual]**

| | | | |
|---|---|---|---|
| **handy** 56:16 | **hey** 41:14 52:6 | **horse's** 46:11 | 18:3,5 22:6,7,9 |
| **happened** | 52:10 | **host** 2:9,14,16 | 25:5 26:25 |
| 58:24 59:2 | **hid** 55:10 | 3:22,25 4:7,25 | 28:2,3,4,5,18 |
| **happening** | **high** 8:24,25 | 5:3 | 28:19,20,21 |
| 19:25 34:5 | 22:21 | **hour** 40:18 | 35:9 38:14,15 |
| **happily** 56:12 | **highlights** 55:2 | **hours** 57:14 | 39:2 40:2,21 |
| **hard** 3:14 | **highly** 13:16 | **house** 41:15 | 48:2,3 59:8 |
| 37:18 | 14:5,25 | **huge** 6:22 16:6 | **incidentally** |
| **harvard** 18:25 | **hired** 37:21,22 | 19:23 28:22 | 22:24 |
| 18:25 28:12 | **hit** 37:17 | 41:10 47:22 | **included** 27:23 |
| **hazard** 12:3,6 | **hochster** 51:18 | **human** 16:2,3,5 | **including** 4:13 |
| 40:15 | 51:21 52:10,15 | **hundreds** 21:7 | 21:19,25 |
| **head** 11:10 | 52:18,21 53:6 | **i** | **inconsistent** |
| 27:12 | 53:23 54:15 | | 24:20 |
| **health** 1:3 6:5,5 | 55:18,21 56:4 | **ideas** 26:12,15 | **incredible** 7:5 |
| 6:10,16 15:21 | 56:7 | 27:21 | **index** 49:4 |
| 15:22 16:11 | **hochster's** | **imagine** 23:20 | **indicated** 47:10 |
| 23:8,24 24:12 | 53:24 55:14 | 24:5 38:21 | **individuals** |
| 25:4 34:15 | 56:1 | 47:22 | 4:22 |
| **hear** 4:20 12:14 | **holding** 9:8 | **immediately** | **inferior** 34:17 |
| **heard** 12:13 | **home** 37:24 | 11:7,14 12:1 | **infinitesimally** |
| 29:8 42:25 | 38:1 | 13:18 24:12 | 6:12 |
| 51:24 | **homework** 38:3 | **impact** 30:25 | **information** |
| **heathy** 6:14 | **honest** 49:1 | **impeachment** | 37:23 38:6 |
| **heaven** 44:3 | **honestly** 48:24 | 24:16 | **initial** 52:14 |
| **heavy** 30:13 | **honor** 8:20 | **important** 17:3 | **innovative** |
| **help** 16:10 | 15:20 52:24 | 36:22 43:21 | 26:12 27:21 |
| 49:12 | 56:6 | 45:13 48:5 | **inoperable** |
| **helpful** 39:14 | **honorable** | **inappropriate** | 17:20 20:2 |
| **hereto** 60:13 | 57:25 58:14 | 29:16,22,24 | **inside** 26:18,18 |
| **hereunder** | 59:3 | **inaudible** 2:12 | **instruct** 56:7 |
| 60:14 | **hope** 25:11 | 2:15,17,17,19 | **insurance** 36:6 |
| **hester** 1:25 | **hopefully** 9:8 | 2:24 3:20,21 | **intellectual** 3:5 |
| 60:4,20 | **horrified** 54:25 | 4:6,24 5:5,9 | 4:11 |
| | | 7:3 9:9 15:13 | |
| | | 15:13,17 18:1 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[intend - know]**

