

April 23, 2025

**VIA ECF**

The Honorable Edward M. Chen
U.S. District Court for the Northern District of California
San Francisco Courthouse
Courtroom 5, 17th Floor
450 Golden Gate Avenue
San Francisco, California 94102

Re:   *Guardant Health, Inc. v. Natera, Inc.*, **No. 3:21-cv-04062-EMC (N.D. Cal.)**

Judge Chen:

There are many problems with Quinn Emanuel's Friday letter to the Court regarding an April 10 CLE presentation given by Mr. Scolnick and me to the Los Angeles chapter of the Association of Business Trial Lawyers ("ABTL"). *See* Letter from Derek L. Shaffer re: ABTL presentation ("Quinn Emanuel Letter"), ECF No. 931. Given the letter's allegations of impropriety presented under the cover of purported concerns about civility, I write to address some of these problems and to provide an accurate account of the presentation (which had been scheduled to take place after the Court heard the pending sanctions motion, before that hearing was delayed).

1.   **The letter relies on indirect accounts to repeatedly mischaracterize the CLE presentation.**

The letter's problems start broadly: the letter is disturbingly comfortable chronicling firsthand an event its author admits he did not attend. The letter describes the event authoritatively, even though that description is based on (1) second-hand accounts (or third-hand or fourth-hand or nth-hand accounts—it's unclear what the letter's author means when he says reports of the evening "reached [him]"), (2) incomplete recordings made by Quinn Emanuel attorneys in the audience (there is no authorized recording of the presentation), and (3) an after-the-fact transcript pieced together from those recordings at counsel's direction. The imprimatur of a court reporter's transcript should fool no one—this letter's labeling of the CLE presentation as "mocking," "inflammatory," and "derisive," among other things, is based on a whole lot of hearsay. *See* Quinn Emanuel Letter at 1, 3.

As anyone who has played the game of telephone could predict, the letter's general problems continue into specifics: the letter repeatedly mischaracterizes what happened that evening. For example, it states Mr. Scolnick and I "took the opportunity to . . . cat-call from the podium to Quinn Emanuel attendees." *Id.* at 2. Of course, the letter cites no part of the transcript for this assertion. *See id.* Reviewing that transcript confirms the obvious—there was no catcalling (even setting aside the letter's unusual use of the term, which typically refers to

obscene sexual remarks made to women or the harassing of a speaker by the audience). *See generally id.* at 4 ("Presentation Tr."). No Quinn Emanuel attorney was mentioned by name during the presentation. *See id.* And the only time the firm's name was mentioned was when excerpts from a publicly filed court order that used the firm's name were briefly read near the end of the evening. Presentation Tr. 55:4–24 (reading from Order Granting in Part and Deferring in Part Guardant's Motion for Sanctions, ECF No. 730 (unsealed Jan. 7, 2025) ("Sanctions Order")). That's it.

The mischaracterization doesn't end there. The letter also claims that Mr. Scolnick and I "point[ed] out the supposed inadequacies of Guardant's co-counsel at A&O Shearman." *Id.* at 2. Again, the letter cites no part of the transcript for this assertion. *See id.* That may be because the transcript does not really support this characterization either. Instead, it shows that Mr. Scolnick (correctly) called our colleagues at A&O Shearman "very, very bright and expert in the -- in the law of false advertising and expert in the science," "wonderful through summary judgment," and, one more time, "wonderful," while (correctly) noting that Mr. Scolnick and I have more experience communicating with juries and that we used that experience to our mutual client's benefit. Presentation Tr. at 10:7–9, 10:19–21, 11:4–5, 11:7–12:2. If such treatment is demeaning, it's hard to imagine what a compliment sounds like.

These are just two examples. Given the assertions of impropriety in the letter and Quinn Emanuel's history of misrepresentations to the Court, one might expect greater respect for (or, at least, caution about) accuracy. It is disappointing to see a firm like Quinn Emanuel repeatedly come up short on this front.

