United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GUARDANT HEALTH, INC.,

          Plaintiff,

    v.

NATERA, INC.,

          Defendant.

Case No. 21-cv-04062-EMC

**ORDER ON POST-TRIAL MOTIONS**

Docket Nos. 880, 881, 889, 890, 891

## I.      INTRODUCTION

Before the Court are the Parties' five post-trial Motions:

(1) Natera's Motion for JMOL and a New Trial (Dkt. 880);

(2) Natera's Motion for Judgment on Equitable Claims (Dkt. 881);

(3) Guardant's Motion for Judgment on Cal. Statutory Claims and Motion for Permanent

Injunction (Dkt. 889);

(4) Guardant's Motion for Equitable Monetary Remedies (Dkt. 890);

(5) Guardant's Motion for Attorneys' Fees and Costs (Dkt. 891).

## II.      BACKGROUND

On November 25, 2024, following a 3-week trial, 23 witnesses and nearly 200 exhibits, a

9-person-jury returned the following unanimous verdict (Dkt. No. 847):

Guardant's Claims

- Natera engaged in false advertising in violation of the Lanham Act

- Guardant proved by a preponderance of the evidence that Natera's false or

  misleading advertisement(s) actually deceive or have a tendency to deceive a

substantial segment of consumers.

- Natera's false advertising was willful.

- An award of $75 million would fairly and reasonably compensate Guardant for its damages, if any, that were proximately caused by the false advertising.

- [As an advisory verdict:] Natera should disgorge $42 million in profits in addition to damages awarded for its false advertising.

- $175 million would "reasonably punish Natera's misconduct and deter future misconduct in violation of California common law in the form of punitive damages."

Natera's Counterclaims

- Guardant has not engaged in false advertising in violation of the Lanham Act.

## III.     DISCUSSION

### A.     Natera's Motion for Judgment as a Matter of Law (Docket No. 880)

Judgment as a matter of law requires the moving party to show "that a reasonable jury would not have a legally sufficient evidentiary basis to find" for the other party. Fed. R. Civ. P. 50(a)(1). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008). "[T]he court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury's conclusion." *Id.* The Court must "view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*

Natera largely reraises legal arguments the Court has already—and in some instances, repeatedly—rejected. In particular, Natera argues that its false ads are non-actionable because they are opinion or puffery, were not made in commercial advertisements, and were not material to purchasing decisions. Natera also argues that the First Amendment shields it from liability.

1  Natera's Motion for Judgment as a Matter of Law is **DENIED**.

2

3       **1.    <u>Lanham Act Claim</u>**

4       To prove the elements of a Lanham Act claim: "(1) a false statement of fact by the

5  defendant in a commercial advertisement about its own or another's product; (2) the statement

6  actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the

7  deception is material, in that it is likely to influence the purchasing decision; (4) the defendant

8  caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to

9  be injured as a result of the false statement." *Southland Sod Farms v. Stover Seed Co*., 108 F.3d

10 1134, 1139 (9th Cir. 1997).

11

12       a.   <u>False Statements</u>

13       The jury found Natera's advertisements were false by necessary implication.  These

14 advertisements compared specific performance metrics of Signatera and Reveal (including

15 presurgical sensitivity, failure rate, serial longitudinal sensitivity, lead time, PPV, NPV, and

16 hazard ratio) from two separate studies.  *See* TX-126 (Comparison advertisement).

17

18   ## Signatera vs. Reveal performance comparison

19

| | Signatera | Reveal |
|---|---|---|
| Validation data published or presented (# patients analyzed) | > 2,000[1,2] | < 150[4,5] |
| Pre-surgical sensitivity in CRC | 89-94%[1,3] | 47%[4] |
| Failure rate in CRC – tissue and plasma combined | < 3%[3] | 12-14%[4] |
| Number of blood tubes required | 2 | 4 |
| Diagnostic lead time vs. radiographic recurrence in CRC (avg) | 8.7 months[1] | ~4 months[4] |
| Post-surgical NPV/PPV in CRC (30 days post-surgery) | 88% / 100%[**,1] | not reported[4] |
| Serial longitudinal NPV in CRC | 97%[1] | 82%[4] |
| Serial longitudinal Hazard Ratio in CRC | 43.5[1] | 11.4[4] |
| Serial longitudinal sensitivity in CRC | 88-94%[1,2] | 69%[4] |
| Quantitation of ctDNA burden for monitoring purposes | Tumor copies per mL | none |

*Calculated/derived from study data
**Three in ten post-surgical positive patients cleared ctDNA with adjuvant chemotherapy and did not relapse.
1  Reinert T, Henriksen TV, Christensen E, et al. Analysis of plasma cell-free DNA by ultradeep sequencing in patients with stages I to III colorectal cancer. JAMA Oncol. 2019;5(8):1124–1131.
2  Data presented at conferences or published 2017-2021. Data on file.
3  CIRCULATE data on file
4  Parikh AR, et al. Minimal Residual Disease Detection using a Plasma-Only Circulating Tumor DNA Assay in Colorectal Cancer Patients. Clin Cancer Res April 26, 2021
5  Vidal J, et al. Clinical impact of presurgery circulating tumor DNA after total neoadjuvant treatment in locally advanced rectal cancer. A biomarker study from the GEMCAD 1402 Trial. Clin Cancer Res. April 1, 2021
Not for reproduction or further distribution

 natera

United States District Court
Northern District of California

United States District Court
Northern District of California

Evidence presented at trial demonstrated that missing from the side-by-side advertisement was adequate context of the differences in the studies that could lead to further explanation why specific key metrics were not actually comparable on an apples-to-apples basis.  For example, Reveal's performance in the Parikh Study was based on input volumes of 4 mL or less, whereas Signatera's performance in the Reinert Study was based on input volumes of at least the optimal 8 mL.  TX-0001 at 7; TX-0004 at 2; 11/14/2024 Trial Tr. at 1238:18 – 1239:4 (D. Heitjan).  Evidence at trial demonstrated how low sample volumes negatively affect the performance and failure rate of these tests.  Trial Tr. 302:14-18 (J. Odegaard); Trial Tr. at 913:9-13 (K. Banks); 10/25/2024 C. Andersen Dep. at 95:6-20 (Day 2) ("[I]f you provide one with 4 milliliters and the other with 8, then you have made it more difficult for one than for the other . . . . [I]f you want to provide both tests with the same opportunity, then you should provide them with the equal amount of material."); 10/23/2024 C. Andersen Dep. 104:20-24 (Day 1) ("[I]t would be a bit like comparing apples and pears.").

Further evidence presented at trial suggests the comparisons in Natera's Performance Comparison Chart were statistically invalid and misleading.  For example, Guardant's expert, Prof. Heitjan, explained that Natera's comparison of lead times was biased in Signatera's favor given the different schedules of CAT scans in the Reinert Study versus the Parikh Study.  Ex. BB, 11/14/2024 Trial Tr. at 1245:15 – 1248:23.  Prof. Heitjan explained how Natera's comparisons of NPVs were biased in Signatera's favor given the lower prevalence in the population for the Reinert Study versus the Parikh Study.  *Id.* at 1249:20 – 1252:10 ("So we would expect a difference in NPV between those two studies, just because the prevalence is different has nothing to do with the properties of the test.").  Prof. Heitjan explained that Natera's comparison of hazard ratios ignored the critical confidence interval, which shows the difference in the estimated hazard ratios was "not statistically significant."  *Id.* at 1252:11 – 1253:23.  And Prof. Heitjan explained how Natera's comparison of longitudinal sensitivities was biased in Signatera's favor because of the many more samples per patient in the Reinert versus the Parikh Study.  *Id.* at 1253:24 – 1255:16 ("So the sensitivity of these tests done this way, these longitudinal tests, is artificially increased in the Danish study because there are so many bites at the apple.").

4

1    Natera first argues that no reasonable jury could have found this advertisement to be false

2  because it was merely "corporate puffery," which is non-actionable. Natera argues this

3  advertisement, which consisted of a side-by-side comparison of how Signatera performed in one

4  study, with how Reveal performed in another study, was merely an advertisement claiming that

5  Signatera was "superior" to Reveal.

6    However, as shown at trial, and as the jury found, the advertisement was not one that

7  merely gave a generalized opinion about Signatera being better than Reveal. The Court correctly

8  instructed the jury— "Only statements of fact that are capable of being proven true or false are

9  actionable under the Lanham Act. Opinion statements that cannot be proven true or false are not

10  actionable." Dkt. 814, Instruction No. 38 (False Advertising – Lanham Act – Opinions). A

11  statement of fact is a "specific and measurable claim, capable of being proved false or of being

12  reasonably interpreted as a statement of objective fact." *Ariix, LLC v. NutriSearch Corp.*, 985

13  F.3d 1107, 1121 (9th Cir. 2021). "'Puffing' is exaggerated advertising, blustering, and boasting

14  upon which no reasonable buyer would rely." *Southland Sod*, 108 F.3d at 1145. "While product

15  superiority claims that are vague or highly subjective often amount to nonactionable puffery,

16  'misdescriptions of specific or absolute characteristics of a product are actionable.'" *Id.* Natera's

17  advertisements presented "specific and measurable" claims of superiority of Signatera over

18  Reveal. *See* TX-126 (Comparison advertisement) (comparing, for *e.g.*, pre-surgical sensitivity in

19  CRC between Signatera and Reveal, and number of blood tubes required). Natera cannot argue

20  that, as a matter of law, this was simply "puffing." *Id.* ("A specific and measurable advertisement

21  claim of product superiority based on product testing is not puffery.")

22    There was substantial evidence that the comparisons of data from the two products

23  presented by Natera were misleading. The Court previously addressed this exact issue at summary

24  judgment and denied Natera's motion for summary judgment. Though "all of Natera's advertising

25  statements at issue are directly derived from the Reinert study and the Parikh study," "the numbers

26  are not literally false on their face," Dkt. 326, at 13, considering the advertising statements in

27  context, a reasonable jury could find the statements are "false by necessary inference in context."

28  *Id.* Advertisements using an "'apples-to-oranges' theory of falsity" are literally false by necessary

5

implication "where non-comparable products are portrayed as otherwise equivalent (except for the superior or inferior aspect being illustrated in the advertisement)." *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 637 (N.D. Cal. 2019).  As the jury found, Natera's advertising statement was false because it "omits differences which would have been material to recipients." *Clorox*, 398 F. Supp. 3d at 638.  *See e.g.*, 10/25/2024 C. Andersen Dep. at 95:6-20 (Day 2) ("[I]f you provide one with 4 milliliters and the other with 8, then you have made it more difficult for one than for the other . . . . [I]f you want to provide both tests with the same opportunity, then you should provide them with the equal amount of material."); 10/23/2024 C. Andersen Dep. 104:20-24 (Day 1) ("[I]t would be a bit like comparing apples and pears.").  There was substantial evidence to support the jury's verdict on this point.

b.  <u>Commercial Advertising</u>

Natera argues no reasonable jury could have found Natera's false advertising was distributed as commercial advertising because it was instead just "educational materials."  The jury was properly instructed of the applicable Ninth Circuit definition of commercial advertising.  Dkt. 814, Instruction No. 32 (False Advertising – Lanham Act – Element One Part 2 – Commercial Advertisement or Promotion):

> A party asserting a Lanham Act claim must prove that the statement was made in commercial advertising or promotion. A statement constitutes a commercial advertisement or promotion if it is commercial speech, which is speech that is:
>
> 1. made for the purpose of influencing customers to buy the products of the party making the statement; and
> 2. was sufficiently disseminated to the relevant purchasing public to constitute promotion within that industry.
>
> To determine whether the statement was sufficiently disseminated to constitute promotion, you may consider the size of the market, the frequency and means of dissemination of the statement, and the number of recipients of the statement.
> The statement need not be made in a traditional advertising campaign and may consist instead of less formal types of advertising and promotion.

There was substantial evidence to support the jury's finding that the advertising in question was commercial advertising.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Evidence at trial showed that the purpose of the advertisements was to influence consumers.  *See, e.g.*, Ex. G, Trial Tr. at 1513:23 – 1514:10 (S. Moshkevich) (characterizing TX-126 as a Natera "advertisement"); Ex. D, Trial Tr. at 642:7-10 & 675:15-25 (K. Masukawa) ($24.8 million is what Natera "spent to put these ads out").  The advertisements were disseminated to the relevant public: Natera's Performance Comparison Chart was "provided to the sales force" and used by the sales force in meetings with oncologists and physicians for the purpose of influencing customers (oncologists and physicians) to buy its tests.  Ex. C, Trial Tr. at 576:17-578:13.  And the advertisements were widely disseminated in the relevant market.  Natera's sales force distributed thousands of the false email ads.  *See, e.g.*, TX-286.  It is clear in the advertisements that Natera was referencing the products Signatera and Reveal.  TX-126, TX-286.  Finally, Guardant presented evidence that Natera made its false claims with express economic motive – to advance the sale of Natera's test over Guardant's.  TX-0150; TX-0109 (Natera planning to spend considerable resources to "salt [the] launch" of Guardant's Reveal.)

