UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUARDANT HEALTH, INC., | Case No. 21-cv-04062-EMC |
| Plaintiff, | |
| v. | **ORDER ADOPTING SPECIAL MASTER REPORTS ON SANCTIONS; GRANTING LIMITED SEALING** |
| NATERA, INC., et al., | |
| Defendants. | Docket Nos. 1017, 1018 |

## I.    INTRODUCTION

Picture a mid-level litigation associate at a well-recognized law firm.  It is the summer of 2023, and the firm's client, a maker of cancer tests, has been sued by a competitor for false and misleading advertising.  The client's defense hinges on showing that the science backs up its statements.

In early September, an expert witness retained by the firm contacts the associate with intriguing news — a national clinical study of the plaintiff's product closed early due to higher-than-expected false positives.  The expert calls it a "monumental failure" for the opposition, which means it could be a litigation game-changer for the associate and her case team.  At the team's request, their expert prepares a memo about the shuttered study.  The memo turns out to be more than a summary: it includes data from the clinical trial before it was terminated.  Their expert warns that this trial data is "confidential" and "embargoed," and writes, "PLEASE DO NOT DISCUSS DETAILS with anyone else."

The associate's supervising partner does not seem concerned with how their expert, who was not part of the study, obtained access to embargoed, confidential clinical data.  He tells the associate to "convert" the memo into a supplemental expert report.  In January, the associate

circulates a draft expert report based on the memo to her case team.  A different partner reviews it, questioning the lack of citations for the clinical trial data.  The associate explains that the data was provided by their expert in confidence and so cannot be cited.  She is hoping that this data will be revealed to the public when the abstract is published at an upcoming conference.  If the data is confidential, the reviewing partner asks, how did the expert get it? But she is not interested in pursuing this potential ethical problem further. "Maybe I don't want to know," she says, and the conversation ends there.

The associate's hopes are mostly met.  The abstract is published on schedule and the data in it mostly aligns with the data the firm's expert provided, though some of the data he provided didn't make it into the public abstract.  At the associate's next meeting with the expert, she asks him where he got his data from.  He tells her: "oncologist gossip," "watercooler type talk," and "chatters."  Watercooler talk, for specific clinical trial data?  It's not a real answer, but despite the implausibility she accepts it at face value and lets the conversation end there.  Trial is set for March, and if her team is going to get this supplemental expert report in, she needs to work quickly.  It's not the time or place to second-guess.

Anyway, she reassures herself, the partners know that the supplemental expert report was informed by embargoed data, and their only concern is that she revise the expert report to match the public abstract.  That's easy enough to do.  On the last day of January, with less than six weeks to go before trial, the team serves the report on opposing counsel.  Opposing counsel responds by moving to strike, arguing that the expert report is untimely because it concerns a study that concluded five months ago.

The associate observes the oral argument on opposing counsel's motion to strike. Opposing counsel claims that the firm's expert received the "abstract and the data at least a month and a half before" the abstract was published.  He argues that this untimely report should not vacate a trial that is less than a month away or reopen expert discovery that closed sixteen months ago.  A different partner from the associate's team is handling this argument, one who did not work with her on the supplemental expert report.  He tells the Court that their expert had no "early access" or "inside information" on the clinical trial results.  He implies the information is new and

United States District Court
Northern District of California

late breaking.

Is that true? *Technically*, the associate thinks, their expert did not have early access to the actual abstract. He'd just gotten its data early.

The distinction is thin and evidently not apparent to the Court or opposing counsel. Yet the associate keeps quiet. She does not raise the issue with the Court or her legal team. Instead, perhaps, she takes the oral argument as a lesson: this is what vigorous advocacy looks like.

Her team wins the motion. The Court rules that their delay in serving the expert report was justified, since the study results were not available to the firm or their expert until mid-January, when they were made public. Given the late-breaking evidence, the Court vacates the trial date, pushes trial to August, and reopens discovery.

