Ismail Ramsey (CABN 189820)
Law Office of Ismail Ramsey
ramsey@ismailramsey.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| GUARDANT HEALTH, INC., | Case No. 3:21-cv-04062-EMC |
| Plaintiff and Counterclaim-Defendant | **SPECIAL MASTER'S REPORT AND RECOMMENDATIONS** |
| vs. | To: DISTRICT JUDGE EDWARD M. CHEN |
| NATERA, INC., | FROM: SPECIAL MASTER ISMAIL RAMSEY |
| Defendant and Counterclaim-Plaintiff | **[REDACTED]** |

# TABLE OF CONTENTS

**I. INTRODUCTION**........................................................................................................**3**

**II. RECOMMENDATIONS**............................................................................................**6**

**III. OVERVIEW OF FACTS**.........................................................................................**8**

    A. August 30, 2023, closure of the COBRA study.......................................................8

    B. September 8, 2023, phone call with Dr. Hochster....................................................8

    C. September 15, 2023, memo from Dr. Hochster........................................................9

    D. January 2024 — drafting of Dr. Hochster's supplemental report............................9

    E. February 21, 2024, hearing on Guardant's motion to strike..................................10

    F. March to April 2024 — subpoena for documents to Dr. Hochster and motion to compel.. 11

    G. June 13, 2024, Rutgers production; June 17, 2024, deposition preparation; June 18, 2024 deposition...............................................................................................................13

    H. July 19, 2024, opposition to Guardant's motion for sanctions.............................14

    I. Dr. Hochster's disclosures on July 30 and August 9, 2024, and August 15, 2024, letter to the Court.........................................................................................................15

**IV. PROCEDURAL HISTORY**....................................................................................**16**

    A. Appointment of the Special Master.......................................................................16

    B. Document production, privilege determination, and in camera review..................17

    C. Public Access.......................................................................................................18

    D. Witness Interviews...............................................................................................19

    F. Other matters.......................................................................................................19

**V.  LEGAL STANDARDS**...........................................................................................**20**

**VI. ENTITY RESPONSIBILITY**.................................................................................**22**

    A. Quinn...................................................................................................................22

    B. Natera..................................................................................................................23

**VII. INDIVIDUAL RESPONSIBILITY**.......................................................................**25**

    A. Andrew Bramhall................................................................................................25

        1. Background..................................................................................................25

        2. February 21, 2024, hearing on the motion to strike.....................................27

        3. Subpoena responses and motion to compel.................................................27

        4. Rutgers production and Dr. Hochster's deposition testimony.......................28

        5. Response to motion for sanctions................................................................31

        6. Responsibility, mitigating and aggravating factors......................................32

    B. Brian Cannon.......................................................................................................33

        1. February 21, 2024, hearing on the motion to strike.....................................33

        2. Responsibility, mitigating and aggravating factors......................................36

    C. Elle Wang............................................................................................................37

        1. Background on September 2023 communications with Dr. Hochster.............37

2. Background on the January 2024 supplemental expert report.................................38
3. February 21, 2024, hearing on motion to strike....................................................41
4. Response to subpoena and motion to compel........................................................42
5. Rutgers production, Dr. Hochster's deposition, opposition to motion for sanctions.....44
6. Responsibility, mitigating and aggravating factors..............................................46
D. Ryan Landes.............................................................................................................47
1. Response to Guardant's subpoena........................................................................48
2. Rutgers production and opposition to motion for sanctions.................................48
3. Disclosures in late July and August 2024............................................................49
4. Responsibility, aggravating and mitigating factors.............................................50
**VIII. ADDITIONAL FACTUAL FINDINGS...........................................................51**
A. Victoria Maroulis.....................................................................................................51
1. Rutgers production...............................................................................................51
2. Opposition to motion for sanctions......................................................................53
B. Margaret Shyr...........................................................................................................54
1. Background on Dr. Hochster's supplemental report.............................................55
2. February 21, 2024, hearing on motion to strike...................................................56
3. Rutgers production and subsequent proceedings..................................................59
**IX. CONCLUSION.....................................................................................................59**

## I. INTRODUCTION

Pursuant to this Court's Order at Docket 947, the Special Master submits this Report and Recommendation to address apportionment of the monetary sanctions ordered by the Court at Docket 945 among Natera, Inc., Quinn Emanuel Urquhart & Sullivan, LLP, and individual Quinn attorneys (Andrew Bramhall, Elle Wang, Brian Cannon, Ryan Landes),[1] and whether punitive sanctions or additional disciplinary measures are warranted. Dkt. 947 at 2:1-6. In order to make these recommendations, the Special Master undertook factfinding to assess the individual attorneys' respective responsibilities for the series of misleading statements concerning the supplemental expert report of Natera's expert, Dr. Howard Hochster — in particular, the information Dr. Hochster possessed regarding the results of the COBRA study in the fall of 2023 and his sharing of that information with Quinn — identified by the Court at Docket 730. The Special Master determined whether any of the individual attorneys at Quinn "recklessly or intentionally misled the court," made arguments "without reasonable and competent inquiry," or failed in the "duty to correct or withdraw [meritless] litigation positions" — conduct that warrants individual sanctions under 28 U.S.C. section 1927. *See In re Girardi*, 611 F.3d 1027, 1061-62, 1064 (9th Cir. 2010). Mitigating and aggravating factors were considered, including whether the individuals recognized their own role and fault. *See* ABA Model Rule 10. In addition, the Special Master considered the appropriate apportionment of sanctions to Quinn as a firm and Natera under the Court's inherent authority to sanction conduct that "abuses the judicial process." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1086 (9th Cir. 2021). The Special Master reviewed documents produced by Natera and interviewed Quinn attorneys Andrew Bramhall, Elle Wang, Brian Cannon, Ryan Landes, Victoria Maroulis, and Margaret Shyr, Natera in-house counsel Russ Farr and Jon Rabin, and Dr. Hochster.

---

[1] The Special Master has not made recommendations with respect to Quinn attorneys Victoria Maroulis and Margaret Shyr. Neither Ms. Shyr nor Ms. Maroulis was identified by Guardant in its request for monetary sanctions against individual attorneys or this Court's orders imposing sanctions. See Dkt. 884-13 at 9-13; Dkt. 945. Accordingly, as discussed below in greater detail, the Special Master recommends that this Court issue an Order to Show Cause to allow each to be heard prior to any recommendation.

Key to events is a memo that Dr. Hochster sent to Mr. Bramhall and Ms. Wang on September 15, 2023. Dr. Hochster emailed this memo following a phone call with Mr. Bramhall and Ms. Wang, in which he described the COBRA closure as a "monumental failure" for Guardant and provided certain technical information he had learned from COBRA investigators. That memo contained specific data on the results of the COBRA study; Dr. Hochster made clear that the information was to remain confidential, was embargoed data until its anticipated publication in January, and was not to be shared.

Much of the misconduct that followed stemmed from the initial failures of Mr. Bramhall to read the memo in detail and Ms. Wang to understand the significance of her receipt of such confidential information — and the fact that neither circulated the memo to the broader team. Only on June 13, 2024, after Rutgers produced an email from Dr. Boland to Dr. Hochster forwarding the draft abstract, did Ms. Wang circulate the September 15 memo to others. At that time, everyone on the Quinn team became aware that Dr. Hochster had received the draft abstract and provided the COBRA data it contained to Quinn in the memo.

Even before that revelation, however, the Quinn attorneys involved, including Mr. Bramhall, Ms. Wang, and Ms. Shyr, knew (or willfully ignored) that Dr. Hochster had early confidential information about the COBRA trial results — they used information in Dr. Hochster's memo as the basis for the initial draft of the supplemental expert report. Thus, they knew that Mr. Cannon's later representations to the Court at the February 21, 2024, hearing on the motion to strike — that Dr. Hochster had no "early access" and "inside information" — were not accurate. But they did not speak up at the time, undertake any additional investigation, or correct the record. Their various explanations for these lapses — including that only the published abstract was "material" and that Dr. Hochster had represented to Quinn that he only had "gossip"— ring hollow.

Later, in responding to Guardant's discovery and in response to its motion to compel, Mr. Bramhall and Ms. Wang, without challenge, accepted Dr. Hochster's representations that he had

no emails with COBRA investigators about the COBRA closure. But based on Dr. Hochster's September communications, further scrutiny was required.

After the Rutgers production on June 13, 2024, the entire team indisputably knew that Dr. Hochster had early access to the draft abstract and in September had shared information from that abstract with Quinn, including Ms. Maroulis, who was a co-lead attorney in the matter. The Quinn team knew that the draft memo and published abstract had identical data. But, when the Quinn team considered whether to correct the record from the February 21, 2024, hearing, they decided not to. The individual attorneys maintained that the representations about early access were not material or, alternatively, no longer at issue. Mr. Cannon also maintained that he had spoken exclusively as to his own knowledge at the hearing, not on behalf of Natera or Quinn. These rationales are neither persuasive nor grounded in the record.

Rutgers also produced numerous emails that were responsive to Guardant's discovery requests that Dr. Hochster had not produced. When the Quinn team met with Dr. Hochster they accepted his explanations that he had not remembered his communications or deleted them. Dr. Hochster repeated his explanations at his depositions. But Quinn conducted no additional diligence with Dr. Hochster, despite red flags that he was being untruthful, including that Dr. Hochster may have sought to obfuscate his own potential breach of ethics by having shared the embargoed information with Quinn at all. Further proceedings could have been avoided had one of the Quinn attorneys simply conducted a screenshare with Dr. Hochster and asked him to run a search — which they eventually did when faced with a court-ordered forensic exam.

When Guardant moved for sanctions, Quinn on behalf of Natera claimed that, though Dr. Hochster had received a draft abstract, due to the strict embargo, he "could not (and did not) disclose it to anyone, including anyone at Natera." Natera argued that it could not submit Dr. Hochster's report any sooner than it did due to the embargo. The Quinn attorneys made these representations with full knowledge that Dr. Hochster had shared the COBRA closure data with them in September. Before the Special Master, as they did in their briefs before Judge Chen, the Quinn attorneys claimed that their argument was targeted only at the abstract, not at the data

from the abstract, so it was not misleading. At best, this distinction is a reckless distortion of the record. Astonishingly, before the Special Master, the Quinn attorneys now claim that the draft abstract was "widely distributed" before publication at the ASCO GI conference — in direct contradiction to their earlier arguments that the draft abstract was under strict embargo and could not be disclosed as part of Dr. Hochster's supplemental expert report.

This factual record, which is discussed below in more detail with respect to individual Quinn attorneys, the firm as a whole, and Natera, supports the following recommendations for apportionment of sanctions already imposed by this Court, punitive sanctions, and disciplinary referrals.

## II.    RECOMMENDATIONS

**Andrew Bramhall:** For his conduct, Mr. Bramhall should be apportioned compensatory sanctions on a joint and several basis up to 2% of the total amount ($58,000.00).  Mr. Bramhall should also be required to attend eight hours of ethics training provided by Quinn, as described below.

**Brian Cannon:**  For his conduct, Mr. Cannon should be apportioned compensatory sanctions on a joint and several basis up to 2% of the total amount ($58,000.00). Mr. Cannon should also be required to attend eight hours of ethics training provided by Quinn, as described below.

**Ryan Landes:** Mr. Landes should be apportioned no part of the compensatory sanctions.

**Elle Wang:** For her conduct, Ms. Wang should be apportioned compensatory sanctions on a joint and several basis up to 1% of the total amount ($29,000.00). Ms. Wang should also be required to attend eight hours of ethics training provided by Quinn, as described below.

**Order to Show Cause — Margaret Shyr and Victoria Maroulis:** Neither Ms. Shyr nor Ms. Maroulis were identified by Guardant in its request for monetary sanctions against individual attorneys. *See* Dkt. 884-13 at 9-13. In its Order on Guardant's motion, the Court referenced only Andrew Bramhall, Elle Wang, Brian Cannon, and Ryan Landes as potentially responsible individuals. Dkt. 945 at 1:26-27. As a result, Ms. Shyr and Mr. Maroulis have

asserted that they have not received sufficient notice to meet due process requirements. 12/19/25 Hearing Tr. at 5:24-7:24, *See Roadway Express Inc. v. Piper*, 447 U.S. 752, 767, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980) (the imposition of sanctions requires "fair notice and an opportunity for hearing on the record"); *see also FTC v. Alaska Land Leasing, Inc.*, 799 F.2d 507, 510 (9th Cir. 1986) (notice may be actual or constructive). Notably, although like other witnesses they were represented by Quinn attorney Christopher Tayback at their interviews under oath, Mr. Tayback did not represent Ms. Shyr and Ms. Maroulis for purposes of the closing brief he filed on behalf of the other individual attorneys on December 15, 2025.

Based on the factual findings set forth below, as well as the documentary record and the interviews conducted, the Special Master recommends that the Court issue an Order to Show Cause that would provide sufficient notice to Ms. Shyr and Ms. Maroulis of the potential for an apportionment of the compensatory monetary sanctions and any appropriate punitive sanctions or disciplinary measures. The Special Master recommends that any order issued should provide Ms. Shyr and Ms. Maroulis an opportunity to be heard by the Special Master in the first instance, who in turn can then make recommendation with respect to each of them for apportionment and potential punitive sanctions or disciplinary referrals. *See Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000) (the opportunity to brief sanctions issues meets due process requirements).

**Quinn:** Quinn as a firm should be held jointly and severally liable for 100% of the sanctions awarded. In addition, it should be fined $100,000.00 of punitive sanctions after any required additional process. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). Finally, Quinn should be required to develop, provide, and administer eight hours of training on ethics — with an emphasis on an attorney's duty of candor and the obligations required under section 1927 — to each of the attorneys who were part of the team defending Natera in this litigation. The training shall be supervised by the firm's General Counsel, who shall present to this Court an outline of the training. The training must be completed within 90

-7-

Special Master's Report and Recommendations — Case No. 3:21-cv-04062-EMC

days of an order adopting the Special Master's report and recommendations, and Quinn shall provide a list of all attorneys who underwent the training..

**Natera:** Natera relied on its outside counsel, Quinn. It should not be liable for sanctions.

**Note on Dr. Hochster:** The Special Master interviewed Dr. Hochster under oath on December 9, 2025. Because Dr. Hochster's testimony contradicts many aspects of his own earlier sworn testimony and the documentary record, the Special Master has not relied on this testimony in determining the culpability of the parties.