| | | | |
|---|---|---|---|
| **intend** 5:24 | 20:4 21:18 | **judgment** | 27:2,8 28:2,8 |
| **intensity** 23:18 | 22:24 24:10 | 10:21,22 | 28:22 30:4 |
| **interested** | 26:19 27:2,8 | **junior** 30:15 | 31:25 32:21 |
| 60:13 | 28:2,8,22 30:4 | **juror** 14:4 | 33:23 35:4,7 |
| **internal** 21:24 | 31:25 32:21 | **juror's** 11:10 | 35:16,23 36:16 |
| 22:18 33:22 | 33:23 35:4,7 | **jurors** 13:15 | 37:2,16 38:9 |
| **internally** | 35:16,23 36:16 | 20:20 34:7 | 38:16 41:5,22 |
| 37:15 | 37:2,16 38:9 | 36:11 48:8,14 | 42:13 45:1 |
| **international** | 38:16 41:5,22 | 49:5,12 | 46:14 47:6,8 |
| 10:6 59:1 | 42:13 45:1 | **jury** 2:21,23 | 48:4 49:16,19 |
| **intervals** 12:4 | 46:14 47:6,8 | 3:4,18 4:4 9:25 | 50:16 51:8,20 |
| 38:12 40:16 | 48:4 49:16,17 | 11:3,5,9,16,17 | 53:4,9 54:10 |
| **intimidate** | 49:19 50:16 | 11:20,21,22,23 | 54:24 55:12 |
| 32:17 | 51:8,20 53:4,9 | 12:15 13:9,10 | 56:11,15,18 |
| **intro** 9:12 | 54:10,24 55:12 | 13:11 15:1,2 | 57:13,18 59:6 |
| **introduce** 2:10 | 56:15,18 57:13 | 19:6 23:21 | **kept** 57:8 |
| 5:1 | 57:18 59:6 | 29:13 36:21,25 | **kevin** 4:22 26:7 |
| **introductory** | **job** 1:24 5:12 | 38:4 39:13 | **key** 26:1 |
| 11:15 | **journal** 3:12 | 40:17 48:6,6 | **kids** 38:3 |
| **involved** 16:3 | 28:17,20,23 | 50:15,17 56:7 | **kill** 7:13 8:13 |
| 29:25 52:5,21 | 29:5,17 30:20 | 58:22 | 8:15 23:3 |
| **involvement** | 30:23 31:25 | **justice** 5:14 | 27:13 |
| 51:24 | **journal's** 4:14 | **justin** 2:9,11 | **kim** 55:20 |
| **ip** 37:23 38:2 | **journals** 32:17 | 43:7 | 58:18 |
| **israel** 49:24 | **judge** 9:18,19 | | **kind** 7:16 13:2 |
| **issues** 10:18 | 27:6 44:7,8,12 | **k** | 20:11 31:15 |
| 21:5 56:4 | 44:15 45:21 | | **kinds** 18:14 |
| | 52:7 53:20 | **kahn** 8:21 9:1,4 | **knew** 34:7 |
| **j** | 54:6,13,18 | 9:4 | 49:21 |
| | 55:20 56:20 | **keen** 51:21 | **know** 8:8 12:20 |
| **jennifer** 2:19 | 58:17,18,19 | **keep** 5:20 | 12:21 14:20 |
| 2:19 3:3,12,23 | **judge's** 44:11 | **keller** 2:19 4:12 | 20:17 24:19 |
| 3:25 4:21 5:6,9 | **judges** 54:20 | 5:6,6,9,11,24 | 26:16 29:1,2 |
| 5:11,24 7:4 | 56:8 | 7:4 10:5 12:12 | 29:19 31:12,15 |
| 8:18 9:12 10:3 | | 12:19 20:4 | 34:3,6 36:16 |
| 10:5,16 12:12 | | 21:18 22:24 | |
| 12:19 15:19 | | 24:10 26:19 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[know - los]**

39:2,2 45:23
46:22,24 47:2
48:18,19 50:16
51:23 52:6
53:16 57:4,8
58:1,23
**knowing** 9:20
14:13,16 32:22
53:15,16
**knowingly**
55:10,16
**knowledge**
55:22
**known** 2:23 6:6
6:12 7:7 51:14
51:16

**l**

**lab** 7:23 28:11
30:12
**labeled** 55:12
**lack** 46:5
**ladies** 12:15
**laid** 39:10
**land** 23:17
**language** 14:3
23:20 42:18,22
43:3
**lanham** 42:13
**laptop** 52:25
**large** 10:6
18:20 58:25
**laser** 23:16
**late** 20:7 51:12
**latin** 9:24 14:3

**laughter** 5:10
5:23 9:2,7
12:18 15:10,18
20:21 22:8,10
24:2,14 27:1,7
32:15 34:13
35:10,22 36:15
42:20 46:6
47:7,24 49:15
49:18,25 50:18
51:19 53:3,8
54:9,23 55:7
56:14,17 57:12
57:17 59:7
**launch** 24:9
39:5
**law** 3:6,8 10:8
42:14,19 56:5
56:15 59:1
**lawdragon**
4:15
**lawyer** 2:20 3:8
**lawyers** 3:7,13
3:15 4:4,14,15
10:7 48:12
58:25
**lay** 39:15
**lead** 43:18
46:12
**leading** 4:15
18:24 36:23
**learn** 19:18
**learned** 6:25
22:2

**leave** 38:19
**leaving** 21:10
**left** 10:18 14:8
14:14 39:21,23
40:1,9,11,22
43:7 46:18
57:7
**legend** 3:9
**legitimate** 25:1
**lengths** 32:9
**letter** 31:8 32:3
44:9,11
**letters** 30:22
**letting** 31:20
**level** 52:20,23
53:10 58:12
**leverage** 38:6
**leveraged**
16:10
**levied** 36:25
**lied** 54:13,13
56:8
**life** 19:24 25:15
**lifesaving**
27:25 32:19
**light** 12:21
**liked** 49:7
**likelihood** 17:9
**likely** 41:12
**limited** 52:11
52:13
**line** 23:23
34:18
**liquid** 6:6 23:2

**list** 3:3 14:21
**litigated** 9:18
**litigation** 3:11
4:11 5:19
55:24
**litigators** 58:13
**little** 6:2 16:18
27:18 38:17
58:24
**lives** 23:11
37:10
**lo** 53:6
**location** 37:24
**logistical** 22:4
**logistically**
18:15 19:10
**london** 13:12
**long** 3:3 7:25
14:21
**look** 6:9 8:23
14:2,2,12,14,23
18:8,10 21:23
22:6,17 38:7
40:22 42:2
47:16 50:11,22
54:18
**looked** 10:19
11:7,18 14:16
14:17 40:18
**looking** 19:8
39:23 47:14
50:12
**looks** 39:23
**los** 60:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[lose - murder]