**2.     The CLE presentation was confined to matters in the public record and focused on trial techniques.**

The truth of the matter is the presentation was essentially an abbreviated version of the opening argument I gave at trial, annotated with commentary about trial techniques such as the use of analogies, graphics, and relatable language. We told the same story we told in open court.

That story includes describing Natera's bullying of Dr. Parikh and Dr. Corcoran, an aspect of the presentation that the letter complains about. Quinn Emanuel Letter at 3; *compare* Presentation Tr. 30:4–18*, with, e.g.,* Trial Tr. vol. 2, at 203:9–10 (Guardant's opening statement, describing how "Drs. Parikh and Corcoran refused to give into [Natera's] bullying"). This description is based on the testimony of Dr. Parikh (who described Natera's conduct in the face of her efforts "to contribute to the field and to patient care" as "entirely demoralizing") and Dr. Corcoran (who described Natera's conduct as "super shady" and "probably the most inappropriate thing [he's] ever seen a company do to any study [he was] involved in in [his] entire career"). Parikh Trial Tr. 213:23–214:02; Corcoran Trial Tr. 222:24–223:09.

That story also includes Natera's spying on oncologists, another aspect of the presentation Quinn Emanuel doesn't like. Quinn Emanuel Letter at 3; *compare* Presentation Tr. 38:1–3*, with, e.g.,* Trial Tr. 207:9–13 (Guardant's opening statement, describing how "Natera had targeted hits on doctors."). Again, this description is based on the trial evidence. *See, e.g.*, Trial Ex. 109 (Natera internal email describing its use of algorithms that are "pretty

sophisticated" in tracking oncologists "based on cell phone/IP information combined with public data on location of their home and workplace").

And that story includes our use of the "apples-to-oranges" comparison, which the letter also complains about. Quinn Emanuel Letter at 3. We discussed this as part of a conversation about the usefulness of analogies and relatable language. *See* Presentation Tr. 41:20–42:22. Again, nothing was said that isn't already in the public record. *See, e.g.*, Redacted Order Granting in Part and Denying in Part Parties' Cross Motions for Summary Judgment, ECF No. 329-3, at 11 (finding Guardant's argument about apples-to-oranges comparisons "persuasive"); Order re: Second Revised Final Jury Instructions, ECF No. 814, at 35 (discussing apples-to-oranges comparisons).

Quinn Emanuel may not enjoy our retelling of this story, but it is inaccurate to state that our characterization of Natera's conduct "do[es] not match the evidence." Quinn Emanuel Letter at 3. After all, the jury agreed with our characterization of that evidence. *Cf. Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, No. 13-cv-1803, 2013 WL 6234587, at *3 n.3 (N.D. Cal. Dec. 2, 2013) (Chen, J., stating that "accusations of dishonesty on the part of opposing counsel should be reserved for those instances where the record clearly supports the charge, and not used as a mere rhetorical flourish").

3. **The last few minutes of the CLE presentation were devoted to civility and professionalism.**

For all its inaccuracies, there is one important thing the letter does get right, though. "[C]ivility, professional integrity, personal dignity, and respect for the legal system"—these are all vital to our profession and to practicing before this Court. *See* Quinn Emanuel Letter at 2 (quoting N.D. Cal. Guidelines for Pro. Conduct). In protection of those values, those who care about these things—including this Court—have called out lawyers who fail to satisfy their obligations. *See, e.g.*, *ESC-Toy Ltd. v. Sony Interactive Ent. LLC*, No. 21-cv-778, 2024 WL 1335079, at *11–13 (N.D. Cal. Mar. 27, 2024) (Chen, J., discussing attorneys' duty of candor to courts). Rather than talking about such values in the easy but unhelpful comfort of insipid platitudes, these discussions often center on the propriety (or lack thereof) of particular conduct—they usefully look at the moment the conduct rubber meets the principle road. *See, e.g.*, Hon. William Bedsworth, Hon. Andrew J. Guilford (ret.), and Hon. Deborah Servino, Civility Matters: A View from the Bench (Sept. 5, 2024) (CLE presentation by judicial officers discussing among other things counsel's misconduct in *Masimo Corp. v. The Vanderpool Law Firm, Inc.*, 101 Cal. App. 5th 902 (2024)). Specific examples are helpful (and interesting).