Natera presents no case authority to support a conclusion that a side-by-side comparison of two competing products, sent to thousands of oncologists (the applicable audience for the relevant advertisements) does not come within the purview of the Lanham Act.  Further, Natera offers no case authority that advertisements that a party disseminates to allegedly merely "educate" the consuming public cannot be actionable if false.   The "education" here was intended to drive sales.

Natera cites to the portion of *Ariix, LLC v. Nutrisearch Corp.* where the Ninth Circuit states that "[w]here the facts present a close question [between commercial and non-commercial speech], 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation."  985 F.3d 1107 (9th Cir. 2021) (citing *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (applying the "*Bolger* factors")).  But for the reasons stated above, this is not a close question and the jury's finding was well supported by the evidence.

c.   Material

Natera re-raises another argument the Court previously rejected at summary judgment.

7

United States District Court
Northern District of California

1   Natera argues Guardant did not present sufficient evidence to suggest that Natera's false

2   advertisements were "likely to influence [a] purchasing decision." *Southland Sod*, 108 F.3d at

3   1139. "A false or misleading statement is material if . . . it misrepresents an inherent quality or

4   characteristic of the product that was the subject of the statement." Dkt. 814, Instruction. No. 35

5   (False Advertising – Lanham Act – Element Three); *see also* Dkt. 326 at 28[1]. As this Court held

6   at summary judgment, Mr. Sowers's survey "demonstrates that Natera's advertisements do affect

7   survey respondents' perception of assay quality." Dkt. 326 at 27; *see also* Ex. D, Trial Tr. at

8   839:4-16 (B. Sowers). Guardant presented further evidence that advertisements of this type affect

9   doctor's purchasing decisions. Ex. B, Trial Tr. at 296:1-20 (J. Odegaard) (Dr. Odegaard

10  explaining that medical doctors rely upon the materials provided by companies marketing their

11  diagnostic tests for patient care); Ex. F, Trial Tr. at 1321:1-19; 1316:18 – 1320:2. (J.

12  Malackowski) (Mr. Malackowski explaining how Guardant lost profits following the advertising

13  campaign.) The accused statements which were intended to sow seeds of doubt about the

14  accuracy of tumor naïve assays like Guardant's Reveal undoubtedly went to the inherent quality or

15  characteristic of Guardant's product.

16

17      d.  First Amendment

18      Natera reraises an argument this Court, and many courts before, have rejected—that a false

19  advertisement is protected speech. Natera argues that because the comparison advertisement

20  consisted of results from two scientific studies, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720

21  F.3d 490, 496 (2d Cir. 2013) directs that Natera's comparison advertisement is thus in the realm of

22

23  _____

[1] From the Court's Summary Judgment Order:

24      "Guardant has presented enough evidence that Natera has misrepresented inherent qualities
        of the ctDNA assays. A plaintiff can also establish materiality by showing that the

25      defendant "misrepresented an inherent quality or characteristic of the product." *Clorox Co.
        v. Reckitt Benckiser Grp PLC*, 398 F. Supp. 3d 623, 642 (N.D. Cal. 2019). As Natera stated

26      in its advertisement, the metrics are "key" to whether a ctDNA assay is suitable for MRD
        detection. Docket No. 249 Exh. 300 at 368. Natera's advertising statements comparing the

27      key metrics of Signatera and Reveal implicate inherent qualities of the ctDNA assays and
        would likely influence the purchasing decision of oncologists. Indeed, the fact that Natera

28      highlighted these metrics in its advertising campaign against Reveal suggests Natera is
        being a bit disingenuous in now asserting their metrics are not really material."

a "statement of pure opinion" amongst scientists and cannot be the subject of a Lanham Act claim. But as this Court previously held, *ONY* does not categorically immunize false statements about peer-reviewed studies. As this court noted, instead *ONY* creates a limited zone of protection around description of peer-reviewed studies:

> Statements in peer-reviewed, published scientific articles are entitled to protection against Lanham Act liability because, according to the Second Circuit, they are like "statements of pure opinion," and are "incapable of being proven false." *ONY, Inc. v. Cornerstone Therapeutics, Inc*., 720 F.3d 490, 496 (2d Cir. 2013); *see Coastal Abstract Serv. v. First Am. Title Ins. Co*., 173 F.3d 725, 731 (9th Cir. 1999) (Lanham Act does not govern claims that are not "capable of being proved false or of being reasonably interpreted as a statement of objective fact."). Indeed, the Second Circuit has held that for peer-reviewed scientific studies, "conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, [and] on subjects about which there is legitimate ongoing scientific disagreement . . . are not grounds for a claim of false advertising under the Lanham Act." *Id*. at 498. Following the *ONY* decision, lower courts have held that courts should not decide a claim against "studies and conclusions published in peer-reviewed scientific articles." *Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D*., No. 14- cv-0248, 2014 WL 12579802, at *4 (C.D. Cal. June 4, 2014). "[A]ttacking the validity of experiments and conclusions published in peer-reviewed scientific journal articles is better done in the scientific, not legal, realm." *Id*.

Summary Judgment Order, Dkt. 326 at 32-33.

On the other hand, as this Court noted, there are bounds to that immunity:

> In *Eastman Chemical Co. v. Plastipure, Inc*., the Fifth Circuit endorsed the basic holding of *ONY* but held that *ONY*'s peer-reviewed "statements made within the academic literature and directed at the scientific community" were distinguishable from Eastman's advertising "statements made in commercial advertisements and directed at customers." 775 F.3d 230, 236–37 (5th Cir. 2014). The Fifth Circuit reasoned that "[a]dvertisements do not become immune from Lanham Act scrutiny simply because their claims are open to scientific or public debate. Otherwise, the Lanham Act would hardly ever be enforceable—many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety. The Supreme Court has made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech." *Id*.

*Id*.

Here, there was substantial trial evidence that *Natera* did not merely reproduce and then accurately describe the results of a scientific article. Instead, *Natera* (not scientists in a peer-

9

reviewed, published scientific article) placed, what the jury found to be misleading, apples-to-oranges comparisons of the studies into a side-by-side format.  *See* Summary Judgment Order at 13 ("Although the two numbers are accurately derived from clinical studies, the comparison of the two metrics falsely implies that the presurgical sensitivity calculation for Reveal is comparable to that for Signatera.")  Further, and as noted above, Natera's comparison advertisements were actionable statements of fact, and not merely opinions, let alone opinions by scientists in a peer-reviewed, published scientific article.  Even under *ONY*, Natera's commercial speech is not afforded categorical First Amendment protections of noncommercial speech.  *Eastman Chemical Co. v. Plastipure, Inc.* 775 F.3d 230, 236–37 (5th Cir. 2014) ("Application of the Lanham Act to Appellants' promotional statements will not stifle academic freedom or intrude on First Amendment values […] Appellants may continue to pursue their research and publish their results; they simply may not push their product by making the claims the jury found to be false and misleading".)  The Court properly applied and instructed the jury on *ONY*.

### 2.   Compensatory Damages Award

#### a.   Prospective Corrective Damages

Natera argues prospective corrective damages were not warranted.  Natera first argues Guardant showed no causation between Natera's false advertisements and Guardant's injury.  The jury was properly instructed of the applicable law:

> A party asserting a false advertising claim must prove injury. Injury may be proven by showing the diversion of its sales or the lessening of the goodwill that a party's products enjoy with the buying public.
> Because Guardant and Natera are direct competitors, you may presume that a misrepresentation that tends to mislead consumers caused commercial injury.
> Either party may overcome this presumption by proving that the other party has suffered no injury and is not likely to suffer injury.

Instruction No. 36: False Advertising – Lanham Act – Element Five

As the instruction details, Guardant was entitled to a presumption of commercial injury, and it was Natera's burden to overcome this presumption.  Guardant presented substantial

1    evidence that Natera's advertisements affected Reveal's sales and that Guardant needed

2    prospective corrective damages to remedy the past wrong.  *See, e.g.*, Ex. F, Trial Tr. at 1323:7-25

3    (J. Malackowski) ("[T]he extent of the campaign; because of the timing of the campaign, that it

4    was spent at the launch, which has long-term effects; because there's only a two-player market, so

5    what hurts Guardant is beneficial for Signatera; and, frankly, because Natera admitted that it

6    worked, that they did blunt the sales of Guardant.")

7        Natera argues prospective corrective damages are not appropriate because the model of

8    Reveal at the time of the advertisements is no longer on the market.  But, as the Court already

9    held, the "inclusion of the one generation later CRC test is admissible. The allegedly false

10   advertisements all critique the nature of Reveal products as "tumor-naïve" tests, rather than

11   singling out the Reveal L1.2 vs. RevealINFINITY assays. [. . .] *See generally Complaint*, Dkt. 1.

12   RevealINFINITY has completely replaced Reveal L1.2, but given it too is tumor-naïve, and the

13   fact that it is the immediate successor to Reveal L1.2 and is reasonably proximate in time to the

14   advertising at issue, it is certainly plausible that sales of RevealINFINITY were affected much in

15   the same way as that of Reveal L1.2."  Dkt. 693, 5-6.

16       Natera cites to *Callaway Golf Co. v. Salzenger*, 384 F. Supp. 2d 735 (D. Del. 2005), to

17   support overturning the jury's verdict.  However, this case is inapposite.  In *Callaway*, the court

18   found it made no sense to award prospective corrective damages when the models of golf balls

19   that were the subject of the advertisements had been completely taken off the market.  *Id*. at 741.

20   Here, both products — Signatera and Reveal — are still on the market, even if both products are in

21   versions that are different than the exact ones used in the Parikh and Reinart studies.  Core

22   differences between the two respective products remain.

23

24       b.  Disgorgement

25       Disgorgement is an available remedy which provides for deterrence by making violations

26   of the Lanham Act "unprofitable."  *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d

27   117, 123 (9th Cir. 1968).

28       The jury was instructed on disgorgement as follows:

> In addition to actual damages, the plaintiff is entitled to any profits earned by the defendant that are attributable to the false advertisement, which the plaintiff proves by a preponderance of the evidence. You may not, however, include in any award of profits any amount that you took into account in determining actual damages.
>
> Profit is calculated by deducting expenses from gross revenue.
>
> Gross revenue is all of the defendant's earnings from the sale of its product. The plaintiff has the burden of proving the defendant's gross revenue by a preponderance of the evidence.
>
> Expenses are all of the defendant's overhead and production costs incurred in producing the gross revenue. Those expenses may include wages and sales commissions. The expenses must be directly attributable to producing the defendant's product. The defendant has the burden of proving (1) the expenses and (2) the portion of the profits that is not attributable to the false advertising but which is attributable instead to other factors.

Instruction No. 42: Lanham Act False Advertising – Disgorgement of Profits.

Substantial evidence was presented at trial on Natera's profits, including what portion of the profits could be attributed to the false advertisements.  Natera raises an issue that the prospective corrective damages overlapped with the disgorgement award, thus allowing for double damages.  However, the Court specifically instructed the jury to not "include in any award of profits any amount that you may [take] into account in determining actual damages."  Instruction No. 42.  *See CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ([J]uries are presumed to follow the court's instructions.").

In any event, as the jury's finding on disgorgement was merely advisory, the Court further addresses Guardant's request for disgorgement in the Motions on Equitable Remedies Section.