Opposing counsel refuses to let the issue go. They subpoena the expert, seeking documents and communications related to the clinical study. When the associate asks the expert if he has any documents responsive to the subpoena, he says no. She asks him to run opposing counsel's search terms, and he tells her that no prior correspondence with the sponsors of the study came up in his email. When she asks for additional confirmation, he jokes, "asked and answered, counselor." The associate remembers the expert's memo from back in September, with its detailed, embargoed data months before the public release of the study. But she chooses to take the expert at his word without any further inquiry. She reports back to her team that there are no responsive documents.

When opposing counsel moves to compel on their request for correspondence between the expert and the study sponsor, the associate is given the opportunity to handle the oral argument in front of the magistrate judge. It's a show of trust by her team, and she is determined to do it right. She reassures the judge that their expert's involvement with the clinical study was "very limited" and that his expert report was based on "looking at the published data." She represents to the judge that there is no correspondence to compel.

The magistrate judge agrees with her position: there is nothing to compel, end of story. Another win for her team.

In June, it all comes crashing down. Opposing counsel didn't stop digging — they went

and subpoenaed a third-party sponsor of the study with access to the expert's correspondence. The third-party production includes emails that show in black and white that the firm's expert received a draft of the abstract on September 13, days before he sent the associate his initial memo. The associate finally circulates the memo to the team. She writes in bold and all caps that their expert did not just learn about the trial data in January with everyone else. He'd had "the actual abstract" the whole time, which means that the data he'd sent the team had been directly taken from the abstract.

The team convenes and, after discussing, decides not to correct the record. The decision is not the associate's to make, but she agrees with it. As for the expert, she accepts his explanation for why he failed to turn over that correspondence in response to the discovery request: he'd deleted the emails as a matter of course and "forgotten" that he'd had them. The team resolves to rest on that assertion, as implausible as it sounds. Later, and only after the Court orders a forensic examination of the expert's computer, does the expert come clean. He lied: he'd had the emails the whole time.

Opposing counsel moves for sanctions. In strategy discussions, the team agrees on the party line: nobody misled the Court. Saying that their expert never shared the draft abstract with them was *technically* accurate; he hadn't actually shared the abstract, just the information it contained. More thin distinctions. The associate tells herself that thin distinctions are what lawyering is all about.

In the end, the Court finds that the associate and her firm deliberately and knowingly misled the Court. When asked about it later, the associate doesn't believe that she did anything wrong.

*\*\*\**

This is not a Professional Ethics issue spotter. These are the facts of Quinn Emanuel's conduct in the instant litigation, as investigated by the appointed Special Master.[1] The Special

---

[1] In presenting these facts, the Court has taken some liberty in ascribing to the attorneys states of mind throughout.

4

United States District Court
Northern District of California

Master reviewed internal firm communications and took testimony from the involved attorneys under oath. His thorough investigation revealed not the misstatement or inadvertence of a single attorney but a pattern of conduct that infected an entire litigation team, from mid-level associate to managing partner. No less than four partners were involved in propagating misleading statements to the Court. At virtually every juncture in this misadventure, these attorneys turned a blind eye to the truth, deliberately failed to exercise diligence, violated their duties of candor to the Court, and then attempted to justify it — without basis.

Though each attorney culpable bears individual responsibility for their actions, their conduct implicates a culture of lawyering that is deeply disturbing. It is a culture that takes refuge in lawyering finesse and prioritizes winning motions over acting ethically. This kind of lawyering multiplies proceedings, balloons costs, and erodes trust in counsel. It is not good for anyone: not for the Court, not for the client, and not for the attorneys involved, on either side. It is particularly damaging to younger associates, who take their cues and learn their practice from partners who fail to model ethical behavior, creating a vicious cycle. The undersigned hopes that these events — and their consequences — will be educational for Quinn Emanuel, and for the legal profession as a whole.