### III.    OVERVIEW OF FACTS

#### A.    August 30, 2023, closure of the COBRA study

On August 30, 2023, Dr. Hochster — as a physician with patients in the COBRA study (see ECF 447-2 (Hochster Report) at    37) — received notice that the study would be closed due to higher-than-expected false positives. NATERA_0502017, 26. On September 1, Dr. Hochster sent the letter he had received regarding the recent closure of the COBRA study to Mr. Bramhall and Ms. Wang. *Id.* Because the COBRA closure supported Natera's position, Mr. Bramhall and the team sought to introduce it into the case through a supplemental expert report even though discovery in the case had long been closed. NATERA_SM_0001265.

#### B.    September 8, 2023, phone call with Dr. Hochster

Mr. Bramhall and Ms. Wang set a call for September 8, 2023, to discuss the COBRA closure with Dr. Hochster. On that call, Dr. Hochster described the closure as a "monumental failure" and " XX  " NATERA_SM_0001359;    REDACTION    ; Wang Tr. 18:17-19:11. Dr. Hochster conveyed information he had learned from two Principal Investigators to Mr. Bramhall and Ms. Wang,

REDACTION

 Bramhall Tr. 24:16-20. Dr. Hochster also said that he did not have access to the data.  NATERA_SM_0001359 and Bramhall Tr. 24:17-18; 26:8-17. Mr. Bramhall asked Dr. Hochster to create a memo, which Quinn would use to start an expert report. Bramhall Tr. 23:22-24.

### C.    September 15, 2023, memo from Dr. Hochster

On September 15, 2023, Dr. Hochster emailed Mr. Bramhall and Ms. Wang attaching a memo. NATERA_0502061 (email); NATERA 0502071 (memo). The September 15 memo contains data from the results of the COBRA study. Unbeknownst to Quinn and undisclosed at this time, Dr. Hochster had received an embargoed draft abstract of the COBRA study results from a colleague, Dr. Boland, one of the COBRA investigators. Wang Tr. 86:14-87:21; Bramhall Tr. 207:6-20; NATERA_SM_0014716.

The memo had three sections: background, current status, and interpretation. Under the "current status" section, Dr. Hochster separately reported "public information" and "confidential information." And he introduced the confidential information as: "Additional confidential information embargoed until the GI ASCO meeting in January includes (AND PLEASE DO NOT DISCUSS DETAILS with anyone else)." NATERA 0502071.

Two facts are key to the subsequent events. First, Ms. Wang and Mr. Bramhall did not circulate the September 15 memo to the rest of the team when they received it. Mr. Bramhall testified that he did not read the memo until Ms. Wang circulated it after the Rutgers production in June. Bramhall Tr. 27:17-28:8; 52:6-16. This seems improbable given the importance of the supplemental report, even acknowledging Mr. Bramhall was distracted at the time, experiencing serious health issues. Second, Dr. Hochster made clear that the data was confidential and embargoed, but that it would be made public at the January ASCO GI conference, scheduled for mid-January 2024.

On September 21, 2023, Mr. Bramhall directed Ms. Wang to "convert" the memo to a report. NATERA_SM_0001480, 81. His strategy was to submit the supplemental expert report shortly after the COBRA abstract was published. *See, e.g.*, NATERA_SM_0001669.

### D.    January 2024 — drafting of Dr. Hochster's supplemental report

With a looming trial date, Quinn sought to finalize Dr. Hochster's report immediately after the publication of the COBRA abstract at the ASCO GI conference in mid-January. NATERA_SM_0001683. On January 6, 2024, Ms. Wang circulated a first draft based on the

September 15 memo. NATERA_SM_0001754, 56. Ms. Shyr reviewed the draft report on January 15, 2024, and raised questions about the source of the data. NATERA_SM_0001906, NATERA_SM_0001922, 31-34. Ms. Wang informed Ms. Shyr that she had obtained confidential "interim results" from Dr. Hochster. NATERA_SM_0001906. Although aware that Ms. Wang possessed confidential pre-publication COBRA results from Dr. Hochester, Ms. Shyr did not inquire further as to the source. Instead, she stated "If that data is confidential, how did Hochster get it? Maybe I don't want to know." NATERA_SM_0001910.

On January 16, 2024, the COBRA abstract was published on the ASCO GI conference website. The published data was largely identical to that in the draft report; however, Dr. Hochster had provided some additional information that was not in the published version. *See* NATERA_SM_0001922 at 32 (comments on draft report). Ms. Wang met with Dr. Hochster at Quinn's offices in San Francisco on January 18, 2024. She inquired about the sources for the data he had provided in his September memo. Following Ms. Shyr's direction, Ms. Wang revised the draft supplemental report to make sure that all the information it contained was in the published abstract, removing the data that had not been published. *See* Wang Tr. 48:13-19; 60:12-13; 134:9-135:22.

After approval from Dr. Hochster and the client, Quinn served Dr. Hochster's supplemental report on Guardant on January 31, 2024.

**E.      February 21, 2024, hearing on Guardant's motion to strike**

On February 8, Guardant moved to strike Dr. Hochster's supplemental report. ECF 447. One threshold issue was the timeliness of the report — Guardant argued that the report should be rejected due to the five-month delay following the COBRA closure. Dkt. 447 at 7:16-8:2. Natera responded that it had timely served the report promptly after new data became publicly available at the ASCO GI conference attended by Dr. Hochster. Dkt. 452 at 1:22-25 and n.1. The Court denied Guardant's motion to strike but allowed limited discovery. Dkt. 493.

At the hearing on February 21 (reconvened after February 15), Guardant asserted that Dr. Hochster had received the "abstract and the data at least a month and a half before" the ASCO

conference. 2/21/24 Hearing Tr. 12:10-13. For Natera, Mr. Cannon stated, "there was an accusation that Dr. Hochster somehow had inside information . . . I'm certainly not aware of any sort of early access that Dr. Hochster may have had." 2/21/24 Hearing Tr. 14:23-15:3. At the time, there is no question that Mr. Cannon did not know of early access. But, in fact, Dr. Hochster did have early access to the confidential COBRA results and had provided confidential COBRA data to Quinn. The attorneys who knew the true facts did not speak up, including Ms. Shyr, Ms. Wang, and potentially Mr. Bramhall. And neither Mr. Cannon nor others on the team ever corrected the record, even after Rutgers produced documents which demonstrated that Dr. Hochster possessed the embargoed draft abstract in September and had provided the data from the abstract to Quinn in his September 15 memo.

As further set forth below, the Special Master finds no merit in the various justifications provided for Quinn's failure to correct the record. First, there is no basis for the assertion that Mr. Cannon was only speaking for himself individually and not for Natera or Quinn. *See Eng v. Cooley,* 552 F.3d 1062, 1069 (9th Cir. 2009) ("the private citizen's lawyer must deliver the private citizen's message"). Moreover, the record does not support the argument that Mr. Cannon's statement was somehow "immaterial" or not relied upon; instead, Judge Chen held that the delay in the disclosure was substantially justified because the COBRA study was published on January 16, 2024. Dkt. 493 at 5:11-16; 5:27-6:4. Further, Dr. Hochster's early access remained at issue before the Court after Guardant brought its motion for evidentiary sanctions. *See* Dkt. 578 at 7-9, 11-12.

F.      **March to April 2024 — subpoena for documents to Dr. Hochster and motion to compel**

Guardant served a subpoena on Dr. Hochster seeking COBRA-related documents. After discussions with Dr. Hochster in which they discussed each request with him, Quinn replied in writing on his behalf: "Dr. Hochster is not aware of any non-privileged communications he has had with the COBRA investigators, NRG, NCI, Natera, or Guardant regarding COBRA." Dkt. 578-04 at 11:24-26. In Mr. Bramhall's and Ms. Wang's discussions with Dr. Hochster about the

subpoena, he said, according to contemporaneous notes, that if he had communications about COBRA they would only have been "gossip," and that he did not have responsive documents. NATERA_SM_0007335, 36.

After a meet-and-confer with Guardant counsel, Mr. Landes stepped in to work with Ms. Wang to oversee additional searches by Dr. Hochster and draft the letter-brief on the motion to compel. At this time, Mr. Landes and Ms. Wang asked Dr. Hochster to run Guardant's proposed search terms over his emails. Landes Tr. 42:9-25; NATERA_0502473, 75. Dr. Hochster confirmed that he had done so and that he had "nothing re COBRA." NATERA_0502473, 73-74. After Ms. Wang requested additional confirmation, Dr. Hochster responded, "asked and answered, counselor." NATERA_ SM_0008794. The letter-brief submitted by Quinn before Judge Kim and the oral argument by Ms. Wang relayed that Dr. Hochster had searched his emails and had no responsive documents. Dkt. 510 at 7. Specifically, in its brief, Natera stated that "Guardant is wrong that Dr. Hochster 'had not conducted a reasonable search.' Given his limited role in the COBRA study, he did not need to do a comprehensive search to know he never emailed about COBRA." Dkt. No. 510 at 7. It also stated that "Dr. Hochster has searched his email (again), using Guardant's requested search terms, 'COBRA' and 'NRG-05,' and now confirms (again) that he has no responsive documents." *Id.*

As set forth below, Mr. Bramhall and Ms. Wang should have known that Dr. Hochster had communications that were more than "gossip," as he had conveyed technical information he had learned from COBRA PIs in his September 8, 2023, phone call. Further, Ms. Wang knew that he had sent a memo with confidential COBRA data — the same data that was later published in the COBRA abstract. Even if Dr. Hochster could have retained all the data from oral, rather than written, communications — which was highly unlikely given that it was the identical data that was later published at the ASCO GI conference — he certainly had substantive communications about the COBRA trial results, not merely "gossip." Dr. Hochster's denial that he had any substantive communications with PIs should have raised a red flag for

both Mr. Bramhall and Ms. Wang about the thoroughness of his searches that should have led to additional diligence.

**G.      June 13, 2024, Rutgers production; June 17, 2024, deposition preparation; June 18, 2024 deposition.**

On June 13, 2024, the landscape shifted when Rutgers University produced scores of documents — including many documents responsive to Guardant's earlier subpoena to Dr. Hochster. Among this production were emails showing that Dr. Hochster had received a draft of the COBRA abstract from Dr. Boland on September 13, 2023. Dkt.  578-2; NATERA_SM_0014716, 17.  The production also included emails to COBRA investigators and Natera from the time-frame after the COBRA closure. The Quinn attorneys who had dealt with Dr. Hochster were surprised, as the emails contradicted Dr. Hochster's statements that he had no communications around COBRA. *See* Wang Tr. 86:14-88:1; Bramhall Tr. 69:11-20; Landes Tr. 53:16-54:10; NATERA_SM_0014592, 93.

In connection with the draft abstract in Dr. Hochster's email, Ms. Wang circulated Dr. Hochster's September 15 memo to the larger Quinn for the first time. NATERA_SM_0014475. She informed the team that he had sent Quinn the "the actual data from COBRA PIs/NRG" and that Dr. Hochster "had the actual abstract ahead of time." *Id.; see also* NATERA_SM_0014716. She wrote in bold and all caps that Dr. Hochster had not just learned about the COBRA data in January. NATERA_SM_0014475, 77.

The production occurred on a Thursday; Dr. Hochster was not available to meet to prepare for his deposition until the following Monday. At that meeting on June 17, 2024, Dr. Hochster explained that he had not remembered his communications regarding COBRA and that the documents did not appear when he searched, likely because he routinely deletes emails due to limited space. *See, e.g.*, Shyr 92:21-93:1, 104:5-105:2; NSM_0015300, 01-02. Dr. Hochster did not tell Quinn, as he testified before the Special Master, that he saw thousands of hits that he did not review when he ran the "Cobra" search term. 12/9/25 Hochster Tr. 65:2-19; 220:13-221:10. Nor apparently did Quinn ask him about his sharing the data from the abstract with them,

although they did ask him whether he was "supposed to be receiving this abstract" from Dr. Boland in the first place. NATERA_SM_0015300, 06.

At his deposition the following day, defended by Ms. Maroulis, Dr. Hochster gave the same explanation under oath that he had given to Quinn's lawyers: he had forgotten about the emails and did not find them during his searches. Hochster June 18, 2024, Dep. Tr. 145:17-22, 151:2-16, 178:15-23. While Quinn's attorneys had been suspicious of Dr. Hochster after the Rutgers production, they uniformly testified that they found his explanation (given consistently both privately to them and then under oath) credible and did not think he had any reason to lie given that Dr. Hochster's emails, as produced by Rutgers, were consistent with his opinions. *See* Maroulis Tr. 44:17-45:4; Bramhall Tr. 71:4-72:16; Shyr Tr. 107:18-108:19. Natera counsel apparently did not consider that Dr. Hochster might have wished to hide that he had provided them confidential, embargoed data in violation of his own ethical duties. Equally, though Ms. Maroulis recognized that the emails critical of Guardant undermined Dr. Hochster's status as an impartial expert, NATERA_SM_0014475, they did not consider this a reason that he might avoid producing his emails.

Despite the disclosures, none of the attorneys involved sought to correct the record on the motion to strike before Judge Chen. Nor did they undertake additional diligence with Dr. Hochster to assure that his searches had been reasonably diligent, as they had represented to Judge Kim. Indeed, during the deposition, Guardant's counsel requested that they conduct a search for "COBRA" in Dr. Hochster's email to see what happened — and Natera objected. 6/18/24 Hochster Tr. at 153:1-6. But, even if objecting on the record, the Quinn team failed to undertake this simple exercise outside the deposition room, confidentially, to affirm for themselves that Dr. Hochster had conducted a reasonably diligent search.

### H.     July 19, 2024, opposition to Guardant's motion for sanctions

On July 15, Guardant moved for sanctions. ECF 578. Judge Chen ordered Natera to respond four days later, by July 19. ECF 579. In the brief, Natera again responded to Guardant's argument that Dr. Hochster had early access. Despite the June disclosures, Natera stated, "As Dr.

Hochster testified during his deposition, he only received an early draft abstract that was under strict embargo and could not (and did not) disclose it to anyone, including anyone at Natera." Dkt. 582 at 19:15-17. Natera also wrote, "Certainly, that abstract was never shared with Natera. Guardant's implication to the contrary is grossly misleading." Dkt 582 at 13:18-19.