**lose**  13:5 18:16
  23:17 41:15
**lost**  19:12
**lot**  13:6 41:16
  48:16
**love**  51:18
**lunar**  22:14
  25:19
**lying**  8:7

**m**

**m.d.**  29:12 30:3
  31:6,24
**made**  4:10
  21:15 27:11,17
  29:10,18 30:1
  31:4,10,22
  33:4 40:20
  46:18 48:22,25
  50:5 51:9 52:7
  52:8 55:19
  56:20
**magistrate**
  52:7 53:20
  54:6
**major**  4:18
**majority**  57:24
**make**  24:18
  31:7 34:23
  37:2 42:25
  52:11,13
**making**  34:22
**man**  9:19 42:4
**management**
  21:25

**manipulate**
  54:16
**mark**  8:5
**markers**  17:23
  18:10
**market**  21:21
  25:13
**marketing**  26:8
  27:12 47:20
**massive**  34:22
  38:7,18
**masukawa**
  26:7 27:11
  35:18 47:8
**mat**  22:23
  25:24
**material**  10:2
  45:14
**matter**  26:21
  38:3 60:10
**matters**  3:1
**mba**  20:12
**mbas**  20:23
**mean**  11:14
  18:14 25:17
  52:22 58:10
**meaning**  26:2
**means**  6:8
**meant**  14:7
**measure**  6:11
**measurement**
  12:9
**measurements**
  6:19

**medical**  15:4
  15:24 18:25
  33:1 37:11
**medicare**  27:24
  32:18 33:2,8
  34:23,25 35:1
  35:2,14 36:6
  36:12,19
**meet**  25:22
**meltdown**
  57:19
**member**  3:7
  30:15
**mess**  25:23
**messed**  22:22
**metrics**  14:13
  47:13
**microscopic**
  16:18
**middle**  57:19
**mileage**  42:9
**miles**  42:4,5,6,7
**milliliters**  41:6
**million**  38:9,23
**millions**  21:8
**mind**  58:11
**minimal**  7:7,14
  7:24 17:4
**mischaracteri...**
  47:19
**misconduct**
  51:8
**misfortune**
  14:19

**misleading**
  14:25 42:15
  43:14 55:19,21
  55:23
**misled**  55:16
**misrepresent...**
  51:10
**misrepresented**
  56:23
**mistake**  48:25
**modern**  18:17
**moldx**  32:24
  35:19
**moments**  27:17
**monday**  26:23
**money**  30:12
  32:11 34:17
**monitoring**
  7:13
**monster**  57:15
**month**  18:9
  19:15
**months**  18:9
  19:11,16,16,16
  19:22,22,25
  54:15 56:21
**motion**  11:2
  52:7
**motions**  58:11
**mouth**  46:11
**move**  44:3
**multiple**  21:1
**municipal**  3:6
**murder**  58:3,10

Page 13

**[name - outline]**

**n**

name   5:6 9:4
    51:18
named   3:12
natera   1:6 4:19
    7:15,15 8:11
    19:5 20:23
    21:18,25 23:13
    24:6 26:18
    27:21 28:16
    32:7,23 34:19
    35:19 36:21
    37:5,14,22
    40:9 43:9 44:3
    44:8,10,15
    45:11 46:21
    47:1 49:2 50:6
    55:19
natera's   10:10
    14:9 19:4 21:3
    21:3,10 22:12
    32:3 33:13,17
    40:11,23 41:2
    43:19 46:18
    47:3 55:13
necessarily
    13:15 58:22
necessary   24:8
need   12:24
    16:24,24,25
    18:4,5 22:20
    22:23 23:15,18
    24:7,7 25:24
    26:11 27:14
    34:23 36:5

44:25 52:24
    53:10 57:11,13
needed   7:9
needless   24:15
    52:16
neither   60:9
never   29:8 50:8
    51:21,25
new   1:14,14 2:3
    2:3,6 4:23 51:3
    51:5 59:9
news   53:16
nice   37:25
nicest   54:19
night   8:7 19:21
    53:4 57:14
non   56:22
normally   13:23
north   2:20
northern   1:2
    9:18 13:10
    44:13
notable   4:22
notice   24:10
noticed   11:8
    49:20,20
noticing   49:12
number   15:5
    21:10 22:21
    25:22 39:25
    43:24 51:10
numbers   9:15
    14:14,15 40:1
    40:11,12,15
    42:11 47:3

**o**

objection   27:5
objections   58:9
observe   12:21
obviously   17:8
    24:19 39:4
occasion   12:20
occurred   51:9
odegaard   43:7
offensive   25:7
    33:7
office   3:19 5:15
    5:17,18 9:5
    14:20
officer   58:16
oh   12:16 23:2
    23:25 35:6
    40:5 45:3
    54:21
okay   9:10
    15:19 17:20
    22:11 35:7,16
    36:18 39:24
    40:3,4,4,21
    44:19 45:22
    50:2 58:2
onc   26:2
once   45:11 52:2
oncologist
    20:15,18 26:3
    26:5
oncologist's
    14:20
oncologists
    6:24 7:1 9:16