It is in that spirit that Mr. Scolnick and I spent a few minutes at the end of our hour-long CLE presentation on Quinn Emanuel's conduct. Our discussion briefly recapped the events leading to the Court's October 23, 2024 Sanctions Order. Presentation Tr. 51:8–54:18. It then included a few excerpts from that order. *Id.* at 55:2–24. Those excerpts—two slides out of a deck of over 50—are the only time Mr. Scolnick or I ever said "Quinn Emanuel" during the presentation. *See id.* We only did so in the context of reading excerpts of the Court's order. *See id.* As noted, we never mentioned a single Quinn Emanuel attorney by name. *See id.*

   I then spent a moment previewing what I understand to be the Court's plan for upcoming hearings—a preview that the letter presents as an inappropriate infringement on the Court's upcoming decision-making authority but what really was my reading of the Court's prior order. *See* Quinn Emanuel Letter at 2 (citing Presentation Tr. 56:18–57:3); *see also* Sanctions Order at 2 ("[T]he Court finds monetary sanctions are likely appropriate due to Natera's counsel's, Quinn Emanuel, deliberate misrepresentations to this Court and to Judge Kim."); *id.* at 18 (discussing the Court's intent to "address specific individual attorney responsibility within Quinn Emanuel for the misconduct" and to "refer the matter to appropriate authorities" "should the Court find ethical breaches by any attorney"). Guardant's position on what should happen is of course set out in its publicly available post-trial briefs. *See* Mem. in Support of an Award of Monetary Sanctions Related to Natera's Counsel's Misconduct Concerning COBRA, ECF No. 884-13; Reply Mem. in Support of an Award of Monetary Sanctions Related to Natera's Misconduct, ECF No. 916.

   After lauding Mr. Scolnick's doggedness in pursuing evidence of this misconduct, I then concluded by noting my own disappointment in seeing such conduct from opposing counsel, by telling a story about civility with counsel in other cases during my nearly 50 years as a lawyer, and by expressing my own concerns about the lack of civility expressed to not just us, but to the Court. Presentation Tr. 57:4–58:20.

   That was a short, but I hope valuable, parting thought at the end of an evening about trial techniques. In my view, this message was particularly important for the attorneys from big law firms who were in attendance. Those attorneys can be insulated from some of the pressures that can cause solo or small-firm practitioners to stray from ethical conduct, but they are exposed to other pressures they should be aware of—pressures that may have existed at Quinn Emanuel. I also believed it was important to emphasize the importance of showing respect to judicial officers, particularly in an era in which courts are increasingly under attack from the outside. In this way, I intended our presentation to serve the values of "civility, professional integrity, personal dignity, and respect for the legal system."

**4. The letter's professed concerns about civility are not born out by the facts.**

   Quinn Emanuel's letter professes to serve those same high-minded values, but its walk does not match its talk. The letter's positions are not credible for at least four reasons.

   First, the letter cites a single legal authority, ABA Model Rule of Professional Conduct 3.6, but relegates to a footnote the key subsection of that rule, which makes explicit the obvious—lawyers can share information contained in the public record. *See* Quinn Emanuel Letter at 3 n.2 (citing Model Rules of Pro. Conduct r. 3.6(b)(2) (Am. Bar Ass'n 2025)). While Quinn Emanuel may not have liked our presentation, everything the letter seems to complain about was previously presented in open court or on the public docket. The legal press has also extensively covered Quinn Emanuel's misconduct throughout this case. *See, e.g.*, Bonnie Eslinger, *'Low-Grade Lawyering': Quinn Emanuel Attys Draw Judge's Ire*, Law360 (July 27, 2024), https://www.law360.com/articles/1862818; Craig Anderson, *Lawyers say opponents are lying, judge calls one a fool in DNA test dispute*, Daily Journal (Oct. 2, 2024), https://dailyjournal.com/articles/381227; Craig Anderson, *Quinn Emanuel concedes expert's*