### 3.    **Willfulness**

Natera briefly argues Guardant presented "no" evidence to support the jury's finding that Natera acted "willfully" when it distributed its false comparison advertisements.  Mot. at 14.  The jury was instructed that a finding a willfulness was appropriate if Natera "knew its advertising was false or misleading, or it acted with reckless disregard for, or willful blindness to, the false or misleading nature of its advertising."  Dkt. 814 at 50; 28 U.S.C. § 1117.  The evidence Guardant presented at trial reasonably supported the jury's finding of willfulness.  *See, e.g.*, TX-400 at 1-2;

United States District Court
Northern District of California

TX-395 (Dr. Andersen telling Natera such a comparison would be "unfair"); Ex. J, C. Andersen Depo. at 95:6-20 (Day 2) (as played at trial); 104:20-24 (Day 1) (as played at trial) ("[I]t would be a bit like comparing apples and pears."); Ex. O, TX-150 ("We need to be laser focused on CRC land grab or we will lose to Guardant. We need to put more intensity – this is a war we are entering."); Ex. P, TX-151 ("We need to war room and plan."); TX-0095 ("training to pound" Guardant); Ex. Q, TX-152 ("we need to go to the mat here"); Ex. H, TX-109 ("[s]pend whatever is necessary to salt [Guardant's] launch" of Reveal); Ex. AA, Trial Tr. at 1045:25 – 1046:3 (S. Chapman) (Q: "So Natera sent over 100,000 emails to oncologists, didn't it?" A: "I don't know the exact amount, but there's 10-12,000 oncologists. So 10 each seems about right.").

### 4.    **Punitive Damages**

Natera re-raises its argument that punitive damages were not available here because Guardant did not have a state law claim.  Mot. at 16.  However, Guardant asserted common law, UCL, and FAL claims, and as explained below in the Equitable Remedies Section, Ninth Circuit has held that common law, UCL, and FAL claims rise and fall with a parallel Lanham Act claim. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.") The finding of a Lanham Act violation thus supported a finding of violations of the parallel UCL and FAL, predicates for punitive damages.  And the jury was properly instructed of the "clear and convincing" evidence standard, Instruction No. 29: Burden of Proof, Clear and Convincing Evidence, to find punitive damages, Instruction No. 43: Damages under California State Common Law.

The Court need not address Natera's new argument that a finding of "actual malice" was necessary for punitive beyond what the jury was instructed:

> You may award punitive damages against the liable party only if the injured party proves by clear and convincing evidence that the liable party engaged in that conduct with malice, oppression, or fraud. "Malice" means that the liable party acted with intent to cause injury or that the liable party's conduct was despicable and was done with

13

1

> a willful and knowing disregard of the rights or safety of another. A
> person acts with knowing disregard when the person is aware of the
> probable dangerous consequences of the person's conduct and
> deliberately fails to avoid those consequences.

2

3      Instruction No. 43: Damages Under State Common Law.

4           Natera did not seek a jury instruction on "actual malice."  To the extent Natera is now

5      arguing the actual malice as that term is used in the First Amendment context should have been

6      required, its assertion is meritless.  Actual malice applies only if the defendant's false statements

7      "are of a character which the principles of the First Amendment … protect."  *New York Times Co.*

8      *v. Sullivan*, 376 U.S. 254, 285 (1964).  As noted above, the First Amendment does not protect

9      Natera's false advertisements because "false or misleading commercial statements aren't

10     constitutionally protected" (not afforded protection under *ONY*).  *TrafficSchool.com, Inc. v.*

11     *Edriver Inc.*, 653 F.3d 820, 829-30 (9th Cir. 2011).

12

13          **5.     Natera's Counterclaims**

14          Natera argues, in one-page, the Court should set aside the jury's rejection of Natera

15     counterclaims and find for Natera.  Mot. at 17.  However, Natera cites no case authority to support

16     its claim that there is no "legally sufficient evidentiary basis" for the jury's verdict.  Fed. R. Civ.

17     P. 50(a)(1).

18          The record establishes that a reasonable jury could find Natera failed to prove its Lanham

19     Act claim.  Natera argued to the jury that Guardant misrepresented its 91% sensitivity claim and

20     the 100% specificity claim in various advertisements.  TX-576 at 1.7; TX-554 at 1.  However, at

21     trial, Guardant presented evidence to support a reasonable jury's findings that these claims were

22     not false.  *See, e.g.*, TX-1 at 4 ("[W]e assessed performance in patients with evaluable

23     'surveillance' draws, defined as a draw obtained within 4 months of clinical recurrence, and

24     observed that sensitivity improved to 91%."); TX-576 at 1 (91% sensitivity with "surveillance"

25     samples) & 6, Fig. 3B ("Surveillance analysis Sensitivity: 90.9%"); TX-1 at 4 ("Integrating

26     longitudinal specimens increased sensitivity . . . with specificity remaining 100%."); Ex. C, Trial

27     Tr. at 443:8-16 (K. Price) ("[S]urveillance analysis was a subset . . . so there were no new patients

28     introduced. . . . I do believe the Harvard study supports this 100 percent specificity."); Ex. I,

*United States District Court*
*Northern District of California*

1  Corcoran Dep. at 113:25 – 114:8 (as played at trial) ("91 percent sensitivity and 100 percent

2  specificity in the surveillance analysis" were "part of the overall study" and thus it would not "be

3  improper to say it.").  Further, the methodology behind the study and the data derived were

4  disclosed in the study.

**B.** **Natera's Motion for a New Trial (Docket No. 880)**

Rule 59(a) allows the court to grant "a new trial on all or some of the issues" "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).

One of the grounds Natera asserts in support of this motion challenges certain jury instructions given by the Court. "[J]ury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *Dang v. Cross*, 422 F.3d 800, 804 (9th Cir. 2005). A court does not err when it rejects proposed jury instructions that are not "properly supported by the law and the evidence." *See Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). Moreover, if an "error in the jury instruction is harmless, it does not warrant" a new trial. *Dang*, 422 F.3d at 805. "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." *Id.* (quoting *Swinton v. Potomac Corp.,* 270 F.3d 794, 802 (9th Cir. 2001)).

The Court went through multiple rounds of revisions to the final jury instructions, including holding a charging conference with the Parties to reach agreement on the final 49 instructions. *See* Dkt. Nos. 610, 736, 759, 814.

Natera also claims various of the Court's rulings on evidentiary issues entitles Natera to a new trial.

1.    Lanham Act: False or Misleading Statement Instruction (Instruction No. 31)

The Court gave the following instruction defining a "false or misleading" statement under the Lanham Act:

> The party asserting a Lanham Act claim must prove that one or more statement of fact was false or misleading. In making this determination, you must consider any such statement in the context of the entire advertisement**.** The party may prove a statement is false or misleading in one of two ways:
>
> > 1.   By showing that the statement is literally false. Only an unambiguous message can be literally false. A statement may be literally false on its face, that is, when it explicitly states something untrue. A statement also may be literally false by necessary

United States District Court
Northern District of California

implication. A statement is literally false by necessary implication when it does not explicitly state something that is untrue, but considering the advertisement in its entirety, the only reasonable interpretation of the statement is that it is untrue. Advertisements using an "apples to oranges" comparison are literally false by necessary implication where things that are non comparable are portrayed as otherwise equivalent.

2. By showing that a statement is misleading. A statement is misleading if it is literally true or ambiguous but misled, confused, or deceived a significant portion of the consuming public or is likely to mislead, confuse, or deceive customers.

Natera re-raises its objection to the instruction including its objection to the phrase "apples to oranges." However, Natera cites to no case law demonstrating this instruction incorrectly stated the law. Rather, Natera argues:

"'[A]s the Court instructed the jury, a statement "may be literally false by necessary implication," "when it does not explicitly state something that is untrue, but considering the advertisement in its entirety, the only reasonable interpretation of the statement is that it is untrue." Dkt. 814 at 35. But it is not the case that the "only reasonable interpretation" of an "apples-to-oranges" comparison, when considered "in its entirety," is that what is implied by the comparison "is untrue," *id.*, either as a general matter or on the facts here."

Motion at 19-20.

Natera argues there are instances where dissimilar items can be compared, and those statements are not then literally false. Mot. at 19 ("For instance, it would not be "literally false by necessary implication" to state that apples are superior to oranges if the target audience was looking for a fruit that can be grown in a colder climate and does not need to be peeled.") Natera argues the instruction did not properly tell the jury that "determining whether a comparison between two items is flawed almost always requires considering whether the particular audience would be deceived by it and rely on it—the exact Lanham Act elements that the erroneous instruction allowed the jury to skip over." *Id.*

Natera's argument is unpersuasive. The jury was instructed to consider the advertisement "in its entirety," and to then determine whether the comparison was untrue by "necessary implication." The jury was also instructed: "In determining whether a statement actually or had a tendency to deceive the target audience, you may take into consideration the nature of the

17

1    audience, including how informed or sophisticated the audience is and how likely their purchasing

2    decisions are to be influenced by the complained-of statements."  Instruction No. 34, Lanham Act:

3    Element Two.  The instruction provided an accurate guide by which the jury could determine, in

4    the context of this case, whether the Parikh Study and the Reinert Study were, in fact, not fairly

5    comparable for Natera's purpose of claiming superior performance of Signatera with respect to the

6    specific metrics cited in its ads.

7

8            2.      Punitive Damages Instruction (Instruction No. 43)

9            As noted above, the Court did not err in allowing an instruction on punitive damages

10   because Ninth Circuit has held that UCL and FAL claims rise and fall with a parallel Lanham Act

11   claim.  *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("This Circuit has

12   consistently held that state common law claims of unfair competition and actions pursuant to

13   California Business and Professions Code § 17200 are 'substantially congruent' to claims made

14   under the Lanham Act.").  Given the jury's finding of a Lanham Act violation, and hence common

15   law, UCL, and FAL violations, there was a basis for giving the punitive damages instruction.

16

17           3.      Mitigation Instruction (Deleted Instruction No. 44)

18           Natera challenges the Court's determination not to provide a mitigation instruction, Mot. at

19   22, but the Court withdrew the instruction noting: "There's no evidence to support it.  We talked

20   about it. The parties had a chance to bring it up. It wasn't done."  Trial Tr. at 1931:12 – 1936:5.

21   Natera cites to no trial evidence that would have warranted the Court including the mitigation

22   instruction.  An instruction is not warranted where there is no evidence to support it.  *See Hopper*

23   *v. Evans*, 456 U.S. 605, 611 (1982) (due process requires a jury instruction "be given *only* when

24   the evidence warrants such an instruction") (italics in original).

25

26           4.      Lanham Act: Claims Relating to Peer Reviewed Instruction (Instruction No. 33)

27           The Court gave the following instruction regarding peer reviewed studies:

28                   Statements in a commercial advertisement or promotion which are

United States District Court
Northern District of California

18

based on test results from a peer-reviewed, published scientific study cannot be literally false unless that party challenging the advertisement proves that:

1. The statement in the advertisement of promotion is not, on its face, supported by the peer-reviewed, published science study. In other words, even if the study is reliable, it does not establish the statement at issue in the advertisement; or
2. The statement conveys a false message that is beyond the scope of the peer-reviewed, published scientific study, such as comparing test results from a different study when the results are not actually comparable; or
3. The statement is supported by the peer-reviewed, published scientific study but the results of the study were fabricated or fraudulently created.
A party also may show that a commercial advertisement or promotion that relies on a peer reviewed, published scientific study is misleading if it reports results from the study in a way that is deceptive and that deceived a significant portion of the commercial audience.

Natera raises issues with this Instruction No. 33 but fails to articulate how this instruction misstated the law as it applies to peer-reviewed studies, under *ONY*, *Southland Sod*, and this Court's summary judgment decision. Instead, Natera again tries to claim that Natera's advertisements were just like Guardant's in that they merely were reporting statements from peer-reviewed, published scientific studies. Mot. at 22 ("[I]f this Court rules that the reasoning in *ONY* does not foreclose Guardant's theory of liability" "it was error to instruct the jury that statements based on 'test results from a peer-reviewed, published scientific study'"—such as those made by Guardant regarding the Parikh Study—'cannot be literally false.'"). This argument fails. As noted above, Natera's advertisements did not merely restate scientific opinions contained in the study. *Natera* placed conclusions from two different studies into a side-by-side comparison chart, to argue Signatera outperformed Reveal as to specific key metrics, purporting to compare statistics that were, in fact, not comparable. Such a use of study findings is not immunized by *ONY*. Natera's ads differed from those of Guardant—Guardant reported results of the Parikh study, without manipulation or misleading comparisons. That the jury did not agree with Natera's assertion that Guardant had "fabricated or fraudulently created" the results of the Parikh Study is not the fault of the instruction. It was a failure of evidence. The instruction herein was entirely faithful to *ONY*.

### 5.    Verdict Form

Natera argues the verdict form "incorrectly" did not include the "predicate question of whether a violation of California common law occurred, tainting the punitive-damages award." Mot. at 22.[2]  However, as noted above, the Lanham Act and California common law claims are "substantially congruent" and rises and falls with the Lanham Act claim.  Dkt. 814 (Instr. 39). There was no reason to separately ask the jury to decide liability on the common law claim.