## II. BACKGROUND

The Court will not further belabor the troubling sequence of events that led to this point. They are discussed in the Court's sanction orders at Dkt. Nos. 730 and 945 and at great length in the Special Master's Reports, appended to this Order. In prior orders, the Court found that "Quinn Emanuel deliberately and knowingly misled this Court," and awarded Guardant $2,985,909.63 in compensatory sanctions. Dkt. No. 945 at 2. These fees compensated Guardant for work incurred as a but-for result of Quinn Emanuel's sanctionable conduct, including for the costs of reopening discovery and preparing for an expanded trial based on the supposedly newly discovered clinical trial results. *Id.* at 3. Had Quinn Emanuel not made its deliberate misrepresentations to the Court, the trial would have proceeded in February, fact discovery would not have been reopened, and these substantial costs would not have been incurred. *Id.* at 5.

The Court deferred the question of how these compensatory sanctions should be apportioned between Natera, Quinn Emanuel, and individual Quinn Emanuel attorneys to a Special Master. The Court also deferred the question of whether punitive damages should be assessed. The Court's Appointment Order instructed the Special Master to determine the apportionment of sanctions by taking into account "the relative culpability of Natera, the firm, and individual attorneys responsible." Dkt. No. 947 at 2. The Special Master was authorized to order the production of documents, rule on privilege, conduct evidentiary hearings, and call individual attorneys to testify under oath. *Id.* at 2-3. Guardant was permitted to participate in the proceedings at the Special Master's discretion, *id.* at 3, but the Special Master remained firmly in control over the investigation. The Natera Parties were charged with the costs of the Special Master. *Id.* at 4.

The Special Master filed his initial Report on January 9, 2026. The almost 60-page report provided detailed factual findings based on the Special Master's investigation, which included the review of Quinn Emanuel's internal communications and the testimony of various Quinn attorneys, as well as Dr. Hochster, the expert who misled the Court herein. In forming his recommendation, the Special Master considered "individual culpability, mitigating factors, and the severity of the firm's collective responsibility for the series of failures that unnecessarily protracted litigation and eroded the integrity of the proceedings." Report at 59. He looked to mitigating factors including "lack of any prior discipline, lack of legal experience, personal problems, remorse, cooperative attitude toward proceedings, the imposition of other penalties or sanctions," as well as aggravating factors such as "the refusal to acknowledge the wrongful nature of the conduct and substantial experience practicing law." *Id.* at 21.

The Special Master recommended the following apportionment and additional sanctions:

- Natera: No apportionment of liability.
- Quinn Emanuel Firm: Apportionment on a joint and several basis of 100% of the sanctions, as well as a $100,000 fine of punitive sanctions. Requirement to develop and administer eight hours of ethics training to the team on this litigation, with the outline of the training to be submitted to the Court.

- Andrew Bramhall (Quinn Emanuel Partner):  Apportionment on a joint and several basis up to 2% ($58,000) and eight hours of ethics training.
- Brian Cannon (Quinn Emanuel Partner):  Apportionment on a joint and several basis up to 2% ($58,000) and eight hours of ethics training.
- Ryan Landes (Quinn Emanuel Partner):  No apportionment of liability.
- Elle Wang (Quinn Emanuel Associate):  Apportionment on a joint and several basis up to 1% ($29,000) and eight hours of ethics training.
- Margaret Shyr (Quinn Emanuel Partner):  No recommendation as to apportionment, but show cause order from the Court requested.
- Victoria Maroulis (Quinn Emanuel Managing Partner):  No recommendation as to apportionment, but show cause order from the Court requested.

After receiving the Special Master's Report, the Court issued a Show Cause order as to Ms. Shyr and Ms. Maroulis and authorized the Special Master to issue a supplemental report discussing potential apportionment for each.  Dkt. No. 1010.  A subsequent order also directed the Special Master to discuss "the applicable standard and appropriate procedures for imposing any punitive sanctions against Quinn Emanuel."  Dkt. No. 1016.  The Special Master submitted his Supplemental Report on February 27, 2026.  The Supplemental Report recommended apportionments of 1% for Ms. Shyr and 2% for Ms. Maroulis.