The Quinn team knew that Dr. Hochster had sent the data from the abstract he had received from Dr. Boland to Quinn in his September 15, 2023, memo. NATERA_SM_0014475, 144716, 14862, 21534. Before the Special Master, the Quinn team sought to justify these misleading statements with the explanation that they were responding only to the allegation that Quinn/Natera had the actual **abstract** as opposed to the **data** from the abstract. *See, e.g.,* Bramhall Tr. 108:8-12 and below. Because the data had not been published and remained embargoed, they could not have served the supplemental report earlier—or so the Quinn argument goes (Dkt 582 at 19:14-27); thus, the brief **only** addressed the possession of the abstract, omitting from the brief that Quinn had the results of the COBRA closure from Dr. Hochster all along. *See* Natera SM Brief at 10:21-24; Bramhall Tr. 108:8-12, 111:5-7. The Court has already rejected this reasoning. Dkt. 730 at 13:8-23. Whether Natera needed to wait until the final abstract was published to submit the supplemental report was an issue for the Court to decide based on a full and accurate record, which it did not have. Quinn did nothing to correct this state of facts at the hearing, even when Mr. Bramhall raised the issue again just two days before the hearing and Ms. Wang confirmed that "Hochster sent us his own write up with some data (which we now know was taken from the early abstract)." NATERA_SM_0021534.

In a reversal of the argument before Judge Chen, Quinn now argues before the Special Master that in fact the draft abstract was widely circulated despite its embargoed status. *See* Natera Closing Brief at 4:1-9; Natera Closing Presentation, Slide 26.

> **I.** **Dr. Hochster's disclosures on July 30 and August 9, 2024, and August 15, 2024, letter to the Court**

At the hearing on the motion for sanctions, the Court ordered a forensic inspection, shortly after, on July 30, 2024, Mr. Bramhall called Dr. Hochster with this news. After some

discussion, Dr. Hochster disclosed that he still had the emails produced by Rutgers on his computer. *See* NATERA_SM_0022786-87.  At this point, the team knew that Dr. Hochster had not been truthful and recognized the necessity of clarifying the record; they drafted a declaration to explain what had happened. NATERA_SM_0022913-14; NATERA_SM_0023309.  After some debate, the team scaled back the original draft declaration that described Dr. Hochster's processes; the team had concerns around the accuracy of his memory. *See* NATERA_SM_0023743.

On August 9, Ms. Shyr, Mr. Landes, and Ms. Wang joined a zoom call with Dr. Hochster to review the substance of the draft declaration. NATERA_SM_0023793. During that call, they did a screen share, during which Dr. Hochster typed "COBRA" into his email search bar. It was obvious that there were a plethora of results and that some were responsive to the subpoena. Wang Tr. 115:15-116:9, 117:1-12; Shyr Tr. 71:5-20, 114:3-24; Landes Tr. 50:6-51:21. With no belief in Dr. Hochster's veracity or memory, Quinn submitted a concise letter from Dr. Hochster to the Court and to Guardant. *See* Landes  Tr. 134:15-135:24.  Under the circumstances, though not a model of clarity, the August 15 letter raises no issues under section 1927.

### IV.    PROCEDURAL HISTORY

#### A.    Appointment of the Special Master

On July 23, 2025, the Court appointed Ismail Ramsey as Special Master under Rule 53(c). Dkt. 947. Consistent with the Court's Orders at Dkt. 730 and 945, the Court authorized the Special Master to determine: "(1) the appropriate apportionment among Natera, Quinn, and the individual Quinn attorneys of the compensatory sanctions imposed by this Court's Order Granting Further Compensatory Sanctions; Deferring Allocation and Punitive Sanctions, Dkt. 945 (July 9, 2025); and (2) any appropriate punitive sanctions or disciplinary measures, including but not limited to referral to the State Bar of California." Dkt. 947:1-6. Sanctions against individual attorneys under section 1927 are appropriate upon a finding that an "attorney recklessly or intentionally misled the court" as the Court made clear in its previous orders. *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010); Dkt. 945 at 6:5-14.

Based on the Court's determination that Quinn had acted in bad faith, the Court charged the Special Master to prepare a Report and Recommendation that takes into account the relative culpability of Natera, the firm, and the individual attorneys. To make these findings, the Special Master was authorized to conduct an evidentiary hearing and to hear testimony under oath from any witnesses with relevant information. The Special Master exercised his discretion, permitting Guardant's counsel to participate in the proceedings. Dkt. 947 at 2:26-3:5.  The Special Master also had authority to request documents and make privilege determinations. Dkt. 947 at 2:17-25.

Based on the Court's Orders, the Special Master requested documents and interviewed witnesses with relevant information, including Quinn attorneys Andrew Bramhall, Elle Wang, Brian Cannon, Ryan Landes, Victoria Maroulis, and Margaret Shyr, Natera in-house counsel Russ Farr and Jon Rabin, and Dr. Hochster. The interviews took place on October 20-22, October 27-29, and December 9, 2025.

### B. Document production, privilege determination, and *in camera* review

As a starting point, the Special Master served document requests on Quinn/Natera. That request sought relevant communications for a designated period between and among Andrew Bramhall, Elle Wang, Brian Cannon, Ryan Landes, Victoria Maroulis, and Margaret Shyr related to Dr. Hochster and the COBRA study. It also sought attorney-client communications on these topics. *See* August 20, 2025, Modified Special Master's First Document Requests. Upon Natera's request, the Special Master issued an order under Federal Rule of Evidence 502(d) to clarify that *in camera* disclosure of these documents was not an intended waiver of attorney-client or work product privileges. *See* August 22, 2025, Rule 502(d) Order. Natera also provided a privilege log.

After briefing and hearing oral argument on the privilege issues, the Special Master determined that Natera had not broadly waived privilege. Instead, the Special Master undertook a limited *in camera* review of the documents to determine whether work-product and attorney-client privilege had been waived. The Special Master determined, after a complete *in camera* review, to provide a narrowly tailored set of documents to Guardant that constituted fact work product, over which privilege had been waived based on the Court's earlier finding of

misconduct and necessity. The Special Master further determined that it would consider the remainder of the documents *in camera*, including both fact and opinion work product and attorney-client communications in making the recommendationsas to the culpability of Natera, the firm, and the individual attorneys. 9/10/25 Hearing Tr. at 5:14-7:18; *see United States v. Sanmina Corp. & Subsidiaries*, 968 F.3d 1107, 1122, 1124-25 (9th Cir. 2020) (discussing waiver of fact and opinion work product); *see also Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 454 F. Supp. 2d 957, 963 (N.D. Cal. 2006), *aff'd*, 2006 WL 2329460 (N.D. Cal. Aug. 9, 2006) (same); *Trendsettah USA, Inc. v. Swisher Int'l, Inc.*, 31 F.4th 1124, 1132 (9th Cir. 2022) (discussing waiver of attorney-client privilege). Natera consented to this procedure. 9/10/25 Hearing Tr. at 8:1-3. Before providing any documents to Guardant, Natera had the opportunity to review the documents to assert opinion work product and attorney-client privileges. Following the Special Master's review and proposed disclosures, Natera submitted written objections to the production of documents to Guardant. *See* 9/30/25, 10/14/25, 10/24/25, 10/22/25 Natera Parties' Objections to Document Production. Where Natera asserted opinion work product privilege over the documents, the Special Master either authorized redactions or declined to provide these to Guardant. *See, e.g.*, 10/03/25 Special Master email.

For the individual interviews, the parties proposed and the Special Master approved protocols to address privilege issues that would arise during questioning of witnesses. *See* 10/10/25 Submission on Protocols for Asserting Privilege. In practice, the interviews were divided into two sessions, the first "non-privileged" or public part attended by Guardant and the second "privileged" or non-public part attended only by Natera in which questions involving privileged matters were discussed, as reflected in the hearing transcripts. In addition, during the interviews, the Special Master identified certain additional documents it proposed to disclose to Guardant; Natera had the opportunity to object to the disclosure of these additional documents.

### C.    Public Access

On October 13, 2025, Guardant proposed public access to the upcoming interviews. Natera responded to this request. *See* 10/13/25 Guardant Letter re: Presumptively Public

Proceedings; 10/13/25 Natera Parties' Response re: Public Interviews. On October 14, 2025, the Special Master denied Guardant's request.  The Special Master determined that the public would not be permitted to attend the questioning of witnesses real time; instead, the right of access will be satisfied by the disclosure of the transcripts within a reasonable time after the interviews were completed. *See* 10/14/25 Special Master email, *citing Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 512 (1983).

**Now, the Special Master recommends disclosing the public portions of the transcripts and the limited documents that had been provided to Guardant over which the Special Master found waiver.**

### D.    Witness Interviews

After addressing the preliminary matters and completing the *in camera* review, the Special Master interviewed the Quinn attorneys identified in the Court's Order at Docket 945, Andrew Bramhall, Elle Wang, Brian Cannon, and Ryan Landes. All these individuals were represented at their interviews by Christopher Tayback, a partner at Quinn. The Special Master also interviewed Quinn attorneys Victoria Maroulis, and Margaret Shyr and Natera General Counsel Russ Farr and Natera Head of Litigation Jon Rabin, who were all also represented by Mr. Tayback. The Special Master interviewed Dr. Hochster, represented by David Chase.

All witnesses cooperated by making themselves available and answering all questions under oath. After the Special Master completed his questioning, he provided an opportunity for Guardant and Natera to ask additional questions of the witnesses — Guardant, however, was limited to the non-public portions of the interviews.

### F.    Other matters

On December 10, 2025, the Executive Committee of Quinn sent the Special Master correspondence that attached a memo they had distributed to all its United States attorneys on November 4, 2025, following the Special Master's interviews of its attorneys, concerning the duty of candor. It reminded all attorneys that the duty of candor not only prohibits false or

misleading statements but also requires that attorneys correct any material misstatement of fact or law. And it encouraged attorneys to contact the firm's general counsel with any ethical issues.

On December 12, 2025, after all witness interviews had concluded and days before closing briefing by the parties was to be filed with the Special Master, Natera requested leave to submit a declaration of a previously undisclosed expert on the applicable rules of professional responsibility. Guardant objected to the request. The Special Master denied Natera's request on December 13, 2025, as untimely.

## V.    LEGAL STANDARDS

Federal courts have power to sanction conduct that "abuses the judicial process." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1086 (9th Cir. 2021). To impose sanctions under its inherent power, the Court must find "bad faith or conduct tantamount to bad faith." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir. 2001). "[A]n attorney's reckless misstatements of law and fact, when coupled with an improper purpose . . . are sanctionable under the court's inherent power." *Id.* at 993-994 (9th Cir. 2001).

Under section 1927, the court may award fees against "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously" in any civil suit in federal court. 28 U.S.C. § 1927. The statute applies to only individual attorneys, not law firms. *Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1293 (9th Cir. 2015). Both reckless and intentional misrepresentations warrant sanctions: "a finding that the attorney recklessly or intentionally misled the court is sufficient to impose sanctions under § 1927." *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010). Sanctions are also appropriate for assertions that are "baseless and made without reasonable and competent inquiry" that resulted in the multiplication of proceedings. *Id.* at 1062; *see also Caputo ex rel. United States of Am. v. Tungsten Heavy Powder, Inc.,* 96 F.4th 1111, 1155 (9th Cir. 2024); *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996) ("Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument."). Further, section 1927 creates a "duty to correct or withdraw litigation positions after it becomes obvious that they are meritless." *In re Girardi*, 611 F.3d at 1064.

Special Master's Report and Recommendations — Case No. 3:21-cv-04062-EMC

Sanctions are compensatory, as opposed to punitive, if the sanction is "calibrated to the damages caused" by the sanctionable conduct on which it is based. *Rousseau*, 985 F.3d at 1086. A district court acting under its inherent authority to impose compensatory sanctions must apply a "but-for" causation standard. *Id.* at 1187.

In imposing sanctions, the court may look to the ABA Standards for guidance. *See Caputo*, 96 F.4th at 1159; *In re Girardi,* 611 F.3d at 1038. The ABA Standards were originally adopted in 1986; in 2020 they became the basis for ABA Model Rules for Disciplinary Enforcement, Rule 10. *See* https://www.americanbar.org/groups/professional_responsibility/resources/lawyer_ethics_regulation/model_rules_for_lawyer_disciplinary_enforcement/rule_10/ (last visited January 3, 2026). Rule 10 provides the following relevant factors:

(1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;

(2) whether the lawyer acted intentionally, knowingly, or negligently;

(3) the amount of the actual or potential injury caused by the lawyer's misconduct; and

(4) the existence of any aggravating or mitigating factors. *Id*. Rule 10, C.

The comments to Rule 10 provide a non-exclusive list of aggravating and mitigating factors. Among the relevant mitigating factors here are lack of any prior discipline, lack of legal experience, personal problems, remorse, cooperative attitude toward proceedings, the imposition of other penalties or sanctions. Among the relevant aggravating factors are the refusal to acknowledge the wrongful nature of the conduct and substantial experience practicing law.

Before imposing sanctions, the individual must be provided "fair notice and an opportunity for hearing on the record." *Roadway Express Inc. v. Piper*, 447 U.S. 752, 767, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980). Notice may be actual or constructive. *See FTC v. Alaska Land Leasing, Inc*., 799 F.2d 507, 510 (9th Cir. 1986). Due process requires that the notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United States v. Castro*,

-21-

78 F.3d 453, 456 (9th Cir. 1996), *citing Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). The receipt of legal process providing notice to the individual is sufficient. *See id.; cf. Alaska Land Leasing, Inc.*, 799 F.2d at 510 (holding that sanctions motion that did not identify the individual subject to sanctions to be insufficient notice). When imposing attorney discipline, "an opportunity to be heard does not require an oral or evidentiary hearing on the issue." *Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000). Instead, the opportunity to brief the issue fully meets due process requirements. *Id. see also Baker v. Meiling*, 2023 U.S. App. LEXIS 33042, *3-4 (9th Cir. 2023).

The Ninth Circuit has not established the burden of proof required for compensatory sanctions; however, courts have repeatedly held that a finding of bad faith by clear and convincing evidence is sufficient. *See, e.g., In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 655 F. Supp. 3d 899, 925 (N.D. Cal 2023), *citing Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).

## VI.    ENTITY RESPONSIBILITY

### A.    Quinn

The Court has already imposed sanctions against Quinn under its inherent authority based on Quinn's misleading statements and untruths both to Judge Chen and Judge Kim that it used to gain a litigation advantage. *See generally* Dkt. 730. The Court's findings need not be summarized here. As set forth in the Statement of Facts above, and more specifically below, the individual attorneys interviewed by the Special Master all contributed to the misrepresentations to the Court. Under the circumstances, the separate actions and failures of the individual counsel had a greater impact, or created a larger untruth, when understood together rather than as isolated incidents. Because the misleading statements and untruths are for the most part the product of an overall course of conduct among the Quinn attorneys, Quinn as a firm remains jointly and severally liable for the entire amount of sanctions. In addition, as stated above, it should be fined $100,000.00 of punitive sanctions after any required additional process. *See Goodyear Tire &*

-22-

*Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017). Finally, Quinn should be required to develop, provide, and administer eight hours of training on ethics — with an emphasis on an attorney's duty of candor and the obligations required under section 1927 — to each of the attorneys who were part of the team defending Natera in this litigation. The training shall be supervised by the firm's General Counsel, who shall present to this Court an outline of the training beforehand. The training must be completed within 90 days of this order.