14:1,17,17
    15:23 18:24
    20:10 21:1
    24:12 26:25
    37:8,9,17 38:1
    38:11 41:14
oncology   27:12
    28:17,23 29:5
    32:1 47:20
ones   30:9
ooo   59:12
open   34:1
operation   8:2
opponents
    48:12 52:18
opposing   49:10
    49:13,19 51:9
    53:14 54:5,14
    57:25
option   35:24
oranges   42:14
    42:18,18 43:1
    43:3,14 46:4
    46:13 47:25
order   44:22
    57:1
organization
    32:24,25
ouch   47:6
outcome   35:19
    36:9
outfitted   38:17
outline   11:18
    15:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[outlines - president]

| | | | |
|---|---|---|---|
| **outlines** 11:8 | **pass** 26:1 | **person** 7:21 | **play** 28:6 |
| **outperforms** 47:17 | **patently** 55:9 | 30:17 54:4 57:6 | **played** 29:12 31:6 |
| **outrage** 54:7 | **patient** 7:10 19:18 31:13 | **persuade** 28:19 33:5 35:2 | **please** 53:20 |
| **outraged** 36:17 | 54:20,22 | **persuasive** 50:21 | **pleasure** 2:16 |
| **outrageous** 53:1 | **patients** 7:8 21:3,20 25:11 | **ph.d.** 29:12 30:3 | **pocket** 33:10 36:3 |
| **overruled** 27:6 | 25:14 26:2,4 27:14 31:16,19 | **phase** 21:23 | **point** 17:25 20:7 27:2 |
| **own** 4:13 12:14 28:11 46:12 | 35:24 36:3 41:9 | **phds** 6:17 | 29:18 34:24 35:14 36:22 |
| 47:5 48:25 | **pay** 33:10 36:3 | **phone** 37:23 41:15 | 37:1,2 54:20 |
| **p** | **pears** 46:8,11 46:13 47:25 | **phonetic** 24:8 52:22 | **pointed** 52:15 |
| **page** 50:20 | **pending** 43:23 | **phrase** 11:16 | **poor** 52:21 |
| **pandemic** 31:16 | **people** 5:13,18 8:25 13:3,11 | **phrases** 11:19 12:2,25 | **port** 45:8 |
| **panicked** 8:12 22:5 | 13:14 16:10 17:5,24 18:16 | **physically** 17:17 | **position** 28:15 |
| **papers** 9:22 | 18:20 19:5,12 20:5,8 21:8,16 | **physicians** 13:21 | **pound** 25:3,3 30:8 |
| **parikh** 28:7,13 29:15 30:5,6 | 33:6,12,12 36:9 37:10,11 | **pick** 9:1 10:22 14:3 | **pounding** 25:13 |
| 30:20,25 31:5 31:23 32:4,6 | 37:21,21,22 44:24 45:9 | **picking** 10:18 | **practice** 2:25 14:18 58:11 |
| **parikh's** 31:3 | 48:19 51:1,2 | **pickup** 42:1,2,7 | **practicing** 27:4 |
| **part** 16:2 27:22 35:17 39:15 | **people's** 23:11 | **piece** 6:9 18:7 | **precarious** 28:15 |
| 47:4 | **pepsi** 13:24 | **pieces** 16:19,19 16:23 | **premiere** 20:9 |
| **particular** 20:11 53:21 | **percent** 20:24 21:2,9,15 | **pitch** 13:2,4 | **present** 6:10 46:2 |
| **particularly** 29:7 33:15 | 33:12,12 50:25 | **pizza** 26:17 | **presentation** 21:24 |
| 36:16 48:7 | **perfect** 11:11 12:10 | **plaintiff** 1:5 | **presented** 50:3 |
| **parties** 60:10 60:13 | **performance** 27:24 47:10 | **plan** 23:4 34:24 34:25 35:1,14 | **president** 4:2 8:22 24:21 43:6 |
| **party** 18:7 26:16 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[presidents - recording]**