*errors, says punishment unwarranted*, Daily Journal (Oct. 10, 2024), https://www.dailyjournal.com/articles/381360; Wisdom Howell, *Quinn Emanuel client sanctioned over expert testimony*, Daily Journal (Oct. 16, 2024), https://www.dailyjournal.com/articles/381429; Bonnie Eslinger, *Judge 'Duped' By BigLaw Attys Urged To Preserve Sanctions*, Law360 (Oct. 31, 2024), https://www.law360.com/articles/2254576; Bonnie Eslinger, *'You Stepped Over The Line': Judge Rips Quinn Emanuel Atty*, Law360 (Nov. 18, 2024), https://www.law360.com/articles/2262207.

Second, the letter's dire warnings about the unduly prejudicial impact of this presentation are based on some imaginative (and insulting) speculation about courts' decision-making. The letter warns that the audience included "judges and lawyers—which could have included, for instance, future Ninth Circuit clerks" whose perceptions of any appeal might be colored by the presentation. *Id.* at 2. But there were no Ninth Circuit judges at the CLE presentation. There's no evidence that there were any Ninth Circuit clerks in the room, either. The letter's remaining supposition—that some lawyer in the room will go on to clerk at the Ninth Circuit, work in the chambers of a judge assigned to hear an appeal from this case, and then poison the mind of not only that judge but at least one other member of a three-judge panel to ignore the record and improperly rule against Natera, all based on a CLE presentation the law clerk heard several years ago that discussed items in the record—is incredible. Our judges and their clerks are better (much better) than the letter pretends.

Third, and relatedly, for all the letter's professed handwringing about "imperil[ing] public perception of these proceedings" through purportedly "inappropriate public commentary," Quinn Emanuel is doing a lot more to publicize the presentation than anyone else. Quinn Emanuel Letter at 1. If it were truly concerned about publicity, the firm could have, for example, tried calling to discuss its concerns, either before or after the presentation. That would reflect an attempt at civility. But by instead drafting its letter, commissioning a transcript, and filing both these documents on the public docket, Quinn Emanuel has taken an otherwise unrecorded presentation from an event attended by a small group of lawyers on a routine Thursday night in Los Angeles and published it for all the world. As much as I would like to think Mr. Scolnick and I are remarkable speakers, the truth is that if future Ninth Circuit judges and clerks have access to this presentation, it's certainly because of the letter Quinn Emanuel put on the docket and not because some future clerk happened to have attended and remembered a CLE event from several years past. Quinn Emanuel knows this, of course; it presumably just sees the calculus of raising this presentation to the Court as worth the inevitable added publicity.

Fourth, there remains the biggest issue of all: Quinn Emanuel's own misconduct in this case. If Quinn Emanuel were truly concerned about "civility, professional integrity, personal dignity, and respect for the legal system," it would own its misconduct in this case. But the letter does not acknowledge—let alone apologize for—that misconduct. Of course, it's not the first time Quinn Emanuel has refused to fully accept responsibility for its conduct in this case. But it is the first time its refusal has been paired with an attempt to champion the same values of civility, professional integrity, and respect for the legal system that the firm's conduct betrayed. That is particularly galling.

**5.     For all these reasons, the letter's call for less discussion of attorney misconduct should be ignored.**

Given all this, the letter's apparent request that the Court issue some sort of prior-restraint gag order barring counsel from speaking about this case is uncalled for. If Quinn Emanuel wants to protect its reputation, it can start by acknowledging and remedying its misconduct. Our profession needs more discussion—not less—of unethical, improper, uncivil, or otherwise inappropriate conduct. Such conversations, though at times uncomfortable (particularly for those who have committed the misconduct), allow attorneys to learn from others' mistakes, even if those committing the mistakes cannot seem to learn themselves.

We look forward to seeing Your Honor soon.

Respectfully submitted,

KELLER ANDERLE SCOLNICK LLP

Jennifer L. Keller

cc:     All counsel of record via ECF

Keller Anderle Scolnick LLP   |   18300 Von Karman Ave., Suite 930   |   Irvine, California 92612-1057
949.476.8700   |   Fax 949.476.0900   |   www.kelleranderle.com