### 6.    Evidentiary Rulings

Natera seeks a new trial based also on alleged error in the Court's rulings on evidence. The court has broad discretion with respect to evidentiary rulings.  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008).  "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party."  *Id*. (quoting *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995)).

### a.    Statements to Moldx

---

[2] Throughout the course of this litigation, *both* Parties consistently maintained that the California claims were substantially congruent to the Lanham Act claims.  Natera Mot. for Summ. J., Dkt. 220, at 24 (citing *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) & *Quidel Corp. v. Siemens Med. Sols. USA, Inc.*, 2021 WL 4622504, at *1 n.1 (9th Cir. Oct. 7, 2021)).

Natera reiterated the same point in the Joint Pretrial Statement.  Dkt. 362 at 13 ("These claims [UCL and FAL claims] are treated as 'substantially congruent' to claims under the Lanham Act."); *see also id*. at 26 (citing *Airwair Int'l Ltd. v. Vans, Inc.*, 2013 WL 3786309, at *8 (N.D. Cal. Jul. 17, 2013) ("the analysis for California unfair competition claims under Business and Professions Code Section 17200 is the same as the analysis under the Lanham Act"); *Dairy, LLC v. Milk Moovement, Inc.*, 2022 WL 2392622, at *4 (E.D. Cal. Jul. 1, 2022) ("[C]laims under the Lanham Act § 43(a)(1)(b) and California Business and Professions Code § 17500 may be analyzed together because the analysis under federal and state law is identical.")).

It was only towards the end of the litigation on the final rounds of jury instructions revision, did Natera change its tune—arguing the California state claims are different than Lanham Act, as they sought to change the jury instructions and verdict form, to get punitive damages thrown out of the case.  The Court analyzed Natera's exact argument and was not persuaded.  Dkt. 610 at 29 ("[A]lthough, there is some ambiguity in the substantive law, the Court finds Guardant's position more persuasive. [. . .] Courts including the Ninth Circuit have found the scope of this claim is broader and generally congruent with the Lanham Act.")

1    In the Court's prior MIL Order, the Court granted in part and denied in part Natera's MIL

2    No.2 "to exclude evidence or argument that Natera had any effect or impact on Medicare coverage

3    approval for Reveal, Guardant's product, including any argument, evidence, or suggestion that

4    Natera caused any delay in this process." Dkt. 509 at 3, 9.  Specifically, the Court held:

> "Guardant has not shown MolDX's regulatory decision was not a
> supervening event that breaks the chain of causation. In any event,
> such evidence is also barred under FRE 403. Introduction of this
> evidence to establish Natera's liability raises a considerable risk of
> undue delay and jury confusion. Specifically, under Guardant's
> theory, it would have to show that MolDX would not have delayed
> approval but for the statements made by Natera. This would involve
> establishing the thoughts and motivations of MolDX officials,
> examination of all the materials considered by MolDX, and would
> thus entail a trial within a trial to prove causation."

10   Dkt. 509 at 7-8 (MIL Order).  This was a ruling in Natera's favor.

11   At trial, the Court adhered to its decision to preclude Guardant from arguing that Natera

12   had inflicted harm on Guardant by influencing MolDX thereby delaying approval of Medicare

13   coverage of Reveal.  However, the Court did allow Guardant to present evidence of Natera's

14   specific communications with MolDX for the limited purpose of showing Natera's state of mind at

15   the time it launched Natera's "Anti-Reveal" campaign.  In allowing Guardant to present this

16   evidence, the Court found it was admissible "[s]pecifically, to the extent that Natera made

17   unfounded statements to MolDX regarding issues with Reveal, this tends to show Natera's intent

18   to disparage Guardant/Reveal, including a motivation to undermine Reveal in its advertising

19   statements as well." Dkt. 509 at 8.  This evidence for state of mind was relevant, in part because it

20   was likely Natera would "contend at trial that in challenging Reveal, it was motivated by altruism

21   and a desire to save patients and educate oncologists." *Id.* at 8-9.  By drawing the evidentiary line

22   it did, the Court struck a delicate balance between the parties' interests, allowing Guardant to

23   introduce evidence of Natera's state of mind, but not permitting it to pursue damages against

24   Natera allegedly resulting from MolDX delay of approval of Medicare coverage.  At trial, the

25   Court repeatedly gave a limiting instruction to the jury that statements to Medicare were not

26   actionable statements under the Lanham Act, but rather were being presented for the limited

27   purpose of showing the state of mind of Natera in making and distributing its advertisements.

28

United States District Court
Northern District of California

1    Natera fails to support any contentions that this Court's rulings on state of mind evidence,

2    combined with limiting instructions to the jury, led to "substantial prejudice."  Natera had ample

3    chances at trial to paint a broader picture to its actual state of mind.  *See, e.g*., Ex. 1440 (Chapman

4    Dep. 202:9- 12 (asserting that Natera's "goal was to correctly inform physicians about the

5    Guardant misinformation campaign, which we thought was putting patients in harm's way");

6    202:2-5 (claiming "patients were at risk, and it was our duty to stop the misinformation

7    campaign").  Guardant was allowed to rebut that narrative with evidence of a less than altruistic

8    motive.  The issue was fairly presented to the jury.  Natera was not unfairly suffer "substantial

9    prejudice" from the limited admission of this evidence, particularly when viewed in the full

10    context of the related evidentiary rulings which were designed to benefit in large part Natera.

12            b.    <u>Scope of Medicare Coverage</u>

13    Natera argues the Court did not allow Natera to present evidence that "Guardant's damages

14    expert's disgorgement opinion failed to account for other factors that could have driven Natera

15    sales," by precluding "Natera from offering evidence to show that the difference in the parties'

16    sales was due to Reveal's 'limited scope of … Medicare coverage.'"  Mot. at 23-24.  However, the

17    Court did allow Natera to present evidence at trial that "it had obtained Medicare approval" for

18    Signatera before the commercial release of Guardant's Reveal to support Natera's "first … mover

19    argument."  Trial Tr. 1810:11-19.  Going much beyond that presentation, such as quantifying how

20    much of Natera's profits were due to Medicare coverage, would risk complication and confusion.

21    For instance, this would have opened the door regarding MolDX Medicare decision on coverage,

22    inviting further evidence as to why the scope of coverage differed.  Trial Tr. at 1805:4 – 1808:12.

23    More fundamentally, if Natera were allowed to deeply analyze and quantify the economic effect of

24    its earlier acquisition of Medicare approval, this would have opened the door to Guardant's

25    assertion that Natera unfairly caused the delay of approval of its test through Natera's effort to

26    influence MolDX.  Again, the Court limited Natera at trial to keep from opening the door this

27    Court had already closed for Natera's own benefit – preventing Guardant from arguing it is

28    entitled to damages Natera caused by delaying MolDX approval of Medicare coverage.  Natera

United States District Court
Northern District of California

22

cannot now have it both ways. Natera is essentially asking for the Court to reconsider its order on MIL No.2. These is no basis for doing so. Moreover, the Court notes, that allowing Natera to opine on the varying types of Medicare coverage it obtained would have required further discussion on the meanings of the types of Medicare coverage (for *e.g.*, adjuvant Medicare approval vs. unlimited number of tests approval vs. surveillance approval). This danger of confusing and misleading the jury far outweighed any limited probative value the varying scope of Medicare coverage had on the damages calculation. Fed. R. Evid. 403.

Further, Natera offers no arguments of any "substantial prejudice" it suffered. Guardant's expert sought over $95 million in disgorgement of 100% of Natera's profits during the applicable period. *See* Malackowski Report. The jury only awarded Guardant $42 million in disgorgement. It is apparent that the jury substantially discounted Guardant's request. Natera was allowed to present to the jury evidence that it had Medicare coverage for Signatera earlier than Reveal. And there was evidence presented to the jury that Natera's coverage was broader in scope. This could well explain why the jury (and this Court) refused to award the full amount of disgorgement sought by Guardant.

### 7. Remitter

"[A] jury's award of damages is entitled to great deference." *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006). A jury's damages award must be upheld "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986).

Natera argues they are entitled to a remitter of the jury's damages award given the "lack of support" for the award, and the 3x multiplier Guardant's expert used to go from the $24.8 million Natera spent on the anti-Reveal campaign to the $75 million in prospective corrective damages awarded by the jury. Mot. at 24. As noted above, the Court finds the jury's verdict was reasonable. And as the Court previously held in rejecting Natera's *Daubert* challenge to this multiplier, the 3x multiplier "was rational and supported." Dkt. 322 at 2-7 (Order on *Daubert*);

United States District Court
Northern District of California

1    *see, e.g*., Trial Tr. 1327:1-6 (J. Malackowski) ("And then, lastly, I looked to other industry

2    references, other cases that have been published [. . .] in other cases experts are talking about three

3    times, four times, five times the effort that's needed to correct a false ad.").

4          Natera also argues the award of punitive damages should be reduced as unsupported or

5    excessive.  The jury awarded $75 million in prospective corrective damages, and $175 million in

6    punitive damages, for a 2.3x multiplier, well within the range of an appropriate ratio.  *See State*

7    *Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003); *Riley v. Volkswagen Grp. of*

8    *Am.*, 51 F.4th 896, 902 (9th Cir. 2022) ("We have limited punitive damages to a 4 to 1 ratio where

9    there are significant economic damages . . . but behavior is not particularly egregious.").

10         Natera's Motion for a Judgement as a Matter of Law, a New Trial, or a Remitter, is

11   **DENIED**.

United States District Court
Northern District of California

**C. Motions on Equitable Remedies**

The Court previously deferred "ruling on the California statutory claims, and any other equitable issues, until after the jury has returned its verdict on the legal claims, at which time the Parties shall offer proposed findings of fact and conclusions of law relating to the equitable issues to be determined by the Court." Dkt. 501 at 8. The Court reserved the right to "take additional evidence to adjudicate any remaining equitable issues." *Id.*

Both Natera and Guardant filed motions for judgment on equitable claims. Natera asks the Court to enter judgment in its favor on Natera's UCL and FAL counterclaims. Additionally, Natera asks the Court to eliminate or reduce the jury's disgorgement award. Dkt. 881, Natera's Motion for Judgment on Equitable Claims. Guardant asks the Court to enter judgment in its favor on Guardant's UCL and FAL claims, and for a permanent injunction against Natera. Dkt. 889, Guardant's Motion for Judgment on California Statutory Claims and Motion for Permanent Injunction. Guardant also seeks further disgorgement of Natera's profits through February 2024, a 1.5x multiplier on the jury's award, and prejudgment interest. Dkt. 890, Motion for Judgment on Equitable Monetary Remedies.

1. <u>State Law Claims</u>

The Court has already determined that Guardant's FAL and UCL claims "are treated as 'substantially congruent' to claims under the Lanham Act." Summ. J. Order, Dkt. 326, at 11 n.2. In *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 8168854 (C.D. Cal. Oct. 6, 2023), the court concluded that the jury's determination that the defendants were liable for false advertising under the Lanham Act required the court to find that defendants also were liable for false advertising under California's FAL and UCL. *Id.* at *13 ("Courts apply the same analysis to Lanham Act, unfair competition, and false advertising claims where, as here, they are based on the same alleged conduct. Accordingly, Defendants are also liable for false advertising under the UCL and FAL.")

As noted above, the Ninth Circuit has held that common law, UCL, and FAL claims rise and fall with a parallel Lanham Act claim. *See Cleary*, 30 F.3d at 1262-63 ("This Circuit has

consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."); *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 8168854, at *13 (C.D. Cal. Oct. 6, 2023) ("Courts apply the same analysis to Lanham Act, unfair competition, and false advertising claims where, as here, they are based on the same alleged conduct.").[3]

The Court is bound by the jury's verdict in finding violations of the UCL and FAL. "[I]n a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989)). Thus, a court "must abide by the jury's findings of fact in making any subsequent ruling," including "in determining both liability and relief on the equitable claims." *Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016).

Accordingly, given the jury's verdict on Guardant's Lanham Act claims and on Natera's counterclaims on the Lanham Act, the Court **ENTERS JUDGMENT** for Guardant on Guardant's UCL and FAL claims and **ENTERS JUDGMENT** for Guardant on Natera's UCL and FAL counterclaims.

Although potentially obviated by the jury's verdict, to ensure compliance with Rule 52, the Court enters the following findings of fact and conclusions of law.