Quinn submitted consolidated Objections to the Reports on March 23, 2026. Dkt.  No. 1023.  Certain Quinn attorneys have also submitted personal letters to the Court.  *See* Dkt. No. 1012 (Bramhall Letter); Dkt. No. 1013 (Cannon Letter); Dkt. No. 1014 (Landes Letter); Dkt. No. 1015 (Wang Letter); Dkt. Nos. 1024 (Maroulis Letter).

### III.    DISCUSSION

**A. Sealing of the Special Master's Report**

The Court initially lodged the Special Master Reports under temporary seal.   The parties now agree that the portions of the Reports redacted by the Special Master concern privileged documents for which no waiver was made, and therefore should remain under seal.  Dkt. Nos.

United States District Court
Northern District of California

7

1025, 1028.  Preservation of the attorney-client and work product privilege satisfies the good cause standard for sealing.  *See Ctr. for Auto Safety v. Chrysler Grp.*, LLC, 809 F.3d 1092, 1096 (9th Cir. 2016) (good cause sealing standard applies for collateral, non-dispositive issues); *Capitol Specialty Ins. Corp. v. GEICO Gen. Ins. Co.*, No. CV 20-672-RSWL-EX, 2021 WL 7708484, at *3 (C.D. Cal. Apr. 14, 2021) (granting requests to seal given that "[a]ttorney-client privileged materials, of course, are archetypical examples of material that has traditionally been kept secret for important policy reasons") (quoting *Lambright v. Ryan*, 698 F.3d 808, 820 (9th Cir. 2012)).

Natera's request to seal the redacted portions of the Report is therefore **GRANTED**.   With those redactions, the Reports may be made public.  The Reports are attached hereto.

### B.  Objections of the Quinn Emanuel Parties to the Special Master Report

As a preliminary matter, the Quinn Emanuel Parties have stated in their Objections, and confirmed at oral argument, that they make no substantive objections to the Reports or the recommendations herein.  *See* Dkt. No. 1023, Consolidated Objections, ("[T]he Quinn Emanuel Parties respectfully submit this response and objections to the Special Master's Supplemental Report not to challenge or contest the specific findings and recommendations he made, but to reiterate certain procedural objections regarding how those findings and recommendations were made.")  The Quinn Emanuel Parties do not object to the Special Master's recommended apportionment of compensatory sanctions, nor do they object to the Special Master's recommended award of $100,000 in punitive damages.  Their only objections are procedural.  The Court is thus not required to examine de novo any findings of fact or conclusions of law made by the Special Master.  Fed. R. Civ. P. 53(f)(3-4).

1.  Scope of Waiver

The first of the Quinn Emanuel Parties' objections is not actually an objection but concerns potential future waiver disputes.  During the Special Master proceedings, the Special Master reviewed in camera numerous privileged attorney-client and work product documents under rule 502(d).  502(d) provides that a disclosure of privileged documents does not have the effect of

waiving the privilege over those documents.  Fed. R. Civ. Pr. 502(d).  For a narrow segment of these documents, however, the Special Master found waiver of privilege over fact work product.  Due to this waiver finding, these documents were also produced to Guardant.

The Quinn Emanuel Parties do not object to the Special Master's waiver finding over these documents.  Rather, they are concerned that in some future proceeding, Guardant or another party may argue that the production of these documents effected a broad or subject matter waiver of privilege over *other* documents that the Special Master did not deem waived and only reviewed *in camera*.  This concern is premature, since no such assertion has been made.  The Court reiterates that the privilege is presumptively maintained for the class of documents for which the Special Master found no waiver, without prejudice to any future argument that waiver was in fact effected.

2.  Due Process as to Ms. Shyr and Ms. Maroulis

The Quinn Emanuel parties contend that Ms. Shyr and Ms. Maroulis' due process rights were violated when the Special Master ultimately recommended individual apportionment for these attorneys, after initially interviewing them only as witnesses in the course of the initial report.