### B. Natera

The responsible in-house Natera attorneys, Russ Farr, general counsel, and Jonathan Rabin, lead litigation counsel, had no direct involvement with Dr. Hochster. They did, however, review the briefs and attend hearings. Notably, the expert reports submitted by Dr. Hochster and his deposition testimony contained certain attorneys' eyes only material that Natera counsel was not permitted to see; for this reason, Quinn wholly managed Dr. Hochster. Rabin Tr. 33:4-13. Both testified that they did not know that Dr. Hochster had received either the early COBRA data or the draft abstract in September 2023. Farr Tr. 23:12-24:22; Rabin Tr. 23:23-24:24. Both saw Dr. Hochster's September 2023 memo for the first time during their interviews, and neither had any knowledge of or involvement with Dr. Hochster's e-mail searches. Rabin Tr. 53:13-54:10; Farr Tr. 46:14-47:23.

After the COBRA closure, Quinn and Natera decided to submit a supplemental expert report. Farr Tr. 17:13-18:11. ] On timing, Mr. Farr agreed that they should wait until the data was publicly available to present Dr. Hochster's supplemental report. Farr Tr. 20:2-5. Similarly, Mr. Rabin assumed that Guardant would present the data soon after the COBRA closure and they were waiting for the data to be made public to submit the supplemental report. Rabin Tr. 16:16-20; 19:8-10. Mr. Rabin received a draft supplemental report only after the January 16 public presentation of the COBRA data; he understood that the supplemental report relied on the public presentation. Rabin Tr. 20:1-18. Although he attended the February 21, 2024, hearing on the motion to strike, he did not focus on the statements about early access to data and had no knowledge of the underlying facts. Rabin Tr. 23:2-24:2.

In June 2024, Mr. Farr was shocked by the Rutgers production. Dr. Hochster had represented that he had produced everything when in fact, he had not. Farr Tr. 25:22-26:19. Nonetheless, Dr. Hochster's explanations made sense to him; he did not believe Dr. Hochster had a reason to lie. Farr Tr. 28:3-10. Mr. Rabin also reacted with surprise and concern — but did not have visibility into the production and understood that Dr. Hochster had deleted the emails in question, which seemed reasonable. Rabin Tr. 27:2-29:3.

REDACTION

. In response to the motion for sanctions, Natera again relied on Quinn; although Natera counsel reviewed the brief it was Quinn that dealt with Dr. Hochster. Farr Tr. 31:7-23; Rabin Tr. 32:14-33:13. And only when Dr. Hochster conducted a search of his emails and the emails that had been produced to Rutgers were found on his computer did Mr. Farr understand that he had lied. Farr Tr. 56:22–25.

Mr. Farr sought to be "absolutely candid with the Court" and testified that, if they could go back, he would make certain they were completely accurate. At the time, he felt that they had been completely candid but now understands that Judge Chen felt differently. Farr Tr. 32:3-17. After this experience, Mr. Farr testified that Natera now verifies everything. Farr Tr. 40:4-11. By contrast, Mr. Rabin testified that he did not think additional measures were necessary and respectfully disagreed with the Court's findings. Rabin Tr. 39:15-40:12. Nonetheless, Mr. Rabin described the situation as "challenging" and that it was a "very unpleasant surprise that this all unfolded in the way it unfolded." Rabin Tr. 40:17-25. He expects outside counsel to be completely truthful with Natera and to provide the court with honest, complete, and accurate information. Rabin Tr. 44:4-16.

The record as a whole — including the attorney-client communications reviewed in camera by the Special Master and discussed in the closed sessions with Natera — reflects that Natera reasonably relied on Quinn to handle the issues involving Dr. Hochster, an outside expert. Natera counsel had no direct contact with Dr. Hochster, no insight into Dr. Hochster's early

Special Master's Report and Recommendations — Case No. 3:21-cv-04062-EMC

access to the draft abstract, no knowledge of Dr. Hochster's sharing of data with Quinn, and no involvement in Dr. Hochster's email searches. While Natera counsel could have taken a more active role after the Rutgers production raised questions about Dr. Hochster's credibility and impartiality, it was not reckless or in bad faith for Natera to rely on Quinn's factual assessments and disclosures to the Court. Further, Natera reasonably relied on Quinn's legal judgment: "the duty of competence is one imposed on lawyers, and clients may rely on their attorneys to comply with this duty." *Ceron v. Liu*, 112 Cal. App. 5th 307, 315 (2025). "It is the lawyer's obligation—not the client's— to undertake reasonable research . . . and to make an informed decision as to a course of conduct based upon an intelligent assessment of the problem." *Id*. *citing Janik v. Rudy, Exelrod & Zieff* 119 Cal.App.4th 930, 937 (2004) (punctuation omitted). No sanctions are warranted against Natera under the Court's inherent authority or against individual Natera counsel under section 1927.

## VII.    INDIVIDUAL RESPONSIBILITY

### A.    Andrew Bramhall

Andrew Bramhall was the partner responsible for the day-to-day activity in the litigation. He had the primary relationship with Dr. Hochster, supervised Ms. Wang and Ms. Shyr, and signed the opposition to the motion to strike, the written responses to the subpoena, and the opposition to the motion for sanctions.

### 1.    Background

Upon receiving the letter and news of the closure of the COBRA trial, Mr. Bramhall arranged a call with Dr. Hochster. In that call on September 8, 2023, Dr. Hochster told Mr. Bramhall and Ms. Wang that the closure was a "    XX    " and "monumental failure."  XX  REDACTION    ; NATERA_SM_0001359. Mr. Bramhall understood that Dr. Hochster had called two Principal Investigators and was conveying information being shared publicly and privately. Bramhall Tr. 24:17-18; 26:8-9; 26:16-17. 
) REDACTION
.

REDACTION

Still, at this time, Dr. Hochster did not have "access to data." NATERA_SM_0001359. Mr. Bramhall stated that, after the call with Dr. Hochster, the understanding was that Dr. Hochster would create a memo "based on what he learned from what was going around in the field." Bramhall Tr. 23:22-23. The Quinn team would "convert that into the start of an expert report." Bramhall Tr. 23:24. Mr. Bramhall received the September 15, 2023, memo from Dr. Hochster, but testified that he did not read it at the time— not until June 2024. Bramhall Tr. 27:21-25. Nor did he discuss the memo with Ms. Wang. Bramhall Tr. 53:15-17. Nonetheless, on September 23, 2023, he directed Ms. Wang to look at the memo and "convert to a report." NATERA_SM_0001480.

REDACTION

. Later, he asked Ms. Wang to prepare a "near-final draft" of the expert report, in advance of the publication of the data at the ASCO-GI conference. NATERA_SM_0001669. The Special Master does not find it credible that Mr. Bramhall did not so much as glance at the September 15, 2023, memo due to the importance of the supplemental report to the litigation. But for the sake of argument and given other factors at the time, including that Mr. Bramhall was undergoing treatment for a serious medical issue, the Special Master acknowledged that he may not have read it in detail or recalled specifics. The contemporaneous emails reflect that Mr. Bramhall neither believed that Dr. Hochster possessed hard data on the COBRA study results nor discussed the memo with Ms. Wang. Nonetheless, Mr. Bramhall unquestionably knew that Dr. Hochster had conveyed information he received about the COBRA closure from COBRA investigators and that REDACTION .

REDACTION

That said, Mr. Bramhall did not oversee the drafting of the supplemental expert report — he handed this off to Ms. Shyr who had not received the September memo. As a result, he was not aware at the time that the initial draft of the supplemental report contained COBRA data that would be published only later at the ASCO GI conference.

### 2.    February 21, 2024, hearing on the motion to strike

Mr. Bramhall listened in via Zoom to the February 21, 2024, hearing on the motion to strike, at which Mr. Cannon argued. When the issue of early access to the abstract and the data came up, Mr. Bramhall did not believe he had an ethical duty to clarify the record because he did not realize or remember that he had received the detailed data. Bramhall Tr. 53:9-17. Mr. Bramhall testified that, had he read the memo, he would have felt compelled to clarify to the Court that Dr. Hochster had some early data from the COBRA study — but he would not necessarily have understood that this information came from the abstract. Bramhall Tr. 54:1-4. From the September 8, 2023, call, Mr. Bramhall knew that Dr. Hochster had some limited technical information from conversations with COBRA investigators that was not public. But Mr. Bramhall did not inform Mr. Cannon at the hearing or afterward that Dr. Hochster had spoken with COBRA investigators. Even when it became an issue in the litigation, Mr. Bramhall did not go back to review his emails or question Dr. Hochster. Under the circumstances, however, Mr. Bramhall's failure to undertake further investigation appears negligent rather than reckless or intentional.

### 3.    Subpoena responses and motion to compel

Mr. Bramhall worked with Ms. Wang to compile the initial responses to the document subpoena served by Guardant that sought Dr. Hochster's communications surrounding COBRA. In response to request number six, Mr. Bramhall responded on behalf of Natera and Dr. Hochster that "following a reasonably diligent search, Dr. Hochster is not aware of any non-privileged

communications he has had with the COBRA investigators, NRG, NCI, Natera, or Guardant regarding COBRA." Dkt. 578-4 at 11:24-28.

Mr. Bramhall testified that he and Ms. Wang reviewed the requests with Dr. Hochster and that Dr. Hochster was "unequivocal" in his denial of having responsive documents. Bramhall Tr. 58:17-59:9. Mr. Bramhall found Dr. Hochster to be credible. Bramhall Tr. 59:8-9. But, in fact, Mr. Bramhall knew that Dr. Hochster had communicated with COBRA investigators based on their September 8, 2023, call ( REDACTION ) and further that Dr. Hochster had included the substance of these communications in a memo he had sent to Mr. Bramhall and Ms. Wang. Moreover, that Dr. Hochster had substantive communications with COBRA investigators suggests that he very likely also had written communications with these individuals — which even a cursory review of the September 15, 2023, memo would have confirmed. But rather than look at his own inbox and review the memo to ascertain the nature of the communications Dr. Hochster had had with COBRA investigators and others, Mr. Bramhall simply accepted Dr. Hochster's blanket denial. Under the circumstances, this was at a minimum negligent.

Later, when the parties filed a joint letter-brief on Guardant's motion to compel, Mr. Bramhall supervised the briefing (by Ms. Wang and Mr. Landes) and the oral argument (by Ms. Wang). Again, Mr. Bramhall's continued acceptance of Dr. Hochster's blanket denials around communications about COBRA was at a minimum negligent.

### 4. Rutgers production and Dr. Hochster's deposition testimony

After the Rutgers production, Mr. Bramhall knew that Dr. Boland had sent Dr. Hochster the draft abstract and that Dr. Hochster had sent the data from the abstract to him and Ms. Wang in the September 15, 2023, memo. NATERA_SM_0014475, NATERA_SM_0014716. Mr. Bramhall also knew that Dr. Hochster had likely received and provided the confidential data in violation of the imposed embargo — as the cover email from Dr. Boland to Dr. Hochster with the draft abstract also forwards an email from Dr. Van Morris admonishing that the draft abstract should not be shared outside the co-authors. NATERA_SM_0014716.. And the September 15,

2023, memo states that the information is confidential and embargoed until the GI ASCO meeting in January, and that it is not to be disseminated. He also knew that there were numerous other emails potentially responsive to the subpoena, including with COBRA investigators and Natera, many with disparaging remarks about Guardant's test.

After the bombshell of a production from Rutgers, Mr. Bramhall and others sought an explanation from Dr. Hochster. The day before Dr. Hochster's deposition, during the June 17, 2024, prep session, Mr. Bramhall, like others, accepted Dr. Hochster's explanation under "really intense grilling" that he had conducted the requested searches and had not found these documents — likely due to his practice of deleting emails.  Bramhall Tr. 81:5-11; 83:12-25; 95:1-3. Dr. Hochster then testified to the same under oath at his deposition, which Mr. Bramhall viewed as the "ultimate test" as he did not believe that Dr. Hochster would perjure himself. *Id*. and 99:2-4. Mr. Bramhall explained that he did not request that Dr. Hochster re-run the searches as a matter of trust. Bramhall Tr. 81:5-11. Nor did he or the team correct the record before the Court because Guardant had equal information: "all the cards are laid bare on the table . . . and they have the same explanation [] from the deposition." Bramhall Tr. 84:21-24. Further, there was "no pending motion"— so the team "didn't think it was necessary" to correct the record before the Court. Bramhall Tr. 85:1-2.

But Mr. Bramhall ignored statements from Dr. Hochster that undermined his trustworthiness. For example, when they were preparing the subpoena response, Dr. Hochster had told Ms. Wang and Mr. Bramhall that he did not "talk" to anyone regarding the COBRA closure in connection with the subpoena response. NATERA_SM_0014269, 71. But, in September 2023, Mr. Bramhall unquestionably knew that Dr. Hochster had communicated with COBRA investigators—the substance of which would form the basis of the supplemental report. NATERA_SM_0001359;    REDACTION    . During the prep session, Dr. Hochster also stated, "what if I just didn't want to give my emails over." NATERA_SM_0015195, 96. On questioning by the Special Master, Mr. Bramhall explained that he believed Dr. Hochster was just being "dismissive" or "difficult." Bramhall Tr. 96:1-20. Yet, at the time, Mr. Bramhall stated

Special Master's Report and Recommendations — Case No. 3:21-cv-04062-EMC

that he did not trust Dr. Hochster — nor did Ms. Shyr, who texted that, when Dr. Hochster made that comment, "[her] heart stopped." Mr. Bramhall replied: "I know. Wtf." Then he wrote: "I hate to say it but I don't trust him at all on this issue. Still, seems like we have an explanation of sorts." NATERA_SM_0015195, 96. The Quinn team also had evidence that Dr. Hochster made clear that he "didn't think this was a big deal." Bramhall Tr. 96:22-25. Further, at his deposition, Dr. Hochster testified that he had only searched once for subpoenaed communications and that he did not know if he would find the documents if they did another search. Hochster Dep. Tr. at 150:18-22; 154:23-155:11. And, fundamentally, Dr. Hochster had shared information with Quinn in violation of the embargo.