| | | | |
|---|---|---|---|
| presidents  22:1 | proceed  10:22 | 26:24 33:19 | quinn  55:4,6,8 |
| pressure  28:23 | product  14:9 | 34:15,15 37:23 | 55:10,16,18 |
| 32:17,18 | 14:10 22:13 | 39:7 | quit  57:15 |
| pressures  32:1 | 25:1,20 26:6 | publication | quite  49:5,5 |
| pressuring | 34:16 38:13,14 | 23:5 | **r** |
| 27:24 | 39:6,8 50:10 | publicly  19:6 | radiation  7:9 |
| pretty  3:16 9:5 | professional | publish  28:17 | 7:21 |
| 17:19 30:14 | 31:8 | 32:2,6 | raise  30:17 |
| 37:20,22 54:24 | professionals | published  23:1 | ranked  3:9 |
| 59:1 | 23:9 | publishing  32:3 | rather  40:14 |
| prevalent  6:21 | profit  23:23 | purportedly | ratio  12:7 |
| prevent  25:13 | profits  23:14 | 55:13 | 40:15 |
| 44:4 | profound  30:25 | purpose  5:21 | ratios  12:3 |
| prevented | program  5:3 | 10:25 | reaction  31:3 |
| 45:13 | 18:12 | put  10:13 11:9 | read  29:13 49:4 |
| preventing | progress  34:22 | 13:21 20:15,17 | reading  9:21 |
| 25:14 | project  16:2,5 | 23:4,18 28:22 | real  41:8 |
| principal's  9:5 | 22:15,15 27:22 | 33:11 55:4 | realized  16:11 |
| print  14:23 | prong  37:3 | 58:5 | really  5:11 7:14 |
| 38:19 | pronged  39:15 | **q** | 8:20 9:13 |
| prior  26:2 | property  3:6 | question  11:11 | 11:22 29:3,22 |
| prioritizes | 4:11 | 20:20 26:21 | 31:10 32:7,12 |
| 23:23 | prosecutor | 27:4 29:13,21 | 33:24 34:10,11 |
| priority  22:21 | 58:2 | 31:7,11 35:23 | 39:8 44:4 45:6 |
| 22:21 25:22 | protect  24:11 | 36:2,5,8 43:8 | 48:8 49:3,7,16 |
| private  2:24 | 33:19 48:21 | 43:13 47:9,15 | 50:15,24 52:24 |
| privilege  53:18 | protective | 58:7 | 54:24 58:15 |
| probably  15:2 | 44:21 | questioning | received  36:11 |
| 20:7 27:17 | prove  57:9 | 48:11,13 | 38:4 |
| 29:23 | provided  39:16 | questions  8:3 | recognition |
| problem  17:14 | 47:3 60:7 | 11:8 27:9 35:9 | 5:12 |
| 18:13 34:4 | public  2:22 4:9 | 44:17,24,25,25 | record  24:18 |
| problems  18:15 | 5:16,16 10:12 | 46:3 48:24 | recording  1:12 |
| 19:10 22:4 | 12:13 23:24 | quickly  16:17 | 1:14,14 2:1,3,3 |
| 30:17 | 24:12,18 25:2 | 56:5 | 2:6,7 51:3,4,5,6 |

**[recording - saying]**

59:9,10 60:7
**recovered** 21:9
**recur** 46:24,24
**recurred** 17:19
**recurrence** 7:7
**referred** 37:15
**referring** 35:13
**refuse** 32:1
**regardless**
　16:15 21:13
**regretted** 27:18
**rejected** 36:22
　36:25 45:4,15
**relatable** 42:22
　42:25
**related** 56:4
　60:10
**relationship**
　48:5,14 49:22
**relative** 60:11
**relentless** 59:1
**relevant** 44:24
**remarkable** 4:8
　49:5
**remember** 23:8
　37:5 39:20
　54:11
**removed** 17:6
**report** 57:2
**reporter's** 1:12
**represent** 6:4,4
　14:7
**representation**
　29:10 30:1
　31:4,22 52:8

**representations**
　39:19
**representatives**
　47:15
**represented**
　44:10 47:1
**representing**
　15:20
**reps** 38:17
**required** 7:18
**research** 31:2
**researcher**
　43:19
**researchers**
　27:23 29:3
**residual** 7:7,14
　7:24 17:4
**resonated**
　50:15,16
**respond** 31:8
**response** 29:14
　29:15 32:6
**responsible**
　57:2
**result** 19:12
**resulted** 27:22
**results** 19:17
　19:19 46:23
**retracted** 30:24
**reveal** 7:6
　14:11 25:20
　27:13 34:22
　36:19 39:22
　47:17

**reveal's** 27:24
**review** 47:10
　53:20
**rich** 42:23
**right** 8:8 9:21
　10:15 11:13,17
　11:24 12:17
　13:19 14:10,13
　14:15,21 15:1
　16:15 17:11,25
　21:13 22:16,20
　23:9 24:9 25:4
　27:13 32:6
　33:9 34:9 35:9
　35:9,20,25
　39:22,24 40:10
　40:12,12,23
　41:23,25 42:9
　42:22 43:12
　44:5 46:11,15
　47:18 49:21
　50:9,12 54:5
　58:4,7,23 59:2
**ring** 37:16
**ringers** 8:24
**roberts** 2:9
**rolling** 58:19
**room** 22:20
　25:19 30:8
**round** 3:22
**rules** 9:1
**run** 1:15 2:4
　28:20 53:11
**running** 47:4

**rural** 45:8
**rutgers** 52:10
　52:19
**ryan** 28:7
　29:11 30:2

**s**

**sabotage** 21:21
**sacrifice** 37:10
**safe** 24:19
　33:18
**safety** 25:2
**sales** 38:17
　47:9,12,15
**salt** 24:8
**sample** 7:20,22
　41:3
**samples** 29:2
　41:6,8 46:25
**san** 13:11
**sanctionable**
　55:5
**sanctions** 55:25
　56:19,25
**sanders** 2:9,9
**sat** 58:2
**saving** 23:11
　25:15
**saw** 8:15 10:20
　16:8 39:4
　50:17 53:22
　54:3
**saying** 11:22,23
　23:15 45:12
　47:16 57:8