---

[3] Guardant also raises the doctrine of judicial estoppel to stop Natera from raising this late argument that California common law false advertising is limited to the "passing off" of goods, as opposed to the "substantially congruent" analysis both Parties maintained throughout the litigation. The Supreme Court has held the three factors the court *may* consider in invoking the doctrine include: (1) the party's later position is "clearly inconsistent" with its earlier one; (2) the party "succeeded in persuading a court" to accept the earlier position; and (3) the party asserting an inconsistent position would "derive an unfair advantage" or "impose an unfair detriment to the opposing party" if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 750-751 (2001); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). It does seem unfair for Natera to raise this argument so late in the litigation, but the Court will not address estoppel because the Court has already found the Lanham Act was "substantially congruent" to California common law claims.

United States District Court
Northern District of California

a. <u>Guardant State Law Claims</u>

i.<u>FINDINGS OF FACT</u>

1.   Natera launched a coordinated campaign to attack Guardant's Reveal Product at the product launch. *See, e.g.*, TX-0109 ("Spend whatever is necessary to salt their launch."); TX-48 ("Key here is is to cut off Guardant at the pass and get patients on Signatera prior to Onc decision."); TX-0151 ("We need to war room and plan."); TX-0095 ("training to pound" Guardant); TX-0152 ("we need to go to the mat here"); Ex. C, TX-0048 ("Key here is is to cut off Guardant at the pass and get patients on Signatera prior to Onc decision."). Trial Tr. at 735:6-14 ("[T]hese early launch dates are extremely important to depart the right information.") (H. Eltoukhy); *id.* at 741:20 – 742:15 ("[T]he first impression is the most important one. It's where people make a judgment call, and it becomes very hard to change that initial impression, that initial judgment.")

2.   This campaign included side-by-side comparisons of specific metrics from two independent studies, the Parikh Study (analyzing Guardant's Reveal) and the Reinart Study (analyzing Natera's Signatera). TX-0126 ("Performance Comparison Chart").

3.   Natera sent this advertisement to oncologists via FedEx and in over 100,000 emails. *See, e.g.*, 11/7/2024 Trial Tr. at 573:7-14 & 574:3-4; Ex. K, TX-0128; Ex. R, TX-0220, & Ex. T, TX-0286 (excerpted); 11/13/2024 Trial Tr. at 1045:25 – 1046:3 (S. Chapman) (Q: "So Natera sent over 100,000 emails to oncologists, didn't it?" A: "I don't know the exact amount, but there's 10-12,000 oncologists. So 10 each seems about right.").

4.   Evidence at trial showed that 69.7 percent of oncologists "understood the main message of Natera's email advertisement to be that Signatera is superior to Guardant's Reveal." 11/12/2024 Trial Tr. at 839:6-9 (B. Sowers).

5.   Missing from the side-by-side advertisement was adequate context of the differences in the studies that could lead to further explanation why specific key metrics were not actually appropriate to be compared.  Natera's chart concealed the fact that Reveal's performance in the Parikh Study was based on input volumes of 4 mL or less, whereas Signatera's performance in the Reinert Study was based on input volumes of at least the optimal 8 mL. *See, e.g.*, TX-0001 at 7; TX-0004 at 2; 11/14/2024 Trial Tr. at 1238:18 – 1239:4 (D. Heitjan). Low sample volumes

United States District Court
Northern District of California

1    negatively affect the performance and failure rate of these tests. Trial Tr. 302:14-18 (J. Odegaard);

2    Trial Tr. at 913:9-13 (K. Banks).

3         6.    The comparisons in Natera's Performance Comparison Chart were statistically

4    invalid and misleading.  For example, Guardant's expert, Prof. Heitjan, explained that Natera's

5    comparison of lead times was biased in Signatera's favor given the different schedules of CAT

6    scans in the Reinert Study versus the Parikh Study. Ex. BB, 11/14/2024 Trial Tr. at 1245:15 –

7    1248:23.  Prof. Heitjan explained how Natera's comparisons of NPVs were biased in Signatera's

8    favor given the lower prevalence in the population for the Reinert Study versus the Parikh Study.

9    *Id.* at 1249:20 – 1252:10 ("So we would expect a difference in NPV between those two studies,

10   just because the prevalence is different has nothing to do with the properties of the test.").  Prof.

11   Heitjan explained that Natera's comparison of hazard ratios ignored the critical confidence

12   interval, which shows the difference in the estimated hazard ratios was "not statistically

13   significant." *Id.* at 1252:11 – 1253:23.  And Prof. Heitjan explained how Natera's comparison of

14   longitudinal sensitivities was biased in Signatera's favor because of the many more samples per

15   patient in the Reinert versus the Parikh Study.  *Id.* at 1253:24 – 1255:16 ("So the sensitivity of

16   these tests done this way, these longitudinal tests, is artificially increased in the Danish study

17   because there are so many bites at the apple.").

18        7.    As one of Natera's collaborators, Dr. Claus Andersen, explained (through his

19   deposition played at trial), one cannot reasonably compare the performance of tests using different

20   input volumes.  10/25/2024 C. Andersen Dep. at 95:6-20 (Day 2) ("[I]f you provide one with 4

21   milliliters and the other with 8, then you have made it more difficult for one than for the other . . . .

22   [I]f you want to provide both tests with the same opportunity, then you should provide them with

23   the equal amount of material."); 10/23/2024 C. Andersen Dep. 104:20-24 (Day 1) ("[I]t would be

24   a bit like comparing apples and pears.").  Dr. Andersen informed Natera that one cannot compare

25   the results from two tests generated with different input volumes: "As I have explained the ddPCR

26   results were generated using much less input than used for Signatera. Therefore, the comparison

27   makes no sense, scientifically. It is biased towards showing Signatera as more sensitive." TX-400

28   at 1-2.

United States District Court
Northern District of California

8.   Natera's advertisement had the effect of reducing Guardant's sales of Reveal. Trial Tr. at 1316:18 – 1317:3 (J. Malackowski) (discussing Natera's sales of Signatera grew substantially following the start of its false advertising campaign in Q2 2021, while sales of Reveal remained relatively low and stagnant. Natera's cumulative revenue from Signatera for 2021 through August 2023 (~$200 million) was more than 10x Guardant's revenue from Reveal.).

9.   On November 25, 2024, a unanimous jury found Natera liable for false advertisement under the Lanham Act. Dkt. 847.

## ii.    CONCLUSIONS OF LAW

1.   Given the congruency of the Lanham Act to the UCL and FAL, and the facts found herein, the Court concludes Natera liable under the UCL and FAL.

2.   The Court enters **JUDGMENT** on these claims for Guardant.

b.    Natera State Law Counterclaims

i.    FINDINGS OF FACT

1.    Natera argues the following Guardant documents constitute false advertising under the UCL and FAL: TX-573, TX-576; TX-554; TX-1810; and TX-1114.  Natera Mot. at 18.  TX-573 is a presentation by Guardant on January 11, 2021, at the "J.P. Morgan Healthcare Conference."  Natera challenges the following statements about Guardant's Reveal: "91% Sensitivity For recurrence detection with surveillance samples" and "100% Specificity For recurrence detection following competition of definitive therapy."  Slide 17.  The presentation cites "Parikh (Corcoran) ESMO 2020, manuscript under review," which was later published in the peer-reviewed publication Clinical Cancer Research. *See* A. Parikh et al., *Minimal Residual Disease Detection using a Plasma-only Circulating Tumor DNA Assay in Patients with Colorectal Cancer*, Clinical Cancer Research 27:5586-94 (2021) ("Parikh Study").

2.    Guardant did not present false information in its advertisements.  *See, e.g.*, TX-1 at 3-4 (explaining the timing of landmark samples: "Blood was drawn a median of 30 days (range, 11–148) postoperatively and median of 32 days (range, 0–193) after completion of definitive therapy."); TX-22 ("[T]he only two patients that had detectable ctDNA post-definitive therapy (of 17 total) but did not recur by the data cut had limited follow up of less than 1 year.  Thus, it was not possible to determine whether these patients represented actual false positives or if these patients might go on to recur with additional follow up."); TX-22 at 6614 ([T]o best approximate the surveillance analysis performed in [the Reinert Study], we assessed a cohort of patients with a serial draw within 4 months of recurrence, since the majority of patients with longitudinal draws in Reinert and colleagues had systematic draws every 3-6 months during the study and all but 2 patients who recurred (-.90%) had a draw within 4 months of recurrence.  Importantly, as the basis for their analysis, Reinert and colleagues excluded from their surveillance analysis at least 7 patients . . . who were false negatives in the overall analysis but who lacked surveillance draws, and this is the only reason we similarly excluded such patients in our surveillance analysis in an effort to replicate these methods. If the authors of this Letter believe that doing so 'artificially inflates sensitivity,' then this criticism should be first directed at their own study, as this method

increased the sensitivity in their study from approximately 41% at the landmark timepoint . . . to the 88% reported in their surveillance analysis.); Ex. H, Trial Tr. at 1839:11-19 (Dr. Corcoran testified that the Parikh Study was in fact prospective); Ex. B, Trial Tr. at 328:12-15 (J. Odegaard) ("The Harvard study was blinded."); *id*. at 330:18 – 331:3; Ex. E, Trial Tr. at 1114:18-25 (V. Raymond) (confirming description in Parikh Study of being blinded was "entirely accurate"); Ex. G, Trial Tr. at 1658:5 – 1659:18 (A. Talasaz); *id*. 1642:8-17 ("[T]hey did not use that clinical information to change the call.").  The methodology behind the study and the data derived were disclosed in the study.

3.      Natera presented no evidence regarding how oncologists (the relevant consumers) understood or interpreted Guardant's advertisements.  Natera did not present any survey of oncologists regarding how they understood or interpreted Guardant's advertisements.  Natera presented no evidence showing the extent to which Guardant's advertisements were distributed to relevant consumers.  Natera presented no evidence showing that Guardant's advertisements actually deceived or had a tendency to deceive a substantial segment of consumers.

4.      On November 25, 2024, a unanimous jury found Guardant was not liable for false advertisement under the Lanham Act. Dkt. 847.

ii.      <u>CONCLUSIONS OF LAW</u>

1.  Given the congruency of the Lanham Act to the UCL and FAL, and the facts found herein, the Court concludes Guardant is not liable under the UCL and FAL.

2.  The Court enters **JUDGMENT** for Guardant on Natera's counterclaims asserting violations of the UCL and FAL.

2.    <u>Injunctive Relief</u>

Guardant seeks an injunction against Natera.  *See* Dkt. 889-33 (Guardant's Proposed Injunction).  Courts routinely grant permanent injunctions prohibiting deceptive advertising. *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 829 (9th Cir. 2011); *see also* 15 U.S. Code § 1116 (Lanham Act, Injunctive Relief).  "To obtain a permanent injunction, the moving party must satisfy a four-factor test: (1) it has suffered irreparable injury; (2) remedies at law are inadequate; (3) the balance of hardships favors an equitable remedy; and (4) that the public interest would not be disserved by a permanent injunction."  *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 2918724, at *2 (C.D. Cal. Apr. 12, 2023) (citing *eBay, Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006)).

A limited permanent injunction is warranted for Natera's violations under the UCL, FAL, and Lanham Act.  Natera's advertising directly compared Reveal to Signatera, creating a presumption of irreparable harm.  15 U.S. Code § 1116 (Lanham Act, Injunctive Relief); Motion at 13 (citing *Performance Indus.*, 1990 WL 161253 at *6) ("The basis for the distinction is that in comparative advertising cases the misleading advertisement directly diminishes the value of the mistreated product in the minds of the consumer, while in non-comparative cases the harm to a competitor's product is less clear.")  The jury found that where Natera compared the results of one study to the results of another study, this was false by necessary implication because of the "apples to oranges" type of comparison. Dkt. 847 (Jury Verdict).  A jury verdict on a Lanham Act claim creates a rebuttable presumption of irreparable harm.  *Monster Energy*, 2023 WL 2918724 at *2 (Party is "entitled to a rebuttable presumption of irreparable harm upon a finding of a violation" of Section 1125(a).)  This is particularly so where the attack on the effectiveness of Reveal was made at its inception.  Impugning the test amongst the intended audience of oncologists before it could get established likely has lasting residual impact on Guardant's Reveal.  Natera has failed to rebut this presumption of harm; aside from allegedly ceasing the advertisement after this case began, Natera has not shown it has conducted any further activity to remedy the harm flowing from the false advertisements.  There is no evidence of Natera creating any sort of compliance program.  Though the versions of Reveal have changed, the advertisements were aimed at "Reveal" and

"tumor-naive" assays, not singling out a specific version.  The attack was directed in large part the basic methodology of Guardant's tumor-naïve assay.