Some background is helpful.  When Guardant filed its motion for sanctions at Dkt. No. 884-13, it sought to apportion sanctions against "at least" four Quinn Emanuel attorneys it believed bore personal culpability for the sanctionable conduct:  Andrew Bramhall, Elle Wang, Ryan Landes, and Brian Cannon.  Ms. Shyr and Ms. Maroulis were not mentioned in this motion.  Guardant named these four attorneys based on the evidence available to it at the time but deferred to the Court to determine the extent to which individual Quinn Emanuel attorneys should be held liable for the compensatory sanctions.  Dkt. No. 884-13 at 16.  The Court then deferred to the Special Master the appropriate apportionment of the "individual attorneys responsible" for the sanctionable conduct.  Dkt. No. 947 at 2.  Notably, the Court's order did ***not*** limit this inquiry to specific Quinn Emanuel attorneys; indeed, the order mentions no specific attorneys by name.

The Special Master initially interviewed Ms. Shyr and Ms. Maroulis as witnesses.  In his initial Report, he made factual findings as to their role in the sanctionable conduct.  These factual findings were based in large part on the internal emails and documents that the Special Master

9

reviewed.  For example, the Special Master gleaned from internal documents that Ms. Maroulis directed the strategic decision to rely on facile distinctions between the draft abstract and data from that abstract in briefing before the Court.  Report at 53-54.  The Special Master's review of internal documents also demonstrated that when faced with the knowledge that Dr. Hochester had access to non-public data, Ms. Shyr's response was to write, "If that data is confidential, how did Hochster get it? Maybe I don't want to know."  Report at 55.  In his initial Report, the Special Master provided these factual findings, and based on them requested that the Court enter a show cause order specifically authorizing him to make an apportionment recommendation as to Ms. Shyr and Ms. Maroulis.  Once the Court did so, the Special Master provided both attorneys with the opportunity to provide further testimony under oath or submit additional evidence to amend or clarify their prior testimony.  Ms. Shyr and Ms. Maroulis submitted a formal waiver declining to do so.  Ex. A to Supp. Report.

On this record, the Court finds Quinn Emanuel's process objection meritless.  First, the Special Master acted well within the scope of his authority.  The Court's initial order authorized him to determine apportionment for *any* Quinn Emanuel attorney found to be culpable in the sanctionable conduct; the order did not limit the Special Master to only the four attorneys Guardant named in their sanctions motion.  The Special Master, acting out of an abundance of caution, declined to make any apportionment recommendations for Ms. Shyr and Ms. Maroulis without formal notice from the Court authorizing him to do so.  Once he received this specific authorization, he then provided them with a further chance to provide testimony or evidence, which they declined.  The Special Master had full authority to make the recommendations he did.

Quinn's reliance on *In re Ruffalo*, 390 U.S. 544, 551 (1968) is misplaced.  In *Ruffalo*, the Supreme Court held that in quasi-criminal proceedings such as disbarment, an individual must know the charge before proceedings commence.  Otherwise, such proceedings "become a trap" when "charges are amended on the basis of the testimony of the accused," who cannot "expunge his earlier statements, even if provided a second chance to testify.  *Id.* at 551.  In *Ruffalo*, the attorney provided testimony when he had "no reason even to suspect" the charges that would lead to his disbarment.  *Id*. at n.4.  The Court therefore found that he may have been "lulled into a false sense of security" in his prior testimony that could not be cured by a later opportunity to

10

testify. *Id.*

*Ruffalo* is inapposite for multiple reasons. First, it is not clear that Ms. Shyr and Ms. Maroulis' testimony — as opposed to the written documentation of their conduct (*e.g.* internal emails) — was the material factor in the Special Master's recommendation. As noted, Ms. Shyr and Ms. Maroulis' actions, as documented in their internal communications, provide an independent basis for the Special Master's finding even without their witness testimony. Ms. Shyr and Ms. Maroulis do not point to any statements made by them in testimony that they were 'entrapped' into, nor do they argue they would have said something different to the Special Master had they known they might be subject to shared responsibility for the sanction.