After the Rutgers production, Dr. Hochster's statements both to Quinn and at his deposition raised sufficient red flags that it was negligent for the Quinn team not to conduct additional diligence on Dr. Hochster's searches to verify the accuracy of the representations to Judge Kim. Had they conducted additional diligence, they would have discovered many communications regarding COBRA in his inbox—as they later did when faced with a court-ordered forensic exam. Because Mr. Bramhall had signed the subpoena response assuring that Dr. Hochster had conducted reasonably thorough searches, oversaw the briefing to Judge Kim, and was one of the senior members of the team, he was personally negligent in not directing additional diligence and clarifying the record if necessary. Although certain contemporaneous documents suggest that he fully believed Dr. Hochster had conducted the searches, Mr. Bramhall's failure to recognize the inconsistencies in Dr. Hochster's statements reveals a lack of thoroughness.

As to the February 21, 2024, representations regarding when Dr. Hochster had access to the COBRA closure data, it was reckless not to correct the record before Judge Chen — even absent a pending motion. In his role as the partner in charge of the day-to-day litigation, Mr. Bramhall was in a position to advocate within the Quinn team to go back and inform the Court of the new information. Instead, rather than correct the record before the Court, Mr. Bramhall apparently adopted the strategy advocated by Ms. Maroulis to "[p]reserve HH's credibility as an

impartial, unbiased expert." NATERA_SM_0014475. As a result, the failure to correct the record warrants sanctions under section 1927 and the Court's inherent authority as reckless conduct undertaken for the litigation advantage of preserving Dr. Hochster's credibility.

### 5.    Response to motion for sanctions

Mr. Bramhall signed Natera's Opposition to Guardant's Motion for Sanctions, Dkt. 578, dated July 19, 2024. In that brief Natera states: "As Dr. Hochster testified during his deposition, he only received an early draft abstract that was under strict embargo and could not (and did not) disclose it to anyone, including anyone at Natera." Dkt. 582 at 19:15-18; *see also* Dkt 582 at 13:19-20 ("Certainly, that abstract was never shared with Natera"). Because Mr. Bramhall knew that Dr. Hochster had conveyed substantial, detailed information from the draft abstract to the Quinn team in his September 15, 2023, memo — NATERA_SM_0014475, 14716 — this statement is deliberately misleading. In his testimony, Mr. Bramhall explained that, in the fall of 2023, they did not have the abstract and they were not "sitting on it" as alleged by Guardant. Bramhall Tr. 106:7-8. Mr. Bramhall maintained that at the time they received the information, they did not know that it was from the draft abstract or that it was the formal data. Bramhall Tr. 106:1-15; 107:10-16. Even so, Mr. Bramhall conceded that Dr. Hochster had provided Quinn embargoed information that contained detailed results with some level of formality and that would later be released to the public. Bramhall Tr. 105:23-25; 107:7-11. Further, he conceded that, "if you go back and you put two and two together[,] you figure out that this is the same" information as in the published abstract. Bramhall Tr. 106:13-15. And, indeed, Quinn put this together in the June and July time frame.  *See* NATERA_SM_0014475, 14716, 14862, 21534.

But Quinn made none of this clear to the Court, either in the brief or at the July 24, 2024, hearing. And the Court lacked the context to evaluate Quinn's explanations in the absence of Dr. Hochster's communications with Quinn. Whether or not it was necessary to wait until the abstract was published in January before finalizing the supplemental report as Mr. Bramhall and Quinn have argued, Bramhall Tr. 108:8-12, NATERA_SM_SM21534, only stands as a justification for the delay in producing the report. It is not a justification for telling the Court that

Dr. Hochster had not disclosed the embargoed draft abstract to Quinn. Mr. Bramhall's concession that the brief is "maybe not" "the perfect model of clarity," Bramhall Tr. 107:20-21, distorts the repeated statements in the brief that "Dr. Hochster did not, and could not, disclose the abstract to anyone." Dkt. 582 at 13:3-4; *see also* 13:17-19; 19:15-18. Mr. Bramhall's failure to recognize that these statements were misleading is a failure to grasp his own responsibility to be truthful to the Court. As a result, the conduct warrants sanctions under section 1927 and the Court's inherent authority as reckless conduct undertaken for the litigation advantage of preserving Dr. Hochster's credibility.

### 6.    Responsibility, mitigating and aggravating factors

Mr. Bramhall has responsibility for not correcting the record in June when he knew that Dr. Hochster did in fact have early access to the abstract and thus making Mr. Cannon's position at the February 21, 2024, hearing no longer factually sound. Mr. Bramhall also has responsibility for the misleading statements in Natera's opposition to the motion for sanctions that Dr. Hochster had not shared the abstract with Quinn or Natera even after he knew that Dr. Hochster's memo contained the very same data as in the published abstract. By his failure to correct the record and make full disclosure to the Court, Mr. Bramhall continued the misrepresentations and caused the multiplicity of proceedings.

In determining apportionment, the Special Master also considers both mitigating and aggravating factors in accordance with ABA Model Rule 10. Significant mitigating factors for Mr. Bramhall include the serious health issues he faced during the relevant time which arguably explains why he did not review in detail the September 15, 2023, memo and his lack of attention to the drafting process of supplemental expert report — despite the importance of this issue in the litigation. Other mitigating factors include the unusual circumstance of a prominent expert misrepresenting his communications with colleagues and the lack of any previous disciplinary record. Aggravating factors include an inability or refusal to recognize his own role in the misleading statements to the Court set forth above. Moreover, due to his seniority, Mr. Bramhall

was in a position to speak up and clarify the record from the February 21, 2024, hearing — but he did not. Instead, Mr. Bramhall placed all the blame on Dr. Hochster.

As a result, the Special Master recommends that Mr. Bramhall be apportioned sanctions under section 1927 jointly and severally with Quinn up to 2% of the total amount, or $58,000. Mr. Bramhall should also be required to attend eight hours of ethics training provided by Quinn, as described above.

### B.    Brian Cannon

#### 1.    February 21, 2024, hearing on the motion to strike

Mr. Cannon is a senior partner at Quinn whose practice focuses on appeals. He represented Natera at the hearings on the motion to strike on February 15 and 21, 2024, and edited the briefs. Cannon Tr. 22:18-23:10. His responsibility is limited to this motion and the failure to correct the record after the Rutgers production.

When Judge Chen scheduled an emergency hearing on the motion on February 15, Mr. Cannon agreed to handle it because other team members were unavailable. Cannon Tr. 27:10-13. The hearing did not conclude that day, and a further hearing was scheduled for February 21. Before the hearing, Mr. Cannon reviewed the briefing and the talking points prepared by team members. Cannon Tr. 27:10-28:8. Guardant argued, in part, that Dr. Hochster's supplemental report should be rejected due to Natera's delay in serving the report. Under a separate bold-faced heading, Guardant argued that Natera decided to submit a supplemental report soon after learning of the COBRA closure on August 30, 2023 — and thus the five-month delay caused the report to be untimely under Fed.R.Civ.P. 37(c)(1). Dkt. 447 at 7:16-8:2. In response, Natera argued that it had timely served the report after the new data became publicly available on January 16, 2024, at the ASCO GI conference attended by Dr. Hochster. Dkt. 452 at 1:22-25 and n.1. Although the specific allegation that Dr. Hochster had early access to the COBRA results — either the abstract or the data — was not in Guardant's briefs, the timeliness of the report in relation to the availability of information was put at issue by both parties.

At the February 21 hearing, Guardant asserted that COBRA investigators disagreed about the COBRA closure. Mr. Cannon stated, "That's inside info . . . Natera is working off the public information." 2/21/24 Hearing Tr. 11:7-9. Counsel for Guardant, Mr. Perloff, replied to this assertion: "We understand that actually Dr. Hochster, for some reason, actually had the abstract and the data at least a month and a half before." 2/21/24 Hearing Tr. 12:10-13. Following up, Mr. Cannon stated, "[T]here was an accusation that Dr. Hochster somehow had inside information . . . . I'm certainly not aware of any sort of early access that Dr. Hochster may have had." 2/21/24 Hearing Tr. 14:23-15:3.

At the time of the hearing, Mr. Cannon did not know about the September 15 memo or that Dr. Hochster had obtained confidential COBRA results and had provided that data to Quinn. As a result, Mr. Cannon's statement is literally true for him, albeit not for the entire Quinn team. Cannon Tr. 21:1-12; 29:10-19. Significantly, Mr. Cannon confirmed that his statement encompassed both the abstract and the data in the abstract — he made no distinction. Cannon Tr. 38:3-8.

During the hearing, the team members with knowledge about Dr. Hochster's access to confidential information did not inform Mr. Cannon that Quinn had received a memo from Dr. Hochster that contained the COBRA data. *See* Wang Tr. 66:9-23; Shyr Tr. 63:1-14; Bramhall Tr. 53:8-54:6. But this changed when Rutgers produced Dr. Hochster's emails. In June, Mr. Cannon learned that Dr. Boland had sent Dr. Hochster the draft abstract and that Dr. Hochster sent the data from the abstract to Quinn, specifically to Mr. Bramhall and Ms. Wang in the September 15, 2023, memo. NATERA_SM_0014475, 81, 90.. Mr. Cannon, however, did not correct the record before the Court.

During his testimony and in Natera's briefing before the Special Master, Mr. Cannon advanced several reasons for not correcting the record, despite having considered doing so. Cannon Tr. 56:4-12. Primarily, Mr. Cannon claimed that Judge Chen did not rely on his statement that Dr. Hochster had no early access — in essence, that the statement was not material to his decision. Cannon Tr. 43:17-25; 85:19-22; Natera brief 17:14-17. But Judge Chen's order

on the motion to strike demonstrates that the timing of the disclosure of the COBRA results was key to his ruling: he held that Natera's delay was substantially justified because the COBRA study was published on January 16, 2024. Judge Chen specifically cited authority allowing late expert disclosure where the delay was "beyond counsel's control." Dkt. 493 at 5:11-16; 5:27-6:4. Judge Chen therefore implicitly accepted the assertion that Natera/Dr. Hochster were not aware of the COBRA results earlier.

In addition, Mr. Cannon testified that the statement needed no correction because it was limited to his own knowledge: "I said a true statement, which is, I was not aware." Cannon Tr. 43:9-16; 85:15-16. In his view, he represented only his own personal knowledge when making this statement, and the statement did not extend to the client or the firm. Cannon Tr. 137:19-138:15. But while an attorney may not always know the answer to all questions and may so state, when the attorney stands up in court, that individual is speaking on behalf of his client and his firm. Upon learning that a statement is not true, including that a fact is not known, there is a duty to correct that statement. *See In re Girardi*, 611 F.3d at 1064 (section 1927 creates a "duty to correct or withdraw litigation positions after it becomes obvious that they are meritless").

Further, Mr. Cannon testified that, without a pending motion, the record did not need to be corrected: "the motion was resolved and we were now in a whole new phase of the case six months later." Cannon Tr. 85:16-22. But issues surrounding Dr. Hochster's supplemental report were not yet resolved — Guardant filed a motion to exclude Dr. Hochster on July 2, 2024, and a motion for evidentiary sanctions on July 16, 2024. Dkt. 568, Dkt. 578. In these motions, Guardant brought to the Court's attention that, in contrast to earlier claims by Quinn, Dr. Hochster had received a draft abstract from Dr. Boland in September 2023. Dkt. 578-2. And it was not until September 25, 2024, that Judge Kim disclosed the September 15 memo after her *in camera* review. There can be no doubt that the proceedings multiplied as a result of Mr. Cannon's failure to correct the record when he learned the true facts in June.

Special Master's Report and Recommendations — Case No. 3:21-cv-04062-EMC

In addition, at the July 26, 2024, hearing on the motion for sanctions, Mr. Cannon did not clarify that Dr. Hochster had provided data from the embargoed abstract to Quinn/Natera though he knew that to be the case. *See* 7/26/24 Hearing Transcript and NATERA_SM_0021534. Relatedly, Mr. Cannon testified that Guardant had equal access to the new information: "all the parties were learning in real time the facts." Cannon Tr. 136:11-14. But Guardant did not have the September 15 memo and would not obtain that document until Judge Kim ruled that it must be disclosed. *See* Docket 675 (holding, in part, that Guardant had a substantial need for the document under Fed. R. Civ. P.26(b)(3)(A)(ii)). As a result, the facts known to Mr. Cannon and Quinn — that Dr. Hochster had disclosed the confidential, embargoed COBRA trial results to Quinn in September 2023 — were not fully disclosed to Guardant or the Court until September 25, 2024.

On this record, Mr. Cannon's intentional failure to correct the record resulted in a continuing misrepresentation to the Court and caused the proceedings to multiply.

### 2.     Responsibility, mitigating and aggravating factors

As a senior partner at Quinn, Mr. Cannon had the ability to step forward and demand a correction of the record on the motion to strike. He is responsible for failing to do so. In mitigation, Mr. Cannon, when communicating with his colleagues, repeatedly urged transparency with the Court, including that Dr. Hochster "come clean." NATERA_SM_0022913; NATERA_SM_0022908, 09; NATERA_SM_0023309; NATERA_SM_0023530. He also suggested that Quinn make an *in camera* submission; the team, however, rejected this approach. Cannon Tr. 102:2-10. At the same time, however, as an aggravating factor, he urged transparency primarily as a litigation strategy and did not believe that there was any ethical violation, continuing to insist that he spoke only for himself and that the representation was either immaterial or essentially in the past. Still, Mr. Cannon has no history of ethical violations and had a limited role in connection with Dr. Hochster.

As a result, the Special Master recommends that Mr. Cannon be apportioned sanctions under section 1927 jointly and severally with Quinn up to 2% of the total amount, or $58,000.

Mr. Cannon should also be required to attend eight hours of ethics training provided by Quinn, as described above.

### C.    Elle Wang

At the time of these events, Ms. Wang was a senior associate in the firm's San Francisco office. She drafted the initial version of Dr. Hochster's supplemental expert report, was involved in the responses to Guardant's subpoena, the related motion to compel, and motion for sanctions and participated in Dr. Hochster's deposition.

### 1.    Background on September 2023 communications with Dr. Hochster

Ms. Wang was the Quinn attorney who most communicated with Dr. Hochster. After Dr. Hochster forwarded the letter informing doctors of the closure of the COBRA study to the Quinn team, she and Mr. Bramhall spoke with Dr. Hochster on September 8, 2023; he described the results as a "monumental failure" for Guardant's assay. NATERA_SM_0001359. During the call, Dr. Hochster also informed them that NCI was the contractual organization, and the data was held by NRG. *Id*. Mr. Bramhall testified that, on this call, Dr. Hochster informed them that he had called two Principal Investigators and that he was conveying both public and private information. Bramhall Tr. 24:6-20; 26:3-17.