Page 17

[says - smear]

| | | | |
|---|---|---|---|
| **says** 3:15 25:21 34:10 55:4 | 35:11 36:13,18 37:7 38:5 39:9 | **sending** 38:10 | **signatera** 14:8 19:17,23 26:2 |
| **scan** 16:25 17:15 20:7 | 40:3 41:20,23 42:21 45:3 | **senior** 21:25 30:17 | 26:5 35:23,25 39:22,23 41:5 |
| **scandinavia** 46:8 | 46:7,15 47:21 47:25 48:3 | **sent** 43:9 54:14 | 47:17 51:1 |
| **scans** 17:12,13 17:14 | 49:23 50:1,19 55:2,8 | **separate** 3:4 | **signatera's** 20:5 |
| **scary** 3:16 39:8 | **scope** 44:11 | **sequence** 18:6 18:19 | **signature** 60:19 |
| **scenes** 19:8 28:24 32:21 35:5 | **screens** 33:1 35:12 | **serious** 51:8 | **signed** 44:21 |
| **school** 8:24,25 13:13 19:1 37:11 | **se** 42:15 | **serve** 60:14 | **significant** 5:14 5:19 19:10 41:3 |
| **science** 6:18 9:13 10:9 48:9 | **search** 41:17,17 52:2,20,22 | **server** 52:20,23 53:10 | **silence** 48:7 |
| **sciences** 13:16 | **searches** 17:23 53:11 | **set** 6:22 22:14 | **simple** 8:4 16:25 17:22 18:4 21:14 |
| **scientific** 11:1 12:23 14:6 15:3 32:17 42:24 | **seated** 3:25 | **sets** 6:25 | **simplifying** 39:10 |
| **scientist** 31:1 | **seats** 2:18 | **several** 4:18 53:21 | **simply** 55:4,8 |
| **scientists** 6:25 15:22 30:22 | **second** 13:4 | **shady** 29:20,22 | **singer** 22:9 |
| **scolnick** 4:1 5:1 5:7 8:18 9:3,8 10:15 13:19 15:11,19 20:22 21:22 22:9,11 23:6 24:3,15 25:6 27:20 28:5 30:19 32:14,16,23 34:9,14 35:5 | **secretly** 35:4,4 | **shamelessly** 5:22 | **sir** 26:23 |
| | **secured** 44:1 | **shed** 6:14 16:18 | **sitting** 57:7 |
| | **see** 2:16 6:25 7:13 11:14,19 14:14 15:8,11 19:9 23:15 34:7 41:18 45:1 | **shocked** 29:7 | **six** 8:1 |
| | | **shortly** 43:24 | **sleep** 57:11 |
| | | **show** 18:21 21:24 | **slide** 9:17 |
| | | **showed** 26:13 32:7 34:19 35:1 | **slides** 43:16 |
| | **seemingly** 42:11 | **showing** 40:25 | **slowed** 34:6 |
| | **seen** 20:6 29:24 40:7 | **shown** 58:17 | **small** 6:12 18:19 45:8 |
| | | **sick** 31:16 | **smart** 11:23 15:2 |
| | **send** 7:20,22 8:5 18:7 38:12 52:10 53:25 | **side** 5:18 14:8 14:10 17:11 39:21,22,23,24 40:9,10,12,22 40:23 43:12 46:18 | **smarter** 3:15 12:24 |
| | | | **smear** 32:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[social - surprised]**

social  37:17
solar  26:9
  27:22
sole  5:21
somebody  34:2
sophisticated
  15:2 37:20
sorry  19:15
  30:23 35:12
  40:5,5
sort  31:11,19
sought  15:25
sounded  49:3
sounds  2:15
  3:21 4:6,24 5:5
  7:3 18:12
  19:14 25:5
  28:4,21 38:15
  48:2 59:8
southern  4:23
space  25:7 37:8
  41:4 45:6,7
  46:22
spacey  4:22
speak  12:24
speaker  15:14
  40:2
speakers  2:10
  2:11
speaking  50:24
specific  18:10
specifically
  10:24
spend  24:8
  37:6

spent  2:24 13:6
  38:9 39:3,5
  48:16 56:21
spread  17:20
spying  38:1
ss  60:2
stab  34:2
stage  8:9,10
  11:2 17:8,9
  18:15
stand  20:15,18
  29:21 38:24
  58:19
standard  17:11
stanford  6:17
  16:2
start  9:10 12:6
  23:3 46:25
started  2:7 6:20
  11:12 13:17
  16:10 22:25
  39:20 43:2
  51:6 53:18
starting  40:6
state  60:1,5,21
statement  9:17
statements
  36:24 55:19,21
  55:23
states  1:1 44:22
  44:23 45:18
statistical  15:4
statistics  9:14
stay  59:6

step  44:20
stepping  5:20
steps  46:1
steve  24:1 37:5
stewards  33:20
stop  42:3
stories  5:25
  15:15 39:11
  41:17
story  15:16
  33:22 39:12
  41:15,18
straight  3:13
straightforward
  48:24
strategies  15:6
  15:6
strategy  4:20
  24:7 39:9,18
  50:6,19
strong  27:24
struggled  9:22
  9:23,25
studies  40:20
study  23:1
  28:18 29:19,25
  32:4 40:12,13
  40:23,24 41:2
  41:5 43:19
  46:12,18,21,23
  51:22,23,23
  53:23,24,25
  56:1,23
studying  16:1