Guardant argues because this harm is "irreparable," inadequate remedy at law then is the other "side of the same coin." *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 2918724, at *14 (C.D. Cal. Apr. 12, 2023).  The jury's award of prospective corrective damages (and this Court's award of disgorgement), work to remedy the effects of the past wrong.  However, such an award does not prevent future conduct that may cause further harm, and thus an award of damages, even for prospective advertising costs, for past conduct, is not an adequate remedy at law to prevent future misconduct and further harm. *Nutrition Distrib. LLC v. IronMag Labs*, 2018 WL 6264986, at *4 (C.D. Cal. Nov. 16, 2018) ("Monetary damages . . . would be inadequate to protect the public in the absence of an injunction due to the possibility of Defendants selling products [with false statements] in the future . . . .").

As to the balance of hardships, Natera is not unfairly injured by being required to stop deceptive or false advertising that is similar to the type of advertising the jury (and the Court herein) found was unlawful.  "[T]here is no harm to a defendant from an injunction which prevents continuing dissemination of false statements." *Monster Energy*, 2023 WL 2918724 at *7 (quoting *POM Wonderful LLC v. Purely Juice, Inc.*, 2008 WL 4222045, at *16 (C.D. Cal. July 17, 2008)).

As for the final factor, "[t]here is a strong public interest in preventing false advertising of products in the marketplace." *POM Wonderful*, 2008 WL 4222045 at *16 (*quoting Kennedy Industries, Inc. v. Aparo*, 416 F. Supp. 2d 311, 317 (E.D. Pa. 2005)).

On the other hand, an injunction should not be overbroad and should be tailored to prevent the threatened wrong.  As to Guardant's proposed injunction, Dkt. 889-33, the Court rejects or revises the following provisions which Guardant requested:

- Section 1(b), 1(c): This request is vague and beyond the scope of the jury's verdict regarding unlawful comparative advertising.

  - Falsely or deceptively compares, explicitly or implicitly, the performance of Natera's Signatera with Guardant's Reveal in terms of sensitivity, specificity,

failure rate, lead time, negative predictive value, positive predictive value, or hazard ratio.

- o  Falsely or deceptively claims, explicitly or implicitly, the superiority of Natera's Signatera over Guardant's Reveal with respect to sensitivity, specificity, failure rate, lead time, negative predictive value, positive predictive value, or hazard ratios.

- Section 1(d) barring Natera from "Falsely or deceptively claims, explicitly or implicitly, that Guardant's Reveal is ineffective, inaccurate, unsafe, dangerous, or potentially harmful to patients."  This request is beyond the scope of the jury's verdict regarding unlawful comparative advertising.

- Sections 5 and 6 requiring Natera to notify customers that a jury unanimously found its advertising comparing the performance of Signatera and Natera was false.  The jury's award of prospective corrective damages is an adequate legal remedy for this request, thus no further equitable remedies will be entered.

- Sections 3, 7 and 8 requiring Natera to institute a Compliance Monitor and file reports with this Court.  The Court will retain jurisdiction of this matter for the limited purpose of enforcement—should there be any future violations, Guardant may bring those to the attention of this Court.  It is Natera's responsibility to implement what is needed to ensure compliance with the Court's orders.  The Court will not mandate any sort of compliance reports.

Accordingly, the Court **GRANTS IN PART** Guardant's request for an injunction but finds the injunction (Dkt. 889-33) Guardant proposes is too broad.  The Court **enters the limited and narrow injunction** as follows:

**United States District Court**
**Northern District of California**

**Permanent Injunction**

Defendant Natera, Inc. ("Natera") and all Natera's officers, agents, servants, employees, attorneys, successors, and assigns, and all other persons who are in active concert or participation with them (collectively, the "Enjoined Persons") are hereby enjoined as follows:

1.  The Enjoined Persons are permanently enjoined from disseminating any marketing, promotional, or advertising material to actual or potential customers of tests for the detection of Minimal Residual Disease (MRD) in cancer patients that:

    a) Compares Natera's Signatera with Guardant's Reveal in terms of sensitivity, specificity, failure rate, lead time, negative predictive value, positive predictive value, or hazard ratio based, in whole or in part, on the Reinert Study[4] or the Parikh Study.[5]

    b) "Marketing, promotional, or advertising material" includes, but is not limited to, one-on-one meetings, group presentations, educational or industry seminars, mailings, brochures, posters, white papers, letters, e-mails, videos, webpages, communications including text messages, and any other effort by any Enjoined Persons to detail, influence, or otherwise educate customers or potential customers regarding Signatera and/or Reveal.

    c) The provisions of this section apply to materials or communications that reference Signatera or Reveal directly by name or indirectly, such as referring to Reveal as a "tumor naïve" assay or Signatera as a "tumor informed" assay.

2.  This Court retains jurisdiction over this matter for purposes of the enforcement of this Permanent Injunction.

The injunction is predicated upon the jury verdict as well as the findings of fact and conclusions of law above.

---

[4] T. Reinert et al., *Analysis of Plasma Cell-Free DNA by Ultradeep Sequencing in Patients With Stages I to III Colorectal Cancer*, JAMA Oncology 5(8):1124-1131 (2019) ("Reinert Study").
[5] A. Parikh et al., *Minimal Residual Disease Detection using a Plasma-only Circulating Tumor DNA Assay in Patients with Colorectal Cancer*, Clinical Cancer Research 27:5586-94 (2021) ("Parikh Study").

3.    Disgorgement

Guardant's expert arrived at a disgorgement figure of $95.4 million by taking all of Natera's revenue from U.S. clinical sales of Signatera ($198.4 million) and subtracting a portion of production-related costs ($103 million).  *See* Tr. 1341:3-7.  Natera's expert, Dr. Stec, presented a different analysis, arguing that Signatera sales that were potentially attributable to the accused statement is no more than $32,278,685, and after deductions and costs, Natera incurred – $35,120,407 in costs – leaving no profits available to disgorge.  Tr. 1862:3-22; Tr. 1864:16-18; Tr. 1865:1-14 (Stec); *see also* Tr. 1086:16-1087:2 (Chapman) (testifying that Signatera remains net unprofitable).

The jury was properly instructed on disgorgement.  Instruction No. 40 (Lanham Act False Advertising—Monetary Recovery); Instruction No. 42 (Lanham Act False Advertising—Disgorgement of Profits).  The jury, after assessing both expert's opinions, entered an advisory award of $42 million in disgorgement, which is about 44% of Guardant's request.

The Court enters the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a).

i.    FINDINGS OF FACT

1.    Natera's false advertising campaign against Reveal was substantial and targeted Reveal's launch into the multi-billion dollar MRD market. *Id*. at 1310:1-21. Natera made $280 million in sales from Signatera through August 31, 2023. *Id*. at 1321:20 – 1322:11. In conducting his disgorgement analysis, Mr. Malackowski excluded Signatera sales from non-CRC tests, nonclinical sales, sales outside the U.S., and sales before Reveal's launch to calculate $198.4 million in Signatera sales for clinical use with CRC patients in the U.S. only. *Id*. Mr. Malackowski then deducted $103 million of production-related costs claimed by Natera to calculate Natera's profits for purposes of disgorgement to be $95.4 million. *Id*. at 1322:12 – 1323:6. Mr. Malackowski argued that 100% of those profits should be subject to disgorgement because of the extent of Natera's false advertising, the timing of Natera's false advertising, the success of Natera's false advertising in salting Guardant's launch, and the two-player nature of the market. *Id*. at 1323:7 – 1324:2; Malackowski Demonstrative Slide 17.

2.    Natera's expert, Dr. Jeffrey Stec, did not contest Mr. Malackowski's calculation of $198.4 million in Signatera sales for clinical use with CRC patients in the U.S. Dr. Stec also did not contest Mr. Malackowski's deduction of $103 million in costs claimed by Natera. Dr. Stec opined that additional costs should be deducted to the point that Natera earned no actual profits that could be disgorged. Trial Tr. at 1867:7-20 (J. Stec). Dr. Stec characterized those additional deductions as sales commissions and "oncology sales costs, the oncology marketing expenses, and then the overhead portion of cost of goods sold." *Id*. at 1864:20 – 1865:10.

3.    Dr. Stec disagreed with Mr. Malackowski's attribution of 100% of profits to the false advertising. He presented a regression analysis that purported to show Signatera sales attributable to Natera's false advertising. Dr. Stec testified that his regression showed $32,278,685 in Signatera sales "are potentially due to the alleged false or mislead[ing] statements." *Id*. at 1862:14-22. Dr. Stec's regression, therefore, implies that 16.3% of U.S. Signatera CRC sales ($32.3 million out of $198.4 million) are potentially attributable to Natera's false advertising. Dr. Stec's regression included just three independent variables: price of Signatera, a spline variable meant to "represent the false or misleading statements," and a "time-

squared" variable meant to represent "a number of other factors." *Id*. at 1859:15-18.  Dr. Stec did not explain what data or values he used for the spline variable or the time variable or how those variables accurately represented what they were designed to measure.  Dr. Stec did not explain how the price or time variables accurately captured factors, other than Natera's false advertising, that drove Signatera sales. Dr. Stec ultimately did not identify any specific factor from his regression — other than Natera's false advertising — that explained Signatera sales.  Dr. Stec admitted that his regression did not take into account the extent of Natera's false advertising.  *Id*. at 1904:2-4 ("I wasn't asked to look into the liability portion which would, in my opinion, include the scope of the false and misleading statements."); *id*. at 1909:15-25 (explaining how spline variable is "supposed to represent the false advertising" but did not incorporate the "actual money that went into Project Solar" and did not account for the "number of false ads that went out to doctors").

4.    The Court finds that Dr. Stec's testimony concerning his regression analysis is entitled to little weight in determining the extent to which Natera's profits were attributable to factors other than Natera's false advertising campaign against Guardant.  Dr. Stec failed to adequately explain how the regression analysis accurately captures that portion of Natera sales attributable to the false ads.  Thus, Natera failed to meet its burden of attributing the sales of Signatera that were not attributable to false advertising.  Instruction No. 42 (Disgorgement of Profits); *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1408 (9th Cir. 1993) (defendant "bears the burden of showing which, if any, of its total sales are not attributable to" its false advertising).

5.    In particular, Dr. Stec did not take into account the extent of Natera's false advertising — the $25 million spent by Natera on those advertisements, the total number of advertisements disseminated by Natera, or the number of oncologists who received those advertisements — Dr. Stec ignored one of the most important factors in assessing the impact of Natera's false advertising. Dkt. 322 at 17 ("Stec's choice of the kind of spline variable is grounds for cross-examination, including the fact that the value of the regression may be limited because the spline variable does not purport to represent the amount of advertising but the combination of other unidentified factors.").  By not controlling or accounting for the extent of Natera's false

United States District Court
Northern District of California

advertising, Dr. Stec's analysis effectively suggests the effect of Natera's false advertising on Signatera sales would have been the same whether Natera spent $1 or $25 million on its false advertising.

6. The Court also finds that although it was not Mr. Malackowski's burden to prove the portion of Signatera's sales that were or were not attributable to Natera's false advertising, a 100% attribution is not plausible.

7. In an advisory verdict, the jury awarded $42 million in disgorgement of Natera's profits. It appears the jury accepted Mr. Malackowski's calculation of $95.4 million in profits, but credited additional deductions claimed by Dr. Stec of $11.5 million. That results in about $84 million in profits. The jury appears to have attributed half of those profits to Natera's false advertising — $42 million. Guardant accepts and agrees with the jury's advisory verdict. The jury's 50% attribution is reasonable and supported by the evidence.

8. The Court agrees with Natera that additional deductions in costs against Natera's revenues to determine profit are appropriate.

9. In particular, Dr. Malackowski started out with a $198,376,103 in Signatera Total Revenue. Malackowski, Slide 23. The Court so finds.

10. Beginning with this figure, Dr. Malackowski then deducted $103,005,494 in Deductible Cost of Goods. *Id*. Natera did not dispute this amount (and the Court agrees), but sought further deductions of "Sales Commission Expense," "Oncology Sales Cost," "Oncology Marketing Expense," "Overhead Portion of Cost of Goods Sold."

11. However, the "Sales Commission Expense" may be further deducted, as this cost is "directly attributable to producing the defendant's product." Instruction No. 42. Dr. Stec presented $3,439,141 for sales commission expenses were to be deducted in the scenario of the "Regression Adjusted" calculations. Stec presentation, DDX9.21. Dr. Stec's "Regression Adjusted" calculations were about 1/6.2 of the overall costs (Stec "Regression Adjusted" Total Revenue $32,278,685/ Malackowski Total Revenue /$198,376,103). The Court finds the total "Sales Commission Expense" to deduct is $21,322,674 ($3,439,141*6.2). No other expenses should be deducted in determining Natera's profit.