Second, and more importantly, unlike in *Ruffalo*, when Ms. Shyr and Ms. Maroulis testified as witnesses during the initial investigation, they were well aware of the relevant "charge" in this case — the misrepresentations made and the failure to correct them. They cannot argue that they had "no reason to suspect" that they could be sanctioned if their testimony revealed that they engaged in the same pattern of conduct as their colleagues. It is no answer to say that they had no notice because Guardant did not name them in its sanctions motion. Guardant did not know the extent of Ms. Shyr and Ms. Maroulis' involvement at that time; only Ms. Shyr and Ms. Maroulis knew what they knew, said, and did. In short, there was no trap for the unwary here. The Quinn Emanuel Parties' objection on this score is overruled.

### 3. Due Process for Punitive Sanctions

Although Quinn Emanuel claims that it "recognizes the gravity of the Court's and Special Master's findings, accepts responsibility, and will not challenge the $100,000 punitive sanction recommended in the Report," it nonetheless challenges whether the punitive sanction complies with due process. Dkt. No. 1023 at 3.

As a preliminary matter, Quinn Emanuel suggested at oral argument that its process objections on this score applied not only to the $100,000 punitive sanction award but to the individual apportionment of the compensatory sanctions. Quinn's position is apparently that individual apportionment is inherently punitive. This position holds no water. The sanctions

imposed by this Court were compensatory, not punitive. And apportionment of that compensatory sanction is aimed at ensuring that the actors involved bear only the costs proportionate to their culpability. Rather than being punitive, apportionment puts a limit on personal liability which would otherwise be fully joint and several. If anything, this is the opposite of a punitive process. Indeed, as a result of the apportionment process, Natera — Quinn Emanuel's client — was absolved entirely of millions in sanctions it might otherwise have had to pay. And the Special Master determined that one Quinn attorney, Ryan Landes, was not sufficiently culpable to be held individually liable at all. As to the remaining attorneys, the Special Master capped their liability at 1-2% of the sanctions. The Court therefore rejects Quinn Emanuel's contention that the apportionment process itself was punitive and turns to Quinn Emanuel's argument as to the punitive damages recommendation.

"[W]hen strictly compensatory or remedial sanctions are sought, civil procedures, rather than criminal-type procedures, may be applied." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1089 (9th Cir. 2021) (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826-830 (1994)). But where a sanction is "imposed under a court's inherent authority as a penalty or to punish someone," the "procedural guarantees applicable in criminal cases" must be provided. *Id.* (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). "[T]he seriousness of a criminal fine affects what due process protections are required." *Coleman v. Newsom*, 131 F.4th 948, 964 (9th Cir. 2025) (emphasis omitted). "[W]hile all criminal sanctions require heightened due process protections," "the right to trial by jury applies only to serious criminal sanctions." *Id.*

The Special Master found that his recommended $100,000 punitive sanction was not a "serious" one within the meaning of *Coleman*, and Quinn Emanuel does not dispute this finding. Nor could it: the Ninth Circuit takes into consideration the resources of the sanctioned party to determine the seriousness of the sanction. *See F.J. Hanshaw Enters. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1139 n.10 (9th Cir. 2001) (taking into consideration that the party subject to the sanction was a "wealthy individual"). Here, the proposed sanction amounts to 0.004% of Quinn's revenue for 2025 alone. Supp. Report at 19-20. (For another comparator, the proposed sanction is

United States District Court
Northern District of California

a mere 1.2% of a single equity partner's profits from 2025, which were reported as over $9,000,000 per partner.  Dkt. No. 1027 at n.1; Bloomberg Law, https://news.bloomberglaw.com/business-and-practice/quinn-emanuel-partners-join-rare-club-with-9-million-payouts.)  Since the sanction is not serious, the Ninth Circuit's caselaw is clear that Quinn Emanuel was not entitled to a jury trial.  Less clear is to what extent Quinn Emanuel was entitled to other traditional criminal protections.  Beyond noting that "heightened protections" apply, the Ninth Circuit does not appear to have provided guidance on how to assess *which* further protections apply in any given case.