REDACTION

. At the time, Dr. Hochster  had no actual data. Still, he agreed to "send something next week" that they could "convert to a supplemental report." NATERA_SM_0001359. As promised, on September 15, 2023, Ms. Wang and Mr. Bramhall received a memo from Dr. Hochster that contained both background information and a paragraph with specific data reflecting the results of the COBRA trial. Dr. Hochster wrote that the COBRA trial data was "confidential" and "embargoed;" he asked that they not share the information with anyone. NATERA_0502061, 71.

Despite this, Ms. Wang has maintained that she did not believe that the memo contained information that Quinn should not possess or share. Wang Tr. 29:18-30:16. She has maintained that she did not understand what "embargoed" meant in this context, but also never asked Dr. Hochster. Wang Tr. 31:6-32:1. She did not discuss the memo with Mr. Bramhall, and she did not forward the memo to others within Quinn. Wang Tr. 25:7-26:4.

### 2.    Background on the January 2024 supplemental expert report

At Mr. Bramhall's direction, Ms. Wang converted the memo to a draft supplemental report. NATERA_SM_0001480, 81; Wang Tr. 27:6-25. She based her draft on the COBRA trial data provided by Dr. Hochster in the September 15 memo; she understood that the "information was meant to be used in the supplemental report and in the litigation." Wang Tr. 23:12-24:20; 32:4-14. In her initial draft supplemental report, she included placeholders for additional information that was to be made public later and understood that they would wait for "the publication of the data" before providing the supplemental expert report to Guardant. Wang Tr. 28:1-8; 29:12-15; 41:21-25.

Before the expected publication of the data at the ASCO GI conference, Ms. Wang sent a draft on January 6, 2024, to Mr. Bramhall as well as to Ms. Shyr, who had stepped in to supervise Ms. Wang. Though the entire draft was based on the September 15 memo, Ms. Wang neither informed Ms. Shyr of the source of the information nor shared the memo with her. Wang Tr. 45:2-6; 45:18-46:7. After publication of the abstract on January 16, 2024, which was also a one-page report, Ms. Wang removed information from the draft supplemental report that was not published in the abstract. Wang Tr. 60:12-13; 135:2-22.

Before the publication of the abstract, Ms. Shyr reviewed the draft supplemental report and questioned its lack of citation. Ms. Wang replied: "The lack of citation for the interim results is because they are confidential. Hochster sent those to me and I'm largely hoping they will be revealed to the public one way or the other tomorrow." NATERA_SM_0001906.  For the most part, as Ms. Wang hoped, the published abstract aligned with the data provided by Dr. Hochster, although he had also included additional data that was not published. *See*

NATERA_SM_0001922, 32. In the comments to the first draft, after Ms. Shyr highlighted the lack of certain sources, Ms. Wang responded: "Ugh I think this is part of the confidential results not released in the ASCO GI abstract. Need to ask Hochster where he got it." NATERA_SM_0001922, 32; Wang Tr. 47:3-13; 49:3-15; 55:12-25. But Ms. Shyr declined to inquire into Dr. Hochster's sources. She wrote: "If that data is confidential, how did Dr. Hochster get it? Maybe I don't want to know." NATERA_SM_0001910.

At their meeting on January 18, 2024, Ms. Wang asked Dr. Hochster about the source of the information. She testified that Dr. Hochster told her that the information was "going around," "oncologist gossip," "watercooler type talk," and "chatters." Wang Tr. 51:21-52:3;; 67:4-10. Ms. Wang testified she understood this meant that it was information "disseminated among oncologists that he heard from or received or from [] talking to other oncologists." Wang Tr. 52:4-7. Ms. Wang testified that she received no further explanation from Dr. Hochster. Wang Tr. 53:1-15. Ms. Shyr herself spent little time at this meeting and was not present during this part of the conversation. Wang Tr. 58:16-19; Shyr Tr. 56:11-57:6. In representations to the Court and the Special Master, Ms. Wang and the Quinn team rely on this purported response from Dr. Hochster to dismiss or downplay the significance of the information in the September 15, 2023, memo and incorporated into the initial draft report — even though the results in the abstract published on January 16, 2024 are identical to those in the memo. By dismissing this information as of no real import — merely "gossip"— Ms. Wang and by extension the Quinn team absolve themselves of responsibility for not recognizing that Dr. Hochster indeed had early access to COBRA data.

Importantly, there is no contemporaneous record of the conversation with Dr. Hochster on January 18, 2024. The documents produced reflect a *later* conversation with Dr. Hochster in connection with the Guardant subpoena response, in March 2024, in which he described, in a different context, his communications with other oncologists as "gossip." NATERA_SM_0007335, 36. This appears to be the source of the "gossip" explanation. Additionally, on June 14, 2024, Ms. Wang wrote to the team that Dr. Hochster said "he learned [about the data] from gossiping with others" and "water cooler type chats."

NATERA_SM_0014475. Again, this statement is after-the-fact and represents largely a self-serving explanation of why Ms. Wang did not actively highlight the memo later produced by Rutgers (and that then appeared as a bombshell). But the fundamental nature of the memo's information — including the specific data on trial results — is inconsistent with information that was merely "gossip" or "watercooler talk" without real significance.

Dr. Hochster made clear that the memo was more than mere gossip: he headlined the information as "***embargoed until the GI ASCO meeting in January***" (emphasis added) — thus conveying that the data he provided would be published at the conference. NATERA 0502061, 71. Although this term "didn't really cause [Ms. Wang] concern" (Wang Tr. 60:18-25), Dr. Hochster also made clear that he was providing "confidential" information and admonished "PLEASE DO NOT DISCUSS DETAILS with anyone else." NATERA 0502061, 71. Dr. Hochster's own words contradict Ms. Wang's stated understanding that Dr. Hochster provided mere "gossip and chatters" "going around" among oncologists. Wang Tr. 52:17-18; 67:9-10. Additionally, Ms. Wang's characterization of the information she received as "interim results" and "confidential results" is wholly incompatible with "gossip." Moreover, once the abstract was published, it contained the very same data confirming that Dr. Hochster had the actual data from the COBRA trial in September. On this record, either Dr. Hochster did not describe the data he provided as "gossip" or Ms. Wang should not have believed Dr. Hochster on this point after the published abstract so clearly aligned with the data contained in the memo. And, indeed, Dr. Hochster undoubtedly would prefer to obfuscate the source of his information than to reveal beyond the Quinn team members that he may have violated the terms of the embargo by sharing the information with Quinn.

Nonetheless, Ms. Wang's failure to grasp the significance of Quinn's receiving confidential, embargoed information lies in large part on the inadequate supervision by the Quinn partners. The memo contains embargoed data that reflect the results of the COBRA trial that Dr. Hochster seemingly never should have shared with Quinn. Ms. Wang should have elevated this memo to the partners — but perhaps she did not because she knew that Mr.

Bramhall had also received the memo directly from Dr. Hochster and had not himself raised concerns. Though Ms. Shyr oversaw the supplemental expert report, she deliberately declined to obtain any understanding of the sources of the confidential information Dr. Hochster possessed, despite receiving a draft report that contained COBRA data before its publication. That the partners in charge did not question how or when Dr. Hochster came to possess the COBRA data and glossed over the ethical issues of Dr. Hochster forwarding confidential, embargoed information to Quinn set the stage for Ms. Wang to do the same.

### 3.    February 21, 2024, hearing on motion to strike

Ms. Wang observed the February 21, 2024, hearing at which Mr. Cannon represented that Dr. Hochster had no "early access" or "inside information" on the COBRA results. 2/21/24 Hearing Tr. at 14:23-15:3. She testified that she interpreted Mr. Cannon's statement to mean that the Quinn team was not aware that Dr. Hochster had access to an early draft *abstract*, not early access to a broader set of information.  Wang Tr. 65:19-25. Ms. Wang believed that to be accurate. Wang Tr. 65:25-66:1; 66:15-13. Ms. Wang rests her explanation on the fact that neither she nor others knew that Dr. Hochster had the draft abstract.  Ms. Wang testified that, at the time, she believed whatever information Dr. Hochster had was through "oncologist gossip and chatters," and the memo didn't "have an indication that it came from a draft abstract." Wang Tr. 67:4-15. Given that Ms. Wang knew that Dr. Hochster had early access to the data that was eventually published in the abstract, she should have alerted Mr. Cannon or others on the team to clarify the record at the time of the hearing. But she did not.

After Rutgers produced the documents that contained the draft abstract, Ms. Wang made clear to the team that Dr. Hochster "did not just learn about [COBRA] data in January as with everyone else." NATERA_SM_0014475, 77. In June, she knew that Mr. Cannon's representation to the Court was not true, as it was based on his incomplete knowledge, but she still did not correct the record. Due to Ms. Wang's status as a junior member of the team, she is not primarily responsible for the failure to correct the record, either at the time of the hearing or in June.

#### 4.    Response to subpoena and motion to compel

Ms. Wang had substantial responsibility for responding to the subpoena for documents served on Dr. Hochster on March 3, 2024. She communicated with Dr. Hochster to draft the written response, produced documents, met and conferred with the Guardant team, drafted the letter-brief on the motion to compel, and argued the motion before Judge Kim. Mr. Bramhall oversaw the initial response and oral argument; Mr. Landes oversaw the meet-and-confer process and briefing.

Guardant's request No. 6 sought communications concerning "COBRA," "the COBRA abstract[,] and data presented at ASCO-GI 2024" with COBRA investigators, NRG, NCI, NATERA, GUARDANT, or any other oncologist. Dkt. 578-2 at 11:23-26. When reviewing this request on March 22, 2024, Dr. Hochster told Mr. Bramhall and Ms. Wang that he had: "Nothing written down. If there were any comms it'd just be sort of gossip. It would never be anything about how to run the study, etc. I had no involvement." NATERA_SM_0007335, 36. On behalf of Dr. Hochster, Quinn responded: "following a reasonably diligent search, Dr. Hochster is not aware of any non-privileged communications he has had with the COBRA investigators, NRG, NCI, Natera, or Guardant regarding COBRA." Dkt. 578-4 at 11:23-26. After a meet-and-confer process, Mr. Landes and Ms. Wang asked Dr. Hochster to run Guardant's proposed search terms in his emails. NATERA_0502438; NATERA_0502473, 75. Dr. Hochster confirmed that he had "nothing re COBRA." NATERA_0502473-74. Ms. Wang asked Dr. Hochster to confirm the scope of his search in several emails, emphasizing that his response would inform how Quinn "present[s] this issue to the Court," and Dr. Hochster repeatedly confirmed that he had searched as Guardant requested. NATERA_0502598-99;; NATERA_SM_0008794. In April, the parties submitted a joint letter-brief in which Quinn opposed Guardant's motion to compel a further production from Dr. Hochster. In that letter-brief, Quinn relayed what Dr. Hochster told them: that he had searched his emails using Guardant's search terms and had found no responsive documents. Dkt. 510 at 7. At a hearing before Judge Kim, Ms. Wang again recounted the same. 4/22/24 Hearing Tr. 6:17-7:15.

Was it reasonable for Ms. Wang to take Dr. Hochster's blanket statement that he had searched and found no communications regarding COBRA at face value? In her role as a senior associate it is understandable that she would give Dr. Hochster the benefit of the doubt. At the same time, the contemporaneous record demanded further diligence from Ms. Wang. Although Dr. Hochster stated in response to request No. 6 that the only communications he would have had would be "gossip," this statement appears directed at communications about the conduct of the COBRA trial, not communications *after* the COBRA closure: "It would never be anything about how to run the study." NATERA_SM_0007335, 36. Because Dr. Hochster was not a COBRA investigator, during the study, he would largely have heard "gossip." Ms. Wang appears to have stretched this term to cover *all* communications about COBRA. In addition, Guardant's request No. 7 is more precisely directed at communications *after* the COBRA closure. In response to request No. 7, Dr. Hochster reminded Quinn that he had communicated with them about the COBRA closure. NATERA_SM_0007335, 40. While Ms. Wang knew that Dr. Hochster had provided specific COBRA analysis data in the September memo, she did not question him on the source of the data when the communications that formed the basis of the memo were at issue in the motion to compel before Judge Kim. Though protracted, Ms. Wang's email threads with Dr. Hochster are along the lines of "did you conduct the search?" Not "how did you know about the COBRA results in September?"

Nor did Ms. Wang raise the September 15 memo with Mr. Bramhall even though communications around the COBRA closure were at issue. Wang Tr. 70:15-72:20.  Ms. Wang testified that she believed that because there was no draft abstract, the source of the information in that memo was of no concern. *Id*. Later, after the Rutgers production, Ms. Wang also claimed Dr. Hochster "repeatedly told us he talked to no one about COBRA" in connection with the subpoena response. NATERA_SM_0014265; *see also* NATERA_SM_0014476. But this was inconsistent with the facts known by Ms. Wang. She knew that Dr. Hochster must have had substantive communications who provided him the data from the COBRA study in September 2023 that was published at the ASCO GI conference in January 2024. Almost certainly, to create

-43-

a densely-spaced memo with significant data, the communication would have been in writing. *See* NATERA_050261, 71. And Dr. Hochster had told them he had conversations with COBRA PIs in their September 8 call. On this record, it was at a minimum negligent for Ms. Wang not to have suggested that they screenshare while Dr. Hochster conducted a search — which the team eventually did after the Court ordered a forensic exam.

Again, Mr. Bramhall, an experienced partner, also had spoken with Dr. Hochster on September 8, and Ms. Wang was aware that he had received the September 15 memo. Because Ms. Wang relied on the direction she received from Mr. Bramhall, she is not primarily responsible for the failure to dig deeper on the subpoena response and motion to compel.

**5.    Rutgers production, Dr. Hochster's deposition, opposition to motion for sanctions**

As set forth above and in the section on Mr. Bramhall's responsibility, after the Rutgers production, Ms. Wang along with the whole Quinn team knew that Dr. Hochster had possession of the draft abstract in September, that he had provided confidential, embargoed information to Quinn from the draft abstract, and that he had other written and verbal communications with COBRA investigators and Natera about COBRA. Despite the reasons to doubt Dr. Hochster's veracity, Ms. Wang like others on the Quinn team became convinced that Dr. Hochster had simply not correctly remembered his communications, did not see the emails in his search, and had deleted emails as a matter of course. Wang Tr. 100:4-9; 103:18-104:2.

Immediately after the Rutgers production, Ms. Wang circulated key documents to the team. For the first time, she provided Dr. Hochster's September memo to the partners along with the embargoed draft abstract sent from Dr. Boland to Dr. Hochster produced by Rutgers. She made clear both that Dr. Hochster had received the draft abstract and had communicated the data to Quinn. NATERA_SM_0014475-77, NATERA_SM_0014716; NATERA_SM_0014862. She summarized the key emails from the production with COBRA investigators that discussed the COBRA trial closure — often in disparaging terms — and the emails with Natera that suggested the possibility of re-running the samples. Despite the Rutgers production revealing that Mr.