stuff  10:13
stunned  39:4
stupid  13:9
submit  12:16
subordinate
  53:24 54:16
substantively
  56:24
success  4:8
successfully
  4:21
suffer  21:9
suffering  37:12
sufficient  19:3
  21:4,14 35:24
summary  10:21
  10:22 53:25
  54:14
super  29:16,20
  29:22
superb  5:12
superior  10:11
supposed  23:9
  25:8 53:5 54:2
suppressing
  27:23
sure  24:18
  34:23 36:7
  47:21 49:19,20
surgery  7:8,11
  7:19 17:6,22
  18:17,19
surprised
  58:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[survival - tissue]**

survival  7:14
switched  3:1
system  5:15
system's  59:3

**t**

tab  9:1
table  47:23
tablets  38:17
  38:20
tackle  40:14
tactics  44:4
tainted  29:2
take  2:18 6:9
  7:20,22 8:5,17
  17:22 18:9
  22:6 27:14
  38:7 54:17,18
taken  41:8
takes  17:15
  19:11 37:6
talk  10:3 15:6
  20:19 27:20
  49:16
talking  9:11,13
  25:12 26:9
  49:11 58:18
talks  12:17,22
tank  42:6,7
target  13:25
  22:15
targeting  14:24
  25:20
tax  33:20
teachers  9:3

teaching  18:25
technical  39:17
technology
  16:9,13 20:11
tell  5:24 6:2
  8:24 9:3 13:3
  57:6
telling  11:20
  28:25 42:5
tens  21:7,16
  25:10 50:25
  51:1
tenure  28:14
tenured  28:11
terms  30:9
  37:20 47:13
terrible  28:25
  29:1
test  7:5,17 8:4,5
  8:5,12,13
  10:11 12:9
  16:22 17:1,23
  18:4,6,10,22
  19:4,7,10,13,19
  20:5,24 21:4
  21:13,14 22:3
  22:4,16 23:1
  24:11 25:10,12
  25:15 27:14,25
  30:10 32:19
  33:13,14,18,25
  34:16 35:3,25
  36:10 42:10,11
  47:4 51:11,11

testified  20:8
testify  21:2
testimony  28:6
  29:11 30:2
  31:5,23 43:4,5
  43:21 44:2
  45:19 46:2
  47:3 50:3
  55:14 56:2
testing  7:16
tests  7:17 21:19
  30:9 33:1 43:9
text  34:21
thank  8:18,19
  8:21 15:16
  40:3
thematically
  23:21
theme  40:18
themes  50:21
theory  24:6
thing  29:24
  34:8 46:9 48:4
  48:18 58:23
  59:2
things  12:2,15
  40:16 43:25
  58:20
think  8:23
  10:19 12:16
  13:23 19:17
  21:6,6 22:6
  24:4 25:6
  31:12 37:1
  40:4 43:13

48:12 50:14
  52:23 54:25
  58:9,21,21
thinking  13:24
  19:21,22
third  18:7
  21:20
thought  52:4
thousand  16:6
thousands  21:7
  21:7,16 25:11
  50:25 51:1
threat  8:16
threaten  32:11
three  3:4,4,5
  9:20 19:16,22
  19:25 27:22
  39:15 54:1
time  7:25 13:6
  14:22 17:18
  30:10 38:25
  41:8 48:16
  52:12 58:3
times  1:15 2:4
  11:19 19:2
  25:22 40:8
  48:6
timestamp  2:7
  51:4,6 59:10
tiny  14:23
  16:18,23
tissue  6:9,13,14
  7:18,20 19:3
  19:12 21:4,14
  35:25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[titled - unfair]**

**titled** 2:6 51:3,5
  59:9
**titles** 1:13 2:2
**today** 4:20
  39:12
**together** 23:4
**told** 19:5,6
  33:22 38:19
  39:12,13 44:8
  44:15 46:17
  47:12
**tonight** 8:19
**took** 7:25 8:1
  30:12 32:12
  45:9
**top** 3:13 4:14
  15:20 38:13
**topic** 41:21
  42:22
**tough** 48:18
**tracking** 37:21
  37:22
**transcribed**
  1:25
**transcript** 1:12
  45:16
**transcription**
  60:7
**transfer** 52:14
**transition** 4:10
**translate** 11:2
  13:7 15:1
**translated** 12:4
**translation**
  45:24

**translation's**
  45:20
**treat** 37:11
**treatable** 8:10
**treatment**
  18:17
**tremendous**
  17:25 21:10
**trial** 3:8 4:3,20
  10:23 11:15
  19:6 21:2
  24:23 27:19
  33:16,17 34:12
  40:8,18 43:24
  44:2 50:24
  57:19 58:3,10
**trials** 3:10 4:5
  41:1
**tried** 2:20 4:4
  27:18 30:6
  32:18 33:5
  44:3 45:18
**truck** 42:1,2,7
**true** 10:11,14
  19:7 20:25
  33:21 35:21
  47:2 60:6
**truly** 18:1
**trust** 48:8,10
  48:21
**trusted** 4:17
  48:17
**truth** 21:1
  55:22 57:4