39

12. The Court finds the following with respect to Natera's profits: (Signatera Total Revenue) $198,376,103 – (Deductible Cost of Goods) $103,005,494 – (Sales Commission Expenses) $21,322,674 = $74,047,935 (Natera Total Profit).

13. The Court agrees with the jury's apparent 50% attribution of Natera's profits to the false advertisements. In addition to the above, such attribution is supported by Mr. Malackowski's presentation of Signatera's projected vs. actual sales. Malackowski Demonstrative, Slide 17. Natera exceeded its projected sales of Signatera by about 40-60% - in other words, only roughly half of its actual sales had been projected in 2021. Trial Tr. 1318:21-24. Moreover, Guardant did not reach its projections as it was short by about 50%. *Id*. at Slide 18. It is a reasonable inference that about half of Natera's sales of Signatera were attributable to the success of Natera's campaign championing Signatera over Reveal.

14. Attributing 50% of the Natera Total Profit ($74,047,935) to the false advertisements results in disgorgement of $37,023,968.

15. Natera's violation of the Lanham Act was willful.

## ii.  CONCLUSIONS OF LAW

1. On November 25, 2024, a unanimous jury found Natera liable for false advertisement under the Lanham Act. Dkt. 847.

2. The Lanham Act states that "the plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). There are "three categorically distinct rationales" for the Lanham Act's disgorgement remedy: "(1) to avoid unjust enrichment; (2) as a proxy for plaintiff's actual damages; and (3) to deter infringement." *4 Pillar Dynasty LLC, v. New York & Co.*, 933 F.3d 202, 212 (2d Cir. 2019). In determining monetary remedies for a Lanham Act violation, "the trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party." *Playboy Enters. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982); *see also Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) ("Remedies that do not remove the economic incentive 'would encourage a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    counterfeiter to merely switch from one infringing scheme to another as soon as the infringed

2    owner became aware of the fabrication.'") (quoting *Playboy*, 692 F.2d at 1274).

3            3.    Instruction No. 42: Lanham Act False Advertising – Disgorgement of Profits was

4    as follows:

> In addition to actual damages, the plaintiff is entitled to any
> profits earned by the defendant that are attributable to the false
> advertisement, which the plaintiff proves by a preponderance of the
> evidence. You may not, however, include in any award of profits
> any amount that you took into account in determining actual
> damages.
>        Profit is calculated by deducting expenses from gross
> revenue.
>        Gross revenue is all of the defendant's earnings from the sale
> of its product. The plaintiff has the burden of proving the
> defendant's gross revenue by a preponderance of the evidence.
>        Expenses are all of the defendant's overhead and production
> costs incurred in producing the gross revenue. Those expenses may
> include wages and sales commissions. The expenses must be
> directly attributable to producing the defendant's product. The
> defendant has the burden of proving (1) the expenses and (2) the
> portion of the profits that is not attributable to the false advertising
> but which is attributable instead to other factors.

14           4.    "[W]here trademark infringement is deliberate and willful both the trademark

15    owner and the buying public are slighted if a court provides no greater remedy than an injunction.

16    . . . [T]his court's clear mandate in *Maier* [is] to make willful trademark infringement

17    unprofitable." *Playboy*, 692 F.2d at 1275 (citing *Maier Brewing Co. v. Fleishmann Distilling

18    Corp.*, 390 F.2d 117 (9th Cir. 1968)).  Recently, the Supreme Court held in *Romag Fasteners, Inc.

19    v. Fossil Inc.*, 590 U.S. 212 (2020), that willfulness is not a strict prerequisite for disgorgement

20    under the Lanham Act, but the "defendant's mental state is a ***highly important*** consideration in

21    determining whether an award of profits is appropriate." *Id*. at 219 (emphasis added).  *Romag*

22    confirms that a defendant's "[w]illfulness . . . generally supports disgorging ill-gotten gains."

23    *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2023 WL 2652855, at *4 (C.D. Cal.

24    Mar. 13, 2023).

25           5.    Natera's violation of the Lanham Act was willful, as found by the jury and by this

26    Court.  This strongly supports an award requiring disgorgement of Natera's ill-gotten gains.

27           6.    Remedies other than disgorgement are inadequate to prevent Natera's unjust

28    enrichment and to compensate Guardant adequately for the harm inflicted by Natera's false

advertising, and to deter the type of false advertising at issue in this case.  The jury's $75 million damages award is the amount Guardant will need to spend *in the future* to correct the misimpressions in the marketplace caused by Natera's prior false advertisements.  The damages award does not account for Natera's ill-gotten gains from 2021 through August 2023.

7.   For all of the reasons stated herein, the Court concludes Guardant shall be awarded $37,023,968 million in disgorgement of Natera's unjust profits for the period of the false advertisements prior to September 2023.

### 4.    Additional Disgorgement

The Court previously set a cut-off for damages "up to August 2023" to avoid any potential issues around COBRA from coming into the trial. Dkt. 719. Guardant now asks the Court to adopt the jury's disgorgement award of $42 million, and then to award an additional $29 million for Natera's profits from August 2023 (the damages cutoff date for trial) up to February 2024. Guardant Mot. for Equitable Remedies at 16. This $29 million is 44% of Signatera's profits from August 2023 February 2024, in line with the jury's award of 44% of Guardant's request. Guardant argues that its expert Mr. Malackowski analyzed the impact of the COBRA Study on Reveal's sales and concluded that "the COBRA Study has little, if any, measurable impact on Reveal's CRC Clinical revenue or samples." Dkt. 603-11 at 40.

The Court sees no reason to disturb its prior ruling that a cut-off for damages up to COBRA was correct. Guardant is asking for reconsideration of the Court's prior ruling and offers no basis to support it. Should the Court now allow a disgorgement for a period that includes public release of the COBRA study, Natera would have had a right to interrogate the likely effect of the COBRA study and any other factors that may contributed to Natera's profits independent of the prior false ads, including the fact that by 2023-24, the accused ads were years old. And introducing COBRA would require a whole minitrial and raise substantial concerns under F.R.E. 403. There were and still are good reasons to exclude COBRA. *See* Ex. E (10/15/24 Hr'g Tr.) at 71:7-72:20 (the Court noting Guardant had to "take the good with the bad" when it came to excluding the COBRA evidence).

### 5.    Enhanced Legal Damages

Guardant asks the Court to multiply the jury's award of $75,000,000 for actual damages by 1.5, which would add $37,500,000 to the jury's award for a total of $112,500,000. Guardant Equitable Mot. at 17.

For actual damages, the Lanham Act empowers the Court to adjust the amount "according to the circumstances of the case" "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such

43

sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). Courts have discretion to enhance the damages award by up to "three times such amount." 15 U.S.C. § 1117(a). "[T]he trial court's primary function should center on making any violations of the Lanham Act unprofitable to the infringing party." *Playboy Enters. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982). Actual damages should "constitute compensation and not a penalty." *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1114 (9th Cir. 2012) (quoting 15 U.S.C. §1117(a)). "[T]he Lanham Act has been construed to expressly forbid the award of [enhanced] damages to punish an infringer." *Id.* Although courts may not enhance damages purely to punish the defendant, *Skydive Ariz. Inc. v. Quattrocchi*, 673 F.3d 1105, 1115 (9th Cir. 2012), courts may consider the defendant's willfulness in the enhancement determination. *Nintendo of Amer., Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1010 (9th Cir. 1994).

Courts sometimes award treble damages because economic harm is hard to prove, where there is loss to reputation and goodwill, and to deter future infringing conduct. *PepsiCo, Inc. v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999); *Tu Thien The, Inc. v. Tu Thien Telecom, Inc.*, 668 F. App'x 299, 300 (9th Cir. 2016) ("the court may consider any loss of reputation and goodwill"); *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 343 (6th Cir. 2010) (Enhancement of damages is also appropriate when "'imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct.'").

To support Guardant's request for an enhancement, Guardant points to Guardant's CEO, Dr. Eltouky, statement at trial:

> Just the -- the damages that have been done to the reputation of this product, to the whole field of thinking about a blood-only approach that can potentially help millions of cancer patients that don't -- and cancer survivors that don't have tissue.
>
> It's just irreparable harm and we're going to have to go out and reeducate the field, do corrective messaging. And, you know, and it's going to take an enormous amount of time and money, and I don't know if we can ever sort of get back to sort of where we . . . would have been without this campaign.

Ex. Z, Trial Tr. at 740:11-25 (H. Eltoukhy).

United States District Court
Northern District of California

44

However, Guardant did not present evidence at trial of harm to Guardant's reputation that would justify any additional enhanced award.  In fact, Guardant's damages expert testified at trial that $75 million was "necessary in order to put [Guardant] back in the position they should have been, level the playing field," Trial Tr. at 1324:15-18 (J. Malackowski), and "correct the impressions that have been left in the market" *Id*. at 1327:15-1328:4.  The jury then fully awarded Guardant's proposed damages for prospective corrective damages, which was already a 3X multiplier of the amount of money Natera spent on the false advertising ($24.8 million).  This multiplier incorporates the cost to remedy any concerns about goodwill.  Thus, an assertion by a CEO that *additio*nal damages should be awarded for *e.g.* loss of goodwill, without any further evidence, does not warrant an additional enhancement of the jury's award of $75 million for corrective advertising.  *Deckers Outdoor Corp. v. Aleader Grp., Inc.*, 2024 WL 4744028, at *5 (C.D. Cal. Oct. 9, 2024) (denying enhanced damages because "plaintiff has not met its burden to show that loss-of-goodwill damages are appropriate here").  This is particularly true here, where a $175 million award for punitive damages (along with the disgorgement order) can function as a deterrence to Natera to conduct this type of conduct again.

Guardant again relies on the jury's finding of willfulness to try to assert a *per se* rule that Guardant is entitled to a multiplier.  However, willfulness is just one factor in the analysis.  Courts have emphasized that, notwithstanding a willfulness finding, enhanced damages are inappropriate where—as here—the actual damages awarded already compensate for the alleged harm.  *See, e.g.*, *Falcon Stainless*, 2011 WL 13130487, at *5 (rejecting argument that enhanced damages were warranted despite the jury's willfulness finding because that "d[id] not address whether the damages awarded were fully compensatory"); *Monster Energy Co. v. Vital Pharms., Inc.*, 2023 WL 8168854, at *15 (C.D. Cal. Oct. 6, 2023) (declining to enhance damages because they "are not necessary to 'ensure that the plaintiff receives compensation'" despite jury's willfulness finding in false advertising case); *Anhing Corp.*, 2016 WL 6661178, at *5 (declining enhancement "as the jury award adequately compensates Plaintiff or the damages … based on the evidence presented at trial"); *see also Skydive Arizona*, 675 F.3d at 1114 ("[E]nhancement of damages is only available to ensure that the plaintiff receives compensation.")

Guardant's request for an enhancement is **DENIED**.

### 6.    Prejudgment Interest

Guardant asks the Court to award prejudgment interest on the jury's actual damages award of $75,000,000 from the date Guardant filed its complaint, May 27, 2021, to entry of the Court's judgment, when post-judgment interest would apply.  Guardant Equitable Mot. at 20. Specifically, Guardant seeks prejudgment interest of $9,921,674 through December 31, 2024, and an additional $7,999 per day until judgment is entered.

As both Parties concede, there is no clear Ninth Circuit authority addressing whether prejudgment interest is available under Section 1117(a)[6].  In *Y.Y.G.M. SA v. Redbubble, Inc.*, 75

---

[6] Section 1117, Lanham Act Recovery for Violation of Rights
**(a)Profits; damages and costs; attorney fees**
    When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.
**(b)Treble damages for use of counterfeit mark**
    In assessing damages under subsection (a) for any violation of section 1114(1)(a) of this title or section 220506 of title 36, in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of—
    (1)intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services; or
    (2)providing goods or services necessary to the commission of a violation specified in paragraph (1), with the intent that the recipient of the goods or services would put the goods or services to use in committing the violation.
    In such a case, the court may award prejudgment interest on such amount at an annual interest rate established under section 6621(a)(2) of title 26, beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and

46

F.4th 995, 1008 (9th Cir. 2023), the Ninth Circuit explicitly noted that there is an express

provision awarding prejudgment interest in Section 1117(b), but not in Section 1117(c).  The

Court applied traditional statutory interpretation tools to find this omission was intentional by

Congress, and thus prejudgment interest was not available under Section 1117(c).