The Court does not need to resolve this question, however, because Quinn Emanuel obtained nearly all of the panoply of procedural guarantees applicable in criminal cases.  To wit, Quinn Emanuel was advised of the charges against it, had the assistance of counsel, could have invoked a right against self-incrimination but chose not to do so, had the opportunity to present a defense (including calling witnesses), did not exercise a right to cross-examine witnesses (only because the relevant witnesses were all Quinn attorneys), and had the equivalent of a disinterested prosecutor in the form of the Special Master.  In this regard, Quinn Emanuel does not dispute that the Special Master was disinterested but contends that Guardant's participation in the proceedings tainted the proceedings.  But to adopt Quinn Emanuel's preferred metaphor, it is common in criminal proceedings for the victim to work closely with the prosecution.  While it is true Guardant's counsel was allowed to ask questions, unlike a victim at a criminal trial, Quinn Emanuel does not contend that the Special Master ever deferred to Guardant or exercised anything other than his own independent judgment in running the investigation and in reaching his findings and recommendations.  To the extent Quinn Emanuel was entitled to an independent "prosecutor," it received one.  Guardant's limited participation in the investigation, as permitted by the Special Master, does not change that.

Quinn Emanuel also contends that the applicable standard to assess its conduct is a beyond reasonable doubt standard, rather than clear and convincing.  Such a standard may make sense when the punitive sanctions at issue involve a restriction of liberty.  Here, though, the punitive sanction is only monetary.  In the typical civil case, such punitive damages can be awarded by a

13

jury upon a clear and convincing finding.  It is difficult to see why this standard would not apply here.  Even assuming that a beyond reasonable doubt standard does apply, the Court finds that the Special Master's factual findings show beyond a reasonable doubt that Quinn Emanuel recklessly or intentionally misled the Court, failed to correct an obviously meritless litigation position, and proliferated court proceedings, and that the findings as to the responsible attorneys hold even under a higher standard of proof.  *See In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010) ("[A] finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under § 1927.").  Under either standard, the punitive sanction is warranted, and Quinn does not actually dispute that it is warranted.  Quinn's procedural objection is accordingly overruled.

### C.  Adoption of the Special Master's Report

No party has challenged the substance of the Special Master's factual findings, nor the merits of his recommendations.  Based on the Court's independent review of the Special Master's Reports, the Court finds that the Special Master's investigation was extensive and thorough, that the Special Master's conclusions are well-supported by the record evidence, and that his apportionment reflects balanced judgment as to each attorney's personal degree of culpability.  The Court accordingly **ADOPTS** the Special Master's Report and Supplemental Report.

### D.  Mandatory Reporting to the California Bar

Under California Code, Business and Professions Code § 6086.7(a)(3), the Court is required to notify the California State Bar of "[t]he imposition of any judicial sanctions against an attorney, except sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000)."  Mr. Bramhall, Mr. Cannon, Ms. Wang, Ms. Shyr, and Ms. Maroulis have all been apportioned individual sanctions greater than $1,000.  Accordingly, the Court will transmit to the State Bar a copy of this Order, with the appended Special Master Reports.

United States District Court
Northern District of California

14

United States District Court
Northern District of California

IV.   **CONCLUSION**

The Court **ADOPTS** the Special Master's Reports and Recommendations.  Quinn Emanuel is directed to begin development of an eight-hour course on ethics training.  The firm shall submit its initial outline to the Court by July 6, 2026.  The Court will enter a final sanctions order upon adjudication of Guardant's outstanding motion for further fees.

**IT IS SO ORDERED**.

Dated: 5/19/2026

_____

EDWARD M. CHEN
United States District Judge