Cannon's statements at the February 21 hearing were not accurate, the team decided not to correct the record. Ms. Wang was not the decisionmaker, but has testified that she agreed with the decision. Also, like other members of the team, Ms. Wang accepted Dr. Hochster's representations at the deposition prep meeting that he had simply forgotten about and deleted from his email the numerous communications with COBRA investigators, Natera, and others. She testified that she had overcome her earlier serious doubts in the immediate aftermath of learning about the Rutgers production. NATERA_SM_0014592 ("His explanation better be: I had a head trauma recently."); Wang Tr. 101:22-102:23.  Like others, only after the Court ordered a forensic inspection did she take the simple step of asking Dr. Hochster to screenshare while he conducted a search.

At this time, apparently to provide better context, Ms. Wang informed the larger team that Dr. Hochster "repeatedly told us he talked to no one about COBRA." NATERA_SM_0014265; *see also* NATERA_SM_0014475, 76. But, as set forth above, Ms. Wang knew this could not have been true. On the September 8 call, Dr. Hochster relayed information he attributed to COBRA PIs and the September 15 memo contains COBRA results that were later published in the abstract. In addition, she downplayed the significance of Quinn's possession of the embargoed COBRA trial data, emailing that Dr. Hochster had described his communications as "gossip" and "watercooler talk." *See* NATERA_SM_0014475. In her emails, she made the distinction between having the "actual abstract" and the data from the abstract — although it is unclear whether Ms. Wang or another team member first drew this line. In one example, she wrote to Andrew Bramhall that the September memo "contains the actual data . . .  we did not know these were verifiable, or that they were obtained directly from the draft abstract." NATERA_SM_0014716, *see also* NATERA_SM_0014475.

This meaningless distinction also underlies key representations in the Quinn team's opposition to the motion for sanctions both in the brief and at the hearing, as set forth above. Ms. Wang assisted in drafting the opposition brief. Before the Special Master, Ms. Wang testified that there was nothing misleading about the statement that Dr. Hochster did not share the abstract

-45-

with Quinn because only the draft abstract, but not the information in the abstract, was at issue. Wang Tr. 106:4-107:25. Her testimony before the Special Master echoes her position at the time; in July; she wrote to Mr. Bramhall of Dr. Hochster's memo: "He said this information is confidential and embargoed, but no mentioning [sic] of abstract." NATERA_SM_0021692.  As Ms. Wang is aware, the Court has rejected the patently specious distinction. *See* Dkt. 730 at 13:16-21. Ms. Wang did not, however, sign the opposition brief or argue at the two motion hearings; again, she was a junior member of the team without decision-making authority.

### 6.    Responsibility, mitigating and aggravating factors

Ms. Wang had a large role in communicating with Dr. Hochster but little authority. Her, at times, reckless conduct contributed to the misrepresentations by Quinn to the Court. Primarily, although she heard and observed the hearing on February 21, 2024, she did not inform Mr. Cannon or others that Dr. Hochster had provided Quinn confidential COBRA data in September that was later published in the abstract at the ASCO GI conference in January. Her explanation that the statement referenced only the abstract is not grounded in the record.  Once Rutgers produced documents, Ms. Wang recognized that Dr. Hochster possessed the draft abstract in September and that he had shared the data from the abstract with Quinn. Despite this knowledge, Ms. Wang did not step forward to correct the record, even internally among the Quinn team. Later, in July, she contributed to the opposition brief that perpetuated the misleading representations that Dr. Hochster had never shared the abstract with Quinn or Natera.

The Special Master does not find Ms. Wang's explanation that Dr. Hochster told her in January that he obtained the COBRA data he shared in September from mere "gossip," "water cooler talk," or "chatter" credible. Ms. Wang uses this characterization as an excuse for discounting the importance of the September 15 memo. If he in fact told her this, he contradicted it himself by informing her that the information was embargoed until the conference in January, when it was later  published. It is also contradicted by the nature of the information itself — data that represented the results of the COBRA trial, not idle opinions. Ms. Wang's contemporaneous

emails in January recognize that he had sent her "interim results" and "confidential results" not worthless chatter.

She also at least negligently failed to recognize that Dr. Hochster almost certainly had substantive written communications to have obtained the data in the September memo, which she knew also contained additional results not in the published abstract.

In mitigation, as an associate, Ms. Wang was not the decision-maker on the key decisions and followed the lead of the partners. For example, when she informed Ms. Shyr that Quinn possessed confidential COBRA results from Dr. Hochster, Ms. Shyr brushed this off. Ms. Wang seems to have followed suit. As a result, her personal responsibility is limited. Even so, Ms. Wang has not grasped the seriousness of the misrepresentations to the Court made by Quinn. She does not believe anyone at Quinn did anything "wrong," including herself. Nor does she believe that Quinn had any duty to correct the representations surrounding early access and has not recognized the misleading nature of the representations in the opposition to the motion for sanctions.

As a result, the Special Master recommends that Ms. Wang be apportioned sanctions under section 1927 jointly and severally with Quinn up to 1% of the total amount, or $29,000. Ms. Wang should also be required to attend eight hours of ethics training provided by Quinn, as described above.

### D.    Ryan Landes

Mr. Landes had a limited role in the events at issue. He is a mid-level partner and acted mainly as a "utility player" who pitched in where needed. Landes Tr. 12:4-12. Importantly, even though he oversaw the searches with Dr. Hochster after receiving search terms from Guardant, and he signed the letter brief on the motion to compel, at the time, he did not have full knowledge of Quinn's earlier communications with Dr. Hochster. He did not receive the September 15 memo until June 2024 when Ms. Wang circulated it to the team at the time of the Rutgers production, and he had not discussed its contents before then. Landes Tr. 23:11-24:3.

### 1.   Response to Guardant's subpoena

Mr. Landes' first substantive involvement with Dr. Hochster followed the response to Guardant's subpoena during March and April 2024. Landes Tr. 38:13-39:15. After Quinn served Dr. Hochster's written responses, Mr. Landes and Ms. Wang had a meet-and-confer call with Guardant and Mr. Landes oversaw the additional searches Dr. Hochster conducted in response to Guardant's requests. *See generally* Landes Tr. 32:5-36:4. Mr. Landes, at the time, believed Dr. Hochster's repeated representations that he had run the search terms and had no responsive documents; Mr. Landes saw no motive to lie. NSM_0008794; Landes Tr. 33:1-34:23, 35:13-37:18; 43:22-44:10. Because he had no knowledge of the September 15 memo or its contents, Landes Tr. 23:11-24:3, he did not have cause to doubt Dr. Hochster's representations.

After Guardant moved to compel, Mr. Landes had responsibility for the discovery letter-brief before Judge Kim. Landes Tr. 46:15-47:13. Again, the representations in that brief were consistent with what Dr. Hochster had told him. *See* Landes Tr. 154:23-159:5. Ms. Wang argued the hearing on that motion; he participated little in her preparation, which Mr. Bramhall covered.

### 2.   Rutgers production and opposition to motion for sanctions

When Rutgers produced numerous emails that were responsive to the subpoena, Mr. Landes was surprised. Landes Tr. 53:16-55:9. Mr. Landes remotely attended part of Dr. Hochster's deposition preparation and questioned Dr. Hochster regarding his email searches. Landes Tr. 55:10-22; NSM_0015300, 01-02. Mr. Landes believed Dr. Hochster's explanation that he simply had not remembered the emails and that, when he had searched his computer, they had not come up because he deleted his emails in the normal course. Landes Tr. 81:9-84:11. Had Mr. Landes not trusted Dr. Hochster, he would have spoken up more. Landes Tr. 87:17-89:18. If he had to do it again, he would have had Dr. Hochster rerun the searches while he was watching. Landes Tr. 89:23-25. Had he known the true facts, "I would have had him come clean at this deposition and say, 'I did not do these searches.'" Landes Tr. 90:10-16.

Mr. Landes was also involved in editing the opposition to the motion for sanctions. He testified that he did not believe there was an intent to mislead, but acknowledged that, in hindsight, the statements around Quinn's receipt of COBRA results were misleading. Landes Tr. 108:4-24, referencing Docket 582, 19:14-17, 19:25-27. At the time, he believed the focus was to discuss when they could have submitted the expert report based on the final data. Mr. Landes explained that he did not have the full context for all that was happening at the time of the COBRA closure letter. Landes Tr. 109:22-110:13. At the hearing on the motion for sanctions on July 26, 2024, Mr. Landes believed that Dr. Hochster had run the searches and that Dr. Hochster had been truthful to Quinn and at his deposition. He now regrets that he believed something that was not true and wishes he had uncovered the truth sooner. Landes Tr. 112:18-113:18.

### 3.    Disclosures in late July and August 2024

In late July and early August, Dr. Hochster revealed that he "might not have deleted his emails" and "might not have done the search as well as I should have;" this was the first time Mr. Landes learned that Dr. Hochster had been untruthful Landes Tr. 114:2-15. Mr. Bramhall led the first call, on July 30; Mr. Landes did not participate. On this call, Dr. Hochster searched his email and reported that he had "a couple hundred" emails when he searched the term COBRA. NATERA_SM_0022913, 15. When he learned of this, Mr. Landes found it infuriating. Landes Tr. 118:15-120:22. After this call, the team began drafting a declaration for Dr. Hochster to submit to the Court to explain what happened. NATERA_SM_0023309, NATERA_SM_0023530. On August 9, they planned to review the declaration with Dr. Hochster and conduct a screenshare. Mr. Landes led this call. NATERA_SM_0023793. Dr. Hochster confirmed that he had numerous emails in his inbox. Landes Tr. 118:1-4; 130:20-131:10. Based on Dr. Hochster's equivocal responses to his questions, Mr. Landes concluded that Dr. Hochster had not searched at all — but Mr. Landes remains uncertain whether Dr. Hochster was intentionally deceptive. Landes Tr. 49:9-51:14. When Quinn learned that Dr. Hochster's statements were false, they notified Guardant and submitted a letter to the Court. Landes Tr. 115:24-116:4. During this process, Mr. Landes strongly advocated for full disclosure, and the

team agreed. Landes Tr. 123:18-125:1, 129:6-17; NATERA_SM_002290; NATERA_SM_0022913. The August 15 letter to the Court included what Dr. Hochster could say truthfully without invading privilege, but Mr. Landes and others felt that Dr. Hochster could not say anything under oath. Landes Tr. 135:1-24.

### 4.      Responsibility, aggravating and mitigating factors

Mr. Landes has limited responsibility for the misrepresentations and untruths presented to the Court. At the time of the motion to compel, Mr. Landes had never seen the September 15 memo and had no insight into Dr. Hochster's early access to COBRA information, his sharing that information with Quinn, and his communications with COBRA investigators. After the Rutgers production, Mr. Landes did not follow up with additional diligence with Dr. Hochster; but he was not the primary decisionmaker. And he now acknowledges that he should have done more. Mr. Landes edited the brief on the opposition to the motion for sanctions; he now sees the misleading nature of the statements identified at Docket 730 that he did not correctly focus on at the time.

In mitigation, Mr. Landes has never been subject to discipline. He forthrightly stated that there are plenty of things that he wished he had done differently. Landes Tr. 10:2-10. Mr. Landes has changed his practice as a result of this experience, more closely overseeing associates, encouraging them to elevate issues, and instilling the need for candor. Landes Tr. 140:18-143:19, 179:7-18. Again, he has candidly acknowledged areas where he could have done more and been more accurate. He recognized the communication and supervision failures that led to the Court's sanctions order and specifically that the September memo should have been distributed to the team earlier.  Landes Tr. 138:17–140:16. A potential aggravating factor is his substantial experience as a litigator; however, he had never encountered a similar situation with an expert. Landes Tr. 142:21-143:4. For all these reasons, he should not be apportioned any monetary sanctions.

## VIII.  ADDITIONAL FACTUAL FINDINGS

The following factual findings by the Special Master form the basis for Special Master's recommendation to issue an Order to Show Cause with respect to Ms. Maroulis and Ms. Shyr.

### A.    Victoria Maroulis

Victoria Maroulis together with Kevin Johnson is co-lead trial counsel in the *Guardant v. Natera* matter. She is a senior partner at Quinn, the managing partner at the Silicon Valley office, and co-chair of the Intellectual Property Litigation and Life Science Practice Groups. As a leader of the team, she directed strategy after the Rutgers production revealed that Dr. Hochster had substantial communications with COBRA investigators and that he had both received the draft abstract and provided the data in that abstract to Quinn. She also represented Dr. Hochster at his deposition, and she reviewed and commented on the briefs in Natera's opposition to Guardant's motion for sanctions.

### 1.    Rutgers production

After the Rutgers production, Ms. Maroulis, like others, knew that Dr. Hochster had received the draft abstract, and she then received the September 15 memo. NATERA_SM_14475; Maroulis Tr. 34:3-5; 35:16-22. She knew that the memo contained confidential, embargoed information from the draft abstract; she testified that she "did not have the exact details of what came from where." Maroulis Tr. 34:25-35:10. She did understand that at least certain members of the team had received non-public information in the memo. Maroulis Tr. 35:16-22. She also "search[ed her] email to see if [she] had this document from anyone, and [she] did not." Maroulis Tr. 36:1-3. She was concerned that she might have missed it. Maroulis Tr. 36:12-13. She did not ask the attorneys who drafted Dr. Hochster's declaration whether they relied on the confidential, embargoed data. Maroulis Tr. 37:9-14. The team compared the memo to the published abstract, because Ms. Maroulis "wanted to know whether what's in the memo is the same as what was presented." She learned "there were several sentences that were not in the final presentation." Maroulis Tr. 37:15-38:10. Thus, she knew that the data in the published abstract had been provided to Quinn by Dr. Hochster in the September 15 memo. Maroulis Tr.

89:18-25; *cf.* NATERA_SM_0014475; NATERA_SM_0021534 (Ms. Wang confirming that the information in the memo was the same as in the draft abstract). Despite these realizations, Ms. Maroulis did not believe that there was any need to correct the record regarding Mr. Cannon's statement at the February hearing that Dr. Hochster had no "inside information" or "early access," because Mr. Cannon had not personally been aware of any early access at the time of the hearing. Maroulis Tr. 85:9-13. She apparently was not concerned that the other members of the team, who were at the hearing, had not spoken up. Maroulis Tr. 85:14-19.