**try** 2:18 3:1,17
  7:23,24 11:2
  24:18 28:19
  32:10,16 33:13
  35:2 40:14
**trying** 10:25
  13:6 29:18
  31:13,18 33:19
  34:2 54:15
**tumor** 6:9,13
  16:19,19,20,23
  17:14,19 18:5
  18:6,7,8,11,16
  18:19 19:3
  35:24 41:12
**tumors** 16:15
  16:16,16
**tuned** 59:6
**turn** 49:14
**turned** 51:20
  53:9,23
**turning** 10:25
  39:11
**turns** 55:14
**twice** 41:2
  42:12 52:3
  53:11
**twisted** 53:25
**two** 6:16 7:23
  9:20 15:22
  16:5 18:9
  19:15,22 25:21
  28:8 35:11
  40:20 41:1,15
  42:1 43:4,5,9

  56:8 57:13
  58:9
**typed** 7:20
**types** 12:1

**u**

**u.s.** 5:15
**uh** 23:2
**ultimately** 12:6
  36:18 52:6
**unable** 13:1
**unacceptable**
  55:5
**unauthorized**
  44:10
**under** 16:4
  29:19 30:21
  42:13 44:17
**undergoing**
  18:16
**undermine**
  29:18
**undersigned**
  55:20
**understand**
  9:16,22,23
  13:1,25 14:4,5
  15:3 39:17
  42:24 48:9,10
**understandable**
  12:5 13:8
**unearthed**
  57:21
**unfair** 40:20
  46:14

**[unfortunate - workplace]**

| | | | |
|---|---|---|---|
| **unfortunate** 24:4 | **v** | 23:23,23 25:19 26:9 | **wire** 52:12 |

unfortunate
   24:4
unfortunately
   12:25 17:7
unidentified
   15:14 40:2
union 45:12
unique 6:11
united 1:1
   44:22,23 45:18
university
   43:20
unjustified
   55:5
unsafe 34:17
untruth 55:23
updates 25:21
upset 30:14
upsetting 31:21
usa 3:9
use 18:22 19:3
   19:12 20:5,24
   21:3,12,19
   26:5 33:13
   45:18,21,25
   48:23 50:23
   51:1 56:3
used 15:5 19:7
   22:3 39:18
   41:24 43:9
   55:24 58:12
user 50:14
using 26:4 43:2
   44:21

**v**

vacation 49:9
value 28:18
   31:18
various 5:18
vast 57:24
vehicle 12:21
veil 29:19
verdict 2:21
   5:22 49:9 50:1
   50:17
verdicts 4:5
version 12:23
   39:13
versus 4:19
   13:24 58:25
vice 22:1 43:6
vp 26:7
vs 1:5

**w**

wait 14:21 20:6
waited 30:5
waiting 14:21
walk 27:18
want 9:10 10:3
   19:19 21:24
   33:24,25 37:2
   48:8 57:18
   58:8
wanted 25:3
   42:25 43:25
   56:3
war 5:24 22:20
   23:10,13,13,14
   23:14,18,22,22

23:23,23 25:19
   26:9
warfare 32:12
warm 3:22
warranted 56:1
watch 16:4
way 4:17 6:11
   6:18 9:5 33:4
   46:16 48:20,24
   53:15,15 54:19
ways 58:18
we've 35:11
   39:12 40:7
   42:1
weak 27:16
web 37:17
week 19:15
   25:22
weekly 25:22
weeks 8:1
   19:11
welfare 34:15
went 30:4,6,20
   32:24 47:15
   54:4 58:3
whereof 60:14
white 3:5
whitney 1:25
   60:4,20
willfully 56:9
willing 32:9
win 32:13
wind 8:11 23:2
wins 3:4 50:11

wire 52:12
withdrawn
   56:13
withdrew
   30:11
withhold 32:11
witness 11:21
   56:9,13 60:14
witnesses 33:17
   43:5 48:16,16
   48:22 49:2,5,6
   50:4
woman 28:14
won 3:3,4 4:13
   59:4
wonderful 2:17
   9:19 10:20
   11:4 16:12
   23:21 43:1
   45:9,19
wondering 4:2
   8:7
word 54:17
words 54:12
work 7:1 18:6
   27:19 29:1
   31:20 53:5
worked 3:14
   33:15 52:11
working 2:25
   13:15,17 16:9
   57:21
workplace
   37:24 38:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[world - young]**

| |
|---|
| **world**   18:24 |
| 20:10 21:9 |
| 51:2 |
| **world's**   36:23 |
| **worse**   37:19 |
| **writing**   46:25 |
| **wrong**   20:9 |
| 29:4 32:8 |
| 45:20,22,23,25 |
| 47:18 |
| **wrote**   15:9 |
| **y** |
| **yeah**   29:15 |
| 35:11 36:7 |
| 39:7 44:23 |
| 45:3 48:4 |
| 50:21 58:4 |
| **year**   38:10,23 |
| 57:23 |
| **years**   3:13 8:25 |
| 8:25 9:20 23:5 |
| 36:13 37:10 |
| 43:24 |
| **york**   4:23 |
| **young**   28:13 |
| 32:10 |

Page 23