> The express allowance of prejudgment interest in § 1117(b) supports our conclusion. When Congress created a remedy that operates differently—in that subsection, treble damages—it specified the availability of prejudgment interest. Section 1117(c), like § 1117(b), changes the calculation of damages by substituting a statutory amount, yet makes no mention of prejudgment interest. This variation is meaningful, and we presume that Congress's lack of express inclusion amounts to intentional exclusion.[3] *See Bittner v. United States*, ––– U.S. ––––, 143 S. Ct. 713, 720, 215 L.Ed.2d 1 (2023) ("When Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusio alterius*).").

*Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1008 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 824,

218 L. Ed. 2d 32 (2024).  The court did not address Section 1117(a).  However, there is no reason

why the same logic would not apply here.  Like Section 1117(c), prejudgment interest is not

mentioned in Section 1117(a).

Guardant points to out-of-circuit cases that found prejudgment interest was available for

claims brought under Section 1117(a).  *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,

874 F.2d 431, 437 (7th Cir. 1989) ("The time has come . . . to announce a rule that prejudgment

interest should be presumptively available to victims of federal law violations.  Without it,

---

ending on the date such entry is made, or for such shorter time as the court considers appropriate.

**(c) Statutory damages for use of counterfeit marks**

In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   compensation of the plaintiff is incomplete and the defendant has an incentive to delay."); *Merck*

2   *Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 264 (2d Cir. 2014) ("Although Section 1117(a) does

3   not provide for prejudgment interest, such an award is within the discretion of the trial court and is

4   normally reserved for 'exceptional' cases.")[7]  Neither of these out-of-circuit cases (which are not

5   binding on district courts in this circuit) addressed the differential language within the subsections

6   of Section 1117;  none address the interpretive principle of *expressio unius est exclusio alterius*.

7   Both cases simply relied on the discretion of courts to award prejudgment interest.  The Court

8   holds these cases are not persuasive.

9       Accordingly, as in *YYGM*, the lack of a mention of prejudgment interest in Section 1117(a)

10  is a reliable indication that Congress did not intend for prejudgment interest to be applied to

11  remedies under this section.

12      For good measure, the Court will also address the underlying rationale behind prejudgment

13  interest to ascertain whether it should be awarded in this case to the jury's award of $75 million in

14  prospective corrective damages.

15      "[P]rejudgment interest is a 'make whole' remedy.  That is, it is appropriate in

16  circumstances where the plaintiff will not be made whole without additional compensation in the

17  form of prejudgment interest."  *Nat'l Products, Inc. v. Gamber-Johnson LLC*, 734 F. Supp. 2d

18  1160, 1172 (W.D. Wash. 2010).  Further, "[p]re-judgment interest is intended to cover the lost

19  investment potential of funds to which the plaintiff was entitled."  *Nelson v. EG & G Energy*

20  *Measurements Grp., Inc.*, 37 F.3d 1384, 1391 (9th Cir. 1994).  Here, Guardant fails to cite to any

21  cases where a court awarded prejudgment interest to ***prospective*** corrective damages.

22      The jury awarded Guardant all of the corrective damages Guardant argued would make

23  Guardant whole to be able to correct Natera's false advertising.  Natera cites to an out-of-circuit

24  case that illustrates this concept well.  In *Illinois Tool Works Inc. v. Rust-Oleum Corp.* the court

25  declined prejudgment interest under the Lanham Act, holding because "the jury awarded

26

27  ─────────────────────────
[7] An "exceptional case" is one where the Lanham Act violation was "malicious," "deliberate," or
28  "willful," *Merck*, 760 F.3d at 264 (citing S. Rep. No. 93-1400, at 2 (1974), reprinted in 1974
    U.S.C.C.A.N. 7132, 7133.

48

1   [plaintiff] monetary damages for disgorgement of [defendant]'s profits and prospective corrective

2   advertising" "[i]t is undisputed [plaintiff] was not awarded damages for any amount of lost profits

3   or money [plaintiff] already spent on corrective advertising."  346 F. Supp. 3d 951, 960 (S.D. Tex.

4   2018), *aff'd in relevant part, vacated in part, rev'd in part*, 955 F.3d 512 (5th Cir. 2020).  Here,

5   Guardant is ineligible for prejudgment interest—as a matter of statutory interpretation, and as a

6   matter of logic and policy because Guardant was not awarded monetary damages for past lost

7   profits, profits that it "lost [the] opportunity to invest."  *Id.*  The award for corrective advertising

8   was for future expenses.  Guardant's request for prejudgment interest is **DENIED**.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

D.     **Guardant's Motion for Attorneys' Fees and Costs (Docket No. 885-2, 891)**

Guardant is seeking $22 million in attorneys' fees, and $5 million in costs.  The Court

**DENIES** Guardant's Motion for Attorneys' Fees and Costs.[8]

The Lanham Acts provides that a Court may award the prevailing party an award of

attorney's fees only in the "exceptional" case.  15 U.S.C. § 1117(a).  The current definition of

"exceptional" requires the court to look at the "totality of the circumstances."  Although the Ninth

Circuit has refrained from proscribing an exact formula as to what qualifies as an "exceptional"

case, it has held that an "exceptional" case is one that "stands out from others with respect to the

substantive strength of a party's litigating position (considering both the governing law and the

facts of the case) or the unreasonable manner in which the case was litigated."  *SunEarth, Inc. v.*

*Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting *Octane Fitness, LLC v.*

*ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  The Court must use "equitable

discretion," analyzing the "nonexclusive list of factors," including "frivolousness, motivation,

objective unreasonableness (both in the factual and legal components of the case) and the need in

particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 1181

(citing *Octane Fitness*, 572 U.S. at 554).

Guardant bases most of its request on the fact that the jury found Natera acted willfully,

arguing "[w]illful misconduct is the hallmark of exceptional cases."  Motion at 5.  Natera argues a

finding of willfulness does not immediately entitle a party to attorney's fees but instead is merely

one factor in the analysis.  Natera is correct.  What the Court must focus on are the

following *Octane Fitness* factors: (A) frivolousness; (B) objective unreasonableness; and (C)

considerations of compensation and deterrence.  As explained below, the Court concludes that an

award of attorneys' fees is **not** warranted because Natera's litigation positions were not so

unreasonable as to render this case exceptional.

---

[8] To the extent Plaintiff seeks costs under Rule 54(d), Plaintiff must follow Local Rule 54-1 and
refile a Bill of Costs separately with the Court.

1.    <u>Frivolousness</u>

"An award of attorneys' fees is not warranted where a party puts forth good faith arguments and evidence supporting those claims." *Blue Bottle Coffee, LLC v. Liao*, 2024 WL 4004047, at *3 (N.D. Cal. July 24, 2024) (citing *Caiz v. Roberts*, 2017 WL 830386, at *5 (C.D. Cal. Mar. 2, 2017)). This case has been ongoing since 2021. Both Parties vigorously fought for their respective positions. At summary judgment, the Court found for Natera on some claims, and Guardant on others, while allowing many issues to go to trial as there were many issues that the Court found a reasonable juror could differ. Though Guardant points to their complete Plaintiff's verdict to now argue all of Natera's positions were unreasonable or frivolous, a well-fought case where one side wins on all claims does not transform a Lanham Act case into one that is exceptional. Were that the case, attorneys' fees would be awarded in almost all Lanham Act cases. And as noted in *Octane*, the Lanham Act standard is not one that is a default award of attorneys' fees. Natera's defense of the Lanham Act claims and its counterclaims was not frivolous. The Court notes that many claims survived summary judgment as the Court found there were genuine disputes of fact. Success at a jury trial does not deem the opposing party's positions weak or frivolous. *See, e.g., Angioscore, Inc. v. Trireme Med., Inc.*, 2015 WL 8293455, at *2 (N.D. Cal. Dec. 9, 2015) ("Although the patent case was not particularly strong, it was not exceptionally weak—as evidenced in part by its survival through summary judgment."), *revised and superseded* by *AngioScore, Inc. v. TriReme Med., LLC*, 666 F. App'x 884 (Fed. Cir. 2016) (finding district court did not abuse its discretion in denying award of attorneys' fees); *Gonzalez v. Tagged, Inc.*, 2016 WL 4376343, at *3 (N.D. Cal. Aug. 17, 2016) (finding that despite a complete defense verdict, no exceptional case where a magistrate judge's recommendation of denial of summary judgment suggested that plaintiff's underlying lawsuit was not objectively unreasonable).

2.    <u>Objective Unreasonableness</u>

For the same reasons, Natera's substantive positions in this case were not on the whole objectively unreasonable. However, Guardant argues the *manner* in which Natera litigated

United States District Court
Northern District of California

warrants an exceptional finding in this case.  However, this Court has already found sanctions were appropriate for the most egregious conduct – that regarding COBRA.  *See* Dkt Nos. 730, 945.  Though the Court looked highly unfavorably on some of Natera's conduct at trial, the Court held further sanctions were not warranted.  Dkt. 877; *BillFloat Inc. v. Collins Cash Inc.,* No. 20-CV-09325-EMC, 2023 WL 2333879 (N.D. Cal. Mar. 1, 2023), aff'd, 105 F.4th 1269 (9th Cir. 2024) (this Court holding that a party's litigation conduct did not render the case exceptional, despite the party "fail[ing] to conduct pre-suit investigation, producing roughly 98,000 documents without an index, refusing to produce basic documents, obstructive deposition conduct, joining [a] defendant in bad faith, and proceeding to trial [] without sufficient evidence.").  The sanctionable conduct is thus already adequately addressed in the separate sanctions motion.

Guardant argues Natera continuing with advertising after Guardant sent a cease-and-desist letter also was unreasonable, citing to *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 (9th Cir. 2023).  However, as Natera points out, this case does not rise to the same type of conduct in *Jason*, where there were multiple cease and desists letters over many years.  Here, Guardant sent a cease-and-desist letter on May 21, 2021 merely days before filing the lawsuit on May 27, 2021.  Mot. at 7.

### 3.     Considerations of Compensation and Deterrence

Guardant further argues Natera repeatedly violated the Parties Joint-Statement which barred the parties from engaging in certain kinds of marketing during the pendency of the agreement, and thus for purposes of compensation and deterrence, attorneys' fees are necessary.  However, the Joint-Statement contemplated a procedure to follow if a violation of it is alleged; namely Guardant would promptly notify Natera and meet and confer in good faith if it believe Natera violated it.  Dkt. 25-3, ¶ 5.  Then if the "movant reasonably believes the breach is ongoing or in bad faith," Guardant could file a motion for contempt with the Court based on a potential breach.  Guardant never brought any issue to the Court through the Joint-Statement's mechanisms.  There is insufficient evidence of misconduct during the litigation to make this case "exceptional."  Additionally, the jury's award of $175 million in punitive damages, combined with the permanent

injunction against Natera, are adequate forms of compensation and deterrence.

Accordingly, the Court fails to find this case is an "exceptional" warranting an award of attorneys' fees and costs.  Therefore, Guardant's Motion is **DENIED**.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court:

**(1) DENIES** Natera's Motion for JMOL or a New Trial (Dkt. 880);

**(2) DENIES** Natera's Motion for Judgment on Equitable Claims (Dkt. 881);

**(3) GRANTS IN PART AND DENIES IN PART** Guardant's Motion for Judgment on Cal. Statutory Claims and Motion for Permanent Injunction (Dkt. 889);

   a.  The Court **ENTERS JUDGMENT** for Guardant on Guardant's UCL and FAL claims and **ENTERS JUDGMENT** for Guardant on Natera's UCL and FAL counterclaims.

   b.  The Court enters the limited and narrow injunction against Natera as stated herein.

//
//
//
//
//
//
//
//
//
//
//
//
//

(**4**) **GRANTS IN PART AND DENIES IN PART** Guardant's Motion for Equitable

Monetary Remedies (Dkt. 890);

    a.   The Court finds Guardant shall be awarded $37,023,968 million in

          disgorgement of Natera's unjust profits for the period of the false

          advertisements prior to September 2023.

    b.   The Court **DENIES** Guardant's request for additional disgorgement and

          enhanced legal damages.

    c.   The Court **DENIES** Guardant's request for prejudgment interest under the

          Lanham Act.

(**5**) **DENIES** Guardant's Motion for Attorneys' Fees and Costs (Dkt. 891).

The Court directs the Clerk of the Court to enter a final judgment in accordance with this

Order.

**IT IS SO ORDERED**.

Dated: July 28, 2025

_____
EDWARD M. CHEN
United States District Judge