Rutgers also disclosed numerous emails responsive to the subpoena on Dr. Hochster that had not been produced. Ms. Maroulis spoke with the team who responded to the subpoena, and they all reported that Dr. Hochster had repeatedly told them that he did not have communications and did not have emails — and she had no reason to doubt their diligence. Maroulis Tr. 40:11-15. When they met with Dr. Hochster and later at his deposition, Dr. Hochster stated he could not find the emails and that they were deleted. Maroulis Tr. 40:23-41:2. When they confronted him with the emails and asked if he had conducted the specific searches requested by Guardant, he said that he had done so by searching in his email; he said that he must have deleted them to preserve his limited space. Maroulis Tr. 43:10-16. Despite being incredulous at first, Ms. Maroulis respected Dr. Hochster as an oncologist and luminary in his field and believed him. Maroulis Tr. at 44:10-22. She did not think that he had a reason to lie to them and had never had an expert lie to her about documents. Maroulis Tr. 44:23-45:4. In retrospect, she said she wished they would have asked him to do a key-word search in front of them — but she believed him and did not wish to invade his patients' privacy. Tr. 45:10-17. Dr. Hochster testified consistently at his deposition.

Significantly, Ms. Maroulis's emails immediately after the production reveal her strategy and direction to the team going forward. On June 13, the day of the Rutgers production and just after Ms. Wang circulated certain key emails, Ms. Maroulis identified "multiple issues to address." First among these was to "Preserve HH's credibility as an impartial, unbiased expert — not an easy task in view of some of the below emails." NATERA_SM_0014475. She was

concerned that the emails were partisan — "he was advocating in a way that impartial experts shouldn't be." Maroulis Tr. 46:1-7. Thus, a guiding objective seemingly was to preserve the litigation advantage of having Dr. Hochster testify for Natera. The second issue was to "[m]eaningfully explain why his search of his email didn't pick up some of these emails." NATERA_SM_0014475. Thus, from the start, Ms. Maroulis sought an explanation before considering Dr. Hochster's veracity and motives — that he might have sought to conceal the fact that he had very probably violated the terms of the embargo imposed on the abstract and to also conceal the emails that reflected his advocacy and partiality. Moreover, from the beginning, she adopted the distinction between the published abstract and Dr. Hochster's or Quinn/Natera's knowledge of the COBRA trial results, writing to the team on June 14: "both we and the Court made reference to the publication of the results in January which is different from when HH or even Natera knew about the results." NATERA_SM_0014633.

After the Rutgers production, Ms. Maroulis did not correct the record from the February 21, 2024, hearing. Despite her attempt to circumscribe Mr. Cannon's statements, he was speaking for Natera and Quinn, not only about his personal state of mind; and the statements addressed Dr. Hochster's early access generally, not just the actual abstract.

### 2. Opposition to motion for sanctions

Ms. Maroulis had a limited but impactful role in connection with the brief opposing Guardant's motion for sanctions in July. b

REDACTION

-53-

REDACTION

.

Following Ms. Maroulis's direction, the brief filed with the Court repeatedly claimed that Dr. Hochster did not share the draft abstract with anyone, despite his having shared the data with Quinn: "As Dr. Hochster testified during his deposition, he only received an early draft abstract that was under strict embargo and could not (and did not) disclose it to anyone, including anyone at Natera." Dkt. 582 at 19:15-18. Quinn also represented that: "Dr. Hochster did not, and could not, disclose the abstract to anyone, let alone put it in a supplemental expert report." Dkt. 582 at 13:3-4. Further down the page, Quinn wrote: "Certainly, that abstract was never shared with Natera. Guardant's implication to the contrary is grossly misleading." Dkt. 582 at 13:18-19. Again, Dr. Hochster provided the data in the abstract to Quinn and made certain that Quinn knew the information was "embargoed until the GI ASCO meeting in January." And Ms. Maroulis testified to the fact that Ms. Wang and Mr. Bramhall "received a memo that was labeled confidential and embargoed and had had some data that must have come from the abstract." Maroulis Tr. 51:11-13.

On this record, Judge Chen found the above statements misleading. *See* Dkt. 730 at 13:8-28.

### B.    Margaret Shyr

At the time of these events, Ms. Shyr was a junior partner in Quinn's Silicon Valley office. Ms. Shyr has a Ph.D. in Materials Science and Engineering. She had a limited role in connection with Dr. Hochster. Ms. Shyr oversaw the drafting of Dr. Hochster's supplemental report; she stepped in to supervise Ms. Wang in early January 2024, when Mr. Bramhall became tied up in trial in another matter. She also observed the February 21, 2024, hearing on the motion to strike, although she did not make an appearance. At Dr. Hochster's deposition on June 18, 2024, Ms. Shyr assisted in representing Dr. Hochster.

**1.**     **Background on Dr. Hochster's supplemental report**

On January 5, 2024, Mr. Bramhall charged Ms. Shyr with getting the draft supplemental report ready to go at the end of the week of the ASCO GI conference (January 18-120) as it was "hugely important to the client." NATERA_SM_0001740, 41; NATERA_SM_0001683. Ms. Wang sent Ms. Shyr the first draft of the supplemental report on January 6, 2024; that draft contains specific COBRA data from Dr. Hochster. *See* NATERA_SM_0001784-85. Ms. Shyr sent comments to Ms. Wang on January 15 — the day before the COBRA abstract was released to the public on January 16. NATERA_SM_0001906. Ms. Shyr wrote: "There are no cites for the Guardant interim reports. We might want to reorganize this section a bit once we get the final results this week but TBD."  Ms. Wang responded that the "lack of citation for the interim results is because they are confidential. Hochster sent those to me and I'm largely hoping that they will be revealed to the public one way or the other tomorrow." *Id.* This correspondence leaves no doubt that Ms. Shyr knew that Quinn had received confidential interim COBRA trial results from Dr. Hochster before they were released to the public.

On January 16, 2024, the COBRA abstract was published on ASCO GI website. *See* NATERA_SM_0001910. Upon reviewing the abstract sent by Ms. Shyr, Ms. Wang responded: "seems like this is the embarrassing 'interim analysis' data." *Id.* Ms. Shyr wrote back: "If that data is confidential, how did Hochster get it? Maybe I don't want to know." *Id*. Read together, these exchanges demonstrate Ms. Wang's confirmation that Quinn received confidential data on the COBRA results from Dr. Hochster that later became public. But rather than gain an understanding of the source of that confidential information — and whether Quinn should have this information in its possession at all — Ms. Shyr largely turned a blind eye to this issue. In her testimony, she claimed that in this exchange she was merely being "flippant" and speaking in "shorthand." Shyr Tr. 46:12-17. She further testified that without a verifiable source, the data "was irrelevant." Shyr Tr. 48:4-7. But Ms. Shyr knew, as the draft and comments make clear, that Ms. Wang incorporated data received from Dr. Hochster that *was* published in the abstract as well as data that *was not* in the published abstract. *See* NATERA_SM_0001922 at 32. When Ms.

Shyr asked for cites to certain data, Ms. Wang commented "Ugh. I think this is part of the 'confidential' results. Not released in the ASCO GI abstract." *Id.* And Ms. Wang's cover email suggests that "maybe there's some communication channel he has with NCI people." NATERA_SM_0001922. Nonetheless, Ms. Shyr testified that, to her, the purpose of the supplemental report was "to have Dr. Hochster report on what was published," and she removed data that was not published. Shyr Tr. 53:3-7; 55:3-6.

Even so, Ms. Shyr wanted to confirm where Dr. Hochster got his information. Shyr Tr. 54:5-8. But, on the day of the meeting with Dr. Hochster, January 18, Ms. Shyr had to work on another project and only met with him for 30 minutes or less. Shyr Tr. 57:1-6. She left the discussion of the sources of the draft supplemental report to Ms. Wang. Shyr Tr. 57:19-25. She testified that Ms. Wang had told her the source was "gossip." *Id*. at 39:11-14. But that characterization directly contradicts Ms. Wang's statements that the information in the draft was "confidential results," "interim results," and "interim analysis data" and Ms. Shyr's own description of the information as "Guardant interim reports." Fundamentally, interim reports, results, and analysis data are not "gossip."

### 2.    February 21, 2024, hearing on motion to strike

At the February 21, 2024, hearing on Guardant's motion to strike, Ms. Shyr heard Mr. Cannon's statement: "So I'm certainly not aware of any sort of early access Dr. Hochster may have had." Shyr Tr. 61:13-23. At the time, she believed it to be true. *Id*. Ms. Shyr testified that her focus was on the abstract; she texted Mr. Cannon during the hearing to make clear that Quinn had the abstract on January 16 before it was presented at the conference on January 18. Shyr Tr. 63:1-14. She believed the issue at the hearing related only to early access to the published abstract itself — ***not*** other information. Shyr Tr. 64:18-21. Even though she prepared talking points for both hearings on the motion (Shyr Tr. 59:5-60:1, 60:23-61:10), she did not recall whether she informed Mr. Cannon or other partners that Quinn had received confidential information that contained detailed results of the COBRA trial before the ASCO conference and before the abstract became public. Shyr Tr. 62:4-13. The record reflects that she did not inform

Mr. Cannon or others before, during, or after the hearing of this key information. Instead, for her, that was not the issue on the motion to strike. *Id*.

Ms. Shyr's assertion that the issue before Judge Chen was limited to whether Dr. Hochster had early access to the abstract does not resound in the record. Instead, Guardant raised the overall timeliness of the supplemental report in its brief under a separate bold-faced heading, arguing that it should be rejected due to delay. Dkt. 447 at 7:16-9:9. Guardant argued that Natera decided to submit a supplemental report soon after learning of the COBRA closure on August 30, 2023 — and thus the five-month delay caused the report to be untimely under Fed.R.Civ.P. 37(c)(1). *Id.* at 7:17-8:2. In response, Natera argued that the report was based on the new data that was publicly revealed on January 16, 2024, making the supplemental report timely. Dkt. 452 at 1:22-25. At the hearing, Mr. Cannon was the first to raise the issue of inside information. As to information about the opinions of COBRA PIs, he argued that though **Guardant** had "inside info . . . Natera is working off the public information." Tr. 11:7-9. Counsel for Guardant, Mr. Perloff, replied to this assertion: "We understand that actually Dr. Hochster, for some reason, actually had the abstract and the data at least a month and a half before." Tr. 12:10-13. Following up, Mr. Cannon stated "there was an accusation that Dr. Hochster somehow had inside information . . . I'm certainly not aware of any sort of early access that Dr. Hochster may have had." Tr. 14:23-15:3. Neither Guardant's brief, nor Mr. Perloff's and Mr. Cannon's oral arguments circumscribe the issue of timeliness to whether Dr. Hochster possessed the abstract.

Ms. Shyr knew, although Mr. Cannon did not, that Dr. Hochster possessed confidential nonpublic data on the COBRA results — by definition "inside information"— that he had provided to Quinn. She knew that Ms. Wang had initially drafted the report based on this information; indeed, Natera was "working off" this information. And she excised the early confidential information that did not land in the published abstract, leaving the remainder in the report. Mr. Cannon's statements were incorrect, and Ms. Shyr knew it. That she unilaterally deemed the confidential information to be "irrelevant" once the abstract was published (Shyr Tr.

at 48:1-7) does not mean that Dr. Hochster did not possess early confidential information nor that he kept it from Quinn.

After the Rutgers production, Ms. Shyr learned that Dr. Hochster had received the abstract from Dr. Boland. Shyr Tr. 85:3–86:8, 94:12–20. She also learned both that Dr. Hochster had provided this information to Quinn in the September memo and that this information matched the published abstract. NATERA_SM_0014475; Shyr Tr. 83:16-21. Even then, however, Ms. Shyr did not believe it necessary to correct Mr. Cannon's statements from the February 21 hearing. Her stated reasoning that "it's not material" and "there wasn't a live issue to trouble the court with," Shyr Tr.  102:1-14, again finds no basis in the record. This Court's order on the motion to strike demonstrates the timing of the availability of the COBRA results was material; he held the delay was substantially justified because the study was published on January 16, 2024. He specifically relied on authority allowing late expert disclosure where the delay was "beyond counsel's control." Dkt. 493 at 5:11-16; 5:27-6:4. Even so, in her testimony, Ms. Shyr insisted there was no need for correction because the information Dr. Hochster possessed and gave to Quinn was not reliable and therefore not material. *See* Shyr Tr. 101:1-7 (stating that the early data isn't "material" and didn't "look like something a reliable expert would rely on"). But Mr. Cannon told the Court that Dr. Hochster and Natera had **no** early access or inside information; Quinn now knew that to be false. Instead, the Rutgers production revealed that Dr. Boland had forwarded the embargoed abstract from Dr. Van Morris, the lead COBRA investigator, subject to contractual restrictions from NCI, that contained the same data (and more) in the same format as the published abstract. Dkt. 578-21. Ms. Shyr knew this. NATERA_SM_0014475; Shyr Tr. 86:3-4. She also knew in June that Dr. Hochster had turned around and shared that data with Quinn, making clear that the data was "embargoed until the ASCO GI meeting in January." NATERA_SM_0014475 at 14490. It was her own conclusion — not the Court's — that the embargoed abstract and the data from it was somehow "immaterial." Whether it was "reliable" had also not been determined. And given the continued litigation around Dr. Hochster's supplemental report, including Guardant's imminent motions to exclude

Dr. Hochster and for sanctions, Dkt. 568, Dkt. 578, the issue indisputably remained "live," despite Ms. Shyr's assertion.

### 3. Rutgers production and subsequent proceedings

Ms. Shyr participated in the June 17, 2024, meeting with Dr. Hochster before his deposition. Responding to Ms. Shyr's questioning, Dr. Hochster was "adamant" that he had conducted the requested searches and had not found the many documents in the Rutgers production potentially responsive to Guardant's subpoena, likely due to his practice of deleting emails. Shyr Tr. 91:18-92:1. She accepted this explanation like the rest of the team. Shyr Tr. 92:11-20. Ms. Shyr gave him the benefit of the doubt despite his statement "what if I just didn't want to give my emails over. NATERA_SM_0015195, 96. She stated that when she heard this "My heart stopped" and further stated that "I don't trust him at all." *Id*.

## IX. CONCLUSION

These recommendations reflect a careful assessment of the responsibility of Natera, individual culpability, mitigating factors, and the severity of the firm's collective responsibility for the series of failures that unnecessarily protracted litigation and eroded the integrity of the proceedings.

DATED: January 9, 2026                     Respectfully Submitted

                                                          //s//

                                          By:    Ismail Ramsey
                                                 Special Master

Special Master's Report and Recommendations — Case No. 3:21-cv-04062-EMC